**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

| | | |
|---|---|---|
| RUSSELL, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 4:19-cv-00226 |
| v. | ) | (Class Action) |
| | ) | The Honorable Lee H. Rosenthal |
| HARRIS COUNTY, TEXAS, et al. | ) | U.S. District Judge |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MOTION AND MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### I.   Introduction

A public health catastrophe of historic proportion looms in the Harris County Jail. Only this Court can avert it. With every passing hour, the risk of disaster increases.  All eyes turn to this Court in this dire moment. Thousands of lives may hang in the balance.

As the novel coronavirus that causes COVID-19 has spread across the globe, hundreds of thousands of people have been infected and thousands of people have died.[1]  There is no known cure.  The Harris County Jail has never confronted a global health pandemic like this one.[2] By the admission of the County and the Sheriff, the jail is unequipped to prevent transmission of COVID-19 among people detained at the jail and the jail staff, or to isolate and treat individuals who become infected there. As Sheriff Ed Gonzalez explained in a desperate public warning:

---

[1] The World Health Organization has officially classified the spread of Covid-19 as a global pandemic. *See* World Health Organization, Director-General Opening Remarks (March 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[2] Given COVID-19's contagiousness and relatively high death rate, particularly in vulnerable populations, the President ordered a 15-day directive to avoid gatherings in groups of more than 10 people. The President's Coronavirus Guidelines for America, Whitehouse.gov (Mar. 16, 2020), https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf.

"Currently have 8,000 individuals, most pre-trial, in tight quarters."[3] The jail has "[v]ery limited services. No capacity for ICU care. If someone older and/or with frail health gets the virus it can be a death sentence. **Plus spread like wildfire**. . .  Individuals would need to be taken to our public health system, which does not have capacity to handle an outbreak in the jail and the anticipated needs of the general community."[4] On March 20, prominent Houston physicians wrote an emergency letter to Sheriff Gonzalez, Commissioners Court, and the judges stating that they "urge the County's leadership to take swift action *today* to avert the catastrophic loss of life that would result if and when the Harris County jail becomes a vector for Covid-19." Ex. A at 2 (Harris County Physicians' Letter); *see also* Ex. A at 4 (Letter from Dr. Esmaeil Porsa, President and CEO of Harris Health) ("The Harris County Jail . . . pose[s] a real and immediate danger to the health of the community."); Ex. A at 2 ("[T]he Harris County Jail is a ticking time bomb that has the potential to devastate the lives of inmates, jail personnel, and others throughout the entire Harris County community").[5] Dr. Elizabeth Chiao, expert in infectious diseases, writes that "The horizon of risk for COVID-19 in [the Harris County Jail] is a matter of days, not weeks." Ex. B ¶ 43

Plaintiff class members ("Plaintiffs") are confined in jail cells at the Harris County Jail solely because they cannot pay enough money to be allowed to return to their homes, families, jobs, and communities. As of Wednesday, among many other people, this list included:

- About 65 people charged with possession of a controlled substance, penalty group 1, 1-4 grams;
- About 53 people charged with possession of less than a gram of a controlled substance, penalty group 1 or 2;

---

[3] Ed Gonzalez (@SheriffEd_HCSO), TWITTER (Mar. 21, 2020, 8:41 AM), https://twitter.com/SheriffEd_HCSO/status/1241344221921136641.

[4] *Id.* (Mar. 21, 2020, 8:05 AM), https://twitter.com/SheriffEd_HCSO/status/1241335204905713664 (emphasis added); *id.* (Mar. 20, 5:19 PM), https://twitter.com/SheriffEd_HCSO/status/1241112204067381249. ("Jail health is community health.").

[5] Ex. B (Expert Declaration of Dr. Elizabeth Chiao) ¶ 4; *see also* Ex. C (Declaration of Dr. Jaimie Meyer, filed in *Velesaca v. Wolf et al*, Case No. 1:20-cv-01803-AKH, Mar. 16, 2020); Ex. A (Letter from Harris County Physicians).

- About 47 people charged with theft under $2500 with two or more prior convictions;
- About 44 people charged with unauthorized use of a motor vehicle;[6] and
- About 39 people charged with credit/debit card abuse, forgery, or fraudulent use/possession of an ID.

Their continued detention, and the detention of hundreds of additional people cycling in and out of the jail daily, poses a much larger "public safety" risk than granting the relief Plaintiffs seek. Ex. B ¶¶ 28–44; *id.* ¶ 41 ("From a public health perspective, it is my strong opinion that individuals who can **safely and appropriately** remain in the community not be placed in the Harris County Jail at this time. I am also strongly of the opinion that individuals who are already in those facilities should be evaluated for release[.]").

There has been no inquiry or findings concerning their ability to pay, and no one has made any finding that subjecting Plaintiffs to a heightened risk of contracting a life-threatening and incurable virus, separating Plaintiffs from their children and families, interrupting medications and medical care, and taking them away from their jobs and homes is necessary to serve the government's compelling interests in preventing flight or reasonably assuring public safety, as the federal Constitution requires. *United States v. Salerno*, 481 U.S. 739, 751 (1987); *Bearden v. Georgia*, 461 U.S. 660, 672 (1983). Not only has the pandemic created the risk of a health catastrophe for Plaintiffs—who are presumed innocent—it has made it even more difficult for them to receive basic constitutional protections. Court appearances are being canceled and lawyer visits are being indefinitely postponed. It is unclear whether or when Plaintiffs will have an opportunity to challenge their unconstitutional detention.[7] Even before the pandemic, people

---

[6] Total Population Stats, March 25, 2020, Harris County Sheriff's Office, https://charts.hctx.net/dr00226/App/DR15AUG19All.

[7] These harms are in addition to the typical harms people detained pretrial always face, even absent the risk of death from a novel virus. As a result of their pretrial detention, Plaintiffs suffer a greater likelihood of conviction and longer sentences, as well as other cascading, negative effects on their physical, mental, and economic well-being. The irreparable harms of Defendants' practices will extend to the health and well-being of Plaintiffs' children, who are

arrested for felonies were waiting *three to four weeks* after arrest to see a district judge and have any opportunity to seek their release at hearings that comply with the Constitution.

Plaintiffs seek an emergency order from this Court requiring Defendants not to enforce pretrial detention orders against Plaintiff class members unless they provide constitutionally adequate bail proceedings.[8]  Plaintiffs ask that this emergency request be heard as expeditiously as possible. Absent immediate action by this Court, some Plaintiffs likely will face the ultimate irreparable harm: death.

## II.   The Parties Agree On the Facts, the Merits, and the Balance of Harms

The parties have conferred numerous times prior to filing this emergency motion.  First, the Parties appear to agree concerning the facts about local bail practices set forth in the declaration of Sarah Wood, Policy Director for the Harris County Public Defender's Office. Ex. D.

Defendants also appear to agree that Plaintiffs are likely to succeed on the merits of their claim because, as the same Defendants agreed in *ODonnell*, it violates the Equal Protection and Due Process Clauses of the U.S. Constitution to detain a person solely because the person cannot afford to make a monetary payment, unless the government treats the order to pay secured bail like a detention order and provides the person with notice, a hearing with counsel and an opportunity to present and confront evidence, and findings on the record by clear and convincing evidence that

---

deprived of the ability to hug their parent; have higher rates of anxiety and depression; suffer shame and social stigma; and are six times more likely to become involved in the criminal legal system themselves—all because of their parent's detention due to inability to pay.  This year, 90,000 children will be separated from a parent by the Harris County jail. The vast majority of these forced separations would be avoided if the family could pay enough money. Nancy P. Correa, MPH, et al., *The Forgotten Families: A Needs Assessment on Children with Incarcerated Parents in Harris County, Texas* (February 2019).

[8] *See McNeil v. Community Probation Servs., Inc.*, 945 F.3d 991, 996 (6th Cir. 2019) (upholding a preliminary injunction prohibiting a sheriff from enforcing unconstitutional bail orders and stating that "[t]here are plenty of cases allowing injunction actions like this one" pursuant to principles set forth in *Ex parte Young*, 209 U.S. 123 (1908); *ODonnell v. Harris Cty.*, 892 F.3d 147, 165 (5th Cir. 2018) (holding that the Sheriff is "authorized to decline to enforce orders requiring payment of prescheduled bail amounts as a condition of release for said defendants if the orders are not accompanied by a record showing that the required individual assessment was made and an opportunity for formal review was provided").

pretrial detention is necessary because no other alternatives can reasonably serve the government's interests in court appearance and public safety.

Finally, Defendants also appear to agree that the public interest and balance of harms weigh overwhelmingly in favor of immediately providing Plaintiffs with constitutionally adequate bail hearings that would determine whether their ongoing pretrial detention is absolutely necessary, given the COVID-19 pandemic and the threat it poses to every person detained at the jail. County Judge Hidalgo told the Houston Chronicle that "[h]ealthcare professionals have urged us to reduce the amount of people in the jail."[9] She told the Chronicle that mitigating an outbreak is "a very high priority" because if Covid-19 arrives, it "could spread like wildfire."[10] And Defendant Sheriff Ed Gonzalez has compared the situation to "three massive ships docked in downtown Houston," telling the Chronicle that an outbreak in the jail would be a catastrophe for "the region" that would overwhelm the hospitals. The Sheriff has called for "bold action" to avoid the impending devastation.[11] He stated, "Jails and prisons are fertile ground for the spread of infectious disease . . . My nightmare scenario is that an outbreak happens at the county jail."[12]

Yet despite this, more than 4,000 people languish at the jail, convicted of nothing, with no finding having been made that their detention serves any government interest. They are detained

---

[9] Gabrielle Banks, *Exclusive: Lina Hidalgo seeking compassionate releases at Harris County Jail due to coronavirus* (Mar. 26, 2020), available at https://www.houstonchronicle.com/news/houston-texas/houston/article/Harris-County-Judge-Lina-Hidalgo-seeking-15159260.php?utm_campaign=CMS%20Sharing%20Tools%20(Premium)&utm_source=t.co&utm_medium=referral.

[10] Gabrielle Banks, *Sheriff Gonzalez is seeking compassionate release of some inmates at the Harris County Jail* (Mar. 19, 2020), available at https://www.houstonchronicle.com/news/houston-texas/houston/article/harris-county-sheriff-gonzalez-jail-inmate-release-15143578.php?utm_campaign=CMS%20Sharing%20Tools%20(Premium)&utm_source=t.co&utm_medium=referral.

[11] *Id.*

[12] *Id.*

only because they are poor. Harris County does not dispute that they would be released almost immediately if they could make a payment. More such persons arrive at the jail each day.

Although the parties apparently agree on the facts, the merits, and the need for an immediate remedy, Defendants have failed to devise one. Time is running out. As of last night, fifteen people detained in the jail were quarantined, and a sixth deputy was confirmed positive for Covid-19. Continued logistical, political, and bureaucratic delays are intolerable in light of the risk of unnecessary loss of life. The Parties have been unable to agree on a plan for conducting constitutionally adequate bail proceedings, and on how to prioritize certain categories of arrestees against whom existing orders of detention must not be enforced if adequate bail proceedings do not occur. Plaintiffs do not question the abiding good faith of the County and the Sheriff.  But good faith cannot excuse the extraordinary jeopardy into which Defendants are placing the Plaintiffs, all the while violating their fundamental constitutional rights. Plaintiffs respectfully request an immediate order (1) requiring the Parties to confer on relief, including a plan for conducting bail hearings, and (2) ordering the Parties to submit either an agreed proposed order or their respective alternative proposals within 24 hours of this Court's order.

### III.    Nature and Stage of Proceedings

On January 21, 2019, Named Plaintiffs Dwight Russell, Johnnie Pierson, and Joseph Ortuno filed this civil rights class action lawsuit on behalf of themselves and thousands of other people charged with felony offenses and detained in the Harris County Jail solely because they cannot afford to pay money bail. They sought injunctive relief and moved simultaneously for class certification of a Rule 23(b)(2) class seeking purely equitable relief. On February 4, 2019, the parties jointly requested a 90-day stay to discuss settlement, Dkt. 14, which the Court granted, Dkt. 15. In May 2019, the parties sought a further stay of proceedings to continue good-faith settlement

discussions. Dkt. 24. The same parties and counsel were then engaged in intensive negotiations regarding the misdemeanor bail lawsuit, *ODonnell v. Harris County*, the resolution of which the parties believed would implement certain systems with the potential to improve felony bail practices as well. On July 25, 2019, the parties informed the Court that they were nearing an agreement on the misdemeanor case and requested additional time to continue discussions regarding the felony system. On January 10, 2020, the Parties informed the Court that negotiations were continuing in good faith. Dkt. 31.

Since filing this lawsuit, the parties and other stakeholders have been engaged in earnest negotiations, attempting to reach agreement on constitutional post-arrest policies and procedures for felony arrestees. However, more than a year has passed since Plaintiffs sued and circumstances have changed significantly. The Harris County jail is quickly becoming a disaster area that could explode in pandemic, in large part due to the overwhelming number of class members who are being detained illegally solely because they cannot make monetary payments. While other jurisdictions across the country have taken bold steps to decrease the jail population, Harris County has not. The Plaintiff class cannot wait any longer. Accordingly, they now seek emergency relief from this Court while this case proceeds to final resolution.

## IV.    Factual Background

At a hearing on this Motion, Plaintiffs will prove the facts set forth below.

### A.    Arrest and the Initial Bail-Setting Process

For decades, Harris County has used a predetermined money bail schedule, promulgated through administrative order by the Harris County District Court Judges ("the felony judges"), to determine financial conditions of pretrial release for felony arrestees in Harris County. *See* Ex. E (Felony Bond Schedule); Ex. D (Wood Declaration) ¶ 5. The schedule currently requires

arrestees charged with certain offenses to remain in custody until a magistrate determines conditions of release at a probable cause hearing. *Id.* ¶ 6. For all other arrestees, the schedule lists an amount of money the person must pay for release. *Id.* ¶ 7. Anyone who cannot pay the predetermined amount will be detained. *Id.* ¶ 8. On March 20, in the midst of the global Covid-19 pandemic, the felony judges promulgated an order requiring the release of people whose highest offense of arrest is one of 20 state jail felony offenses. Ex. F (General Order Bond Order); Ex. D ¶ 9. After several days of delay, as of Wednesday, March 24, the order had apparently gone into effect, but not everyone eligible for release was being released. *Id.* ¶ 10. As the order applies only to certain offenses that comprise a small percentage of arrests, large categories of people will still be detained after arrest without a constitutionally adequate hearing to determine ability to pay or whether detention is necessary. *Id.* ¶ 11.

About 75% of people arrested for felonies in Harris County are arrested by either Harris County or the Houston Police Department ("HPD").[13] *Id.* ¶ 12. Those people are taken after arrest to the Joint Processing Center ("JPC"). *Id.* ¶ 13. People arrested by other arresting agencies are sometimes taken to "field stations" before being transported to the JPC. *Id.* ¶ 14.

At the scene, officials call the District Attorney's Office's (DAO) hotline to ask whether they will accept charges. If the DAO declines charges, the person is released. *Id.* ¶ 15. If the DAO accepts charges, the officer submits a probable cause statement and the DAO files a complaint with the District Clerk who creates a case number and assigns the case to a specific judge's court. *Id.* ¶ 16. Pretrial Services then runs the person's information through an algorithm to create a "risk assessment" score and applies the County bail schedule using the charged offense and the

---

[13] Harris County Pretrial Services, 2017 Annual Report (2017), at 16, https://pretrial.harriscountytx.gov/Library/2017%20Annual%20Report.pdf

person's "risk" score to identify the scheduled amount of money required for release. *Id.* ¶ 17.

Once the scheduled amount is set, the person can pay the amount and, absent another basis for detention, the person will be released. *Id.* ¶ 18. If a person arrested by an agency other than the Harris County Sheriff's Office or HPD pays the amount required for release pursuant to the bail schedule *before* transport to the JPC, the person may be released without being transported to or booked into the Harris County Jail. *Id.* ¶ 19. If a person pays the amount required for release in the felony case but is subject to detention for any other reason, such as a hold from another jurisdiction, that person will be eligible for release, subject to the other basis for detention. *Id.* ¶ 20. Typically, there is a set time period within which the entity asserting the hold must pick the individual up. That period is not triggered unless and until the person pays the amount required for release. Defendants will continue to detain a person who cannot pay. *Id.* ¶ 21.

Sometime after a person arrives at the JPC—and usually before the person is assigned to a housing unit—the person will be taken by Sheriff's Office employees to a courtroom in the jail with other recent arrestees to appear before a Hearing Officer, who will determine probable cause for warrantless arrests and set conditions of release. *Id.* ¶ 22. If a person pays money bail after arriving at the JPC but prior to the probable cause hearing, she will be released and the probable cause determination in her case will be made at a subsequent court appearance. *Id.* ¶ 23.

### B. Probable Cause and Bail Hearings

The first post-arrest hearing inside the JPC is referred to locally by a variety of terms, including "magistration," "Article 15.17 hearing," "bail hearing," and "probable cause hearing." *Id.* ¶ 24. Defendants attempt to provide this hearing within 48 hours of arrest. *Id.* ¶ 26.

The Public Defender's Office represents felony arrestees at these hearings. *Id.* ¶ 27. By order of the judges, the PDO is appointed for the limited purpose of arguing bail and is not

authorized to represent the person during the portion of the hearing in which probable cause is

determined. *Id.* ¶ 28. When determining conditions of release at the magistration hearings:

- Hearing Officers routinely do not make findings as to whether a person can pay any particular amount of money before requiring secured money bail as a condition of release.
- Hearing Officers routinely do not make findings as to whether an order to pay secured bail will operate to detain the person because the person cannot pay it.
- Hearing Officers routinely do not make findings that detention is necessary to meet a compelling government interest or that less-restrictive conditions are inadequate to meet a compelling government interest.
- Hearing Officers do not apply any evidentiary standard to any factual finding.

*Id.* ¶ 29.

When the docket begins, arrested individuals sit on benches in a courtroom inside the JPC.

*Id.* ¶ 30. The Hearing Officer calls an individual's name and reads the charge, and then asks the

person whether he or she wishes to be represented by a public defender for purposes of the bail

decision. *Id.* ¶ 31. A typical felony bail hearing proceeds as follows: An ADA, who appears by

video, reads the allegations in the police probable cause statement. In cases involving warrantless

arrests, the Hearing Officer decides whether there  is probable cause. Next, the Hearing Officer

considers whether to adjust the money bail amount pre-determined by the schedule, or, if no

amount was set, whether to release the person and if so on what conditions. If the person arrested

accepted the representation of the public defender's office, the public defender will provide

information about the person's ties to the community and other life circumstances. Sometimes

Hearing Officers grant personal bonds. However, routinely, the Hearing Officers order arrestees

released but condition release on payment of a secured money bail amount without first

determining the person's ability to pay or making any findings. *Id.* ¶ 32. These financial

conditions result in the pretrial detention of people who are too poor to pay them, but the Hearing

Officer makes no findings concerning the availability of less-restrictive, alternative conditions,

or the necessity of detaining the person. *Id.* ¶ 33. Hearing Officers believe that they are not

permitted to impose non-monetary conditions of release in certain cases. *Id.* ¶ 34.

Sheriff's Office agents observe the hearings, *id.* ¶ 36, where Hearing Officers routinely fail and refuse as a matter of policy to consider alternatives to secured financial conditions.

If an individual is not brought to the initial hearing for medical reasons, which is a frequent occurrence, the Hearing Officer will make a finding of probable cause and require financial conditions of pretrial release in that person's absence. *Id.* ¶ 37. The County generally prohibits public defenders from representing people who are not present at the hearing. In these cases, the money bail amount is set without any argument on the arrestee's behalf. *Id.* ¶ 38.

### C.  The Use of Personal Bonds

Hearing Officers sometimes recommend arrestees for release on "personal bonds," a term Defendants use to describe unsecured release without requiring an up-front payment prior to release, i.e., without a secured financial condition of release. *Id.* ¶ 39. Only about 18% of cases were released on personal bonds in 2018, and about 33% of cases were released in 2019.[14] Defendants fail to provide the constitutionally required findings and procedural safeguards in all other cases resulting in pretrial detention.

For decades, Hearing Officers adhered strictly to written and oral directives regarding the money-bail-setting process issued by the felony judges, who control their employment.[15] *Id.* ¶ 40.

---

[14] Data is not available to show the number of *people* who were released on personal bonds. Some people have multiple cases.

[15] *See e.g.* Ex. G (State Commission on Judicial Conduct Documents)  at 186 (HARRISCO_CourtOrder 1909) (Written instructions from 182nd District Court Judge to Hearing Officers) ("I don't want any bonds lowered at [the magistration hearing]. Ok to raise it, but no lowering."); *id.* at 187 (HARRISCO_CourtOrder 1910) (Written instructions from 185th District Court Judge to Hearing Officers) ("Please set bond for felon in poss. of a weapon. Habitual offenders should be held w/out bond."); Ex. H (*ODonnell*, Dkt. 523-2) at 11 (Written instructions from District Court Judge Joan Huffman to Hearing Officers) ("No pre-trial bonds; no lowering of bonds."); *id.* at 13, 17-18, 23 (State Commission on Judicial Conduct finds that Hearing Officers Hagstette, Licata and Wallace violated the law "by strictly following directives not to issue personal bonds to defendants per the instructions of the judges in whose court the underlying cases were assigned." The Hearing Officers' "conduct was motivated by direct instructions from individual judges who played a role in [their] continued employment.")

The Hearing Officers believed themselves to be bound by these rules and understood that the judges could hire and fire them at will.[16] The Hearing Officers' contracts are reviewed annually by a committee that includes several of the felony judges.[17] For decades, Hearing Officers simply reviewed the bail amount previously affixed to ensure that it conformed to the schedule and the specific policy supplemental instructions from the felony judges.[18] *Id.* ¶ 41.

These instructions included charts and emails instructing Hearing Officers about who could be released on personal bonds and in what circumstances Hearing Officers could deviate from the cash bail schedule (rarely, according to the instructions).[19] *Id.* ¶ 42. For example, the

---

Ex. G at 35 (HARRISCO_CourtOrder 1758) (written testimony of Eric Hagstette: "The Hearing Officers serve many masters. The Hearing Officers exercise the discretion they can within the bounds set."); *id.* at 30 (HARRISCO_CourtOrder 1753) (written testimony of Eric Hagstette: "Most of the District Court Judges also had specific rules to follow in consideration of bond. . . . The County Criminal Court at Law Judges historically had similar rules."); *see also id.* at 29–37 (HARRISCO_CourtOrder 1752–60) (full written testimony of Eric Hagstette); *id.* at 19–26 (HARRICO_CourtOrder 1762–69) (full written testimony of Jill Wallace); *id.* at 48–54 (HARRISCO_CourtOrder 1771–77) (full written testimony of Joseph Licata, III).

[16] *See* Ex. H (*ODonnell*, Dkt. 523-2) at 11, 16, 21 (Hearing Officers Hagstette, Licata and Wallace stated that "a job description by the board of judges made clear the Hearing Officers are 'at will employees,' [and] that the Hearing Officers are the 'delegates' of the judges trying criminal cases."); *id.* at 11 (Hearing Officer Hagstette testified that Hearing Officers could "be dismissed at any time by the same board that appoints us."); *id.* at 11, 16, 21 (Email from retired hearing officer) ("You may never, never ever give a PR bond to a defendant in any of the District courts. This would probably get you fired."); *id.* at 12 (Hearing Officer Hagstette testified that the hearing officers "didn't write the policies, but we had to follow them." Regarding the Hearing Officers making bond determinations on cases, he stated: "Could I do something? Probably by law, I could have. I don't know if it would have been good for my career."); *id.* at 13, 17-18, 23 (State Commission on Judicial Conduct finds that Hearing Officers Hagstette, Licata and Wallace violated the law "by strictly following directives not to issue personal bonds to defendants per the instructions of the judges in whose court the underlying cases were assigned." The Hearing Officers' "conduct was motivated by direct instructions from individual judges who played a role in [their] continued employment.")

[17] *See* Ex. H (*ODonnell*, Dkt. 523-2) at 71 (Declaration of Judge Paula Goodhart) ("A statutorily mandated 9-judge board appoints the Harris County Criminal Law Hearing Officers . . . [including] judges from courts that handle felony cases. . . Hearing Officers serve one-year terms and continue to serve until a successor is appointed. The Board can recommend the termination of Hearing Officers, however any such recommendation must be approved by [the] Commissioners [Court]."); Ex. G at 29 (HARRICO_CourtOrder 1762–69) (Written testimony of Hearing Officer Hagstette) "Hearing Officers are appointed by a nine member board made up of three judges of the district courts. . . Each Hearing Officer is appointed for a one year term that can be renewed, at the board's discretion, each year. The same board can terminate a Hearing Officer at any time.").

[18] *Supra* nn.15–16.

[19] *See* Ex. G at 30, 40, 49 (HARRICO_CourtOrder 1753, 1763, 1772) (Written testimony of Hearing Officers Hagstette, Wallace and Licata) ("Until March 27, 2017, several of the District Court Judges did not permit Hearing Officers to grant personal bonds, instructing that personal bond applications be referred to the assigned trial court for consideration. Most of the District Court Judges also had specific rules to follow in consideration of bond. Included with this response are representative copies of charts outlining the specific instructions issued to the Hearing

felony judges instructed Hearing Officers that they could never grant homeless individuals personal bonds.[20] Some judges instructed Hearing Officers never to set non-financial conditions for any person who was assigned to their courtroom at all, or for particular categories of individuals.[21] *Id.* ¶ 43. Judges placed other policy limitations on Hearing Officers.[22] *Id.* ¶ 44.

Although the felony judges purportedly rescinded these instructions in 2017 (after a federal lawsuit was brought challenging similar practices in misdemeanor cases) with the implementation of a new felony bail schedule, Hearing Officers continue to require secured financial conditions of release without making findings concerning ability to pay, the necessity of pretrial detention, or the adequacy of alternative conditions, and without application of the clear-and-convincing-evidence standard or a statement of reasons concerning why a particular financial condition or pretrial detention is necessary. *Id.* ¶ 45.

### D. People Who Cannot Afford Money Bail Will Often Be Detained For Two to Four Weeks Prior to First Appearance

If an arrestee is unable to pay the secured bail amount initially set, she routinely must wait two to four weeks, or longer, to be taken to court for a first appearance. *See* Ex. I (Felony Court Docket Schedules) (showing that the judges' "jail dockets"[23] are scheduled only every

---

Officers."); Ex. G at 186-211 (HARRISCO_CourtOrder 1909-1934) (Chart of written instructions from District Court Judges to Hearing Officers).

[20] *See, e.g.,* Ex. G at 189 (HARRISCO_CourtOrder 1912) (Written instructions from 185th District Court Judge to Hearing Officers authorizing personal bonds only for arrestees who are "not homeless."); *id.* (Written instructions from 232nd District Court Judge to Hearing Officers authorizing personal bonds only for arrestees who have "no prior criminal history" and a "confirmed place to live and phone #."); *id.* at 190 (HARRISCO_CourtOrder 1912) (Written instructions from 337th District Court Judge to Hearing Officers authorizing personal bonds only for arrestees who have a "confirm[ed] place to live".)

[21] *See, e.g.,* Ex. G at 186-211 (HARRISCO_CourtOrder 1909-1934) (Chart of written instructions from District Court Judges to Hearing Officers) (Multiple Judges answering "No." to the question "Can the hearing officers grant pre-trial bonds?")

[22] *See, e.g.,* Ex. G at 188 (HARRISCO_CourtOrder 1911) (Written instructions from 177th District Court Judge to Hearing Officers authorizing personal bonds for "Full time students not charged with Burg Hab or 3(g).")

[23] The Felony Judges preside over "bond dockets" and "jail dockets." The term "bond docket" refers to a docket of cases in which the person has been released and must appear for a pretrial proceeding. The term "jail docket" refers to a docket of people who are detained and will be brought to the courthouse from the jail for a pretrial proceeding.

other week, though in practice, the judges' dockets are so crowded that arrestees routinely wait until the second "jail docket" that occurs after their arrest); Ex. D ¶ 48.

Even then, there is typically no review of the money bail amount previously imposed, except that some judges revoke personal bonds or increase the monetary amount set by the magistrate and without notice or a formal hearing. *Id.* ¶ 49. Although an informal, off-the-record request for a reduction in the amount required may theoretically occur at first appearance, the felony judges do not provide for an adversarial bail hearing on the record at that time. *Id.* ¶ 50.

As a matter of routine practice, the felony judges do not conduct bail hearings at first appearance: they make no findings concerning ability to pay; they make no findings as to whether pretrial detention is necessary to serve any government interest; they do not allow arrestees to confront the evidence and arguments of the government or put on evidence and argument in support of pretrial release; and they do not provide other basic procedural safeguards, such as making findings by clear and convincing evidence, or providing any reasons concerning why a particular financial condition or pretrial detention is required. *Id.* ¶ 51. Detained individuals typically remain in lock-up outside of the courtroom and are not brought into the courtroom. *Id.* ¶ 52. The case is almost always then "reset," meaning that another hearing is scheduled, typically weeks in the future. *Id.* ¶ 53. As a result, individuals who cannot pay remain in detention and are returned to the jail, usually without ever having been brought into the courtroom. *Id.* ¶ 54.

If a person wishes to have an evidentiary hearing concerning their pretrial detention, the person's lawyer usually must file a motion and then schedule a court proceeding for a later date. *Id.* ¶ 55. A hearing on the motion will likely not occur for more than a week after the motion is filed—likely longer in light of the current public health crisis and the decreased number of open courtrooms. *Id.* ¶ 56; Ex. J (Court Operations Emergency Order).

### E.  The System Affects Thousands of People Every Day

On a typical day, about 90 people are arrested for felonies in Harris County.[24] At any given moment, there are more than 500 people charged only with state jail felonies—the least serious class of felonies in the Texas legal system, consisting mostly of non-violent offenses or misdemeanors enhanced by prior misdemeanors, including possession of marijuana and low-level theft offenses—who are being detained in the Harris County Jail solely because they cannot afford money bail.[25] In 2017, the most recent year for which data is available, about 55% of felony arrestees were still in jail when their case ended.[26] In 2017 alone, there were more than 800 people who were detained at disposition because they could not pay a money bail of $2,000 or less.[27]

### F.  Effects of Detaining People Due to Inability to Pay

Individuals detained pretrial have worse case outcomes.[28] People detained at disposition

---

[24]   Harris   County   Pretrial   Services,   2018   Annual   Report   (2018),   at   6, https://pretrial.harriscountytx.gov/Library/2018%20Annual%20Report.pdf (showing 33,676 felony arrests in 2018).

[25]   Texas   Commission   on   Jail   Standards,   Abbreviated   Population   Report   for   1/1/2020,   at   4, https://www.tcjs.state.tx.us/wp-content/uploads/2020/02/AbbreRptCurrent.pdf (showing that there are 773 pretrial arrestees charged with state jail felonies held in Harris County).

[26]   Harris   County   Pretrial   Services,   2017   Annual   Report   (2017),   at   16, https://pretrial.harriscountytx.gov/Library/2017%20Annual%20Report.pdf (showing in Table B.1 that roughly 45% of felony arrestees are released on some form of bond).

[27] *Id.* at 16(showing in Table B.1 that over 800 felony arrestees with bail amounts from $501-$2000 were unable to post money bail; there were 5014 bonds under $2,000, and 4130 of those bonds were posted).

[28] Megan Stevenson, *Distortion of Justice: How the Inability to Pay Bail Affects Case Outcomes* 18 (May 2, 2016), https://www.law.upenn.edu/cf/faculty/research/details.cfm?research_id=14047; Arpit Gupta, Christopher Hansman and Ethan Frenchman, *The Heavy Costs of High Bail: Evidence from Judge Randomization*, at 13 (finding a 12% increase in the likelihood of conviction using the same data); Sarah R. Guidry, et al., *A Blueprint for Criminal Justice Policy   Solutions   in   Harris   County*   (2015), http://www.americanbar.org/content/dam/aba/events/legal_aid_indigent_defendants/2015/ls_sclaid_summit_03_tcjc_2015_harris_county_blueprint.authcheckdam.pdf at 13 ("[D]efendants who are not released pre-trial are more likely to be incarcerated following a conviction, and they generally receive longer sentences upon conviction."); Lise Olson, *Study:   Inmates   who   can't   afford   bond   face   tougher   sentences*, Houston Chron. (Sept. 15, 2013), http://www.houstonchronicle.com/news/houston-texas/houston/article/Study-Inmates-who-can-t-afford-bond-face-tougher-4817053.php (discussing Carlos Mathis, an African-American man, who was detained in jail for seven months on minor drug and theft charges because he could not afford money bail, and whose charges were dismissed); Isami Arifuku & Judy Wallen, *Racial Disparities at Pretrial and Sentencing and the Effects of Pretrial Services Programs* (Mar. 11, 2013), http://www.pretrial.org/download/research/Racial%20Disparities%20at%20Pretrial%20and%20Sentencing%20and%20the%20Effects%20of%20Pretrial%20Services%20Programs%20-%20NCCD%202013.pdf; Cynthia E. Jones,

15

are more likely to be convicted, more likely to be sentenced to jail, less likely to be sentenced to probation, and given longer sentences than similarly situated people released pretrial.[29] People detained have a more difficult time preparing their defense, gathering evidence and witnesses, and meeting their lawyers. Detained people are more likely to plead guilty, even if they are innocent.[30] Harris County has led the country for years in exonerations—many of which resulted from wrongful convictions in drug cases involving people who pled guilty to get out of jail.[31]

Relying on access to cash creates racial disparities. Money bail is disproportionately imposed on non-white arrestees.[32] Non-white arrestees disproportionately are unable to afford money bail.[33] Regardless of the amount imposed, people of color are more likely to be detained at disposition than whites.[34] One study found that even when criminal charges and criminal histories are the same, black men receive money bail that is 35% higher on average, when compared to all arrestees, while Hispanic men receive money bail that is 19% higher than the average for all arrestees.[35] Moreover, money bail amounts for black arrestees are $7,000 higher

---

*"Give Us Free": Addressing Racial Disparities in Bail Determinations*, 16 N.Y.U. Legis. & Pub. Pol'y 919 (2013); Tina L. Freiburger, et. al, *The Impact of Race on the Pretrial Decision*, 35 Am. J. of Crim. Just. 76 (2010), http://libres.uncg.edu/ir/asu/f/Marcum_CD_2010_Impact_of_Race.pdf.

[29] Megan Stevenson, *Distortion of Justice: How the Inability to Pay Bail Affects Case Outcomes* 18 (May 2, 2016), https://www.law.upenn.edu/cf/faculty/research/details.cfm?research_id=14047; Paul Heaton, et al., *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 Stan. L. Rev. 711 (2017) .

[30] Megan Stevenson, *Distortion of Justice: How the Inability to Pay Bail Affects Case Outcomes* 18 (May 2, 2016), https://www.law.upenn.edu/cf/faculty/research/details.cfm?research_id=14047; *see also* Gupta, et. al, *supra* n. 28 at 13 (finding a 12% increase in the likelihood of conviction using the same data).

[31] Alex Samuels, *Study finds Harris County leads nation in exonerations*, Texas Tribune (Mar. 7, 2017) https://www.texastribune.org/2017/03/07/report/.

[32] Gupta, et. al, *supra* n. 28 at 4–5.

[33] Steven Demuth, Racial and Ethnic Difference in Pretrial Release Decisions and Outcomes: A Comparison of Hispanic, Black, and White Felony Arrestees, 41 J. of Crim. 873, 897 (2003).

[34] *Id*.

[35] Jonah B. Gelbach and Shawn D. Bushway, *Testing for Racial Discrimination in Bail Setting Using Nonparametric Estimation of a Parametric Model* (Aug. 20, 2011).

for violent crimes and $13,000 higher for drug crimes.[36] Another study revealed that African-American arrestees were 66% more likely than white arrestees to be jailed pretrial.[37] African-Americans and Latinos were twice as likely to receive bond amounts they could not pay.[38]

Unnecessary pretrial detention causes instability in employment,[39] housing,[40] and care for dependent relatives.[41] Children of incarcerated parents suffer enormous social, emotional, educational, and economic harms.[42] Approximately half of all people detained in the Harris County Jail have a child.[43] Each year, almost 93,000 children are separated from a parent in Harris County Jail, which is 7% of all children in the County.[44] These children "can experience multiple difficulties after parental incarceration, including traumatic separation, loneliness, stigma, confused explanations to children, unstable childcare arrangements, strained parenting, reduced income, and home, school, and neighborhood moves."[45] "[R]igorous studies show[] that parental

---

[36] *Id.*

[37] Steven Demuth, Racial and Ethnic Difference in Pretrial Release Decisions and Outcomes: A Comparison of Hispanic, Black, and White Felony Arrestees, 41 J. of Crim. 873, 897 (2003).

[38] *Id.*

[39] Will Dobbie, Jacob Goldin & Crystal Yang, *The Effects of Pretrial Detention on Conviction, Future Crime, and Employment: Evidence from Randomly Assigned Judges*, 108(2) AM. ECON. REV. 201, 204 (2018).

[40] Mark Pogrebin, Mary Dodge & Paul Katsampes, The Collateral Costs of Short-Term Jail Incarceration: The Long-Term Social and Economic Disruptions, CORR. MGMT. Q., Fall 2001, at 64, 64-65.

[41] Wendy Sawyer, Prison Policy Initiative, How does unaffordable money bail affect families? (2018) (One study "found that 56% of the detained [pretrial] defendants were parents. Alarmingly, 40.5% of those in this study said that pretrial detention would change — or already had changed — the living situation for a child in their custody.), https://www.prisonpolicy.org/blog/2018/08/15/pretrial/.

[42] Nancy P. Correa et al., THE FORGOTTEN FAMILIES: A NEEDS ASSESSMENT ON CHILDREN WITH INCARCERATED PARENTS IN HARRIS COUNTY, TEXAS 8 (February 2019), https://www.texaschildrens.org/sites/default/files/uploads/documents/Children%20of%20Incarcerated%20Parents%20Report%20Final.pdf (listing multiple negative impacts of parental incarceration).

[43] *Id.*

[44] *Id.*

[45] Murray J, Farrington DP, Sekol I. Children's antisocial behavior, mental health, drug use, and educational performance after parental incarceration: A systematic review and meta-analysis. Psychological Bulletin. 2012;138(2):175-210.

incarceration is associated with higher risk for children's antisocial behavior."[46] Children of detained individuals are significantly more likely to drop out of school, which creates a long-term cost to society of roughly $260,000 per child.[47] Separation due to incarceration can have lifelong consequences for child development, including increased attention difficulties and aggressive behavior.[48] Even a temporary separation has an enormous negative impact on the health of children later in life; in one study, separation for as short as a week within a child's first 2 years of life was related to higher levels of child negativity and aggression.[49] Many parents struggle to restore the parent-child bond once it has been disrupted by a separation, with the attachment bond between parents and children threatened by fear and lack of safety.[50]

Financial conditions also harm those who are released, the vast majority of whom pay non-refundable premiums to private corporations for release. In 2017, approximately 78% of Harris County felony arrestees who were released paid a company to get out of jail.[51] In 2017, felony pretrial arrestees paid approximately $13.5 million dollars of non-refundable premiums.[52] Overwhelmingly, these individuals come from the poorest zip codes in Harris County.

### G.  The Efficacy of Money Bail as Compared to Less-Restrictive Alternatives

Setting a secured money bail amount in an amount higher than a person can afford by

---

[46] *Id.*

[47] Shima Baradaran Baughman, *Costs of Pretrial Detention*, BOSTON UNIVERSITY LAW REVIEW, VOL. 97:1 (2017), 7.

[48] Geller A, Cooper CE, Garfinkel I, Schwartz-Soicher O, Mincy RB. Beyond Absenteeism: Father Incarceration and Child Development. Demography. 2012;49(1):49-76.

[49] Howard K, Martin A, Berlin LJ, Brooks-Gunn J. Early Mother-Child Separation, Parenting, and Child Well-Being in Early Head Start Families. Attach Hum Dev. 2011;13(1):5-26. doi:10.1080/14616734.2010. 488119

[50] Wood LCN. Impact of punitive immigration policies, parent-child separation and child detention on the mental health and development of children. BMJ Paediatr Open. 2018;2(1).

[51] Harris County Pretrial Services, 2017 Annual Report (2017), at 16-17, https://pretrial.harriscountytx.gov/Library/2017%20Annual%20Report.pdf (11,562 felony arrestees posted surety bonds and a total of 14,743 were released on any type of bond).

[52] *Id.* at 17.

definition defeats the theoretical purpose of money bail—to incentivize a person to return to court—and removes any legitimate interest in requiring a monetary payment as a condition of release. Studies show that just two days of pretrial detention increases the likelihood of future arrests and increases the future risk level of low-level offenders.[53] The empirical evidence shows no relationship between requiring money bail as a condition of release and rates of appearance.[54]

Instead of relying on money, other jurisdictions release arrestees with assistance, such as court reminders or transportation vouchers, that promote court attendance and public safety without requiring detention. Other jurisdictions employ numerous strategies for assuring public safety and court appearance that do not result in pretrial detention. These strategies include: unsecured bonds (which do not require payment up front for release but instead allow immediate release upon a promise to pay the monetary amount if the person does not appear as required), reporting obligations, two-way phone and text-message reminders of court dates, rides to court for those without transportation or a stable address, flexible court appearances including evening and weekend court sessions for those with jobs they cannot miss, counseling, drug and alcohol treatment, batterer intervention programs, anger management courses, personal sureties, alcohol monitors, or, in extreme cases of particular risk, electronic monitoring, among other alternatives.

Jurisdictions all over the country have instituted simple alternatives to the unlawful system of jailing the poor and freeing the rich after arrest. They routinely using non-monetary conditions of release achieve high rates of court appearance and public safety. For decades, Washington, D.C. has run its pretrial system without the use of money bail. The District operates an "in or out" pretrial system in which decisions about release or detention are made without

---

[53] Laura and John Arnold Foundation, *Research Summary: Pretrial Criminal Justice Research* (2013).

[54] Arpit Gupta, Christopher Hansman, & Ethan Frenchman, *The Heavy Costs of High Bail: Evidence from Judge Randomization* 5 (May 2, 2016), http://www.columbia.edu/~cjh2182/GuptaHansmanFrenchman.pdf ("We find no evidence that money bail increases the probability of appearance.").

regard to a defendant's wealth. D.C. releases 75% of felony arrestees and 98% of misdemeanor arrestees pretrial.[55] Overall, it has a low pretrial detention rate of 6%.[56] In 2019, 88% of defendants made all scheduled court appearances.[57] Only 1% of released defendants were arrested for violent crimes.[58]

In 2017, New Jersey overhauled its pretrial system, virtually eliminating the use of secured money bail. New Jersey currently has a pretrial detention rate of only 6.4% of all defendants.[59] 71% of all defendants are released on a summons. They are not booked into jail and are given a summons to appear in court.[60] In addition to a low rate of pretrial detention, New Jersey has a high rate of court appearance: almost 90% of defendants appear for court appearances.[61] Moreover, New Jersey's pretrial population dropped by over 25% in the last two years[62] while violent crime fell by more than 30%.[63] Defendants are permitted by state (and federal) law to use these alternatives but routinely choose not to.

In July 2017, the Chief Judge in Cook County, Illinois, issued an order prohibiting judges from using money bail to detain, and requiring any secured financial condition to be based on a

---

[55] Washington D.C. Pretrial Services Agency, FY 2019 Release Rates for Pretrial Defendants within Washington, DC, https://www.psa.gov/sites/default/files/2019%20Release%20Rates%20for%20DC%20Pretrial%20Defendants.pdf.

[56] *Id.*

[57] Washington D.C. Pretrial Services Agency, FY 2021 Congressional Budget at 12, https://www.psa.gov/sites/default/files/FY2021%20PSA%20Congressional%20Budget%20Justification_0.pdf.

[58] *Id.*

[59] New Jersey Judiciary, *2018 Report to the Governor and the Legislature* at 8. available at https://njcourts.gov/courts/assets/criminal/2018cjrannual.pdf?c=dSE.

[60] *Id.* at 5.

[61] *Id.*

[62] NJ Courts, Criminal Justice Reform Information Ctr., *Criminal Justice Reform Statistics: Jan. 1 – Jun. 31, 2019*, 6 (2009), https://njcourts.gov/courts/assets/criminal/cjrreport2018.pdf?cacheID=t9KI5Gk.

[63] Star-Ledger Editorial Board, *Has bail reform been a success? Check the crime numbers, then decide*, Star-Ledger (Dec. 5, 2018), https://www.nj.com/opinion/2018/12/has_bail_reform_been_a_success_check_the_crime_num.html.

finding on the record that the individual "has the present ability to pay" the sum.[64] Since the order took effect in September 2017, the daily jail population has decreased by approximately 1,650 people.[65] Moreover, 83.2% of defendants made all of their court appearances,[66] and very small fraction (0.6%) of defendants were charged with a new violent offense while on pretrial release and violent crime in Chicago fell by 8% after the order was put in place.[67]

Defendants have no basis for believing that people released on secured bail in Harris County are more likely to return to court or are more likely to remain crime-free in the pretrial period. Indeed, Defendants have not studied the question of the comparative efficacy of secured bail versus less-restrictive alternatives. Empirical evidence proves that unsecured bond is at least as effective at promoting appearance in court as secured money bail.[68] Empirical evidence also demonstrates that secured money bail does not have any positive benefit to public safety.[69]  In Texas, a person cannot forfeit a secured money bail by committing a new crime.[70] Accordingly, paying money bail cannot incentivize law-abiding behavior. And, in fact, short periods of pretrial

---

[64] The Order is available at http://www.cookcountycourt.org/Manage/DivisionOrders/ViewDivisionOrder/tabid/298/ArticleId/2562/GENERAL-ORDER-NO-18-8A-Procedures-for-Bail-Hearings-and-Pretrial-Release.aspx.

[65] Circuit Court of Cook County, *Bail Reform in Cook County: An Examination of General Order 18.8A and Bail in Felony Cases* (May 2019), available at http://www.cookcountycourt.org/Portals/0/Statistics/Bail%20Reform/Bail%20Reform%20Report%20FINAL%20-%20%20Published%2005.9.19.pdf (showing that the jail population decreased from 7,443 in September 2017 to 5,799 in December 2018).

[66] *Id.* at 2.

[67] *Id.* at 1-2.

[68] Michael R. Jones, *Unsecured Bonds: The As Effective and Most Efficient Pretrial Release System*, Pretrial Justice Institute (2013).

[69] Paul Heaton et al., *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 Stan. L. Rev. 711, 768 (2017) (concluding, after reviewing hundreds of thousands of cases, that detention for even brief periods because of inability to pay money bail led to higher rates of conviction, longer sentences, and a greater likelihood of commission of new crimes in the future); Arpit Gupta et al., *The Heavy Costs of High Bail: Evidence from Judge Randomization* 21 (2016) ("Our results suggest that money bail has a negligible effect or, if anything, increases failures to appear."); Christopher T. Lowenkamp et al., *The Hidden Costs of Pretrial Detention* 4 (2013) ("The longer low-risk defendants are detained, the more likely they are to have new criminal activity pending trial.").

[70] *ODonnell*, 251 F. Supp. 3d at 1009 (citing Tex. Code Crim. Pro. Art. 22.01–02; 22.13(5)).

detention actually increase the likelihood of future crime.[71] The current system is not only effective; it is also expensive and wasteful: Harris County spends $88 per day per person detained, as compared to $0.88 per day per person who is supervised in the community. Alternative tools save taxpayer expense while maintaining high public safety and court appearance rates.

## V.    Summary of the Argument

"In our society liberty is the norm, and detention prior to trial . . . is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). But Harris County detains approximately 55 percent of all felony arrestees—tens of thousands of people every year—for the duration of their cases solely because they cannot pay money bail.[72] This automatic detention of impoverished people is not an "exception" at all, let alone a "carefully limited" one.

Plaintiffs' constitutional claims have both substantive and procedural aspects. *See, e.g.*, *Washington v. Harper*, 494 U.S. 210, 220 (1990) (explaining the interaction between claims that share substantive and procedural aspects). Substantively, Plaintiffs' claims flow from two lines of precedent. First, equal protection and due process forbid jailing a person solely because of her inability to make a payment. *ODonnell v. Harris County*, 892 F.3d 147, 161 (5th Cir. 2018); *Bearden v. Georgia*, 461 U.S. 600, 665 (1983); *Pugh v. Rainwater*, 572 F.2d 1053, 1057 (5th Cir. 1978); *Frazier v. Jordan*, 457 F.2d 726, 728 (5th Cir. 1972). Second, due process protects a "fundamental" right to pretrial liberty. *United States v. Salerno*, 481 U.S. 739, 750 (1987).

---

[71] Laura and John Arnold Foundation, *Research Summary: Pretrial Criminal Justice Research* (2013); Paul Heaton et al., *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 Stan. L. Rev. 711, 768 (2017) (concluding, after reviewing hundreds of thousands of cases, that detention for even brief periods because of inability to pay money bail led to higher rates of conviction, longer sentences, and a greater likelihood of commission of new crimes in the future); Christopher T. Lowenkamp et al., *The Hidden Costs of Pretrial Detention* 4 (2013) ("The longer low-risk defendants are detained, the more likely they are to have new criminal activity pending trial.").

[72] *Supra* n. 26.

The two substantive constitutional rights at issue—the right against wealth-based detention and the fundamental right to pretrial liberty—cannot be infringed unless the government demonstrates that wealth-based pretrial detention is necessary to serve a compelling interest.[73] Thus, before requiring a person to make a monetary payment in exchange for release from detention, the government must make findings concerning the person's ability to pay. If the person cannot pay the amount required, such that the condition of release will function as a de facto detention order, then the government must justify the order to pay unattainable bail in the same way that it justifies a transparent order of detention.

Procedurally, the Constitution requires the government to provide safeguards to protect against the erroneous deprivation of these substantive rights. *Harper*, 494 U.S. at 228; *ODonnell*, 892 F.3d at 157 ("'The first question [in procedural-due-process analysis] asks whether there exists a liberty interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.'") (quoting *Meza v. Livingston*, 607 F.3d 392, 399 (5th Cir. 2010)). Here, the safeguards required include notice, an opportunity to be heard and to present and confront evidence at a hearing with counsel, and

---

[73] The Fifth Circuit held that "heightened" scrutiny applies to policies infringing the right against wealth-based detention. *ODonnell*, 2018 WL 2465481, at *9. Strict scrutiny and intermediate scrutiny are both forms of "heightened" scrutiny. *ODonnell v. Harris County*, 251 F. Supp. 3d 1052, 1138 (S.D. Tex. 2017) (citing *Lauder, Inc. v. City of Houston*, 751 F. Supp. 2d 920, 933 (S.D. Tex. 2010), *aff'd.*, 670 F.3d 664 (5th Cir. 2012)). Both require the government to show that its policy is narrowly tailored to a compelling interest. *Id.* Under strict scrutiny, the policy must be necessary to achieve that interest. *Id.* Under intermediate scrutiny, the policy is constitutional only if it "promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id.* (quoting *Lauder*, 751 F. Supp. 2d at 933).

   *Rainwater* did not address whether strict or intermediate scrutiny applies in the context of wealth-based detention. But *Frazier*, which is binding, explicitly applied strict scrutiny, 457 F.2d at 728, consistent with *Bearden*'s later rejection of wealth-based detention because the government's interest could "be served fully by alternative means," 461 U.S. at 671-72. This Court need not resolve which form of heightened scrutiny applies if it finds that the practices flunk intermediate scrutiny, or if it concludes that Defendants' policies infringe Plaintiffs' fundamental right to pretrial liberty, because strict scrutiny unquestionably applies when a fundamental right is at issue.

findings on the record by clear and convincing evidence explaining the basis for detention. Defendants evade the findings and safeguards required for pretrial detention.

## VI.   Argument

### A.  Standard of Review

A preliminary injunction is warranted if the movant demonstrates: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011); *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009). Plaintiffs easily satisfies each of these requirements.

### B.  Plaintiffs are Likely to Succeed on the Merits

This motion raises constitutional issues that are similar to the ones this Court confronted in *ODonnell v. Harris County*, challenging misdemeanor bail practices in Harris County. The Fifth Circuit did not, however, have occasion to resolve several of the substantive and procedural constitutional issues Plaintiffs raise in this case. Nonetheless, other federal courts have applied this Court's and the Fifth Circuit's reasoning in issuing orders enjoining the same equal protection and due process violations when those violations have been committed against people accused of felony offenses. *See Schultz v. Alabama*, 330 F. Supp. 3d 1344, 1376 (N.D. Ala. 2018) (granting preliminary injunction), *appeal filed sub. nom. Hester v. Gentry*, No. 18-13894 (11th Cir. Sept. 13, 2018); *Caliste v. Cantrell*, 329 F. Supp. 3d 296, 320 (E.D. La. 2018) (issuing declaratory judgment), *aff'd on other grounds*, 937 F.3d 525 (5th Cir. 2019).

#### 1.   The Constitution protects a right against wealth-based detention and a right to pretrial liberty

The Equal Protection and Due Process Clauses protect a substantive right against wealth-based detention. *Rainwater*, 572 F.2d at 1057 ("The incarceration of those who cannot [pay money bail], without meaningful consideration of other possible alternatives, infringes on both due process and equal protection requirements."); *ODonnell*, 892 F.3d at 161; *Tate v. Short*, 401 U.S. 395 (1971); *Williams v. Illinois*, 399 U.S. at 244; *Bearden*, 461 U.S. at 665; *Frazier*, 457 F.2d at 728 (holding that an order to pay a fine or serve time in jail violates equal protection and due process unless it is "necessary to promote a compelling governmental interest" (quotation and citation omitted)); *see also* Brief of Conference of Chief Justices as Amicus Curiae in Support of Neither Party at 35, *ODonnell*, 2017 WL 3536467, at *24 (5th Cir. Aug. 9, 2017) ("[A]ll the concerns that attend post-conviction deprivations based on indigence apply with even greater force where a defendant has not been convicted of a crime. . . . If a state may not imprison convicted indigent defendants solely 'on account of their poverty,' how can a state constitutionally detain presumably innocent persons for the same reason?"). In *ODonnell*, the Fifth Circuit held that Harris County's practices—in which "poor arrestees . . . are incarcerated where similarly situated wealthy arrestees are not, solely because the indigent cannot afford to pay a secured bond"— creates a "basic injustice." 892 F.3d at 162. The Court concluded that heightened scrutiny applies when the government infringes the right against wealth-based detention and that Harris County failed to justify its practices under that scrutiny. *Id.*

But *ODonnell* did not consider the second substantive constitutional right in this case: the "fundamental" federal right to pretrial liberty. *See id.* at 157 ("Here, our focus is the law of Texas."); *Salerno*, 481 U.S. at 750 (recognizing the "importance and fundamental nature" of "the individual's strong interest in liberty"); *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause

from arbitrary governmental action.") (citing *Youngberg v. Romeo*, 457 U.S. 307, 316 (1982)); *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001); *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 780 (9th Cir. 2014) (*en banc*) (applying strict scrutiny to Arizona pretrial detention law because it infringed on the "fundamental" right to pretrial liberty); *In re Humphrey*, 19 Cal. App. 5th 1006, 1049 (Ct. App. 2018) (review pending) (recognizing the "fundamental constitutional right to pretrial liberty"); *Brangan v. Commonwealth*, 80 N.E.3d 949, 961 (Mass. 2017) (holding that the right to pretrial liberty is "fundamental"); *Buffin v. City & Cty. of San Francisco*, No. 15-CV-04959-YGR, 2018 WL 424362, at *6 (N.D. Cal. Jan. 16, 2018) (holding that pretrial detention "implicates plaintiffs' fundamental right to liberty"). The Conference of Chief Justices recently affirmed this principle. Brief of Conference of Chief Justices at 38 ("[T]he right of an accused to freedom pending trial is inherent in the concept of a liberty interest protected by the due process clause of the Fourteenth Amendment." (quoting *Dodds v. Richardson*, 614 F.3d 1185, 1192 (10th Cir. 2010))). Deprivation of this right requires a finding that pretrial detention of a presumptively innocent person is necessary to serve a compelling interest.

> **2. Defendants violate Equal Protection and Due Process by requiring unattainable financial conditions without making a finding that detention is necessary to serve a compelling government interest**

Defendants impose unattainable financial conditions of release that function as detention orders without providing the substantive findings and procedural safeguards required by equal protection and due process to justify an order of detention. Plaintiffs are therefore likely to succeed on the merits of their claims. *Schultz*, 330 F. Supp. 3d at 1376; *Caliste*, 329 F. Supp. 3d at 320.

> **a. An unattainable financial condition is the functional equivalent of an order of pretrial detention**

Applying *Salerno*, every appellate court to consider the question has held that an order requiring an unattainable financial condition of release is a de facto order for pretrial detention.

*ODonnell*, 892 F.3d at 162 (holding that Defendants' practices result in the "absolute deprivation of [indigent misdemeanor arrestees'] most basic liberty interests—freedom from incarceration"); *see also, e.g.*, *United States v. Leathers*, 412 F.2d 169, 171 (D.C. Cir. 1969) ("[T]he setting of bond unreachable because of its amount would be tantamount to setting no conditions at all."); *United States v. Mantecon-Zayas*, 949 F.2d 548, 550 (1st Cir. 1991) ("[O]nce a court finds itself in this situation—insisting on terms in a "release" order that will cause the defendant to be detained pending trial—it must satisfy the procedural requirements for a valid *detention* order[.]"); *State v. Brown*, 338 P.3d 1276, 1292 (N.M. 2014) ("Intentionally setting bail so high as to be unattainable is simply a less honest method of unlawfully denying bail altogether."); *Brangan*, 80 N.E.3d at 963 (unattainable money bail "is the functional equivalent of an order for pretrial detention, and the judge's decision must be evaluated in light of the same due process requirements applicable to such a deprivation of liberty."); *Humphrey*, 228 Cal. Rptr. 3d at 517. This Court in *ODonnell* reached the same conclusion, stating that when secured money bail is set "at unpayable amounts," it operates "as [a] de facto pretrial detention order." 251 F. Supp. 3d at 1150; *id.* at 1131, 1156, 1161 (holding that secured money bail set in an amount that an arrestee cannot afford is constitutionally equivalent to a detention order). Indeed, the court found that Harris County had a "policy and practice of imposing secured money bail as de facto orders of pretrial detention." *Id.* at 1059-1060 aff'd as modified, 892 F.3d 147 (emphasis added).

### b. Pretrial detention requires the government to demonstrate necessity, regardless of whether the detention results from a transparent order or a de facto one

Pursuant to either the *Bearden-Frazier-Rainwater* wealth-based detention cases, or the fundamental right to pretrial liberty articulated in *Salerno*, an unattainable financial condition of release is unconstitutional unless the government demonstrates that less-restrictive alternatives are

inadequate and incapacitation is therefore necessary to serve a compelling government interest in court appearance or community safety.

Because a person's "interest in liberty" is "fundamental," the Supreme Court has held that it is a "'general rule' of substantive due process that the government may not detain a person prior to a judgment of guilt in a criminal trial." *Salerno*, 481 U.S. at 750, 749. Like other constitutional rights, however, the right to pretrial liberty is not absolute: the government may deprive a person of her right to pretrial liberty if the government's interest is sufficiently compelling and the deprivation is narrowly tailored—meaning that pretrial detention is necessary because alternatives are inadequate—to serve that interest. *Salerno*, 481 U.S. at 749, 751 (describing the government interest in preventing serious pretrial crime as "compelling" and the statute as "careful[ly] delineat[ing] . . . the circumstances under which detention will be permitted"); *Reno v. Flores*, 507 U.S. 292, 301-302 (1993) (citing *Salerno* as part of its "line of cases which interprets … 'due process of law' to … forbid[] the government to infringe certain  fundamental' liberty interests … unless the infringement is narrowly tailored to serve a compelling state interest."); *Foucha*, 504 U.S. at 81 (explaining that the statutory scheme *Salerno* addressed was "narrowly focused on a particularly acute problem in which the government interests [were] overwhelming."); *see also Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (holding that the government may not infringe "'fundamental' liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest."); *Zablocki v. Redhail*, 434 U.S. 374, 388 (1978) (noting that when the government's action infringes a fundamental right, "it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests").

Not surprisingly in light of *Reno* and *Foucha*, the *en banc* Ninth Circuit has squarely held that "*Salerno* applied heightened scrutiny." *Lopez-Valenzuela*, 770 F.3d at 780-781; *id.* at 780 (holding that the government must demonstrate that its "infringement [of pretrial liberty] is narrowly tailored to serve a compelling state interest"); *accord, e.g.*, *Simpson v. Miller*, 387 P.3d 1270, 1276-1277 (Ariz. 2017) ("heightened scrutiny" applies where, as in *Salerno*, the "fundamental" "right to be free from bodily restraint" is implicated), *cert. denied sub nom. Arizona v. Martinez*, 138 S. Ct. 146 (2017). Under these cases, Defendants (like the government in *Salerno*) must establish that de facto pretrial detention through unattainable conditions of release is "narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302 (1993); *see also ODonnell*, 251 F. Supp. 3d at 1156–57 (holding that government action infringing pretrial liberty must be the least restrictive means necessary to promote court appearance and community safety); *Reem*, 2017 WL 6765247, at *1 ("The due process clauses of the Fifth and Fourteenth Amendments bar pretrial detention unless detention is necessary to serve a compelling government interest."); *Humphrey*, 19 Cal. App. 5th at 1028, 1037 (holding that a person may be detained only if "no less restrictive alternative will satisfy" the government's interests because pretrial detention is permissible "only to the degree necessary to serve a compelling governmental interest"); *Brangan*, 80 N.E.3d at 962 (holding that pretrial detention is permissible if "such detention is demonstrably necessary" to meet a compelling interest).

Independently, government action that infringes the right against wealth-based detention must likewise be necessary to serve a compelling government interest. In *Frazier*, the Fifth Circuit invalidated a practice requiring an indigent person to either pay a fine or be jailed after conviction because the alternative jail term was not "necessary to promote a compelling governmental interest." 457 F.2d at 728 (quotations omitted). *Frazier* explained that there were "far less onerous

alternatives" that would satisfy the "state's interest in collecting its fine revenue." *Id.*; *see id.* at 729–30 (reviewing adequate alternatives available). *Bearden*, similarly required "careful inquiry" into the state's asserted interests and "the existence of alternative means for effectuating" those interests. 461 U.S. at 666, 667; *id.* at 672 ("Only if the sentencing court determines that alternatives to imprisonment are not adequate in a particular situation . . . may the State imprison a probationer[.]"; *see also Rainwater*, 572 F.2d at 1057 (explaining that the same principles apply prior to trial and that the Constitution requires "meaningful consideration of . . . alternatives" to "incarceration of those who cannot" pay a financial condition of release, and a finding that secured money bail "is *necessary* to reasonably assure defendant's presence at trial." (emphasis added)). Accordingly, if the government's interest in "appearance at trial could reasonably be assured by … alternate [conditions] of release, pretrial confinement for inability to post money bail" is unconstitutional. *Id.* at 1058; *see also Buffin*, 2018 WL 424362, at *8 (holding that "an examination of the *Bearden-Tate-Williams* line of cases persuades the Court that strict scrutiny applies to plaintiffs' Due Process and Equal Protection claims."); *ODonnell*, 251 F. Supp. 3d at 1140 ("[P]retrial detention of indigent defendants who cannot pay a financial condition of release is permissible only if the court finds, based on evidence and in a reasoned opinion, either that the defendant is not indigent and is refusing to pay in bad faith, or that no less restrictive alternative can reasonably meet the government's compelling interest"); *id.* at 1145 (before requiring an unaffordable financial condition, a judicial officer must make a finding that wealth-based detention "is the only reasonable way to assure the arrestee's appearance at hearings and law-abiding behavior before trial"); *Brangan*, 80 N.E.3d at 965 (holding that an order requiring an unattainable condition must explain why "the defendant's risk of flight is so great that no alternative, less

restrictive financial or nonfinancial conditions will suffice to assure his or her presence at future court proceedings"); *Humphrey*, 19 Cal. App. 5th at 1026 (same).[74]

The Fifth Circuit in *ODonnell* held that "heightened scrutiny" applies to Harris County's wealth-based bail practices. *ODonnell*, 892 F.3d at 161; *id.* at 157 (affirming this Court's equal protection holding because detention due to inability to pay requires "'meaningful consideration of other possible alternatives'" (quoting *Rainwater*, 572 F.2d at 1057)); *id.* (a court must explain why a "'particular financial requirement is a *necessary* part of the conditions for release' when setting a bond that a detainee cannot pay" (quoting *United States v. McConnell*, 842 F.2d 105, 110 (5th Cir. 1988) (emphasis added)))). Regardless of the label, the cases are clear that there must be a finding that detention is necessary because less-restrictive alternatives are inadequate to meet the government's interests in court appearance and public safety.[75]

Therefore, under either line of cases, Plaintiffs are entitled to a preliminary injunction on their claim that Defendants violate equal protection and due process by detaining them without the substantive finding of necessity that is required for a valid order of pretrial detention.

### 3.   Defendants do not provide adequate safeguards prior to detention

Procedural-due-process analysis "proceeds in two steps: We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S.

---

[74] Imposing money bail cannot be justified by purported concerns about community safety because "[m]oney bail . . . has no logical connection to protection of the public, as bail is not forfeited upon commission of additional crimes. Money bail will protect the public only as an incidental effect of the defendant being detained due to his or her inability to pay, and this effect will not consistently serve a protective purpose, as a wealthy defendant will be released despite his or her dangerousness while an indigent defendant who poses minimal risk of harm to others will be jailed." *Id.* at 1029; *ODonnell*, 251 F. Supp. 3d at 1109–10.

[75] Moreover, in Harris County, Defendants have no basis for their policy using a secured bail schedule to automatically determine conditions of release prior to any adversarial hearing because they have no basis for believing that secured bail is as effective, let alone more effective, than less-restrictive alternatives at reasonably assuring court appearance or preventing bodily harm to another person. Indeed, rigorous research and evidence shows that alternatives to secured bail are at least as effective.

216, 219 (2011) (citing *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)). Plaintiffs satisfy the first step of the procedural-due-process inquiry because, as explained above, Plaintiffs have been deprived of two substantive liberty interests under federal law: the right against wealth-based detention and the "fundamental" "interest in [pretrial] liberty." *Salerno*, 481 U.S. at 750. The second step of the procedural-due-process analysis—determining the procedures required for a valid pretrial detention order—proceeds under the *Mathews v. Eldridge* three-part balancing test, pursuant to which a court must consider, for each procedure: (1) "the private interest" at issue, (2) "the risk of an erroneous deprivation" absent the additional safeguard, and (3) the state's interest in not providing it. 424 U.S. 319, 335 (1976).

The balancing of the *Mathews* factors establishes that, before a person can be detained pretrial, the government must provide notice of the relevant critical issues; an inquiry into ability to pay if a financial condition is contemplated; an adversarial hearing at which the arrestee is represented by counsel and has an opportunity to be heard, to present evidence, and to confront evidence offered by the government; meaningful consideration of less restrictive alternatives; and, if the decision-maker issues a transparent or de facto order of detention, findings on the record by clear and convincing evidence that detention is necessary, and a statement of reasons, supported by evidence that meets minimum standards of reliability, explaining the decision.

### a. When requiring financial conditions, the government must conduct an inquiry into ability to pay and make on-the-record findings concerning ability to pay

As a threshold matter, when the government contemplates requiring a secured financial condition of pretrial release, it must provide procedures adequate to determine whether the monetary condition will operate as a detention order. The Supreme Court, the Fifth Circuit, and this Court have held that if the government seeks to condition physical liberty on a payment, due

process requires notice that financial information will be collected and of the nature and significance of the financial information; an inquiry into the person's ability to pay; and findings on the record as to whether the person has the ability to pay. *See Turner v. Rogers*, 564 U.S. 431, 447 (2011) (applying the *Mathews* test and holding that, before the state may jail a person for not paying child support, the government must provide notice that ability to pay is a "critical issue," an opportunity to be heard, and "an express finding by the court that the defendant has the ability to pay"); *Bearden*, 461 U.S. at 673 (holding that, before the state can revoke probation for nonpayment, it must determine whether the person could afford to pay such that the nonpayment was willful); *United States v. Payan*, 992 F.2d 1387, 1396 (5th Cir. 1993) (the "court must inquire into the reasons" the person did not pay and determine whether she could afford to pay and willfully refused to do so); *ODonnell*, 251 F. Supp. 3d at 1144–45 (concluding that Harris County's automatic use of secured money bail, without an inquiry into ability to pay, presents an intolerably high risk of erroneous deprivation, and that Defendants failed to demonstrate an interest in not providing these safeguards); *id.* at 1161 (requiring an inquiry into ability to pay and notice to arrestees about the significance of the financial information they provide). If, after notice and inquiry, the government considers requiring a secured bail amount that the person cannot pay, then further safeguards are required before the government may detain the person.

> **b. When pretrial liberty is at stake, the government must provide additional safeguards to protect against an erroneous deprivation of Plaintiffs' fundamental rights**

The substantive rights to pretrial liberty and against wealth-based detention require rigorous process to ensure the accuracy of any finding that preventive pretrial detention is necessary and to ensure that detention of the presumptively innocent remains the "carefully limited exception." *Salerno*, 481 U.S. at 755.

*Salerno* upheld the procedural protections required by the Bail Reform Act and emphasized that an order of detention under the Act may be issued only after the provision of robust safeguards, including: a "full-blown adversary hearing," *id.* at 750, "findings of fact" by "clear and convincing evidence," and a "statement of reasons for a decision to detain," *id.* at 752. Balancing the individual and government interests at stake, the *Mathews* test makes clear that due process requires safeguards similar to the provisions the Supreme Court emphasized when it upheld that law.[76]

### i. The government must provide notice, an adversarial hearing within 48 hours of arrest, and findings on the record

The procedures due process required prior to the deprivation of *any* liberty interest are well established. Most of them apply even in the post-conviction context, where a person's liberty interest is diminished. In *Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973), the Court explained what due process requires at a probation revocation hearing for a person whose liberty interest has been diminished by a conviction: (a) "notice" of the critical issues to be decided; (b) "disclosure" of the evidence presented by the government; (c) an "opportunity to be heard in person and to present witnesses and documentary evidence"; (d) "the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)"; (e) a "neutral and detached" factfinder; and (f) findings and reasons on the record of "the evidence relied on." *See also Morrissey v. Brewer*, 408 U.S. 471, 489 (1972) (holding that "the minimum requirements of due process" require the same six procedural protections for parole revocation of a convicted and sentenced person); *Turner*, 564 U.S. at 447 (requiring "notice to the defendant that 'ability to pay' is a critical issue," the opportunity to be heard, and findings on the

---

[76] *Salerno* addressed the procedural protections required for preventively detaining someone charged with certain particularly serious felony offenses, for only in such cases could the balance of interests that might permit deprivation of an individual's "fundamental" right tilt in the government's favor. *Id.* at 747, 750. Plaintiffs have not raised a claim here that due process prohibits pretrial detention of people charged with less-serious felony offenses.

record); *see also, e.g.*, *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) ("Parties whose rights are to be affected are entitled to be heard."); *Concrete Pipe & Prods. of Cal.. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 617 (1993) ("[D]ue process requires a 'neutral and detached judge in the first instance.'" (quoting *Ward v. Village of Monroeville*, 409 U.S. 57, 61–62 (1972))); *Wolff v. McDonnell*, 418 U.S. 539, 564–65 (1974) (requiring a statement of reasons for revocation of good-time credits). Because a bail hearing implicates the fundamental right to bodily liberty prior to trial, each of these safeguards is required. In *ODonnell*, the Fifth Circuit made clear that these safeguards must be provided within 48 hours. 892 F.3d at 160, 163.

### ii.   The government must prove by clear and convincing evidence that detention is necessary

When the government seeks to infringe the fundamental right to bodily liberty prior to or absent a criminal conviction, the government also bears a heightened evidentiary burden. As the Supreme Court explained in its seminal procedural due process decision in *Addington v. Texas*, 441 U.S. 418 (1979), the deprivation of the fundamental right to bodily liberty requires a heightened standard of proof beyond a mere preponderance to ensure the accuracy of the decision to detain. Since *Addington*, the Supreme Court has never permitted application of a standard lower than "clear and convincing" evidence in any context in which bodily liberty is at stake.

In *Addington*, the Supreme Court held that, under the Due Process Clause, the standard of proof required before a person can be confined in state custody for mental illness based on the possibility of future dangerousness must be "equal to or greater than" the "clear and convincing" evidentiary standard. *Id.* at 433. Applying the *Mathews* balancing test, the Court first articulated the government's interest: "to protect the community from the dangerous tendencies of some who are mentally ill." *Id.* at 426. However, the Court explained: "Since the preponderance standard creates the risk of increasing the number of individuals erroneously committed, it is at least unclear

35

to what extent, if any, the state's interests are furthered by using a preponderance standard in such commitment proceedings." *Id*. The Court then balanced the important private interests and concluded that "the individual's interest in the outcome of a civil commitment proceeding is of such weight and gravity that due process requires the state to justify confinement by proof more substantial than a mere preponderance of the evidence." *Id*. at 427.

In determining what the appropriate due process standard was, the Court explained that requiring proof "beyond a reasonable doubt" was too stringent, particularly because of the non-punitive nature of commitment and because, "given the uncertainties of psychiatric diagnosis, it may impose a burden the state cannot meet and thereby erect an unreasonable barrier to needed medical treatment." *Id*. at 432. The Court explained that in other contexts, such as deportation and denaturalization, it had consistently required the intermediate "clear and convincing" standard of proof to protect against erroneous deprivations of important individual interests. *Id*. at 424. The "clear and convincing" standard enables the government to achieve its interest when it has a convincing basis but rigorously protects the fundamental individual rights at stake. *See id.*

The Court has reached the same conclusion in every other context in which a person's bodily liberty is at stake. *See Santosky v. Kramer*, 455 U.S. 745, 756 (1982) ("This Court has mandated an intermediate standard of proof—'clear and convincing evidence'—when the individual interests at stake in a state proceeding are both 'particularly important' and 'more substantial than mere loss of money.'"); *Cruzan by Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 282–83 (1990) (explaining that the Court has required the clear and convincing evidence standard in deportation proceedings, denaturalization proceedings, civil commitment proceedings, proceedings for the termination of parental rights, in cases involving allegations of civil fraud, and in a variety of other kinds of civil cases implicating important interests).

In its next seminal case on the evidentiary standard required for deprivation of bodily liberty, the Court struck down Louisiana's statute for ongoing confinement of those acquitted on the basis of insanity. *Foucha*, 504 U.S. at 82–83. The Court held that although "[t]he State may [] confine a mentally ill person if it shows by clear and convincing evidence that the individual is mentally ill and dangerous, [h]ere, the State has not carried that burden." *Id.* at 80 (quotation and citation omitted). In reaching this holding, *Foucha* relied on *Salerno*, 481 U.S. at 749, explaining that the Court had upheld the federal statute's preventive detention mechanism in part because it required findings of dangerousness by the "clear and convincing" standard. *Foucha* held: "Unlike the sharply focused scheme at issue in *Salerno*, the Louisiana scheme of confinement is not carefully limited. Under the state statute, Foucha is not now entitled to an adversary hearing at which *the State must prove by clear and convincing evidence* that he is demonstrably dangerous to the community." 504 U.S. at 81 (emphasis added). *Foucha* concluded with a reminder of the importance of the evidentiary standard: "[F]reedom from physical restraint being a fundamental right," detention must remain the "carefully limited exception" in our society. *Id.* at 86, 83.

Lower courts, interpreting *Salerno*, have consistently required clear and convincing evidence to justify detaining a person prior to trial. *Lopez-Valenzuela* stuck down the Arizona pretrial detention statute in part because the Arizona law, unlike the federal Bail Reform Act, did not require the government to prove by clear and convincing evidence that an individual arrestee's detention was necessary. 770 F.3d at 784–85. As the Ninth Circuit explained, one of the features that *Salerno* relied on was that the Act required the government "to prove by 'clear and convincing evidence' that the individual presented 'a demonstrable danger to the community' and that 'no conditions of release c[ould] reasonably assure the safety of the community.'" *Id.* at 785. Most recently, in *Humphrey*, the court held under the federal Constitution that "[i]f [a] court concludes

that an amount of bail the defendant is unable to pay is required to ensure his or her future court appearances, it may impose that amount only upon a determination by clear and convincing evidence that no less restrictive alternative will satisfy that purpose." 19 Cal. App. 5th at 1037.[77]

The intermediate standard of "clear and convincing" evidence should apply regardless of whether the government seeks to detain a person pretrial based on a purported risk of public safety or a purported risk of flight because the private right at stake is the same. And the Court has already held in *Santosky*, *Addington*, and *Foucha* that fundamental private interests require a heightened standard before the government can infringe them, because those interests are "particularly important" and "more substantial than mere loss of money." *Santosky*, 455 U.S. at 756. There is no compelling reason that "the degree of confidence our society thinks [it] should have in the correctness of factual conclusions," *id.* at 755, should be *lower* when the question is whether a person poses a risk of flight than when the question is whether the person poses a danger.

Analogous case law from the immigration context, where the liberty interest is considered more constrained than in the pretrial context, supports this conclusion. *See Singh v. Holder*, 638 F.3d 1196, 1203, 1204 (9th Cir. 2011) (requiring clear and convincing evidence regardless of whether the government seeks detention based on flight or dangerousness because "due process places a heightened burden of proof [where] the individual interests at stake . . . are both particularly important and more substantial than mere loss of money."); *Lora v. Shanahan*, 804 F.3d 601 (2d Cir. 2015) (same), vacated and remanded on other grounds, 138 S. Ct. 1260 (2018).

Only one court appears to have addressed in depth whether the standard of proof the government must satisfy to detain someone due to a concern about flight risk is the same as the

---

[77] Numerous other state courts have held this standard to apply. *See, e.g.*, *State v. Ingram*, 165 A.3d 797, 803, 805 (N.J. 2017); *State v. Butler*, No. 2011–K–0879, 2011 WL 12678268 (La. App. 4th Cir. July 28, 2011), *writ not considered*, 75 So. 3d 442 (La. 2011); *Wheeler v. State*, 864 A.2d 1058, 1065 (Md. App. 2005); *Brill v. Gurich*, 965 P.2d 404, 409 (Okla. 1998).

standard when the concern is community safety. In *Kleinbart v. United States*, 604 A.2d 861, 868 (D.C. 1992), the D.C. Court of Appeals held that the "clear and convincing" evidence standard should apply to determinations about whether to order pretrial detention based on flight risk. The court explained that "[a] defendant's liberty interest is no less—and thus requires no less protection—when the risk of his or her flight, rather than danger, is the basis for justifying detention without right to bail." *Id.* at 870. The court therefore held: "Although the federal Bail Reform Act could be construed—purely as a matter of statutory construction—to require only a preponderance standard in risk of flight cases . . . we believe that *Salerno*'s emphasis on the clear and convincing evidence standard to sustain the constitutionality of that statute as applied to danger necessarily carries over, as a requirement of due process, to risk of flight cases." *Id.* This analysis has been adopted by the American Bar Association's Criminal Justice Standards.[78]

In *United States v. Motamedi*, 767 F.2d 1403 (9th Cir. 1985), a pre-*Salerno* case, the court held that the government failed to prove by a "clear preponderance" of the evidence that the defendant was a flight risk and reversed an order of pretrial detention. In the process, the court held that the *statutory* standard for determining flight risk under the Bail Reform Act was a "clear preponderance of the evidence" as opposed to the "clear and convincing" standard later upheld in *Salerno* for dangerousness. *Id.* at 1406. In reversing the lower court's detention order, the Ninth Circuit made "no attempt to analyze the constitutional ramifications of its decision." *Id.* at 1412

---

[78] ABA Standard 10-5.8 explains that the "clear and convincing" standard applies to decisions relating to dangerousness and risk of flight. Courts have long looked to the Standards for guidance when answering constitutional questions about the appropriate balance between individual rights and public safety in the field of criminal justice. *See, e.g.*, *Padilla v. Kentucky*, 559 U.S. 356, 367 (2010); *Strickland v. Washington*, 466 U.S. 668, 688-89 (1984); *United States v. Teague*, 953 F.2d 1525, 1533 n.10 (11th Cir. 1992). Similarly, the Conference of Chief Justices has emphasized the safeguards upheld in *Salerno* and argued that misdemeanor arrestees detained due to inability to pay money bail are entitled to the same procedural safeguards afforded to arrestees who are detained pursuant to transparent orders of detention. *See* Brief of Conference of Chief Justices at 38.

(Boochever, J., concurring and dissenting in part). Judge Boochever, however, addressed the constitutional question, applying the *Mathews* balancing test. *Id*. at 1413–15. He explained:

> [T]he consequences to the defendant from an erroneous pretrial detention are certain and grave. The potential harm to society, although also significant, is speculative, because pretrial detention is based on the possibility, rather than the certainty, that a particular defendant will fail to appear. Moreover, society's interest in increasing the probability of detention is undercut by the fact that it has no interest in erroneously detaining a defendant who can give reasonable assurances that he will appear. I conclude therefore that the injury to the individual from an erroneous decision is greater than the potential harm to society, and that under *Addington* due process requires that society bear a greater portion of the risk of error: the government must prove the facts supporting a finding of flight risk by clear and convincing evidence.

*Id.* at 1415.

Given the importance of this legal question to pretrial justice in this country, the case law on the proper standard of proof when determining flight risk is surprisingly thin, perhaps because appellate courts have difficulty resolving pretrial detention issues before cases become moot. Indeed, the Supreme Court has not ruled on a constitutional issue relating to pretrial detention since *Salerno* in 1987. Although the issue should be uncontroversial in light of *Addington* and *Foucha*, and after balancing the *Mathews* factors, counsel has been unable to find precedent from any circuit addressing the question of whether, as a matter of due process, the "clear and convincing" standard applies to determinations of pretrial detention based on a risk of flight.[79]

Thus, although the constitutional issue of what ultimate standard of proof must apply at a pretrial detention hearing appears to be one of first impression in this Court, the holdings and reasoning in *Addington, Foucha, Santosky, Salerno*, *Lopez-Valenzuela*, *Kleinbart,* and *Humphrey* demonstrate that the deprivation of the fundamental right to bodily liberty requires a heightened

---

[79] Counsel has found a number of federal cases after *Motamedi* that likewise apply a "preponderance" standard to risk of flight determinations as a matter of *statutory interpretation* under the Bail Reform Act, but none of those cases raised, analyzed, or decided the constitutional issue.

standard of proof whether the government is considering alternatives to mitigate a risk of flight or alternatives to mitigate a risk of danger to the community.[80]

As Judge Boochever explained, any interest the government might have in making a less reliable pretrial detention decision is less significant than minimizing pretrial detention and ensuring the integrity of convictions. At a hearing on this Motion, Plaintiffs will present overwhelming evidence of the negative effects of even short periods of pretrial detention, which can lead to job termination, lost housing, separation from children, lapses in medical and mental health care, and pressure to plead guilty. Both the individual and the government have a strong interest in avoiding these harms, in ensuring the accuracy of the pretrial detention determination, and in avoiding wrongful convictions and new crimes. Given the impossibility of predicting future behavior, courts have struck a middle ground and followed *Addington*, avoiding the stringent "beyond a reasonable doubt" standard. The "clear and convincing" standard strikes the correct balance, allowing the government to use detention in those "carefully limited" circumstances when there is clear evidence to support a finding that total incapacitation is necessary.[81]

### c. Defendants do not provide the required procedural safeguards

In Harris County, the procedural safeguards required to ensure the accuracy of their pretrial detention decisions are lacking. Pre-determined money bail amounts are imposed on arrestees prior to any legal proceeding before a judicial officer. Although a proceeding occurs in the jail after

---

[80] Although the formal rules of evidence need not apply at detention hearings, the findings of clear and convincing evidence on which the government relies for the incapacitation of a presumptively innocent person must meet minimal standards of reliability. *See, e.g.*, *United States v. LaFontaine*, 210 F.3d 125, 131 (2d Cir. 2000) ("[W]hile the informality of bail hearings serves the demands of speed, the magistrate or district judge must also ensure the reliability of the evidence, by selectively insisting upon the production of the underlying evidence or evidentiary sources where their accuracy is in question." (quotation omitted)); *United States v. Accetturo*, 783 F.2d 382, 389 (3d Cir. 1986); *United States v. Acevedo-Ramos*, 755 F.2d 203, 207-08 (1st Cir. 1985); *Reem*, 2018 WL 1258137, at *3.

[81] Procedural due process also requires the government to provide counsel at bail hearings. The County is currently meeting this requirement. Accordingly, Plaintiffs are not suffering irreparable harm with respect to this procedural due process requirement and do not seek preliminary injunctive relief requiring counsel. However, Plaintiffs will seek a ruling on the merits of this issue and a permanent injunction requiring the County to provide lawyers at bail hearings.

arrest for those who cannot afford to pay the bond amount set pursuant to the judges' schedule, there is no notice of the critical issues to be decided at the hearing. There are no findings on the record concerning ability to pay, the availability or adequacy of alternative conditions of release, or the necessity of detention in light of alternatives. And there is no evidentiary standard, let alone the heightened evidentiary standard required by due process, to any findings.

### d. Defendants have effective, constitutional alternatives to jailing people who cannot pay arbitrary monetary amounts

Harris County is free to choose among a variety of options without offending the Fourteenth Amendment, but Harris County's wealth-based post-arrest detention scheme makes a mockery of the "carefully limited" circumstances, *Salerno*, 481 U.S. at 755, in which due process permits the pretrial detention of a presumptively innocent person. Because the Plaintiff class is, or will be, detained pretrial without the procedural safeguards and substantive finding of necessity due process requires, they are highly likely to prevail on the merits of their constitutional claim.

### C.  Plaintiffs Will Suffer Irreparable Harm Without a Preliminary Injunction

The deprivation of constitutional rights alone is sufficient to establish irreparable harm. *See*, *e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); *Michigan State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 669 (6th Cir. 2016); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996); *Calvert v. Paniagua,* No. 2:17CV2 HEA, 2018 WL 2121508, at *11 (E.D. Mo. May 8, 2018). On that basis, this element is satisfied.

Class members face additional irreparable harm as a result of their imprisonment. Every additional night in jail causes harm to a person that cannot be later undone. *See, e.g. United States v. Bogle*, 855 F.2d 707, 710-11 (11th Cir. 1988) ("unnecessary deprivation of liberty clearly constitutes irreparable harm"); *Matacua v. Frank*, 308 F. Supp. 3d 1019, 1025 (D. Minn. 2018) ("loss of liberty . . . is perhaps the best example of irreparable harm"). Depriving persons of their

fundamental right to pretrial liberty may cause psychological and economic harm and undermine

their ability to prepare a defense. As the Supreme Court eloquently explained, pretrial incarceration

> has a detrimental impact on the individual. It often means loss of a job; it disrupts family life; and it enforces idleness. Most jails offer little or no rehabilitative programs. The time spent in jail is simply dead time. Moreover, if a defendant is locked up, he is hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense. Imposing those consequences on anyone who has not yet been convicted is serious. It is especially unfortunate to impose them on those persons who are ultimately found to be innocent. Finally, even if an accused is not incarcerated prior to trial, he is still disadvantaged by restraints on his liberty and by living under a cloud of anxiety, suspicion, and often hostility.

*Barker v. Wingo*, 407 U.S. 514, 532-33 (1972); *see also Pugh*, 572 F.2d at 1056-57; *ODonnell II*,

892 F.3d at 155, 162-63; *Schultz*, 330 F. Supp. 3d at 1375 ("[I]ndividuals who, by law, are

presumed innocent suffer irreparable injury when they are detained because they cannot afford to

pay secured bond and are deprived of constitutionally adequate procedures for examining potential

nonmonetary conditions of release."). Here, class members suffer irreparable harms including:

> ***Long-term economic instability and poverty due to class members' inability to work while incarcerated and risk of losing jobs.***

- Pretrial detention decreases tax revenue and depresses future earnings. Three to four years post-bail hearing, individuals initially released pretrial are 9.4 percent more likely to be formally employed, with these earnings $948 higher on average.[82]
- The probability of having *any* formal sector income over this time period increases 10.2 percent for individuals initially released pretrial, while the probability of filing a tax return (two years post-bail hearing) increases 10.2 percent.[83] These effects not only affect individuals, but also have ripple effects through local economies.
- If a person detained pretrial loses employment, he or she often encounters reduced wages upon securing new employment. For men, serving time pretrial reduces hourly wages by approximately 11 percent, annual employment by nine weeks and annual earnings by 40 percent.[84]

---

[82] Will Dobbie, Crystal Yang and Jacob Goldin, *The Effects of Pre-Trial Detention on Conviction, Future Crime, and Employment: Evidence from Randomly Assigned Judges*, AMERICAN ECONOMIC REVIEW, 23 (2018).

[83] See *id.*

[84] Shima Baradaran Baughman, *Costs of Pretrial Detention*, BOSTON UNIVERSITY LAW REVIEW, VOL. 97:1 (2017), at 5.

- Approximately 23% of people facing pretrial incarceration lose their housing.[85]
- Research also shows that when someone experiences incarceration of any form, their odds of experiencing houselessness increase from 1 in 200 for the general population to 1 in 11 for individuals recently released from incarceration.[86]

***Harm to families that are reliant on jailed class members for support.***

- Approximately half of all people detained in the Harris County Jail have a child.[87]
- Each year, almost 93,000 children have a parent in Harris County Jail, which is 7% of all children in the county.[88]
- "Children of prisoners can experience multiple difficulties after parental incarceration, including traumatic separation, loneliness, stigma, confused explanations to children, unstable childcare arrangements, strained parenting, reduced income, and home, school, and neighborhood moves."[89]
- "[R]igorous studies show[] that parental incarceration is associated with higher risk for children's antisocial behavior."[90]
- Children of detained individuals are significantly more likely to drop out of school, which creates a long-term cost to society of roughly $260,000 per child.[91]
- 48% of families which have an incarcerated family member have difficulty meeting basic housing needs because of the loss of income due to the family member being incarcerated.[92]
- Separation due to incarceration can have lifelong consequences for child development, including increased attention difficulties and aggressive behavior.[93]

---

[85] *Id.*

[86] Human Impact Partners and Free Hearts. February 2018. Keeping Kids and Parents Together: A Healthier Approach to Sentencing in Tennessee. Oakland, CA.

[87] Nancy P. Correa et al., THE FORGOTTEN FAMILIES: A NEEDS ASSESSMENT ON CHILDREN WITH INCARCERATED PARENTS IN HARRIS COUNTY, TEXAS 14 (February 2019), https://www.texaschildrens.org/sites/default/files/uploads/documents/Children%20of%20Incarcerated%20Parents%20Report%20Final.pdf

[88] *Id.*

[89] Murray J, Farrington DP, Sekol I. Children's antisocial behavior, mental health, drug use, and educational performance after parental incarceration: A systematic review and meta-analysis. Psychological Bulletin. 2012;138(2):175-210.

[90] Murray J, Farrington DP, Sekol I. Children's antisocial behavior, mental health, drug use, and educational performance after parental incarceration: A systematic review and meta-analysis. Psychological Bulletin. 2012;138(2):175-210.

[91] Shima Baradaran Baughman, *Costs of Pretrial Detention*, BOSTON UNIVERSITY LAW REVIEW, VOL. 97:1 (2017), 7.

[92] deVuono-Powell S, Schweidler C, Walters A, Zohrabi A. Who Pays? The True Cost of Incarceration on Families (2015) Ella Baker Center, Forward Together, Research Action Design.. http://whopaysreport.org/.

[93] Geller A, Cooper CE, Garfinkel I, Schwartz-Soicher O, Mincy RB. Beyond Absenteeism: Father Incarceration and Child Development. Demography. 2012;49(1):49-76.

- Even a temporary separation has a negative impact on the health of children later in life — in one study, separation for as short as a week within a child's first 2 years of life was related to higher levels of child negativity and aggression.[94]
- Many parents struggle to restore the parent-child bond once it has been disrupted by a separation, with the attachment bond between parents and children threatened by fear and lack of safety.[95]

### *Worse case outcomes and pressure to plead guilty because of the potential for prolonged unconstitutional pretrial detention.*

- A study on Philadelphia found that initial pretrial release makes people 24.2% *less likely* to be found guilty.[96]
- A different study, looking at New York City, found that pretrial detention increases conviction likelihood by 13 percentage points.[97]
- Another study showed that assigning money bail causes a 12 percent rise in conviction likelihood.[98]
- Another study on Philadelphia found that pretrial detention leads to a 42% increase in the length of the sentence a defendant receives.[99]
- The increase in conviction stems largely, though not entirely, from the fact that pretrial detainees plead guilty more often – approximately 25 percent more often, according to one study.[100] A study of Harris County, Texas, showed that releasing all misdemeanor defendants between 2008 and 2013 would have avoided 5,900 criminal convictions, primarily owing to fewer wrongful guilty pleas.[101]

---

[94] Howard K, Martin A, Berlin LJ, Brooks-Gunn J. Early Mother-Child Separation, Parenting, and Child Well-Being in Early Head Start Families. Attach Hum Dev. 2011;13(1):5-26. doi:10.1080/14616734.2010. 488119

[95] Wood LCN. Impact of punitive immigration policies, parent-child separation and child detention on the mental health and development of children. BMJ Paediatr Open. 2018;2(1).

[96] Will Dobbie, Crystal Yang and Jacob Goldin, *The Effects of Pre-Trial Detention on Conviction, Future Crime, and Employment: Evidence from Randomly Assigned Judges*, AMERICAN ECONOMIC REVIEW, 108 (2018).

[97] Emily Leslie & Nolan G. Pope, *The Unintended Impact of Pretrial Detention on Case Outcomes: Evidence from NYC Arraignments*, Journal of Law and Economics, Vol. 60, 543 (2017).

[98] Arpit Gupta, Christopher Hansman and Ethan Frenchman, *The Heavy Costs of High Bail: Evidence from Judge Randomization*, Unpublished Working Paper, 3 (2016).

[99] Megan T Stevenson, Distortion of Justice: How the Inability to Pay Bail Affects Case Outcomes, *The Journal of Law, Economics, and Organization*, Volume 34, Issue 4, November 2018, Pages 511–542

[100] Paul Heaton et al., *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 STAN. L. REV. 711, 711 (2017). *See also* Criminal Justice Policy Program, *Moving Beyond Money: A Primer on Bail Reform*, Criminal Justice Policy Program at Harvard Law School, 7 (October 2016).

[101] Paul Heaton et al., *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 STAN. L. REV. 711, 711 (2017). *See also* Criminal Justice Policy Program, *Moving Beyond Money: A Primer on Bail Reform*, Criminal Justice Policy Program at Harvard Law School, 7 (October 2016).

In addition to all the typical harms of unconstitutional pretrial detention, Plaintiffs face a heightened risk of contracting a deadly virus. Ex. B ¶¶ 10, 14–22, 39. Most people (80%) will develop a mild upper respiratory infection, but serious illness can occur in up to 16% of cases. *Id.* ¶¶ 23–24. Older people and those with underlying medical conditions, such as lung disease, heart disease, or diabetes, are more likely to develop serious illness.[102] *Id.* ¶ 24. The number of cases and deaths from Covid-19 is increasing exponentially in the Houston area.[103] This exponential growth is straining the health care system, which is struggling to care for the current and imminent influx of serious Covid-19 patients.[104] An outbreak in the jail will spread rapidly and further strain health care resources, resulting in a "catastrophic loss of life,"[105] making it more likely that people who would ordinarily recover from the virus will die.[106] Dr. Chiao states, "[I]t is my professional judgment that the Harris County Jail is dangerously under-equipped and ill-prepared to prevent and manage a COVID-19 outbreak, which would result in severe harm to detained individuals, jail and prison staff, and the broader community." *Id.* ¶ 29.  Class members will suffer irreparable injury unless this Court enjoins Defendants' actions.

### D. The Harm Plaintiffs Are Suffering Outweighs Any Potential Harm to Defendants Caused by a Preliminary Injunction

---

[102] World Health Organization, Q&A on coronaviruses (COVID-19) (Mar. 9, 2020), https://www.who.int/news-room/q-a-detail/q-a-coronaviruses.

[103] Todd Ackerman & Dylan McGuiness, *Coronavirus spread in Houston could burn out by mid-May under stay-at-home order* (Mar. 25, 2020), https://www.houstonchronicle.com/news/houston-texas/houston/article/harris-county-stay-at-home-coronavirus-spread-15157648.php; Stacy Fernandez, *Texas Gov. Greg Abbott says to expect 'exponential' increase in positive coronavirus cases* (Mar. 16, 2020), https://www.texastribune.org/2020/03/16/texas-coronavirus-cases-will-increase-exponentially-gov-greg-abbott/.

[104] Dylan Scott, *The next coronavirus crisis will be a shortage of doctors and nurses* (Mar. 26,2020), available at https://www.vox.com/2020/3/26/21192191/coronavirus-us-new-york-hospitals-doctors-nurses; Andrew Jacobs, *'At War With No Ammo': Doctors Say Shortage of Protective Gear Is Dire* (Mar. 19, 2020), https://www.nytimes.com/2020/03/19/health/coronavirus-masks-shortage.html.

[105] Ex. A.

[106] Sarah Kliff, *There Aren't Enough Ventilators to Cope With the Coronavirus* (Mar. 18, 2020), https://www.nytimes.com/2020/03/18/business/coronavirus-ventilator-shortage.html; Austin Frakt, *Who Should Be Saved First? Experts Offer Ethical Guidance* (Mar. 24, 2020), https://www.nytimes.com/2020/03/24/upshot/coronavirus-rationing-decisions-ethicists.html

These harms considerably outweigh any potential harm to Defendants. The provision of constitutionally required process to pretrial detainees and substantive determinations regarding the necessity of their detention—the sole relief requested by Plaintiffs in this motion— causes no harm to Defendants. Further, Defendants will save the cost of unnecessarily detaining class members if this Court grants a preliminary injunction. As one federal judge explained, "unnecessary pretrial detention burdens States, localities, and taxpayers, and its use appears widespread: nationwide, about 60% of jail inmates are pretrial detainees, and the majority of those people are charged with nonviolent offenses." *Jones*, 2015 WL 5387219, at *3. Class members are part of the unnecessary burden on Harris County, and ending their wealth-based detention is more likely to benefit Defendants than it is to cause them harm. Thus, the balance of harms weighs substantially in favor of the class members who suffer serious long-term injury from the imposition of unaffordable financial conditions without any finding of necessity, while providing no real benefit to Defendants. *See, e.g.*, *Daves*, 341 F. Supp. 3d at 697 (finding balance of harms weighed in favor of enjoining use of secured money bail without the requisite substantive findings and procedural safeguards); *Schultz*, 330 F. Supp. 3d at 1375-76 (finding balance of harms weighed in favor of an injunction, in part, because "alternative pretrial detention policies are cost effective").

### E.  A Preliminary Injunction Promotes the Public Interest

"'[I]t is always in the public interest to prevent the violation of a party's constitutional rights.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citation omitted); *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012). Accordingly, the public interest would be served by issuance of a preliminary injunction requiring Defendants to provide class members with adequate procedures to vindicate their constitutional rights.  At the same time, detaining indigent people solely because that cannot afford to pay financial conditions of release is expensive, draining

public coffers of money that could be spent on other public needs. *Jones*, 2015 WL 5387219, at *3. Harris County spends approximately $2.3 million every *week* on pretrial detention.[107] A study of Harris County found that if all misdemeanor defendants held on $500 money bond – the lowest amount of bail – between 2008-2013 had been released instead, the county would have released an additional 4,000 people and saved $20 million dollars in supervision costs.[108]

Moreover, there is no evidence that financial conditions of release (even for those who can afford to pay) are more effective than alternative measures for ensuring court appearance and public safety. *ODonnell,* 892 F.3d at 154 (finding "reams of empirical data" showing that "release on secured financial conditions does not assure better rates of appearance or law-abiding conduct before trial compared to release on unsecured bonds or nonfinancial conditions of supervision"); *see also McNeil v. Cmty. Prob. Servs., LLC*, 1:18-cv-33, 2019 WL 633012, at *14-15 (M.D. Tenn. Feb. 14, 2019) (finding no evidence that "that arrestees who are able to pay the secured bail amount are more likely to appear for their revocation hearing and less likely to commit crime"); *Schultz*, 330 F.Supp.3d at 1363 ("[T]he evidence demonstrates that secured bail is no more effective than other conditions to assure a criminal defendant's appearance at court proceedings, and secured bail is not necessary to secure a criminal defendant's appearance."); *Id.* at 1364 (citing "prolonged pretrial detention is associated with a greater likelihood of rearrest upon release, meaning that pretrial detention may *increase* the risk of harm to the community.").

These factors amply demonstrate that the public interest is undermined by Defendants' current unconstitutional procedures, and would benefit from a system that grants class members the freedom they could enjoy were they wealthy enough to purchase it.

---

[107] Ex. K (Harris County Felony Pretrial Detention Reports) ("Harris County taxpayers spent over $2.3 MILLION DOLLARS on illegal pretrial detention this week. That's close to twice the $1.3 million Harris County taxpayers spend every week on public health services, the public library, and pollution control COMBINED.")
[108] Heaton, *Downstream Consequences*, at 787.

## VII.    The Court Should Exercise Its Discretion to Waive the Posting of Security

Federal Rule of Civil Procedure 65(c) normally requires the moving party to post security to protect the other party from any financial harm likely to be caused by a temporary injunction if that party is later found to have been wrongfully enjoined. Rule 65(c), however, vests the district court with broad discretion to determine the amount of security required, or to waive the bond requirement. *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981); *see also ODonnell*, 251 F. Supp. 2d at 1159–60 (waiving the bond requirement). This Court should waive the bond requirement because Plaintiffs are indigent, *Wayne Chem. v. Columbus Agency Serv. Corp.*, 567 F.2d 692, 701 (7th Cir. 1977) (requiring no bond for indigent person), and this lawsuit is brought to enforce constitutional rights. *City of Atlanta*, 636 F.2d at 1094 (upholding district court's decision to waive the bond requirement because "plaintiffs were engaged in public-interest litigation, an area in which the courts have recognized an exception to the Rule 65 security requirement."); *ODonnell*, 251 F. Supp. 2d at 1159–60.[109] Moreover, Defendants are unlikely to suffer any harm from an improperly issued injunction requiring them to follow the Constitution, *Steward v. West*, 449 F.2d 324, 325 (5th Cir. 1971) (finding that no injunction bond need be posted when "it is very unlikely that the defendant will suffer any harm"), and Plaintiffs are overwhelmingly likely to succeed on the merits.[110]

---

[109] *See also, e.g.*, *Mitchell v. City of Montgomery*, No. 14-CV-186, ECF No. 18 at *3 (M.D. Ala. May 1, 2014); *Bass v. Richardson*, 338 F. Supp. 478, 490 (S.D.N.Y. 1971) ("It is clear to us that indigents, suing individually or as class plaintiffs, ordinarily should not be required to post a bond under Rule 65(c)."); *see also* 11A Wright & Miller § 2954 (courts can waive the bond requirement in cases involving poor plaintiffs); *Rodriguez v. Providence Cmty. Corr., Inc*., 155 F. Supp. 3d 758, 761 (M.D. Tenn. 2015); *Cooper v. City of Dothan*, No. 1:15-CV-425-WKW, 2015 WL 10013003, (M.D. Ala. June 18, 2015).

[110] Although this case, like *ODonnell*, is a prototypical situation for which the class action vehicle was created, and the certification motion was contemporaneously filed with the complaint, this Court need not rule on the certification motion or formally certify a class in order to issue preliminary injunctive relief. *See, e.g.*, Newberg on Class Actions § 24:83 (4th ed. 2002) ("The absence of formal certification is no barrier to classwide preliminary injunctive relief."); Moore's Federal Practice § 23.50, at 23-396, 23-397 (2d ed.1990) ("Prior to the Court's determination whether plaintiffs can maintain a class action, the Court should treat the action as a class suit."); *see also, e.g.*, *Lee v. Orr*, No. 13-CV-8719, 2013 WL 6490577, at *2 (N.D. Ill. Dec. 10, 2013) ("The court may conditionally certify the class or

## Conclusion

This is a matter of life and death. The Court must act.

Date: March 27, 2020                                    Respectfully Submitted,

*/s/ Alec Karakatsanis*                                 */s/ Neal S. Manne*
*/s/ Elizabeth Rossi*                                   Neal S. Manne
Alec George Karakatsanis                                Texas Bar No. 12937980
alec@civilrightscorps.org                               nmanne@susmangodfrey.com
Elizabeth Rossi                                         Lexie G. White
elizabeth@civilrightscorps.org                          Texas Bar No. 24048876
Civil Rights Corps                                      lwhite@susmangodfrey.com
1601 Connecticut Ave NW, Suite 800                      Joseph S. Grinstein
Washington, DC 20009                                    Texas Bar No. 24002188
Telephone: (202) 681-2721                               jgrinstein@susmangodfrey.com
                                                        SUSMAN GODFREY L.L.P.
*s/ Mimi Marziani*                                      1000 Louisiana Street, Suite 5100
Mimi Marziani (*Pro Hac Vice*)                          Houston, Texas 77002
Texas State Bar No. 24091906                            Telephone: (713) 651-9366
Meagan T. Harding                                       Facsimile: (713) 654-6666
Texas State Bar No. 24080179
Southern District No. 3365526
Texas Civil Rights Project                              */s/ Michael Gervais*
405 N Main St, Suite 716                                Michael Gervais (*Pro Hac Vice* pending)
Houston, TX 77002                                       mgervais@susmangodfrey.com
Phone: 512-474-5073 ext 118                             SUSMAN GODFREY L.L.P.
Fax: 832-554-9981                                       1900 Avenue of the Stars, #1400
mimi@texascivilrightsproject.org                        Los Angeles, CA 90067
meagan@texascivilrightsproject.org                      Telephone: (310) 789-3100

---

otherwise order a broad preliminary injunction, without a formal class ruling, under its general equity powers. The lack of formal class certification does not create an obstacle to classwide preliminary injunctive relief when activities of the defendant are directed generally against a class of persons."); *N.Y. State Nat. Org. For Women v. Terry*, 697 F. Supp. 1324, 1336 (S.D.N.Y. 1988) (holding that "the Court acted in the only reasonable manner it could under the circumstances, ruling on the continuation of [the] temporary restraining order and leaving the question of class certification for another day."); *Leisner v. N.Y. Tel. Co*., 358 F. Supp. 359, 371 (S.D.N.Y. 1973) ("[R]elief as to the class is appropriate at this time even though when the preliminary injunction motion was heard, the class action had not yet been certified."); *Ill. League of Advocates for the Developmentally, Disabled v. Ill. Dep't of Human Servs*., No. 13-CV-1300, 2013 WL 3287145, at *4 (N.D. Ill. June 28, 2013) ("At this early stage in the proceedings, the class allegations in the Second Amended Complaint are sufficient to establish Plaintiffs' standing to seek immediate injunctive relief on behalf of the proposed class. At a later stage, we may revisit whether that classwide representation is inappropriate, but until that time, we will preserve the status quo (within the limits set forth in the TRO) with respect to all potential class members."); *Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 433 (6th Cir. 2012) ("Simply put, there is nothing improper about a preliminary injunction preceding a ruling on class certification.").

**CERTIFICATE OF SERVICE**

I certify that on March 27, 2020 a true and correct copy of this document properly was served on counsel of record via electronic filing in accordance with the USDC, Southern District of Texas Procedures for Electronic Filing.


*/s/ Elizabeth Rossi*
Elizabeth Rossi