United States District Court
Southern District of Texas
**ENTERED**
April 14, 2020
David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| DWIGHT RUSSELL, *et al.*, | § | |
| | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-19-226 |
| | § | |
| HARRIS COUNTY, TEXAS, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

Individuals arrested in Harris County, Texas, for felony charges are usually brought to the Harris County Jail to wait for hearings and trials. Those who can post the money bond usually imposed under a preset bail schedule do so. Those who cannot, because they are too poor to post the bond premium, wait. First, they wait for counsel to be appointed, then for opportunities to seek release on a personal bond with no upfront payment. In this lawsuit, three plaintiffs allege that many indigent arrestees are in jail because they were denied a pretrial personal bond and cannot make the upfront payment on a financial bond. They would, they argue, be released without delay if they could make the bond payment. They argue that Harris County provides an inadequate process for individually assessing who can meet the requirements for safe release on a personal bond. They claim due process and equal protection violations from wealth-based detention before formal bail hearings. The plaintiffs asserted these claims before the coronavirus and pandemic produced the national emergency now facing the country.

The plaintiffs urge that approximately 4,000 felony arrestees, not convicted of the charged offense, are kept in the densely packed Harris County Jail for weeks or months longer than those able to post a bond. They incur the costs of prolonged pretrial detention, including job loss,

eviction, a greater likelihood of pleading guilty, and a higher chance of receiving a harsher sentence.  Now they face a greater risk of exposure to, or exposing others to, the coronavirus. COVID-19 raised and changed the stakes.

In the crowded Jail, social distancing and adequate sanitation are hard to maintain.  There are daily arrivals of new arrestees with a variety of underlying health and medical issues, likely including COVID-19.  Those with the disease risk infecting other arrestees, as well as the deputies and employees who guard them, feed and care for them, and who then go home, potentially to infect their own families and communities.

These motions and opinion are not directly about prison conditions or whether public health is best served by releasing which arrestees.  They are instead about the process and timing of individualized hearings to determine whether a particular pretrial felony arrestee can be dismissed on a personal bond.  The plaintiffs ask this court to authorize the Harris County Sheriff to release many felony arrestees, who have not had a trial or been convicted, and cannot post the upfront payment based on bail-schedule amounts, if they do not promptly get formal, individualized, evidentiary hearings to determine whether they could be safely released on a personal bond.  The plaintiffs also ask this court to overturn as unconstitutional part of Governor Greg Abbott's Executive Order GA-13, which limits state district judges' discretion to issue personal bonds during the COVID-19 crisis.  That Order was one of several issuing from those with authority to set and implement policies to meet the COVID-19 crisis in our state's jails and prisons.  The Harris County Commissioners Court Judge and the State Administrative Judge both issued orders that attempt, in different ways, to expedite the release of pretrial, not convicted, low-level, nonviolent felony arrestees from the Harris County Jail on personal bonds to safely reduce the Jail population.

2

State and local policymakers agree that the Harris County Jail population must be reduced, but they disagree on how to safely do so.  A federal district court asked to wade into policy and political disagreements among State and County elected officials is in risky territory.  There is no good, clearly safe, constitutionally, and jurisdictionally right solution to many of the short-term problems and disagreements the pandemic has made so acute.  And when, as here, these disagreements appear to have been somewhat resolved, at least to the extent necessary to achieve a workable, voluntary process for the safe release of appropriate pretrial, not convicted, arrestees within the present pandemic constraints, that is a powerful reason for a federal court to decline to intervene through the blunt instrument of a temporary restraining order.

After careful consideration of the motions, the State intervenors' responses, the parties' arguments in the many teleconferences, the applicable law, the views of the interested nonparties, the sparse record, and the court's limited authority, the court denies the plaintiffs' motions for temporary restraining orders.  The court is not issuing any definitive ruling on the merits. That comes later, on a fuller record.

This is neither an easy nor good solution.  It is simply the best one this court can devise from the law and the facts that constrain its authority.  The good news, however, is that it reflects the commendable, though still halting, progress made by the parties and interested nonparties in safely reducing the Harris County Jail population during this dangerous time.

The reasons for these decisions are set out below.

## I.    Background

When this lawsuit was filed in January 2019 to challenge Harris County's bail procedures for pretrial felony arrestees, the world was different.  The three plaintiffs, Dwight Russell, Johnnie Pierson, and Joseph Ortuno claimed that they and others felony arrestees not yet convicted of a

crime were detained pending trial because they were too poor to post any financial bond, while those presenting the same kind and degree of risk factors but who were able to pay were routinely promptly released.

The plaintiffs brought a class action suit against Harris County and Sheriff Ed Gonzalez under 42 U.S.C. § 1983.  (Docket Entry No. 1).  They alleged that the County's system of setting bail for indigent felony arrestees violated their equal protection and due process rights under the Fourteenth Amendment of the United States Constitution.  (*Id.* at 6).  The plaintiffs advised the court that the suit raised issues similar to *ODonnell v. Harris County*, No. H-16-1414 (S.D. Tex. 2016), which challenged bail policies and practices for misdemeanor arrestees.  (*Id.* at 7).  The parties in *Russell* moved to stay, first pending the resolution of *ODonnell*, and then to try to have the responsible policymakers resolve this case.  (Docket Entry Nos. 14, 24).  The efforts continued until they were upended by the COVID-19 pandemic and national emergency.

As the Fifth Circuit recently recognized, "our nation faces a public health emergency caused by the exponential spread of COVID-19, the respiratory disease caused by the novel coronavirus SARS-CoV-2."  *In re Abbott*, No. 20-50264, 2020 WL 1685929, at *2 (5th Cir. Apr. 7, 2020).  On March 13, 2020, the President of the United States declared a national state of emergency and the Governor of Texas declared a state of disaster.  *Id.* (citing Proc. No. 9994, 85 Fed. Reg. 15,337, 2020 WL 1272563 (Mar. 13, 2020); Tex. Proc. of Mar. 13, 2020, https://gov.texas.gov/uploads/files/press/DISASTER_covid19_disaster_proclamation_IMAGE_0 3-13-2020.pdf).  Less than a week later, the Texas Health and Human Services Executive Commissioner declared a public health disaster because the virus "poses a high risk of death to a large number of people and creates a substantial risk of public exposure because of the disease's

method of transmission and evidence that there is community spread in Texas." *Id.* (citing Tex. Proc. of Mar. 19, 2020, https://gov.texas.gov/uploads/files/press/DECLARATION_of_public_ health_disaster_Dr_Hennerstedt_03-19-2020.pdf).

On March 11, Harris County Commissioner's Court Judge Lina Hidalgo, the County's chief executive, issued an emergency declaration, and on March 24, entered a stay-at-home order for the County. The Office of the County Engineers ordered the closure of all but four County Criminal Courtrooms and all but eight District Courtrooms within the Criminal Justice Center on any given day. (Docket Entry No. 32-10). The order also prohibited more than 10 people in any gathering except "as determined constitutionally necessary by a Judge." (*Id.*).

This lawsuit is one of a growing number around the country challenging whether due process guarantees are met in this unprecedented intersection of the pandemic with mass incarceration. As the coronavirus spread, public health officials warned that the Harris County Jail, the third largest in the nation, threatened to become a hotbed of contagion. (*See* Docket Entry Nos. 32-1, 32-2). The densely packed Jail and shortage of supplies make social distancing and hygienic practices impractical. (*Id.*) The predicted result is widespread infection, not only among arrestees and inmates, but also for the deputies and police officers who arrest and guard them, and the employees and contractors who care for them. These deputies, officers, and employees leave the jail every day and, if infected, will unwittingly infect their own families and others. (*Id.*). The public health officials urged Harris County promptly to identify and implement ways to reduce the Jail population to protect the entire community. (*Id.*).

Harris County is not unique. Prisons and jails throughout the country—federal, state, and local—have faced similar challenges and demands to safely reduce jail and prison populations, while keeping those who should be detained behind bars. The Harris County Jail was quickly

identified as a potential threat to the community at large.  On March 20, 2020, even before the scale and severity of the virus was fully appreciated, several doctors wrote to the County Board of Commissioners, the Sheriff, the Criminal District Court Judges, and the County Courts at Law to describe the risks and offer policy suggestions to ensure the safety of those detained and working in the Jail.  (Docket Entry No. 32-1).  Also, on March 20, Harris County Administrative Judge Herb Ritchie, who oversees the State Criminal District Courts in Harris County, ordered the Sheriff to process the immediate release of anyone currently detained or booked into the Harris County Joint Processing Center for one of 20 felony charges if the person was not already on felony probation and felony deferred adjudication, or did not have another warrant, hold, or pending felony charge.  (Docket Entry No. 32-6).

On March 27, the plaintiffs moved for the first of two temporary restraining orders in light of the emergency.  (Docket Entry No. 32).  The plaintiffs asked for a 14-day "emergency order . . . requiring Defendants not to enforce pretrial detention orders against Plaintiff class members unless they provide constitutionally adequate bail proceedings."  (Docket Entry No. 32 at 4).  Counsel for the plaintiffs informed the court that there were approximately 4,400 pretrial felony arrestees currently detained because they could not pay the financial conditions of their release.  (Docket Entry No. 37).  Of those arrestees, approximately 1,000 allegedly remained in the Jail only because they could not afford to pay a bondsman $350 or less.  (*Id.*).  The parties alleged that only 38 arrestees were eligible for release under Judge Ritchie's March 20, 2020, Order.  (*Id.*).

The State of Texas, Governor of Texas, and Attorney General of Texas moved to intervene.  (Docket Entry No. 38).  The court granted the motion after the plaintiffs indicated they were not opposed.  (Docket Entry Nos. 45, 46).  The court also sought the views of interested nonparties, including the Harris County District Attorney.  The State intervenors responded to the March 27

motion for a temporary restraining order, arguing that the procedural relief requested was already in place, no substantive relief was available, and that the federal court lacked subject-matter jurisdiction to grant the requested relief.  (Docket Entry No. 54).

The Governor issued Executive Order GA-13 on March 29, prohibiting the release on a personal bond of any individual currently arrested or previously convicted of a felony involving physical violence or a threat of physical violence.  (*See* Docket Entry No. 39-1).  The only exception is for an arrestee who, after an individualized hearing, is able to show that he or she is particularly vulnerable because of underlying health or medical conditions and issues.  (*Id.*).

On April 1, the plaintiffs asked this court for a second temporary restraining order against enforcement of Executive Order GA-13's provisions that bar state judges from making individualized determinations that nonfinancial conditions of release are appropriate for pretrial arrestees accused or previously convicted of violent offenses who do not have particular health or medical reasons for release.  (Docket Entry No. 53 at 9).  Shortly thereafter, the Harris County misdemeanor court judges and several civil-rights and criminal defense organizations sued in in a Texas state court to invalidate the Executive Order.  *See Tex. Crim. Def. Laws. Ass'n v. Abbott*, No. D-1-GN-20-002034, 261st District Court of Travis County, Texas (Apr. 8, 2020).  The state court judge granted the motion, enjoining the Executive Order until April 24, but the Texas Supreme Court promptly stayed that ruling.  (*See* Docket Entry Nos. 112, 113).

Also on April 1, County Judge Hidalgo entered an order "intended to be consistent with [Governor Abbott's Executive Order] in all respects."  (Docket Entry No. 66-1).  Judge Hidalgo instructed Sheriff Gonzalez to "take immediate steps to reduce and control the occupancy of the Harris County Jail system . . . by ceasing to enforce orders" to detain arrestees accused of purely

nonviolent offenses, who have not previously been convicted of crimes involving physical violence or the threat of physical violence, among other conditions.  (*Id.*).

The Sheriff began to comply with Judge Hidalgo's order and released a small number of arrestees, but stopped on April 3 after receiving a conflicting order from Administrative Judge Herb Ritchie, who supervises the state felony criminal district judges in Harris County.  (Docket Entry No. 66-2).  Judge Ritchie ordered the Sheriff and local criminal justice agencies to disregard Judge Hidalgo's order or be held in criminal contempt of court.  (*Id.*).   Only approximately 14 arrestees were released before Judge Ritchie's order halted the efforts.  (Docket Entry No. 65 at 2; Docket Entry No. 86 at 2; Docket Entry No. 98 at 13).   Judge Ritchie also issued an April 2 order, consistent with Executive Order GA-13, for the immediate release of eligible pretrial felony arrestees, expanding the prior list of 20 low-level felony offenses eligible for release to almost 50 offenses, as long as they did not involve the use or threat of physical violence.  (Docket Entry No. 66-3).

In a matter of a few days, then, the Sheriff "faced three conflicting orders from three different officials," and the "already slow machinery of jail release ground to a halt.  But the health crisis respects no orders.  The virus cares not for the turf wars of government."  (Docket Entry No. 65 at 3).  The Sheriff turned to this court to "cut the Gordian knot that currently impedes [him] from acting."  (*Id.* at 3–4).

The court held a number of long hearings by teleconference with the parties and representatives of relevant stakeholders, including the Harris County District Attorney, and made several requests for advisories to supplement the factual record and clarify the complex legal arguments involving federalism, jurisdiction, abstention, exhaustion, and separation of powers.  The parties also updated the court on the current conditions at the Jail.  As of April 13,

the Sheriff reported that the Jail held 7,474 individuals, of whom 6,051 were pretrial arrestees not convicted of the crime, and of whom 1,192 remained in jail on nonviolent offense charges.

Also as of April 13, 50 Jail detainees and 71 Harris County Sheriff's Office staff members had tested positive for COVID-19. The Sheriff reported that "dozens more" inmates with symptoms were awaiting results, and that 1,689 arrestees had been separated from the main Jail population as a form of quarantine because of their exposures to someone who had tested positive. While the Sheriff reported that no detainee is in serious condition, everyone recognizes that with each passing day, as more tests are administered, the number of arrestees with positive results is likely to grow.

## II.    The Legal Standard

A court may grant a temporary restraining order or preliminary injunction only if the movant shows: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Jones v. Tex. Dep't of Criminal Justice*, 880 F.3d 756, 759 (5th Cir. 2018) (per curiam) (quoting *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009)). The party seeking injunctive relief must meet all four requirements. *Jordan v. Fisher*, 823 F.3d 805, 809 (5th Cir. 2016) (quoting *Bluefield Water Ass'n v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009)).

## III.    The Record on the Processes in Place

The plaintiffs allege that the County's system of setting bail for indigent felony arrestees violates their equal protection and due process rights under the Fourteenth Amendment of the United States Constitution. (Docket Entry No. 1). The plaintiffs describe the County's bail

procedures as follows, relying largely on the declarations of Harris County's Chief Public Defender, as well as publicly available court docket information.

- Based on the offense charged, arrestees are either required to remain in custody until a hearing officer, not a district judge, determines the conditions of release at a probable cause hearing, or they are assigned a predetermined amount of money for release. (Docket Entry No. 32 at 7–8). If an arrestee cannot pay that predetermined amount, he remains detained until a hearing. (*Id.* at 8). The first postarrest hearing, called a magistration, Article 15.17 hearing, bail hearing or probable cause hearing, is slated to occur within 48 hours of arrest. (*Id.* at 9).

- Before the pandemic, the first individualized formal court appearance in which an arrestee can raise bail issues and present evidence allegedly did not occur for two to four weeks after requested. Even then, according to the plaintiffs, some "felony judges [did] not provide for an adversarial bail hearing on the record at that time."[1] (*Id.* at 13–14). The plaintiffs contend that to have an evidentiary hearing on the necessity of pretrial detention, an arrestee's "lawyer usually must file a motion and then schedule a court proceeding for a later date. . . . A hearing on the motion will likely not occur for more than a week after the motion is filed." (*Id.* at 14).

- According to the plaintiffs, during the COVID-19 pandemic, individualized bail hearings are rarely occurring and greatly delayed. (Docket Entry No. 74-1 at 3). They allege that these hearings are routinely scheduled for months after defense attorneys request them, in part because of restrictions on court facilities. (Docket Entry No. 32 at 14.; *see also* Docket

---

[1] The plaintiffs allege that these hearings were delayed because of a shortage of courtrooms following Hurricane Harvey in 2017. (Docket Entry No. 74-1 at 2–3).

Entry No. 74-1 at 4).  They allege that no video or teleconferencing technology is yet in place to ensure that individualized bail hearings can occur in keeping with social distancing practices.  (Docket Entry No. 74-1 at 3).  While they acknowledge that some district judges are holding informal "hearings," in which personal bond requests may be granted, the plaintiffs allege that this is not a constitutionally adequate hearing because "because the arrested individual is not present, there is no record, there are no findings entered, and there are no legal or evidentiary standards articulated."  (*Id.* at 4).  These limits matter only if no personal bond is issued after an informal hearing occurs.

At the request of the court, the Harris County District Attorney appeared as a nonparty and provided information on the current pretrial processes.  (Docket Entry Nos. 64, 72, 90, 115).  The District Attorney also solicited the views of the Harris County district judges, and Administrative Judge Ritchie provided additional information.  (Docket Entry Nos. 90, 95).

The Harris County District Attorney provided a different picture of the facts on the ground. (Docket Entry No. 72).  According to the District Attorney:

- Arrestees are brought before a hearing office for an initial bail hearing within 48 hours of arrest.[2]  (*Id.* at 2).  The District Attorney described an initial appearance before a district judge that is held "typically the next business day," but admitted that this practice "has been disrupted by displacement of the felony courts due to Hurricane Harvey in 2017." (*Id.* at 2 n.2).  The District Attorney alleges that "[i]n most cases, the state district judges

---

[2] The plaintiffs argue that some of the factual disagreements between the parties exist because the District Attorney and county judges characterize the initial appearance before a hearing officer as a "bail hearing" and therefore can allege that arrestees receive a bail hearing within 48 hours of arrest.  (Docket Entry No. 74-1 at 2).  As explained above, the plaintiffs argue that this initial appearance is not constitutionally adequate.

will hear and rule upon motions for pretrial release or lower bonds in very short order after a motion or request is made by the defense counsel." (*Id.* at 2–3).

- The District Attorney disagrees with the plaintiffs' allegations, arguing that "upon request from a defendant, the state district judges will expedite an evidentiary bail hearing to take place within days – not weeks – of the request." (*Id.* at 3).

On April 8, the County district judges advised the court that:

- They were "capable of conducting evidentiary bail hearings with witness testimony and other evidence within days of notice of a defendant's filing of such request, and provided Harris County allocates sufficient courtroom space." (Docket Entry No. 90 at 4). The judges admitted that current restrictions on courtroom use "may hinder [their] efforts." (*Id.* at 4 n.1).

On April 9, Judge Ritchie informed the court that:

- The State district felony judges "do not lack the technology to conduct hearings with all parties and witnesses and court reporters appearing remotely." (Docket Entry No. 95 at 5). He advised that "[a]ll empirical evidence points to the fact that State District Felony Judges are working diligently to reduce the jail population while protecting the rights of the accused, the safety of potential victims, and the community as a whole." (*Id.* at 4).

In the meantime, lawyers have repeatedly expressed reluctance to come to the courthouse for any hearing. They too emphasize the need to rely on technology for all hearings, with the lawyers, judges, and defendants remotely present.

This court lacks a full record. It is worth noting that the misdemeanor bail litigation had eight days of evidentiary hearings before a preliminary injunction issued. The record facts here change every day, throughout the day. This makes it difficult to make findings adequate to support

12

the tailored, effective, and safe relief that these plaintiffs seek.  Although these concerns often would not prevent granting a temporary restraining order—which may be granted without notice to the opposing party on the basis of less information than the court has now—caution here is required given the complex and dynamic factual situation and uniquely fraught circumstances.

Local officials have worked diligently to create a process for identifying and expeditiously releasing certain indigent arrestees accused of nonviolent crimes, devising a process that complies with the limitations of the Governor's order, Judge Ritchie's orders, and Judge Hidalgo's order. The Sheriff, the County Justice Administration Department, and the state district judges have compiled and circulated lists of pretrial arrestees potentially eligible for release on personal bonds to the relevant stakeholders, namely the District Attorney and the Public Defender's Office. (Docket Entry No. 64 at 2; Docket Entry No. 66 at 2; Docket Entry No. 72 at 3; Docket Entry No. 92 at 5; Docket Entry No. 107 at 2; *id.* at n.2; Docket Entry No. 111-1 at 3).  Sometime between March 28 and April 1, the Sheriff generated the largest list of 1,470 arrestees, including 125 who were deemed especially medically vulnerable.  (Docket Entry No. 64 at 2–3; Docket Entry No. 107 at 2; *id.* at n.1; Docket Entry No. 111-1 at 3–4; Docket Entry No. 115 at 2).  This list was originally created under Judge Hidalgo's order that Judge Ritchie in turn ordered disregarded, but officials have continued to use the list consistent with Judge Ritchie's new directive.  (*See* Docket Entry No. 115 at 3).  On April 4, the Justice Administration Department created another list of 534 arrestees under Judge Ritchie's April 2 Order, but subsequently cut the number down to 60. (Docket Entry No. 64 at 3).  The state district judges provide other lists "almost daily" to courtroom prosecutors.  (Docket Entry No. 107 at 2 n.2).

The District Attorney reviews the lists and objects to specific arrestees, mostly because an arrestee's criminal history disqualifies him or her under the orders of the Governor, Judge Ritchie,

and Judge Hidalgo.  As of April 13, the District Attorney continues to object to the release of 1,066 out of 1,470 arrestees.  (Docket Entry No. 115 at 2).  The Public Defender's Office reviews these objections and challenges many of them, though public defenders represent only a "fraction" of pretrial arrestees and therefore cannot speak for—or request a formal bail hearing for—"the vast majority" of those who receive prosecutorial objections.  (Docket Entry No. 111-1 at 3, 5).  No party has informed the court that the lists are being quickly electronically distributed to the numerous private and court-appointed defense attorneys in Harris County.

Arrestees whose release the District Attorney opposes may request a formal, evidentiary, individualized bail-hearing.  Those whose release draws no objection will be released promptly without a hearing unless "there is a unique or specific matter that needs to be addressed with the defendant prior to the Judge signing the bond."  (Docket Entry No. 92 at 5).  It is not clear from the record what would constitute a "unique or specific matter" or how often such matters arise.

Significant obstacles initially hampered the efficient implementation of the list-based release policy, but at least some of those obstacles appear to have been overcome.  First, there was confusion among stakeholders after Judge Ritchie's April 3 order voided Judge Hidalgo's April 1 order to release certain arrestees.  According to the Sheriff, "[t]he already slow machinery of jail release ground to a halt."  (Docket Entry No. 65 at 3).  Even as officials have pressed on with list-based releases since then, in compliance with Judge Ritchie's orders, the Sheriff reports that "communication among the stakeholders and with the felony judges has been spotty at best." (Docket Entry No. 86 at 1).  The District Attorney states that the Sheriff's list of 1,470 arrestees was created on March 28, but not delivered to prosecutors until April 1, "and thus did not include changes in custody status from creation of [the] list to delivery."  (Docket Entry No. 107 at 2 n.1). The list included some arrestees "who were no longer in custody, some subject to holds and

14

ineligible for release, and some [who had] current violent [charges] and prior violent criminal histories," making them ineligible for release on a personal bond under the Governor's Executive Order, Judge Ritchie's orders, and Judge Hidalgo's order. (*Id.*). "The list even included some defendants where bond had been revoked or forfeited by the District Court for various reasons." (*Id.*; *see also* Docket Entry No. 92 at 5–6). The District Attorney explains that "[m]uch time has been spent culling individuals who should never have been on the lists in the first place, requiring work by prosecutors on a twenty-four-hour basis." (Docket Entry No. 92 at 6). Judge Ritchie reported that the state district judges were kept out of the process and did not receive any lists until April 8, 2020. (Docket Entry No. 95 at 3). That omission appears to have been rectified.

The Public Defender's Office reports that the process of seeking pretrial release orders during the pandemic is complicated for many reasons, including: "[m]any defense attorneys are unable or unwilling to appear in court"; "[m]any inmates are not being brought to court because they are in quarantine"; "[n]o standard procedures exist for interacting remotely with the court"; "[s]ignificant confusion exists within the defense bar regarding how or when to appear in court, and how or when to reach a judge"; and "[s]ignificant confusion exists regarding how to accommodate attorney-client communications for those in custody who appear at a remote proceeding." (Docket Entry No. 111-1 at 3). And again, public defenders do not represent "the vast majority" of people who prosecutors object to releasing and cannot request formal bail hearings for those individuals.

Both the Public Defender's Office and the District Attorney's Office have accused each other of communication breakdowns on the District Attorney's objections and the Public Defender's challenges to some of those objections. (*See, e.g.*, *id.*). The Public Defender's Office claims that it has difficulty responding to prosecutorial objections based on an arrestee's criminal

history because the Public Defender's Office does not have access to the same criminal history data as the prosecutors do.  (*Id.* at 5).  The Chief Public Defender and District Attorney also disagree about what offenses are "violent."  (*Id.* at 4).

Despite these hurdles, as of April 13, this process has resulted in the pretrial release of 372 arrestees from the Sheriff's list of 1,470.  (Docket Entry No. 115 at 2).  Another 32 individuals whose release on personal bond the District Attorney does not oppose remain in custody.  (*Id.*).  The other 1,066 arrestees on the Sheriff's list have objections from the District Attorney, and may request a formal individualized hearing.  (*Id.*).  The District Attorney has pledged to review 311 arrestees for release on personal bonds who are not on the Sheriff's list.  (*Id.* at 3).  From April 1 through April 8, 998 arrestees were released through the pretrial process that predates the pandemic (*i.e.*, the process unrelated to the lists), though hundreds of new arrestees arrive each day.  (Docket Entry No. 58 at 36; Docket Entry No. 92-2).

All fear that current processes are releasing too few arrestees relative to new arrivals to stop the virus from spreading in the Jail.  Between April 1 and April 12, the Jail's population of felony pretrial arrestees decreased by only 133 people out of over 5,400.  *Harris County Jail Population Statistics*, https://charts.hctx.net/dr00226.  A warning of what may lie ahead comes from the Cook County Jail in Chicago, one of the largest in the nation, which as of April 8 was the biggest COVID-19 hot spot in the United States.  *See* Timothy Williams and Danielle Ivory, *Chicago's Jail Is Top U.S. Hot Spot as Virus Spreads Behind Bars*, N.Y. TIMES (Apr. 8, 2020), https://www.nytimes.com/2020/04/08/us/coronavirus-cook-county-jail-chicago.html.  Delays in releases heighten the risk of a Jail-wide outbreak.  But releasing those who cannot safely be released—whether because of risks of new offenses, particularly crimes involving physical violence, or risks of nonappearance—is of equal concern.

16

This court is concerned about creating harm by granting a temporary restraining order that disrupts the parties' commendable efforts under difficult circumstances to address the COVID-19 crisis in the Jail, and that will require judges and others to do what simply cannot be done as fast as desired.

## IV.    The Case Law

The case law responding to the pandemic is scant and conflicting.   Courts around the country have taken different approaches to, and reached different conclusions on, challenges to detention in the face of this crisis.   The facts are unusual and as a result, the case law is of limited help.

This case does not, like many, involve a federal-court challenge to a federal jail or prison facility, on either the conditions of confinement (including medical care) or on the duration of confinement and conditions of pretrial release.   *See, e.g., Coronel v. Decker*, No. 20-cv-2472 (AJN), 2020 WL 1487274 (S.D.N.Y. Mar. 27, 2020) (granting a temporary restraining order requiring four detainees' release under 28 U.S.C. § 2241 in part because "[an immigration-court bond] hearing weeks from now may be no relief at all, because Petitioners may contract COVID-19 in the interim and face serious health consequences—including death"); *Zhang v. Barr*, No. 20-cv-331 (C.D. Cal. Mar. 27, 2020) (granting a habeas petitioner in immigration detention an expedited bond hearing, noting that "delay in determining Petitioner's release exposes him to unnecessary risk [in light of the pandemic]"); *Calderon Jimenez v. Wolf*, No. 18-cv-10225, Docket Entry No. 507-1 (D. Mass. Mar. 26, 2020) (ordering a single habeas petitioner's release from immigration detention on bail in light of the pandemic); *Basank v. Decker*, No. 20-cv-2518 (AT), 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020) (granting a temporary restraining order under § 2241 requiring the release of one detainee from immigration custody); *Castillo v. Barr*, No. 20-cv-605,

Docket Entry No. 32 (C.D. Cal. Mar. 27, 2020) (ordering two habeas petitioners to be released from immigration detention under a temporary restraining order because of COVID-19); *Arana v. Barr*, No. 19-cv-7924 (PGG) (DCF) (S.D.N.Y. Mar. 27, 2020) (magistrate judge's report and recommendation recommending "that, due to extraordinary circumstances brought about by the COVID-19 outbreak, which has apparently reached the jail where [the habeas] Petitioner is being detained, and by which he may be particularly seriously impacted as a result of underlying medical conditions, [the] Petitioner be ordered released from [immigration] custody pending his bond hearing").

Nor does this case pose a direct federal-court challenge to the conditions of confinement in a state or local facility, such as the medical and health steps in the jail or prison to reduce and address infection and illness. *See, e.g., Mays v. Dart*, No. 20-cv-2134 (N.D. Ill. Apr. 9, 2020) (granting a limited temporary restraining order requiring certain coronavirus-related safety measures at the Cook County Jail in Chicago, but denying most requests for relief, including a putative subclass's request to be transferred to a safer facility or other form of custody); *Swain v. Junior*, No. 20-cv-21457-KMW (S.D. Fla. Apr. 7, 2020) (granting in part a temporary restraining order requiring increased coronavirus protections at Metro West Detention Center in Miami-Dade County); *Plata v. Newsom*, No. 4:01-cv-01351-JST (N.D. Cal. Apr. 4, 2020) (denying California prisoners' motion before a three-judge Prison Litigation Reform Act panel to require COVID-19-related releases, but suggesting that relief may be available at single-judge courts).

Given how this case differs from other COVID-19 litigation, the court is operating on uncertain legal terrain with limited guidance. In the related case challenging Harris County's misdemeanor bail system, the Fifth Circuit illuminated the scope of indigent pretrial arrestees' constitutional rights in the bail context. The Fifth Circuit held that "the County's mechanical

18

application of [its] secured bail schedule without regard for the individual arrestee's personal circumstances" violated arrestees' rights to procedural due process and equal protection of the laws under the U.S. Constitution. *ODonnell v. Harris Cty.*, 892 F.3d 147, 163 (5th Cir. 2018). The Fifth Circuit's multiple opinions in that litigation provide important direction even though this proceeding concerns felony arrestees and it is unclear whether the Fifth Circuit's holdings apply in equal force to the pretrial felony arrestees the *Russell* plaintiffs want to represent. For the purposes of this opinion, the court proceeds as if they do.

The Fifth Circuit began with the procedural due process inquiry, which has two steps. "The first question asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Id.* at 157 (quoting *Meza v. Livingston*, 607 F.3d 392, 399 (5th Cir. 2010)). The Fifth Circuit explained that Texas law, including the Texas Constitution, "creates a right to bail that appropriately weighs the detainees' interest in pretrial release and the court's interest in securing the detainee's attendance."[3] *Id.* at 157–58. The Fifth Circuit held that bail decisions that serve as de facto detention orders on arrestees who cannot afford to pay "must reflect a careful weighing of the individualized factors set forth by both the state Code of Criminal

---

[3] The right has limited state constitutional exceptions. Bail may be denied in capital cases; when a felony arrestee has two previous felony convictions ("the second conviction being subsequent to the first"); when an arrestee is accused of a felony committed "while on bail for a prior felony for which he has been indicted"; when an arrestee with a previous felony conviction is charged with a felony involving the use of a deadly weapon; when an arrestee is "accused of a violent or sexual offense committed while under the supervision of a criminal justice agency . . . for a prior felony"; when an arrestee is accused of an offense—not only a felony—involving family violence and has had his bail "revoked or forfeited for a violation of a condition of release . . . related to the safety of a victim of the alleged offense or to the safety of the community"; and when an arrestee is charged with violating a protective order in a family violence case. TEX. CONST. art. I, §§ 11, 11a, 11b, 11c. All of these exceptions, aside from the capital-case exemption, require a hearing before bail may be denied. *Id.* The Fifth Circuit noted that the scope of the exceptions "has been carefully limited by state courts." *ODonnell*, 892 F.3d at 158 (citing *Ex parte Davis*, 574 S.W.2d 166, 169 (Tex. Crim. App. 1978)).

Procedure and Local Rules." *Id.* at 158.  These factors include the arrestee's ability to pay, the charge, victim and community safety, and the need to "give reasonable assurance" that the defendant will appear.  *Id.* at 153; TEX. CODE. CRIM. PROC. art 17.15.  As the Fifth Circuit put it, "magistrates may not impose a secured bail solely for the purpose of detaining the accused." *ODonnell*, 892 F.3d at 158.

The Fifth Circuit clarified that there is no "fundamental *substantive* due process right to be free from any form of wealth-based detention."  *Id.* at 163 (emphasis added); *ODonnell v. Goodhart*, 900 F.3d 220, 225 (5th Cir. 2018).  But the court held that "the *automatic* imposition of pretrial detention on indigent misdemeanor arrestees" violated federal due process and equal protection doctrine.  *Goodhart*, 900 F.3d at 224 (quoting *ODonnell*, 892 F.3d at 160, 163).  The proper remedy was individualized hearings in which impartial magistrates must "specifically enunciate their individualized, case-specific reasons" for imposing bail, including unaffordable bail.  *Id.* (quoting *ODonnell*, 892 F.3d at 160).  The Fifth Circuit also required notice of the hearing and "an opportunity to be heard and submit evidence within 48 hours of arrest."  *ODonnell*, 892 F.3d at 163.

On equal protection, the Fifth Circuit applied heightened scrutiny to the treatment of misdemeanor arrestees in *ODonnell* because "the inability to afford bail was coupled with the lack of meaningful considerations of alternatives."  *Goodhart*, 900 F.3d at 226–27.  The Fifth Circuit held that rational-basis review applies when indigent arrestees claim simply that they are detained longer than wealthier arrestees.  *Id.* at 226–28.  Even under this deferential standard, the court stated that the consequences of prolonged pretrial detention—an increased likelihood of pleading guilty, receiving a longer sentence, and suffering the ruinous social consequences of incarceration—cannot be imposed on misdemeanor arrestees simply because they are too poor to

pay bail.  *Id.* at 227–28.  The Fifth Circuit held that consequences are "critical" to the constitutional analysis of whether indigent arrestees may be held for longer than wealthier detainees before a bail hearing.  *Id.*  The court ruled that it was permissible to hold indigent misdemeanor arrestees for 48 hours before their individualized bail hearings because arrestees detained for that amount of time "do not face the same dire prospects of 'bear[ing] the brunt' of a lengthy pretrial incarceration caused by an unconstitutional bail system."  *Id.* at 228.  An individualized hearing after 48 hours was "sufficient to cure the automatic imposition of bail."  *Id.*

This court also looks to the guidance from the Fifth Circuit in *In re Abbott*, No. 20-50264, 2020 WL 1685929, at *6 (5th Cir. Apr. 7, 2020), which directs courts to defer to state actions taken in times of emergency, even if they infringe on individual constitutional rights.  The Fifth Circuit affirmed the standard laid out in *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 31 (1905), which provides that judicial review is only available:

> if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law.

*Id.* at *6.

The court recognizes that the plaintiffs' March 27 motion for a temporary restraining order does not involve a statute, order, or other decision that was enacted to combat the COVID-19 crisis, and therefore *Jacobson* is not clearly implicated.  But the court takes note of the deference required to state and local actors in the face of the crisis, and examines the Harris County stakeholders' responses to the crisis with that in mind.

## V.   Putting It Together, For Now

The plaintiffs argued that in light of COVID-19, they and other poor pretrial felony arrestees are denied an adequate opportunity to challenge their potentially unconstitutional wealth-

based detentions, but the current record evidence is not enough to support granting either of the temporary restraining orders they seek.  Yes, there have been delays between when an arrestee: (1) is denied release on a personal bond; (2) then is denied release in an informal hearing with a hearing officer that the district judges have stated, and the plaintiffs have acknowledged, are provided within a few days after arrest; and when the arrestee (3) actually has a formal individualized hearing after counsel requests one.[4]  Yet despite the numbers of people involved, and the impact of the virus and stay-at-home orders on the bar, the bench, the District Attorney and Public Defender's Offices, the Sheriff's Office, and Harris County, new processes to consider eligible arrestees for expedited release have been hammered out, put in place, and are slowly but surely being implemented.

The district judges are working hard under post-Hurricane Harvey courtroom space constraints that predated, but are made much worse by, the pandemic.  This court cannot safely order judges to have more hearings with more in-person participants than social distancing limits permit.  The judges are also operating under constraints of resources and personnel made much worse by the pandemic.  They are working on getting the technology—much of which is available—in place to hold remote hearings, and ensure that the judges and others are trained in its use.  This court cannot devise relief that would fairly and safely result in more technology being put into place faster for more judges, or for them to become adept in using it on a specific schedule. The record shows that all stakeholders are working to have the necessary formal, individualized evidentiary hearings on releasing pretrial arrestees on personal bonds to take place within days after defense counsel requests them, in an adequate and safe manner, in keeping with the County's emergency operations order and the risks of the COVID-19 pandemic.

---

[4] A lawyer is appointed approximately one business day after an indigent arrestee requests counsel. (Docket Entry No. 72 at 2).

According to Judge Ritchie's April 9, 2020, letter, "[i]n the Harris County State District Courts, hearings can be set generally within days of request, *even under the current conditions*, depending on the complexity of coordinating witnesses, the availability of courtroom space, and the ability to comply with public health measures to avoid spreading COVID-19."  (Docket Entry No. 95 at 5 (emphasis added)).

The court does not find that the record disproves the plaintiffs' claims, but rather that the sparse, conflicting accounts do not support awarding the extraordinary relief the plaintiffs seek.  To prevail, the plaintiffs must satisfy all four temporary-restraining-order factors: a substantial likelihood of success on the merits, irreparable harm, the balance of equities, and the public interest.  *Fisher*, 823 F.3d at 809.  The court assumes, but does not decide, that the plaintiffs have shown a substantial likelihood of success on the merits of the claim that, in the circumstances of the pandemic and with the added risks of detention that result, the delay in getting formal individualized hearings for indigent arrestees—a delay that those able to post bond can avoid—is unconstitutional.  It is undisputed that arrestees who must wait in jail for a bail hearing for as long as the plaintiffs allege face irreparable harm from contracting the coronavirus.  But the court less easily assumes that the plaintiffs have met their burden of showing that the relief sought is in the public interest.  Granting temporary relief and allowing the alleged lengthy detention both present risks.  There is the threat of releasing on a personal bond those who should not be released because of risks such as not only failure to appear, but also of new offenses.  On the other hand, there is the risk that if they are detained in tight jail conditions, they may have a greater likelihood of being infected or infecting others, as well as the risks of the collateral consequences of prolonged wealth-based detention (*e.g.*, job loss and an increased sentence) and constitutional violations.

The court cannot find that the present record, sparse and fast-changing as it is, meets the plaintiffs' burden to show that it is in the public interest to grant the relief sought, or that denying it will disserve the public interest.  This is particularly true because it is not clear that local officials could implement any remedy more effective than the current processes they are trying to execute and improve.  A temporary restraining order backed by the threat of contempt might even create confusion and fear that would disrupt current efforts and make matters worse.  These concerns apply not only to the public interest factor, but also to the balance of equities.  Both factors weigh against granting a temporary restraining order.

The recent support for releasing pretrial felony arrestees accused of nonviolent offenses in Harris County supports the court's conclusion.   In the few weeks since the plaintiffs first moved for a temporary restraining order, the County stakeholders have devised and executed a process to ensure that those who might safely be released on personal bonds are identified for the District Attorney to review.  Those whose release the District Attorney does not oppose (or initially opposed but then agrees to) are slated for release and are being released, although it needs to be faster.  This process has resulted in 372 releases as of April 13.  (Docket Entry No. 115 at 2). Those whose release is opposed can request a formal evidentiary hearing before a Harris County district judge for an individualized bail determination.  The judges are working hard to provide this formal hearing quickly.  They have informed the court that these hearings will proceed, even during the current state of emergency.  The court cannot find on this record that in this time of crisis, federal-court intervention in fraught and rapidly evolving County affairs is required, safe,

or would at this time materially improve the processes under way.[5]  *C.f. In re Abbott*, 2020 WL 1685929, at *1 (citing *Jacobson*, 197 U.S. at 29).

The court denies the plaintiffs' March 27 motion, without prejudice.  The plaintiffs may reurge their claims if the laudable efforts local officials are making to expedite formal individualized bail hearings and safe releases on personal bonds fail.  The plaintiffs may also move to lift the stay and proceed with class certification and a motion for a preliminary injunction, which may be granted if they can prove their entitlement to relief on a fuller record.

## VI.    The April 1, 2020, Motion for a Temporary Restraining Order

Nor have the plaintiffs shown a sufficient likelihood of success on the merits of their challenge to the Governor's Executive Order GA-13.  A key issue is abstention.  "[U]nder the *Pullman* doctrine, a federal court should abstain from exercising its jurisdiction 'when difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided.'"  *Nationwide Mut. Ins. Co. v. Unauthorized Prac. of Law Comm.*, 283 F.3d 650, 652 (5th Cir. 2002) (quoting *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 236 (1984)).  *Pullman* abstention is appropriate when a case involves "(1) a federal constitutional challenge to state action and (2) an unclear issue of state law that, if resolved, would make it unnecessary for [the court] to rule on the federal constitutional question."  *Id.* at 653.  "To satisfy the second prong, there must be an uncertain issue of state law that is 'fairly susceptible' to an interpretation that would render it unnecessary for [the court] to decide the federal constitutional questions in a case."  *Id.* (citing *Baran v. Port of Beaumont Navigation Dist.*, 57 F.3d 436, 442

---

[5] Another part of the plaintiffs' requested relief is problematic.  The plaintiffs request that the court define "violent offense."  (Docket Entry No. 75-1 at 2; Docket Entry No. 96 at 5).  But federal courts have struggled for years to determine which state offenses are "violent."  *See Johnson v. United States*, 135 S. Ct. 2551, 2555–56 (2015) (collecting cases applying the definition of "violent felony" under the Armed Career Criminal Act, 18 U.S.C. § 924(e)(2)(B)).  A quick and temporary fix is not the appropriate answer here.

n.29 (5th Cir. 1995)).  Finally, in addition to those factors, "the district court must assess the totality of the circumstances presented by a particular case, considering the rights at stake and the costs of delay pending state court adjudication." *Baran*, 57 F.3d at 442.

The court finds that *Pullman* abstention is appropriate.  To begin, there is a pending state-court lawsuit challenging the Executive Order that raises questions about novel, uncertain issues of state law.  *See Tex. Crim. Def. Laws. Ass'n v. Abbott*, No. GN-20-002034, 459th District Court of Travis County, Texas (Apr. 8, 2020), complaint available at https://www.aclutx.org/sites/default/files/eo_petition_2020.4.8._comms.pdf).    The state-court plaintiffs include the Harris County misdemeanor court judges and several civil rights and criminal defense organizations.  They argue that the Executive Order exceeds the Governor's authority under the Texas Constitution and the Texas Disaster Act of 1975. *Id.* at ¶¶ 34–35.  The complaint notes that the case appears to be one of first impression because, "[u]ntil now, no Texas Governor has invoked the Disaster Act to purport to suspend provisions of the Code of Criminal Procedure." *Id.* at ¶ 48.  For their part, the State intervenors emphasize that "Texas courts have yet to interpret the [Governor's] order's scope." (Docket Entry No. 67 at 21).

On April 10, 2020, the judge in the state-court case temporarily enjoined the enforcement of the Executive Order, though the Texas Supreme Court stayed that decision the following day. (Docket Entry Nos. 112–13).  The state litigation may make it unnecessary for this court to rule on whether the Executive Order violates the U.S. Constitution.

The state case will also illuminate the federal constitutional inquiry because the Fifth Circuit's analysis of indigent arrestees' due process rights in the bail context turns on a state-created liberty interest, which the Executive Order purports to limit. *ODonnell*, 892 F.3d at 157–58; (Docket Entry No. 67 at 21); *see Harris Cty. Comm'rs Ct. v. Moore*, 420 U.S. 77, 84 (1975)

26

("Among the cases that call most insistently for abstention are those in which the federal constitutional challenge turns on a state statute, the meaning of which is unclear under state law. If the state courts would be likely to construe the statute in a fashion that would avoid the need for a federal constitutional ruling or otherwise significantly modify the federal claim, the argument for abstention is strong.").  The Fifth Circuit in *ODonnell* focused on the right to bail on "sufficient sureties" under Texas law rather than "a fundamental substantive due process right to be free from any form of wealth-based detention," which "is [not] in view."  *ODonnell*, 892 F.3d at 158, 163.  Because "[d]ue process and equal protection principles converge" in cases involving "the treatment of indigents in our criminal justice system," *Bearden v. Georgia*, 461 U.S. 660, 664–65 (1983), the state court's resolution of the state law issues may also impact the federal equal protection analysis.  The extent to which relevant Fifth Circuit precedent focuses on Texas law supports abstention until Texas courts have resolved whether the Executive Order validly limited the state liberty interest during the pandemic.

The plaintiffs in this case respond that this court need not abstain because the Executive Order's violation of federal rights is clear no matter how the state litigation turns out.  (Docket Entry No. 88 at 10–11 n.5).  This contention does not refute that the relevant state law is uncertain and will impact any argument in this court.

A better argument against abstention may be that "the costs of delay pending state court adjudication" are intolerable given the risk that, as the plaintiffs argue, the Executive Order violates federal rights, threatens indigent arrestees' lives, and jeopardizes efforts to prevent COVID-19 from engulfing the Harris County Jail and spreading throughout the Houston region.  *See Baran*, 57 F.3d at 442.  The court takes this concern seriously, and recognizes the critical constitutional, health, and public safety interests the plaintiffs invoke as reasons for swift federal action.

27

But delicate considerations of federalism and separation of powers support abstention in this complex, rapidly evolving situation.  The Executive Order is not permanent.  This dispute involves a dizzying array of government actors with different interests, policies, and legal positions.  This court is in the middle of, as Sheriff Gonzalez puts it, "turf wars"[6] between the State of Texas, America's third-largest county, the County Sheriff, the District Attorney, the Chief Public Defender, state felony judges, and the state-court plaintiffs, including the Harris County misdemeanor judges, who are challenging the same Executive Order that the plaintiffs in this case seek to enjoin.  Because the state courts are well positioned to provide expedited review of the Executive Order, this court should, and will, stay out of the fray for now.

Moreover, on the current, limited record, in the emergency circumstances presented, it is best to leave sensitive policy and political decisions on crafting procedures to accomplish the shared goal of safely reducing the Jail population to elected and appointed officials.  "Turf wars" allow different interests and views to be heard and addressed on the ground, by those who must actually implement the policies and procedures.  The court does not want to disrupt the laudable existing efforts to address the crisis.  Disrupting a process that strives to recognize the different interests and concerns is an added risk of intruding with a temporary restraining order that is backed by the threat of contempt.

The County's current response is consistent with the Executive Order, respecting the Executive Order's limitation on which pretrial felony arrestees are eligible for release on a personal bond absent a health or medical reason.

---

[6] (Docket Entry No. 65 at 3).

VII.    **Conclusion**

This case is far from easy.  There are risks no matter what this court decides.  Institutions charged with safeguarding the public and upholding the Constitution have an extraordinary and difficult task, made more difficult and more consequential during this pandemic.  Mindful of the sparse record and of this court's own limited authority, the court has done its best to balance the constitutional and public safety interests at stake.

The court has not addressed, much less foreclosed, the substantive issues on the merits. Those remain open to be decided on a motion for a preliminary injunction.  And, as noted, the court is not foreclosing any party or interested nonparty from raising additional issues or substantially different facts that this pandemic continues to produce.  But for now, the plaintiffs' temporary restraining order motions, (Docket Entry Nos. 32, 53, 75), are denied without prejudice.

On **Tuesdays** and **Fridays** by **5:00 p.m.**, starting April 17, 2020,  the parties and interested nonparties must continue to provide the court with information on: (1) the number of pretrial felony arrestees unable to pay a secured bond who have been released on a personal bond with no remaining disputes preventing that release; (2) the number who remain in pretrial custody because they are unable to pay a secured bond and whose release on a personal bond is challenged by the District Attorney; (3) the population of felony pretrial arrestees in the Harris County Jail; (4) the length of delays before individualized formal bail hearings after such hearings are requested; and (5) the number of arrestees and workers in the Jail who have positive COVID-19 test results and the number with pending test results.

SIGNED on April 14, 2020, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge

29