IN THE ~~UNITED STATES DISTRICT COURT~~UNITED STATES DISTRICT COURT
~~FOR THE~~FOR THE SOUTHERN DISTRICT OF TEXAS
. HOUSTON DIVISION

| | |
|---|---|
| DWIGHT RUSSELL,<br>JOHNNIE PIERSON,<br>JOSEPH ORTUNO,<br>CHRISTOPHER CLACK,<br>MAURICE WILSON | ) ) ) ) ) ) |
| On behalf of themselves and all<br>others similarly situated, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| HARRIS COUNTY, TEXAS, | ) ) |
| SHERIFF ED GONZALEZ, | ) ) ) |
| Defendants. | ) ) |

Case No. 4:19-cv-00226
(Class Action)
The Honorable Lee H. Rosenthal
U.S. District Judge

~~Case No. _____~~
~~(Class Action)~~

## FIRST AMENDED CLASS ACTION COMPLAINT

### I.   Introduction

1.     This case is about Harris County's jailing some of its poorest people, charged with felonies, because they cannot afford to make a monetary payment.

2.     Harris County previously used access to cash to make release-and-detention decisions in the County's misdemeanor bail system. In 2016, certain of undersigned counsel filed a lawsuit against the County, the Sheriff, the misdemeanor judges (who were added later), and the Hearing Officers. Following a nearly two-week evidentiary hearing in March 2017, the Court struck down Harris County's misdemeanor bail policies, finding that the policies violated Equal Protection and Due Process, coerced guilty pleas, and disproportionately affected people of color.

The Court issued a preliminary injunction that led to the release of more than 13,000 people who otherwise would have been illegally detained.

3.      In 2018, a slate of candidates ran for election to the misdemeanor courts on a platform acknowledging the devastating consequences of the County's decades-long policy of detaining poor misdemeanor arrestees after arrest for days and weeks, and promising to work with the Plaintiffs' counsel and other stakeholders to reform the system and end the misdemeanor lawsuit. All of the candidates won; all of the incumbent judges who had resisted the lawsuit were removed by the voters.  On January 17, 2019, after the newly elected judges took office, all of the misdemeanor judges promulgated a new rule that will dramatically change the misdemeanor bail system. It was the result of intensive conversations with class counsel, the District Attorney, the Sheriff and his command staff, and the Public Defender. The rule requires the initial release decision in misdemeanor cases to be made on the basis of the offense charged. Most arrestees—approximately 85%—will automatically qualify for release on unsecured bonds (requiring a payment only if the person willfully misses court and the bond is subsequently forfeited). Only people arrested for a few select offenses will be required to appear before a judge within 48 hours, at which time they may also qualify for release on unsecured bonds or with other appropriate conditions tailored to a specific, identified risk. This rule will give effect to the Supreme Court's requirement that detention prior to trial must be the "carefully limited exception," and will reverse the years-long practice of detaining 40% of misdemeanor arrestees throughout the duration of their cases.

4.      Reforms to Harris County's misdemeanor pretrial detention system came after numerous county officials spoke out against the system's unequal treatment of people who are

poor. Sheriff Ed Gonzalez, though a necessary defendant in the misdemeanor case and in this one, has stated:

> The County's widespread detention of arrestees because they are too poor to pay arbitrary amounts of money is a waste of public resources and actually undermines public safety . . . . I believe that the current operation of the money bail system, including the Sheriff's active participation in that system, violates the United States Constitution . . . . A person's access to money should not be a determining factor in whether he or she is jailed or released after arrest and pending trial.[1]

District Attorney Kim Ogg, who is not a defendant in either case but has been a strong voice for reform of the County's misdemeanor bail policies, has stated:

> It is our position that bail reform is necessary and long overdue. Holding un-adjudicated misdemeanor offenders in the Harris County Jail solely because they lack the money or other means of posting bail is counterproductive to the goal of seeing that justice is done. We do not want to be complicit in a system that incentivizes presumptively innocent people to plead guilty merely to expedite their release from custody. We do not want to administer punishment before the defendant has been adjudicated. It makes no sense to spend public funds to house misdemeanor offenders in a high-security penal facility when the crimes themselves may not merit jail time. These secure beds and expensive resources should be prioritized for the truly dangerous offenders and "flight risks" who need to be separated from the community.[2]

5. For people charged with felonies, however, the practice of conditioning release on access to money persists: arrestees charged with felonies are released from custody almost immediately if they can make a predetermined payment of money to the County while arrestees

---

[1] Meagan Flynn, *Incoming Sheriff Ed Gonzalez Declares Bail System Unconstitutional*, Houston Press (Nov. 29, 2016), https://www.houstonpress.com/news/incoming-sheriff-ed-gonzalez-declares-bail-system-unconstitutional-8984569; *see also* Michael Hardy, *In Fight Over Bail's Fairness, Sheriff Joins the Critics,* New York Times (Mar. 9, 2017), https://www.nytimes.com/2017/03/09/us/houston-bail-reform-sheriff-gonzalez.html?module=inline (quoting Sheriff Gonzalez saying "When most of the people in my jail are there because they can't afford to bond out, and when those people are disproportionately [B]lack and Hispanic, that's not a rational system."); Cameron Langford, *Texas Sheriff Among Critics of His Own Bail System*, Courthouse News (Mar. 9, 2017), https://www.courthousenews.com/texas-sheriff-among-critics-bail-system/ (quoting Sheriff Gonzalez's testimony in federal court, in which he stated, "When we look at equal protection, in my opinion it should be equal protection for everyone, but statistically speaking it doesn't bear that out. When I see that many of the people inside the jail, on any given day an average of 9,000, are just poor and can't bond out, and I look at racial disparities, disproportionally communities of color, then that's very concerning to me.").

[2] Position Statement of District Attorney Kim Ogg About Bail Bond Litigation Pending in the United States District Court, Case No. 4:16-cv-1414, ECF 206 (Mar. 3, 2017).

who are too poor to purchase their liberty remain in jail solely because of their poverty. As a result of these policies and practices, more than half of the people arrested for felony offenses remain detained for the entire duration of their case until its disposition.[3] Many of the lowest level arrestees are then released on the day of conviction.

6.      The felony bail system in Harris County raises the same legal issues as the misdemeanor system, has the same devastating consequences for impoverished arrestees, is similarly coercive of guilty pleas, and is even more costly to the system, in part, because felony arrestees constitute approximately 77% of the jail population on any given day. The felony system demands analogous reforms: ending the use of the secured bail schedule to make the initial release decision and ensuring that anyone detained prior to trial is afforded the substantive findings and procedural protections the Constitution requires to protect against an erroneous deprivation of the right to bodily liberty—the most important right protected by the Constitution, other than the right to life itself.

7.      Approximately twelve percent of the felony pretrial population in the Harris County Jail consists of people whose most serious charge is a "state jail" felony. State jail felonies are the least serious class of felony charges in the Texas criminal legal system. They consist mostly of non-violent offenses and, in many instances, they are simply misdemeanor offenses enhanced by prior misdemeanor convictions.

8.      Almost 70% of all felony arrestees are charged with non-violent offenses.[4] The most common charge for all felony arrestees is drug possession, which is the most serious charge

---

[3]      Harris      County      Pretrial      Services,      2017      Annual      Report      16      (2017), https://pretrial.harriscountytx.gov/Library/2017%20Annual%20Report.pdf (showing that non-violent felony arrests account for 68.9% of all felony arrests).

[4] Harris County Pretrial Services, *supra* note 3, at 21.

for 26.8% of felony arrestees.[5] Only 8.6% of all felony arrestees are released on an unsecured bond.[6] Money bail is required as a condition of release for the overwhelming majority of felony arrestees, meaning that these arrestees are eligible for release, but will be released only if they can make an up-front monetary payment. Those who are too poor to pay must stay in jail cells.

9.      This mass detention caused by arrestees' inability to access money has devastating consequences for arrested individuals, for their families, and for the community. Pretrial detention of presumptively innocent individuals causes them to lose their jobs and shelter, interrupts vital medication cycles, worsens mental health conditions, makes people working to remain sober more likely to relapse, and separates parents and children. It exposes people to dangerous overcrowding, violence, and infectious disease at the jail. It coerces guilty pleas and results in longer sentences. In part because arrest and detention for any period of time destabilizes a person's life, even a couple of days in pretrial detention makes a person more likely to commit crimes in the future. It also costs Harris County tens of millions of dollars every year—money that could be invested in systems that provide support to people suffering from addiction, housing instability, mental health issues, and poverty, instead of a system that research shows actually exacerbates those conditions.

10.     Between 2009 and the present, 125 people died in the Harris County Jail awaiting trial,[7] including a woman this month who committed suicide while being detained due to her inability to pay $3,000 money bail. She was granted a personal bond an hour after she was found hanging.[8]

---

[5] *Id.*

[6] *Id.* at 17.

[7] Attorney General of Texas, *Custodial Death Report*, https://oagtx.force.com/cdr/cdrreportdeaths, last accessed Jan. 21, 2019.

[8] Keri Blakinger, *Harris County jail inmate dies by suicide days after misdemeanor arrest*, Houston Chron. (Jan. 16, 2019) https://www.chron.com/news/houston-texas/article/Harris-County-jail-inmate-dies-by-suicide-days-

11.     Named Plaintiffs ~~Dwight Russell, Johnnie Pierson, and Joseph Ortuno~~<u>Christopher Clack and Maurice Wilson</u> are currently being detained in the Harris County Jail because they cannot afford the monetary payment required for their release. Mr. ~~Russell~~<u>Clack</u> is required to pay <u>$17,500 to be released.  And Mr. Wilson is required to pay $10,000 to be released. Dwight Russell, Johnnie Pierson, and Joseph Ortuno were detained when the initial Complaint was filed on January 21, 2019.[9] Mr. Russell was required to pay </u>a $25,000 secured bail amount to be released. Mr. Pierson ~~is~~<u>was</u> required to pay $15,000 to be released. ~~And~~Mr. Ortuno ~~is~~<u>was</u> required to pay $30,000 to be released. Because of their poverty, each of the Plaintiffs is <u>(or was)</u> confined to a Harris County jail cell. In none of their cases did a judicial officer make any finding concerning ability to pay, the availability of alternative non-financial conditions of release, or the need to detain them to serve any government interest. Moreover, none of the Plaintiffs was afforded the procedural safeguards required to ensure the accuracy of any decision to detain them pretrial.

12.     On behalf of the many other arrestees subjected to Harris County's unlawful and ongoing post-arrest wealth-based detention scheme, the Plaintiffs challenge in this action the use of secured money bail to detain only the most impoverished felony arrestees. Harris County's wealth-based felony pretrial detention system violates the Equal Protection and Due Process Clauses of the United States Constitution.

13.     By and through their attorneys and on behalf of themselves and all others similarly situated, Plaintiffs seek an injunction against Defendants' wealth-based post-arrest policies and practices and a declaration that Defendants cannot employ a system of pretrial detention based solely on access to money by imposing and enforcing secured financial conditions of pretrial

---

13538819.php~~?hchronfb&fbclid=IwAR00Vn77-~~
~~P8IM5CQ1jUjqPkLSPOrnGNBxOzFrNQjAR6SzMqYqFbK3EnSfa8&utm_campaign=CMS%20Sharing%20Tools~~
~~%20(Desktop)&utm_source=share-by-email&utm_medium=email.~~.

[9] <u>Each of the original named Plaintiffs was subsequently released after the lawsuit was filed.</u>

release without factual findings on the record, after adequate procedural safeguards to ensure the accuracy of the findings, either (1) that the person can afford to pay the amount required for release or (2) that, although the person cannot afford it and will be detained, pretrial detention is necessary because every less-restrictive alternative condition is inadequate to meet a specific, compelling government interest in court appearance or community safety.

## II.    Related Litigation

14.     In accordance with Local Rule 5.2, Plaintiffs advise the Court of related litigation that is currently pending: *ODonnell v. Harris County*, Case No. 4:16-cv-1414 (S.D. Tex. 2016), in the United States District Court for the Southern District of Texas, Houston Division.  *ODonnell* raises the same legal claims and challenges materially identical bail policies and practices as applied to people arrested for misdemeanor offenses. This lawsuit is a companion case to *ODonnell*; the claims pled here could have been added to *ODonnell* itself by way of an amended Complaint.

## III.    Nature of the Action[10]

15.     It is the policy and practice of Defendants to detain all felony arrestees who are eligible for release unless they pay a monetary sum. The amount of money required is initially determined by a generic schedule and is subsequently set by Hearing Officers at arrestees' probable cause hearings, during which the Hearing Officers fail to make the findings required by the Constitution, and the County fails to provide the procedural protections required to ensure the accuracy of any decision that results in a person's pretrial detention. It is the policy and practice of the Harris County Sheriff to require these payments as a condition of release without a judicial

---

[10] Plaintiffs make the allegations in this Complaint based on personal knowledge as to matters in which they have had personal involvement and on information and belief as to all other matters.

officer having made a finding either that the person can afford to pay the amount or that detention is necessary to serve any government interest. This practice results in the systemic detention of those arrestees who are too poor to pay.  Plaintiffs seek declaratory and injunctive relief prohibiting Defendants' post-arrest detention scheme based on access to money.

## Jurisdiction and Venue

16.     This is a civil rights action arising under 42 U.S.C. § 1983 and 28 U.S.C. § 2201, *et seq*., and the Fourteenth Amendment to the United States Constitution. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

17.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

## Parties

18.    Dwight Russell is a 61-year-old man who has lived in Houston his entire life. He represents himself as an individual and a Class of similarly situated people subjected to Defendants' wealth-based post-arrest detention practices.

19.    Johnnie Pierson is a 51-year-old man who has lived in Houston his entire life. He represents himself as an individual and a Class of similarly situated people subject to Defendants' wealth-based post-arrest detention practices.

20.     Joseph ~~Oturno~~Ortuno is an 18-year-old teenager who has lived in Houston his entire life. He represents himself as an individual and a Class of similarly situated people subject to Defendants' wealth-based post-arrest detention practices.

21.     Christopher Clack is a 46-year-old man who lives in Houston. He represents himself as an individual and a Class of similarly situated people subject to Defendants' wealth-based post-arrest detention practices.

20.22.  Maurice Wilson is 36-year-old man who lives in Houston. He represents himself as an individual and a Class of similarly situated people subject to Defendants' wealth-based post-arrest detention practices.

21.23.  Defendant Harris County is a municipal corporation organized under the laws of the State of Texas. The County, through the judges who are its final policymakers for promulgating bail procedures, makes policy decisions about which arrestees are eligible for release on non-financial conditions. The County, through the judges, also makes policy decisions about the content of the findings that are required to justify pretrial detention and about the procedural safeguards to provide for arrestees, including: whether and when to provide adversarial hearings and counsel; whether to provide notice, an opportunity to be heard, and an opportunity to present and confront evidence; and whether to make findings on the record. The County's policies and practices result in systemic wealth-based pretrial detention of Harris County felony arrestees without the substantive findings or procedural safeguards required by the United States Constitution.

22.24.  The Harris County Sheriff is the chief law enforcement officer for Harris County and operates the Harris County Jail, the forthcoming Joint Processing Center, and several other detention facilities.  He is responsible under state law for enforcing pretrial bail orders and directives issued by judges or promulgated by local rule. State law also obligates the Sheriff to ensure the lawfulness of any order resulting in a person's detention in the Harris County Jail and requires him to not enforce orders he knows to be illegal.

23.25.  The Sheriff's Office is itself responsible for about 19% of felony arrests within Harris County. The Sheriff's Office also transports arrestees from field stations run by various other authorities with arresting power to the Harris County Jail, which houses all people to be

detained pending prosecution within the Harris County courts. The Sheriff's Office detains arrestees at the Harris County Jail and several other facilities. The officers and employees of the Sheriff's Office are authorized by County policy to accept money bail, as determined by the money bail schedule or by a judicial officer, and release arrestees.





Bonding office in the Joint Processing Center, which the County expects will open on February 1, 2019, subject to further delays.

24.26.  After arrest, Sheriff's Office employees and agents bring arrestees detained because they cannot pay money bail to a room inside the jail for probable cause hearings and bail setting. Sheriff's Office employees supervise and monitor the arrestees during the hearing. The Sheriff has

knowledge that Hearing Officers require secured financial conditions of release without findings concerning a person's ability to pay the amount set and without any findings concerning alternatives to pretrial detention.

25.27.  The Sheriff, who operates the jail, is aware of who is in the jail and the basis for each person's detention, including whether any person is eligible for pretrial release, and the amount of money bail any person is required to pay for immediate release. The Sheriff therefore has knowledge that the imposition of secured money bail results in systemic, wealth-based detention, and that there are thousands of people in the jail every night who would be released but for their inability to pay a money bail amount imposed without any finding that pretrial detention is necessary and without the basic procedural safeguards necessary to ensure the accuracy of such a finding.

26.28.  The Sheriff's Office, by policy and practice, detains arrestees too poor to afford the money bail amounts that are imposed without findings concerning ability to pay or the need for detention, and releases arrestees who pay their money bail.

27.29.  The Sheriff is sued in his official capacity because he is the final policymaker for all law enforcement decisions in Harris County. To the extent the Sheriff is not a County policymaker for the conduct challenged in this Complaint, the Sheriff is sued in his official capacity as an enforcement actor for purposes of injunctive relief and can be enjoined in his capacity as an enforcement actor, regardless of whether he acts on behalf of the County or the State of Texas when he enforces bail directives.[11]

## Factual Background

---

[11] Defendant Ed Gonzalez is named separately from the County as a defendant in the event that the Court concludes that he acts on behalf of the State in any capacity, and thus is subject to prospective relief only in that capacity. If the Court, however, determines that he is a final policymaker for the County, naming him individually is redundant of a suit against the County.

A.   **The Named Plaintiffs Are Being Kept in Jail Because They Cannot Afford the Money Bail Required for Their Release, Even Though the Government Has Not Made a Substantive Finding that Detention is Necessary**

~~28.~~30.   Dwight Russell is a 61-year-old man. Ex. 1 (Declaration of Dwight Russell) ¶ 1.

~~29.~~31.   Mr. Russell was arrested on January 19, 2019 and taken into the custody of Harris County for allegedly driving while intoxicated, third offense. He was informed that, because of the Harris County bail schedule, he would be released immediately, but only if he paid a money bail amount of $25,000. He was told that he will be detained by Harris County if he does not pay. *See Id.* ¶¶ 3, 4.

~~30.~~32.   Mr. Russell appeared while in custody at the jail at a probable cause hearing, and a Hearing Officer found probable cause for his arrest. Pursuant to the policies and practices described in this Complaint, no findings were made concerning his ability to pay or the need to detain him in light of available, less-restrictive alternative conditions of release. *Id.* ¶¶ 5, 6. Nor was he afforded the procedural protections required, including an adversarial hearing with an opportunity to present evidence and on-the-record findings by clear and convincing evidence.

~~31.~~33.   The predetermined money bail amount required by the Harris County bail schedule was confirmed to be $25,000. *Id.* ¶ 4.

~~32.~~34.   Mr. Russell struggles to meet the basic necessities of life. His only income is from food stamps. He is unemployed and has no savings. He lives with his sister, who provides him with financial support. *Id.* ¶ 7.

~~33.~~35.   He cannot afford to purchase his release from jail. *Id.* ¶ 4.

~~34.~~36.   Johnnie Pierson is a 51-year-old man. Ex. 2 (Declaration of Johnnie Pierson) ¶ 1.

35.37.  Mr. Pierson was arrested on January 18, 2019, for possession of less than one gram of a Penalty Group 1 controlled substance, a state jail felony offense. He was taken to the Houston city jail and then to the Harris County jail. *Id.* ¶ 3.

36.38.  At the jail, deputies took him to see a Hearing Officer, who told Mr. Pierson that he could be released, but only if he paid $15,000. He was told that, if he does not pay the money, he will be kept in a jail cell. *Id.* ¶ 4.

37.39.  Pursuant to the policies and practices described in this Complaint, no findings were made concerning his ability to pay or the need to detain him in light of available, less-restrictive alternative conditions of release. *Id.* ¶ 7. Nor was he afforded the procedural protections required, including an adversarial hearing with an opportunity to present evidence and on-the-record findings by clear and convincing evidence.

38.40.  Mr. Pierson struggles to meet the basic necessities of life. He survives on food stamps and works part-time on cars when he can. He does not have any other income. *Id.* ¶ 10.

39.41.  He cannot afford to purchase his release from jail. *Id.* ¶ 13.

40.42.  Joseph Ortuno is an 18-year-old teenager who is in high school. Ex. 3 (Declaration of Joseph Ortuno) ¶¶ 1, 6.

41.43.  He was arrested on January 17, 2019, for possession with intent to deliver a controlled substance. He was taken first to the Houston city jail and then to the Harris County jail. *Id.* ¶ 3.

42.44.  At the jail, deputies took him to see a Hearing Officer, who told Mr. Ortuno that he could be released, but only if he paid $30,000. He was told that, if he does not pay the money, he will be kept in a jail cell. *Id.* ¶ 4.

43.45.  Pursuant to the policies and practices described in this Complaint, no findings were ever made concerning his ability to pay or the need to detain him in light of available, less-restrictive alternative conditions of release. *See Id.* ¶ 5. Nor was he afforded the procedural protections required, including an adversarial hearing with an opportunity to present evidence and on-the-record findings by clear and convincing evidence.

44.46.  Mr. Ortuno struggles to meet the basic necessities of life. When not in school, he makes money by helping his uncle with tile installation, but he cannot afford to purchase his release from jail. *Id.* ¶¶ 4, 7, 12.

47.     Christopher Clack is 46 years old.

48.     Mr. Clack was arrested on January 17, 2020 for two felony offenses, and taken to the Harris County Jail.

49.     At the jail, deputies took him to see a Hearing Officer, who told Mr. Clack that he could be released, but only if he paid $17,500. He was told that, if he does not pay the money, he would be kept in a jail cell.

50.     Mr. Clack struggles to meet the basic necessities of life.  Prior to being detained, Mr. Clack typically earned about $200–$400 per week as an independent contractor.  He does not have any financial support outside of the income he used to earn by working. He does not have a bank account.

51.     He cannot afford to purchase his release from jail.

52.     Pursuant to the policies and practices described in this Complaint, no findings were made concerning his ability to pay or the need to detain him in light of available, less-restrictive alternative conditions of release. Nor was he afforded the procedural protections required,

including an adversarial hearing with an opportunity to present evidence and on-the-record findings by clear and convincing evidence.

53.     Although court records show that Mr. Clack had settings on January 21 and March 12, 2020, he was transported to court from the jail only on March 12, and he was kept in lock-up during the hearing. There was no review of his bail conditions, and the judge did not make a finding that his continued detention was necessary. His next court appearance is scheduled for July 16.

54.     Mr. Clack learned on May 4, 2020, that a few weeks ago, his lawyer called the judge in his case to ask for a bond reduction. Mr. Clack was not present for the call. The judge refused to reduce the bond amount, but the reasons were never explained to him.

55.     Mr. Clack fears for his health and life because of an outbreak of COVID-19 in the Harris County Jail.

56.     Mr. Clack is ineligible for release on a personal bond pursuant to GA-13.

57.     Maurice Wilson is 36 years old.

58.     He was arrested on January 30, 2020 for drug possession, and taken to the Harris County Jail.

59.     At the jail, deputies took him to see a Hearing Officer, who told Mr. Wilson that he could be released, but only if he paid $15,000. He was told that, if he does not pay the money, he will be kept in a jail cell.

60.     Although court records show that Mr. Wilson had court settings on February 3, February 12, April 6, April 13, and May 4, he was transported to court from the jail only on February 12, and he was kept in lock-up during that proceeding and did not see the judge. On February 12, 2020, the judge lowered Mr. Wilson's bond from $15,000 to $10,000, but Mr. Wilson

still could not afford the sum. There was no on-the-record bail hearing, and the judge did not make a finding that detention was necessary. Mr. Wilson's next court date is currently set for June 15.

61.     Mr. Wilson struggles to meet the basic necessities of life.  Before his arrest, he earned money by working sporadically for his father's landscaping business. He has no other source of income. Mr. Wilson provides financial support for his 15-year-old son.

62.     He cannot afford to purchase his release from jail.

63.     Pursuant to the policies and practices described in this Complaint, no findings have been made concerning Mr. Wilson's ability to pay or the need to detain him in light of available, less-restrictive alternative conditions of release. Nor was Mr. Wilson afforded the procedural protections required, including an adversarial hearing with an opportunity to present evidence and on-the-record findings by clear and convincing evidence.

64.     Mr. Wilson fears for his health and life because of an outbreak of COVID-19 in the Harris County Jail.

65.     Mr. Wilson is ineligible for a personal bond pursuant to GA-13.

**B.     Defendants' Post-Arrest Practices Cause the Detention of Arrestees Who Cannot Pay a Money Bail Amount While Those Who Can Pay Are Released**

**i.     Arrest and the Initial Money Bail-Setting Process**

45.66.  Harris County uses a predetermined money bail schedule, promulgated through administrative order by the Harris County District Court Judges ("the felony judges"), to determine financial conditions of pretrial release for nearly all felony arrestees in Harris County. *See* Ex. 4 (Harris County District Court Felony Bond Schedule). The schedule requires arrestees charged with certain offenses to remain in custody until a magistrate determines conditions of release at a probable cause hearing. For all other arrestees, the schedule lists an amount of cash a person must pay to purchase her release. The cash amount is based on a combination of the type of offense and

the "risk" level of the arrestee as determined by a risk assessment algorithm. The algorithm itself is a secret, and the County's use of the assessment tool to determine the price of release is nonsensical and an improper use of the tool. First, there is no science showing that higher amounts of money mitigate higher risks of nonappearance or new criminal activity. Second, the tool is intended only to identify a risk *absent* interventions, such as text-message reminders or appropriate conditions like a stay-away order.

46.67.  Harris County itself made 19% of felony arrests within the County in 2017. The City of Houston Police Department made 53.9% of felony arrests in 2017.[12] There are roughly 100 additional agencies within Harris County that have the authority to make arrests.

47.68.  When a person is arrested within Harris County, she will be taken to a "field station" run by the arresting authority. If she is arrested by Harris County, she will be taken either to a field station or directly to the jail. These field stations vary in size and their capacity to hold and process arrestees. Some include holding cells. In others, arrestees are made to sit shackled to a bench while initial post-arrest procedures are conducted.

48.69.  When the newly constructed Joint Processing Center ("JPC")—which Harris County spent $100 million to build—opens later this year, all people arrested by Harris County or the Houston Police Department will be taken directly to the JPC. This means that about 75% of arrestees will immediately be in the Sheriff's physical custody upon arrest.

49.70.  Once at a field station, if the person was arrested without a warrant, the arresting officer will determine whether the Harris County District Attorney's Office wishes to pursue the charge by calling a hotline that is staffed 24 hours a day, 7 days a week by Harris County's assistant

---

[12] Harris County Pretrial Services, *supra* note 3, at 8.

district attorneys. The arresting officer describes the allegations to the assistant district attorney ("ADA") on duty, who makes an initial charging decision over the phone.

~~50.~~71.  If the ADA on hotline duty does not wish to pursue charges, she tells the officer to release the individual.

~~51.~~72.  If the ADA decides to pursue the charges, the arresting officer will type a summary of the facts giving rise to the arrest into the District Attorney's Intake Management System.

~~52.~~73.  The summary will be transmitted to the District Attorney's ("DA") intake division where an ADA will formally accept charges.

~~53.~~74.  The District Clerk's Office then files the case, creates a case number, and assigns the case to a courtroom. Pretrial Services runs the person's information through an algorithm to create a "risk assessment" score and applies the felony judges' schedule. The process from arrest to formal charges being filed and the cash amount required for release being set typically lasts about 6 to 8 hours.

~~54.~~75.  Once the charging document is filed, a case number assigned, and a monetary amount set, the arrestee will be eligible to pay the secured money bail amount and be released. Up to this point, Harris County does not perform any inquiry into the arrestee's ability to pay the money bail amount required by the felony judges' schedule.

~~55.~~76.  From the moment a secured bail amount is set in a felony case, the arrestee is eligible for release from Harris County custody if she can pay the amount required. If a person is subject to certain "hold" orders (e.g., an immigration detainer, probation hold, or process from another county), that person will be eligible for transfer to the jurisdiction where the hold is operative as soon as she pays. Typically, there is a set time period within which the other

jurisdiction can come and pick up the arrestee. That time period does not begin ticking down unless and until the person pays the amount required by the judges' schedule in Harris County.

56.77.  Arrestees can pay the amount themselves, make a phone call to ask a friend or family member to pay the money on their behalf, or contact a commercial bonding agent to post bail. A person who can afford to pay will be released from the field station and will never be transported to the Harris County Jail.

57.78.  The imposition of a financial condition of release is the moment of differential treatment: Defendants will release a person with financial resources almost immediately after money is paid, but Defendants will continue to detain a person who cannot afford to pay. This policy and practice results in systemic and automatic wealth-based detention.

58.79.  Whether a person is arrested pursuant to a warrant or pursuant to a warrantless arrest, that person can pay the secured money bail amount predetermined by the schedule and be released immediately from the field station,[13] prior to formal booking.[14] If the individual is unable to pay, she will be transported to and booked into the jail.

59.80.  The time it takes for an arrestee to be transported to the Harris County Jail varies depending on a variety of factors, including where the person was arrested.

60.81.  Harris County is a large county, and individuals arrested within its borders can be taken initially to field stations as geographically close to the Harris County Jail as the Houston Police Station located a little over a mile from the jail, or as far away as, for example, the City of Lakeview, which is more than 30 miles away.

---

[13] Individuals arrested by Harris County officers are generally taken directly to the Harris County Jail. However, as noted, Harris County itself is only one of roughly 100 agencies with arresting authority in the County, some of which are 60 to 90 minutes outside of Houston.

[14] The vast majority of arrestees use a bail bond, obtained through a commercial bail bond company, to secure their release from jail.  Typically, if accepted by a for-profit bail agent, an arrestee will have to pay the agent a non-refundable fee of 10% of the value of the bond to be released.

61.82.  Sometime after a person arrives at the jail—and usually before she is assigned to a housing unit—she will be taken by Sheriff's Office employees to a room in the jail with several dozen other new arrestees to appear before a Hearing Officer, who will determine probable cause. Many people every month must wait up to 48 hours for a probable cause hearing, though some have their hearings within 24 hours of arrest.

62.83.  These policies have consistently, for years, resulted in the needless and devastating jailing of impoverished people accused of felony offenses.  In 2017, up to 85% of felony arrestees were booked into the jail because they were unable to immediately pay for their release.[15] Arrestees booked into the jail endure a lengthy, intrusive, and humiliating process that includes seizure of their property, bodily searches, personal questions about their physical health, and interviews requiring them to disclose private financial and mental health information. The inmate processing center is notoriously crowded with people who are in moments of extreme crisis, having just been arrested, separated from their children and families, and deprived of their freedom. Some are suffering from painful withdrawal symptoms or mental health episodes. Many are worried about missing shifts at their jobs or making rent payments. All are, at that moment, presumed innocent of all charges. The processing center is loud, dirty, and full of flies and noxious smells. The risk of suicide—elevated for all people detained in jails—is at its highest in the hours and days immediately following arrest. Similarly situated arrestees who were able to pay the predetermined money bail amount avoid the booking process altogether.

---

[15] Harris County Pretrial Services, *supra* note 3, at 19.

63.84.  In 2017, approximately 55% of felony arrestees were still in jail when their case reached disposition.[16] Many of these arrestees were detained solely due to their inability to afford the secured financial condition set for their release.[17]

### ii.  Probable Cause Hearings

64.85.  The Harris County Sheriff's Office, through its jail personnel, assembles recently arrested people nine times per day, every day of the week, for an appearance before one of the Harris County Hearing Officers. The Hearing Officer determines probable cause for the arrest, if it was warrantless, and imposes conditions of release.

65.86.  These hearings are referred to locally as "magistrations," "Article 15.17 hearings," or "probable cause hearings."

66.87.  In March 2017, in the middle of the evidentiary hearing in the *ODonnell* case, challenging the County's misdemeanor bail system, the County Commissioners voted to fund a pilot program allowing defense attorneys to appear on behalf of detained arrestees at these hearings beginning in July 2017.[18] Assistant public defenders are currently authorized to represent most arrestees, though there are some exclusions.

---

[16] *Id.* at 16.

[17] *Id.* at 19 (showing in Table B.1 that roughly 45% of felony arrestees post money bail).

[18] Harris County received $150,000 in May 2015 from the MacArthur Foundation to create a proposal for improvements to the criminal legal system.  *See* Press Release, *MacArthur Announces 20 Jurisdictions to Receive Funding to Reduce Jail Use* (May 26, 2015), https://www.macfound.org/press/press-releases/macarthur-announces-20-jurisdictions-receive-funding-reduce-jail-use/. Harris County subsequently convened a Criminal Justice Coordinating Council, which investigated ways to reduce incarceration.  Among the most important reforms that participants recommended was to provide defense attorneys at the probable cause hearings. Early in January 2016, the Coordinating Counsel submitted its grant proposal to the MacArthur Foundation, seeking $4 million over two years to put its plans into effect.  Without a public explanation and despite the availability for funding for lawyers to represent all arrestees, the final document included a proposal for counsel *only* to represent individuals who are mentally ill.  Meagan Flynn, *Bail Hearings: Where Prosecutors and Magistrates Ensure Defenseless People Stay In Jail* (Jan. 11, 2016), http://www.houstonpress.com/news/bail-hearings-where-prosecutors-and-magistrates-ensure-defenseless-people-stay-in-jail-8058308. On April 13, 2016, Harris County was awarded a $2 million MacArthur grant to reform its criminal system, but that money was not allocated to funding public defenders at bail hearings, even for people with mental illnesses.  *See Harris County receives $2 million grant to reform criminal justice system*, KPRC

67.88.  At the probable cause hearing, Hearing Officers typically make no findings concerning ability to pay; they make no findings as to whether alternative conditions of release serve the government's interests or whether pretrial detention is necessary to serve any government interest; they do not allow arrestees to confront the evidence and arguments of the government or put on evidence in support of pretrial release; and they do not provide other basic procedural safeguards, such as applying any evidentiary standard to any factual finding, let alone the clear-and-convincing-evidence standard, or issuing any statement of findings or reasons explaining why a particular financial condition or pretrial detention is required.

68.89.  An ADA participates in the probable cause hearings via videolink by arguing for the Hearing Officer to make a finding of probable cause and often asking the Hearing Officer to impose money bail in an amount higher than the amount on the schedule or on the warrant. District Attorney Kim Ogg has an internal policy requiring motions for high bond on certain cases. She also has a policy of asking the Hearing Officer to detain using a "no bond" order every arrestee charged with an offense for which the Texas Constitution authorizes pretrial detention, regardless of the person's individual case and circumstances and regardless of the availability of less-restrictive alternatives to detention.

69.90.  When the docket begins, arrestees are seated on benches in a room at the jail.

70.91.  The Hearing Officer calls an individual's name and reads the charge. That individual gets up and stands in the middle of a red square on the floor of the room in the jail.  An ADA then reads from the police report. The Hearing Officer decides whether there is probable cause, finding probable cause in almost every case. The Hearing Officer regularly sets secured

---

News (Apr. 13, 2106), http://www.click2houston.com/news/watch-live-harris-county-receives-2-million-grant-to-reform-criminal-justice-system. That change came only in the midst of the evidentiary hearing on the *ODonnell* Plaintiffs' motion for preliminary injunction.

money bail and sometimes increases the money bail amount from the amount required by the bail schedule.

71.92.  As a matter of routine practice, Hearing Officers do not make findings concerning an arrestee's ability to pay the money bail amount that they impose, nor do they meaningfully consider alternative non-financial conditions of release for those who cannot afford to pay the bail amount set. They do not make findings concerning the necessity of pretrial detention or make findings that less-restrictive conditions are inadequate to meet a compelling government interest.

72.93.  Hearing Officers rarely require alternative, non-monetary conditions of release and routinely state that they are not permitted to impose certain non-monetary conditions of release.

73.94.  For decades, the Hearing Officers simply reviewed the bail amount previously affixed to ensure that it conformed to the bail schedule and the specific policy instructions from the felony judges about how to administer the predetermined schedule. These instructions included laminated charts and emails instructing Hearing Officers about who the Hearing Officers could and could not order released on personal bonds (i.e., unsecured bonds that do not require payment upfront) and in what circumstances they could deviate from the cash bail schedule (almost never, according to the instructions). Although the felony judges purportedly rescinded these instructions in 2017 with the implementation of the new felony bail schedule and expanded the Hearing Officers' authority to determine money bail amounts and other conditions of release, the purported policy changes have not meaningfully changed actual practice. Specifically, the rule changes have failed to correct the core constitutional infirmity of the Harris County bail system: requiring secured financial conditions of release without findings concerning ability to pay, the necessity of pretrial detention, or the adequacy of alternative conditions, and without all of the safeguards required to ensure the accuracy of those findings, including application of the clear-and-

convincing-evidence standard and a statement of reasons concerning why a particular financial condition or pretrial detention is required.

74.95.  Throughout the hearing, the arrestees remain in the Harris County Jail, supervised by Sheriff's Office employees.  Sheriff's Office employees and agents also observe the probable cause hearings and witness Defendant Hearing Officers routinely failing and refusing as a matter of policy to consider alternatives to secured financial conditions.

75.96.  State law requires probable cause hearings to occur within 48 hours.  Although the County strives to hold these probable cause hearings within 24 hours of arrest for people charged with felonies, the County's online case records show that the hearings sometimes do not occur until up to 48 hours after arrest. At any point in the booking process, an arrestee can pay his or her predetermined money bail and be released.

76.97.  If a person pays money bail prior to the probable cause hearing, she will be released and the probable cause determination in her case will be made at a subsequent court appearance.

77.98.  If an individual is not brought to the probable cause hearing due to medical reasons, which is a frequent occurrence (approximately 5% to 10% of male arrestees are not brought to the probable cause hearing for medical reasons and approximately 25% of female arrestees are not brought to the probable cause hearing for medical reasons), the Hearing Officer will make a finding of probable cause and require financial conditions of pretrial release in that person's absence. The County's protocol prohibits assistant public defenders from representing people who are not present at the hearing. Therefore, in these cases, the money bail amount is set without any argument on the arrestee's behalf.

### iii.  The Use of Personal Bonds

78.99.  Hearing Officers sometimes recommend arrestees for release on "personal bonds," a term Defendants use to describe release without requiring an up-front payment prior to release, i.e., without a secured financial condition of release. The felony bond schedule lists certain low-level offenses for which there is a presumption of personal bond.

79.100.     Only about 8% of felony arrestees were released on personal bonds in 2017.[19]

80.101.     Even when individuals are recommended for personal bonds, many will not be released immediately, and some will not be released at all. This is because some Hearing Officers require Pretrial Services to first "verify" a person's references, meaning that the arrestee must provide Pretrial Services with contact information for friends or family members, and Pretrial Services must then contact those individuals and attempt to confirm certain information reported by the arrestee. Sometimes Pretrial Services is required to verify the information with multiple "references." Among the information Pretrial Services seeks to confirm, as a matter of policy, is whether the person has a place to stay if she is released from the jail. If a person does not have an address to verify, then the verification process cannot be completed, and the person will not be released. According to these policies and practices, a person who is homeless will not be released on a personal bond, i.e., without payment of the scheduled amount of bail, because she has no address that can possibly be verified. Homeless defendants are therefore categorically ineligible for personal bonds due to the verification policy. Sometimes, references cannot be reached to verify information for days or a week.  Sometimes they cannot be reached at all. In those cases, the person will not be released on a personal bond and will be detained unless she can pay the money bail.

---

[19] Harris County Pretrial Services, *supra* note 3, at 17.

81.102.    At any point in the verification process, the arrestee is permitted to pay the money set pursuant to the schedule and be released immediately.

82.103.    For decades, in violation of state judicial conduct rules, there has been an entrenched culture among the Hearing Officers of abiding strictly by written and oral directives regarding the money bail–setting process issued by the felony judges, who control their employment. For example, the felony judges instructed Hearing Officers that they could never recommend homeless individuals for release on personal bonds, i.e., without secured financial conditions. Some judges told Hearing Officers never to issue non-financial conditions for any defendant who was assigned to their courtroom at all,[20] or for individuals who previously received personal bonds in other cases.[21] Other judges told Hearing Officers to consider unsecured financial conditions only for "students."[22] The Hearing Officers believed themselves to be bound by these rules and understood that the judges could hire and fire them at will. The Hearing Officers' contracts are reviewed annually by a committee that includes several of the felony judges.

83.104.    These explicit written instructions have purportedly been rescinded with implementation of the current schedule in 2017, and Hearing Officers have purportedly been given greater discretion to determine bond amounts. Although written rules prohibiting or categorically limiting release have purportedly been formally rescinded, videos and data demonstrate that actual practices are virtually the same as they have been for many years.

### iv.  Assignment to a Housing Unit

---

[20] Gabrielle Banks, *Harris County hearing officers sanctioned by state for not considering personal bonds*, Houston Chron. (Feb. 23, 2018), https://www.chron.com/news/houston-texas/article/Trio-of-Harris-County-hearing-officers-sanctioned-12494892.php

[21] James Pinkerton & Laura Caruba, *Tough bail policies punish the poor and the sick, critics say*, Houston Chron. (Dec. 26, 2015), http://www.houstonchronicle.com/news/houston-texas/houston/article/Tough-bail-policies-punish-the-poor-and-the-sick-6721984.php?t=373b57d418&cmpid=email-premium.

[22] *Id.*

84.105.     People who are being processed through the Inmate Processing Center cannot be contacted by people outside the jail, including attorneys, with the exception of a brief interview with an assistant public defender shortly before the probable cause hearing. Most arrestees are not assigned to a housing unit until after their probable cause hearing and will remain inaccessible to their appointed attorney, who will represent them in their case, and everyone else outside the jail until the jail assigns the individual to a housing unit sometime after the probable cause and bail hearing.

85.106.     It is only after being assigned to a housing unit that an arrestee can be contacted by anyone outside the jail and will be scheduled for a hearing in a Criminal District Court.

86.107.     Typically, a lawyer is not appointed until the first appearance in court. First appearance cannot occur until booking is complete. The booking process can take days.

87.108.     In total, it takes a minimum of 24 hours for an arrested person to be fully booked into the jail, assigned to a housing unit, and made available for a visit. Arrested persons who cannot pay generally will not have counsel appointed or be able to meet with counsel until after their first court appearance. Felony arrestees virtually never meet their lawyer before the first appearance. At any point during this period of time, a person can pay money bail and be released.

### v. First Appearances

88.109.     If, after the probable cause hearing, an arrestee is still unable to purchase her release from jail, general Harris County practice is that she will be taken to a District Court, usually within 24 to 48 hours of the probable cause hearing.  However, many arrestees who have their probable cause hearings on Thursday or Friday will not see a District Judge until the following Monday at the earliest, and sometimes must wait until Tuesday.

89.110.     Detained individuals are usually assigned a court-appointed attorney or public defender at the first appearance hearing, but there is typically no review of the money bail amount previously imposed. Although an informal off-the-record request for bail reduction may, in theory, be made at first appearance, it is not possible to have a bail hearing at that time.

90.111.     Detained individuals typically remain in lock-up outside of the courtroom and are not brought into the courtroom on this court date. The case is almost always then "reset," meaning that another hearing is scheduled, typically weeks in the future.

91.112.     As a result, arrestees who cannot pay for their release remain in detention and are returned to jail cells, usually without ever having been brought into the courtroom.

92.113.     As a matter of routine practice, the felony judges do not conduct bail hearings at first appearance:  they make no findings concerning ability to pay; they make no findings as to whether pretrial detention is necessary to serve any government interest; they do not allow arrestees to confront the evidence and arguments of the government or put on evidence and argument in support of pretrial release; and they do not provide other basic procedural safeguards, such as making findings by any evidentiary standard, let alone by clear and convincing evidence, or issuing any statement of reasons concerning why a particular financial condition or pretrial detention is required.

93.114.     Typically, if a person wishes to have an evidentiary hearing concerning the appropriateness of the secured bond amount set, the need to keep the person in a jail cell pending resolution of the case, and whether less-restrictive conditions of release are available, the person's lawyer must file a motion and then have a court proceeding scheduled for a later date. A hearing on the motion will likely not occur for more than a week after the motion is filed. This hearing will

be the arrestee's first opportunity to present witnesses or documentary evidence and the first time that a judge will even conceivably make findings on the record regarding release conditions.

94.115.       One of the purposes and effects of Harris County's post-arrest detention is to coerce and process large numbers of guilty pleas prior to any person conducting any legal or factual investigation into the charges, let alone the complete and zealous investigation and defense required by professional standards and the Sixth Amendment to the United States Constitution. If an arrestee agrees to plead guilty at this first appearance, then the arrestee will be brought out from the lock-up to plead guilty.

95.116.       The felony judges routinely accept guilty pleas from individuals who are in jail solely because they are too poor to pay money bail.

96.117.       The felony judges—and every other actor in the County's post-arrest system (as well as anyone who has observed probable cause hearings or first appearances)—know that many of the detained individuals who appear in front of them charged with felonies are being detained in jail solely because they are too poor to pay the money bail amount required as payment for release. The judges and Sheriff's Office employees and agents have knowledge that, in thousands of people's cases every day, there is no reason for a person's detention other than the person's inability to make a monetary payment.

97.118.       In 2017, approximately 55% of felony arrestees were still in jail when their case reached disposition.[23]  Individuals detained pretrial are more likely to be sentenced to jail, are less likely to be sentenced to probation, and are given longer sentences than those received by

---

[23] Harris County Pretrial Services, *supra* note 3, at 16 (showing in Table B.1 that roughly 45% of felony arrestees post money bail).

individuals who were released pretrial. The conviction rates for people released at disposition are significantly lower than for similarly situated people who are detained at disposition.

### C.    The Harris County Jail

~~98.~~119.        The Harris County Jail is the largest jail in Texas and the third largest jail in the United States, behind only Rikers in New York and the Los Angeles County Jail.[24]  The Harris County Jail books on average 120,000 individuals per year and 330 individuals per day.[25]

~~99.~~120.        The vast majority of human beings in the Harris County Jail cells are not there because they have been convicted of a crime. Instead, most people—an average of 85% in September 2018—are being kept in jail cells prior to trial, despite the presumption of innocence. Many of these people are in jail solely because they cannot afford to pay money bail.  If they could pay the money bail assigned to them, they could walk out of the doors of the jail at any time.

~~100.~~121.        In September 2018, a typical month, the average daily population of the Harris County Jail was 9,803 individuals, 8,386 of whom were pretrial detainees. About 90% of these pretrial detainees—7,553 individuals—had been arrested for felony or state jail felony charges.

~~101.~~122.        Over 10 years ago, the Department of Justice investigated the Harris County Jail and launched an era of federal oversight because of the serious and systemic violations of constitutional rights that pervaded the facility.[26] The investigation led the County to form the Harris County Criminal Justice Coordinating Council in an effort to address the overcrowding in

---

[24] Sarah R. Guidry, et al., *A Blueprint for Criminal Justice Policy Solutions in Harris County* 1 (2015), http://www.americanbar.org/content/dam/aba/events/legal_aid_indigent_defendants/2015/ls_sclaid_summit_03_tcjc _2015_harris_county_blueprint.authcheckdam.pdf.

[25] *Id.* at 9.

[26] *Id.* at 2.

the jail.[27] Although there have been some decreases in the jail population in more recent years, Harris County consistently struggles to stay within its operating capacity. In fact, the jail's persistent overcrowding, resulting largely from the thousands of people detained pretrial on felony charges, has led the Sheriff to refuse to accept new arrestees from arresting agencies like Houston Police Department ("HPD"), which in turn has meant that HPD arrestees are forced to languish in the City's custody for days before being transferred to the County's inmate processing center.[28]

102.123.        In 2013, taxpayers spent almost $500,000 *per day* to operate the jail.[29]

103.124.        Since 2009, 125 human beings have died while in pretrial custody in the Harris County Jail.[30]

104.125.        In August 2018, arrestee Debora Lyons hanged herself in a common area of the Harris County Jail while detained on a felony theft charge with money bail set at $1,500.[31] She had been arrested on July 21 for allegedly stealing clothes and an airbed totaling less than $2,500. The day *after* she died, former Judge Jim Wallace granted her a personal bond.

105.126.        Three weeks earlier, Navy veteran Eldon Lee Harris had hanged himself while in solitary confinement.[32]

---

[27] *Id.*

[28] Undersigned counsel Civil Rights Corps sued the City of Houston for detaining people in violation of their Fourth Amendment right to a probable cause determination within 48 hours. *Hernandez v. City of Houston*, 4:16-cv-3577 (S.D. Tex. Dec. 5, 2016).

[29] Guidry, *supra* note 23, at 13.

[30] Attorney General of Texas, *Custodial Death Report*, https://oagtx.force.com/cdr/cdrreportdeaths, last accessed Jan. 21, 2019.

[31] Keri Blakinger, *Inmate who killed herself in Harris County jail had previously threatened suicide*, Houston Chron. (Aug. 22, 2018), https://www.chron.com/news/houston-texas/article/Inmate-who-killed-herself-in-jail-had-previously-13172633.php.

[32] *Id.*

106.127.     The Texas Commission on Jail Standards has found the Harris County Jail to be in noncompliance of state standards five times in the past two years.[33] Three out of five of these compliance failures have been related to preventable deaths.

107.128.     On January 17, 2019, two days after Tracy Whited committed suicide in the Harris County Jail, Texas state Senator John Whitmire sent a letter to County Judge Lina Hidalgo citing "unsanitary and unhealthy conditions" at the jail and proposing state oversight for the facility. He stated that conditions at the jail "jeopardize[] the safety and well-being of our fellow citizens who find themselves housed in the Harris County Jail."[34]

108.129.     According to the Harris County Sheriff's Office, one-quarter of individuals in the Harris County Jail have been diagnosed with some form of mental illness.[35]

109.130.     There is a documented history of inmate abuse by jail guards, deaths and suicides in the jail, inadequate training of jail staff, and lack of access to medications and medical services. For years, the County has been aware of these intolerable conditions, which exist largely because of the overcrowding resulting from the volume of pretrial felony detainees who cannot afford to pay money bail.  It has failed to remedy them.[36]

---

[33] Keri Blakinger, *State finds Harris County jail out of compliance for 5th time in two years*, Houston Chron. (Nov. 30, 2018), https://www.chron.com/news/houston-texas/article/State-finds-Harris-County-jail-out-of-compliance-13435304.php.

[34] Keri Blakinger, *Houston senator raises possibility of state oversight for Harris County jail*, Houston Chron. (Jan. 17, 2019), https://www.chron.com/news/houston-texas/article/Houston-senator-raises-possibility-of-state-13542101.php.

[35] Harris County Sheriff's Office, *Jail Mental Health Initiatives*, http://www.harriscountycit.org/jail-mental-health-unit/ (last visited January 19, 2019).

[36] *Jailhouse Jeopardy: Uncovering abuses at Harris County's jail*, Houston Chron., (Oct. 3, 2015–Mar. 6, 2016), http://www.houstonchronicle.com/local/investigations/jailhouse-jeopardy/ (providing links to a series of articles written by several reporters).

~~110.~~131.     On a typical day, hundreds of new arrestees, presumed innocent, are arrested and booked into this jail.[37] At any given moment, there are hundreds of people charged only with state jail felonies—the least serious class of felony charges in the Texas criminal legal system, consisting mostly of non-violent offenses or misdemeanor offenses enhanced by prior misdemeanor convictions—who are being detained in the Harris County Jail solely because they cannot afford money bail.[38]

~~111.~~132.     In 2017 alone, there were more than 500 people who were detained at disposition because they were unable to pay a $2,000 money bail.  Many of these individuals could have walked out of the jail if they had been wealthy enough to pay the monetary amount required for freedom. Only those individuals who are too poor to purchase their release are subjected to these conditions and the health and safety risks of pretrial jailing.

### D.     Defendants' Wealth-Based Detention Practices Are Causing Plaintiffs to Be Jailed Solely Due to Their Inability to Pay Bail

~~112.~~133.     The named Plaintiffs are eligible for release and would not have to endure pretrial incarceration if they paid the amount of money required by Defendants.

~~113.~~134.     Arrestees are given a right to release pending trial, but Defendants' wealth-based detention system conditions their release on their ability to afford money bail, thus tying their pretrial freedom to their wealth status.

~~114.~~135.     As a matter of policy and practice, when a new arrestee is brought to the Harris County Jail, county employees inform the arrestee that she will be released from jail

---

[37] Guidry, *supra* note 23, at 9 (stating that there are 330 bookings per day); Harris County Pretrial Services, *supra* note 3, at 16 (stating that, in 2017, 30,978 people were arrested on felony charges, which averages more than 80 arrests per day).

[38] *See, e.g.*, Guidry, *supra* note 243, at 15 (noting that, in 2013 alone, there were 3,120 misdemeanor arrestees who could not post the $500 money bail that Harris County demanded of them).

immediately if she pays the money bail amount. The arrestee is told that she will remain in jail if she is not able to make that payment.

115.136.    The Harris County Sheriff's Office collects arrestees' money bail payments. It is the policy and practice of the Harris County Sheriff's Office to release only those arrestees who pay their money bail amount.

116.137.    In a typical week, the Sheriff's Office releases hundreds of individuals who pay their money bail amount.

117.138.    It is the policy and practice of the Sheriff's Office to detain individuals who do not pay the money bail amount. Before an individual's probable cause hearing, it is the policy and practice of the Sheriff's Office to detain the individual based on a money bail amount set pursuant to a predetermined bail schedule. After a probable cause hearing, it is the policy and practice of the Sheriff's Office to detain the individual based on a money bail amount imposed by a Hearing Officer.

118.139.    If a person cannot pay money bail after her first court appearance before a District Judge, it is the policy and practice of the Sheriff's Office to continue to detain that individual unless and until she makes a monetary payment.

119.140.    Under Defendants' wealth-based practices, those who have enough money to pay are released from the County jail. Some poorer arrestees eventually make arrangements with private bail bond companies, after spending hours, days, or weeks in jail.[39] And many others who are poorer still are left to languish in jail until their case resolves.

---

[39] Because of the common availability of commercial bail bonds, those who remain in the Harris County jail are typically those who cannot even afford to pay a third-party bonding agent.  Typically, bonding agents require a non-refundable premium of 10% of the bail amount, although a bonding agent is free to refuse to pay for the release of any arrestee for any reason or for no reason. Bonding agents also routinely accept lower premiums, or no premiums, and place the arrestee on a payment plan for the rest. In short, it is completely up to the bonding company whether to make

**E.     Defendants' Use of Money Bail Is Not Narrowly Tailored—Nor Is It as Effective as Many Other Methods—in Securing Court Attendance or Public Safety**

~~120.~~141.     The empirical evidence shows that there is no relationship between requiring money bail as a condition of release and defendants' rates of appearance in court.[40]

~~121.~~142.     While tying pretrial freedom (for those charged with felonies) to access to money is the norm in Harris County, other jurisdictions throughout the country do not keep people in jail because of their poverty.  Instead of relying on money, other jurisdictions release arrestees with pretrial supervision practices and procedures that can help increase court attendance and public safety without requiring detention.

~~122.~~143.     Other jurisdictions employ numerous less restrictive strategies for assuring public safety and court appearance when the government determines, on the basis of evidence and argument, that there is a need to guard against a particular risk.  These strategies include: unsecured or "signature" bonds (which do not require payment up front for release but instead allow immediate release upon a promise to pay the monetary amount if the person does not appear as required), reporting obligations, two-way phone and text message reminders of court dates, rides to court for those without transportation or a stable address, flexible court appearances including evening and weekend court sessions for those with jobs they cannot miss, counseling, drug and alcohol treatment, batterer intervention programs, anger management courses, alcohol monitors, or, in extreme cases of particular risk, electronic monitoring, among other services.

---

a deal with a particular individual who cannot afford to pay the sum required for release. The Named Plaintiffs cannot afford such a bail.

[40] Arpit Gupta, Christopher Hansman, & Ethan Frenchman, *The Heavy Costs of High Bail: Evidence from Judge Randomization* 5 (May 2, 2016), http://www.columbia.edu/~cjh2182/GuptaHansmanFrenchman.pdf ("We find no evidence that money bail increases the probability of appearance.").

123.144.      Defendants are permitted by state (and federal) law to use these alternatives but, as a matter of routine practice and policy, choose not to for impoverished felony arrestees. The vast majority of Harris County arrestees are therefore processed and detained through Harris County's money bail scheme rather than non-monetary supervision methods. As a matter of policy and practice, Defendants do not consider, or make findings concerning, less restrictive alternatives than detention based on money bail that a person cannot afford.

124.145.      Jurisdictions routinely using non-monetary conditions of release achieve high rates of court appearances while ensuring public safety. In Washington, DC, where 94% of cases resulted in pretrial release without secured financial conditions in Fiscal Year 2017,[41] 88% of defendants released pretrial made all scheduled appearances throughout the life of their cases, with more than 86% of those released pretrial remaining arrest-free (and 99% remaining arrest-free for violent crimes).[42]

125.146.      Empirical evidence proves that unsecured bond alone is at least as effective at reasonably assuring appearance in court as secured money bail.

126.147.      Empirical evidence also demonstrates that secured money bail does not have any positive benefit to public safety.  In fact, short periods of pretrial detention actually increase future crime.  And in Texas, because a person cannot forfeit a secured money bail by committing a new crime, there is no rational relationship between a higher secured money bail and public safety, unless the higher bail is intended to accomplish pretrial detention—and even then, as noted, studies show that the resulting detention has a criminogenic effect on that person. Thus,

---

[41] Pretrial Services Agency for the District of Columbia, *FY 2017 Release Rates for Pretrial Defendants within Washington, DC* (2018), https://www.psa.gov/sites/default/files/2017%20Release%20Rates%20for%20DC%20Pretrial%20Defendants.pdf.

[42] Pretrial Services Agency for the District of Columbia, *Congressional Budget Justification and Performance Budget Request: Fiscal Year 2019* (2018), https://www.csosa.gov/wp-content/uploads/bsk-pdf-manager/2018/07/FY2019-PSA-CBJ-Performance-Budget-02122018-1.pdf.

even though the person may be incapacitated for the pretrial period, the destabilizing effects of pretrial detention make it *more likely* she will commit *new* crimes during the pretrial period and after.

127.148.    Detention due to inability to pay money bail increases the likelihood of conviction. A person who is detained pretrial is 13% more likely to be convicted and 21% more likely to plead guilty.[43] Additionally, individuals detained pretrial are more likely to be given longer jail sentences.[44] Overall, individuals who are detained—instead of released on money bail or on a personal bond—have worse case outcomes.[45]

128.149.    Money bail is disproportionately imposed on non-white arrestees.[46] In other words, even the rare personal bond in Harris County is disproportionately given to white arrestees.

129.150.    Setting a secured money bail amount in an amount higher than a person can afford by definition defeats the purpose of money bail—to incentivize a person to return to court—and removes any legitimate (let alone compelling) state interest in the setting of a financial

---

[43] Megan Stevenson, *Distortion of Justice: How the Inability to Pay Bail Affects Case Outcomes* 18 (May 2, 2016), https://www.law.upenn.edu/cf/faculty/research/details.cfm?research_id=14047; *see also* Gupta, et. al, *supra* note 40 at 3 (finding a 12% increase in the likelihood of conviction using the same data).

[44] Stevenson, *supra* note 43 at 18; Paul Heaton, et al., *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 Stan. L. Rev. 711 (2017).

[45] Stevenson, *supra* note 42 at 18; Gupta, et. al, *supra* note 40 at 13 (finding a 12% increase in the likelihood of conviction using the same data); Guidry, *supra* note 23 at 13 ("[D]efendants who are not released pre-trial are more likely to be incarcerated following a conviction, and they generally receive longer sentences upon conviction.").

[46] Gupta, et. al, *supra* note 40 at 4–5; Lise Olson, *Study: Inmates who can't afford bond face tougher sentences*, Houston Chron. (Sept. 15, 2013), http://www.houstonchronicle.com/news/houston-texas/houston/article/Study-Inmates-who-can-t-afford-bond-face-tougher-4817053.php (discussing Carlos Mathis, an African-American man, who was detained in jail for seven months on minor drug and theft charges because he could not afford money bail, and whose charges were dismissed); Isami Arifuku & Judy Wallen, *Racial Disparities at Pretrial and Sentencing and the Effects of Pretrial Services Programs* (Mar. 11, 2013), http://www.pretrial.org/download/research/Racial%20Disparities%20at%20Pretrial%20and%20Sentencing%20and%20the%20Effects%20of%20Pretrial%20Services%20Programs%20-%20NCCD%202013.pdf; Cynthia E. Jones, *"Give Us Free": Addressing Racial Disparities in Bail Determinations*, 16 N.Y.U. Legis. & Pub. Pol'y 919 (2013); Tina L. Freiburger, et. al, *The Impact of Race on the Pretrial Decision*, 35 Am. J. of Crim. Just. 76 (2010), http://libres.uncg.edu/ir/asu/f/Marcum_CD_2010_Impact_of_Race.pdf.

condition. Nor is setting money bail without findings concerning ability to pay narrowly tailored to meet any other legitimate or compelling government interest.

130.151.        Defendants' use of money bail leads disproportionately to the detention of people of color.  Regardless of the amount of money bail imposed, people of color are more likely to be detained at disposition than whites.[47]

131.152.        Unnecessary pretrial detention causes instability in employment, housing, and care for dependent relatives. Studies show that those detained pretrial face worse outcomes at trial and sentencing than those released pretrial, even when charged with the same offenses. Detained defendants are more likely to plead guilty just to shorten their jail time, even if they are innocent. In fact, Harris County has led the country for years in exonerations—many of which resulted from wrongful convictions in drug cases involving people who pled guilty to get out of jail.[48] People detained pretrial have a more difficult time preparing for their defense, gathering evidence and witnesses, and meeting with their lawyers. Studies also show that just two days of pretrial detention increases the likelihood of future arrests and increases the future risk level of low-level offenders.

132.153.        Pretrial detention is more than ten times more expensive than effective pretrial supervision programs. Through non-monetary tools, pretrial supervision programs can save taxpayer expense while maintaining high public safety and court appearance rates.

---

[47] Gupta, et. al, *supra* note 3940 at 4–5

[48] Alex Samuels, *Study finds Harris County leads nation in exonerations*, Texas Tribune (Mar. 7, 2017) https://www.texastribune.org/2017/03/07/report/.

154.    Since March 2020, due to the COVID-19 pandemic, people detained in the Harris County Jail face yet another irreparable harm: a heightened risk of contracting a deadly disease and dying because they cannot practice social distancing or basic health and sanitation measures.

155.    On March 11, 2020, the World Health Organization declared COVID-19 a pandemic.[49]

156.    As COVID-19 swept across the United States, it quickly became apparent that the Harris County Jail, like most jails and prisons, is devastatingly ill-equipped to prevent the virus from rapidly spreading among detainees and staff. Indeed, Sheriff Ed Gonzalez issued a desperate public warning on March 21, 2020: "Currently have 8,000 individuals, most pre-trial, in tight quarters."[50] The jail has "[v]ery limited services. No capacity for ICU care. If someone older and/or with frail health gets the virus it can be a death sentence. Plus spread like wildfire… Individuals would need to be taken to our public health system, which does not have capacity to handle an outbreak in the jail and the anticipated needs of the general community."[51]

157.    On March 29, 2020, the Houston Chronicle reported that the first detained person in the Harris County Jail had tested positive for COVID-19.[52]

158.    Also on March 29, 2020, Texas Governor Greg Abbott issued Executive Order GA-13.[53] GA-13 purports to prohibit anyone currently charged with a crime involving "violence" and

---

[49] World Health Organization, "WHO Timeline – COVID-19" (Apr. 27, 2020), https://www.who.int/news-room/detail/27-04-2020-who-timeline---covid-19 (last accessed May 1, 2020).

[50] Ed Gonzalez (@SheriffEd_HCSO), Twitter (Mar. 21, 2020, 8:41 AM), https://twitter.com/SheriffEd_HCSO/status/1241344221921136641.

[51] Id. (Mar. 21, 2020, 8:05 AM), https://twitter.com/SheriffEd_HCSO/status/1241335204905713664; id. (Mar. 20, 5:19 PM), https://twitter.com/SheriffEd_HCSO/status/1241112204067381249. ("Jail health is community health.").

[52] Gabrielle Banks & Nicole Hensley, "First Harris County Jail inmate tests positive for COVID-19," Houston Chron. (Mar. 29, 2020), https://www.houstonchronicle.com/news/houston-texas/houston/article/First-Harris-County-Jail-inmate-tests-positive-15164825.php.

[53] See Dkt. 39-1.

anyone with a prior conviction at any time in the past for a crime involving "violence" (regardless of the current charge), from being released on unsecured bail, regardless of any individualized proceedings or findings by a state court judge.[54]

159.     Thus, for all of the people in these broad categories, GA-13 *requires* pretrial detention if they cannot pay for release and requires enforcement officials, including the Sheriff and County, to refuse to release categories of people on personal bonds.[55]

160.     GA-13 also makes pretrial detention indefinite by suspending relevant speedy trial provisions of Texas law that ordinarily would require a person's release if the state is not ready for trial.[56]

161.     A little more than a month after GA-13 was issued, the number of reported COVID-19 cases in the jail—among both detainees and staff—has exploded. As of May 5, 2020, 599 people detained in the Harris County Jail and 255 employees of the Sheriff's Office had tested positive for COVID-19.[57] Almost half of people detained the jail were in quarantine: 2,828 people detained in the jail were in observational quarantine (possible exposure), 601 were in buffer quarantine (for those newly booked into the jail), 92 were in surveillance quarantine (asymptomatic patients who tested positive), and 157 in recovery quarantine.[58]

## Class Action Allegations

~~133.~~162.          The named Plaintiffs bring this action, on behalf of themselves and all others similarly situated, for the purpose of asserting the claims alleged in this Complaint on a

---

[54] *See id.*

[55] A personal bond is an unsecured bond that allow a person to be released without making an up-front payment if the person agrees to pay an amount of money if the person does not appear.

[56] *Id.*

[57] Dkt. 138.

[58] *Id.*

common basis.

~~134.~~163.      A class action is a superior means, and the only practicable means, by which the named Plaintiffs and unknown Class members can challenge Defendants' unlawful wealth-based post-arrest detention scheme.

~~135.~~164.      This action is brought and may properly be maintained as a class action pursuant to Rule 23(a)(1)–(4) and Rule 23(b)(2) of the Federal Rules of Civil Procedure.

~~136.~~165.      This action satisfies the numerosity, commonality, typicality, and adequacy requirements of those provisions.

~~137.~~166.      The Plaintiffs propose a single Class seeking declaratory and injunctive relief.  The Declaratory and Injunctive Class is defined as: All felony arrestees who are detained by Harris County, for whom a secured financial condition of release has been set and who cannot pay the amount necessary for release on secured money bail because of indigence.

A.      Numerosity—Fed. R. Civ. P. 23(a)(1)

~~138.~~167.      In September 2018, the average daily population of felony and state jail felony arrestees being held pretrial was 7,553 individuals. Many of these people were held only because they could not afford to pay a money bail. Arrestees are detained in jail for varying lengths of time depending on how long it takes them to make the cash payment that is required for their release.

~~139.~~168.      Some arrestees are able to pay immediately for their release. Others are forced to wait one or two days until they or family members can make the payment. Others will never be able to come up with any amount of money to pay for their release.

~~140.~~169.      The number of current and future arrestees subject to this policy—if it is not enjoined—is well into the thousands.

### B.        Commonality—Fed. R. Civ. P. 23(a)(2)

~~141.~~170.        The relief sought is common to all members of the Class, and common questions of law and fact exist as to all members of the Class. The named Plaintiffs seek relief concerning whether Defendants' policies, practices, and procedures violate the rights of the Class members and relief mandating that Defendants change their policies, practices, and procedures so that the constitutional rights of the Class members will be protected in the future.

~~142.~~171.        Common legal and factual questions arise from one central scheme and set of policies and practices: Defendants' post-arrest wealth-based detention scheme. Defendants operate this scheme openly and in materially the same manner every day. The material components of the scheme do not vary from Class member to Class member, and the resolution of these legal and factual issues will determine whether all of the members of the Class are entitled to the constitutional relief that they seek.

Among the most important, but not the only, common questions of fact are:

- Whether Defendants have a policy and practice of using a predetermined schedule to determine the amount of money required to secure post-arrest release;
- Whether Defendants require that scheduled amount of money to be paid up front before releasing a person from the jail;
- Whether Defendants require arrestees who have had probable cause hearings to pay the secured money bail amount imposed by the Hearing Officer before releasing such people from the jail;
- Whether, when requiring a financial condition of release there is an inquiry into ability to pay;
- Whether, if a person cannot pay for release, there is any inquiry into and findings concerning availability of alternative conditions of release and a finding that pretrial detention is necessary;
- Whether, in requiring pretrial detention, there is an adversarial hearing with counsel and notice of the critical issues at stake, opportunity to be heard and to confront evidence, findings by clear and convincing evidence, and a statement of reasons orally or in writing concerning the need for pretrial detention; and
- What standard post-arrest procedures Defendants perform on felony arrestees, for example, whether Defendants use any other alternate procedures for promptly releasing people determined otherwise eligible for release but who are unable to afford a monetary payment.

143.172.   Among the most important common questions of law are:

- Whether requiring arrestees to pay money up front to secure release from post-arrest detention without an inquiry into or findings concerning the arrestee's present ability to pay the amount required, and without meaningful consideration of less restrictive alternative conditions of release, violates the Fourteenth Amendment's Equal Protection and Due Process Clauses;
- Whether it is lawful to impose a secured financial condition of release that operates as a de facto order of pretrial detention because of a person's inability to pay without complying with the substantial findings, legal standards, and procedural safeguards required for issuing and enforcing a transparent order of preventive detention; and
- What substantive findings and procedural safeguards are required as a matter of federal law prior to pretrial detention of a presumptively innocent person.

**C.     Typicality—Fed. R. Civ. P. 23(a)(3)**

144.173.   The named Plaintiffs' claims are typical of the claims of the other members of the Class, and they have the same interests in this case as all other Class members. Each Class member is threatened with imminent and/or ongoing confinement in jail because she cannot afford to pay a standardized cash bail amount. The answer to whether Defendants' wealth-based detention scheme is unconstitutional will determine the claims of the named Plaintiffs and every other Class member.

145.174.   If the named Plaintiffs succeed in the claim that Defendants' policies and practices concerning post-arrest detention violate their constitutional rights, that ruling will likewise benefit every other member of the Class.

**D.     Adequacy—Fed. R. Civ. P. 23(a)(4)**

146.175.   The named Plaintiffs are adequate representatives of the Class because their interest in the vindication of the legal claims that they raise is entirely aligned with the interests of the other Class members, each of whom has the same basic constitutional claims. They are members of the Class, and their interests do not conflict with those of the other Class members.

147.176.	There are no known conflicts of interest among members of the proposed Class, all of whom have a similar interest in vindicating their constitutional rights in the face of Defendants' pay-for-freedom post-arrest detention system.

148.177. Plaintiffs are represented by attorneys from Civil Rights Corps, Susman Godfrey, and Texas Civil Rights Project who have experience in litigating complex civil rights matters in federal court and extensive knowledge of both the details of Defendants' scheme and the relevant constitutional and statutory law. Counsels' relevant qualifications are more fully set forth in the contemporaneously filed Motion for Class Certification.

149.178. The combined efforts of Class counsel have so far included extensive investigation into Harris County's predetermined money bail practices over a period of years, including numerous interviews, most intensively in recent months, with witnesses, court employees, people detained in jail, families, judges, attorneys practicing in courts throughout the region, community members, statewide experts in the functioning of state and local courts, empirical researchers, and national experts in constitutional law, post-arrest procedure, law enforcement, judicial procedures, criminal law, pretrial services, and jails.

150.179.	Class counsel have a detailed understanding of state law and practices as they relate to federal constitutional requirements. Counsel have studied the way that these systems function in other cities and counties in order to investigate the wide array of lawful options in practice for municipalities.

151.180.	Counsel have devoted enormous time and resources to becoming intimately familiar with Defendants' practices and with all of the relevant state and federal laws and procedures that can and should govern it.  Counsel have also developed relationships with many of the individuals and families victimized by unlawful wealth-based pretrial detention practices.

The interests of the members of the Class will be fairly and adequately protected by the Plaintiffs and their attorneys.

### E.  Rule 23(b)(2)

~~152.~~181.    Class action status is appropriate because Defendants, through the policies, practices, and procedures that make up their wealth-based post-arrest detention scheme, have acted in the same unconstitutional manner with respect to all Class members. Defendants apply and enforce a wealth-based system of pretrial justice: some arrestees can purchase their immediate release, while other arrestees must remain in jail solely because they cannot pay.

~~153.~~182.    The Class therefore seeks declaratory and injunctive relief that will prevent Defendants from detaining arrestees who cannot afford cash payments. Because the putative Class challenges Defendants' scheme as unconstitutional through declaratory and injunctive relief that would apply the same relief to every member of the Class, Rule 23(b)(2) is appropriate and necessary.

~~154.~~183.    Injunctive relief compelling Defendants to comply with these constitutional rights will similarly protect each member of the Class from being subjected to Defendants' unlawful policies and practices. A declaration and injunction stating that Defendants cannot detain arrestees solely due to their inability to make a monetary payment would provide relief to every Class member. It would ensure that pretrial detention based on lack of access to money does not occur without the substantive findings and procedural safeguards that the Constitution requires for that government detention.  Therefore, declaratory and injunctive relief with respect to the Class as a whole is appropriate.

155.184.         Plaintiffs seek the following relief.

## **Claims for Relief**

**Count One:   Defendants Violate Plaintiffs' Equal Protection and Due Process Rights by Jailing Them Solely Because They Cannot Afford a Monetary Payment.**

156.185.          Plaintiffs incorporate by reference the allegations in paragraphs 1-155.

157.186.          The Fourteenth Amendment's Equal Protection and Due Process Clauses prohibit jailing a person solely because of her inability to make a monetary payment.  Defendants violate Plaintiffs' rights by enforcing against them a system of pretrial detention that keeps them in jail solely because they cannot afford to pay money bail amounts imposed without findings concerning their present ability to pay and without findings concerning the necessity of the detention in light of alternative conditions of release that could serve the government's interests.

**Count Two: Defendants Violate Plaintiffs' Substantive Due Process Right to Pretrial Liberty by Jailing Them Without a Finding That Pretrial Detention Is Necessary**

158.187.          Plaintiffs incorporate by reference the allegations in paragraphs 1-157.

159.188.          The Fourteenth Amendment protects the fundamental interest in pretrial liberty that is infringed whenever a person is subject to a transparent or de facto order of pretrial detention.  That interest in bodily liberty is not absolute, and it can be overcome, but only if the government first demonstrates that no alternative short of pretrial detention exists to mitigate an identifiable risk to the safety of the community or a risk of flight from prosecution, and that pretrial detention is therefore necessary to serve a specified, compelling interest in public safety or court appearance. Defendants violate Plaintiffs' rights by jailing them prior to trial without making any finding that pretrial detention is necessary to serve the government's interests.

**Count Three: Defendants Violate Plaintiffs' Procedural Due Process Rights**

160.189.          Plaintiffs incorporate by reference the allegations in paragraphs 1-159.

161.190.      The Due Process Clause requires that, for a transparent or de facto order of pretrial detention to be constitutionally valid, the government must provide rigorous procedural safeguards to ensure the accuracy of the substantive finding that pretrial detention is necessary because less-restrictive conditions are insufficient. The minimal safeguards required by the Constitution include: an adversarial hearing, with counsel, at which the person has notice of the critical issues to be decided at the hearing, an opportunity to be heard and to present and confront evidence, and a statement of reasons on the record explaining the reasons for the finding that pretrial detention is necessary. Defendants violate procedural due process by detaining plaintiffs prior to trial without providing these safeguards to ensure the accuracy of any substantive determination that pretrial detention is necessary.

## Request for Relief

WHEREFORE, Plaintiffs and the other Class members request that this Court issue the following relief:

a. A declaratory judgment that Defendants violate the Named Plaintiffs' and Class members' constitutional rights by operating a system of wealth-based detention that keeps them in jail solely because they cannot afford to pay secured money bail amounts required without findings concerning ability to pay, without consideration of or findings concerning non-financial alternatives, without findings that pretrial detention is necessary to meet a compelling government interest, and without safeguards to ensure the accuracy of that finding;

b. An order and judgment permanently enjoining Defendants from operating and enforcing a system of post-arrest detention that keeps Named Plaintiffs and Class members in jail because they cannot pay a secured financial condition of release required without findings concerning ability to pay, without consideration of or findings concerning non-financial alternatives, without findings that pretrial detention is necessary to meet a compelling government interest, and without safeguards to ensure the accuracy of those findings;

c. A declaratory judgment that Executive Order GA-13 is unconstitutional to the extent it requires pretrial detention of arrestees who cannot afford secured money bail without the substantive findings and procedural safeguards required for an order of pretrial detention;

d. An order and judgment permanently enjoining the Sheriff and the County from enforcing GA-13 to the extent enforcing GA-13 results in the pretrial detention of individuals against

whom there has been no substantive finding that pretrial detention is necessary following a hearing with sufficient procedural safeguards to ensure the accuracy of that finding;

~~e.~~c. Any other order and judgment this Court deems necessary to permanently enjoin Defendants—whether acting on behalf of the State, the County, or some other government entity—from implementing and enforcing a system of wealth-based pretrial detention that keeps arrestees in jail solely because they cannot afford to pay a secured financial condition of release required without an inquiry into or findings concerning ability to pay, without consideration of or findings concerning non-financial alternatives, without findings that a particular release condition is necessary to meet a compelling government interest, and without safeguards to ensure the accuracy of those findings;

~~d.~~f. An order certifying the class defined above; and

~~e.~~g. An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and any other relief this Court deems just and proper.

Date: May 6, 2020                                    Respectfully ~~submitted~~Submitted,

-/s/ Alec Karakatsanis                              /s/ Neal S. Manne
/s/ Elizabeth Rossi                                 Neal S. Manne
                                                                        Alec George
Karakatsanis (*Pro Hac Vice* ~~application forthcoming)~~)      Texas Bar No. 12937980

                                                    alec@civilrightscorps.org
                                                    nmanne@susmangodfrey.com
~~D.C. Bar No. 999294~~
Elizabeth Rossi (*Pro Hac Vice*)               Lexie G. White ~~application forthcoming)~~
~~D.C.~~elizabeth@civilrightscorps.org          Texas Bar No. 24048876~~1500502~~
                                                                        Civil Rights Corps
                                                    lwhite@susmangodfrey.com
                                                                        ~~910 17th Street~~1601
Connecticut Ave NW, Suite 800                  Joseph S. Grinstein 200
                        Washington, DC ~~20006~~
                        ~~Phone: (202) 599-0953~~
                        ~~Fax: (202) 609-8030~~
                        ~~alec@civilrightscorps.org~~
                        elizabeth@civilrightscorps.org

                        /s/ Neal 20009 Texas~~Manne~~
Neal S. ~~Manne~~
                        State Bar No.~~: 12937980~~

~~Lexie G.~~ ~~White~~

~~State Bar No.: 24048876~~

~~Joseph S. Grinstein~~

~~State Bar No.:~~ 24002188

~~Elizabeth Hadaway (*Pro Hac Vice* application forthcoming)~~

~~State Bar No. 24109962~~

Telephone: (202) 681-2721

~~jgrinstein@susmangodfrey.com~~

~~SUSMAN GODFREY L.L.P.~~

*s/ Liyah Brown*

1000 Louisiana Street, Suite 5100

Mimi Marziani (*Pro Hac Vice*)

Houston, ~~TX~~Texas 77002

~~Phone~~Texas State Bar No. 24091906

~~Telephone:~~ (713) 651-9366

~~nmanne@susmangodfrey.com~~

~~lwhite@susmangodfrey.com~~

~~jgrinstein@susmangodfrey.com~~

~~ehadaway~~mimi@texascivilrightsproject.org

~~Facsimile: (713) 654-6666~~

Liyah Brown (*Pro Hac Vice*)

D.C. Bar No. 500149

*/s/ Michael Gervais*

liyah@texascivilrightsproject.org

Michael Gervais (*Pro Hac Vice*)

Peter Steffensen

mgervais@susmangodfrey.com

~~/s/ Natalia M. Cornelio~~

~~Natalia M. Cornelio~~

~~Illinois~~Texas State Bar No. ~~628926~~724106464

~~SUSMAN GODFREY L.L.P.~~

Southern District No. ~~1278866~~3327006

~~1900 Avenue of the Stars, #1400~~

peter@texascivilrightsproject.org

~~Los Angeles, CA 90067~~

Texas Civil Rights Project

~~Telephone: (310) 789-3100~~

~~405 N Main St, Suite 716~~

2202 Alabama Street

Houston, TX ~~77003~~77004

~~Phone: 832-767-3650~~

~~Fax: 832-554-9981~~

~~natalia@texascivilrightsproject.org~~

Telephone: 512-474-5073 ext. 118

*Attorneys for Plaintiffs*