United States District Court
Southern District of Texas
**ENTERED**
November 10, 2020
David J. Bradley, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| DWIGHT RUSSELL, *et al.*, | § | |
| | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-19-226 |
| | § | |
| HARRIS COUNTY, TEXAS, *et al.*, | § | |
| | § | |
| Defendants. | § | |

### MEMORANDUM AND OPINION

Courts across the country are being asked to examine our nation's approach to pretrial bail for those accused of a wide range of felony offenses, who are allegedly too poor to post bond and who are detained, while those who can pay are released.[1] The arrestees are innocent; no judge or jury has found them guilty. They have a right to liberty from detention for the offenses charged, unless and until they are convicted. *See*, *e.g.*, *ODonnell v. Harris County (ODonnell I)*, 892 F.3d 147, 157–58 (5th Cir. 2018). At the same time, the public must be protected against the risk that, if released, a felony arrestee will fail to appear or will commit other offenses. The interests in individual liberty and public safety are complicated, more recently, by pandemic. To this mix, add

---

[1] *Rasmussen v. Garrett*, No. 3:20-CV-00865-IM, 2020 WL 5752334 (D. Or. Sept. 27, 2020); *Hill v. Hall*, No. 3:19-CV-00452, 2019 WL 4928915 (M.D. Tenn. Oct. 7, 2019); *Booth v. Galveston County*, No. 3:18-CV-00104, 2019 WL 3714455 (S.D. Tex. Aug. 7, 2019); *Dixon v. City of St. Louis*, No. 4:19-CV-0112-AGF, 2019 WL 2437026 (E.D. Mo. June 11, 2019), *vacated and remanded*, 950 F.3d 1052 (8th Cir. 2020); *McNeil v. Cmty. Prob. Servs., LLC*, No. 1:18-CV-00033, 2019 WL 633012 (M.D. Tenn. Feb. 14, 2019), *aff'd*, 945 F.3d 991 (6th Cir. 2019); *Knight v. Sheriff of Leon Cty.*, 369 F. Supp. 3d 1214 (N.D. Fla. 2019); *Daves v. Dallas County, Tex.*, 341 F. Supp. 3d 688 (N.D. Tex. 2018); *Little v. Frederick*, No. 6:17-CV-00724, 2018 WL 6036911 (W.D. La. Aug. 28, 2018); *Coleman v. Hennessy*, No. 17-CV-06503, 2018 WL 541091 (N.D. Cal. Jan. 5, 2018); *Schultz v. State*, 330 F. Supp. 3d 1344 (N.D. Ala. 2018); *Buffin v. City & County of San Francisco*, No. 15-CV-04959, 2018 WL 424362 (N.D. Cal. Jan. 16, 2018); *Welchen v. County of Sacramento*, No. 2:16-CV-00185, 2016 WL 5930563 (E.D. Cal. Oct. 11, 2016); *Rodriguez v. Providence Cmty. Corr., Inc.*, 155 F. Supp. 3d 758 (M.D. Tenn. 2015); *Jones v. City of Clanton*, No. 2:15-CV-34, 2015 WL 5387219 (M.D. Ala. Sept. 14, 2015).

the inevitable but complicating factor of politics.  The challenges of maintaining a system that meets federal and state constitutional requirements, and is workable, effective, and fair, are formidable, but our laws demand no less.

Dwight Russell, Johnnie Pierson, Joseph Ortuno, Christopher Clack, and Maurice Wilson, seeking to represent a class, sued Harris County, the Harris County Sheriff, Ed Gonzalez, and 23 Harris County Felony District Court Judges[2] under 42 U.S.C. § 1983, alleging that the defendants promulgate, enforce, and acquiesce in pretrial bail policies for individuals arrested on felony charges that violate the Equal Protection and Due Process Clauses of the United States Constitution.  (Docket Entry No. 195-1).  The alleged violations include detaining individuals who have not been convicted of the crimes charged, solely because they are unable to post an upfront secured financial bail bond, without finding that detention is necessary to serve governmental interests, without holding a timely hearing at which the individuals can present evidence, while arrestees with similar charges and criminal backgrounds who can afford to pay are released.  The alleged result is "mass detention caused by arrestees' inability to access money."  (*Id.* at ¶ 9).

The plaintiffs also challenge the governor's March 29, 2020 Executive Order GA-13, providing that "no authority should release on personal bond any person previously convicted of a crime that involves physical violence or the threat of physical violence, or any person currently arrested for such a crime that is supported by probable cause."  (Docket Entry No. 39-1 at 3).  The plaintiffs allege that Executive Order GA-13 keeps pretrial detainees in jail solely because of their inability to pay and without finding that pretrial detention is necessary, violating equal protection and procedural and substantive due process.  (Docket Entry No. 259 at 34–35).

---

[2] The complaint names Judges Hazel B. Jones, Nikita V. Harmon, Robert Johnson, Kelli Johnson, Randy Roll, DaSean Jones, Danilo Lacayo, Chuck Silverman, Abigail Anastasio, Jason Luong, Greg Glass, Brian E. Warren, Frank Aguilar, Chris Morton, Josh Hill, Hilary Unger, Lori Chambers Gray, Amy Martin, Herb Ritchie, Ramona Franklin, Jesse McClure, III, George Powell, and Brock Thomas.

The plaintiffs seek injunctive and declaratory relief against Harris County, Sheriff Gonzalez, and the 23 Harris County felony district judges in their official capacities. (Docket Entry No. 195-1 at ¶ 197). The State of Texas, the Governor of Texas, and the Attorney General of Texas successfully moved to intervene. (Docket Entry Nos. 38, 46).

The state intervenors and felony judges have moved to dismiss, (Docket Entry Nos. 214, 228), the plaintiffs responded, (Docket Entry No. 259), and the state intervenors and felony judges replied, (Docket Entry Nos. 292, 293). The court held oral argument in October 2020. Based on the pleadings; the motions, responses, and replies; the record; the applicable law; and the oral arguments of counsel, the court denies the state intervenors' and felony judges' motions to dismiss because the record raises vigorously disputed factual allegations that must be developed further to resolve the legal issues the parties present. The parties may reassert their arguments later in the case, on a record that will allow accurate resolution. The present record does not provide a sufficient basis to do so.

The reasons for these rulings are set out below.

## I.     Background

Harris County is one of the largest counties in the United States, both geographically and by population. Many overlapping officials and authorities coordinate and control the County's felony pretrial procedures. The parties sharply dispute basic facts about the pretrial procedures that govern Harris County's felony bail system, including the sources of authority governing bail procedures; the entities or persons operating under that authority; and the roles those entities and officials play in exercising their authority. Taking the plaintiffs' plausible factual allegations as

true for the Rule 12(b)(6) motions, and considering the record as required for the Rule 12(b)(1) motions,[3] Harris County's bail procedures are administered as described below.

### A.    The Sources of Felony Bail Regulation

The Texas Constitution states that "[a]ll prisoners shall be bailable by sufficient sureties, unless for capital offenses, when the proof is evident."  TEX. CONST. art. I, § 11.  The Texas Constitution also forbids "[e]xcessive bail."  *Id.* at § 13.  The Texas Government Code grants magistrates, known as criminal law hearing officers, "limited concurrent jurisdiction over criminal cases filed in the district courts and county criminal courts at law."  Tex. Gov't Code § 54.856(a). Hearing officers may commit an arrestee to jail, discharge the arrestee from custody, or admit the arrestee to bail.  *Id.*  This grant of limited jurisdiction, however, does not "limit or impair the jurisdiction of the court in which the complaint, information, or indictment is filed to review or alter the decision of the criminal law hearing officer."[4]  *Id.* § 54.856(b).

The Texas Code of Criminal Procedure states that "a magistrate may, in the magistrate's discretion, release [an arrestee] on personal bond without sureties or other security," unless the arrestee is charged with certain serious felonies.[5]  Tex. Code Crim. Proc. art. 17.03.  Under the

---

[3] *See Stratta v. Roe*, 961 F.3d 340, 349 (5th Cir. 2020) (a court reviewing a Rule 12(b)(1) motion to dismiss "take[s] the well-pled factual allegations of the complaint as true and view[s] them in the light most favorable to the plaintiff."); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) ("[C]ourts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true.").

[4] The felony judges argue that "discretion whether to release arrestees on personal bond without sureties or to require secured money bail is left to the hearing officers alone, without regard to any direction from other courts or judges."  (Docket Entry No. 228 at 15).  The Texas Government Code grants the felony judges the power to "review or alter" a hearing officer's bail determination.  Tex. Gov't Code § 54.856(b).

[5] Only the district court "may release on personal bond a defendant who . . . is charged with an offense under the following sections" of the Texas Penal Code:
    (A) Section 19.03 (Capital Murder);
    (B) Section 20.04 (Aggravated Kidnapping);
    (C) Section 22.021 (Aggravated Sexual Assault);

Texas Code of Criminal Procedure, "[t]he amount of bail to be required in any case is to be regulated by the court, judges, magistrate or officer taking the bail." *Id.* § 17.15.  Five rules govern their authority:

> 1. The bail shall be sufficiently high to give reasonable assurance that the undertaking will be complied with.
>
> 2. The power to require bail is not to be so used as to make it an instrument of oppression.
>
> 3. The nature of the offense and the circumstances under which it was committed are to be considered.
>
> 4. The ability to make bail is to be regarded, and proof may be taken upon this point.
>
> 5. The future safety of a victim of the alleged offense and the community shall be considered.

*Id.*

The Texas Government Code authorizes felony judges to "adopt rules consistent with the Code of Criminal Procedure . . . for practice and procedure in the courts."  Tex. Gov't Code § 75.403(f).  On September 12, 1996, the Harris County Criminal Court Board of Judges approved the Rules of the Judicial District Courts of Harris County for District Courts Trying Criminal Cases.  Rule 6.12 requires hearing officers to "set bail," "determine whether the defendant is eligible for release on personal recognizance, and commit [the] defendant to custody of the Sheriff

---

(D) Section 22.03 (Deadly Assault on Law Enforcement or Corrections Officer, Member or Employee of Board of Pardons and Paroles,1 or Court Participant);
(E) Section 22.04 (Injury to a Child, Elderly Individual, or Disabled Individual);
(F) Section 29.03 (Aggravated Robbery);
(G) Section 30.02 (Burglary);
(H) Section 71.02 (Engaging in Organized Criminal Activity);
(I) Section 21.02 (Continuous Sexual Abuse of Young Child or Children); or
(J) Section 20A.03 (Continuous Trafficking of Persons).

subject to defendant's posting bond in the amount of set bail."  Rule 6.12 of the Judicial District Courts of Harris County for District Courts Trying Criminal Cases.[6]

On December 12, 2006, the Harris County Administrative Judge for the Criminal Division issued the current Direct Filing Order.  (Docket Entry No. 259-6).  Rule I of the Direct Filing Order states:

> The district judges shall enter a written general order setting the initial amount of bail required of any person charged with a felony offense.  The initial amount of bail so specified in the general order *shall be required of the defendant* (unless the judge of the district court where the case is then pending orders otherwise) pending appearance before the criminal law hearing officer or Preliminary Assigned Court Appearance (PACA) Docket.  Should the attorney for either party desire a bond different in amount than that initially set by the general order of the judges, it is his duty to make written application to the judge where the case is then pending at the next call of the docket.

(*Id.* at 7–8) (emphasis added).  Rule D of the Direct Filing Order states:

> *The criminal law hearing officer shall set bail in accordance with the Bail Schedule established by the board of District Judges Trying Criminal Cases.*  The criminal law hearing officer may, under the authority of the District Court to which the case is assigned, determine whether the defendant is eligible for release on personal bond, and commit the defendant to the custody of the sheriff subject to the defendant's posting bond in the amount of bail set.

(*Id.* at 5) (emphasis added).

The current felony bond schedule became effective in August 2017.  (Docket Entry Nos. 214-D at 3, 214-F at 1).  The Harris County District Court Felony Judges issued the schedule through an administrative order.  (Docket Entry No. 195-1 at ¶ 34).  The bond schedule divides felony arrestees into three risk categories.  (Docket Entry No. 1-4).  One category identifies a set of charged crimes and other criteria that require the arrestee to "remain in custody and have a bail

---

[6] These rules are available at https://www.justex.net/Courts/Criminal/LocalRules.aspx.

hearing at the [probable cause hearing]."[7]  (*Id.*).  The second category carves out low-level offenses that presumptively qualify arrestees for release on personal bond, with no requirement to pay in advance.[8]  Arrestees in the third category are charged with neither high-level nor low-level offenses.  For arrestees in this category, the schedule sets a bond amount based on the arrestee's charged crime and risk-assessment score.

The risk-assessment score measures the likelihood that one of three outcomes will occur: (1) the arrestee will fail to appear; (2) the arrestee will engage in new criminal activity; or (3) the arrestee will engage in new violent criminal activity.  (*Id.*).  The higher the arrestee's scores in any of these three areas, the higher the overall risk score.  New violent criminal activity alone triggers a "High Risk" score.  *(Id.)*.

---

[7] Those offenses and criteria are: "Capital Felony"; "First Degree Felony"; "On bail for any felony charge"; "On bail with multiple pending misdemeanor cases stemming from different arrest events"; "Felony and twice convicted of a felony (higher than SJF)"; "On felony probation or deferred adjudication"; "Felony involving a deadly weapon and prior felony conviction"; "[New violent crime activity] flag or either the [failure to appear] or [new criminal activity] risk score is 6*"; "Assault Family Violence"; "PC 25.07-Violation of Certain Court Orders or Conditions of Bond (family violence, sexual assault or abuse, stalking, or trafficking)"; "PC 38.06 - Escape"; "PC 38.10 - Bail Jumping and Failure to Appear"; and "PC 46.04 - Unlawful Possession of Firearm by felon."  (Docket Entry No. 1-4).

[8] The offenses that presumptively entitle an arrestee to a personal bond are: "Credit/Debit Card Abuse 32.31(d)(SJF)"; "Criminal Nonsupport 25.05"; "Evading 38.04(b)(1)(a)"; "False Alarm/Report 42.06(b)(SJF)"; "Interference w/ Emerg Call 42.062(c) (w/ prior)"; "Prostitution 43.02(c)(2) and (c-1)(2)"; "Possession/Delivery/Manufacture (SJF)"; "Delivery of Marijuana less than 5 lb (SJF)"; "Possession of Marijuana less than 5 lb (SJF)"; "Possession of Marijuana 5-50 lbs (3rd degree)"; "Criminal Mischief (28.03)(b)(4)"; "False Stmt to Obtain Property/Credit 32.32(c)(4)"; "Fraudulent Transfer of Motor Vehicle 32.34(f)(1)"; "Unauth. Use Motor Vehicle 31.07(b)"; "Graffiti 28.08(b)(4)"; "Insurance Fraud 35.02(c)(4)"; "Money Laundering 34.02(e)(1)"; "Theft of Service 31.04(e)(4)"; "Theft 31.03 (e)(4)"; "Trademark Counterfeiting 32.23(e)(4)"; "Bigamy 25.01(e) (3rd degree)"; "Hindering Sec'd Creditors 32.33(d)(4) and (e)(4)"; "Interference with Railroad Property 28.07(e)(3)"; "Misapplication of Fiduciary Property 32.45(c)(4)"; "Unauthorized Use of Telecomm Services 33A.02(b)(3)"; "Forgery 32.21 (d)(SJF)"; "Forgery 32.21(e) (3rd degree)"; "Tampering with Evidence 37.09(c)(3rd degree)"; "Securing Execution of Document by Deception 32.46(b)(4)"; and "Illegal Recruitment of Athlete 32.441(e)(4)."  (Docket Entry No. 1-4)

Each arrestee's risk-assessment score is set by a "risk[-]assessment algorithm."  (Docket Entry No. 195-1 at ¶ 80).  The risk-assessment score is based on nine factors: age at current arrest; current violent offense; pending charges at current arrest; prior misdemeanor convictions; prior felony convictions; the number of prior violent convictions; the number of prior failures-to-appear in the past two years; the number of prior failures-to-appear older than two years; and prior sentences involving incarceration.  *See* Harris County Public Defender's Office, *The Harris County Bail Manual* (2018), https://www.nacdl.org/getattachment/e11b870d-0647-4468-a9aa-408204004509/the-harris-county-bail-manual.pdf.

Once the arrestee's risk score is determined, the hearing officer refers to the following table in the bond schedule, which provides "the bond recommendation":

| Offense | Below Average Risk (1-2) | Average Risk (3-4) | Above Average Risk (5) |
|---|---|---|---|
| State Jail Felony | Presumption PR Bond for Listed Offenses Other $1,000 | No Early Presentment Refer to Magistrate for PR Bond Other $1,500 | $15,000 |
| Third Degree | Presumption PR Bond for Listed Offenses Other $2,500 | $5,000 | $10,000 |
| Second Degree | $10,000 | $20,000 | $30,000 |
| Third Degree -- Specified Charges Intoxication offenses Kidnapping Deadly Conduct Injury Child/Elderly | $15,000 | $25,000 | $35,000 |
| Second Degree -- Specified Charges Agg Assault Offenses Sexual Assaults Burglary Habitation Intoxication Manslaughter Manslaughter Compelling Prostitution | $30,000 | $40,000 | $50,000 |

(Docket Entry No. 1-4).

The rules setting the bail criteria raise several issues.  One set of issues is whether the bail schedule and presumptive bail amount are derived and applied mechanically, with inadequate individualized consideration of arrestees' ability to post pretrial money bail and of less restrictive

alternatives to continued detention.  Another set of issues focuses on the procedures used to set bail and other conditions of pretrial release.

### B.    The Postarrest Procedures

The plaintiffs allege that the defendants have a "policy and practice . . . to detain all felony arrestees who are eligible for release unless they pay a monetary sum" that is "initially determined by a generic schedule and is subsequently set by Hearing Officers at arrestees' probable cause hearings." (Docket Entry No. 195-1 at ¶ 15).  In determining the bail amount, hearing officers do not make findings "either that the person can afford to pay the amount or that detention is necessary to serve any government interest" or "provide the procedural protections required to ensure the accuracy of any decision that results in a person's pretrial detention." (*Id.*).  The second amended complaint describes the hearing officers' consistent practice as arising from written policies issued by the felony district court judges, rules informally communicated to the hearing officers by the felony district court judges, and unwritten customs set by the felony district court judges. (*Id.* at ¶¶ 15, 39, 42, 106, 108, 115, 117, 118, 127, 152).  The plaintiffs allege that Harris County's bail procedures are designed to "coerce and process large numbers of guilty pleas prior to any person conducting any legal or factual investigation into the charges." (*Id.* at ¶ 129).

The second amended complaint describes how the challenged rules, policies, customs, and practices work.

- A person arrested in Harris County is first taken to a field station "run by the arresting authority." (*Id.* at ¶ 82).  Arrestees are held in the field station, a holding cell in the field station, or in the jail.[9] (*Id.*).

---

[9] The complaint alleges that a "Joint Processing Center" is under construction and will be completed by the end of 2017. (*Id.* at ¶ 83).  Once open, "all people arrested by Harris County or the Houston Police Department will be taken directly to the" joint processing center. (*Id.*).  The complaint alleges that "75%

- If the person was arrested without a warrant, the arresting authority uses a "hotline that is staffed 24 hours a day, 7 days a week" to relay the arrest to the Harris County district attorney's office, which decides whether to file formal charges.  (*Id.* at ¶ 84).

- If the district attorney's office declines to file formal charges, it instructs the arresting authority to release the arrestee.  (*Id.* at ¶ 85).  If the district attorney opts to file charges, the arresting officer types a summary of the facts and sends it to the district attorney's office, which formally "will formally accept charges."  (*Id.* at ¶¶ 86–87).

- The district clerk's office "files the case, creates a case number, and assigns the case to a courtroom."  (*Id.* at ¶ 88).

- Pretrial services creates a risk-assessment score by running the arrestee's information through an algorithm, applies the felony-bond schedule, and sets the arrestee's presumptive bond amount.  (*Id.*).  This presumptive bond calculation takes about "6 to 8 hours," (*id.*), and does not include or reflect the arrestee's ability to pay.  (*Id.* at ¶ 89).

- An arrestee who can afford the presumptive bond amount and is not subject to other detention holds—such as an immigration detainer—can post bail be "released from the field station and will never be transported to the Harris County Jail."  (*Id.* at ¶¶ 89–90).  That arrestee may personally pay the bail by posting a bail bond, call and ask a friend or family member to pay the bail, or contact a "commercial bonding agent to post bail."  (*Id.* at ¶ 91).  The "majority of arrestees use a bail bond, obtained through a commercial bail bond company, to secure their release from jail."  (*Id.* at ¶ 93 n.15).  If the arrestee cannot post bail at that point, he or she is transported to the Harris County Jail and formally

---

of arrestees" will "be in the Sheriff's custody upon arrest" once the joint processing center is completed. (*Id.*).

booked.[10]  (*Id.* at ¶ 93).  In 2017, "up to 85% of felony arrestees were booked into the jail because they were unable to immediately pay for their release."  (*Id.* at ¶ 97).

- The Harris County Sheriff "operates the Harris County Jail, the forthcoming Joint Processing Center, and several other detention facilities."  (*Id.* at ¶ 24).  The Harris County Sheriff and his employees are "authorized by County policy to accept money bail, as determined by the money bail schedule or by a judicial officer, and release arrestees."  (*Id.* at ¶ 25).

- After formal booking at the Jail, the arrestee has a probable-cause hearing,[11] which can happen within 24 hours of arrest, though it sometimes takes up to 48 hours.  (*Id.* at ¶ 96). The hearing officer "determines probable cause for the arrest, if it was warrantless, and imposes conditions of release."  (*Id.* at ¶ 99).

- An assistant district attorney attends the probable-cause hearings, "often asking the Hearing Officer to impose money bail in an amount higher than the amount on the schedule or on the warrant."  (*Id.* at ¶ 103).  The district attorney has an "internal policy requiring motions for high bond on certain cases."  (*Id.*).  The district attorney also "has a policy of asking the Hearing Officer to detain using a 'no bond' order [for] every arrestee charged with an offense for which the Texas Constitution authorizes pretrial detention," even if an arrestee's risk-assessment score is low, and without regard to that arrestee's ability to pay. (*Id.*).

---

[10] Transport to the Harris County Jail can require arrestees to travel from 1 to 30 miles, depending on where they were arrested.  (*Id.* at ¶¶ 95).  Harris County is sprawling, encompassing 1,777 square miles.

[11] These hearings are also called "magistrations" or "Article 15.17 hearings."  (*Id.* at ¶ 99).

- Assistant public defenders "are currently authorized to represent most arrestees, though there are some exclusions."[12] (*Id.* at ¶ 101).

- The hearing officer first determines probable cause, then determines any conditions of pretrial release.[13] (*Id.* at ¶ 105). The hearing officer "regularly sets secured money bail and sometimes increases the money bail amount from the amount required by the bail schedule." (*Id.*). The plaintiffs allege that hearing officers, as a matter of "routine practice," (*id.* at ¶ 106), "typically make no findings concerning ability to pay; they make no findings as to whether alternative conditions of release serve the government's interests or whether pretrial detention is necessary to serve any government interest; they do not allow arrestees to confront the evidence and arguments of the government or put on evidence in support of pretrial release; and they do not provide other basic procedural safeguards, such as applying any evidentiary standard to any factual finding, let alone the clear-and-convincing-evidence standard, or issuing any statement of findings or reasons explaining why a particular financial condition or pretrial detention is required." (*Id.* at ¶ 102; *see also id.* at ¶ 106). The hearing officers "rarely require alternative, non-monetary conditions of release and routinely state that they are not permitted to impose certain non-monetary conditions of release."[14] (*Id.* at ¶ 107).

---

[12] The plaintiffs attached to their opposition a joint order from the felony judges that appoints the public defender to represent arrestees at their probable cause hearings. The plaintiffs do not allege that felony arrestees lack counsel. (Docket Entry No. 259-4).

[13] If the arrestee posts bail before the probable-cause hearing, probable cause is determined at "a subsequent court appearance." (*Id.* at ¶ 111). If the arrestee is unable to attend the probable-cause hearing because of medical reasons, the hearing officer "will make a finding of probable cause and require financial conditions of pretrial release in that person's absence." (*Id.* at ¶ 112). Harris County "protocol prohibits assistant public defenders from representing people who are not present at the hearing." (*Id.*).

[14] The plaintiffs contrast these procedures with those required for misdemeanor arrestees. In attachments to their opposition to the motions to dismiss, the plaintiffs describe a misdemeanor bail hearing in which

- The plaintiffs allege that the hearing officers' routine is to "simply review[] the bail amount previously affixed to ensure that it conformed to the bail schedule and the specific policy instructions from the felony judges about how to administer the predetermined schedule." (*Id.* at ¶ 108).

- The instructions from the district court felony judges allegedly specify which categories of arrestees the hearing officers "could and could not order released on personal bonds (i.e., unsecured bonds that do not require payment upfront) and in what circumstances they could deviate from the cash bail schedule (almost never, according to the instructions)." (*Id.*).

- The plaintiffs allege that hearing officers work in an "entrenched culture" of "abiding strictly by written and oral directives regarding the money bail-setting process issued by the felony district judges, who control their employment," even when those directives are "in violation of state judicial conduct rules." (*Id.* at ¶ 117). For example, some felony district judges told hearing officers not to release any "homeless individuals" on "personal bonds."[15] (*Id.*). Others told hearing officers not to give any personal bonds to "individuals who previously received personal bonds in other cases." (*Id.*). Other judges "told Hearing Officers never to issue non-financial conditions for any defendant who was assigned to

---

the hearing officer considered whether secured money bail was "the least restrictive way" to assure the misdemeanor arrestee appeared in court and did not pose a public safety threat. (Docket Entry No. 259-2 at 1). The hearing officer also considered the arrestee's "right to pretrial liberty, alternatives to pretrial detention, whether pretrial detention is necessary for [the arrestee], and how much of a bond [the arrestee] can afford based on [his or her] financial affidavit to pretrial services." (*Id.*). The hearing officer noted that, to impose bail the arrestee could not afford, she was required to find, by "clear and convincing evidence," that "no condition" could ensure that the arrestee would appear in court or prevent the arrestee from posing a threat to public safety. (*Id.* at 2). The plaintiffs describe another misdemeanor bail hearing in which the hearing officer announced similar requirements. (*Id.* at 2–3).

[15] After arrestees pay a personal bond, pretrial services is required to confirm "whether the person has a place to stay if she is released from the jail." (*Id.* at ¶ 115). Because homeless arrestees by definition lack a "permanent" home address, pretrial services cannot confirm that they have a place to stay. (*Id.*). As a result, "[h]omeless defendants" are "categorically ineligible for personal bonds." (*Id.*).

their courtroom at all." (*Id.*).  The hearing officers "believed themselves to be bound by these rules and understood that the judges could hire and fire them at will." (*Id.*).  Even though the felony district judges have "purportedly . . . rescinded" some of these "written instructions" and appear to have given hearing officers "greater discretion to determine bond amounts," the plaintiffs allege that "videos and data demonstrate that actual practices are virtually the same as they have been for many years." (*Id.* at ¶ 118).

- If arrestees do not post money bail after the probable-cause hearing, they remain in jail until their first appearance in front of a felony district judge. (*Id.* at ¶ 123).  While they wait, arrestees are held in a housing unit. (*Id.* at ¶ 122).  Arrestees "generally will not have counsel appointed or be able to meet with counsel until after their first court appearance." (*Id.*).

- First appearances usually occur "within 24 to 48 hours of the probable cause hearing." (*Id.* at ¶ 123).  Arrestees are taken to a district court and usually assigned a court-approved attorney at their first appearance. (*Id.* at ¶¶ 123–124).  Any matters beyond the appointment of counsel are "almost always" reset at a time usually "weeks in the future." (*Id.* at ¶¶ 125–126).

- At the first appearance, the felony district judges do not typically review "the money bail amount previously imposed." (*Id.* at ¶ 124).  Nor do the felony district judges "conduct bail hearings at first appearance." (*Id.* at ¶ 127).  As a result, for weeks after arrest, the judges "make no findings concerning ability to pay; they make no findings as to whether pretrial detention is necessary to serve any government interest; they do not allow arrestees to confront the evidence and arguments of the government or put on evidence and argument in support of pretrial release; and they do not provide other basic procedural safeguards,

14

such as making findings by any evidentiary standard, let alone by clear and convincing evidence, or issuing any statement of reasons concerning why a particular financial condition or pretrial detention is required." (*Id.*).

- If an arrestee wants to challenge the hearing officer's bail decision by having an evidentiary hearing with counsel to seek individualized findings, the arrestee's counsel must file a motion. The requested hearing will likely be scheduled "more than a week after the motion is filed." (*Id.* at ¶ 128). This hearing is the arrestee's "first opportunity to present witnesses or documentary evidence" and have "a judge . . . make findings on the record regarding release conditions." (*Id.*). The hearing, the plaintiffs allege, is usually weeks after arrest, meaning that the arrestee has spent weeks in detention with no evidentiary hearing or particularized findings on detention.

The plaintiffs allege that these practices result in a "wealth-based detention system" that "conditions [arrestees'] release on their ability to afford money bail, thus tying their pretrial freedom to their wealth status." (*Id.* at ¶ 148). Arrestees who are subject to no other basis for pretrial detention and "who have enough money to pay are released"; poorer arrestees with similar charges and histories "eventually make arrangements with private bail bond companies"; and those who "are poorer still are left to languish in jail until their case resolves." (*Id.* at ¶ 154).

The plaintiffs allege that, in 2017, "85% of felony arrestees were booked into the jail [awaiting trial] because they were unable to immediately pay for their release." (*Id.* at ¶ 97; *see also id.* at ¶ 134). If the arrestees "could pay the money bail assigned to them, they could walk out of the doors of the jail at any time." (*Id.* at ¶ 134). Roughly "55% of felony arrestees were still in jail when their case reached disposition," many only because they could not "afford the secured

financial condition set for their release." (*Id.* at ¶ 98). In 2017, only 8% of felony arrestees were released on personal bonds. (*Id.* at ¶ 114).

The plaintiffs separately challenge Governor Abbott's March 29, 2020, Executive Order GA-13. (*Id.* at ¶¶ 172–175). Executive Order GA-13 requires pretrial detention for all arrestees who cannot post a financial bond and who have any prior conviction for a crime involving violence, regardless of their current charge. (*Id.* at ¶¶ 172–173). The plaintiffs allege that Executive Order GA-13 makes pretrial detention indefinite by "suspending relevant speedy trial provisions of Texas law that ordinarily would require a person's release if the state is not ready for trial." (*Id.* at ¶ 174). The plaintiffs allege that Clack and Wilson were ineligible for bail under Executive Order GA-13. (*Id.* at ¶¶ 70, 79). The plaintiffs allege that GA-13 also violates their equal-protection and due-process rights because it requires felony arrestees to be jailed pretrial solely because of their inability to pay and without findings that pretrial detention on the specified secured financial condition is necessary. (Docket Entry No. 259 at 34–35).

The second amended complaint alleges significant collateral consequences of pretrial detention. Felony arrestees who are not released pending trial "are more likely to be sentenced to jail, are less likely to be sentenced to probation, and are given longer sentences than those received by individuals who were released pretrial." (*Id.* at ¶ 132). The "conviction rates for people released at disposition are significantly lower than for similarly situated people who are detained at disposition." (*Id.*). Those detained pretrial are "13% more likely to be convicted and 21% more likely to plead guilty." (*Id.* ¶ 162). Pretrial detention causes "instability in employment, housing, and care for dependent relatives. (*Id.* at ¶ 166). These effects are more pronounced for "people of color." (*Id.* at ¶ 165). The pandemic has only made matters worse for people in crowded jails.

The plaintiffs allege that there is "no relationship between requiring money bail as a condition of release and defendants' rates of appearance in court." (*Id.* at ¶ 155). Personal bonds are "at least as effective at reasonably assuring appearance in court as secured money bail." (*Id.* at ¶ 160). The plaintiffs allege that, in jurisdictions using nonmonetary conditions of release, "88% of defendants released pretrial made all scheduled appearances throughout the life of their cases." (*Id.* at ¶ 159). The plaintiffs allege that "secured money bail does not have any positive benefit to public safety." (*Id.* at ¶ 161). Over "86% of those released pretrial" remained "arrest-free (and 99% remain[ed] arrest-free for violent crimes)." (*Id.* at ¶ 159). The plaintiffs allege that, perversely, pretrial detention makes it "more likely" that an arrestee "will commit new crimes during the pretrial period and after." (*Id.* at ¶ 161). Meanwhile, alternatives to money bail tend to have better outcomes. (*Id.* at ¶¶ 156–160). The argument is that community safety and the public interest are usually better served by pretrial release, not detention.

The second amended complaint alleges that the "felony judges—and every other actor in the County's post-arrest system (as well as anyone who has observed probable cause hearings or first appearances)—know that many of the detained individuals who appear in front of them charged with felonies are being detained in jail solely because they are too poor to pay the money bail amount required as payment for release." (*Id.* at ¶ 131).

### C.      The Complaint Allegations as to the Individual Plaintiffs

The five named plaintiffs are charged with felonies. When the plaintiffs initially filed their claims, they allege, they were each in jail because they could not pay bail.

- Dwight Russell was 61 years old when he was arrested on January 19, 2019, for a third offense of driving while intoxicated. (Docket Entry No. 214-7 at 1; Docket Entry No. 259-8). His bail was set at $25,000. (Docket Entry No. 195-1 at ¶¶ 44–49; Docket Entry No.

214-7 at 1).  He could not afford to post the bond.  (Docket Entry No. 195-1 at ¶ 49).
Russell was released from jail after pleading guilty on March 11, 2019.  (Docket Entry No.
259-9 at 3).  He was in jail for almost two months.

- Johnnie Pierson was 51 years old when he was arrested on January 18, 2019, for possession
  of less than one gram of a controlled substance.  (Docket Entry No. 195-1 at ¶ 51; Docket
  Entry No. 259-8).  His bail was set at $15,000.  (Docket Entry No. 195-1 at ¶¶ 50–55;
  Docket Entry No. 259-8).  Pierson could not afford to promptly post bond.  (Docket Entry
  No. 195-1 at ¶ 55).  Pierson was released from jail on a surety bond on January 31, 2019.
  (Docket Entry No. 259-8).  He was subsequently remanded to custody for allegedly
  violating the terms of his deferred adjudication in a new case.  (*Id.*).  He was detained from
  March 6 to April 7 in connection with that case.  (*Id.*).

- Joseph Ortuno was 18 years old and still in high school when he was arrested on January
  17, 2019, for possessing a controlled substance with intent to deliver.  His bail was set at
  $30,000.  (Docket Entry No. 195-1 at ¶¶ 56–60).  Ortuno was released on a surety bond on
  April 5, 2019, after three months of pretrial detention.  (Docket Entry No. 259-7).

- Christopher Clack was 46 years old when he was arrested on January 17, 2020, for
  tampering with a governmental record and fraudulent use of identifying information.
  (Docket Entry No. 195-1 at ¶¶ 61–70; Docket Entry No. 259-10).  Clack was ineligible for
  a personal bond under Executive Order GA-13.  (Docket Entry No. 195-1 at ¶ 70).  His
  bail was set at $17,500.  (Docket Entry No. 195-1 at ¶ 63; Docket Entry No. 259-10).  Clack
  was homeless at the time he was arrested and could not afford to pay his bond.  (Docket
  Entry No. 195-1 at ¶ 63).  Clack was still in jail as of July 30, 2020.  (Docket Entry No.
  228 at 13 n.7).

- Maurice Wilson was 36 years old when he was arrested on January 30, 2020, for drug possession. (Docket Entry No. 195-1 at ¶¶ 71–79; Docket Entry No. 214-1). Wilson was ineligible for a personal bond under Executive Order GA-13. (Docket Entry No. 195-1 at ¶ 79). His bail was set at $15,000. (Docket Entry No. 195-1 at ¶¶ 71–79; Docket Entry No. 214-1). He could not afford to post bond. (*See* Docket Entry No. 195-1 at ¶ 74). On February 12, 2020, the felony district judge assigned to his case lowered his bail to $10,000, but Wilson could not afford the lower bond. (*Id.*). It is not clear from the record when Wilson was released from jail, but it appears that he was detained for at least four months. (*See id.*)

The plaintiffs allege that their bail amounts were set without "findings concerning [their] ability to pay or the need to detain [them] in light of available, less-restrictive alternative conditions of release." (*Id.* at ¶¶ 11, 46, 53, 59, 66, 77). Nor were they "afforded . . . an adversarial hearing with an opportunity to present evidence and on-the-record findings by clear and convincing evidence." (*Id.* at ¶¶ 46, 53, 59, 66, 77). They allege that these procedures, combined with their pretrial detention, violated their equal-protection and due-process rights.

Each plaintiff's bail order was submitted in the response to the defendants' motions to dismiss. Each bail order contains a boilerplate statement that the hearing officer "considered the Public Safety Assessment results and also considered the . . . presumptive personal bond recommendation." (Docket Entry No. 259-5 at 16). Each order lists the presumptive bail amount, followed by the bail requests of the district attorney and public defender. (*Id.*). The order shows whether the arrestee filled out a financial affidavit. (*Id.*). The order also contains a boilerplate statement that the hearing officer explained the "reasons for this individual assessment of the appropriate conditions of release." (*Id.*). The orders usually contain a very brief explanation of

19

why a personal bond was not approved.  For example, in one case, the hearing officer denied a personal bond because the arrestee's bond had been revoked in a misdemeanor case.  (*Id.* at 14). In another case, the hearing officer wrote: "5/5, Facts & Hist, several Vio Conv's & 2 ++ FTA's, Refer MHU."  (*Id.* at 16).

Video recordings of each plaintiff's probable-cause hearing were attached to the state intervenors' motion to dismiss.  (Docket Entry No 214-2 at 11:04–18:33 [Clack]; at 25:55–30:30 [Wilson]; at 32:37–36:22 [Russell]; at 52:30–55:46 [Pierson]; at 30:29–37:05 [Ortuno]).  In the video recordings of each plaintiff's bail hearing, an assistant public defender in the courtroom for the hearing gave basic facts about each arrestee—age; criminal history; prior failures to appear; place of residence; employment; location of family; and available transportation—and asked for a personal bond or a bond amount.  (*Id.*).  The assistant district attorney, usually appearing by video, then asked for a higher amount, not less than the amount in the bail schedule.  (*Id.*).  The hearing officer then set the bail amount, without making any findings or statements about whether the plaintiff had the ability to pay, whether alternative conditions would adequately serve the government's interests, which facts the officer was relying on to set the pretrial bond, or what standard the officer was applying.  (*Id.*).  The hearing officer informed each arrestee that he or she could challenge the bail amount before the felony district judge.  (*Id.*).  As noted, the plaintiffs allege that the next opportunity to do so was usually weeks in the future.

### D.   Procedural History

The plaintiffs filed this lawsuit on January 21, 2019.  (Docket Entry No. 1).  The case was stayed for roughly a year for settlement discussions.  (Docket Entry Nos. 13, 14, 15, 31).  On March 27, 2020, the plaintiffs filed an emergency motion for a temporary restraining order based on the COVID-19 pandemic.  (Docket Entry No. 32).  Two days later, the State of Texas, the

Governor of Texas, and the Attorney General of Texas moved to intervene.  (Docket Entry No. 38).  The court granted their motion.  (Docket Entry No. 46).  The plaintiffs again moved for a temporary restraining order.  (Docket Entry No. 53).  The court denied the plaintiffs' motions for temporary restraining orders.  (Docket Entry No. 122).

On May 6, 2020, the plaintiffs moved to lift the stay and file an amended complaint. (Docket Entry No. 139, 140).  The plaintiffs' second amended complaint named the felony district court judges as defendants.  (Docket Entry No. 195).  The state intervenors and the Harris County felony district judges have moved to dismiss.  (Docket Entry Nos. 214, 228).  The plaintiffs responded, (Docket Entry No. 259), and the state intervenors and the felony district judges replied, (Docket Entry Nos. 292, 293).   Each basis for dismissal, and the response, is analyzed below.

## II.    The Legal Standards

### A.    Standing, Mootness, and Sovereign Immunity Challenges under Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) applies to challenges to the court's subject-matter jurisdiction based on standing and mootness.  "Federal courts have jurisdiction only over 'cases' or 'controversies.'"  *Williams v. Parker*, 843 F.3d 617, 620 (5th Cir. 2016).   If a party lacks standing, "[t]here is no case or controversy."  *Id.*  Because standing is necessary for subject-matter jurisdiction, it "is a threshold issue that [the court] consider[s] before examining the merits."  *Id.*  The plaintiff has the burden of demonstrating that subject-matter jurisdiction exists. *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).  Because sovereign immunity "deprives the court of jurisdiction," the court also considers motions to dismiss based on sovereign immunity under Rule 12(b)(1).  *Warnock v. Pecos County, Tex.*, 88 F.3d 341, 343 (5th Cir. 1996).

Courts may dismiss for lack of subject-matter jurisdiction based on: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint

supplemented by undisputed facts plus the court's resolution of disputed facts." *Clark v. Tarrant County*, 798 F.2d 736, 741 (5th Cir. 1986) (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)).   When examining a factual challenge to subject-matter jurisdiction under Rule 12(b)(1), which does not implicate the merits of a plaintiff's cause of action, the district court has substantial authority "to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Garcia v. Copenhaver, Bell & Assocs.*, 104 F.3d 1256, 1261 (11th Cir. 1997) (citation omitted); *see also Clark*, 798 F.2d at 741.   The court may consider matters outside the pleadings, such as testimony and affidavits, to resolve a factual challenge to subject-matter jurisdiction, without converting the motion to dismiss to one for summary judgment. *See Garcia*, 104 F.3d at 1261.   A court decides motions to dismiss under Rule 12(b)(1) by "take[ing] the well-pled factual allegations of the complaint as true and view[ing] them in the light most favorable to the plaintiff." *Stratta v. Roe*, 961 F.3d 340, 349 (5th Cir. 2020) (quotation omitted).   "At earlier stages of litigation . . . the manner and degree of evidence required to show standing is less than at later stages." *Speech First, Inc. v. Fenves*, No. 19-50529, 2020 WL 6305819, at *7 (5th Cir. Oct. 28, 2020).

Standing requires: "(1) an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent; (2) a causal connection between the injury and the conduct complained of; and (3) the likelihood that a favorable decision will redress the injury." *Croft v. Governor of Tex.*, 562 F.3d 735, 745 (5th Cir. 2009) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).   As "the party invoking federal jurisdiction," the plaintiffs "bear[ ] the burden of establishing these elements." *Lujan*, 504 U.S. at 561.   They must meet this burden "'with the manner and degree of evidence required at the successive stages of the litigation,'" which means that "on a motion to dismiss, plaintiffs must allege facts that give rise to a plausible claim of . . . standing." *Cornerstone*

22

*Christian Sch. v. Univ. Interscholastic League*, 563 F.3d 127, 133–34 (5th Cir. 2009) (quoting *Lujan*, 504 U.S. at 561). When a complaint seeks multiple kinds of relief, the plaintiff must show standing "for each type of relief sought." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)).

If a party's claims are moot, there is no actual and ongoing controversy within the court's subject-matter jurisdiction. *Honig v. Doe*, 484 U.S. 305, 317 (1988). Mootness "has two aspects: 'when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.'" *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 396 (1980) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). "If a dispute has been resolved or if it has evanesced because of changed circumstances, including the passage of time, it is considered moot. With the designation of mootness comes the concomitant designation of non-justiciability." *Am. Med. Ass'n v. Bowen*, 857 F.2d 267, 270 (5th Cir. 1988) (citations omitted).

"[S]uits against the States and their agencies . . . are barred regardless of the relief sought" by the Eleventh Amendment to the United States Constitution. *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) (citing *Ex parte Young*, 209 U.S. 123 (1908); *Cory v. White*, 457 U.S. 85 (1982)). There is a narrow exception to Eleventh Amendment immunity for suits brought against individuals in their official capacity, as agents of the state or a state entity, if the relief sought is injunctive in nature and prospective in effect. *See Aguilar v. Tex. Dep't of Crim. Just.*, 160 F.3d 1052, 1054 (5th Cir. 1998) (citing *Ex parte Young*, 209 U.S. at 123).

### B.     Pleading Sufficiency under Rule 12(b)(6)

A pleading is deficient and may be dismissed under Rule 12(b)(6) if a plaintiff fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that

the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* The court must "construe the complaint in the light most favorable to the plaintiff." *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 210 (5th Cir. 2010).

"[I]n deciding a motion to dismiss for failure to state a claim, courts must limit their inquiry to the facts stated in the complaint and the documents either attached to or incorporated in the complaint." *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996). A court may "consider documents integral to and explicitly relied on in the complaint, that the defendant appends to his motion to dismiss, as well as the full text of documents that are partially quoted or referred to in the complaint." *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 882 (S.D. Tex. 2001) (quotation marks omitted). Consideration of documents attached to a defendant's motion to dismiss is limited to "documents that are referred to in the plaintiff's complaint and are central to the plaintiff's claim." *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003) (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000)). The court may consider these materials without converting the motion to dismiss to a summary-judgment motion. *See Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 193 n.3 (5th Cir. 1988) (quoting 5 Wright & Miller, FEDERAL PRACTICE AND PROCEDURE, § 1366 (3d ed. 2020)).

### C.       Section 1983

"Section 1983 provides a remedy against 'any person' who, under color of state law, deprives another of rights protected by the Constitution." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992).  A local government may not be sued under § 1983 for the deprivation of rights guaranteed by the Constitution or federal law inflicted solely by its employees or agents. Instead, it is "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government entity is responsible under § 1983." *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  To allege a plausible claim under § 1983 against a municipality, "a plaintiff must show that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009).

An official policy may be either "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipality's] officers," or a "governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell*, 436 U.S. at 690–91.  "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  "*Monell*'s 'policy or custom' requirement applies in § 1983 cases irrespective of whether the relief sought is monetary or prospective." *Los Angeles County v. Humphries*, 562 U.S. 29, 39 (2010).

"[A] municipal judge acting in his or her judicial capacity to enforce state law does not act as a municipal official or lawmaker" for the purposes of § 1983 liability. *Johnson v. Moore*, 958

F.2d 92, 94 (5th Cir. 1992); *see also Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir. 1980) (distinguishing a county judge's "judicial duties" from his or her "executive, legislative and administrative chores in the day-to-day governance of the county").  A municipality may be held liable for "deprivations resulting from the decisions of its duly constituted legislative body."  *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997).  A claim against a municipal defendant in her official capacity is the equivalent of a claim against the municipality itself.  *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985).

"[S]uits against States and their agencies . . . are barred regardless of the relief sought" by the Eleventh Amendment.  *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) (citing *Ex parte Young*, 209 U.S. 123 (1908); *Cory v. White*, 457 U.S. 85 (1982)).

There is a narrow exception to Eleventh Amendment immunity for suits brought against individuals in their official capacity, as agents of the state or a state entity, if the relief sought is injunctive in nature and prospective in effect.  *See Aguilar*, 160 F.3d at 1054 (citing *Ex parte Young*, 209 U.S. at 123).

## III.   Standing and Mootness

The state intervenors and felony judges argue that the plaintiffs lack standing for several reasons.  They argue that: (1) the plaintiffs lack an injury in fact, because (a) they have already received the process required by the Constitution and by *ODonnell v. Harris County (ODonnell I)*, 892 F.3d 147 (5th Cir. 2018), (Docket Entry No. 214 at 23); and (b) four of the plaintiffs were released from pretrial detention before they sued the felony district judges in the second amended complaint (Docket Entry No. 228 at 13); (2) the plaintiffs "have not plausibly shown how their alleged injuries are traceable to the [felony] judges," because each plaintiff's bail was determined by a hearing officer, not a felony district judge, (*id.* at 13–15); and (3) the plaintiffs' injuries are

26

not redressable, because (a) the felony judges lack the authority to release anyone from detention, and (b) sovereign immunity bars the plaintiffs' requested relief, (*id.* at 16).   Each argument is addressed in turn.

### A.   Injury-in-Fact and Mootness

Article III's standing requirement is intertwined with the doctrine of mootness, because a "moot case presents no Article III case or controversy."  *Goldin v. Bartholow*, 166 F.3d 710, 717 (5th Cir. 1999); *see also Smith v. Tarrant Cty. Coll. Dist.*, 694 F. Supp. 2d 610, 616 (N.D. Tex. 2010) ("[T]he doctrine of standing requires the plaintiff to have a person interest in the suit by having suffered an injury in fact, [and] the doctrine of mootness requires that the controversy created by the injury exist throughout the litigation." (citing *Geraghty*, 445 U.S. at 397)).   The state intervenors and felony judges argue, on different grounds, that the plaintiffs' claims are moot for lack of an injury-in-fact.

### 1.   The State Intervenors' Argument

The state intervenors argue that the claims are moot, because the plaintiffs have received all the process to which they are entitled.   But that argument goes to the merits of plaintiffs' claims, not to standing.   *See Bond v. United States*, 564 U.S. 211, 219 (2011) ("[T]he question whether a plaintiff states a claim for relief goes to the merits in the typical case, not the justiciability of a dispute." (quotation marks omitted)); *see also ODonnell v. Harris County, Tex.*, 227 F. Supp. 3d 706, 728 (S.D. Tex. 2016) ("Whether [a plaintiff] challenging the misdemeanor bail system] received due process and equal protection goes to the merits").   This is not a proper standing objection under 12(b)(1).   *Id.*   The sufficiency of the plaintiffs' claims is discussed in Section V, below.

## 2.    The Felony Judges' Argument

The felony district judges urge that the plaintiffs' claims are moot because all but one of the named plaintiffs have now been released from pretrial detention.  (Docket Entry No. 228 at 13).  The plaintiffs do not dispute that Russell, Pierson, Ortuno, and Wilson have been released. (Docket Entry No. 259 at 9–10).  Clack remained in jail as of July 30, 2020.  (Docket Entry No. 228 at 13 n.7).

The fact some of the named plaintiffs were released from pretrial detention before the plaintiffs amended their complaint to name the felony judges does not moot the plaintiffs' claims. First, Clack, a named plaintiff, remained in jail as of July 30, 2020.  The felony judges argue that the court cannot consider Clack's claims because he brought them under § 1983 rather than as a habeas corpus petition, but this is not a standing argument.[16]  (*See* Docket Entry No. 228 at 13) The felony judges do not dispute that Clack's alleged injury is ongoing.  This satisfies Article III's mootness inquiry.  *See Honig v. Doe*, 484 U.S. 305, 317 (1988); *see also United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1538 (2018) (class actions are ordinarily "moot if *no* named class representative with an unexpired claim remain[s] at the time of class certification." (emphasis added)).

Second, even if Clack has now been released, that does not moot the plaintiffs' claims in this inherently transitory putative class action.  The plaintiffs have asserted due-process and equal-protection claims based on constitutionally inadequate bail determinations.  The Supreme Court has held that, in class-action cases challenging procedures for pretrial detention, the release of the

---

[16] The court already dealt with this argument at length in *ODonnell I*, 260 F. Supp. 3d at 815–16.  This case, like *ODonnell I*, is a "broad-based" attack on a regulatory procedure that does not "automatically entitle" the plaintiffs to release but only "enhance[s] eligibility for accelerated release."  *Id.* at 816 (quoting *Serio v. Members of La. Bd. of Pardons*, 821 F.2d 1112, 1119 (5th Cir. 1987)).  Those types of actions "may be brought under § 1983."  *Id.*

named plaintiff from jail did not moot the action. *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975). In *Gerstein*, the Court explained that the alleged injuries were inherently transitory and "capable of repetition, yet evading review":[17]

> Pretrial detention is by nature temporary, and it is most unlikely that any given individual could have his constitutional claim decided on appeal before he is either released or convicted. The individual could nonetheless suffer repeated deprivations, and it is certain that other persons similarly situated will be detained under the allegedly unconstitutional procedures. The claim, in short, is one that is distinctly capable of repetition, yet evading review.

*Id.* The Court went on to explain that the claims were not moot even if the class was certified after the named plaintiffs were released. While "[i]t is by no means certain that any given individual, named as plaintiff, would be in pretrial custody long enough for a district judge to certify the class," in the pretrial detention context, "the constant existence of a class of persons suffering the deprivation is certain." *Id.*; *see also Nielsen v. Preap*, 139 S. Ct. 954, 963 (2019) (plurality opinion); *Ward v. Hellerstedt*, 753 F. App'x 236, 242 (5th Cir. 2018).[18]

The plaintiffs allege constitutional violations affecting a putative class of thousands of felony pretrial detainees. A live controversy exists. The plaintiffs' claims are not moot.

---

[17] The inherently transitory exception to mootness is "distinct" from the capable-of-repetition-yet-evading-review exception. *Olson v. Brown*, 594 F.3d 577, 582 (7th Cir. 2010).

[18] *See also Booth v. Galveston County*, 352 F. Supp. 3d 718, 728 (S.D. Tex. 2019) ("[T]he Supreme Court has expressly held on several occasions that, in a class action challenging procedures for pretrial detention, the release of the named plaintiff from jail does not moot the action."); *County of Riverside v. McLaughlin*, 500 U.S. 44, 51–52 (1991) ("That the class was not certified until after the named plaintiffs' claims had become moot does not deprive us of jurisdiction. We recognized in *Gerstein* that '[s]ome claims are so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires.'"); *Sosna v. Iowa*, 419 U.S. 393, 402 (1975) ("There may be cases in which the controversy involving the named plaintiffs is such that it becomes moot as to them before the district court can reasonably be expected to rule on a certification motion."); *Olson*, 594 F.3d at 583 ("[T]he length of incarceration in a county jail generally cannot be determined at the outset and is subject to a number of unpredictable factors, thereby making it inherently transitory.").

### B.    Traceability

Standing requires a causal connection between a plaintiff's injury and the defendant's challenged conduct.  The injury must be "fairly … trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court."  *Lujan*, 504 U.S. at 560–61.  Traceability "requires something more than conjecture . . . but less than certainty."  *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp*., 968 F.3d 357, 368 (5th Cir. 2020), *as revised* (Aug. 3, 2020).[19]

Construing the second amended complaint's well-pleaded factual allegations in the light most favorable to the plaintiffs, the alleged injuries are traceable to the felony district judges.  The Texas Government Code authorizes the judges to set the policies and procedures that control the bail hearings.  *See* Tex. Gov't Code § 75.403(f).  The felony judges have allegedly exercised this power by enacting policies and procedures that control the bail-setting process, including the felony bail schedule, the Direct Filing Order, and other oral and written directives.  (*See* Docket Entry No. 195-1 at ¶¶ 15, 39, 42, 106, 108, 115, 117, 118, 127, 152).  The plaintiffs allege that the hearing officers work in an "entrenched culture" of "abiding strictly by written and oral directives regarding the money bail-setting process issued by the felony judges."  (*Id.* at ¶ 117).  The plaintiffs allege, for example, that the felony judges have told hearings officers not to release "homeless individuals" on "personal bonds," not to give personal bonds to "individuals who previously received personal bonds in other cases," and "never to issue non-financial conditions for any defendant who was assigned to their courtroom at all."  (*Id.*).  The hearing officers allegedly follow those directives, even when they violate state judicial conduct rules, because the officers "believed

---

[19] For example, in the environmental pollution context, "observational injuries" such as "seeing flares, smoke, and haze" are traceable when they originate from the polluter's buildings; odors are traceable when they get stronger closer to the polluter's complex; and physical symptoms are traceable when they improve the further away the victim is from the polluter's structures.  *ExxonMobil Corp*., 968 F.3d at 369.

themselves to be bound by these rules and understood that the judges could hire and fire them at will." (*Id.*).

Under Texas law, the felony judges have concurrent jurisdiction with the hearing officers over the initial bail proceeding.  Tex. Gov't. Code § 54.856(b).  The felony judges have exercised that jurisdiction by intervening in the initial bail-setting process to reverse the decisions of hearing officers and revoke bonds.  Keri Blakinger, *'A broken system in action': Judge's handling of bond in student's case sparks criticism* (Dec. 18, 2019), https://www.houstonchronicle.com/news/houston-texas/houston/article/A-broken-system-inaction-Judge-s-14914415.php (describing a felony judge revoking a personal bond set by a hearing officer three minutes earlier); (Docket Entry No. 259-26 (ethics complaint describing a felony judge who revoked bonds set by magistrate judges within days or hours of the initial bond hearings)).

The plaintiffs allege that the felony judges promulgate and implement the policies and procedures for the bail hearings and determinations, and that these policies and procedures violate the plaintiffs' equal-protection and due-process rights.  Those alleged injuries have a "fairly traceable causal link" to the felony district judges.  *See Cadle Co. v. Neubauer*, 562 F.3d 369, 371 (5th Cir. 2009) (quotation marks omitted).

C.     **Redressability**

The felony judges argue that the plaintiffs' alleged injuries are not redressable by the relief that they seek because (1) the felony judges lack the authority to release detainees, and (2) sovereign immunity bars the plaintiffs' requested relief.  On the current record, neither argument is enough to dismiss.

### 1.    The Felony Judges' Authority

Article III standing requires that it must be "likely," as opposed to merely "speculative," that a plaintiff's injury will be "redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61 (citation omitted); *see also Aransas Project v. Shaw*, 775 F.3d 641, 648 (5th Cir. 2014).  The felony judges argue that any relief ordered against them will not redress the plaintiffs' alleged injury, because felony pretrial detainees are in the custody of the Harris County Sheriff, not the felony district judges, and because the felony judges cannot order the release of detainees.  (Docket Entry No. 228 at 16).

This assertion mischaracterizes the relief the plaintiffs seek.  The plaintiffs are not seeking the categorical release of the proposed class.  They seek a declaratory judgment and increased procedural protections at bail hearings.  The plaintiffs request an order enjoining the defendants from jailing felony arrestees "without findings concerning ability to pay, without consideration of or findings concerning non-financial alternatives, without findings that pretrial detention is necessary to meet a compelling government interest, and without safeguards to ensure the accuracy of those findings."  (Docket Entry No. 195-1 at 50).

The plaintiffs have adequately shown that, under the standards that apply to this early stage of the case, their injuries could be redressed through relief ordered against the felony district judges.  *See Speech First*, No. 19-50529, 2020 WL 6305819, at *7 ("At earlier stages of litigation . . . the manner and degree of evidence required to show standing is less than at later stages.").

### 2.    Sovereign Immunity

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S.

CONST. amend. XI.  The Supreme Court has long held that federalism extends immunity to states sued by their own citizens in a federal court.  *See Hans v. Louisiana*, 134 U.S. 1, 13 (1890) (sovereign immunity bars suits by citizens of a state against their own state).  The Supreme Court has repeatedly affirmed that sovereign immunity protects states from undue intrusion by the federal judiciary and accords them dignity consistent with their role as sovereign entities in our federalist system.  *See Va. Off. for Prot. & Advocac. v. Stewart*, 563 U.S. 247, 258 (2011) ("The specific indignity against which sovereign immunity protects is the insult to a State of being haled into court without its consent");  *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002) ("The preeminent purpose of state sovereign immunity is to accord States the dignity that is consistent with their status as sovereign entities.").   Because "[s]overeign immunity is jurisdictional in nature," this court may not hear a suit that the Eleventh Amendment bars.  *FDIC v. Meyer*, 510 U.S. 471, 475 (1994).

But the Eleventh Amendment bar to suits against states is "not absolute."  *AT&T Commc'ns v. BellSouth Telecomms. Inc.*, 238 F.3d 636, 643 (5th Cir. 2001).  When, as here, a state does not consent to suit, a plaintiff may nonetheless "sue individual state officers in federal court to obtain prospective [injunctive or declaratory] relief from an ongoing violation of federal law."  *Id.* at 647. The Supreme Court recognized that exception to sovereign immunity in *Ex parte Young*, 209 U.S. 123 (1908).  *Id.*  The felony judges argue that *Ex parte Young* does not apply, because (1) the judges "do not enforce the state laws Plaintiffs challenge," (2) the plaintiffs "cannot identify any colorable violation of federal law," and (3) any alleged violation was in the past.  (Docket Entry No. 228 at 18–19).[20]

---

[20] The state intervenors also question, in passing, whether *Ex parte Young* applies.  (Docket Entry No. 214 at 21) ("[H]ow can Plaintiffs sue the District Court Judges without an ongoing violation of law capable of leveraging the *Ex parte Young* exception to sovereign immunity?").

To determine whether *Ex parte Young* applies, the "court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., joined by Scalia and Thomas, JJ., concurring in part and concurring in judgment)). In conducting that inquiry, the court considers three things.

First, the "contours" of the constitutional right "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right," but a court can act without a binding precedent condemning the precise challenged conduct. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Second, the official who is the subject of the lawsuit must have "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Okpalobi v. Foster*, 244 F.3d 405, 416 (5th Cir. 2001) (en banc). A "general duty to see that the laws of the state are implemented" is not enough. *Id.* Rather, there must be "some enforcement power or act that can be enjoined." *Id.* at 419. The fact that an official promulgated the challenged law or rule is not enough; the official must have the authority to enforce that law or rule. *See e.g.*, *In re Abbott*, 956 F.3d 696, 709 (5th Cir. 2020); *Mi Familia Vota v. Abbott*, No. 20-50793, 2020 WL 6058290, at *4 (5th Cir. Oct. 14, 2020). The Fifth Circuit has recently found, for example, that the Louisiana Governor and Attorney General did not have the requisite connection to a statute making Louisiana abortion providers liable, in tort, for harm to patients. *Okpalobi*, 244 F.3d. at 423–424. The Fifth Circuit has also held that the Texas Governor and Attorney General lacked the necessary enforcement authority over an Executive Order and Rule requiring the postponement of all nonurgent medical procedures in a pandemic. *In re Abbott*, 956 F.3d at 709. In another recent

case, the Fifth Circuit ruled that the Texas Governor and Secretary of State did not have the required connection to be subject to suit for a voting-related Executive Order and statute that were enforced county-by-county for those officials. *Mi Familia Vota*, 2020 WL 6058290 at *4.

Finally, relief in suits brought under *Ex parte Young* must be within the bounds of the narrow exception to sovereign immunity that the doctrine provides. The plaintiffs' requested relief may not unduly infringe on a state's sovereign interests. As the Fifth Circuit recently explained in discussing prospective relief under *Ex parte Young*, "[o]ften, the line between the permissible and the forbidden is fuzzy." *Green Valley Special Util. Dist. v. City of Schertz, Tex.*, 969 F.3d 460, 471 (5th Cir. 2020) (en banc). Whether, and when, a federal court may order a state official to take "affirmative action" under *Ex parte Young* are unsettled questions that have inspired "significant debate." *Id.* at 472 n.21.[21] It is clear, however, that the court cannot order relief that would control a defendant's exercise of discretionary functions. *Richardson v. Tex. Sec'y of State*, No. 20-50774, 2020 WL 6127721, at *16 (5th Cir. Oct. 19, 2020) (citing *Ex parte Young*, 209 U.S.

---

[21] *Green Valley* discusses the debate over the statement in *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 691 n.11 (1949) that "a suit may fail, as one against the sovereign . . .if the relief requested cannot be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign." The Fifth Circuit has adopted a balancing approach under *Larson*, requiring district courts to determine "whether the relief sought would work an intolerable burden on governmental functions, outweighing any consideration of private harm." *Saine v. Hosp. Auth. of Hall Cty.*, 502 F.2d 1033, 1037 (5th Cir. 1974) (quotation marks omitted). Other circuits have questioned whether *Larson*'s footnote 11 is good law, or have concluded that it does not bar all injunctions requiring affirmative action. *See Vann v. Kempthorne*, 534 F.3d 741, 752–754 (D.C. Cir. 2008) (injunctive relief preventing the Cherokee Nation from holding further elections without allowing Cherokee descendants of freed slaves to vote did not "run afoul" of *Larson*'s footnote 11 because the relief would not compel the Cherokee Nation's discretionary functions); *Dotson v. Griesa*, 398 F.3d 156, 178 (2d Cir. 2005) ("Subsequent decisions by the Supreme Court, this court, and our sister circuits all indicate that" *Larson* does not bar court orders of reinstatement); *Saine*, 502 F.2d at 1036 ("[T]he Courts of Appeals for the Ninth and District of Columbia Circuits . . . have concluded that footnote 11 of *Larson* does not bar all actions seeking affirmative action by governmental officials." (citing *Knox Hill Tenant Council v. Washington*, 448 F.2d 1045 (D.C. Cir. 1971); *State of Washington v. Udall*, 417 F.2d 1310 (9th Cir. 1969) *superseded by statute on other grounds*)).

at 158).[22]   A court may not order a state judge to reach a particular result in a particular case, or rule a certain way on an issue committed to judicial discretion.  *See Richardson*, 2020 WL 6127721 at *21 (requiring the Secretary of State to promulgate a federal district court's precise, mandated procedures for curing ballots with mismatched signatures, when the Secretary of State had "considerable" discretion to enforce election law, "impinge[d] on her discretionary function in flat violation of *Young*.").

The plaintiffs' well-pleaded factual allegations are enough, on this record, to preclude dismissal on sovereign immunity grounds.  The plaintiffs assert § 1983 claims based on three constitutional rights:  (1) the equal-protection right to be not be detained based solely on one's inability to pay a bond; (2) the substantive due-process right to pretrial liberty in the absence of a compelling state interest in detention; and (3) the procedural due-process right to constitutionally sufficient procedures before the deprivation of a fundamental right.  (*See* Docket Entry No. 259 at 11).  The Fifth Circuit has "concluded that '[t]he incarceration of those who cannot [pay money bail], without meaningful consideration of other possible alternatives, infringes on both due process and equal protection requirements.'"  *ODonnell I*, 892 F.3d at 157 (citation omitted).[23]

---

[22] *Richardson* explains that "[i]f a statute, regulation, or policy leaves it to . . . [an] agency to determine when and how to take action, the agency is not bound to act in a particular manner and the exercise of its authority is discretionary."  2020 WL 6127721 at *21 (alteration in original) (quoting *St. Tammany Par. ex rel. Davis v. FEMA*, 556 F.3d 307, 323 (5th Cir. 2009)).

[23] The felony judges also rely on an unpublished Fifth Circuit case to support their argument that the *Ex parte Young* exception to sovereign immunity does not apply to this case because the plaintiffs have not advanced a colorable constitutional claim.  (Docket Entry No. 228 at 21–22 (citing *Hall v. Tex. Comm'n on Law Enf't*, 685 F. App'x 337, 338 (5th Cir. 2017) (per curiam)).   In *Hall*, a pro se former law-enforcement officer alleged that the Texas Commission on Law Enforcement violated due process by allowing his peace-officer license to expire after he was unemployed for two years, and by "not allowing him to be re-certified."  685 F. App'x 338.  The court found that sovereign immunity barred Hall's suit because the law was settled that due process did not require a hearing or adjudicatory proceeding before the commission denied of Hall's recertification as a peace officer.  *Id.* at 340–341.  The plaintiffs' allegations in the current case dictate a different conclusion.

The plaintiffs' alleged facts are vigorously disputed.  Their allegations are that the felony district judges have, and exercise, enforcement authority over the challenged bail procedures and criteria.  Unlike a governor who promulgates an executive order but has no involvement in its day-to-day enforcement, the felony judges both issue the bail determination rules, policies, and procedures and have ultimate authority over each bail determination, sometimes intervening to reverse hearing officers in individual cases.  (*See, e.g.*, Docket Entry No. 259-26).  The felony district judges have statutory authority to make the rules, policies, and procedures for felony bail in Harris County.  *See* Tex. Gov't Code § 75.403(f).  The felony judges have demonstrated their willingness to exercise that statutory authority by enacting the rules, policies, and procedures that control the bail-setting process, including the felony bail schedule, the Direct Filing Order, and other oral and written directives.  (*See* Docket Entry No. 259 at 49; Docket Entry Nos. 259-6, 214-4 at 3, 214-6 at 1).

The plaintiffs allege that the felony judges exercise detailed control over the bail hearings by requiring hearing officers to "abid[e] strictly by written and oral directives regarding the money bail-setting process issued by the felony judges."  (Docket Entry No. 195-1 at ¶ 117).  These directives vary from judge to judge, but they include detailed commands that demonstrate the hands-on nature of the felony judges' supervisory authority.  For example, felony judges have allegedly told hearing officers not to release any "homeless individuals" on "personal bonds," not to give personal bonds to "individuals who previously received personal bonds in other cases," or "never to issue non-financial conditions for any defendant who was assigned to their courtroom at all."  (*Id.*).  The hearing officers follow these directives, even when they require the officers to act "in violation of state judicial conduct rules," because the officers "believed themselves to be bound by" these directives and "understood that the judges could hire and fire them at will."  (*Id.*).  The

plaintiffs allege facts showing that the felony judges have the required connection to the procedures they challenge.

Finally, at least some of the plaintiffs' requested relief could be permissible under *Ex parte Young*. The plaintiffs' requested relief includes: (1) a declaratory judgment that the defendants are violating the plaintiffs' constitutional rights by detaining them solely because of their inability to pay; (2) an order enjoining the defendants from continuing those unconstitutional acts; (3) a declaratory judgment that Executive Order GA-13 is unconstitutional because it results in unconstitutional pretrial detention based solely on an arrestee's inability to pay; and (4) an order enjoining Sheriff Gonzalez and Harris County from enforcing Executive Order GA-13. (*Id.* at 50–51). Prospective declaratory relief is permitted under *Ex parte Young. See Nelson v. Univ. of Tex. at Dall.*, 535 F.3d 318, 322 (5th Cir. 2008). The felony district judges agree that the relief that the plaintiffs seek is properly characterized as prospective. (Docket Entry No. 228 at 13 (The plaintiffs "ask for only prospective relief.")).

The plaintiffs assert that they seek a declaratory judgment and procedural safeguards, not an order mandating or shaping a felony judge decision in any particular case or in any class of cases. (Docket Entry No. 159 at 10–11). In *ODonnell I*, the Fifth Circuit concluded that similar prospective injunctive relief sought "to impose 'nondiscretionary procedural safeguard[s],' which will not require federal intrusion into pre-trial decisions on a case-by-case basis." *ODonnell I*, 892 F.3d at 156 (alteration in original) (quoting *Tarter v. Hury*, 646 F.2d 1010, 1013–14 (5th Cir. Unit A June 1981)). The Fifth Circuit's *ODonnell I* opinion stated that "[s]uch relief does not implicate our concerns for comity and federalism." *Id.* at 157.

The felony judges and state intervenors dispute whether the plaintiffs' requested relief is permissible, as well as the need and basis for that relief. But whether relief is permitted or required,

and, if so, the limits of that relief, cannot be determined without discovery and an opportunity to be heard.   The issue now before the court is only whether all of the plaintiffs' requested relief is barred by sovereign immunity.  *See Green Valley*, 969 F.3d at 473 ("[E]ven if some of the relief sought is not available, it does not follow that *Young* bars [the] entire suit").  At this stage, the court need not determine the contours of the relief that might be granted on a fuller record.  *See Mi Familia Vota*, 2020 WL 6058290 at *6–8 (explaining that, based on the plaintiffs' complaint and motion for a preliminary injunction, much of the requested relief would "violate principles of federalism" and remanding for further proceedings to determine whether any relief was necessary and permissible).  It is enough that, given the allegations and the disputed factual issues they raise, the plaintiffs are not foreclosed from obtaining some of the relief they seek.

The felony judges primarily raise arguments about the sufficiency of the plaintiffs' allegations, denying facts that the plaintiffs may or may not be able to prove at a later stage of the case. But at this stage, the court must take the plaintiffs' well-pleaded allegations as true.  The plaintiffs have alleged sufficient facts to allow their claims to proceed under the *Ex parte Young* exception at this stage of the case.  *See Stratta*, 961 F.3d at 349 ("When reviewing 12(b)(1) dismissals, we take the well-pled factual allegations of the complaint as true and view them in the light most favorable to the plaintiff." (quotation omitted)).

## IV.    **Sovereign Immunity Under** *Coeur d'Alene*

Relying on *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261 (1997), the felony district judges also argue that the "special sovereignty interests" inherent in the criminal justice system preclude applying the *Ex parte Young* exception here.  (Docket Entry No. 292 at 22).  But the Fifth Circuit has "rejected the idea that *Coeur d'Alene* affects the traditional application of *Ex parte Young*."  *AT&T Commc'ns*, 238 F.3d at 648.  The Fifth Circuit has explained that:

> We concur with the consensus among other courts that although the principal opinion in *Coeur d'Alene* suggests a case-by-case (rather than rule-based) approach the application of *Ex parte Young*, this part of the opinion did not muster a majority, and a majority of the Court would continue to apply the rule of *Ex parte Young* as it has been traditionally understood.

*Id.* at 648–49 (citations omitted).   A Supreme Court majority subsequently adopted the concurrence in *Coeur d'Alene*, affirming that "a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'"   *Verizon*, 535 U.S. at 645 (alternation in original) (quoting *Coeur d'Alene*, 521 U.S. at 296 (O'Connor, J., joined by Scalia and Thomas, JJ., concurring in part and concurring in the judgment)).

Even if *Coeur d'Alene* did apply, the felony judges have not identified the kind of "special sovereignty interest" that, in *Coeur d'Alene*, prevented the federal judiciary from hearing the case. *See* 521 U.S. at 281.  The Coeur d'Alene tribe sued state defendants, claiming a right to own certain submerged lands.  *Id.* at 264.  The Supreme Court found that "the Tribe's suit [was] the functional equivalent of a quiet title action."  *Id.* at 281.  Because the lawsuit implicated the state's special sovereignty interest in its land, the Court held that in "these particular and special circumstances" the tribe could not sue the state officials in federal court.  *Id.* at 287.

The felony district judges argue that the special interests associated with the criminal justice system require this court to extend *Coeur d'Alene* beyond the state property interests at issue in that case.  (Docket Entry No. 292 at 22–23).  But federal courts have intervened to remedy constitutional violations by state officials related to the administration of the criminal justice system.  *See, e.g.*, *Nelson v. Colorado*, 137 S. Ct. 1249, 197 (2017) (Colorado statutes violated due process by requiring defendants whose convictions had been reversed or vacated to prove their innocence in order to obtain the refund of costs, fees, and restitution paid due to the invalid conviction); *Brown v. Plata*, 563 U.S. 493 (2011) (upholding an order requiring California to

reduce overcrowding in its prisons to remedy Eighth Amendment violations); *Meza v. Livingston*, 607 F.3d 392, 401 (5th Cir. 2010), *decision clarified on denial of reh'g*, No. 09-50367, 2010 WL 6511727 (5th Cir. Oct. 19, 2010) (a parolee had a liberty interest in being free from being required to register as a sex offender and participate in sex-offender therapy, and his due-process claims were not barred by sovereign immunity).  The Fifth Circuit did so in the *ODonnell* case.  *See ODonnell I*, 892 F.3d at 158 (injunctive relief directed at Harris County, based on its misdemeanor bail system did not implicate "concerns for comity and federalism").

To be sure, states have an important interest in the administration of their criminal justice systems.  But federal courts may still consider suits alleging violations of core constitutional rights, even when a state criminal justice system is involved.  The special interests in the criminal justice system do not justify the broad extension of *Coeur d'Alene* that the judges seek.  At this stage, given the allegations, the plaintiffs' claims against the felony judges may fall within the *Ex parte Young* exception and are not barred by sovereign immunity.

On this record, the motions to dismiss under Rule 12(b)(1), (Docket Entry Nos. 214, 228) are denied.  The arguments may be raised again, on a fuller record.

## V.      The Constitutional Challenges to Pretrial Detention

The plaintiffs allege that Harris County's felony bail practices violate their equal-protection rights, because felony arrestees are detained pretrial "solely because they cannot afford to pay money bail amounts imposed without findings concerning their present ability to pay and without findings concerning the necessity of the detention in light of alternative conditions of release that could serve the government's interests."  (Docket Entry No. 195-1 at ¶ 200).  The plaintiffs allege violations of their substantive due-process rights, because they have a protected "interest in pretrial liberty" that is denied by the "de facto order[s] of pretrial detention" imposed without any finding

41

"that no alternative short of pretrial detention exists to mitigate an identifiable risk to the safety of the community or a risk of flight from prosecution, and that pretrial detention is therefore necessary to serve a specified, compelling interest in public safety or court appearance." (*Id.* at ¶ 202). The plaintiffs also allege violations of their procedural due-process rights, because the felony judges fail to provide "minimal safeguards required by the Constitution," including "an adversarial hearing, with counsel, at which the person has notice of the critical issues to be decided at the hearing, an opportunity to be heard and to present and confront evidence, and a statement of reasons on the record explaining the reasons for the finding that pretrial detention is necessary." (*Id.* at ¶ 204).

### A.      The Eighth Amendment

The state intervenors and felony judges argue that the plaintiffs' complaint dresses an Eighth Amendment case in a Fourteenth Amendment costume that "cannot circumvent" the limits of the Eighth Amendment. (Docket Entry No. 214 at 19; *see also* Docket Entry No. 228 at 28 n.16). The Fifth Circuit rejected that argument in *ODonnell I*.

The Eighth Amendment prohibits "[e]xcessive bail." U.S. CONST. amend. VIII. It is generally true that, "when a constitutional provision specifically addresses a given claim for relief under 42 U.S.C. § 1983, a party should seek to apply that provision directly." *ODonnell I*, 892 F.3d at 157 (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989)). But the Fifth Circuit has "already concluded that '[t]he incarceration of those who cannot [pay money bail], without meaningful consideration of other possible alternatives, infringes on both due process and equal protection requirements.'" *ODonnell I*, 892 F.3d at 157 (quoting *Pugh v. Rainwater (Rainwater II)*, 572 F.2d 1053, 1057 (5th Cir. 1978) (en banc)). This case is like *ODonnell I* and the *Rainwater* cases.

The plaintiffs challenge the incarceration of those who are too poor to pay secured financial bail, without meaningful consideration of possible alternatives. The second amended complaint asserts due-process and equal-protection violations, not Eighth Amendment violations. *ODonnell I*, 892 F.3d at 157; *see also Walker v. City of Calhoun, Ga.*, 901 F.3d 1245, 1259 (11th Cir. 2018) (rejecting "the defendant's contention that relief can be accorded only under the Eighth Amendment."). This argument does not support dismissal.

### B.      The Equal-Protection Claims

In the Fifth Circuit, "imprisonment solely because of indigent status" qualifies as "invidious discrimination." *Rainwater II*, 572 F.2d at 1056; *see also Tate v. Short*, 401 U.S. 395, 397–99 (1971) (invalidating a facially neutral statute that authorized imprisonment for failure to pay fines because it violated the equal protection rights of indigents); *Williams v. Illinois*, 399 U.S. 235, 242 (1970) (a facially neutral system of imprisoning convicted defendants who did not pay their fines "works an invidious discrimination" as applied to indigent defendants). In *ODonnell I*, the Fifth Circuit reaffirmed this principle, holding that "detainment solely due to a person's indigency" is a "discriminatory action" and "unconstitutional." 892 F.3d at 161.

Although pretrial detention based on wealth is unconstitutional, a state may detain a felony arrestee before trial if it has a compelling reason to do so. The state may impose pretrial detention to ensure the arrestee's "presence at trial." *Rainwater II*, 572 F.2d at 1056. The state may also justify pretrial detention if the arrestee presents a danger of committing new crimes. *See ODonnell I*, 892 F.3d at 162 ("[T]he County had a compelling interest in the assurance of a misdemeanor detainee's . . . lawful behavior").

The Fifth Circuit has twice applied heightened scrutiny when assessing classifications based on wealth in the context of pretrial incarceration. In its first *Rainwater* opinion, *Pugh v.*

*Rainwater (Rainwater I)*, 557 F.2d 1189 (5th Cir. 1977), the Fifth Circuit applied strict scrutiny to a § 1983 equal-protection challenge to Florida's refusal to consider a defendant's inability to pay when setting bail.  The court noted that, although the Supreme Court did not consider wealth a suspect classification, the Court was still "extremely sensitive to classifications based on wealth in the context of criminal prosecutions."  *Id.* at 1196.  The panel applied strict scrutiny because the claim implicated the "fundamental" Fourteenth Amendment rights to be presumed innocent and eligible for release before trial and criminal conviction.  *Id.* at 1197.  The panel decision was vacated en banc after Florida changed its bail rules while the appeal was pending.  *See Rainwater II*, 572 F.2d at 1055.  But the en banc court affirmed the panel's basis for its ruling, stating that "[a]t the outset we accept the principle that imprisonment solely because of indigent status is invidious discrimination and not constitutionally permissible." *Id.* (citations omitted).

In *ODonnell I*, the Fifth Circuit held that that Harris County's misdemeanor bail practices were unconstitutional because Harris County judges imposed bail based on "predetermined amounts beyond a person's ability to pay and without any meaningful consideration of other possible alternatives," which "resulted in detainment solely due to a person's indigency." *ODonnell I*, 892 F.3d at 161.  The court made clear that neither prisoners nor indigents "constitute a suspect class," but noted that the Supreme Court had created an exception to that rule, applying "heightened scrutiny" when "criminal laws detain poor defendants *because of* their indigence." *Id.*  The court noted that the Supreme Court has applied heightened scrutiny to actions affecting "indigents" when "two conditions" were met: "(1) 'because of their impecunity [the indigents] were completely unable to pay for some desired benefit,' and (2) 'as a consequence, they sustained an absolute deprivation of a meaningful opportunity to enjoy that benefit.'"  *Id.* (quoting *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 20 (1973)).  Both factors applied in *ODonnell*

*I*: "indigent misdemeanor arrestees [were] unable to pay secured bail, and, as a result, sustain[ed] an absolute deprivation of their most basic liberty interests—freedom from incarceration." 892 F.3d at 162. The result was a "basic injustice: poor arrestees in Harris County are incarcerated where similarly situated wealthy arrestees are not, solely because the indigent cannot afford to pay a secured bond." *Id.*

The Fifth Circuit upheld the district court's application of intermediate scrutiny and the finding that Harris County's misdemeanor bail system was unconstitutional. *Id.* The Fifth Circuit noted the district court's findings, based on an extensive record, that there was no "link between financial conditions of release and appearance at trial or law-abiding behavior before trial." *Id.* Although the state had compelling interests in assuring lawful behavior and appearances at trial, it had not "narrowly tailored" its bail practices to meet those interests, which rendered the practices unconstitutional. *Id.*

The plaintiffs argue that intermediate scrutiny applies here, because they allege the same two conditions found in *ODonnell I*. The plaintiffs allege that they cannot, or could not, pay the secured bail amounts set in their cases. (Docket Entry No. 195-1 at ¶¶ 11, 48–49, 54–55, 60, 64–65, 74–76; *see also* Docket Entry Nos. 1-1 at ¶ 4, 1-2 at ¶ 5, 1-3 at ¶ 4). They allege that they were deprived of their fundamental liberty interest in freedom from pretrial detention solely because they could not afford to pay secured money bail. (Docket Entry No. 195-1 at ¶¶ 5, 11, 202). If proven, those facts would trigger intermediate scrutiny. *See ODonnell I*, 892 F.3d at 162.

The plaintiffs allege that, if intermediate scrutiny applies, Harris County's felony bail system is unconstitutional, because imposing "money bail without findings concerning ability to pay" is not related to "legitimate or compelling government interest[s]." (Docket Entry No. 195-1 at ¶ 164). They allege that:

- Empirical evidence decisively shows that "secured money bail does not have any positive benefit to public safety" because it neither increases the likelihood that an arrestee will appear at trial nor decreases the likelihood of new criminal behavior, (*id.* at ¶¶ 160–161);

- Imposing secured money bail on those unable to pay, who remain in detention solely because they cannot do so, increases the risk of new crimes, (*id.*);

- Despite the negative effects of imposing secured money bail, the defendants use money bail to keep impoverished arrestees in jail, without considering alternatives to pretrial detention that are effective in protecting the public and assuring that the arrestees appear in court, (*id.* at ¶¶ 157–59);

- Hearing officers, as a matter of "routine practice," (*id.* at ¶ 106), "typically make no findings concerning ability to pay; they make no findings as to whether alternative conditions of release serve the government's interests or whether pretrial detention is necessary to serve any government interest; they do not allow arrestees to confront the evidence and arguments of the government or put on evidence in support of pretrial release; and they do not provide other basic procedural safeguards, such as applying any evidentiary standard to any factual finding, let alone the clear-and-convincing-evidence standard, or issuing any statement of findings or reasons explaining why a particular financial condition or pretrial detention is required," (*id.* at ¶ 102; *see also id.* at ¶ 106); and

- Hearing officers "rarely require alternative, non-monetary conditions of release and routinely state that they are not permitted to impose certain non-monetary conditions of release," (*id.* at ¶ 107).

Construing these allegations in the light most favorable to the plaintiffs, the second amended complaint states a plausible claim for relief under *ODonnell I* and the Fourteenth Amendment's Equal Protection Clause.[24]  892 F.3d at 163.

The felony judges argue that the plaintiffs are receiving everything required by *ODonnell I*. (*See* Docket Entry No. 292 at 18–20).  The state intervenors similarly argue that the plaintiffs' equal-protection claims deserve only rational-basis scrutiny because they are receiving the procedures guaranteed by *ODonnell I*.[25]  (Docket Entry No. 214 at 22).

The plaintiffs allege otherwise.  Even though the plaintiffs do not cite *ODonnell I* in their second amended complaint, they allege that they are not receiving the protections found necessary in *ODonnell I*, including an opportunity to be heard and present evidence, a reasoned decision by the decisionmaker, and "individual consideration for each arrestee of whether [an affordable bail] amount or [nonmonetary] condition provides sufficient sureties."  *ODonnell I*, 892 F.3d at 163– 64; (Docket Entry No. 195-1 at ¶ 102).  The plaintiffs allege, for example, that they are not allowed to "confront the evidence and arguments of the government or put on evidence in support of pretrial

---

[24] The plaintiffs here are accused of committing felonies; in *ODonnell I*, the plaintiffs were arrested on misdemeanor charges.  The state intervenors and felony judges do not explain why the *ODonnell I* constitutional protections against wealth-based pretrial detention apply differently to felony arrestees. Individual case determinations are obviously affected by the crimes charged, but those individual outcomes are not the issue here.

[25] The state intervenors claim that "Harris County . . . has changed its bail system for all arrestees to bring it in line with *ODonnell*'s holdings."  (Docket Entry No. 214 at 7).  Similarly, the felony judges argue that "Harris County's criminal justice system follows [the] procedures [outlined in *ODonnell*] when determining bail for felon arrestees."  (Docket Entry No. 228 at 9).  The state intervenors and felony judges do not point to the basis for their arguments that felony arrestees receive the same protections as misdemeanor arrestees. The Rules of the Judicial District Courts of Harris County for District Courts Trying Criminal Cases, which govern bail in felony cases, differ significantly from the reformed rules governing bail in misdemeanor cases.  *Compare* Rules of the Judicial District Courts of Harris County for District Courts Trying Criminal Cases, Rule 6.12, https://www.justex.net/Courts/Criminal/LocalRules.aspx, *with* Rules of Court for Harris County Criminal Courts at Law, Rule 9, http://www.ccl.hctx.net/attorneys/rules/Rules.pdf.  The plaintiffs also attached documents showing that the procedures and criteria for bail in misdemeanor cases applied after *ODonnell I* differ from the procedures and criteria allegedly used for bail setting in felony cases. (Docket Entry No. 259-2).

release." (Docket Entry No. 195-1 at ¶ 102). They also allege that, in practice, the hearing officers set bail without individually considering the plaintiffs' ability to pay. (Docket Entry No. 195-1 at ¶¶ 11, 26, 28, 40–42, 46, 53, 59, 66, 77, 89, 200).

Assessing the truth of these allegations and applying the appropriate level of scrutiny to determine the constitutionality of Harris County's felony bail practices will require the court to resolve critical factual disputes. But the court cannot, on the current record, assess the state interests at stake; whether, and to what degree, those interests fit with Harris County's bail practices; and the consequences of those practices for the plaintiffs. *See Doe No. 1 v. Putnam County*, 344 F. Supp. 3d 518, 538 (S.D.N.Y. 2018) ("Whether [the statute] survives intermediate scrutiny is difficult to discern based on the record before the Court at the Motion To Dismiss stage, because the Court cannot resolve how the important government interest at stake fits with the challenged regulation absent more evidence on either question."). To allow the necessary development of the record, the court denies the state intervenors' and felony judges' motions to dismiss the plaintiffs' equal-protection claim. Their arguments may be renewed at a later stage of this case, on the fuller record that discovery and hearings will provide.

### C.    Substantive Due Process

The Fourteenth Amendment's Due Process Clause prohibits a state from depriving any person "of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV § 1. Substantive due process prohibits the government from "infring[ing] certain 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302 (1993) (citations omitted). The Supreme Court has described two types of government action that violate an individual's substantive due-process rights: (1) government action that infringes on a right without sufficient

justification, and (2) government action that deprives a person of life, liberty, or property in such an arbitrary way that it shocks the conscience. *See United States v. Salerno*, 481 U.S. 739, 746 (1987)

The plaintiffs argue that Harris County's felony bail system violates two liberty interests: (1) the fundamental right, allegedly recognized in *United States v. Salerno*, 481 U.S. 739, to pretrial liberty that cannot be infringed without an individualized finding that detention is necessary to serve compelling government interest, (Docket Entry No. 259 at 20, 23–24); and (2) the fundamental right, allegedly created by *Bearden v. Georgia*, 461 U.S. 660 (1983), to freedom from pretrial detention based solely on inability to pay the financial condition of bond, (*id.* at 20, 24–25).[26]

### 1.    The Fundamental Right to Pretrial Liberty

In *United States v. Salerno*, 481 U.S. 739 (1987), the Supreme Court addressed a facial challenge to the Federal Bail Reform Act, which allowed judicial officers to deny bail to certain arrestees charged with serious offenses.  The Court first distinguished between regulatory and punitive detention, holding that, although punitive pretrial detention violates due process, the Bail Reform Act was regulatory because the limited detention of a small class of arrestees it allowed was not "excessive in relation to the regulatory goal Congress sought to achieve."  *Id.* at 747.  After concluding that the Bail Reform Act was regulatory in purpose, the Court turned to its general due-process analysis.  The Court "conceded" the "general rule" that "the government may not detain a

---

[26] The *ODonnell I* Fifth Circuit panel noted that liberty interests under substantive due process "can arise from two sources, the Due Process Clause itself and the laws of the states."  *ODonnell I*, 892 F.3d at 157 (citation and quotation marks omitted).  The *ODonnell I* court focused on "the law of Texas" and did not address liberty interests arising under the Due Process Clause itself.  *Id.*  The plaintiffs' claims in this case "arise purely under the federal Constitution."  (Docket Entry No. 259 at 16 n.18).  The plaintiffs state that they "do not allege a violation of a state-created liberty interest" like the one recognized in *ODonnell I*, and they "do not seek a ruling on the findings or procedures required to protect any such right."  (*Id.*).

person prior to a judgment of guilt in a criminal trial." *Id.* at 749.  Individuals have a "strong interest in liberty" that is "fundamental." *Id.* at 750.  The Court also recognized "the well-established authority of the government, in special circumstances, to restrain individuals' liberty prior to or even without criminal trial and conviction," and outlined circumstances when "sufficiently compelling governmental interests [justified the] detention of dangerous persons." *Id.* at 748–749.  The Court then reaffirmed the government's "legitimate and compelling" interests in "preventing crime by arrestees." *Id.* at 749.

Considering the competing interests, the Court concluded that the Bail Reform Act was constitutional.  The Act's scope was narrowly circumscribed and applied only to "individuals who [had] been arrested for a specific category of extremely serious offenses." *Id.* at 750.  Congress had made specific findings that those individuals were "far more likely to be responsible for dangerous acts in the community after arrest." *Id.*  Even after making these findings, Congress did not "incapacitate" every person "suspected of these serious crimes." *Id.*  Congress required the government to "demonstrate probable cause to believe that the charged crime [had] been committed by the arrestee." *Id.*  Then, in "a full-blown adversary hearing, the Government [had to] convince a neutral decisionmaker by clear and convincing evidence that no conditions of release [could] reasonably assure the safety of the community or any person." *Id.*  In short, the Act was not a "scattershot attempt" to jail anyone accused of any felony or to jail all those accused of a felony but who could not pay a financial condition of release. *Id.*  Instead, it was "a careful delineation of the circumstances under which detention" was required, after a "clear and convincing" showing that each "arrestee presents an identified and articulable threat to an individual or the community." *Id.* at 751.

50

Courts construing *Salerno* have disagreed about whether it recognized a fundamental right and about what level of scrutiny applies to alleged deprivations of that right. Later Supreme Court cases describe *Salerno* as applying heightened scrutiny to a fundamental interest. In *Reno v. Flores*, the Court cited *Salerno* as involving substantive due process, which "forbids the government to infringe certain 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." 507 U.S. at 301–02 (citation and quotation marks omitted). Similarly, in *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992), the Court described *Salerno* as holding that "in certain narrow circumstances persons who pose a danger to others or to the community may be subject to limited confinement." *Salerno*, the *Foucha* Court stated, stood for the proposition that "liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *Id.* (citation and quotation marks omitted).

Lower courts grappling with *Salerno* have focused on different language and reached varying conclusions. The Ninth Circuit adopted a strong reading of *Salerno*, holding that pretrial liberty is a fundamental right, which requires the government to show a compelling governmental interest and narrow tailoring to infringe. *See Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 780 (9th Cir. 2014) ("*Salerno* involved a fundamental liberty interest and applied heightened scrutiny."). District courts in and out of the Fifth Circuit have also concluded that pretrial liberty is a fundamental right that requires the application of strict scrutiny.[27]

---

[27] *See Rasmussen*, 2020 WL 5752334, at *22 ("Put simply, a defendant's interest in freedom before trial is fundamental, but that interest must yield where pretrial detention is narrowly tailored to serve a compelling state interest.") (citation omitted), *appeal docketed as* No. 20-35849 (9th Cir. Oct. 21, 2020); *Hill*, 2019 WL 4928915, at *10 ("Beyond recognizing that heightened scrutiny applies to restrictions on a pretrial detainee's interest in liberty, it did not establish a strict threshold or enumerate required safeguards, the absence of any one of which would signal a violation of due process."); *Coleman*, 2018 WL 541091, at *1 ("[F]reedom from bodily restraint is a fundamental right and infringement thereon must be narrowly tailored to serve a compelling state interest."); *Schultz*, 330 F. Supp. 3d 1344, 1358 (explaining that *Salerno*

The Tenth Circuit read *Salerno* differently, concluding that *Salerno* did not recognize a fundamental right to pretrial liberty. *Dawson v. Bd. of Cty. Comm'rs. of Jefferson Cty., Co.*, 732 F. App'x 624, 631 (10th Cir. 2018). The *Dawson* court applied rational-basis review to the plaintiff's bail-based challenge, emphasizing that the government has a "regulatory interest in community safety [that] can, in appropriate circumstances, outweigh an individual's liberty interest . . . prior to or even without criminal trial and conviction." *Id.* (quoting *Salerno*, 481 U.S. at 749); *see also Edwards v. Cofield*, No. 3:17-CV-321, 2018 WL 4101511, at *3 (M.D. Ala. Aug. 28, 2018) ("But the *Salerno* Court did not explicitly or implicitly hold that strict scrutiny applied.").[28]

Even if the state intervenors and felony judges are correct that rational-basis scrutiny applies, (Docket Entry No. 293 at 6), the court would still deny their motions to dismiss under Rule 12(b)(6).[29] Applying rational basis scrutiny is often, and clearly is here, an intensely factual

---

found a fundamental liberty interest and that the state may not incarcerate a pretrial detainee absent flight risks or showing of danger to community), *appeal docketed sub nom. Hester v. Black*, No. 18-13898 (11th Cir. Sep. 13, 2018); *Buffin*, 2018 WL 424362, at *6 ("[T]his Court concludes that the Sheriff's use of the Bail Schedule implicates plaintiffs' fundamental right to liberty, and any infringement on such right requires a strict scrutiny analysis."), *appeal docketed as* No. 20-15518 (9th Cir. Mar. 25, 2020); *Welchen*, 2016 WL 5930563, at *10 (applying strict scrutiny to policies imposing restrictions on pretrial detention); *Barnes v. District of Columbia*, 793 F. Supp. 2d 260, 274–75 (D.D.C. 2011) (stating that individuals have a basic liberty interest in being free from incarceration absent a criminal conviction).

[28] The state intervenors and felony judges argue that "[e]very district court in this Circuit has rejected [a substantive due process right] in the bail context." (Docket Entry Nos. 214 at 19, 293 at 6). But the cases cited by the state intervenors do not support that argument, because none of them involve a substantive due process claim. *See Little v. Frederick*, No. 6:17-CV-0724, 2020 WL 605028, at *13 (W.D. La. Feb. 7, 2020) (the plaintiffs did "not invoke substantive due process concerns"); *Booth v. Galveston County*, No. 3:18-CV-00104, 2019 WL 3714455, at *8 (S.D. Tex. Aug. 7, 2019) ("[The plaintiff] is sufficiently clear that his argument is procedural in nature."), *report and recommendation adopted as modified, Booth v. Galveston County*, No. 3:18-CV-00104, 2019 WL 4305457 (S.D. Tex. Sept. 11, 2019); *Edwards*, 2018 WL 4101511, at *3 (denying reconsideration of its decision denying procedural protections requested by the plaintiffs, such as appointed counsel).

[29] Contrary to the state intervenors' suggestion, the plaintiffs are not arguing that "any amount of cash bail that an arrestee cannot afford . . . amounts to a substantive due process violation." (Docket Entry No. 214 at 18). Nor are the plaintiffs asking for an absolute right to release or arguing "subjecting them to a wealth-

inquiry.  District courts are reluctant to dismiss a sufficiently pleaded claim without allowing the

plaintiffs to make a showing, if they can, that the challenged government policy is irrational.  *See*

*Mahone v. Addicks Util. Dist.*, 836 F.2d 921, 937–38 (5th Cir. 1988) (explaining why district courts

deciding issues under rational-basis review deny dismissal under Rule 12(b)(6)).  Rational-basis

analysis would require the court to resolve critical factual disputes about Harris County's felony

bail system.  The parties vigorously dispute the procedures and criteria currently used to decide

conditions of pretrial release for felony arrestees, (*compare* Docket Entry No. 214 at 7, 18, *with*

Docket Entry No. 259 at 4–5); the rules that govern the felony bail system, (*compare* Docket Entry

No. 214 at 7, *with* Docket Entry No. 259 at 4–5); the number and characteristics of arrestees

released on personal bonds, (*compare* Docket Entry No. 214 at 11, *with* Docket Entry No. 195 at

¶¶ 8, 97, 98); and the roles the various defendants play in promulgating and administering Harris

County's bail system, (*compare* Docket Entry No. 228 at 19, *with* Docket Entry No. 259 at 4–6).

These disputes go to the merits of the rationality and legitimacy of Harris County's bail policies

and procedures.  Without discovery allowing the parties to present a proper factual record, these

---

based detention system" automatically violates due-process or equal-protection principles.  (Docket Entry
No. 228 at 23; *see also* Docket Entry No. 292 at 20).  The plaintiffs are arguing that unaffordable bail is the
"functional equivalent" of a detention order and, as a result, must be justified by individualized findings
that this detention is necessary to realize a compelling government interest, such as guaranteeing the
arrestee's appearance in court or preventing the arrestee from harming members of the public.  (Docket
Entry No. 259 at 22–25).

Many of the state intervenors' and felony judges' arguments center on one quote from the *ODonnell*
decision: "[T]here is no fundamental substantive due process right to be free from any form of wealth-based
detention."  *Russell v. Harris Cty., Tex.*, 454 F. Supp. 3d 624, 636 (S.D. Tex. 2020) (quoting *ODonnell I*,
892 F.3d at 163; *ODonnell II*, 900 F.3d at 225).  Read correctly, that sentence means that arrestees do not
have an absolute right to freedom from wealth-based detention.  But it does not mean, as the state
intervenors and felony judges argue, that wealth-based detention is necessarily constitutional.  An order of
wealth-based detention is constitutional or not depending on the "case-specific reasons for imposing bail."
*Russell*, 454 F. Supp. 3d at 636 (quotation marks omitted) (quoting *ODonnell I*, 892 F.3d at 163; *ODonnell
II*, 900 F.3d at 225).

disputes cannot be accurately, reliably, or fairly resolved.  Again, the defendants' arguments can be reasserted when a fuller factual record is before the court.

### 2.    A Fundamental Right Against Wealth-Based Detention

The plaintiffs also argue that the Supreme Court and Fifth Circuit recognize a fundamental right to freedom from wealth-based detention.  The plaintiffs primarily rely on two cases.[30]  In the first, *Bearden v. Georgia*, 461 U.S. 660 (1983), the Supreme Court addressed a condition of probation that required a criminal defendant to pay a $750 fine within four months after release. The plaintiff (then-defendant) was unable to pay the fine, and a state court revoked his probation and sentenced him to a prison term of roughly three years.  *Id.* at 663–64.

The Court did not analyze the issues as neatly divided into either equal protection or due process.  Instead, the Court noted that "[d]ue process and equal protection principles converge in the Court's analysis."  *Id.* at 665.  The case presented questions of "differential treatment" under the Equal Protection Clause that were "substantially similar" to the related due-process question of "whether and when it is fundamentally unfair or arbitrary for the state to revoke probation when an indigent is unable to pay the fine."  *Id.* at 665–666.  Regardless of which constitutional provision applied, the Court held, the issue could not "be resolved by resort to easy slogans or pigeonhole analysis."  *Id.* at 666.  Instead, it required "a careful inquiry into such factors as the nature of the individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose, [and] the existence of alternative means for effectuating the purpose."  *Id.* at 666–67 (alteration in original) (citation and quotation marks omitted).

---

[30] The plaintiffs point to three cases, but the third, *Frazier v. Jordan*, 457 F.2d 726, 727 (5th Cir. 1972), is an equal-protection case that does not discuss due process.

The Court began its analysis with two cases: *Williams v. Illinois*, 399 U.S. 235 (1970), and *Tate v. Short*, 401 U.S. 395 (1971). *Williams* held that the government could not extend a defendant's sentence beyond the maximum prison term solely because the defendant was unable to pay a fine. 399 U.S. at 242. Similarly, *Tate* held that the government could not imprison a defendant who was sentenced to pay a fine solely because the defendant could not pay. 401 U.S. at 397–99. Together, these cases stood for the rule that "the state cannot 'impos[e] a fine as a sentence and then automatically conver[t] it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full.'" *Bearden*, 461 U.S. at 668 (alteration in original) (quoting *Tate*, 401 U.S. at 398). If a person on probation "has made all reasonable efforts to pay the fine or restitution, and yet cannot do so through no fault of his own, it is fundamentally unfair to revoke probation automatically without considering whether adequate alternative methods of punishing the defendant are available." *Id.* at 668–69. The Court, recognizing the government's legitimate interests in "punishment and deterrence," held that these interests "can often be served fully by alternative means." *Id.* at 671–72. Without a finding that "alternatives to imprisonment are not adequate in a particular situation to meet the state's interest in punishment and deterrence," the state could not "imprison a probationer who has made sufficient bona fide efforts to pay." *Id.* at 672.

The plaintiffs also rely on *Rainwater II*, in which the Fifth Circuit addressed a Florida statute that set a "master bond schedule" that specified the "amount of a bond . . . for each listed offense." 572 F.2d at 1057 & n.6. Citing *Williams* and *Tate*, the court accepted as given the principle that "imprisonment solely because of indigent status is invidious discrimination and not constitutionally permissible." *Id.* at 1056. As in *Bearden*, the court discussed bail in terms of both equal protection and due process. But the court concluded that "due process prohibit[s] depriving

pre-trial detainees of the rights of other citizens to a greater extent than necessary to assure appearance at trial and security of the jail." *Id.* at 1057 (citation omitted).  While the state could set bail high enough to assure the "accused's presence at trial," it could not set bail any higher; otherwise bail "would be inherently punitive and run afoul of due process requirements." *Id.*  As a result, the court required the state to determine, for each arrestee, the amount of bail that was "necessary to reasonably assure defendant's presence at trial," giving "meaningful consideration of other possible alternatives." *Id.*  If a defendant's "appearance at trial could reasonably be assured by one of the alternate forms of release, pretrial confinement for inability to post money bail would constitute imposition of an excessive restraint." *Id.* at 1058.

The plaintiffs argue that, together, these cases recognize a fundamental right to freedom from wealth-based pretrial detention.  (Docket Entry No. 259 at 23–25).  Subsequent case law is not so clear.  The Fifth Circuit in *ODonnell I* cited *Rainwater*, *Williams*, and *Tate* only in its equal-protection analysis.  *ODonnell I*, 892 F.3d at 161–163.  Other courts have held that *Bearden* and *Rainwater* are better viewed as involving a hybrid due-process and equal-protection analysis.  *See Walker*, 901 F.3d at 1260 ("Because [the plaintiff's] claim indeed rests on an allegation of categorically worse treatment of the indigent, it falls within the *Bearden* and *Rainwater* framework, and the district court was correct to apply those cases' hybrid analysis of equal protection and due process principles.").  While binding precedent does not affirmatively recognize freedom from wealth-based detention as a substantive due-process right, some district courts have held that jailing arrestees because of their indigence does violate due-process principles.[31]

---

[31] *See Rasmussen*, 2020 WL 5752334, at *22 ("A state, therefore, cannot not imprison an individual awaiting trial solely on account of his indigency because doing so serves no compelling state interest. . . . That does not mean, however, that there is a constitutional right to affordable bail."); *Hill*, 2019 WL 4928915, at *13 ("A number of other district courts that have considered detention under circumstances similar to that here have held that, at a minimum, to comport with due process, the court imposing detention upon an indigent defendant must both expressly consider and make findings of fact on the record regarding

Regardless of whether these cases support finding a fundamental liberty interest, the plaintiffs' claims would be subject to rational-basis scrutiny, which, as discussed above, is a fact-based inquiry. On a fuller factual record, *Bearden* and *Rainwater* might provide a basis for finding that Harris County's felony bail practices violate substantive due process. At a minimum, these cases give guidance on the equal-protection and due-process principles, and rational-basis, intermediate, or strict scrutiny in cases involving detention for those accused, but not convicted, of felonies.[32] *See Bearden*, 461 U.S. at 672 ("Only if alternate measures are not adequate to meet the State's interests in punishment and deterrence may the court imprison a probationer who has made sufficient bona fide efforts to pay."); *Rainwater II*, 572 F.3d at 1058 ("[P]retrial confinement

---

the defendant's ability to pay the bail amount imposed and whether non-monetary alternatives could serve the same purposes as bail."); *Knight v. Sheriff of Leon Cty.*, 369 F. Supp. 3d 1214, 1219 (N.D. Fla. 2019) ("A system that unnecessarily detains defendants pending trial based on inability to make bail—that detains defendants on this basis without regard to the state's compelling interests in detention—is unconstitutional at several levels"); *Rodriguez v. Providence Cmty. Corr., Inc.*, 155 F. Supp. 3d 758, 768 (M.D. Tenn. 2015) ("A slew of recent district court cases have aptly and appropriately applied *Pugh* to invalidate bond systems that have the effect of imprisoning indigent individuals where those with financial resources would go free."); *Jones v. City of Clanton*, No. 2:15-CV-34, 2015 WL 5387219, at *2 (M.D. Ala. Sept. 14, 2015) ("Thus, the use of a secured bail schedule to detain a person after arrest, without an individualized hearing regarding the person's indigence and the need for bail or alternatives to bail, violates the Due Process Clause of the Fourteenth Amendment.").

[32] The state intervenors argue that a more deferential level of scrutiny applies to Executive Order GA-13 because it is a response to the COVID-19 pandemic, a public health emergency. (Docket Entry No. 214 at 24–25 (citing *Jacobson v. Massachusetts*, 197 U.S. 11 (1905))). In *Jacobson*, the Supreme Court considered a Massachusetts statute that allowed cities to require all adults to be vaccinated for smallpox. The Court concluded that the vaccination law was entitled to deference, but that the Court should intervene "if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law." 197 U.S. at 31. Recently, concurring in a denial of injunctive relief in a free-exercise challenge to California's COVID-19 stay-at-home order, Chief Justice Roberts indicated that *Jacobson*'s reasoning may be applicable to federal court review of states' COVID-19 measures. *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (Roberts, C.J., concurring) (the Constitution entrusts public health and safety decisions to the states, and decisions about COVID-19-related restrictions should be given broad latitude (citing *Jacobson*, 197 U.S. at 38; *Marshall v. United States*, 414 U.S. 417, 427 (1974); *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 545 (1985))). Executive Order GA-13 was designed to prevent the COVID-19-related release of pretrial detainees with prior violent convictions. Whether it is entitled to special deference, and whether relief may nevertheless be required, must be considered, along with the other scrutiny issues, on a fuller factual record.

for inability to post money bail would constitute imposition of an excessive restraint" if the arrestee's "appearance at trial could reasonably be assured by one of the alternate forms of release."). The plaintiffs have identified the case law and alleged sufficient facts to survive the motions to dismiss. Again, the defendants may re-urge their arguments at a later stage of the case, on a fuller record.

### D.    The Procedural Due-Process Claims

If and after a court locates a fundamental right,[33] procedural due process requires the court to determine "whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (citing *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)). Procedural due process does not raise an "impenetrable barrier to the taking of a person's possessions, or liberty, or life." *Carey v. Piphus*, 435 U.S. 247, 259 (1978) (quotation marks omitted). Instead, procedural due process protects against "the mistaken or unjustified deprivation of life, liberty, or property." *Id.* To determine what process is due, courts apply the balancing test from *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

The plaintiffs seek procedural protections that include an adversarial hearing, with counsel, at which the arrestee has notice of the critical issues to be decided at the hearing, an opportunity to be heard and to present and confront evidence, and a statement of reasons on the record explaining the reasons for the finding that pretrial detention is necessary." (Docket Entry No. 195-1 at ¶ 204). The plaintiffs argue that procedural due process requires these protections. (*Id.*). The state intervenors argue that "Harris County complied with" *ODonnell I*'s requirements and that the plaintiffs want "more relief than was outlined in" *ODonnell I*. (Docket Entry No. 214 at 17–18).

---

[33] The felony judges argue that the plaintiffs' procedural due-process claim depends on their substantive due-process claim succeeding. (Docket Entry No. 228 at 26). As noted above, the plaintiffs' substantive due-process claim survives the motions to dismiss.

In *ODonnell I*, after finding that the arrestees had a state-created due-process interest, the Fifth Circuit considered whether "the procedures in place adequately protect[ed] that interest." *ODonnell I*, 892 F.3d at 158.  To answer that question, the court applied the balancing test from *Mathews v. Eldridge*, which looks to (1) "the private interest . . . affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedure used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens" that new procedures would impose.  *ODonnell I*, 892 F.3d at 159 (citing *Matthews*, 424 U.S. at 335).  The court determined that Harris County's misdemeanor bail procedures were procedurally inadequate.

The district court had found that Harris County "almost automatically" imposed "secured bail orders . . . on indigent arrestees."  *Id.*  Hearing officers ignored an arrestee's "ability to pay" and "almost always set a bail amount that detain[ed] the indigent."  *Id.*  Harris County's procedures allowed hearing officers to use bail as an "instrument of oppression."  *Id.*  After noting these serious deficiencies and problems, the Fifth Circuit upheld the majority of the procedures the district court held were required, which were:

> (1) notice that the financial and other resource information Pretrial Services officers collect is for the purpose of determining a misdemeanor arrestee's eligibility for release or detention; (2) a hearing at which the arrestee has an opportunity to be heard and to present evidence; (3) an impartial decisionmaker; (4) a written statement by the factfinder as to the evidence relied on to find that a secured financial condition is the only reasonable way to assure the arrestee's appearance at hearings and law-abiding behavior before trial; and (5) timely proceedings within 24 hours of arrest.

*Id.*  The Fifth Circuit changed two aspects: (1) allowing proceedings to take place within 48, not 24, hours; and (2) permitting factfinders to state on the record, rather in writing, the evidence the

factfinder relied on to find that the secured money bail set was the only reasonable approach. *Id.* at 160.

The plaintiffs allege that the procedures they receive as felony arrestees are deficient in many of the same ways as the procedures struck down in *ODonnell I*, without constitutionally sufficient reasons for the difference. For example, the plaintiffs allege that the felony judges require hearing officers to automatically apply a bond schedule. (Docket Entry No. 195-1 at ¶ 108). The plaintiffs allege that the hearing officers work in an "entrenched culture" of "abiding strictly by written and oral directives regarding the money bail-setting process issued by the felony judges." (*Id.* at ¶ 117). The felony district judges have allegedly directed the hearing officers not to release "homeless individuals" on "personal bonds," not to give personal bonds to "individuals who previously received personal bonds in other cases," or "never to issue non-financial conditions for any defendant who was assigned to their courtroom at all." (*Id.*). The hearing officers follow those directives, even when they are "in violation of state judicial conduct rules," because the officers "believed themselves to be bound by these rules and understood that the judges could hire and fire them at will." (*Id.*).

The plaintiffs allege that the hearing officers, following the directions of the felony judges, do not "perform any inquiry into the arrestee's ability to pay the money bail amount required by the felony judges' schedule." (*Id.* at ¶¶ 89, 106). Nor do the hearing officers "consider alternative non-financial conditions of release," (*id.* at ¶ 106), or "the necessity of pretrial detention," (*id.* at ¶ 108). Hearing officers have "simply reviewed the bail amount previously affixed to ensure that it conform[s] to the bail schedule and the specific policy instructions from the felony judges about how to administer the predetermined schedule." (*Id.* at ¶ 108). They do not issue a "statement of reasons" or apply a clear evidentiary standard, or at least none that is identified. (*Id.* at ¶ 108).

The state intervenors and felony judges vigorously dispute those allegations.  (Docket Entry No. 214 at 17; Docket Entry No. 228 at 24).

The parties disagree sharply on the facts that go to the heart of the plaintiffs' procedural due-process claim against the defendants, and their legal significance.  Without a more developed factual record, these disputes cannot be resolved.  The state intervenors' and felony judges' motions to dismiss the plaintiffs' procedural due-process claim, (Docket Entry Nos. 214, 228), are denied.  The court will revisit these arguments at a later stage, with the factual record needed to resolve them.

## VI.    The Claims Against the Harris County Sheriff

The state intervenors argue that Sheriff Gonzalez is not a proper party under § 1983 because he is not a municipal policymaker.[34]  (Docket Entry No. 214 at 25).  Liability under § 1983 attaches to local government officers "whose [unlawful] decisions represent the official policy of the local governmental unit."  *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989).  Whether an officer has been given that authority is "a question of state law."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986).  "Official policy" includes unwritten, widespread practices that are "so common and well settled as to constitute a custom that fairly represents municipal policy."  *Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992) (quoting *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984) (en banc)).  Unlawful decisions include "acquiescence in a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity."  *Jett*, 491 U.S. at 737 (quotation marks omitted).

In *ODonnell I*, the Fifth Circuit found that the Harris County Sheriff was "not an appropriate party for attaching municipal liability" because he did not "have the same

---

[34] Sheriff Gonzalez did not move to dismiss the claims against him.

policymaking authority as the County Judges." *ODonnell I*, 892 F.3d at 156.  The Sheriff was obligated "to execute all lawful process" and could not "release prisoners committed to jail by a magistrate's warrant."  *Id.*  The Sheriff could not "avoid executing judicial orders imposing secured bail by unilaterally declaring them unconstitutional."  *Id.*  As a result, he did "not qualify as a municipal policymaker under § 1983."  *Id.*

The plaintiffs do not dispute this aspect of *ODonnell I*.  Instead they argue that *ODonnell I* gave the Harris County Sheriff the power to refuse to execute judicial decisions imposing bail, which transformed the Sheriff into a local policymaker.  (Docket Entry No. 259 at 49).  While *ODonnell I* gave the Sheriff the power to refuse to execute unconstitutional judicial bail decisions, it did so only for arrestees accused of misdemeanors.  This grant of discretion was part of the Fifth Circuit's model injunction, which applied only to misdemeanor arrestees.  *ODonnell I*, 892 F.3d at 165 ("The Harris County Sheriff is therefore authorized to decline to enforce orders requiring payment of prescheduled bail amounts as a condition of release for *said defendants* if the orders are not accompanied by a record showing that the required individual assessment was made and an opportunity for formal review was provided." (emphasis added)).  Neither *ODonnell I* nor the court's consent decree recognized Sheriff Gonzalez as having discretion over bail decisions for arrestees accused of felonies.  He may have that authority, but the plaintiffs do not identify the authority that expressly and clearly grants Sheriff Gonzalez added discretion over felony defendants.

While Sheriff Gonzalez is not a policymaker for Harris County, the second amended complaint states a sufficient claim against Sheriff Gonzalez for prospective injunctive relief in his official capacity as a Texas state law-enforcement officer.[35]  *Collins*, 503 U.S. at 120 ("Section

---

[35] *ODonnell I* reversed the district court's finding that the Harris County Sheriff was a municipal policymaker for bail policies and procedures.  The court noted that the Texas statutes "do not authorize the

1983 provides a remedy against 'any person' who, under color of state law, deprives another of rights protected by the Constitution.").

The office of the county sheriff is established in the Texas Constitution.  TEX. CONST. art. V, § 23.  A sheriff may be removed from office by the state district judges presiding over the sheriff's county.  *Id.* § 24.  Under the Texas Local Government Code, the sheriff is required to "safely keep all prisoners committed to the jail by a lawful authority, subject to an order of the proper court."  Tex. Loc. Gov't Code § 351.041.  The Texas Code of Criminal Procedure provision setting out the factors that guide an officer's discretion to set bail apply to "the court, judge, magistrate, or officer taking the bail."  Tex. Code Crim. Pro. art. 17.15.  An "officer taking the bail" includes the jailer.  *Id.* art. 17.025.  In felony cases, the Texas Code authorizes "the sheriff or other peace officer . . . to take a bail bond of the accused in the amount as fixed by the court, to be approved by such officer taking the same, and . . . thereupon discharge the accused from custody."  *Id.* art. 17.21.  When "the court before which the [case] is pending is not in session in the county where the defendant is in custody," the Texas Code authorizes "the sheriff or other peace officer, or a jailer . . . who has the defendant in custody . . . [to] take the defendant's bail bond in such amount as may have been fixed by the court or magistrate, or if no amount has been fixed, then in such amount as such officer may consider reasonable."  *Id.* art. 17.22.

In similar circumstances, other courts have held that prospective relief could run against state actors who, in their official capacities, were tasked with enforcing state statutes.  *See McMillian v. Monroe County*, 520 U.S. 781, 783 (1997) (an Alabama sheriff alleged to have suppressed exculpatory evidence "represent[ed] the State of Alabama"); *Echols v. Parker*, 909

---

County Sheriff to avoid executing judicial orders imposing secured bail by unilaterally declaring them unconstitutional."  *ODonnell I*, 892 F.3d at 156.  The court affirmed the part of the relief addressed to the Sheriff.  *Id.* at 165 ("The Harris County Sheriff is therefore authorized to decline to enforce orders requiring payment of prescheduled bail amounts as a condition of release.").

F.2d 795, 800 (5th Cir. 1990) (a district attorney was a state actor in enforcing a state anti-boycott statute and the state was liable for attorney's fees under § 1988); *Hamill v. Wright*, 870 F.2d 1032, 1037 (5th Cir. 1989) (district judges are state actors under § 1983 when they execute their duty to appoint counsel); *Familias Unidas*, 619 F.2d at 404 (a district court judge implementing a state statute, "much like that of a county sheriff in enforcing a state law, may more fairly be characterized as the effectuation of the policy of the State of Texas embodied in that statute, for which the citizens of a particular county should not bear singular responsibility."); *see also Buffin*, 2016 WL 6025486, at *9 (California sheriffs are state actors when detaining misdemeanor defendants on secured financial bail under facially valid detention orders).

The plaintiffs allege that, under Texas law, Sheriff Gonzalez is responsible for "enforcing pretrial bail orders and directives issued by judges or promulgated by local rule" and is obligated to "ensure the lawfulness of any order resulting in a person's detention in the Harris County Jail and requires him to not enforce orders he knows to be illegal." (Docket Entry No. 195-1 at ¶ 24). The plaintiffs allege that Sheriff Gonzalez knows "who is in the jail and the basis for each person's detention, including whether any person is eligible for pretrial release, and the amount of money bail any person is required to pay for immediate release." (Docket Entry No. 195-1 at ¶ 27). The plaintiffs allege that Sheriff Gonzalez "detains arrestees too poor to afford the money bail amounts that are imposed without findings concerning ability to pay or the need for detention, and releases arrestees who pay their money bail." (*Id.* at ¶ 28). The plaintiffs also allege that the Sheriff "has knowledge that the imposition of secured money bail results in systemic, wealth-based detention" and that many arrestees "in the jail every night" are detained only because of "their inability to pay a money bail." (Docket Entry No. 195-1 at ¶ 27).

Based on the current pleadings and record, the court cannot preclude prospective relief that could run against Sheriff Gonzalez in his official capacity as a Texas State officer tasked by Texas statutes with detaining felony arrestees in the Harris County Jail. Factual disputes as to what Sheriff Gonzalez knows when felony arrestees are detained in the Harris County Jail preclude dismissal of the claims against the Sheriff in his official capacity at this time. Again, the arguments may be raised again at a later stage and on an adequate record.[36]

## VII.  Conclusion

At this stage of the litigation, the court denies the felony district judges' and the state intervenors' motions to dismiss. (Docket Entry Nos. 214, 228).[37] The difficult issues that the parties have raised remain for later resolution with the developed record needed to do so.

SIGNED on November 10, 2020, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge

---

[36] In *Daves v. Dallas County*, No. 18-11368 (5th Cir. Oct. 19, 2018), the Fifth Circuit has heard oral argument but has not decided whether the Dallas County Sheriff is a state actor when she enforces bail orders.

[37] The felony judges moved to stay discovery pending resolution of their motion to dismiss, (Docket Entry No. 317), and the plaintiffs responded opposing the stay in part. (Docket Entry No. 325). This memorandum and opinion resolves the jurisdictional issues and moots the motion to stay.