**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

**DWIGHT RUSSELL, ET AL.**
     **On behalf of themselves and all**
     **Others similarly situated,**
     *Plaintiffs*,

**v.**

**HARRIS COUNTY, TEXAS, ET AL.,**
     *Defendants*.

**C.A. No. 4:19-CV-00226**

**NON-PARTY FELONY JUDGES' REPLY IN SUPPORT OF MOTION TO QUASH**

Plaintiffs have now had the opportunity to tell this Court what discovery they must obtain that no other source, save for the Felony Judges, can provide them to support their claims. Rather than do so, Plaintiffs urge the Court to compel the Felony Judges to comply with discovery because they believe the Felony Judges control all aspects of the Harris County bail system.

The Felony Judges are not parties.

So, no discovery is necessary to "show that the Judges have the authority to promulgate and comply with constitutional rules and policies." After all, let's say, arguendo, that Plaintiffs will show just that. What then? This Court cannot issue an order that the Felony Judges are acting in violation of 42 U.S.C § 1983– they are not parties. The Felony Judges cannot be enjoined to create policies – they are not parties. The Felony Judges cannot be ordered to withdraw "unconstitutional" policies – they are not parties. The Felony Judges cannot be told to refrain from or participate in working with their County cohorts within the State's criminal justice system – they are not parties.

If this Court chooses to enjoin the County to pass its own policies or even refuse to comply with alleged polices of the Felony Judges, so it may be. But discovery from the Felony Judges in no way assists in proving such an order is constitutionally required.[1]

ARGUMENT

## I.   PLANTIFFS FAIL TO OVERCOME SOVEREIGN IMMUNITY.

### A. Plaintiffs are Seeking to Maintain a "Suit" Against the Felony Judges.

The Felony Judges have not argued that Rule 45 subpoenas are always inappropriate in any case. That much is plain from their motion. Rather, the Felony Judges have argued that the Rule 45 subpoenas served on them *in this specific case* constitutes a "suit," which entitles them to Eleventh Amendment Immunity.

Rule 45 subpoenas *can* constitute "suits" to which immunity attaches. The Fourth Circuit and the Eighth Circuit have recognized this—albeit in the context of federal sovereign immunity and tribal sovereign immunity.[2] *See Baron Oil Co. v. Downie*, 873 F.2d 67, 70–71 (4th Cir. 1989); *Alltel Communications, LLC v. DeJordy*, 675 F.3d 1100, 1105–06 (8th Cir. 2012). Plaintiffs provide no meangingful reason why the same rationale applied in these cases would not apply in the context of state sovereign immunity. Instead, as they acknowledge, a "suit" is against the sovereign "if the

---

[1] Much less compliant with relevant case law or statutes. *See, e.g.*, Tex. Code. Crim Pro. Art. 17.03 (prohibiting magistrates from granting personal bonds on certain offenses); *Id*. at Art. 15.19. ("If the arrested person fails or refuses to give bail...the arrested person shall be committed to the jail of the county where the person was arrested."); *see also Valentine v. Collier*, 20-20525, 2021 WL 1153097, at *12 (5th Cir. Mar. 26, 2021) (Oldham, J., concurring) (stating "federal supervision of state prisons" is "not normal today. Rather,...this sort of federal-court intervention is unlawful.").

[2] The cases Plaintiffs cite in support of their position are distinguishable from this case. Generally, they stand for the proposition that a state and its employees do not enjoy Eleventh Amendment immunity from a Rule 45 subpoena where "no judgment or other relief of any kind is sought against them" in the underlying litigation. *See Allen v. Woodford*, 544 F. Supp.2d 1074, 1079 (E.D. Cal. 2008). That is clearly not the case here. Plaintiffs' response makes clear that the Felony Judges are the very subject of the litigation and the relief they want. Because of the belief that the Felony Judges can be compelled to act in a certain way should Plaintiffs ultimately prevail, immunity applies.

judgment sought would expend itself on the public treasury or domain, or interfere with the public administration." *Dugan v. Rank*, 372 U.S. 609, 620 (1962). A Rule 45 subpoena is also a "suit" for immunity purposes if it compels an agency to exercise its public function differently than it would ordinarily choose to. *See Downie*, 873 F.2d at 70–71.

Plaintiffs continue to seek relief against the Felony Judges as if they were still parties, specifically demanding "relief from the enforcement actors" – who they deem to be the Felony Judges – in the form of "enjoin[ing] them." Dkt. No. 453 at 15, n.17; *see also id*. at 19 ("[t]his case is about the Judges' failure to exercise their rulemaking authority...and their failure to follow the Constitution when setting bail in their own courtrooms."). This Court appears to have considered this course of action. Dkt. No. 461 (denying the Felony Judges their deliberative process privilege noting that the Court is "consider[ing] civil-rights and constitutional violations."). Assuming this is something Plaintiffs could obtain (it is not; the Felony Judges are not parties), such a judgment would unquestionably interefere with the Felony Judges' administration of their duties and compel them to act differently than they would ordinarily choose to act. They would be compelled to modify their practices to fit Plaintiffs' requests and be subject to federal oversight of their actions.

Plaintiffs' notion that voluntarily dismissing the Felony Judges and then using Rule 45 subpoenas to circumvent the Felony Judges entitlement to sovereign immunity, despite continuing to seek discovery, and even ultimate relief, from them as if they *were* parties, negates the protections that immunity was created to safeguard. It is under these limited—and perhaps unprecedented—circumstances that the Felony Judges argue they are entitled to Eleventh Amendment immunity from subpoena proceedings.

### B.  Immunity is Immunity from Discovery, Not Just Immunity from Suit

Whether or not these subpoenas are a "suit" against the Felony Judges, the fact remains: sovereign immunity is immunity from discovery, not just immunity from suit. *Harlow v. Fitzgerald*, 457 U.S. 800, 817 (1982). In other words, "sovereign immunity is an immunity from the burdens of becoming involved in **any part** of the litigation process." *United States v. Moats*, 961 F.2d 1198, 1203 (5th Cir. 1992). The Supreme Court has made clear that discovery is an independent stage of litigation that sovereign immunity protects state actors from, given that "'[i]nquiries of this kind can be peculiarly disruptive of effective government.'" *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (quoting Harlow, 457 U.S. at 817)). The protection sovereign immunity provides "would be greatly depreciated if it did not include protection from discovery.... [C]lose control of discovery is essential to the preservation of meaningful official immunity." *Williamson v. U.S. Dep't of Agriculture*, 815 F.2d 368, 382–83 (5th Cir. 1987).

Thus, whether the Felony Judges are " parties," or even if this Court agrees with Plaintiffs that there is no "suit" in this case, sovereign immunity, nevertheless, bars discovery from proceeding. *Ray v. Judicial Corr. Services, Inc.*, 2:12-CV-02819-RDP, 2014 WL 5090723, at \*2 (N.D. Ala. Oct. 9, 2014) ("Although [the judge] is a nonparty, "[t]he policy behind immunity does not merely extend to suits, it also extends to protection against discovery."). Accordingly, "[u]ntil [the] threshold immunity question is resolved," whether by this Court or the Fifth Circuit, "discovery should not be allowed." *Harlow*, 475 U.S. at 818.

## II.  PLAINTIFFS HAVE FAILED TO ALLEVIATE THE UNDUE BURDEN THAT THE SUBPOENAS PLACE ON THE FELONY JUDGES.

Plaintiffs' Response fails to demonstrate how they have fulfilled their affirmative duty to refrain from posing an undue burden on the Felony Judges in responding to discovery. *See* FED. R. CIV. P. 45(d)(1). Plaintiffs' Response is an amalgamation of vague assertions of "critical" need

for discovery, cherry-picking of testimony from deposition testimony that fails to reflect the actual evidence gathered in the case, and a demand that any true burden placed on the Felony Judges due to the time, breadth or harassing nature of their subpoenas simply be disregarded. None of the arguments Plaintiffs present overcome the Felony Judges' assertions that undue burden justifies quashal of the subpoenas.

### A. Rule 45 Discovery is Unecessary Based on Plaintiffs' Own Gathered Testimony.

Plaintiffs have deposed County Actors as well as Felony Judge Brian Warren. Those deponents have described the Harris County bail process, and the roles of each agency as follows:

Sheriff's Office: The Sheriff's Office employs officers who place people under arrest. Deposition of 30(b)(6) for the Sheriff's Office, Major Patrick Dougherty (Dougherty Depo.) 27:19-22 (**Exhibit A**). The arresting officer then contacts the District Attorney's (DA) office and discusses arrest with an intake DA.[3] *Id.* at 27:22-28:4. While on the phone, the intake DA will reach a conclusion on what charge to file, if any, in the system. *Id.*

If the intake DA determines charges are appropriate, the officer will take the arrestee to the Joint Processing Center and into the Sheriff's Office's custody. Dougherty Depo. 33:1-4. The arresting officer will then fill out a DA intake form (DIMS) to include descriptors of the arrestee, a probable cause statement, and witness info. *Id.* at 33:20-34:11. The information the officer inputs is used by the DA in formulating a charging documents and also by the hearing officer in setting bail. *Id.* at 34:12-35:1.

Once the arresting officer completes these tasks, their remaining duties, and the duties of the Sheriff's Office in general, as it pertains to bail are defined by law. Tex. Code Crim. Pro. Art.

---

[3] For obvious reasons, officers will not call the intake DA on warrant arrest. Dougherty Depo. 32:7-10

15.20; Tex. Code Crim. Pro. art 2.18; Dougherty Depo. 37:15-18. The Sheriff's Office does not use a bail schedule to determine a detainee's bail nor whether to release them. Dougherty Depo. 82:23-24. However, when it comes to releasing people, the Sherifff's Office does, in fact, "have to determine whether somebody can be released or not." *Id*. at 84:15-16. If the Sheriff's Office has determined a detainee has posted bond, they will be released. Tex. Code Crim. Pro. art 2.18; Dougherty Depo. 92:18-22. If the Sheriff's Office determines a hold exists, the detainee will not be released. *Id*. at 84:12-16. The Sheriff's Office releases detainees under the General Bond Order based on Pretrial Services' determination that the detainee qualifies. *Id*. at 119:12-17.

Pretrial Services ("PTS"): After an arrestee is brought over to the Joint Processing Center, PTS will interview the arrestee. Dougherty Depo. 50:19-23. That interview prompts PTS to make several independent determinations. First, PTS make the unilateral determination that an arrestee qualifies for release under the General Order Bond. Dougherty Depo. 118:10-119:2; Deposition of 30(b)(6) for PTS, Spurgeon Kennedy, (Kennedy Depo.) 28:6-8, 199:1-6 (**Exhibit B**). Second, PTS will independently assigned an arrestee a "risk level"[4] meant to give a reasonable estimate of a detainees risk of failing to reappear at his next court date and risk of engaging in criminal activity if released. *See* Kennedy Depo. 44:14-45:4. The PTS-determined risk level is what is used to recommended a bail amount. *See* Deposition of 30(b)(6) for DA's Office, Jennifer Keith, (Keith Depo.) 61:16-62:1; 62:19-24 (**Exhibit D**). Third, PTS will autonomously make conditions of release recommendations. *See* Deposition of 30(b)(6) for PD's Office, Alex Bunin, (Bunin Depo.) 76:23-79:6; 145:6-9 (**Exhibit E**). At times, these recommendations are not made but, instead, the matter is referred to the Hearing Officer to decide, with no position from PTS. Keith Depo. 60:4-15

---

[4] Implemented in the PSA by an outside consulting company. St. Julian Depo. 33:9-21; Deposition of Felony Judge Brian Warren (Warren Depo.) 70:7-13 (**Exhibit C**).

The results of PTS' interviews and the subsequent recommendations are contained in what is called a Pretrial Safety Assessment ("PSA"). Dougherty Depo. 43:6-44:7. The recommendations contained with the PSA are made based on PTS policies, not any external instructions. Bunin Depo. 142:25–143:13; Kennedy Depo. 60:17-61:10. PTS does not directly recommend whether a person should be released or detained, but they have a "great deal of power how to present" information that "would support one or the other." Bunin Depo. 147:13-22.

PTS works under the direction and supervision of the Harris County Budget Office and Jim Bethke. *Id.* at 64:8-20. To the extent any part of the PTS post-arrest, pre-15.17 hearing processes were to be changed, those decisions would rest entirely in the hands of PTS' direct supervisors. *Id.*

<u>DA's Office:</u> An intake DA will receive a call from an officer who just placed a person under arrest and will consult with the officer until a determination is made as to whether the DA would like to file charges. Dougherty Depo. 27:19-30:24. The DA's office will then wait to receive the DIMS report from the Sheriff's Office as well as the PSA from PTS. Bunin Depo. 73:17-23; Keith Depo. 60:10-15. With that information, the DA's office will create the charging document. Keith Depo. 60:10-15; Dougherty Depo. 36:21-23. The charge that the DA's office decides to make affects whether that arrestee is eligible for certain bonds or bond amounts, a General Order Bond or release under GA-13 or release at all. Keith Depo. 54:7-11; 55:9-19; 63:21-64:9.

The DA's office often places a recommended bail amount in the charging document. Keith Depo. 59:22-60:3. This amount could be what PTS has determined is the recommended bail amount; or the DA's office "has discretion to put whatever bond it wants on the complaint" Bunin Depo. 127:11-14; Keith Depo. 59:22-60:3, 185:22-186:7 (stating a higher or lower bond will be

placed on the charging document by the DA's office if the DA's office believes it is appropriate to do so); *see also* Deposition of 30(b)(6) for Hearing Officers, Judge Courtney St. Julian (St. Julian Depo.) 40:9-21 (**Exhibit F**). Either way, that amount could, or could not, be recommended in accordance with the bail schedule. Bunin Depo. 69:9-16, 74:2-5, 74:22-25. Once complete, the charging document gets sent to the clerk's office to be assigned to a hearing officer. Dougherty Depo. 36:24-25.

Public Defender's ("PD") Office: The PD's Office will receive information as to charges filed against Harris County arrestees from the DA's Office. Bunin Depo. 34:25-35:6. It will also obtain all pertinent information on the arrestee from PTS such as the arrest report, criminal background, financial affidavit and PSA. *Id*. Prior the Article 15.17 hearing, the assigned PD will interview the defendants/clients to find out all other information necessary to argue for a certain bail result. Bunin Depo. 35:7-10, 51:8-10. The PD's Office also makes the independent determination when to consult with social workers employed by PD's office to the extent health or mental health placement may be a concern at the 15.17 hearing. Bunin Depo. 91:2–92:22.

Hearing Officers: Each hearing officer, when hired, is not instructed to follow policy, but rather, to conduct themselves pursuant to "the Texas Penal Code, Texas Code of Criminal Procedure, the United States Constitution and all the definitions that are found in each of those." *See* St. Julian Depo. 70:2-8. Hearing Officers "are an independent body" that is "not really supervised."[5] St. Julian Depo. 13:25-14:4.

Once cases are placed on their dockets by the clerk's office, prior to Article 15.17 hearings, Hearing Officers will review the information provided to them exclusively by PTS, the Sheriff's

---

[5] In fact, the only supervisor Judge St. Julian could name was herself, because she is "responsible for evaluating the work of the other hearing officers." St. Julian Depo. 14:3-4.

Office, the DA's Office and the PD's Office. Bunin Depo. 101:5-10 (Hearing officer gets to "see everything [the DA and PD] have gotten to see."); St. Julian Depo. 79:16-80:2, 125:5-16, 128:14-21. If, upon that review, a Hearing Officer determines someone is eligible for the General Order Bond, they have the discretion to release them on that basis *or* to issue secured bond despite the order. Bunin Depo. 134:13-20. Hearing Officers also can, and have, choose to release arrestees on personal bond prior to any bail hearing. [6] Keith Depo. 56:3-25. It is "in the discretion of the hearing officers" to make such a choice. Keith Depo. 55:24-56:8. In other words, "if...*the hearing officer* believes that a Personal Bond is appropriate, *the Bail Schedule and the Risk Assessment notwithstanding*, the hearing officer can grant a Personal Bond." Keith Depo. 56:19-25. Hearing Officers "do not interpret [the felony bail schedule] to be an order to [them]." St. Julian Depo. 25:9-10.

Bail Hearing: Article 15.17 hearings occur in Harris County jail. Dougherty Depo. 38:1-4. Present at those hearings are a hearing officer, an assistant district attorney, an assistant public defender and the defendant.[7] Bunin Depo. 97:18-20. The Hearing Officer will begin "[b]y reading each defendant their rights[8], then giving an overview of what to expect in court that day and usually by concluding all that by saying, 'And here are some of the factors I will consider in assessing your bond amount.'" St. Julian Depo. 64:14-18; Bunin Depo. 97:21-98:1. This opening speech is usually the result of a written script that the Hearing Officers have worked off of until memorized. St. Julian Depo. 64:19-65:3. Each Hearing Officer writes their own script. *Id.* at 65:4-6.

---

[6] Subject only to statutory prohibitions on doing so. *See* Warren Depo 38:23-39:3 ("there are statutory provisions for felony cases where a magistrates is prohibited by law from giving a PR bond, not from instructions by a judge, but from the Code of Criminal Procedure.").

[7] The only other party that will attend is, sometimes, PTS if requested. Bunin Depo. 98:4-6

[8] This is the same recitation as is done in the misdemeanor courts pursuant to the *ODonnell* decree. St. Julian Depo. 65:7-14

The Hearing Officer will then hear from the DA's Office "about the seriousness of the crime and the likelihood that the person will commit future crimes, and that the person is unlikely to appear when requested." Bunin Depo. 101:24-102:3; St. Julian Depo. 79:16-80:9. The DA's office will also provide argument as to probable cause.[9] St. Julian Depo. 69:20-70:1. The PD's Office will then make "many" arguments to include "ties to the community, that they have ties. Possibly employment, school. Lack of a significant criminal history...if they have a criminal history, lack of non-appearances. Low risk on the PSA. The offense itself, again...[E]ven though there may be enough for probable cause, it may still sound like a fairly weak case, and that is often considered favorably for defendants." Bunin Depo. 102:4-17; St. Julian Depo. 80:10-23.

When ruling on bail, the Hearing Officer, in addition to hearing, and independently considering, the adversarial positions of the parties, must also consider financial information of the defendant provided and sign off that they did so. Bunin Depo. 102:24-103:3; St. Julian Depo. 49:1-6. Far from even referencing it, the bail schedule is frequently disregarded by Hearing Officers and without fear of reproach. St. Julian Depo. 87:23-88:1. The Hearing Officer then makes an **independent**, **discretionary** ruling as to what the bail amount should be and, while doing so, makes a factual finding as to the amount a person can afford to pay. Bunin Depo. 103:4-8; St. Julian Depo. 87:23-88:5. The Hearing Officers also set their own nonfinancial conditions of release, without instructions from anyone, subject only to what PTS can actually monitor. St. Julian Depo. 103:23-104:1, 105:20-106:6, 111:11-112:9.

The Hearing Officer will fill out their own findings on probable cause and bail on a computer, which then generates a document containing their rulings. Dkt 259-5; St. Julian Depo.

---

[9] There are no policies or orders, written or unwritten, that direct the Hearing Officers on how to apply the probable cause standard. St. Julian Depo. 70:23-71:10.

67:15-69:10. Nowhere in that document is there a reference to another judge, bail schedule or any other orders. *See id.*

***

A careful reading of Plaintiffs' gathered deposition testimony makes one thing very clear: nowhere, in the entire process from arrest to bail determination, does a Felony Judge instruct anyone on how bail should be deteremined or what bail amount should ultimately be set on an individual arrestee. *See* March 3, 2021 Hrg. Trans. (Mar. 3 Hrg.) 29:17-21 (**Exhibit G**) ("to the extent you already have that information either from the county or the sheriff or from publicly available sources, then, perhaps, it would not be needed to get it again from the felony judges[.]").

Felony Judge Brian Warren recently made this point abundantly clear to Plaintiffs. For close to 7 hours, Judge Warren reiterated to Plaintiffs, in numerous ways, that the Felony Judges play no role in any part of the process as explained above. Some examples are as follows:

- "We're not giving instructions on magistrates how to set bonds. We are not telling the sheriff when he can or cannot release people." Warren Depo. 60:14-17.
- "We do not have a Bond Schedule." *Id.* at 41:1-2.
- "[The bail schedule] has never been binding **on any magistrate** as long as I've been a judge." *Id.* at 72:19-20
- "[The felony bail schedule] is not being implemented. In my experience prior to getting on the bench, it's never been implemented. And it is definitely not being used currently." *Id.* at 78:22-79:1.
- "[T]he current magistrates are not bound by anything but the law and their discretion." *Id.* at 148:19-21.
- "Felony judges currently...do not give instructions to magistrates about what they can do and what they can't do within the bounds of the law... we don't give them instructions. So we don't limit their discretion." *Id.* at 40:12-23.

After twenty-seven hours of deposition testimony, Plaintiffs have yet to find a single way in which the Felony Judges play any role in the injury claimed within the four corners of their complaint.

## B.  The Demanded Discovery is Irrelevant

The undue burden on the Felony Judges is not outweighed by some "critical" need in this case. Plaintiffs are seeking specific relief that, if granted, must be narrowly tailored only to redress the harm alleged and end the case. *John Doe #1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004) ("The district court must narrowly tailor an injunction to remedy the specific action which gives rise to the order."); *Valentine v. Collier*, 20-20525, 2021 WL 1153097, at *13 (5th Cir. Mar. 26, 2021) (Oldham, J., concurring) (disfavoring the "reforming [of] the internal structural relationships of government agencies or public institutions" though use of a "forward-looking, mandatory injunction...whose prescriptions displace significant areas of defendants' discretion.").

Plaintiffs allege injury from being held on bail where they have not received an Article 15.17 hearing containing "findings concerning the person's present ability to pay and without a showing by the government that pretrial detention is necessary to serve a compelling interest in protecting public safety or preventing flight from prosecution." Dkt. No. 195-1 at ¶40. Plaintiffs want relief in the form of money bail being imposed after there have been "findings concerning their present ability to pay and...the necessity of the detention in light of alternative conditions of release that could serve the government's interests." *Id.* at ¶200.

The discovery obtained in this case reflects what has always been known to Plaintiffs (and, thus, why the Felony Judges were not initially parties nor do they remain parties): the Felony Judges have no bearing on, no input on, and no role in the 15.17 findings. As occurs in this Court, the rulings made in a case in Harris County, even as to bail, are made by the judicial decisionmaker assigned to that case. Plaintiffs' response attempts to stretch what their case says, and what they are entitled to, by making several claims about the "vital" importance of discovery from the Felony Judges. But none of these claims hold merit because they are premised on needs that do not exist.

Plaintiffs give two reasons why discovery and depositions of the Felony Judges are necessary. First, they claim they must prove "that bail orders resulting in felony arrestees' pretrial detention due to inability to pay—whether those orders are issued before the Article 15.17 hearing, following that hearing, *or by the Felony Judges in their own courtrooms*—are issued without the factual findings and procedural protections the Constitution requires." Dkt. No. 453:20.

The Felony Judges are not parties.

Plaintiffs only need to prove what occurs prior to and at Article 15.17 hearings. What happens in a Felony Judges' courtroom in any particular case has no bearing on this matter. If that is not logically clear, it is, at the very least, clear from what the discovery has demonstrated – what the Felony Judges do in their courtrooms does not bind any of the county actors, or defendants while participating in Article 15.17 hearings. *See*, *supra*, para. II.A.

The Plaintiffs' second basis for non-party discovery is that "the Felony Judges possess, and routinely exercise, the authority to promulgate post-arrest rules and policies." Dkt. No. 453:20.

The Felony Judges are not parties.

The claims against them, even as policymakers, are gone. Remarkably, Plaintiffs believe that any final judgment in this case *against the County* requires a result where "this Court **must** hold that **the Judges' conduct**...**violates the Constitution**." Dkt. 453 at 15, n. 17. Again, the Felony Judges cannot, as non-parties, be found to have violated Plaintiffs' rights under 42 U.S.C. § 1983.[10] The Felony Judges' alleged policies cannot be declared unconstitutional nor can they be

---

[10] In that same footnote cited just above, Plaintiffs appear to claim that their own personal reasons for wanting the Felony Judges to be dismissed – to do with avoiding "delay" rather than conceding that sovereign immunity applied – somehow permits this Court to make this ruling without jurisdiction to do so. Dkt. 453 at 15, n. 17. This is wrong. There is no "prudential reasons" exception to the rule requiring jurisdiction over a party before declaring they are violating someone's constitutional rights under 42 U.S.C. § 1983. *See* Dkt. No. 453 at 37.

enjoined in any way from issuing the policies or not issuing others. *ODonnell v. Goodhart*, 900 F.3d 220, 224 (5th Cir. 2018) (This Court is required to "narrowly tailor an injunction to remedy the **specific action which gives rise to the order**."). Since Plaintiffs believe discovery would permit them to obtain a judgment against a non-party based on proof that they promulgate certain policies, and this is wrong, there is no rational reason why such discovery is necessary.

Moreover, even assuming it is necessary to this case to do so, proving a policy is only half the battle. Plaintiffs must also demonstrate to this Court that any of the actual Defendants in this case have not only had these alleged policies conveyed, in writing or orally, to them but also felt in any way obligated to follow them. The discovery on this indicates the answers to both are "no." The Hearing Officers do not consider any order issued by the Felony Judges as unquestionably binding upon them. St. Julian Depo. 95:11-18 (Stating she may follow Felony Judges' instructions "depend[ing] on the wording" and that she "*might* consider it. But...it would greatly hinge on the authority that they're utilizing to [issue the order]"); *see also id*. at 78:2-12 (stating that, even though it is her personal understanding that the PD's office cannot make probable cause arguments at Art. 15.17 hearings she "welcome[s] it" anyway); *see also* Dkt. No. 413 at n. 7 (detailing hearing officers interrogatory responses that they make case determinations in their own courtrooms using their judicial discretion). They can, and do, disregard the bail schedule entirely. St. Julian Depo. 87:23-88:1. And the PD's Office, DA's Office, Sheriff's Office, and PTS, if they know about it at all, either see it as a mere recommendation or do not use it at all. Bunin Depo. 127:7-10; Dougherty Depo. 39:17-40:4; Kennedy Depo. 203:14-18, 206:25-3. No one was able to explain how the 2017 Recommended Bail Practices affected their daily tasks or use of discretion, much less that they felt bound by it. Bunin Depo. 104:22-25; 105:15-20; Kennedy Depo. 229:12-231:14.

Most telling, Judge Warren, who intervened in this case as a defendant with the goal of "shaping bond reform in favor of a more just system," (Dkt. No. 255) has attempted to explain to Plaintiffs that this system is not unjust due to any current policies or customs that the Felony Judges dictate, or fail to dictate, to County officials, written or unwritten. Instead, nothing the Felony Judges do impacts what findings are made by Hearings Officers or how. Warren Depo. 38:23-39:3 ("[T]here are statutory provisions for felony cases where a magistrates is prohibited by law from giving a PR bond, not from instructions by a judge, but from the Code of Criminal Procedure."); *Id.* at 148:19-21 ("the current magistrates are not bound by anything but the law and their discretion."); *Id.* at 296:10-13 ("as hard as you try to say it's a Bond Schedule, it's not. It's never been adopted. It's never been approved. It's never been used.").

Based on the foregoing, the list of specific questions Plaintiffs demand answers to is readily discredited. Below are the questions, and summaries of why they require no answer.

1. **Whether Felony Judges promulgated the bail schedule.**
   Plaintiffs claim some deponents were "unsure" of this but decline to mention that those same deponents stated that, at the least, the bail schedule recommends amounts and, at the most, the bail schedule does not get used.[11] Judge Warren expressly told Plaintiffs "[the Felony Judges] do not have a Bond Schedule."[12] Thus, the question about a "policy" that is not even in effect or utilized can hardly be critical to a case about current practices.

2. **Whether the March 2017 Recommended Standard Bail Practices Order, signed by the Felony Judges is still in effect**.
   Plaintiffs have asked every single deponent about this *four-year-old* order.[13] Contrary to demonstrating how this order is relevant to a case for prospective injunctive relief, Plaintiffs' gathered testimony shows no one follows it, and very few are aware of it. Dkt. No. 453 at 21; *see also supra*. Like the bail schedule, its significance in this case is speculative, at best.

3. **Which "documents" were rescinded by the March 2017 Order.**
   Plaintiffs have yet to give a compelling reason why any discovery about policies/orders/practices that are no longer in effect are of any relevance to a case in which

---

[11] Bunin Depo. 127:7-10; Dougherty Depo. 39:17-40:4; Kennedy Depo. 40:10-13, 41:15-19; St. Julian Depo. 87:23-88:1.
[12] Warren Depo. 41:1-2.
[13] Including Judge Warren who stated it was no longer in effect. Warren Depo. 143:18-21.

they must prove ongoing constitutional violations. *See, infra,* para. II.B. This Court cannot order relief that both meets the PLRA's requirements *and* orders retrospective relief. *See, infra, Valentine.* Of note, for a question that is "critical," Plaintiffs *did not ask it* of the one Felony Judge they have deposed. *See* Warren Depo.

4.      **Whether the 2006 Direct Filing Order is still in effect.**

Plaintiffs also did not ask this "critical" question of the one Felony Judge they have deposed. *See* Warren Depo. (Ex. C). Likely because Plaintiffs know[14] there is no need: the Felony Judges have already stated that the direct filing order is in effect. Dkt. No. 292 at 15.

5.      **The meaning of the terms "average," "above average," and "below average," as used in the felony bail schedule.**

This question is irrelevant because the bail schedule is irrelevant as explained above in response to Question 1. Moreover, PTS is the agency that calculates risk scores and utilizes these terms in creating a PSA in each case. Kennedy Depo. 54:3-13. Plaintiffs know the risk assessment tool was developed by outside consultant, the Arnold Foundation. *Id.* at 44:10-13. The best way to understand the meaning of those terms would likely be to ask those who developed and apply them.

6.      **Whether the Judges control the content of the financial affidavit used at the Article 15.17 hearing.**

Whether the Felony Judges had input, or even created, a document containing financial questions to assist the County in obtaining information on ability to pay from a defendant[15] has no bearing on this case. Plaintiffs cannot honestly assert to this Court that the Felony Judges control what is known to County actors about a defendants' ability to pay or their financial situation. Plaintiffs have received hours of testimony, detailed about in para. II.A, *supra,* about the various interviews an arrestee goes through with multiple County actors prior to their Art. 15.17 hearing.[16] Plaintiffs are inarguably aware that ability to pay is information assessed through many means.

7.      **Whether the Felony Judges have any policies relating to court appearance in the Felony Judges' courtrooms for arrestees that the Sheriff's Office must follow."**

As explained throughout this Reply, what occurs in the Felony Judges courtrooms is entirely irrelevant to this suit.

---

[14] Only two days prior to their Response, Plaintiffs told the Fifth Circuit it was a known fact, admitted to by the Felony Judges, that a direct filing order existed in Harris County so as to allow concurrent jurisdiction over felony criminal cases. *Daves v. Dallas County*, Case No. 18-11368, Doc. No. 00515800787 at p.62. It is unclear why Plaintiffs are claiming to this Court that this is an unknown, or that the existence of such a system makes this case dissimilar from *Daves*, when they have told the Fifth Circuit the opposite. Compare *id.* ("The fact that *Russell* involves Harris County hearing officers rather than Dallas County magistrates **does not affect the analysis**.") *with* Dkt. No. 453 at 37 ("Plaintiffs have consistently and vigorously disputed the notion that...the panel decision in *Daves v. Dallas County* required their dismissal.").

[15] Plaintiffs already have testimony that the Felony Judges do not. Warren Depo. 138:5-14.

[16] In fact, Judge St. Julian stated that the public defender's office will give "a more robust version of the affidavit." St. Julian Depo. 81:16-17.

8. **Why the Felony Judges had declined to make more use of the "underutilized" courtroom in the jail to address the backlog of cases and jail overpopulation.**

   In no way does any claim exist in this case that *either* the Defendants *or* the Felony Judges are acting in an unconstitutional manner that creates a backlog of criminal cases or overpopulation of the jail. The findings that Plaintiffs want at bail hearings are either constitutionally required or they are not. This evidence is sought purely as part of a fishing expedition.[17]

9. **Whether the Visiting Judges have been hired to assist with conducting bail hearings or only resolving cases.**

   What Visiting Judges are assisting Felony Judges with on their own dockets is of no consequence. The Felony Judges are not parties. How they manage their own dockets in their own courtrooms has no bearing on this case.

10. **Why the Judges promulgated the felony bond schedule, the General Order Bonds, or decide to hold certain hearings at certain times. And what criteria the Judges use to decide whether to transport a person from jail to the courthouse and whether to bring the person from the lockup into the courtroom.**

    Plaintiffs are barred by the deliberative process privilege from seeking predecisional and deliberative processes behind creating any certain policy. That aside, reasons behind the Felony Judges' "policies" are not relevant. Plaintiffs have had full reign to ask the County to what extent they follow or adhere to the felony bond schedule or General Order Bond. This is the only evidence Plaintiffs need in this case against the County. When the Felony Judges hold hearings or where they place defendants while a hearing is occurring is also irrelevant. Discovery granted on such an issue would serve purely to allow Plaintiffs to fish for new facts to bring in a new lawsuit against the Felony Judges. Rule 45 should not be circumvented to serve this purpose.

Plaintiffs have had complete autonomy over this case and could seek to depose as many of the employees of the non-adversarial Defendants as they want to understand what policies or practices effect pretrial bail determinations. And the actual defendant in this case have an obligation not to simply state "I don't know" to Plaintiff's questions. *See, e.g., Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 433 (5th Cir. 2006) ("[the corporation] violated rule 30(b)(6) by failing to prepare [the representative] with respect to issues that although not within his personal

---

[17] Further, what else Plaintiffs could gather on this point is unclear given how Judge Warren explained it to them: "[W]hy would I bring my whole staff to a different building? … I've had people remotely appear from jail. I mean, to physically walk across the street with all my staff to go into a different building and have a remote hearing is unnecessary." Warren Depo. 199:15-25.

knowledge, were within the corporate knowledge of the organization...."). This Court should not reward Plaintiffs' unwillingness to engage in full discovery with the actual Defendants in this case, or Defendants failure to fulfill its Rule 30(b)(6) obligations, by requiring non-parties to testify to and produce documents that reflect what policies and practices those Defendants follow. *See Smith v. Our Lady of the Lake Hosp., Inc.*, 960 F.2d 439, 448 (5th Cir. 1992) (Noting that Rule 26(g) specifically "requires that parties make a **reasonable** inquiry before conducting or opposing discovery."); *Andra Group, LP v. JDA Software Group, Inc.*, 312 F.R.D. 444, 452 (N.D. Tex. 2015) (information obtained under Rule 45 must be "not otherwise obtainable from a party to the litigation.").

In addition, the fact that Plaintiffs could think of only 10 questions they need answers to, despite 27 hours of depositions, +215,000 documents thus far,[18] should be telling. If anything, this list of questions as Plaintiffs provide them serves only to demonstrate that no third party discovery is necessary because not a single question seeks to prove that the County "jail[s] [criminal defendants] prior to trial without making any finding that pretrial detention is necessary to serve the government's interests." Dkt. No. 195-1 (Plaintiffs' Complaint) at ¶202.

The final obvious indicator of irrelevance should be that, despite having +4,000 documents produced by all of the Felony Judges,[19] Plaintiffs have yet to use **a single document** in the sole possession of the Felony Judges to support their need for discovery in their Response or prove claims that the Felony Judges play a role in bail determinations in numerous previous filings. Dkt.

---

[18] Plaintiffs have indicated there are more forthcoming from the County.

[19] In producing those documents, the Felony Judges used a far more expansive search term list than plaintiffs have proposed, and no limitations on who the Felony Judges had communicated with. *Compare* Dkt. No. 453-3 *with* Dkt. No. 434. The responses also answered extremely broad requests for, for example, "any communications about bail" or "any communications with Hearing Officers and Pretrial Services." Dkt. No. 215-1. Surely something that demonstrates the Felony Judges have documents or ESI that *only* they possess should have revealed itself.

No. 453 (Resp. to MTQ); Dkt. No. 395 (Advisory); Dkt. No. 354 (Resp. Mtn to Stay); Dkt. No. 305 (Sur-Reply to Mtn to Dismiss); Dkt. No. 259 (Resp. Mtns to Dismiss); Ex. C (Warren Depo.). The Felony Judges should not be subjected to months-long discovery production[20] for evidence Plaintiffs are not even utilizing.

### C. 2015 to the Present is an Unduly Burdensome Time Period That Requires, At the Very Least, Limitations from this Court.

Plaintiffs' discovery continues to present an undue burden on the Felony Judges based on "the time period covered by the request." *Wiwa v. Royal Dutch Petroleum Co.,* 392 F.3d 812, 818 (5th Cir. 2004). As this Court explained, "documents that show how the current system is operating are the most important." Mar. 3 Hrg. (Ex. G) 29:13-30:4 ("it does seem to me that one way to reduce the burdensomeness would be to reduce the time period that is sought...**I'm urging you to narrow the time frame as much as you can**."). Ignoring this urgency, Plaintiffs refused to make any modification of their 2015 starting date. *See* Dkt. No. 453 at 23. Thus, even this Court's instructions otherwise are insufficient to deter Plaintiffs from claiming entitlement to whatever they want from the Felony Judges; they are, as they have been, confident this Court will provide it.[21]

---

[20] The final number of pages needing review are approximately 39,420. *See* **Exhibit H** (Second Supplemental Affidavit of Adrian Skinner). This number of pages will take four months to review, at least. Dkt. No. 433. It will also take 3-4 days, per month, to review documents between March 2021 and the month of trial as part of any rolling production that the Felony Judges are ordered to comply with. *See* Ex. H (stating here will likely be 1,436 pages of potentially responsive documents created per month); *see also* Dkt. No. 433 (predicting ability to review, at most, 400 pages/day)

[21] Plaintiffs also appear to argue that it is not unreasonable to ask for old, irrelevant documents because it is only 200 documents between 2015-2017. This ignores that there are 1,302 more documents if 2017-2019 are included, which are also irrelevant time periods. This is a total page review of 5,236 (3.5 avg. pages x 1,496 documents), which would take approximately 2 weeks (5,236÷400pgs/day) to review, in addition to time spent on the other 2020-2021 documents. But undue burden is not assessed simply by coming up with a bright line number that seems reasonable to Plaintiffs, or the Court, for a non-party to review. Relevance and needs of the cases are the bedrocks of the undue burden inquiry. *See Wiwa,* 392 F.3d at 818.

But that is far from true. Plaintiffs claim documents from six to seven years ago are necessary because "Plaintiffs are challenging entrenched policies, procedures, and unwritten customs that...were in place at least **until** the middle of 2017." Dkt. No. 453:23 ("multiple policies **changed** in the middle of 2017.).  This Court has said the same. Mar. 3 Hrg. 29:10-12 ("There are things that have changed since the first promulgation of the request that set that time period.") Thus, Plaintiffs' own characterization of their claims, much less this Court's characterization, belies any assertion that this discovery is necessary.

What is more, Judge Warren has also told Plaintiffs there are no current policies in place that would support a claim that the Felony Judges have "enforcement" control over the bail system. *See*, *e.g.*, Warren Depo. 59:25-60:22 ("[W]e're not implementing policies. We're not saying who should be released and who should not be released. We are not saying when you can take a bond and when you can't take a bond... We're not giving instructions on magistrates how to set bonds. We are not telling the sheriff when he can or cannot release people. We're not telling them how, why. We're not telling the county how to accept bonds and how not to accept bonds.").

Plaintiffs should not be permitted to conduct nonparty discovery on state officials to discover policies that, indisputably, no longer exist. Even assuming any policies by the Felony Judges are proper facts to discover in this case, nonexistent policies cannot logically be relevant where both the claims and possible relief are limited to what is *currently* occurring in Harris County. *Valentine*, 2021 WL 1153097, at *2 ("A permanent injunction is appropriate only if a defendant's past conduct gives rise to an inference that, **in light of present circumstances**, there is a reasonable likelihood of future transgressions.").

### D.  Harrassment That has Been, and will be, Borne from Subjecting the Felony Judges to Non-Party Discovery Demonstrates Undue Burden.

In addition to the examples given in their motion to quash (Dkt. No. 413 (Motion to Quash) at 35, n. 15), Plaintiffs have continued to demonstrate that this Rule 45 discovery, and the Felony Judges' constant forced participation in this case, are primarily used to intimidate and oppress those they are confident will not be protected. For example, once Plaintiffs learned that Judges Robert Johnson and Te'iva Bell[22] were not willing to waive service of the Rule 45 subpoenas, Plaintiffs used, as a first resort, resources to obtain the judges'[23] personal home addresses and share them with third-parties. *See* AAG Corbello's Premotion Conference Letter (**Exhibit I**). Service was effectuated despite Plaintiffs' knowledge[24] that Judge Johnson was at Harris County Court daily. When asked to make reasonable and collegial efforts to restrict access to, or knowledge of, this confidential information, Plaintiffs' counsel responded that the Judges deserved such treatment because they refused to agree to meet their process server at a certain place and time. *See* March 18th Email thread Between Counsel (**Exhibit J**). Upon the Felony Judges plea for assistance (Ex. I), this Court ordered that Plaintiffs' counsel detail "their efforts to maintain the confidentiality of the personal information at issue." **Exhibit K**. Ignoring this order, Plaintiffs responded with the same position that a refusal to meet at a particular time and place to be served justified the intimidation of a sitting judge by sending an unknown person to his home.[25] **Exhibit**

---

[22] Judge Bell was represented by the AG's office at this time but has since retained other counsel.

[23] Plaintiffs have stated they intended to serve Judge Bell at her home but ceased doing so once Judge Robert Johnson sought this Court's protection due to safety concerns.

[24] Even if Plaintiffs' counsel chooses to claim that they do not have personnel placed in felony courtrooms routinely to observe proceedings, it is just as easy to argue that "Plaintiffs have multiple ways in which they could have quickly verified that Judges Johnson or Bell were physically appearing at the Harris County Courthouse."

[25] Many of those times occurred when Plaintiffs' counsel was well-aware Counsel for the Felony Judges was not in the office and/or on medical leave.

**L**. In fact, nowhere in the court-ordered response did Plaintiffs provide a *single detail* as to "their efforts to maintain the confidentiality of the personal information at issue."[26] *See id.*

Additionally, Plaintiffs have also recently used local third-party contacts to ensure this case looms over the Felony Judges heads daily. The Felony Judges have received hundreds of emails from both "local" and "non-local" concerned citizens. Each "concerned citizen" signs the email in the exact same way. **Exhibit M** (example emails received by Felony Judges). Each "concerned citizen" sends the email from the same domain name (@everyactioncustom.com). *Id.* Each "concerned citizen" parrots the exact same assertions and demands about bail and pretrial release that Plaintiffs' counsel claims. *Compare id.* ("More than 9,000 people are trapped in the Harris County Jail under inhumane conditions, with not enough water to drink or bathe, freezing temperatures, and unusable toilets. 88% of these people have not been convicted of a crime") *with* **Exhibit N** (Facebook page seeking signatures to petition Harris County Judges on behalf of Plaintiffs' counsel, the Texas Fair Defense Project,[27] stating "[M]ore than 9,000 people locked in the Harris County Jail. 88% haven't been convicted of a crime. They don't have enough water to drink or bathe, are in freezing temperatures, and are unable to use toilets."). What is worse, agents for Plaintiffs also call the Judges courtroom phonelines threatening them to release people and going so far as to repeatedly tell the judge "you are being watched." **Exhibit O**.

---

[26] No further request was made that Plaintiffs provide such detail.

[27] Contact with a person represented by counsel, even through use of an agent, regarding matters relevant to the case is prohibited by the American Bar Association and Texas Disciplinary Rules of Professional Conduct. ABA Rule 4.2; Tex Disc. R. Prof. Conduct 4.02. Use of the media to influence ongoing litigation is expressly prohibited by the Model Rules of Professional Conduct. Model Rules of Prof'l Conduct r. 3.6(a) ("A lawyer who is participating or has participated in the investigation or litigation of a matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter."). While the Felony Judges are no longer parties, this harassment has been ongoing and must be noted for the record in the event of future litigation. Moreover, to the extent this Court agrees with Plaintiffs that it can declare any of the Felony Judges' actions unconstitutional, these arguments and evidence are contained herein for purposes of appeal.

This has to stop.

The Felony Judges have had their confidential judicial complaints shared, their addresses shared, their emails and phone numbers shared. That information is then used to intimidate and threaten the State's judiciary not just generally, but in order to influence them to act in a way directly related to this case. One way in which this Court can stop what is happening, and what will continue to happen, is to quash these subpoenas.

### III. Plaintiffs' Response Fails to Rebut the Undue Burden Asserted by Judges Kelli Johnson, Herb Ritchie, Ramona Franklin and DaSean Jones in Being Deposed.

#### A. Plaintiffs Are Not Entitled to Deposition Testimony Regarding Irrelevant Information.[28]

Plaintiffs' Response demands depositions by vaguely asserting that these four judges will be able to testify regarding their theory that "the Judges' policies and directives were unwritten, and even written policies were conveyed orally." Dkt. No. 453 at 24. But Judge Warren has already told Plaintiffs that "[the Felony Judges are] not giving instructions on magistrates how to set bonds. [The Felony Judges] are not telling the sheriff when he can or cannot release people." Warren Depo. 60:14-17. Nothing is conveyed to the County, orally or otherwise, regarding how to set bail in each individual case or what findings to make.[29] To allow Plaintiffs to depose non-party judges simply because they have an answer that they do not like violates Rule 45.

Significantly, Plaintiffs never answer a very obvious question: why these four judges? Plaintiffs' Response is devoid of any evidence as to why these judges are the ones who can answer

---

[28] The irrelevance of the information sought by Plaintiffs has been explained in detail above. *See*, *supra*, para. II.B. Given that Plaintiffs intend to depose Judges Kelli Johnson, Ramona Franklin, Herb Ritchie, and DaSean Jones regarding this same information, the arguments above apply equally herein.

[29] In fact, the only example Plaintiffs even give, out of the extensive discovery and testimony they have received in this case, is a comment from Hearing Officer St. Julian, testifying in her personal capacity, that she heard about a written policy from the Judges before she ever saw it. Dkt. No. 453 at 24. An example of a written policy is certainly not one that Plaintiffs need a Judge's testimony to explain how it was conveyed.

the "critical" questions Plaintiffs claim to have. *See* Dkt. No. 453 at 24-25. This, in turn, should make clear that the depositions are an attempt at a fishing expedition, nothing more.[30] Being subjected to 7 hours of deposition purely to allow Plaintiffs to ask questions that have either already been answered or have no bearing on their claims in this case is the epitome of an undue burden.

### B. Undue Burden Exists on the Judges as Public Officials.[31]

"[C]ourts have consistently recognized the undue burden that falls on public officials as a consequence of compulsion to attend depositions." *Payne v. D.C.*, 279 F.R.D. 1, 5 (D.D.C. 2011). In order to overcome this presumptive undue burden, "courts look to whether the official has some personal knowledge about the matter and if the testimony will be relevant and material. " *Id*. Moreover, the party seeking the deposition must make a showing ***that the information cannot be obtained elsewhere*.**" *Id*.; *see also Alexander v. FBI*, 186 F.R.D. 1, 4 (D.D.C. 1998) ("There is substantial case law standing for the proposition that high ranking government officials are generally not subject to depositions unless...the party seeking the deposition makes a showing that the information cannot be obtained elsewhere.").

Assuming, arguendo, there are any policies promulgated by the Felony Judges that are enforced upon County actors, the County would necessarily have to be aware of such policies. It would defy logic to hold that evidence regarding policies the County is unaware of or does not follow is relevant to this case that solely concerns County actors, their actions, and the reasons behind those actions. If Harris County is the party in this suit, it has evidence has to which policies

---

[30] Judge Franklin, in particular, has already been the subject of Plaintiffs' counsels' public criticisms many times over the past few years. The only apparent reason behind Plaintiffs wanting to depose her would be to continue this trend.
[31] Although Judge Ritchie is now retired, he is still functioning as a Visiting Judge.

it follows, where those policies come from and for what purpose; all the information Plaintiffs want can be obtained elsewhere.[32]

### C. These Judges Are Entitled to Judicial Immunity.

To the extent Plaintiffs intend to ask individual capacity questions to the Felony Judges, judicial immunity bars the compulsion of their Rule 45 deposition subpoenas. "Although [the Felony Judges are] a nonparty, the policy behind immunity does not merely extend to suits, **it also extends to protection against discovery**." *Ray v. Judicial Corr. Servs., Inc.*, 2:12-CV-02819-RDP, 2014 WL 5090723, at *2 (N.D. Ala. Oct. 9, 2014) (holding nonparty judge was judicially immune from being deposed as to any of his judicial actions); *see also Harlow v. Fitzgerald*, 475 U.S. 800, 818 (1982) ("[u]ntil [the] threshold immunity question is resolved, discovery should not be allowed."); *In re Lickman*, 304 B.R. 897, 903 (Bankr.M.D.Fla.2004).

"[C]ourts have generally refused subpoenas due to judicial immunity "absent extreme and extraordinary circumstances." *Fed. Trade Comm'n ex rel. Yost v. Educare Ctr. Services, Inc.*, EP-19-CV-196-KC, 2020 WL 4334765, at *4 (W.D. Tex. May 26, 2020). This has led many courts to quash requested discovery from a nonparty judge on immunity grounds.[33] Thus, discovery

---

[32] Plaintiffs may not like that Harris County deponents have mostly testified thus far that they are unaware of any Felony Judge policies in their day-to-day jobs or do not know where the policies that Plaintiffs put in front of them come from. But this is evidence that the Felony Judges do not have the policymaking enforcement power over the County in the way Plaintiffs hoped they did, not that Plaintiffs should be permitted to keep fishing for some other evidence that is either contrary or entirely unrelated to their current claims in this case.

[33] *See United States v. Morgan*, 313 U.S. 409, 422 (1941) ("But the short of the business is that the Secretary should never have been subjected to this examination.... Just as a judge cannot be subjected to such a scrutiny."); *Robinson v. Comm'r of Internal Revenue*, 70 F.3d 34, 38 (5th Cir. 1995) (quashing subpoena for state court judge's testimony where "the whole purpose of the subpoena was to delve into the judge's mental processes"); *Grant v. Shalala*, 989 F.2d 1332, 1344 (3d Cir. 1993) (holding that "[a]vailability of the type of discovery ... that the plaintiffs sought in this case," including documents containing notes and communications, "would undermine th[e] vital independence" of the administrative law judge); *United States v. Roebuck*, 271 F. Supp. 2d 712, 718, 721 (D.V.I. 2003) (finding that "[the judge] cannot be compelled to answer ... as the information sought falls directly within the prohibition established by *Morgan* and its progeny" and that the requested documents could be obtained from other sources); *United States v. Dowdy*, 440 F.Supp. 894, 897 (W.D.Va.1977) (holding that, because the defendant "failed to show any extraordinary circumstances, examination into the judge's decision-making process will not be allowed").

reaching a nonparty official's judicial functions should not be permitted unless the party seeking the discovery can demonstrate extreme and extraordinary circumstances. *See Gary W. v. Louisiana Department of Health & Human Resources*, 861 F.2d 1366, 1369 (5th Cir. 1988).

There is no question that Plaintiffs intend to question the Felony Judges about their actions as judges. Plaintiffs asked numerous questions of Judge Warren about: (1) pending cases in his courtroom in which his judicial decisionmaking is obviously implicated (98:11-99:5); (2) pending cases in *other* Felony Judges' courtrooms (172:2-173:18) (asking about Judge Franklin's decisionmaking in a case); and (3) how he may rule in his cases in the future (172:25-173:8). Plaintiffs have asked the same of Judge St. Julian. *See, e.g.,* St. Julian Depo. 108:5-20 (asking how she would rule in hypothetical criminal case); *id.* at 110:13-15 (asking her to speculate how she will set nonmonetary conditions of release in future cases); *id.* at 129:20-22 (giving hypothetical scenario and asking how she would rule). The Felony Judges will undoubtedly be subject to the same questioning, if not worse. Judicial immunity protects this very sort of compelled oral testimony of decision-makers as to the basis for their opinions and rulings.

**Conclusion**

It is Plaintiffs' responsibility to comply with Federal Rule of Civil Procedure 45 in a way that does not place an undue burden on the nonparty from which discovery is sought. They have not done so. Therefore, Plaintiffs' subpoenas should be quashed in their entirety and the Felony Judges should be granted a protective order from any future discovery by any party in this case.

**Dated:** March 2, 2021.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**SHAWN COWLES**
Deputy Attorney General for Civil Litigation

**SHANNA MOLINARE**
Assistant Attorney General
Chief, Law Enforcement Defense Division

*/s/ Courtney Corbello*
**COURTNEY CORBELLO**
Attorney in Charge
Assistant Attorney General
Texas State Bar No. 24097533
Southern District ID 3089117
Courtney.corbello@oag.texas.gov

*/s/ Landon A. Wade*
**LANDON A. WADE**
Assistant Attorney General
Texas State Bar No. 24098560
Southern Distr. No. 3503435
*Landon.Wade@oag.texas.gov*

*/s/ Jonathan M. Pena*
**JONATHAN PENA**
Assistant Attorney General
Texas State Bar No. 24110207
Southern Distr. No. 3350256
*Jonathan.Pena@oag.texas.gov*

**OFFICE OF THE ATTORNEY GENERAL**
Law Enforcement Defense Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 463-2080 / (512) 370-9410 (Fax)

**Counsel for the Felony Judges**

**NOTICE OF ELECTRONIC FILING**

I, **COURTNEY CORBELLO**, Assistant Attorney General of Texas, certify that I have electronically submitted for filing, a true and correct copy of the above and foregoing in accordance with the Electronic Case Files system of the United States District Court for the Southern District of Texas, on April 12, 2021.

*/s/ Courtney Corbello*
**COURTNEY CORBELLO**
Assistant Attorney General

### CERTIFICATE OF SERVICE

I, **COURTNEY CORBELLO**, Assistant Attorney General of Texas, do hereby certify that a true and correct copy of the above and foregoing has been served directly to all counsel on record by the Electronic Case Files System of the Southern District of Texas on April 12, 2021.

*/s/ Courtney Corbello*
**COURTNEY CORBELLO**
Assistant Attorney General