# EXHIBIT 2

1  prosecutor on duty.

2      Q.    (By Mr. Stein)  So currently under the E-Charge

3  system, when the file comes back from Pretrial to the

4  DA's Office, the log manager is responsible for

5  transposing the recommended bond amount onto the

6  charging instrument with oversight by the chief

7  prosecutor?

8      A.    I don't know if I'd use the term transpose, but

9  they select the type of bond recommended based on what

10  is reflected on the written public safety assessment,

11  yes.  And then it is then reviewed for accuracy and

12  confirmed by the chief prosecutor on duty before they

13  place their electronic signature on the documentation

14  for filing.

15     Q.    And when you say you wouldn't use the word

16  transpose, why is that?

17     A.    I just think there's a simpler way.  I would

18  just put it -- phrase it differently than you.

19     Q.    The reason I'm asking is because I want to

20  understand whether when that log manager looks at what

21  you're calling the second page of the PSA and sees that

22  recommendation, whether that log manager just copies

23  what they see there and submits it to the chief

24  prosecutor for review, or whether there's some element

25  of discretion or judgment that that log manager gets to

30

1   use in deciding what amount to submit to the chief

2   prosecutor to place onto the charging instrument?

3       A.   There is no discretion by the log manager or

4   the chief prosecutor when it comes to the bond amount

5   that is placed on the charging documentation.  It must

6   correspond with the amount that is reflected on the bond

7   recommendation portion of the public safety assessment.

8       Q.   And so when you say that the chief prosecutor

9   reviews what the log manager submits for accuracy, how

10  does the chief prosecutor assess the accuracy of what

11  the log manager has submitted?

12      A.   The chief prosecutor looks at the bond

13  recommendation form and then looks at the appropriate

14  tab in the E-Charge file to make sure that the entry is

15  identical to the recommendation.

16      Q.   So the chief prosecutor is not making any

17  assessment about whether the recommendation received

18  from Pretrial is accurate, the chief prosecutor is just

19  assessing whether the amount submitted by the log

20  manager matches what you're calling the second page of

21  the PSA; is that right?

22      A.   The DA's Office and the chief prosecutor or any

23  other personnel at intake makes no recommendation or

24  assessment of what's received from Pretrial.  We simply

25  utilize the information given to us from Pretrial

Russell vs
Harris County Texas

Jennifer Keith
March 10, 2022

70

1 trained initially by me as well as observing other

2 prosecutors on the day shift for two weeks.  There will

3 also -- if there are changes to the law or procedure,

4 then there will be trainings relative to those

5 particular topics, as I stated earlier, such as the bail

6 reform laws that recently went into effect in December

7 and January and just as needed to address any particular

8 issues with process, procedure and substance as they

9 arise.

10     Q.   (By Mr. Stein)  All right.  I'm going to ask

11 you some questions about whether the actions you took in

12 Ka'Darian Smith's case were consistent with the District

13 Attorney's Office's policies regarding communications

14 with judges and bond requests.

15          Now, in Mr. Smith's case, you were the ADA

16 present at the 15.17 hearing, correct?

17          MR. NICHOLS:  Jeff, so you've mentioned

18 earlier as part of your long prologue in asking a bunch

19 of understandings about the deposition that you were

20 going to be covering matters that relate to the DA's

21 Office generally in her organizational capacity.  Am I

22 now hearing that you want to ask questions specifically

23 about a particular case in her individual capacity?

24          MR. STEIN:  Mr. Nichols, we've already

25 litigated whether we get to inquire about whether the

1  conduct in that case was consistent with the official

2  policies.  Ms. Keith's position as an organizational

3  representative is perfectly appropriate to answer

4  questions about that topic.

5           MR. NICHOLS:  Yeah.  And, Jeff, I politely

6  and respectfully disagree with your characterization as

7  to what was "litigated."

8           My recollection is that there was some

9  discussion about talking about, in general, about the

10 policies that the DA's Office has with respect to

11 ex parte communications with judges.

12          I don't recall any litigation, much less

13 ruling, that said that it would be appropriate to go

14 into the facts and circumstances of a particular case.

15          MR. STEIN:  I'm just going to pull up --

16 it's one of like the three points that we raised before

17 Judge Rosenthal.  And specifically, it was whether Ms.

18 Keith's alerting of prosecutors in Judge Randy Roll's

19 courtroom about a hearing officer's imposition of a

20 personal bond in an aggravated assault case was

21 consistent with HCDAO policies regarding communications

22 with judges and bond requests.

23          MR. NICHOLS:  Yes.

24          MR. STEIN:  You raised it before Judge

25 Rosenthal.  I explained the relevance of that line of

72

1  questioning.  Judge Rosenthal agreed that we are

2  permitted to reopen on that, and so...

3              MR. NICHOLS:  Respectfully, I think the

4  discussion before Judge Rosenthal, which was in the

5  context of a premotion conference, related to the

6  policies that the DA's Office has with respect to

7  ex parte communications.

8              So I just want to make sure it's clear on

9  the record that now you're not asking for her to testify

10 about that subject, you're asking her to testify about

11 an individual case in which she individually was

12 involved?

13             MR. STEIN:  I'm asking her about a case

14 because it bears on the policies.  My questions are

15 about whether the conduct there was consistent with the

16 policies.

17             MR. NICHOLS:  All I want to make sure to

18 get clear, Jeff, the record that you're now asking for

19 -- I'm not saying I'm not going to let her testify to

20 it.  The record that you're asking about is her

21 individual perception of a particular case as opposed to

22 general Harris County District Attorney's Office

23 policies?  And if you just help us out by that,

24 especially in light of your comment at the beginning

25 that said you were only going to talk about things in

1  her capacity as an organizational representative, I

2  think that'll help move things along.

3            MR. STEIN:  In the interest of moving

4  things along and as a good faith agreement, I'll agree

5  to ask in your individual capacity with the

6  understanding that then we will be able to move through

7  this relatively smoothly, not have to argue about

8  whether it's properly within the scope so that everyone

9  can go home hopefully very soon.

10            MR. NICHOLS:  All right.  Could you ask

11  your question again, please.

12      Q.   (By Mr. Stein)  In Mr. Smith's case, you were

13  the ADA present at the 15.17 hearing, correct?

14            MR. NICHOLS:  Objection, form, and beyond

15  the scope.

16            Ms. Keith, you can answer.

17      A.   Yes, I was.

18      Q.   (By Mr. Stein)  And in that case, you asked the

19  hearing officer to impose a $30,000 secured bond?

20            MR. NICHOLS:  Objection to form and beyond

21  the scope.

22            Ms. Keith, you can answer.

23      A.   I believe that's what I asked for, yes.

24      Q.   (By Mr. Stein)  I'm going to throw Exhibit 11

25  into the chat, going to put it up on the screen share so

74

1   we can all look at it.

2                    (Exhibit 11 marked.)

3       Q.   (By Mr. Stein)  All right.  And I'm going to

4   fast forward to time stamp 26:09.

5                    Now, this is a video of that 15.17

6   hearing; is that correct?

7       A.   It appears to be, yes.

8       Q.   And beginning at time stamp 26:09, I'm going to

9   press play.  Let me know if you have trouble hearing.

10                   (Video played.)

11      Q.   (By Mr. Stein)  And I'm stopping at time stamp

12  26:20.

13                   Were you able to hear the hearing officer

14  say, "I will approve you for a personal bond"?

15      A.   Yes.

16      Q.   Now, following a later unrelated 15.17 hearing

17  of that same docket, you came back to address the

18  hearing officer in Mr. Smith's case, correct?

19      A.   Yes.

20      Q.   I'm going to fast forward to 31:08.  And I'm

21  going to play it for you now.

22                   (Video played.)

23      Q.   (By Mr. Stein)  And I'm stopping at 31:45.

24                   Were you able to hear that clip?

25      A.   Yes.

75

1    Q.   Who was the prosecutor in Judge Roll's

2  courtroom that you contacted?

3            MR. NICHOLS:  Objection, form.

4    A.   Allen Otto was the chief in the court.

5            MR. NICHOLS:  Yeah, I'm just objecting to

6  form and beyond the scope; but let's just move through

7  this.

8    Q.   (By Mr. Stein)  How did you contact the

9  prosecutor in Judge Randy Roll's courtroom?

10            MR. NICHOLS:  Objection to form, beyond

11  the scope.

12    A.   I believe it was by email.

13    Q.   (By Mr. Stein)  And what did you tell the

14  prosecutor to relay to Judge Randy Roll?

15            MR. NICHOLS:  Objection to form and beyond

16  the scope.

17    A.   I did not tell the prosecutor to relay any

18  information to Judge Roll.

19    Q.   (By Mr. Stein)  What did you tell the

20  prosecutor in Judge Randy Roll's courtroom?

21            MR. NICHOLS:  Objection, form, and beyond

22  the scope.

23    A.   I advised him of the ruling made during the

24  15.17 hearing as I had prior knowledge from prior cases

25  of Judge Roll's supposed policy regarding aggravated

76

1   offenses.  So I simply advised him of the outcome of the

2   15.17 hearing for that particular defendant.

3       Q.   (By Mr. Stein)  Did you advise other

4   prosecutors in other courtrooms that day of outcomes in

5   the 15.17 hearing over email as you did in this case?

6               MR. NICHOLS:  Objection, form, and beyond

7   the scope.

8       A.   I may have.  I don't have any independent

9   recollection of whether I did or this particular day.

10  But it is not an uncommon occurrence for the hearing

11  court prosecutor to notify the trial court prosecutors

12  of bail hearing outcomes for defendants pending -- with

13  cases pending in their courts for a variety of reasons.

14      Q.   (By Mr. Stein)  When the hearing officers issue

15  a bail ruling in a particular case at the 15.17 hearing,

16  do you record that ruling in the case file or otherwise

17  memorialize it as part of the case file?

18              MR. NICHOLS:  Now, I think he's back in

19  the mode of asking an organizational representative

20  question.

21              MR. STEIN:  That's correct.

22      A.   Yes, we make internal -- we record it

23  internally; and it is also memorialized in the

24  documentation that is generated by the hearing officers

25  at the conclusion of each bail hearing.

77

1    Q.    (By Mr. Stein)  And the calendar prosecutors in

2  the district courtroom will receive the case file with

3  the hearing officer's ruling recorded in it, correct?

4    A.    I'm sorry.  What prosecutors are you referring

5  to?

6    Q.    The prosecutor in the home judge's courtroom.

7    A.    They have access to the documentation, the

8  digital documentation, that the hearing court prosecutor

9  makes; but it's not necessarily directly provided to

10  them.  It's contained as part of the entirety of the

11  digital file for that case.

12    Q.    And that prosecutor will receive the digital

13  file; is that correct?

14    A.    They will have access to it as part of the --

15  they can access it when they go in to review all of the

16  accompanying documentation for that case, yes.

17    Q.    In other words, the prosecutors in the home

18  court don't need to be emailed directly about the

19  hearing officer's ruling to know what the hearing

20  officer did; is that correct?

21          MR. NICHOLS:  Objection, form.

22    A.    That's correct.

23    Q.    (By Mr. Stein)  So if that's the case, why did

24  you email in your individual capacity, in the interest

25  of moving things along, why did you email the prosecutor

78

1   in the home judge's courtroom in Mr. Smith's case?

2                MR. NICHOLS:  Objection, form, and beyond

3   the scope.

4      A.   As I said, I was aware from prior cases in that

5   court of Judge Roll's supposed policy regarding personal

6   bonds on aggravated offenses.  And additionally, I did

7   not feel that a personal bond under the facts and

8   circumstances of that case was appropriate and felt that

9   the trial court prosecutors should know, based on the

10  particular facts of this case, that a personal bond was

11  granted.

12     Q.   (By Mr. Stein)  Did the prosecutors in the

13  courtroom of Judge Randy Roll respond to your email?

14               MR. NICHOLS:  Objection to form and beyond

15  the scope.

16     A.   I believe at some point that the chief

17  prosecutor in the court advised me that they

18  acknowledged my communication and whatever was

19  relayed -- whatever information was relayed to me in

20  response by the prosecutors is what I told the hearing

21  officer as is reflected in the video.

22               I don't have a specific recollection of

23  what the exact communication was, but it's pretty much

24  reflected in what I told the court.

25     Q.   (By Mr. Stein)  Would that communication have

79

1   been over email?

2           MR. NICHOLS:  Objection, form, and beyond

3   the scope.

4       A.   Based on the video and the fact that I didn't

5   pick up a phone, I believe that it probably was.

6       Q.   (By Mr. Stein)  Again, I'm asking you this in

7   your representational capacity.  Is relaying information

8   to prosecutors in a home court or a home judge courtroom

9   about a hearing officer's bail decision that you

10  disagreed with consistent with HCDAO policy?

11      A.   Are you referring to a particular policy?

12      Q.   I'm referring to any policies that HCDAO has,

13  whether that conduct is consistent or inconsistent with

14  HCDAO policy?

15          MR. NICHOLS:  Objection, form, and beyond

16  the scope.

17      A.   It is not inconsistent with any policy in our

18  office for one prosecutor to provide information whether

19  it is subjective or objective to another prosecutor

20  about a case that they either are personally handling or

21  is pending in their court.

22      Q.   (By Mr. Stein)  So the action that you took in

23  Mr. Smith's case were consistent with HCDAO policies; is

24  that fair?

25          MR. NICHOLS:  I think we're back to

Russell vs                                                          Jennifer Keith
Harris County Texas                                                 March 10, 2022

80

1   individual land where we are right now.  So objection to

2   form and beyond the scope.

3            But let's hope that this is Mr. Stein's

4   last question, and we can move on.

5      A.   Yes, it was consistent.

6      Q.   (By Mr. Stein)  Was your conduct in that case

7   consistent or inconsistent with trainings or other

8   guidances that you have been given or that you have

9   given to other prosecutors at HCDAO?

10           MR. NICHOLS:  So we're back to individual

11  question land.  Ms. Keith, I'll let you answer that

12  question again.  But after that, we're going to start

13  instructing you not to answer.  Go ahead.

14     A.   Yes, it is consistent with policy and training

15  that a prosecutor is permitted to communicate with

16  another prosecutor regarding information relevant to the

17  case they are personally handling or cases pending in

18  their court, their assigned court.

19     Q.   (By Mr. Stein)  And is it consistent with HCDAO

20  policy for a home court prosecutor to relay information

21  like that you conveyed in Mr. Smith's case to a home

22  court judge even though the arrestee and the lawyer are

23  not present?

24           MR. NICHOLS:  Yeah, so that's a different

25  question that relates to things that she hadn't even

1  talked about in her individual capacity.  So I'm going

2  to instruct her not to answer that question.

3         You can ask it another way.  Jeff, you're

4  getting now to the topic that I believe was the subject

5  of, as you say, litigation, which is what is the Harris

6  County District Attorney's Office's general policy with

7  respect to ex parte communications with judges.

8         She is here as a representative to address

9  that issue if you decide that it's in your clients' best

10  interests to do that.

11         MR. STEIN:  That's the issue that I'm

12  trying to get at here, Mr. Nichols.

13         MR. NICHOLS:  Okay.  But the problem is

14  you referred to this specific case.  And you made a

15  linkage to a communication with a judge that is not

16  supported by anything that's come out in the deposition

17  or otherwise.  So if you want to ask the question

18  generally, I have no objection.

19  Q.   (By Mr. Stein)  I'm asking whether the

20  prosecutors, the home court prosecutors, relaying of the

21  information that you provided to Judge Randy Roll in Mr.

22  Smith's case was consistent with HCDAO policies

23  regarding ex parte communications?

24         MR. NICHOLS:  Yeah, I'm --

25  Q.   (By Mr. Stein)  And I'm asking you that --

82

1          MR. STEIN:  I'm sorry.

2      Q.   (By Mr. Stein)  I'm asking you that in your

3  organizational representative capacity because it bears

4  directly on what HCDAO's policies are and how they're

5  applied.

6          MR. NICHOLS:  Yeah.  And so the way you

7  phrased it, I'll object to the form.  It's beyond the

8  scope.

9          And, Ms. Keith, if you can answer that

10  question on behalf of the Harris County District

11  Attorney's Office, I guess you can, but, you know...

12      A.   I can't speak to anything that the prosecutors

13  in this particular case did once I provided the

14  information because I was not present to have personal

15  knowledge about that.

16          But what I can say is that it is the

17  policy of the District Attorney's Office, as is

18  reflected in our discretion manual 10.2, that ex parte

19  communication with the court regarding any matter of a

20  pending case is inappropriate, and it violates -- it

21  would violate the office policy as well as could

22  potentially violate and likely violate the rules of

23  disciplinary procedure that all lawyers are subject to.

24  And, you know, obviously the court itself is subject to

25  the code of judicial conduct.

83

1          So not speaking to this particular

2    instance, but generally, we are governed by policies in

3    our discretion manual that prohibit ex parte

4    communication with a court regarding a pending case.

5        Q.   (By Mr. Stein)  I understand that you were not

6    present in the home courtroom, but you were aware that

7    Judge Randy Roll received information from the home

8    court prosecutor about this case, correct?

9               MR. NICHOLS:  Objection, form.

10              I think he's asking in your individual

11   capacity, and it's beyond the scope.

12       A.   I don't know what information the prosecutors

13   provided to the judge.  As I stated, what I told the

14   court in the video would be reflective of the

15   information that I was provided by the trial court --

16   the home court prosecutor.  And I don't believe there

17   was any reference to any specific statements made by the

18   court, only that there was a possibility that the

19   personal bond could be revoked.  And that was based on

20   the information I was provided by that prosecutor.

21       Q.   (By Mr. Stein)  And you know now that the

22   personal bond in Mr. Smith's case was revoked in your

23   individual capacity, correct?

24              MR. NICHOLS:  Objection to form, beyond

25   the scope.

84

1    A.    I believe that it was, but I also believe the

2  $30,000 that had been pre-recommended by the risk

3  assessment had already been posted while he was present

4  in the courtroom anyway.

5    Q.    (By Mr. Stein)  When you say you believe, you

6  know that there was a Chronicle article written about

7  how Judge Randy Roll revoked Mr. Smith's personal bond

8  based on the information that Judge Randy Roll received

9  from the prosecutor that you contacted?

10         MR. NICHOLS:  Objection, form, and beyond

11  the scope.

12    A.    I believe you brought that up, yes, in the

13  original deposition.

14    Q.    (By Mr. Stein)  And so my question, in your

15  organizational representative capacity, is whether

16  assuming that the home court prosecutor relayed all the

17  information that you gave him about Mr. Smith's case to

18  Judge Randy Roll, whether that prosecutor's relaying of

19  that information to the home court prosecutor -- I'm

20  sorry, to Judge Randy Roll is consistent with HCDAO

21  policy?

22         MR. NICHOLS:  Objection to form and beyond

23  the scope.

24    A.    It may have.  Like I said, I don't know all of

25  the circumstances surrounding the how or what

85

1  information was provided; and I also didn't read the

2  Chronicle article, so...

3      Q.   (By Mr. Stein)  I'm not asking you to be a fact

4  witness to something you didn't hear.  So let me just

5  phrase the question this way:  Hypothetically, if that

6  home court prosecutor had told Judge Randy Roll the

7  hearing officer just gave someone charged with an agg

8  assault a personal bond so that Judge Randy Roll would

9  revoke that personal bond, would that ex parte

10  communication have been consistent with HCDAO policy?

11              MR. NICHOLS:  Objection, form, and beyond

12  the scope.

13      A.   It may have been.

14      Q.   (By Mr. Stein)  When you say "it may have

15  been," do you mean --

16      A.   I'm sorry.  It may not have been consistent

17  with policy.

18      Q.   And when you -- why are you unable to give a

19  just decisive answer as to whether it was consistent or

20  inconsistent assuming the hypothetical that I gave you?

21              MR. NICHOLS:  Objection, form, and beyond

22  the scope.

23      A.   Because I don't have all of the information as

24  to how the communication transpired and who may or may

25  not have been present.

Russell vs                                                        Jennifer Keith
Harris County Texas                                              March 10, 2022

86

1    Q.   (By Mr. Stein)  Can you explain what

2  information you would need that you don't have about who

3  may or may not have been present?

4            MR. NICHOLS:  Objection, form, and beyond

5  the scope.

6    A.   I don't know if -- exactly what was said to

7  Judge Roll.  I don't know if Judge Roll reviewed any

8  documents that were on-line relative to the bail hearing

9  or the defendant's financial affidavit, which is placed

10 on file.  I don't know if -- I do know the defendant

11 wasn't present because the defendant clearly was present

12 at the 15.17 hearing, but I don't know if there was any

13 other representation present.

14           But if an attorney may have been appointed

15 to review any information prior to Judge Roll making

16 whatever decision that he made, I don't know any of

17 that.

18   Q.   (By Mr. Stein)  So just assuming that, as you

19 know, the arrestee, Mr. Smith, was not present, assuming

20 that he did not have a lawyer that he spoke with there

21 in Judge Randy Roll's courtroom because obviously, Mr.

22 Smith was in the 15.17 courtroom, would the prosecutors

23 relaying of information about the hearing officer's

24 ruling have been consistent or inconsistent with HCDAO

25 policy?  And I'm just asking about the prosecutor's

87

1  relaying of that information to Judge Randy Roll.

2              MR. NICHOLS:  And you're asking

3  specifically about hypothetical relaying of information?

4              MR. STEIN:  Yes.

5              MR. NICHOLS:  I mean, this is so far

6  beyond the scope.

7                 Objection, form.

8     A.   It may have been inconsistent.

9     Q.   (By Mr. Stein)  Have there been other times

10 that you have emailed prosecutors in home courtrooms

11 about hearing officers' 15.17 decisions on bail that you

12 disagreed with in your individual capacity?

13    A.   Yes.

14    Q.   Can you estimate how many?

15              MR. NICHOLS:  Again, we're back in

16 individual land.

17                 Objection to form, beyond the scope.

18    A.    In the four years that -- almost four years

19 that I participated in bail hearings, I can't give you a

20 number.

21    Q.   (By Mr. Stein)  Would you say more than ten,

22 for example?

23              MR. NICHOLS:  Objection, form, beyond the

24 scope.

25    A.   Yes.

88

1    Q.   (By Mr. Stein)  Would you say more than 40?

2                MR. NICHOLS:  Objection, form, beyond the

3    scope.

4    A.   Likely, yes.

5    Q.   (By Mr. Stein)  Following Mr. Smith's 15.17

6    hearing, you were aware that the Chronicle published an

7    article about that hearing in your individual capacity,

8    correct?

9                MR. NICHOLS:  Objection, form, beyond the

10   scope.

11               And, Jeff, just to give you fair warning,

12   I'm going to cut off this line of questioning in another

13   10 minutes, if it's not done by then already.

14   A.   I became aware of the article when you brought

15   it up in the prior deposition.

16   Q.   (By Mr. Stein)  Your testimony today under oath

17   is that you are unaware that you were specifically named

18   in a Houston Chronicle article about Mr. Smith's 15.17

19   hearing?

20               MR. NICHOLS:  Objection, form, beyond the

21   scope.

22   A.   I don't specifically recall being aware of the

23   article prior to the deposition.  It's possible I was.

24   It was -- but I don't have any independent recollection

25   of knowing about it before the deposition a year ago.

89

1    Q.   (By Mr. Stein)  Is it common for your name to

2   appear in Houston Chronicle articles in your individual

3   capacity?

4                MR. NICHOLS:  All right.  I'm going to

5   instruct the witness not to answer.  Let's move on.

6                MR. STEIN:  I'm sorry.  What is the basis

7   for the instruction?

8                MR. NICHOLS:  Because this has nothing to

9   do with the 30(b)(6) notice that we're here to resume a

10   deposition testimony on.  I've tried to give you a lot

11   of leniency, a lot of rope, but now asking what's in the

12   mind of Jennifer Keith about a Houston Chronicle article

13   that she's already testified she has no recollection of

14   seeing, I mean, we've got a lot of people on this.

15                MR. STEIN:  Mr. Nichols, I appreciate that

16   you are welcome to make objections and instruct the

17   witness not to answer.  But I don't want --

18                MR. NICHOLS:  You asked me for an

19   explanation.  I'm trying to give it.

20                MR. STEIN:  And there is a simple instruct

21   you not to answer, privileged; instruct you not to

22   answer, work product.

23                We don't need an extensive monologue, and

24   we don't need to have an exchange about it.  It's your

25   prerogative to instruct her not to answer.  This is

90

1  going somewhere.  It's setting up something.  It's

2  something that's important.

3         MR. NICHOLS:  Well, let's get there then.

4  Let's get to what we're here for which is the 30(b)(6)

5  deposition.  If you have questions like we talked about

6  with Judge Rosenthal about policies of the DA's Office,

7  let's get to them.  Let's not --  let's not --

8         MR. STEIN:  That's what I'm trying to ask,

9  Mr. Nichols.  So if I could just proceed.  We're not

10  going to need 10 more minutes for this line of

11  questioning.  I'm trying to finish it up, but I need to

12  ask this question.  And the reason I need to ask it is

13  because the witness has testified that she was unaware

14  that she was featured in a Houston Chronicle article

15  about this very case.

16         MR. NICHOLS:  I think she's testified that

17  she has no recollection of seeing the Houston Chronicle

18  article about a particular case prior to the time that

19  you showed it to her in her first deposition.  I think

20  I'm being accurate in that.  And I think that's --

21     Q.  (By Mr. Stein) And, Ms. Keith, my question is:

22  Is the reason that you don't have specific recollection

23  of that article prior to being asked about it in this

24  case, because you're frequently featured by name in

25  Houston Chronicle articles?

91

1          MR. NICHOLS:  Yeah.  So I'm so sorry.  I

2  mean, Ms. Keith, if you can answer a question about

3  whether you believe that you are the frequent subject of

4  Houston Chronicle articles, yes or no, please answer

5  that question so we can move on.

6      A.   I don't read the Chronicle.

7      Q.   (By Mr. Stein)  So is the answer you don't know

8  whether you're featured by name frequently in Houston

9  Chronicle articles?

10     A.   I don't know if I am or if I'm not.

11     Q.   Following that hearing and that article in the

12 Chronicle, did you ever discuss your actions in Mr.

13 Smith's case with any supervisors or others at the

14 Harris County District Attorney's Office in your

15 individual capacity?

16          MR. NICHOLS:  Objection to form and beyond

17 the scope.

18     A.   I don't recall discussing it with any

19 supervisors or other personnel after the hearing, no.

20     Q.   (By Mr. Stein)  So following Mr. Smith's

21 hearing and following that article, you did not have any

22 further discussions about Mr. Smith's case with anybody

23 at the Harris County District Attorney's Office?

24          MR. NICHOLS:  Objection to form and beyond

25 the scope.

92

1          Second time asking the question, third

2    time is a strike.  Ms. Keith, would you answer his

3    question again.

4       A.   I do not recall having any conversations with

5    any supervisors or other District Attorney's Office

6    personnel specifically regarding this defendant, this

7    hearing or this case.

8       Q.   (By Mr. Stein)  And lastly, moving beyond just

9    conversations, did you receive any feedback in any way,

10   either positive or negative, from anyone else at the

11   Harris County District Attorney's Office in response to

12   your conduct in Mr. Smith's case?

13          MR. NICHOLS:  Objection to form, beyond

14   the scope.

15          I'm sure this is his last question on this

16   subject, so please answer.

17      A.   No, I don't believe that I did either positive

18   or negative.  I got no feedback that I recall.

19      Q.   (By Mr. Stein)  What is a supplemental DIMS

20   narrative?

21      A.   A supplemental DIMS narrative is also referred

22   to in our office as a DIMS 41 statement.  That is a

23   statement that is entered into the J-Web system that

24   provides additional sworn information from either the

25   original filing officer after a conversation with a

105

1  in the intake division about what information they must

2  disclose at the time of the 15.17 hearing?

3      A.   Since the Public Defender's Office and the

4  hearing officers have access to all of the same

5  information that we do for purposes of the bail hearing,

6  that being the DIMS summary, their local criminal

7  history, if they have any, their what's called a

8  criminal history 3 which is local, state and federal

9  criminal history, if they have any.

10          The only additional information that we

11  provide is if we have any other information that is --

12  that we intend to argue any information that is not

13  included in all of that other information that is

14  already provided.  That's an unusual circumstance.

15          Perhaps if we discover case dispositions

16  of charges that are reflected in the criminal history,

17  then we provide that information.  But typically, we

18  don't have any more information than is already known to

19  all parties at the time of the 15.17 hearing.

20      Q.   Does HCDAO policy or practice require

21  prosecutors to disclose, prior to the bail hearing

22  before the district court judge, any information in

23  their possession that tends to strengthen an arrestee's

24  arguments for personal bond or low bail?

25          MR. NICHOLS:  Objection, form.

106

 1    A.    Again, we are under Brady obligations as well

 2   as discovery obligations.  And at the time of first

 3   appearance in the home court, the prosecutor is not

 4   going to have much more information than we have at the

 5   15.17 hearings.  But if they do, then they -- and it's

 6   potentially Brady information or otherwise discoverable,

 7   then they are obligated to turn over that information to

 8   the defense at that time.

 9    Q.    (By Mr. Stein) So it's HCDAO policy that

10   information that strengthens an arrestee's arguments for

11   personal bond or low bail must be turned over by the

12   time of first appearance if the prosecutor has it?

13            MR. NICHOLS:  Objection, form, and beyond

14   the scope.

15            Are you asking her about Brady

16   obligations, or are you asking her about something else?

17            MR. STEIN:  I'm asking about HCDAO's

18   policy about whether or not prosecutors must disclose

19   that information relating specifically to bail.

20            MR. NICHOLS:  Yeah.

21            MR. STEIN:  By the time of the bail

22   hearing before the district court judge.

23            MR. NICHOLS:  Yeah.  And this is we --

24   I'll object to form and beyond the scope in terms of

25   having this witness engage with you in an interpretation