**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| DWIGHT RUSSELL, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 4:19-cv-00226 |
| v. | ) | (Class Action) |
| | ) | The Honorable Lee H. Rosenthal |
| HARRIS COUNTY, TEXAS, et al. | ) | Chief U.S. District Judge |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM**
**IN SUPPORT THEREOF**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................v

INTRODUCTION ..............................................................................................................1

NATURE AND STAGE OF PROCEEDINGS ...................................................................3

STATEMENT OF ISSUES ..................................................................................................4

STANDARD OF REVIEW ..................................................................................................4

SUMMARY OF UNDISPUTED MATERIAL FACTS....................................................4

    a.      Harris County's Felony Bail Practices ...................................................4

          i.      People arrested on felony charges are detained prior to magistration................................................................................4

                 1.      For decades, the County relied on a mandatory secured money bail schedule to determine pre-hearing release conditions................................................5

                 2.      Changes since the case was filed have increased the County's reliance on secured financial release conditions and crowded the jail with people detained only because they are poor. ...........................7

          ii.      Release conditions are determined at perfunctory magistration hearings. ........................................................9

                 1.      Hearing officers systematically impose secured financial conditions of release without consideration of ability to pay................................................12

                 2.      Hearing officers provide robust protections to misdemeanor arrestees but deny those same protections to felony arrestees. .......................17

          iii.     First appearances in district court are routinely delayed and do not offer an opportunity for an adversarial bail hearing. ..........................18

          iv.     The first opportunity for an adversarial bail hearing with evidence and findings on the record is at least two to four weeks after arrest. ................................................19

a.      The County's Felony Bail Practices Result in Arbitrary Detention of Thousands of People Every Day and Disproportionately Harm Poor People.................................................................................22

b.      The Felony Judges Control the Post-Arrest Process..............................25

c.      There Are Overwhelming—and Avoidable—Human and Economic Costs Associated with Harris County's Money-Based Post-Arrest Practices. ........................................................................28

d.      Alternatives to Secured Financial Conditions of Release Perform as Well as, or Better Than, Secured Bail in Every Meaningful Way.........................31

e.      Relevant Facts About the Named Plaintiffs..........................................31

SUMMARY OF THE ARGUMENT ...........................................................32

ARGUMENT ...........................................................................35

I.      DEFENDANTS' BAIL PRACTICES VIOLATE TWO SUBSTANTIVE FOURTEENTH AMENDMENT RIGHTS...........................................35

a.      Substantive Due Process Forbids Pretrial Incarceration Unless Detention Is Necessary to Serve the Government's Interests................................35

b.      The Fourteenth Amendment Forbids Money-Based Detention Unless Detention Is Necessary to Serve the Government's Interests................................38

c.      An Unattainable Financial Condition Is the Functional Equivalent of an Order of Pretrial Detention. .......................................................41

d.      Defendants' Bail Practices Violate Both Substantive Fourteenth Amendment Rights by Imposing Pretrial Detention Absent a Finding That It Is Necessary. .................................................................41

II.     DEFENDANTS' BAIL PRACTICES VIOLATE PROCEDURAL DUE PROCESS. ...............................................................................44

a.      Plaintiffs Are Entitled to Constitutionally Adequate Procedures Before Being Deprived of Their Substantive Liberty Interests. ........................................44

        i.      Plaintiffs' private interest is fundamental. ................................45

        ii.     The risk of erroneous deprivation absent safeguards is high....................46

                1.      When requiring financial conditions, the government must inquire into ability to pay and make on-the-record findings to avoid erroneously detaining people because they are poor. ...........................................46

2.    When pretrial liberty is at stake, the government must also provide notice, an adversarial hearing with the opportunity to present and confront evidence, and findings on the record. ....................................................48

3.    The government must apply the clear and convincing evidence standard to any finding that detention is necessary. ..............................................................................50

iii.    Additional procedures advance government interests. ............................55

b.    Harris County Judicial Officers Systematically Fail to Provide the Required Procedural Safeguards Before Imposing Money-Based Pretrial Detention. ........................................................................56

III.    S.B. 6 DID NOT REDRESS PLAINTIFFS' CLAIMS. ....................................................59

CONCLUSION ..........................................................................................................................61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Addington v. Texas*,
  441 U.S. 418 (1979)..................................................................................51, 53, 54, 55

*Aime v. Com.*,
  611 N.E.2d 204 (Mass. 1993) ...................................................................................53

*Bearden v. Georgia*,
  461 U.S. 660 (1983).......................................................................................... *passim*

*Brangan v. Commonwealth*,
  80 N.E.3d 949 (Mass. 2017) .........................................................................38, 40, 41

*Brill v. Gurich*,
  965 P.2d 404 (Okla. 1998)........................................................................................53

*Buffin v. City and County of San Francisco*,
  2018 WL 424362 (N.D. Cal. 2018) ..........................................................................40

*Caliste v. Cantrell*,
  329 F. Supp. 3d 296 (E.D. La. 2018)............................................................48, 50, 53

*Cooper v. City of Dothan*,
  No. 15-CV-432, 2015 WL 10013003 (M.D. Ala. June 18, 2015) ...........................44

*Cruzan by Cruzan v. Dir., Missouri Dep't of Health*,
  497 U.S. 261 (1990)..................................................................................................52

*Daves v. Dallas County*,
  22 F.4th 522 (5th Cir. 2022) ...........................................................................27, 28, 33

*Edwards v. Cofield*,
  No. 17-CV-321, 2017 WL 2255775 (M.D. Ala. May 18, 2017)..............................44

*Ex parte Young*,
  209 U.S. 123, 28 S. Ct. 441 (1908)...........................................................................60

*Foucha v. Louisiana*,
  504 U.S. 71 (1992).............................................................................................. *passim*

*Frazier v. Jordan*,
  457 F.2d 726 (5th Cir. 1972) ...........................................................................33, 38, 39, 40

*Gagnon v. Scarpelli*,
   411 U.S. 778 (1973)..................................................................................45, 50

*Goldberg v. Kelly*,
   397 U.S. 254 (1970)..................................................................................45, 49

*Griffin v. Illinois*,
   351 U.S. 12 (1956)....................................................................................38, 40

*Hamdi v. Rumsfeld*,
   542 U.S. 507 (2004)........................................................................................35

*Harper v. Va. Dept. of Taxation*,
   509 U.S. 86 (1993) (O'Connor, J., dissenting) .......................................34

*In re Humphrey*,
   482 P.3d 1008 (Cal. 2021) ....................................................................*passim*

*In re Newchurch*,
   807 F.2d 404 (5th Cir. 1986) ................................................................37, 38

*Johnson v. Bredesen*,
   624 F.3d 742 (6th Cir. 2010) ........................................................................40

*Jones. v. City of Clanton*,
   No. 15-CV-34, 2015 WL 5387219 (M.D. Ala. Sept. 14, 2015) ............44

*Kleinbart v. United States*,
   604 A.2d 861 (D.C. 1992) ............................................................52, 54, 55

*Lopez-Valenzuela v. Arpaio*,
   770 F.3d 772 (9th Cir. 2014) (en banc) ...........................................*passim*

*Lynch v. United States*,
   557 A.2d 580 (D.C. 1989) .............................................................................53

*Martinez v. City of Dodge City*,
   No. 15-CV-9344, 2016 WL 9051913 (D. Kan. Apr. 26, 2016)............44

*Mathews v. Eldridge*,
   424 U.S. 319 (1976)...............................................................................*passim*

*McMillian v. Monroe Cty., Ala.*,
   520 U.S. 781 (1997)....................................................................................27, 28

*McNeil v. Cmty. Prob. Servs.*, LLC,
   No. 18-CV-33, 2019 WL 633012 (M.D. Tenn. Feb. 14, 2019), *aff'd*,
   945 F.3d 991 (6th Cir. 2019) ........................................................................44

*Mendonza v. Com.*,
    673 N.E.2d 22 (Mass. 1996) .......................................................................53

*Meza v. Livingston*,
    607 F.3d 392 (5th Cir. 2010) .............................................................33, 50

*Morrissey v. Brewer*,
    408 U.S. 471 (1972).................................................................45, 46, 49

*ODonnell v. Harris Cnty., Texas*,
    251 F. Supp. 3d 1052 (S.D. Tex. 2017), *aff'd as modified*, 892 F.3d 147
    (5th Cir. 2018).................................................................37, 41, 46, 49

*ODonnell v. Harris County*,
    892 F.3d 147 (5th Cir. 2018) (op. on reh'g), *overruled on other grounds by*
    *Daves v. Dallas Cnty., Texas*, 22 F. 4th 522 (5th Cir. 2022) ........................... *passim*

*ODonnell v. Harris County*,
    No. 4:16-CV-1414 (S.D. Tex. Nov. 21, 2019), Dkt. 708 ......................................10

*Padilla v. Kentucky*,
    559 U.S. 356 (2010).................................................................................55

*Pierce v. City of Velda City*,
    No. 15-CV-570, 2015 WL 10013006 (E.D. Mo. June 3, 2015) ..............................44

*Pugh v. Rainwater*,
    572 F.2d 1053 (5th Cir. 1978) .............................................33, 39, 40, 46

*Querubin v. Com.*,
    795 N.E.2d 534 (Mass. 2003) ....................................................................54

*Reem v. Hennessy*,
    No. 17-CV-06628, 2017 WL 6765247 (N.D. Cal. Nov. 29, 2017) ........................38

*Reno v. Flores*,
    507 U.S. 292 (1993)........................................................................ *passim*

*Rodriguez v. Providence Cmty. Corr., Inc.*,
    155 F. Supp. 3d 758 (M.D. Tenn. 2015).........................................................44

*Santosky v. Kramer*,
    455 U.S. 745 (1982).................................................................51, 53, 54, 55

*Simpson v. Miller*,
    387 P.3d 1270 (Ariz. 2017).................................................................38, 40

*Snow v. Lambert*,
No. 15-CV-567, 2015 WL 5071981 (M.D. La. Aug. 27, 2015) .............................................44

*State v. Brown*,
338 P.3d 1276 (N.M. 2014) ..........................................................................................41

*State v. Butler*,
No. 2011–K–0879, 2011 WL 12678268 (La. App. 4th Cir. July 28, 2011), *writ not considered*, 75 So. 3d 442 (La. 2011) ........................................................................53

*State v. Ingram*,
165 A.3d 797 (N.J. 2017) ..............................................................................................53

*Strickland v. Washington*,
466 U.S. 668 (1984) ......................................................................................................55

*Swarthout v. Cooke*,
562 U.S. 216 (2011) ......................................................................................................44

*Tate v. Short*,
401 U.S. 395 (1971) ................................................................................................38, 39

*Thompson v. Moss Point*,
No. 15-CV-182, 2015 WL 10322003 (S.D. Miss. Nov. 6, 2015) ...................................44

*Trent v. Wade*,
776 F.3d 368 (5th Cir. 2015) ..........................................................................................4

*Turner v. Rogers*,
564 U.S. 431 (2011) ..........................................................................................45, 47, 48

*United States v. Arzberger*,
592 F. Supp. 2d 590 (S.D.N.Y. 2008) ...........................................................................49

*United States v. Fortna*,
769 F.2d 243 (5th Cir. 1985) .........................................................................................52

*United States v. Leathers*,
412 F.2d 169 (D.C. Cir. 1969) (per curiam) .................................................................41

*United States v. Mantecon-Zayas*,
949 F.2d 548 (1st Cir. 1991) (per curiam) ...................................................................41

*United States v. McKown*,
930 F.3d 721 (5th Cir. 2019) .........................................................................................37

*United States v. Medina*,
775 F.2d 1398 (11th Cir. 1985) .....................................................................................52

*United States v. Motamedi,*
    767 F.2d 1403 (9th Cir. 1985) ......................................................................52, 54

*United States v. Payan,*
    992 F.2d 1387 (5th Cir. 1993) ............................................................................47

*United States v. Salerno,*
    481 U.S. 739 (1987) ................................................................................. *passim*

*Valdez-Jimenez v. Eighth Judicial District Court,*
    460 P.3d 976 (Nev. 2020) ...............................................................38, 41, 44, 53

*Vitek v. Jones,*
    445 U.S. 480 (1980) ....................................................................................48, 49

*Walker v. City of Calhoun,*
    No. 15-CV-0170, 2017 WL 2794064 (N.D. Ga. June 16, 2017), *vacated in part,*
    901 F.3d 1245 (11th Cir. 2018) .........................................................................44

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ...........................................................................................35

*Washington v. Harper,*
    494 U.S. 210 (1990) ....................................................................................33, 50

*Welchen v. Bonta,*
    No. 2:16-cv-00185, 2022 WL 4387794 (E.D. Cal. Sept. 22, 2022) .............38, 40

*Wheeler v. State,*
    864 A.2d 1058 (Md. App. 2005) ........................................................................53

*Williams v. Illinois,*
    399 U.S. 235 (1970) ................................................................................38, 39, 40

*Wolff v. McDonnell,*
    418 U.S. 539 (1974) ....................................................................................48, 50

*Zablocki v. Redhail,*
    434 U.S. 374 (1978) ...........................................................................................42

*Zadvydas v. Davis,*
    533 U.S. 678 (2001) ................................................................................. *passim*

**Statutes**

Tex. Code Crim. P. Ann. § 17.03 ..............................................................................13

**Rules**

Fed. R. Civ. P. 9 .................................................................................................17, 18

Fed. R. Civ. P. 56(a) ...............................................................................................4

**Constitutional Provisions**

Fourteenth Amendment ................................................................... *passim*

Federal Constitution.......................................................................3, 32, 38, 53

**Other Authorities**

ABA Standards for Criminal Justice: Pretrial Release 10-5.8(a) (3d ed. 2007) ...........................55

Brief of Amici Curiae Professors of Criminal, Procedural, and Constitutional Law in
 Support of Plaintiffs-Appellants-Cross Appellees at 19, *Daves*, 22 F.4th 522 (2022)
 (No. 18-11368), 2021 WL 1566349 .......................................................................41

Brief of Conference of Chief Justices as Amicus Curiae in Support of Neither Party
 at 24, *ODonnell*, 892 F.3d 147 (2018) (No. 17-20333), 2017 WL 3536467.........39, 40, 44, 55

## INTRODUCTION

Every day, thousands of presumptively innocent people in Harris County, Texas, are detained in the county jail before trial solely because they cannot afford to pay money bail. Hundreds of them are charged with low-level felonies like minor drug or theft offenses. Many of them would be free if they had access to $1,000. Instead, they are separated from their children and families, lose jobs, lose housing, suffer lapses in medical and mental health care, and are pressured to sacrifice the presumption of innocence to plead guilty as the fastest way out of jail.

Individuals arrested for a crime have both a fundamental right to pretrial liberty and a right to be free from money-based jailing. Therefore, the government may not detain them on money bail before trial unless it makes a substantive finding that pretrial detention is necessary to serve a compelling government interest which cannot be achieved through less restrictive means, and even then only if the government provides the procedural safeguards required to ensure the accuracy of that finding and the serious decision to jail someone that rests on it.

Harris County's felony bail practices fall far short of this constitutional floor, and the consequences are life-changing. J.S., an 18-year-old teenager charged with a non-violent offense, was required to pay a $25,000 bond to be released from jail without any consideration of his ability to pay. He missed the beginning of school and, four months later, he remains in jail without ever having seen a judge.[1] J.B.C., a 68-year old homeless veteran, languished in jail for over a year on a $5,000 bond he could not pay. When he was finally brought to court to plead guilty, he was sentenced to less than half the amount of time he had already spent in jail, and was released.[2] F.H., a teenager with a cognitive disability and no criminal history remained in jail when his family

---

[1] Plaintiffs' Statement of Undisputed Material Facts ("SUMF") ¶ 83 n.165.

[2] SUMF ¶ 153.

could not afford to pay the $20,000 bond set in his case. Weeks later, he was killed.[3] At least 11 of the 27 people who died in the jail this year were detained solely because they could not afford to pay the money bail in their case.[4] For example, K.S., a mother supporting herself and her four children on disability payments, was unable to afford the $340,000 bond set in her case. She died a month after her arrest.[5] M.S. remained jailed on a $10,000 secured bond for an out-of-county DWI charge. A diabetic, M.S. died five days later of diabetic ketoacidosis, a condition linked to a lack of insulin.[6] These examples barely scratch the surface of the irreparable harm class members suffer as a result of Defendants' practices.

As the uncontroverted evidence before the Court demonstrates, Defendants' felony bail practices violate Plaintiffs' constitutional rights to equal protection, substantive due process, and procedural due process. Local bail practices have changed since this lawsuit was filed, but those changes have not addressed, let alone ameliorated, the fundamental deficiencies at the core of Plaintiffs' claims. Plaintiffs are entitled to summary judgment on all counts and equitable relief to protect them from irreparable harm.

The ruling Plaintiffs seek would not eliminate cash bail or pretrial detention, nor would it necessitate the release of any particular detained person. It would simply ensure Defendants do not detain people unless they are given a constitutional bail hearing. The material facts in this case are undisputed, and Plaintiffs' legal arguments are based on well-settled Supreme Court precedent. As such, this Court should enter a declaratory judgment and issue an order permanently enjoining Defendants from enforcing financial conditions of release that result in *de facto* pretrial detention

---

[3] SUMF ¶ 159.

[4] SUMF ¶ 193.

[5] SUMF ¶ 155.

[6] SUMF ¶ 156.

without a finding, after a hearing with sufficient procedural safeguards, that detention is necessary to meet a compelling government interest.

## NATURE AND STAGE OF PROCEEDINGS

Plaintiffs filed this lawsuit challenging Harris County's practice of jailing individuals solely because they could not afford to pay money bail. Dkt. 1. The case was abated to permit settlement discussion for about a year. Dkts. 13, 14, 24, 29, 31. On March 27, 2020, after COVID-19 was declared a global pandemic, Plaintiffs filed an emergency motion for a temporary restraining order ("TRO"). Dkt. 32. On March 29, 2020, the Governor issued Executive Order GA-13, prohibiting certain categories of people from release on personal bond. The Governor, the State of Texas, and the Attorney General intervened in the lawsuit. Dkts. 38, 46. Plaintiffs filed a second motion for TRO seeking to enjoin enforcement of GA-13, to the extent it conflicted with the federal Constitution. Dkt. 53. On April 14, the Court denied Plaintiffs' motions, stating that "disagreements appear to have been somewhat resolved" and local officials had made "commendable [] progress [] in safely reducing the [] Jail population during this dangerous time." Dkt. 122 at 3. The Court declined to address the merits of Plaintiffs' claims in that posture. *Id.*

To recap the proceedings to date as briefly as possible, on May 6, 2020, Plaintiffs moved to lift the stay and filed an Amended Complaint. Dkts 139, 140, 140-1. The Court lifted the stay. Dkt. 152. Plaintiffs filed a Second Amended Complaint naming all Felony Judges as Defendants. Dkt. 195-1. The Sheriff and County Answered. Dkts. 197, 209. The Felony Judges and State Intervenor moved to dismiss. Dkts. 214, 228. The Court denied the motions. Dkt. 326. The State withdrew as a party. Dkts. 341, 342. For the sake of efficiency and to move the case forward as quickly as possible, Plaintiffs agreed to voluntarily dismiss the Felony Judges. Dkt. 370. The State

intervened once more. Dkts. 373, 375. The State Answered. Dkt. 595. The Court ordered Plaintiffs to submit pretrial dispositive motions by December 9, 2022. Dkt. 632.

## STATEMENT OF ISSUES

1. Whether Defendants violate Plaintiffs' Fourteenth Amendment right to substantive due process.

2. Whether Defendants violate Plaintiffs' Fourteenth Amendment right to be free of money-based detention.

3. Whether Defendants violate Plaintiffs' Fourteenth Amendment right to procedural due process.

## STANDARD OF REVIEW

"Summary judgment is required when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015) (quoting Fed. R. Civ. P. 56(a)).

## SUMMARY OF UNDISPUTED MATERIAL FACTS

### a. Harris County's Felony Bail Practices

At any moment, thousands of presumptively innocent people are detained in the Harris County Jail because they cannot afford to pay secured bail, even though no finding has been made that jailing them is necessary. SUMF ¶ 1.

#### i. People arrested on felony charges are detained prior to magistration.

Following recent legislative changes, almost all felony arrestees are detained after arrest until their initial bail hearing, during which they are generally told they must pay secured bail if they want to be released, resulting in the detention of anyone who cannot pay. SUMF ¶¶ 29–33.

### 1. For decades, the County relied on a mandatory secured money bail schedule to determine pre-hearing release conditions.

For decades, Harris County used a predetermined secured money bail schedule, promulgated through administrative order by the Felony Judges, to determine financial conditions of pretrial release for felony arrestees. SUMF ¶¶ 12–14. In 2017, the Felony Judges promulgated a new version of the bail schedule, which was in effect when this lawsuit was filed. *Id.* ¶ 13 (citing Ex. 38 (Felony Bail Schedule, Effective 7/29/2017; 8/22/2017)).[7] The bail schedule included orders to release the arrestee if they could pay a specific secured bail amount (e.g., $50,000). *Id.* ¶ 17. For most people charged with felonies, money bail was automatically set at the scheduled amount at the time charges were filed. SUMF ¶¶ 14-16 (citing Ex. 14 (Declaration of Sarah Wood, then-Policy Director of the Harris County Public Defender's Office, Mar. 26, 2020)).

At the same time they promulgated the 2017 bail schedule, the judges approved a new risk assessment tool, the Public Safety Assessment (PSA). SUMF ¶ 45. From that point on, the County began using the PSA to generate "risk scores" for each person arrested for a felony offense, and lumped those scores into undefined, unexplained, and empirically unsupported categories (specifically, "below average," "average," "above average," and "high" risk). *Id.* ¶¶ 45, 52. Although the PSA is not designed, authorized, or validated for use with a bail schedule or to set financial conditions of release at all, Harris County officials incorporated it into the Felony Bond Schedule (1) to determine which categories of people arrested for felony offenses would be detained prior to a magistration hearing and (2) to set presumptive secured bail amounts for people who were determined eligible for release, regardless of the individual's ability to pay. *Id.* ¶ 51(a). The bail amount required by the schedule was printed by Pretrial Services on a "bond

---

[7] All exhibits cited herein are filed as attachments to Plaintiffs' Statement of Undisputed Material Facts.

recommendation form" and then transferred by the District Attorney's Office to the criminal charging document when the case was filed.[8] *Id.* ¶ 52(b).

Until December 2021, the Felony Judges' bail schedule determined the initial conditions of release that controlled prior to a magistration hearing, and often beyond. If a person was arrested pursuant to a warrant, the warrant would display either a secured monetary amount set by the judicial officer who issued the warrant or an indication that the person must be detained until magistration. SUMF ¶ 17. Similarly, if a person was arrested without a warrant and the District Attorney's Office accepted charges, a charging document would issue containing an indication, directly reflecting the bail schedule, to detain the person until magistration or to allow their release upon payment of a set secured bail amount. *Id.* ¶¶ 14–16. In any type of arrest, including those made for violent offenses, once the charging document was filed, a case number assigned, and a monetary amount set—within hours of arrest—the arrestee could pay the amount and, absent another basis for detention, the Sheriff and County would release them. *Id.* ¶¶ 17–18. The Sheriff and County detained any person who could not pay. *Id.* ¶ 19. As a result of these practices, most people charged with felony offenses were detained after arrest if they could not afford to pay a predetermined amount of money. *Id.* ¶¶ 14, 17-19; 64-65; *see also* SUMF Ex. 1 (Expert Report of Jennifer Copp, Ph.D.) ¶¶ 26, 39, 48 (examining case data from 2015 through 2021 and finding 60% of cases had a money bond amount set on the complaint following arrest and 82% remained detained at magistration).

---

[8] Although the PSA no longer determines automatic conditions of release prior to magistration, the County continues to misuse the PSA to generate "risk scores," and to assign unvalidated risk category labels to arrestees for use in bail proceedings. SUMF ¶¶ 52–54.

**2. Changes since the case was filed have increased the County's reliance on secured financial release conditions and crowded the jail with people detained only because they are poor.**

Local bail practices have changed since this lawsuit was filed. In March 2020, under pressure to reduce the jail population in light of the COVID-19 pandemic, the Felony Judges promulgated a generally applicable order designating certain categories of people for immediate release on unsecured bail. SUMF ¶ 22. Barely a week later, Governor Greg Abbott promulgated Executive Order GA-13, which prohibited pretrial release on unsecured bond for large categories of people accused of crimes across Texas. *Id.* ¶ 23. On April 1, Harris County Judge Lina Hidalgo issued an emergency order, consistent with GA-13, directing the expedited release of certain "non-violent" individuals from the Harris County Jail. *Id.* ¶ 24. On April 2, the Felony Judges promulgated an Amended General Order Bond (GOB), which added additional offenses to the list of offenses eligible for immediate, pre-hearing release on an unsecured bond but, consistent with GA-13, excluded from release anyone with "a prior conviction involving [] physical violence or the threat of physical violence." *Id.* ¶ 25. The next day, Judge Herb Ritchie ordered the Sheriff, Pretrial Services, and the Community Supervisions and Corrections Department to "ignore and wholly disregard" the County Judge's temporary emergency release order, under pain of contempt. *Id.* ¶ 26. All releases pursuant to the County Judge's order were immediately halted. *Id.*

The Judges' general orders did little to decrease the jail population because of their many exclusions. SUMF ¶ 27. The bail schedule's pre-set amounts of money continued to apply to everyone else. *Id.* Thus, the combination of the bail schedule and the General Order Bonds determined pre-hearing release or detention for all people arrested for felonies up until the end of 2021. *Id.* ¶ 28.

7

On September 17, 2021, Governor Abbott signed Senate Bill 6 ("S.B. 6") into law, codifying mandatory secured bail for people charged with certain crimes, and resulting in the automatic detention of anyone who cannot pay. SUMF ¶¶ 29–30. For anyone charged with one or more enumerated offenses "involving violence," or with any felony while released on bail or community supervision for such an offense, S.B. 6 *requires* payment of secured bail, and thus requires the exact violations Plaintiffs challenged in this litigation: pretrial detention due to inability to pay even when the government's interests could be served by less-restrictive means. *Id.* ¶ 30. S.B. 6 also does not address the procedural safeguards that Plaintiffs seek, even going so far as to state that it "may not be construed as requiring the court to hold an evidentiary hearing that is not required by other law." *Id.* ¶ 34. Those provisions went into effect on December 1, 2021. *Id.* ¶ 30.

Local officials have interpreted S.B. 6 to further require that a "Public Safety Report" of every arrestee's criminal history be personally reviewed by a judicial officer prior to setting conditions of release, and so no longer permit felony arrestees to be released before judicial review, whether via payment of secured bail according to the bail schedule or personal bond under the Amended GOB.[9] SUMF ¶ 31. Thus, the Judges' bail schedule and General Order Bonds, which allowed release prior to the initial magistration hearing in the jail, are no longer in effect in Harris

---

[9] The changes to felony bail practices in Harris County are important to understanding how the County's practices work now and to ensuring that the relief the Court crafts is appropriately tailored. But they do not change the fundamental deficiencies at the core of Plaintiffs' claims: specifically, that Defendants enforce orders to pay secured bail that are issued without an opportunity to present evidence, without a finding that detention is necessary, and without application of a heightened standard of proof—and that Plaintiffs are entitled to an injunction ordering Defendants to stop. The changes do, however, likely moot one manifestation of the constitutional violations that Plaintiffs challenged: specifically, the period of pre-hearing, money-based detention of poor people who could not afford the amount of cash required by the generally applicable bail schedule. Now that *no one* is able to secure release by paying the scheduled amount prior to review by a magistrate or judge, the Court likely no longer needs to address whether it violates the Constitution to detain people automatically pursuant to that schedule.

County. *Id.* ¶ 32. *All* people arrested for felony offenses are considered individually for release—subject, of course, to the state law prohibition on personal bonds for numerous offenses. *Id.* Due to S.B. 6, the post-arrest process has slowed down dramatically, leading to massive overcrowding, additional system delays, and the deaths of 27 people in Harris County custody so far this year. *Id.* ¶ 35.

### ii.   Release conditions are determined at perfunctory magistration hearings.

 People arrested in Harris County and booked into the Harris County Jail will be transported to the Joint Processing Center. SUMF ¶ 6. There, if they are not released at Early Presentment,[10] they are eventually brought to a courtroom inside the jail for a Criminal Law Hearing Officer to consider conditions of release. *Id.* ¶ 60. This appearance is called magistration or an Article 15.17 hearing. *Id.* ¶ 61.

From 2015 through 2021, over 14,000 people waited more than 48 hours after arrest to receive a bail determination at magistration. SUMF ¶ 38. While they wait, people arrested on a new charge are interviewed by Pretrial Services, which has already generated a PSA "risk score" for the person. *Id.* ¶¶ 15, 42. The Felony Judges control many of the policies and practices of this agency. *Id.* ¶ 41. For example, Pretrial Services does not interview people who are rearrested on a pre-existing felony charge because the Felony Judges have not authorized them to do so. *Id.* ¶ 44.

Pretrial Services documents arrestees' medical history, prior arrests, prior convictions, marital status, education level, and number of dependents. SUMF ¶ 42. They also question

---

[10] "Early Presentment" is a process started in 2017 by which a Criminal Law Hearing Officer reviews a person's charging documents and criminal history and considers whether to issue a personal bond prior to an initial magistration hearing. No lawyers for the state or defense participate in Early Presentment. Typically, hearing officers consider only those individuals who were charged with certain low-level offenses for release at Early Presentment. The process remains in use today. SUMF ¶ 21.

arrestees about their employment, income, expenses, and other financial information, adding it to an affidavit used at magistration by the hearing officers when considering bail and whether to issue a personal bond. *Id.* ¶ 42-43. The judges control the content of the affidavit. Although the misdemeanor judges have instructed Pretrial Services to ask misdemeanor arrestees the specific amount they can pay for release at the time of the hearing, the Felony Judges have instructed Pretrial Services not to ask that same question of people arrested for felonies. *Id.* ¶ 43 (citing Ex. 123 (O.G. Case Records) at 10) (financial affidavit stating that ability-to-pay question is "FOR MISDEMEANOR ONLY OR FOR MISDEMEANOR AND FELONY ONLY"). If the Felony Judges directed Pretrial Services to amend the form to ask felony arrestees what they can afford, Pretrial Services would comply. *Id.*

In addition to the Pretrial Services interview, an arrested person is typically interviewed by an employee of the Public Defender's Office. SUMF ¶ 57. The Felony Judges have authorized the Public Defender's Office to represent felony arrestees at the magistration hearings for the limited purpose of arguing bail. *Id.* ¶ 58.[11] A public defender asks the arrested person about their ability to return to court—specifically, their access to housing, childcare, and transportation—as well as any criminal history and appearance record. *Id.* ¶ 59. The public defender is often rushed to interview everyone on the docket before magistration begins, with interviews typically lasting less than 15 minutes. *Id.* The public defenders do not have time to work with investigators or social workers to contact witnesses or gather evidence for use during the magistration hearing. *Id.*

At the beginning of each magistration docket, the hearing officer gives a brief admonishment to the group of arrestees sitting in the room, outlining the heightened procedural protections extended to people arrested for misdemeanors. SUMF ¶ 92. In each individual hearing,

---

[11] This Order as applied to misdemeanors was superseded by Section 40 of the *ODonnell* Consent Decree. *ODonnell v. Harris County*, No. 4:16-CV-1414 (S.D. Tex. Nov. 21, 2019), Dkt. 708 ¶ 40.

the hearing officer then announces whether or not they found probable cause for that person's charge(s).[12] *Id.* ¶ 72. If probable cause is found, the parties give their positions on bail. An Assistant District Attorney will highlight any past "failures to appear" (which are actually prior bond forfeitures, because Harris County does not track failures to appear or nonappearance), the nature of the accusations, and a "high" score on any of the PSA scales. *Id.* ¶ 74. The ADAs routinely misstate facts, including that a "violence flag" on the PSA indicates that the person arrested is "likely" to commit a new violent crime, when in fact it indicates that there is a 90% chance that the person will not be arrested for *any* offense. *Id.* (citing Ex. 3 (Expert Report of Melissa Hamilton, Ph.D., Aug. 29, 2022) ¶ 8(a)). The ADA virtually never consents to an unsecured bond. SUMF ¶ 74 (citing Ex. 16 (Third Declaration of Sarah Wood, General Counsel of the Harris County Public Defender's Office, Nov. 18, 2022) ¶ 8 ("I do not recall any cases in recent memory where the prosecutor did not oppose a personal bond at magistration.")). The defense attorney then provides the court with their argument, typically requesting release on a personal bond or an affordable amount of secured bail. *Id.* ¶ 74. The Hearing Officer then briefly considers the information before them—typically, the unverified allegations of the arresting officer or complaining witness, the PSA score, and financial affidavit—and enters an order determining whether and on what conditions release is permitted, before moving to the next person on the docket. *Id.* ¶ 75.

---

[12] When this case was filed, the Assistant District Attorney on duty for the docket read the probable cause statement at the beginning of each individual hearing. Then, a hearing officer made a finding of probable cause or, in rare cases, dismissed the case. Only at that point would the hearing officer ask the person if they would like the assistance of the Public Defender's Office for purposes of determining bail. Some hearing officers would prevent the defense attorney from making any arguments about probable cause, even in relation to the bail determination, understanding the Felony Judges not to have authorized the Public Defender's Office to address probable cause. Currently, probable cause determinations are made by hearing officers *in camera*, prior to magistration, and the probable cause statement is typically not read during the hearing at all. SUMF ¶¶ 72–73.

### 1. Hearing officers systematically impose secured financial conditions of release without consideration of ability to pay.

Hearing officers set secured money bail at magistration in the vast majority of felony cases. SUMF ¶ 109–10; *see also* Ex. 1 (Copp Expert Report) ¶ 41 (from 2015 through 2018, only 6% of people arrested for felonies were released on unsecured bonds). When Hearing officers impose a secured bail amount, it is often consistent with—or in excess of—the amount prescribed by the bail schedule. SUMF ¶ 65. Hearing officers rarely require alternative, non-monetary conditions of release and routinely state that they are not permitted to release people on unsecured bail. *Id.* ¶¶ 84 (citing Ex. 14 (Declaration of Sarah Wood, then-Policy Director of the Harris County Public Defender's Office, Mar. 26, 2020) ¶ 34). As a matter of routine practice, hearing officers do not make findings concerning an arrestee's ability to pay the money bail amount that they impose, nor do they meaningfully consider alternative non-financial conditions of release for those who cannot afford to pay the bail amount set. *Id.* ¶ 112. They do not make any findings that pretrial detention is necessary or that less-restrictive conditions are inadequate to meet a compelling government interest. *Id.* ¶ 113.

The following are descriptions of typical bail hearings from 2018 through 2022:

- E.A. appeared on January 18, 2019. He was charged with second degree robbery for allegedly stealing a soda and pushing the shop owner with his hand. The public defender informed the Hearing Officer that E.A. was homeless, a lifelong county resident, and had no money for bond. The officer granted the State's request and required a $20,000 secured bond. He did not make findings of ability to pay or the necessity of detention. SUMF ¶ 112 (citing Ex. 55 (E.A. Bail Hearing, Jan. 18, 2019)); *see also* Ex. 93 (E.A. Case Records).

- R.M. appeared on June 4, 2020. He was charged with misdemeanor burglary of a coin operated machine and felony burglary of a building for allegedly trying to steal coins from a Watermill Express hut. The Hearing Officer was informed that R.M. was a lifelong county resident, had been homeless for the previous year, and worked as a mobile mechanic. The officer noted that R.M. had no violent convictions and no violence flag on the risk assessment tool. The officer set a $7,500 secured bond and announced he would "refer the matter of a pretrial release bond [on the felony charge] to 339th." The officer did

12

not make findings of ability to pay or the necessity of detention. SUMF ¶ 113 (citing Ex. 70 (<u>R.M. Bail Hearing</u>, June 4, 2020)); *see also* Ex. 126 (R.M. Case Records).

- R.J.M. appeared on July 28, 2022. He was charged with aggravated assault family member. R.J.M., who was 66 years old, attempted to explain something to the Hearing Officer, who cut him off and told him to stop talking. The officer set a secured bond of $10,000. He did not make findings of ability to pay or the necessity of detention. The hearing lasted 65 seconds. SUMF ¶ 113 (citing Ex. 69 (<u>R.J.M. Bail Hearing</u>, July 29, 2022)); *see also* Ex. 125 (R.J.M. Case Records).

- M.A.A. appeared on September 12, 2022. She was charged with aggravated assault with a deadly weapon. The public defender informed the Hearing Officer that M.A.A. was indigent and received food assistance and Medicaid, that she was the single mother of three young children, and that she had never been arrested before. The officer noted that M.A.A. "was a low risk and not a high risk" but said she was going to follow the State's recommendation and required a $50,000 secured bond. The officer did not make findings of ability to pay or the necessity of detention. SUMF ¶ 109 (citing Ex. 63 (<u>M.A.A. Bail Hearing</u>, Sept. 12, 2022)); *see also* Ex. 116 (M.A.A. Case Records).

*See also* Ex. 44 (Bail Hearing Video Index).[13]

Even before S.B. 6 prohibited personal bonds for large categories of people arrested, hearing officers believed that such a restriction applied. SUMF ¶ 84. For example, they routinely cited a statute that they and the Felony Judges interpreted to bar the hearing officers from releasing certain people on personal bonds. *Id.* ¶ 85 (denying personal bonds based on Tex. Code Crim. P. Ann. § 17.03). Relying on this statute, hearing officers set secured financial conditions while stating that they would "refer" the personal bond decision to the assigned Felony Judge. *Id.* ¶ 85. Each such discretionary bail decision, like all orders to pay secured bail in Harris County, was a detention order for people who cannot pay: in every case, the hearing officer signs a document stating, "The Court ORDERS the defendant committed to the custody of the Sheriff . . . until he posts the required bond or until further order[.]" *Id.* ¶ 86. Thus, "referring" a decision on whether to issue a personal bond is an order to detain a person who cannot pay until their first appearance

---

[13] All bail hearing video exhibits to Plaintiffs' Statement of Undisputed Facts are available at: <u>bit.ly/3iLNl63</u>.

in a District Court, which can be a week or more after arrest. Because counsel is typically appointed

at or after first appearance, a person detained during this time rarely had the assistance of counsel.

*Id.* ¶ 87.

To take two examples:

- M.W. was charged with two counts of forgery for allegedly attempting to cash two fraudulent checks. He was not present at magistration in April 2020 because "deputies [weren't] sure where he's at . . ." Without locating M.W., the hearing officer required $100 secured money bail as a condition of release in each case, noting that she would normally grant personal bonds but was prohibited from doing so by GA-13. Two and a half months later, in a letter to the judge in his case, M.W. stated that he had not been brought to court and had not been able to contact his lawyer, and that he would plead guilty if it meant resolving his case. After being detained for three and a half months, M.W. appeared in court for the first time, pleaded guilty, and was sentenced to 105 days in jail with credit for the 105 days he had been detained. SUMF ¶ 111 (citing Ex. 64 (M.W. Bail Hearing, Apr. 23, 2020)); *see also* Ex. 120 (M.W. Case Records).

- N.E.A. appeared at her magistration hearing in June 2020 charged with DWI Third. Despite being informed that N.E.A. had "no cash on hand, no money in her checking or savings account," the hearing officer required a $35,000 money bond and purported to "refer any request for a lower bond or a personal bond" to the Felony Judge. N.E.A. remained detained for 16 days before she eventually paid a surety bond and was released. SUMF ¶ 112 (citing Ex. 66 (N.E.A. Bail Hearing, June 7, 2020)); *see also* Ex. 122 (N.E.A. Case Records).

Subsequent to S.B. 6, hearing officers continue to "refer" the personal bond decision in

cases for which they are required to impose secured bail. These, too, are detention orders issued

without the required findings and procedural protections.

For decades, the Judges explicitly dictated the outcomes of hearing officers' individual bail

decisions. SUMF ¶ 76. In most cases, the hearing officers adhered strictly to the Judges' Felony

Bail Schedule when setting release conditions. *Id.* The Judges preserve a written order on their

current County website, stating that the bail schedule is binding prior to a bail hearing, and that at

a bail hearing, hearing officers "shall set bail in accordance with the Bail Schedule." *Id.* ¶ 80.[14]

---

[14]   Ex. 34 (Direct Filing Order) at 5, also available at https://www.justex.net/Courts/Criminal/CriminalCourts.aspx (last visited Dec. 7, 2022).

And they did—from 2015 through 2021, where a secured bail amount was set on a complaint pursuant to the bail schedule, in 85% of cases the bail amount was not changed before the case was resolved. *Id.* The hearing officers' bail decisions were further informed by written and oral directives from the Judges, who control their employment. *Id.* ¶ 76.[15] These directives eliminated or strictly limited their discretion to grant personal bonds or reduce bail, such as prohibiting personal bonds for people who are homeless or prohibiting them altogether. SUMF ¶¶ 70 n.137, 190 (a).[16]

Although the Felony Judges purportedly rescinded these directives in 2017 in the middle of the *ODonnell* lawsuit, they have continued to make their preferences known to the hearing officers. SUMF ¶ 77. One former hearing officer recalled a felony judge calling him in 2019 on his personal cell phone to tell him that he should begin denying bond altogether on an entire category of cases and "leave them" to her. *Id.* (citing Ex. 17 (Declaration of Former Hearing Officer Colin Amann) ¶¶ 15–17). Another felony judge called him in 2020 to tell him not to set

---

[15] *See also* Ex. 41 (State Commission on Judicial Conduct Documents ("SCJC Docs")) at 13, 17–18, 23 (State Commission on Judicial Conduct finds that Hearing Officers Hagstette, Licata and Wallace violated the law "by strictly following directives not to issue personal bonds to defendants per the instructions of the judges in whose court the underlying cases were assigned." The Hearing Officers' "conduct was motivated by direct instructions from individual judges who played a role in [their] continued employment."); *id.* at 35 (Hagstette: "The Hearing Officers serve many masters. The Hearing Officers exercise the discretion they can within the bounds set."); Ex. 42 (State Commission on Judicial Conduct Documents Part II ("SCJC Docs II")) at 12 (hearing officers "didn't write the policies, but we had to follow them."; "Could I do something? Probably by law, I could have. I don't know if it would have been good for my career."); Ex. 144 at 2 (Jan. 14, 2020 email from Ed Wells (DCA) to members of Hearing Officer Hiring Committee) (forwarding email telling hearing officers "you are employees of the Hearing Officer Committee").

[16] Ex. 41 (SCJC Docs) at 189 (authorizing personal bonds only for arrestees who are "not homeless."); *id.* (authorizing personal bonds only for arrestees who have "no prior criminal history"); *id.* at 186–211 (multiple judges answering "No." to the question "Can the hearing officers grant pre-trial bonds?"); *id.* at 188 (authorizing personal bonds for some "[f]ull time students"); Ex. 43 (Court Directives Binder) at 249–51 (2017 chart of court directives); *id.* at 290 (email to new hearing officers stating "You may never, never, ever give a PR bond to a defendant in any of the district courts. This would probably get you fired. So don't.").

bond on a particular case. *Id.* Several felony judges have a routine practice, when a hearing officer sets a bond that the assigned felony judge believes insufficiently high, of revoking the bond and ordering the person remanded back into custody without notice or an adversarial hearing. *Id.* ¶¶ 123–24. On at least one occasion, a felony judge reversed a hearing officer's bail decision to grant a personal bond just minutes later.[17] *Id.* ¶ 125 (citing Ex. 61 (K-D.S. Bail Hearing, Nov. 7, 2019)). In addition to the judges' instructions and preferences, local stakeholders have recently conceded that criticism from the District Attorney, local media, and other public officials has led to higher bond amounts. *Id.* ¶ 68. As a result, hearing officers continue to require secured financial conditions of release (including for people who are not present) without inquiring into or making findings about ability to pay, *id.* ¶¶ 111–12; without considering whether pretrial detention is necessary, or the suitability of alternatives like unsecured or non-financial conditions of release, *id.* ¶ 109; and without applying any evidentiary standard to any finding or explaining how any fact supports any particular finding, *id.* ¶ 113.

These practices routinely result in the prolonged pretrial detention of people who are too poor to pay. For example, J.M. appeared at magistration in April 2022 charged with a non-violent property offense for allegedly breaking into a building to steal pipes and wiring. SUM ¶ 142 (citing Ex. 103 (J.M. Case Records)). The hearing officer was aware that J.M. was indigent, had never been convicted of a violent offense, and was the primary caretaker for his mother, who was ill with Parkinson's. Nevertheless, the hearing officer required a $25,000 secured bond. SUMF ¶ 113 (citing Ex. 58 (J.M. Bail Hearing, Apr. 22, 2022). After six months in the jail, J.M. pleaded guilty

---

[17] After a representative of the District Attorney's Office explained that she emailed the felony judge to alert him to the hearing officer's determination, Plaintiffs requested those emails in discovery. A motion to quash Plaintiffs' subpoena is currently pending before the Court. Dkt. 589. While Plaintiffs are no longer able to wait for the resolution of that motion due to the ongoing crisis at the jail, they may still use the requested documents to supplement the record at trial.

to 180 days in state jail, with credit for the 189 days he had already spent in pretrial detention. *Id.*
¶ 142 (citing Ex. 103 (J.M. Case Records) at 10); *see also* Ex. 93 (E.A. Case Records) (detained
for nearly six months on $20,000 secured bond before pleading guilty and being sentenced to 100
days in jail with credit for 147 days already served); Ex. 125 (R.J.M. Case Records) (66-year-old
jailed 132 days and counting because he cannot afford the payment for a $10,000 bond).

### 2. Hearing officers provide robust protections to misdemeanor arrestees but deny those same protections to felony arrestees.

The hearing officers treat misdemeanor and felony arrestees differently. Under Rule 9,
promulgated by the local misdemeanor judges, and the *ODonnell* Consent Decree, hearing officers
are required to make certain substantive findings and provide certain procedural protections when
considering release conditions for misdemeanor arrestees. No similar policy exists for felony
arrestees. SUMF ¶ 88. The differing mandates yield bifurcated bail practices: (1) hearing officers
give one set of admonishments of rights to misdemeanor arrestees and a different set to felony
arrestees, *id.* ¶ 92; (2) hearing officers ensure that all information they consider when determining
release conditions for misdemeanor arrestees is provided to defense counsel before the hearing,
without doing the same for felony arrestees, *id.* ¶ 94; (3) hearing officers inquire into and make a
finding of misdemeanor arrestees' ability to afford the amount of bail they set, but are not required
to—and typically do not—make an ability to pay finding for felony arrestees, *id.* ¶¶ 96-97; (4)
hearing officers must allow misdemeanor arrestees the opportunity to challenge the state's
evidence against them and to present evidence of their own in support of pretrial release, but do
not provide the same opportunity to felony arrestees, *id.* ¶¶ 99–101; (5) before requiring an amount
of money that will operate to detain a misdemeanor arrestee, hearing officers make a finding that
pretrial detention is necessary to achieve a particular state interest, and that alternatives to detention
will not suffice, yet in felony cases they are not required to—and often do not—make those

17

findings, let alone explain what evidence their findings are based on, SUMF ¶¶ 102–04; and (6) hearing officers are required to make each of the aforementioned factual findings in misdemeanor cases by a standard of clear and convincing evidence, yet do not apply any standard, and certainly not a heightened one, in felony cases, *id.* ¶¶ 105–06.

The hearing officers consider their felony bail practices to be controlled by the Felony Judges, just as their misdemeanor bail practices are controlled by the misdemeanor judges, who promulgated Rule 9 and other constitutional policies. The hearing officers are required by both state and federal law to follow that Rule. SUMF ¶ 88. Multiple hearing officers testified that the reason they do not provide the same procedural protections or make the same substantive findings for people accused of felonies is that the District Judges have not promulgated a version of Rule 9 that would apply to felony arrestees. *Id.* n.175. They stated that they would follow such a rule— and would provide to felony arrestees the same substantive and procedural protections they provide to misdemeanor arrestees—if it existed. *Id.* ¶¶ 91, 93, 95, 98, 104, 107. As Texas law and the history of Rule 9 show, local judges can order the hearing officers to provide the required findings and procedures. The Felony Judges choose not to.

### iii. First appearances in district court are routinely delayed and do not offer an opportunity for an adversarial bail hearing.

If an arrestee is unable to purchase release from jail after magistration, they will be automatically scheduled for a "Preliminary Assigned Court Appearance" in District Court within a few days. SUMF ¶ 114. According to County data, between 2015 and 2021, 68% of people charged with felonies were still detained at the time of this first scheduled court setting. *Id.*

Detained people regularly do not appear in court for that first "appearance." Sometimes, the first appearance is postponed one or more times. SUMF ¶ 115. Other times, the appearance goes forward, but the person is not transported from the jail to the courthouse and, therefore, is not

present in court. In such cases, the person will not meet their lawyer even if the lawyer is appointed that day. *Id.* Even when arrestees are brought to the courthouse for first appearance, they are typically kept in a holding cell outside the courtroom and so are still not actually present in court. *Id.* ¶ 116. Although they might meet their lawyer, any conversation that occurs will take place in a room full of other detained people, their lawyers, and sheriff's deputies. *Id.* ¶ 117. The case is almost always "reset," meaning that another setting is scheduled, typically weeks or even months in the future. *Id.* ¶ 120. People who cannot pay for their release remain in detention, usually without ever having been brought into a courtroom. *Id.* ¶ 121; *see also, e.g.*, ¶ 115 (citing Ex. 105 (J.S. Case Records) (no evidence of court appearance or meeting attorney through present, more than four months after arrest)).

Although detained individuals are usually assigned a lawyer at this first appearance, there is typically no review of the money bail amount. SUMF ¶ 118. Since the County began tracking bail review hearings in April 2020, only 7% of felony arrestees received one, though even these "reviews" are not uniformly on-the-record, and findings are rarely if ever made. *Id.* ¶ 186(l). The Felony Judges conduct first appearances off the record. *Id.* ¶ 119. While informal conversations about bail may occur—occasionally resulting in an increased or lowered bond amount, though not necessarily an amount the person can afford—"that court setting is not an opportunity for an adversarial bail hearing." *Id.* (citing Ex. 10 (Second Declaration of Alex Bunin, Harris County Chief Public Defender, Apr. 6, 2020) ¶¶ 17-20 (contrasting informal bail requests and on-the-record evidentiary bail hearings)).

### iv. The first opportunity for an adversarial bail hearing with evidence and findings on the record is at least two to four weeks after arrest.

A detained person seeking an evidentiary hearing to challenge their secured bond amount must have their lawyer file a motion and schedule a hearing with the court. SUMF ¶ 129. Arrestees

are often denied hearings, even if they are able to speak with their lawyers and even when their lawyers agree to file motions requesting a hearing. *Id.* ¶¶ 149–50. When a hearing does occur, it is after a substantial delay. *Id.* ¶¶ 130, 151. General Counsel for the Public Defender's Office reviewed a sample of habeas petitions ruled on by a District Court between March and October of 2022 and found that "after an arrestee filed a petition for a writ seeking a hearing on bail, they waited an average of 52 days before a hearing was held." *Id.* ¶¶ 130 (citing Ex. 16 (Third Declaration of Sarah Wood) ¶ 24), 151. This review corroborates prior observations that arrestees wait at least two to four weeks for their first theoretical opportunity to challenge the state's evidence or to present evidence in support of pretrial release, and the first time a judge even conceivably makes findings on the record regarding release or detention. SUMF ¶¶ 130, 151; Ex. 13 (Fourth Declaration of Alex Bunin, Nov. 22, 2022) ¶ 4 ("[O]btaining an on-the-record evidentiary hearing typically takes weeks, if not months, depending on the court.").

For example:

- T.D. filed a habeas petition regarding bail on June 20, 2019, but more than five months later, she still had not received a hearing. SUMF ¶ 130.[18]

- D.H.'s attorney filed a habeas petition on April 27, 2022, asking the court to set an evidentiary hearing on the amount of his bonds. A hearing was not held until September 16, over four months later. SUMF ¶ 130 (citing Ex. 16 (Third Wood Decl.) ¶ 25).

- R.B.'s attorney filed a habeas petition in 2022, asking the court to reduce his bail that was set at a $250,000 secured amount for a state jail felony charge of marijuana possession. He waited 56 days before a hearing was finally held. SUMF ¶ 151 (citing Ex. 16 (Third Wood Decl.) ¶ 26).

---

[18] *See also id.* (citing Ex. 12 (Third Bunin Decl.) ¶ 18 (noting that, of the cases cited by the District Attorney in an April 2020 filing (Dkt. 126) to purportedly show that hearings happen quickly, the only person who received an on-the-record hearing at which he was present waited two and a half months from when the hearing was requested)).

Arrestees who remain detained pretrial are pressured to plead guilty to resolve their cases. Lawyers rarely file motions or visit their clients, while clients' requests for new attorneys often go ignored. SUMF ¶¶ 141–44. Judges continuously reset cases for months on end, often without the arrested person ever seeing the judge. *Id.* ¶¶ 145–46. The arrestee may not get back into court until they agree to enter a guilty plea. For people who are too poor to pay secured bail, a guilty plea is often the fastest way out of custody. *Id.* ¶¶ 186(o), 152–53.[19] Judges routinely release people who have been detained on unaffordable bail as soon as they plead guilty—often on probationary sentences or with credit for time they spent in jail pretrial that exceeds the length of their sentence. *Id.* ¶¶ 152–53; *see also, e.g.*, SUMF ¶ 144 (citing Ex. 109 (K.F. Case Records) (writing after four months in jail, "I'm at a lost if I never get a chance to go to court to change counsel or lower my bond. How am I ever going to get a chance to Prove im inosent?" One week later, K.F. pleaded guilty and was sentenced to 123 days in jail with credit for 125 days served)).

These practices perpetuate the prolonged pretrial detention of people who are too poor to pay. For example:

- J.B.C., a 68-year-old homeless veteran, was arrested in December 2020 for allegedly stealing a bottle of wine from CVS and threatening to strike a person. Bond was initially set at $30,000 secured (during a setting at which J.B.C. was not present) and then reduced to $5,000 secured a few days later. J.B.C. was then detained for over a year because he could not pay $5,000, apparently without seeing a judge. There is no evidence he ever received an adversarial bail hearing. In January 2022, J.B.C. appeared in court, where he pleaded guilty to a lesser-included misdemeanor charge. He was sentenced to 180 days in jail, with credit for the 382 days he had spent in custody since arrest—more than twice the length of his sentence. SUMF ¶ 153 (citing Ex. 100 (J.B.C. Case Records)).

- In another case, a 66-year old veteran, J.S.B., was booked into the jail in August 2021. The public defender informed the hearing officer at magistration that J.S.B. has "MS" (presumably multiple sclerosis) and a blood disorder. The officer stated she could not issue

---

[19] Ex. 1 (Copp Expert Report) ¶ 61 ("When detained people charged with lower level felonies resolved their cases at early court appearances, they were typically released within two weeks, before they would be likely to have a subsequent setting. This data suggests that the fastest way out of jail for people who cannot afford to pay bail is to plead guilty.").

a personal bond "per CCP 17.03" and set a $10,000 secured bond. After magistration, J.S.B. submitted two *pro se* requests to the judge for a personal bond, but no bail hearing was ever set. For at least three months, there was no in-person adversarial bail hearing on the record. Eventually, Plaintiffs' counsel in this case learned of the case and informed the assigned felony judge that J.S.B. was being detained without a constitutional bail hearing, at which point the judge release J.S.B. on a personal bond. He had been detained for over three months. SUMF ¶ 150 (citing Ex. 106 (J.S.B. Case Records)).

### a. The County's Felony Bail Practices Result in Arbitrary Detention of Thousands of People Every Day and Disproportionately Harm Poor People.

Money bail continues to be required as a condition of release for the overwhelming majority of people charged with felonies in Harris County. SUMF ¶ 184. Those who are too poor to pay the financial condition of release must stay in jail cells. *Id.*

The County's bail practices, combined with the effects of S.B. 6, have led to a sharp increase in the number of people languishing in pretrial detention. The average daily jail population between July 1 and October 31, 2022 exceeded 10,000. SUMF ¶ 178. According to Sheriff Gonzalez, "It's the first time that we've had over 10,000 inmates in more than a decade." *Id.* Over the past two years, the average daily jail population has increased by 24%, or nearly 2,000 people. *Id.* Faced with overcrowding at the Harris County Jail, the County has spent tens of millions of dollars to ship over a thousand pretrial detainees to private for-profit jails hundreds of miles away. *Id.* ¶¶ 202–06. One of those people, a 35-year old man arrested in February 2022 for allegedly "evading arrest" over a year earlier, was sent five hours away to a Louisiana jail because he couldn't pay the $75,000 bond set in his case. A few weeks later, he was found dead in his cell. *Id.* ¶ 204.

The main driver of the overcrowding at the Harris County Jail is people detained while awaiting trial. SUMF ¶ 179. In July 2022, these individuals—who are all legally innocent— accounted for over 8,000 of the average daily jail population, over 96% of whom were charged with a felony offense. *Id.* The population of detained people charged only with a "state jail" felony

averaged 534 persons in July. *Id.* ¶ 180. State jail felonies are the least serious class of felony charges in the Texas criminal legal system. *Id.* They consist mostly of non-violent offenses and, in many instances, they are simply misdemeanor offenses enhanced by the existence of prior misdemeanor convictions. *Id.*

According to data provided by the County, as of August 29, 2022, almost 1,500 people were being detained on bonds of $20,000 or less, which would enable them to be released if they paid $2,000 to a for-profit bonding company. SUMF ¶ 185 (citing Ex. 125 (R.J.M. Case Records) (66-year-old jailed 132 days and counting because he can't afford the payment on a $10,000 bond); Ex. 80 (A.P. Case Records) (71-year-old jailed 270 days and counting because she cannot afford the payment for a $20,000 bond); Ex. 72 (Index of Cases), row 17 (C.E.); Ex. 88 (C.E. Case Records) (68-year-old jailed 118 days because he could not afford the payment for a $10,000 bond; C.E. pleaded guilty and was sentenced to 120 days)). Half of them were detained on bonds of $10,000 or less, including 364 people whose bonds were $5,000 or less. SUMF ¶ 185. There were 446 people in the jail charged only with a theft or drug possession charge. *Id.*

In Harris County, most felony cases, regardless of the severity of the charge, do not end in conviction. Only 38% of people arrested on felony charges from 2019 through 2021 saw their cases resolved by conviction. SUMF ¶ 182 (citing Ex. 1 (Copp Expert Report) ¶ 69). By contrast, 60% avoided a conviction altogether, either because their charges were dismissed, they received deferred adjudication (meaning the person pleaded guilty, but was not found guilty, and was released into the community subject to conditions), or they were acquitted. *Id.* Thus, the majority of people charged with felonies are released as soon as their case is resolved. Public safety cannot justify pretrial detention of people who will be released as soon as their cases resolve.

County data covering 2015 through 2021 illustrates that thousands of people in Harris County are detained on unaffordable secured financial conditions that typically remain in place for the duration of their case, creating a vast gulf in the post-arrest experiences of those who can afford to pay the price of pretrial release and those who cannot:

a. For decades, the bail schedule controlled until magistration: 82% of people arrested for felonies remained detained at magistration, typically due to inability to pay secured bail amounts required by the bail schedule. SUMF ¶¶ 64 n. 117, 186(a).[20]

b. Magistration hearings are routinely delayed: Although Texas law requires people arrested for felonies to be magistrated within 48 hours of arrest, over 14,000 people waited longer than 48 hours for magistration. SUMF ¶ 186(b).

c. Numerous people miss their magistration hearing altogether: 9% of felony arrestees did not appear at their magistration hearings. SUMF ¶ 186(c).

d. Money bail is set in a majority of felony cases: About 69% of people charged with felonies had money bail set in their case, typically at arrest pursuant to the bail schedule or else at the magistration hearing. SUMF ¶ 186(k).

e. People arrested for felonies are very poor and typically cannot afford any amount of money without suffering hardship and sacrificing basic necessities: the average monthly income of people interviewed by Pretrial Services was $200. SUMF ¶ 186(f)

f. Most people do not manage to pay their way out of jail prior to first appearance: 68% of people remained detained at their scheduled first appearance in district court. SUMF ¶ 186(d).

g. Bail review hearings are extremely rare: In the 21 months since the County began tracking "bail review" settings, only 7% of felony arrestees were scheduled for one. Data does not show what happened at these "bail review" settings, though even these settings are not uniformly on-the-record, and findings are rarely if ever made.[21]  SUMF ¶ 186(l).

h. Bail modifications, whether occurring at a "bail review hearing" or otherwise, are extremely rare: When a secured bail amount was set on a complaint pursuant to the bail schedule, in 85% of cases it was not changed before the case was resolved. SUMF ¶ 186(j).

---

[20] While 2022 data was unavailable at the time, that number has almost certainly increased now that S.B. 6 has effectively eliminated pre-magistration release.

[21] *See also* Ex. 12 (Third Bunin Decl.) ¶ 9 (observing, "the District Clerk's records show that the defendant was not present at any" of the 10 cases listed by the District Attorney in their April 2020 advisory as having received a "bail review").

i.  Appointment of counsel is routinely delayed for days or even a week or more: 44% of detained individuals did not have counsel appointed until after their first appearance. Five days after arrest, 25% of people still did not have counsel appointed. SUMF ¶ 186(e).

j.  Thousands of people are detained every year solely because they cannot pay the secured bail amounts required for release: Of those people who were required to pay money to be released, 45% remained detained throughout their entire case. 64% of homeless arrestees remained in jail at the time of disposition as compared to 36% of those not identified as homeless. SUMF ¶ 184 n.322, 185(n).

k.  Harris County's reliance on cash bail creates a two-tiered system of justice: one for those with cash, and a separate one for people who are poor. Arrestees who were released pretrial experienced substantially more favorable case outcomes than those who remained detained. People released pretrial were:

  i.   Half as likely to plead guilty (28% vs. 57%);
  ii.  More likely to have their case dismissed (28% vs. 18%); and,
  iii. If convicted, less likely to receive a custodial sentence (39% vs. 70%).

SUMF ¶ 186(p), (q), (r).

### b. The Felony Judges Control the Post-Arrest Process.

The Felony Judges act as a group to formulate, implement, and oversee policies and procedures governing release and detention for felony arrestees.[22] SUMF ¶ 187. Those policies and procedures dictate what happens before, during, and following magistration hearings, and determine who is released and who is detained. For example:

a.  The Felony Judges determine the specific procedural protections that are (and are not) provided to people arrested for felony offenses at the magistration hearings.

---

[22] *See, e.g.*, Dkt. 197 at 3 (Answer of Sheriff Ed Gonzalez and Request for Declaratory Relief) ("Sheriff Answer") ("The felony judges in Harris County are the true policymakers regarding bail practices, both in terms of setting rules and procedures and in applying those rules and procedures in individual cases."). Dkt. 181-1 at 5 (Memorandum in Support of Intervention by Judge Chuck Silverman) ("The criminal district judges have full discretion consistent with state and federal law to determine policies relating to post-arrest release and detention. . . . Under this framework, Judge Silverman, along with the other Harris County District Court Judges, is one of the key stakeholders in promulgating bail procedures and processes to determine which arrestees are eligible for release on non-financial conditions, the findings required to justify pretrial detention, and the procedural safeguards required in bail hearings. Judge Silverman is one of the felony judges who promulgates Harris County's predetermined money bail, which sets the financial conditions of pretrial release for nearly all felony arrestees in Harris County.").

b.  The Felony Judges determine what, if any, substantive finding must be made before a hearing officer can impose an unaffordable bail amount resulting in pretrial detention.

c.  The Felony Judges determine the contents of the form hearing officers use when issuing bail orders following magistration hearings.

d.  The Felony Judges control whether and to what extent the Public Defender's Office can represent people at magistration, including whether the Public Defender is authorized to make arguments on probable cause or represent people who are not present in court.

e.  The Felony Judges determine the timing of bail hearings and other court proceedings in their own courtrooms.

f.  The Felony Judges decide whether to conduct bail hearings virtually or to require an arrested individual to appear in person.

g.  The Felony Judges decide whether a person will be brought from the jail to the courthouse for a court setting, and whether a person who is transported to the courthouse remains in the lock-up or is brought into the courtroom.

h.  The Felony Judges control the timing of appointment of counsel and have refused to authorize hearing officers to appoint counsel, which delays representation by days and sometimes weeks.

i.  The Felony Judges determine whether "bail review hearings" in their courtrooms are on the record.

j.  The Felony Judges have threatened the Sheriff with contempt for failure to comply with their bail policies.

k.  For decades, the Felony Judges issued specific instructions regarding the process by which hearing officers set bail, including not issuing personal bonds to people charged with certain crimes or with certain criminal histories, not giving personal bonds to people experiencing homelessness, and mandating specific secured bail amounts be set in certain types of cases. Hearing officers treated these instructions as binding.

l.  The Felony Judges issued the 2006 Direct Filing Order, stating that "[t]he criminal law hearing officer shall set bail in accordance with the Bail Schedule established by the Board of District Judges Trying Criminal Cases."

m.  The Felony Judges promulgated the felony bail schedule which, until S.B. 6 went into effect, required the pre-hearing detention of those who could not afford the pre-determined secured bail amount.

n. At the beginning of the pandemic, the Felony Judges ordered the Sheriff and other local officials to release certain categories of people on personal bonds before magistration by promulgating the General Order Bond and the Amended General Order Bond.

o. The Felony Judges issued an order purporting to rescind previous instructions from various Felony Judges to hearing officers on how to make particular bail determinations, yet they replaced those instructions with further advisories, labeled "recommendations" that:

    i. Hearing officers "refer all assaultive cases to the presiding judge assigned to the case pursuant to the [2006] Harris County Direct Filing Order,"

    ii. "PR Bond is favored in all cases in which the defendant is determined to be low risk," and

    iii. Hearing officers "[r]efer to the Bail Guidelines" when setting bail amounts.

p. The Felony Judges authorized the use of a financial affidavit prior to magistration and control the content and wording of the affidavit, including refusing to authorize a question that is asked of misdemeanor arrestees: what specific amount of money can the person afford to pay at the time of the hearing?

SUMF ¶ 190.

In the words of one felony judge, "The criminal district judges have full discretion consistent with state and federal law to determine policies relating to post-arrest release and detention." *Id.* n.352 (citing Dkt. 181-1 (Memorandum in Support of Intervention by Judge Chuck Silverman) at 9). As the above list demonstrates, the Felony Judges thoroughly control the post-arrest process.[23]

---

[23] Evidence of the Felony Judges' control over the post-arrest process is relevant to Plaintiffs' theory of liability against Harris County. Specifically, overwhelming evidence in this case shows that the Judges are county policymakers when they promulgate and enforce local administrative rules and acquiesce in countywide practices relating to bail. *McMillian v. Monroe Cty., Ala.*, 520 U.S. 781, 786 (1997). The *en banc* court in *Daves v. Dallas County*, 22 F.4th 522 (5th Cir. 2022), does not require a contrary result. *Daves* held—on the basis of the incomplete, preliminary record in that case—that Plaintiffs had challenged only the application of discretionary bail schedules promulgated by the Dallas County misdemeanor and felony judges. Here, Plaintiffs' challenge is much broader, covering the Judges' involvement in numerous policies and practices relating to the bail system. And as *McMillian* held, the relevant inquiry is whether, as a practical matter, the judges are policymakers *in this particular context* and for the *particular functions* that are challenged—not whether they are County policymakers "in some categorical, 'all or nothing' manner." *McMillian*, 520 U.S. at 785. Indeed, in light of S.B. 6 the question the *en banc* court addressed in *Daves*—whether the felony bail schedule is binding or discretionary—is of secondary (if any) importance here given that the schedule no longer dictates bail amounts prior to a hearing and Plaintiffs do not allege that there is any formal requirement that the hearing officers require the scheduled amounts. Additionally,

**c.   There Are Overwhelming—and Avoidable—Human and Economic Costs Associated with Harris County's Money-Based Post-Arrest Practices.**

Imposing secured bail on people who cannot pay, and for whom pretrial detention is not necessary, causes significant harm. SUMF ¶ 191. It reduces access to legal representation, causes worse case outcomes, leads to wrongful convictions of people who plead guilty because it is the fastest way out of jail, fosters racial disparities in convictions and the jail population, separates families, causes people to lose their jobs and housing, and forces people to forgo essential medical treatment and care for relatives.[24] *Id.* ¶¶ 192–97. As but one example, C.W., a Black veteran, lost his job as he spent two years in the Harris County Jail waiting for a trial, throwing his family into financial tumult and forcing them out of their home. *Id.* ¶ 198; *id.* 197 (citing Ex. 2 (Expert Report of Krishnaveni Gundu) ¶ 87 ("My staff and I have listened to hundreds of people express panic about their family's worsening financial situation after their incarceration deprived their household of an income that kept a roof over their head and food in their pantry.")).

Voluminous peer-reviewed social science demonstrates that pretrial detention leads to (1) decreased rates of court appearance and law-abiding behavior in the short-term; (2) increased rates of recidivism in the long-term; (3) harsher case outcomes, including increased likelihood of convictions, guilty pleas, sentences to incarceration, longer sentence length, and greater jail and prison crowding; (4) negative effects on arrestees' employment, housing, and ability to care for

---

unlike plaintiffs in *Daves* who were denied discovery and forced to proceed on a partial (and misconstrued) record, Plaintiffs in this case have presented overwhelming and uncontroverted evidence about the Felony Judges' control over the system far beyond promulgation of the schedule. SUMF ¶¶ 187–90. In sum, the *McMillian* analysis is a *fact-based* and *context-specific* inquiry that must be assessed on the evidence Plaintiffs *in this case* have adduced: *Daves* does not and cannot control the key questions in this case of (1) which policies and practices Plaintiffs challenge (*i.e.* not only the application of the bail schedule), and (2) whether the Felony Judges act for the County or the state when they perform those functions.

[24] *ODonnell*, 892 F.3d at 154–55 (upholding findings on harms of pretrial detention).

dependent family members; and (5) increased costs to state and local governments. SUMF ¶¶ 192, 209.

Conditions in the Harris County Jail cause detrimental long-term health impacts for people who are detained. People with mental illness are significantly more likely to decompensate in jail. SUMF ¶ 195. Pregnant detainees in the Harris County Jail—of whom there were 50 on August 1, 2022—receive minimal food, are denied necessary medication, are kept in dirty and dangerous conditions, and are at heightened risk of adverse health outcomes, including miscarriage. *Id.* ¶¶ 196.

Detained people also receive inconsistent access to medication:

- M.S. was arrested in March 2022. He received personal bonds on his Harris County charges, but remained jailed on a $10,000 secured bond for an out-of-county DWI charge. M.S. was unemployed and could not pay even $1,000 for a surety bond. M.S. was diabetic. Five days later, staff found him unresponsive in his cell. He died later that day. The medical examiner states that he died of diabetic ketoacidosis, a condition linked to a lack of insulin. A lawyer still had not been appointed in his case. SUMF ¶ 156.

- M.M. was detained for a year because he could not afford the bond set in his case. A Type 1 diabetic, M.M. was denied consistent access to food and insulin while in the jail, causing him to fall unconscious on at least five different occasions and suffer severe memory loss. SUMF ¶ 195 (citing Ex. 2 (Gundu Expert Report) ¶¶ 49-50).

- A.D.W., a Marine veteran with epilepsy and three children, gave jail staff a prescription from his doctor specifying the medication and dosage required to prevent his seizures. But jail staff refused to give him the medication as ordered, leading to multiple seizures. SUMF ¶ 195 (citing Ex. 2 (Gundu Expert Report) ¶¶ 38-45).

The jail is also a vector for airborne illness. As of April 1, 2022, per data released by the Sheriff's office, at least 4,450 incarcerated people have tested positive for Covid-19 in the Harris County Jail. SUMF ¶ 199. At least 10 have died from the virus. *Id.* The spread of monkeypox, including to people within the jail, now presents an additional looming threat. *Id.* ¶ 200.

Pretrial detention in Harris County exposes detainees to violence and death because they are too poor to afford the required price of release. F.H., a teenager with a long history of

intellectual and developmental disabilities lived in a group home. SUMF ¶ 159. He had never been arrested before. *Id.* In October 2021, he was arrested for the first time and, despite having no criminal history, no allegations of failing to appear in court, no pending charges, and scoring "low risk" on the PSA, the hearing officer required a $20,000 secured bond. *Id.* F.H. remained in jail because neither he nor his family could afford to pay the fee required for release. Three weeks after his arrest, F.H. was reportedly beaten, kicked, and stabbed to death. *Id.*

At least 27 people have died in the custody of the Sheriff's Office just this year, the highest death toll in at least 13 years. SUMF ¶ 193. At least 11 were detained only because they could not afford the money bail amount required for their release. *Id.* None of the cases of those who died in 2022 had any indication in the record that a formal, evidentiary bail hearing had occurred. *Id.*

- K.S. was supporting herself and her four children on disability payments when she was arrested in April 2022. A hearing officer set a $340,000 secured bond, an amount she could not afford. K.S. died in the jail a month after her arrest. Three days after K.S. died, the district court apparently lowered her bail to $5,000. She was 38 years old. SUMF ¶ 155.

- L.F., who was homeless, was detained for 587 days pretrial because he could not pay a $50,000 secured bond in his case. He never received an adversarial bail hearing. L.F. died in the jail on June 15, 2022. He was 43 years old. *Id.* ¶ 157.

- V.S. was arrested for a Harris County offense and remained detained in the Harris County Jail on a warrant from Fort Bend County for possession of less than one gram of a controlled substance. Fort Bend case records show that she would have been released if she had paid $5,000. She was found unresponsive in her cell on October 2, 2022. She was 42 years old. *Id.* ¶ 158.

- E.L. was detained for three months on a $35,000 money bond. E.L. sent a letter to the court saying his attorney had told him his bond was lowered to $15,000, an amount he could afford, but the system still listed the old bond amount. He asked the court to "please check it and fix it in the system . . . so I can post bail and get back to my family." In March 2022, E.L. was suddenly transported to an outside hospital, where he fell into a coma and died. He was 31 years old. *Id.* ¶ 160.

- P.C. was charged with burglary for allegedly stealing lawn equipment and frozen meat. He spent three and a half months in the Harris County Jail awaiting trial because he was unable to pay the $100 fee required to satisfy his $1,000 bond. He was also subject to a probation

detainer that his lawyer did not challenge. P.C. died from COVID-19 complications in August 2020. He was 64 years old. *Id.* ¶ 161.

### d. Alternatives to Secured Financial Conditions of Release Perform as Well as, or Better Than, Secured Bail in Every Meaningful Way.

Secured bail will rarely if ever be the most effective way of meeting the government's interests in reasonably assuring that a person does not flee prosecution or commit a violent offense while released pretrial. SUMF ¶ 208-210. Nonfinancial conditions of release—like court-date reminders and risk-based pretrial monitoring—better ensure court appearance and reduce recidivism while avoiding the significant costs associated with secured bail. *Id.* ¶¶ 209.

Empirical studies demonstrate that secured bail does not make it more likely that someone will return to court or less likely that someone will commit a new offense. SUMF ¶ 208. It does not promote public safety. *Id.* ¶¶ 210. In fact, research shows the opposite: people detained on money bail for even 24-48 hours become more likely to fail to appear later in the case and more likely to commit new crimes. *Id.* ¶¶ 214–15. In jurisdictions that have shifted from money-based practices to risk-based practices, including the Harris County misdemeanor system, rates of failures to appear and new criminal activity have decreased, especially when pretrial supervision is used. *Id.* ¶¶ 217–19. For instance, an independent study conducted by Paul Heaton and the University of Pennsylvania's Quattrone Center for the Fair Administration of Justice analyzed data from over 500,000 misdemeanor and felony cases to measure the impacts of the *ODonnell* federal injunction in 2017. Controlling for relevant variables, Heaton found that increasing pretrial release actually *decreased* future contacts with the system (including felony arrests). *Id.* ¶ 219.

### e. Relevant Facts About the Named Plaintiffs

On January 21, 2019, Dwight Russell, Johnnie Pierson, and Joseph Ortuno filed this class action on behalf of themselves and a class of similarly situated people. At the time, each was

detained due to an inability to pay a secured money bail amount. SUMF ¶¶ 164–65. On May 6, 2020, Plaintiffs amended their Complaint to add two named Plaintiffs—Christopher Clack and Maurice Wilson. *Id.* ¶ 173. They, too, were detained in the jail, could not afford to purchase release, and were subject to the same policies as the three original named Plaintiffs. *Id.* ¶ 17. The named Plaintiffs moved for class certification concurrent with filing the complaint. Dkt. 2; Dkt. 503.[25]

Each Plaintiff faced weeks of detention without any opportunity to challenge those conditions on the record with evidence and argument. While detained, Mr. Pierson did not receive enough to eat and missed his granddaughter's birthday. Mr. Russell, who was 61 years old, was forced to sleep in a top bunk despite giving jail staff a doctor's note saying that his health issues required him to sleep on a bottom bunk. Mr. Ortuno, just 18 years old at the time, was crowded in with adults much older than he was, separated from his family and friends, and unable to go to school. SUMF ¶¶ 170–71. Each Plaintiff eventually was released from pretrial custody. *Id.* ¶ 176.

## SUMMARY OF THE ARGUMENT

"In our society liberty is the norm, and detention prior to trial . . . is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). But Harris County detains nearly 40 percent of all felony arrestees—tens of thousands of people every year—for the duration of their cases solely because they cannot pay money bail. It does so even though over half of all felony cases will not end in conviction. This automatic detention of impoverished people is not an "exception" at all, let alone a "carefully limited" one.

Plaintiffs allege violations of two substantive rights under the federal Constitution: the right to pretrial liberty and the right against money-based detention. Plaintiffs' substantive claims flow from two lines of precedent. First, due process protects a "fundamental" right to pretrial liberty.

---

[25] On Nov. 14, 2022, the Court dismissed Plaintiffs' Amended Motion for Class Certification as moot while granting Plaintiffs leave to refile after the Court resolves "threshold issues." Dkt. 622.

*Salerno*, 481 U.S. at 750; *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001); *Reno v. Flores*, 507 U.S. 292, 302 (1993). Second, equal protection and due process forbid jailing a person solely because of her inability to make a monetary payment. *ODonnell v. Harris County*, 892 F.3d 147, 162 (5th Cir. 2018) (op. on reh'g), *overruled on other grounds by Daves v. Dallas Cnty., Texas,* 22 F. 4th 522 (5th Cir. 2022); *Bearden v. Georgia*, 461 U.S. 660, 665 (1983); *Pugh v. Rainwater*, 572 F.2d 1053, 1057 (5th Cir. 1978); *Frazier v. Jordan*, 457 F.2d 726, 728 (5th Cir. 1972). Those two substantive constitutional rights cannot be infringed unless the government demonstrates that doing so is necessary to serve a compelling interest in promoting court appearance or community safety, and that less restrictive conditions cannot suffice. Although the *en banc* Fifth Circuit recently issued a partial ruling in a similar bail case against Dallas County, the court did not address the merits of Plaintiffs' claims. *Daves*, 22 F.4th at 522. Thus, nothing from *Daves* could conceivably undermine the decades-old precedent on which Plaintiffs' claims are based.[26]

Procedurally, the Constitution requires the government to provide safeguards to protect against the erroneous deprivation of these substantive rights. *Washington v. Harper*, 494 U.S. 210, 228-229 (1990); *see also Meza v. Livingston*, 607 F.3d 392, 399 (5th Cir. 2010). In light of the fundamental private interest and heightened risk of erroneous deprivation, the basic procedures required include notice, an opportunity to be heard and to present and confront evidence at a hearing with counsel, and findings on the record by clear and convincing evidence explaining why detention is necessary. In a portion of the *ODonnell* ruling that the *en banc* court did not overturn,

---

[26] As for the jurisdictional issues that the *en banc* court did address, those are fact-bound. If this Court addresses those same or other doctrinal issues, it must apply the facts in *this* case. A previous order of the court contemplated briefing on "threshold issues." Dkt. 562. Given that those issues are typically raised as defenses, Plaintiffs believe it would be unhelpful to the Court to anticipate Defendants' or Intervenor's arguments. Plaintiffs plan to respond to any jurisdictional issues Defendants or Intervenor raise in their motions or response briefs unless the Court clarifies its request for briefing from Plaintiffs at an earlier date.

the Fifth Circuit held that equal protection requires [most of] these procedures. *ODonnell*, 892 F.3d at 16.[27]

Here, Defendants violate Plaintiffs' substantive rights by detaining Plaintiffs without a judicial finding that detention is necessary or that no alternatives to detention will reasonably protect the community's safety and guard against the risk of flight. Defendants also violate Plaintiffs' procedural due process rights because the process resulting in Plaintiffs' detention lacks crucial procedural safeguards, including the ability to present evidence and challenge the evidence against them, application of a clear and convincing evidence standard, findings of fact, and a statement of reasons for a decision to detain.

Plaintiffs seek both substantive and procedural relief. Substantively, Plaintiffs seek a judgment that, prior to enforcing an order that results in the pretrial detention of a presumptively innocent person, the government must demonstrate that pretrial detention is necessary to serve a compelling interest. Procedurally, Plaintiffs seek a judgment identifying the procedural protections required to ensure the accuracy of any pretrial detention decision: adequate notice of the issues at stake; an inquiry into and findings concerning ability to pay; an adversarial, evidentiary hearing with counsel; consideration of less-restrictive alternatives; and, in the event of a transparent or *de facto* order resulting in detention, findings on the record by clear and convincing evidence explaining why detention is necessary.

---

[27] Neither this Court nor the Fifth Circuit addressed in *ODonnell* several issues raised by the *ODonnell* plaintiffs at the later summary judgment stage and raised here by the Plaintiffs, including the substantive findings required for the government to justify depriving a person's interest in pretrial liberty, and whether that right and the right against wealth-based detention require the procedural safeguards of counsel and a heightened evidentiary standard. A court's decision does not foreclose claims it does not address. *Harper v. Va. Dept. of Taxation*, 509 U.S. 86, 118 (1993) (O'Connor, J., dissenting).

**ARGUMENT**

**I.    DEFENDANTS' BAIL PRACTICES VIOLATE TWO SUBSTANTIVE FOURTEENTH AMENDMENT RIGHTS.**

The imposition of unaffordable money bail to deprive arrestees of freedom pretrial implicates two substantive Fourteenth Amendment rights: the right to pretrial liberty and the right to be free from detention due to inability to pay. Defendants' practices violate both rights.

> **a.    Substantive Due Process Forbids Pretrial Incarceration Unless Detention Is Necessary to Serve the Government's Interests.**

The Supreme Court has repeatedly recognized that due process protects a fundamental interest in pretrial liberty. "Freedom from bodily restraint," the Court has explained, "has always been at the core of the liberty protected by the Due Process Clause . . . ." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992). The "fundamental nature of this right," *Salerno*, 481 U.S. at 750, is indisputable: Incarceration implicates the "most elemental of liberty interests—the interest in being free from physical detention by one's own government," *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004) (plurality); *Zadvydas*, 533 U.S. at 690 ("Freedom from imprisonment . . . lies at the heart of the liberty that [the Due Process] Clause protects"); *Reno*, 507 U.S. at 301-302.

The interest in pretrial liberty is not absolute; people *can* be detained pretrial. *See Salerno*, 481 U.S. at 755 ("liberty is the norm, and detention prior to trial or without trial is the carefully limited exception"). But as with other important rights, the pretrial-liberty right may be overcome only when the government's interest is sufficiently "compelling" and the deprivation is narrowly tailored to that interest—meaning that pretrial detention is necessary because alternatives are inadequate. *Id.* at 749, 751; *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997).

*Salerno* applied these principles to a facial challenge to the Bail Reform Act. The Supreme Court recognized both a "'general rule' of substantive due process that the government may not

detain a person prior to" conviction, and "the individual's strong interest in liberty." 481 U.S. at 749-750. The Bail Reform Act facially satisfied that standard, *Salerno* concluded, because it "narrowly focuse[d] on a particularly acute problem in which the Government interests are overwhelming." *Id.* at 750. In particular, *Salerno* held pretrial detention under the Bail Reform Act ("BRA") facially constitutional, finding that the law's prohibition on detention unless "the Government demonstrates by clear and convincing evidence after an adversary hearing that no release conditions 'will reasonably assure . . . [public] safety'" satisfied due process. *Id.* at 741. Absent such a "sharply focused scheme," a state may not detain a presumptively innocent person. *Foucha*, 504 U.S. at 81.

*Foucha* confirmed that the BRA's mandate of a finding that detention is necessary was essential to *Salerno*'s affirmation of the law's facial constitutionality, striking down a Louisiana law permitting the confinement of certain individuals precisely because that law did not require any such finding. *See id.* at 80–83. Indeed, *Foucha* invoked *Salerno*'s recognition that because individuals' interest in physical freedom is the "core of the liberty protected by the Due Process Clause," it may be outweighed only in "narrow circumstances," such as when "persons . . . pose a danger to others or to the community." *Id.* at 80. And contrasting *Salerno*'s "sharply focused scheme" with Louisiana's detention regime, *Foucha* held the latter violated substantive due process by allowing confinement that was not necessary to serve the government's interests. *Id.* at 81-83.

*Reno v. Flores* further affirmed that the right to physical liberty cannot be infringed unless the government demonstrates a need to do so. *See* 507 U.S. at 301–02. Justice Scalia's majority opinion described *Salerno* as falling within the Court's "line of cases which interprets . . . 'due process of law' to include a substantive component, which forbids the government to infringe

certain 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Id*. (emphasis in original).

Lastly, *Zadvydas v. Davis* reiterated that adequate justification is required to detain presumptively innocent individuals. 533 U.S. at 690-692. Citing *Salerno*, *Zadvydas* described the basic principle of non-punitive regulatory detention:

> Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects. . . . [G]overnment detention violates that Clause unless the detention is ordered in a criminal proceeding with adequate procedural protections, or, in certain special and "narrow" nonpunitive "circumstances," where a special justification . . . outweighs the "individual's constitutionally protected interest in avoiding physical restraint."

*Id.* at 690 (citations and emphasis omitted). *Zadvydas* also summarized *Salerno* as "upholding pretrial detention" only after "stressing 'stringent time limitations,' the fact that detention is reserved for the 'most serious of crimes,' the requirement of proof of dangerousness by clear and convincing evidence, and the presence of judicial safeguards." *Id.* at 691 (citations omitted).

Interpreting the *Salerno* line, this Court found that government action infringing pretrial liberty must be the least restrictive means necessary to reasonably assure court appearance and community safety. *ODonnell v. Harris Cnty., Texas*, 251 F. Supp. 3d 1052, 1156–57 (S.D. Tex. 2017), *aff'd as modified*, 892 F.3d 147 (5th Cir. 2018). The Fifth Circuit, too, has repeatedly recognized that substantive due process means the "government must advance a 'sufficiently compelling' interest to justify pretrial detention" because such confinement "constitutes a significant deprivation of liberty." *United States v. McKown*, 930 F.3d 721, 726 & n.3 (5th Cir. 2019) (citation and subsequent history omitted). "Even when a governmental purpose is legitimate and substantial," that court has explained, "that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *In re*

*Newchurch*, 807 F.2d 404, 408 (5th Cir. 1986). Hence, "[a] person accused of a crime should not . . . be deprived of personal liberty unless his confinement is reasonably necessary to assure his presence at trial or to protect some other important governmental interest." *Id.* at 408–09. Thus, the principles in *Salerno* and its progeny forbid pretrial detention without a finding that it is necessary because less restrictive alternatives are inadequate to serve the government's compelling interests.[28]

A holding to the contrary would not only break with a long line of unanimous precedent, it would also open the door to devastating government overreach. If the federal constitution did not recognize an interest in pretrial liberty, any state would be free to pass a law requiring indefinite pretrial detention in each and every criminal case, serious and minor, based only on a finding of probable cause. Such a "scattershot attempt to incapacitate those who are merely suspected of . . . crimes" is inconsistent with the basic values of a legal order that prizes individual liberty and the presumption of innocence. *Salerno*, 481 U.S. at 747. No court has ever adopted this view.

**b.  The Fourteenth Amendment Forbids Money-Based Detention Unless Detention Is Necessary to Serve the Government's Interests.**

In *Williams*, *Tate*, and *Bearden*, the Supreme Court held in the non-bail context that imprisoning people solely based on their inability to pay a sum of money is unconstitutional. *Williams v. Illinois*, 399 U.S. 235, 242 (1970); *Tate v. Short*, 401 U.S. 395, 398 (1971); *Bearden v. Georgia*, 461 U.S. 660, 672 (1983); *see also Griffin v. Illinois*, 351 U.S. 12, 19 (1956).[29] Each

---

[28] *See, e.g.*; *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 780–81 (9th Cir. 2014) (en banc); *Welchen v. Bonta*, No. 2:16-cv-00185, 2022 WL 4387794, at *3 (E.D. Cal. Sept. 22, 2022); *Reem v. Hennessy*, No. 17-CV-06628, 2017 WL 6765247, at *1 (N.D. Cal. Nov. 29, 2017); *In re Humphrey*, 482 P.3d 1008, 1019 (Cal. 2021); *Valdez-Jimenez v. Eighth Judicial District Court*, 460 P.3d 976, 987 (Nev. 2020); *Simpson v. Miller*, 387 P.3d 1270, 1277 (Ariz. 2017); *Brangan v. Commonwealth*, 80 N.E.3d 949, 962 (Mass. 2017).

[29] *See also* 457 F.2d 726 at 728; *In re Humphrey*, 482 P.3d at 1018 ("[I]f a court does not consider an arrestee's ability to pay, it cannot know whether requiring money bail in a particular amount is likely to operate as the functional equivalent of a pretrial detention order. Detaining an arrestee in such circumstances

case invalidated a state law or judicial practice that imprisoned individuals who could not afford a fine, holding that a "converge[nce]" of equal-protection and due-process principles forbids "imprisoning a defendant solely because of his lack of financial resources." *Bearden*, 461 U.S. at 661, 665. Such imprisonment constitutes "little more than punishing a person for his poverty." *Id.* at 671; *accord Williams*, 399 U.S. at 240–242; *Tate*, 401 U.S. at 397–399.

This circuit has also recognized the constitutional right against money-based detention in the pretrial context. In *Rainwater*, the en banc Fifth Circuit—addressing a facial Fourteenth Amendment challenge to Florida's bail rules—"accept[ed] the principle" articulated by the Supreme Court that "imprisonment solely because of indigent status is . . . not constitutionally permissible." 572 F.2d at 1056; *see also Frazier*, 457 F.2d 726 at 728 (same in the post-conviction context). *Rainwater* held that the principle applied by *Williams* and *Tate* to those already convicted applies equally to pretrial detention. *See* 572 F.2d at 1056.

*ODonnell* reaffirmed that holding. 892 F.3d at 162. Comparing the bail practices there to those challenged in the *Bearden* trilogy and *Rainwater*, *ODonnell* concluded that the case "presents the same basic injustice: poor arrestees . . . are incarcerated where similarly situated wealthy arrestees are not, solely because the indigent cannot afford to pay a secured bond." *Id.* at 162. "[T]his state of affairs," *ODonnell* held—as in *Williams*, *Tate*, *Bearden*, and *Rainwater*— "violates the equal protection clause." *Id.* at 163. Importantly, "the distinction between post-conviction detention targeting indigents and pretrial detention targeting indigents is one without a difference." *Id.* at 162 n.6.

---

accords insufficient respect to the arrestee's crucial . . . rights against wealth-based detention . . . ."); Brief of Conference of Chief Justices as Amicus Curiae in Support of Neither Party at 24, *ODonnell*, 892 F.3d 147 (2018) (No. 17-20333), 2017 WL 3536467 ("[A]ll the concerns that attend post-conviction deprivations based on indigence apply with even greater force where a defendant has not been convicted of a crime . . . . If a state may not imprison convicted indigent defendants solely 'on account of their poverty,' how can a state constitutionally detain presumably innocent persons for the same reason?").

The foregoing cases do not mean that wealth-based detention is never constitutional. But *Bearden* explained that such detention is permissible "[o]nly if the sentencing court determines that alternatives to imprisonment are not adequate in a particular situation to meet the State's interest[s]." 461 U.S. at 672. The Fifth Circuit has reached the same conclusion: post-conviction wealth-based detention is permissible when "necessary to promote a compelling government interest," *Frazier*, 457 F.2d at 728, and pretrial wealth-based detention is likewise constitutional when "necessary to reasonably assure defendant's presence at trial," *Rainwater*, 572 F.2d at 1057.[30] Pretrial detention practices that fail to meet this exacting requirement are "constitutionally interdicted." *Id.* at 1058.[31]

---

[30] *See* Brief of Conference of Chief Justices as Amicus Curiae in Support of Neither Party, *ODonnell*, 892 F.3d 147 (2018) (No. 17-20333), 2017 WL 3536467 at *26-27 ("Therefore, a financial condition of release that operates to detain an indigent defendant must be based on a finding that such condition is necessary to secure the state's interest in ensuring appearance at trial or public safety.").

[31] Courts may or may not use the language of the tiers of scrutiny, but nonetheless agree that the state must demonstrate that detention is necessary because less-restrictive alternatives are inadequate to meet the government's interests in court appearance or public safety. *See ODonnell*, 892 F.3d at 161 (holding that "heightened scrutiny" applies to Harris County's wealth-based bail practices); *Lopez-Valenzuela*, 770 F.3d at 779 ("*Salerno* applied heightened scrutiny"); *Simpson*, 387 P.3d at 1276-77 ("heightened scrutiny" applies where, as in *Salerno*, the "fundamental" "right to be free from bodily restraint" is implicated); *Welchen*, 2022 WL 4387794, at *3 ("[T]he Court will first evaluate whether the bail schedule passes constitutional muster by applying strict scrutiny"); *Buffin v. City and County of San Francisco*, 2018 WL 424362, at *8 (N.D. Cal. 2018) ("[S]trict scrutiny applies to plaintiffs' Due Process and Equal Protection claims."); *Brangan*, 80 N.E.3d at 964-965 (an order requiring an unattainable condition must explain why "the defendant's risk of flight is so great that no alternative, less restrictive financial or nonfinancial conditions will suffice to assure his or her presence at future court proceedings"); *Humphrey*, 482 P.3d 1008, 1019 ("[Pretrial] detention is impermissible unless no less restrictive conditions of release can adequately vindicate the state's compelling interests."); *Frazier*, 457 F.2d at 728 (requirement to pay a fine or serve time in jail violates equal protection and due process unless it is "necessary to promote a compelling governmental interest" (internal quotation marks and citation omitted)); *Bearden*, 461 U.S. at 666-667 (money-based detention requires "careful inquiry" into factors including "the existence of alternative means for effectuating" those interests); *Johnson v. Bredesen*, 624 F.3d 742, 749 (6th Cir. 2010) (*Griffin* and *Williams* "concerned fundamental interests subject to heightened scrutiny").

### c. An Unattainable Financial Condition Is the Functional Equivalent of an Order of Pretrial Detention.

*Salerno*, *Foucha*, and their progeny apply equally whether pretrial detention is effected via the imposition of unaffordable secured-money bail or via an explicit detention order.[32] This Court held that when secured money bail is set "at unpayable amounts," it operates "as [a] de facto pretrial detention order," *ODonnell*, 251 F. Supp. 3d at 1150; *id.* at 1131, 1156, 1161, and held that Harris County had a "policy and practice of imposing secured money bail as de facto orders of pretrial detention," *id.* at 1059. Every appellate court to consider the question has reached the same conclusion. *See, e.g.*, *ODonnell*, 892 F.3d at 162 (Defendants' practices result in the "absolute deprivation of [indigent misdemeanor arrestees'] most basic liberty interests—freedom from incarceration").[33] Like transparent detention orders, *de facto* detention orders are permissible only if a court finds it necessary because no alternative would serve the government's interests.

### d. Defendants' Bail Practices Violate Both Substantive Fourteenth Amendment Rights by Imposing Pretrial Detention Absent a Finding That It Is Necessary.

The undisputed facts establish that Defendants enforce unattainable financial conditions of release that function as detention orders without providing the substantive findings required by the

---

[32] Brief of Amici Curiae Professors of Criminal, Procedural, and Constitutional Law in Support of Plaintiffs-Appellants-Cross Appellees at 19, *Daves*, 22 F.4th 522 (2022) (No. 18-11368), 2021 WL 1566349 ("As a matter of both logic and law, an order imposing unaffordable bail constitutes an order of detention.").

[33] *See also, e.g.*, *United States v. Mantecon-Zayas*, 949 F.2d 548, 550 (1st Cir. 1991) (per curiam) ("[O]nce a court finds itself in this situation—insisting on terms in a "release" order that will cause the defendant to be detained pending trial—it must satisfy the procedural requirements for a valid *detention* order . . . ."); *United States v. Leathers*, 412 F.2d 169, 171 (D.C. Cir. 1969) (per curiam) ("[T]he setting of bond unreachable because of its amount would be tantamount to setting no conditions at all."); *In re Humphrey*, 482 P.3d at 1018; *Valdez-Jimenez*, 460 P.3d at 984–85; *Brangan*, 80 N.E.3d at 963 ("Unattainable money bail is the functional equivalent of an order for pretrial detention, and the judge's decision must be evaluated in light of the same due process requirements applicable to such a deprivation of liberty."); *State v. Brown*, 338 P.3d 1276, 1292 (N.M. 2014) ("Intentionally setting bail so high as to be unattainable is simply a less honest method of unlawfully denying bail altogether.").

Equal Protection and Due Process Clauses to justify the government's detention of a person before trial. Plaintiffs are entitled to summary judgment on Counts I and II.

Pursuant to either the fundamental pretrial liberty interest articulated in *Salerno-Foucha-Zadvydas-Reno* or the *Bearden-Frazier-Rainwater* money-based detention cases, one principle is clear: An unattainable financial condition of release is unconstitutional without a substantive finding that less restrictive alternatives cannot reasonably serve the government's compelling interests in court appearance or community safety. Defendants do not meet this demanding test.[34]

Harris County judicial officers, including both hearing officers and the Felony Judges, systematically impose cash-based detention without making the required substantive findings. They routinely impose secured money bail without any consideration of ability to pay, without making any findings about the availability of less-restrictive alternative conditions, and without issuing any statement of findings or reasons explaining why a particular financial condition or pretrial detention is necessary to serve the government's interests. SUMF ¶¶ 79, 119, 128, 131. Indeed, because they do not inquire into felony arrestees' ability to pay,[35] SUMF ¶¶ 97, 110, judicial officers routinely claim not to even "know" whether the requirement to pay money as a condition of release in fact operates as an order of detention, SUMF ¶¶ 97. Moreover, the hearing

---

[34] *See, e.g.*, *Zablocki v. Redhail*, 434 U.S. 374, 388 (1978) (noting that when the government's action infringes a fundamental right, "it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests"); *ODonnell*, 892 F.3d at 162.

[35] Ex. 25 (St. Julian Dep. at 152:16–24) (Q: "What does Rule 9.12.4 require hearing officers to do with respect to misdemeanor defendants?" A: "To ask the defendant under penalty of perjury the amount of money the defendant can afford to pay from any lawful source at the time of the hearing." Q: "Is there any policy requiring hearing officers to make this finding for felony defendants at magistration?" A: "There is not."); Ex. 26 (Gaut Dep. at 104) (Q: "Do you make findings on the record concerning your own determination of whether a felony defendant can afford to pay the secured bail amount that you're setting?" A: "I do not." Q: "Why not?" A: "It just has never been – it's never been part of my practice. It wasn't what I was taught to do. And it's just not something I've done.").

officers routinely state that they are not permitted to release people on unsecured bond in certain cases, even if they determine that such conditions would be appropriate. SUMF ¶¶ 108, 154.

Following S.B. 6's enactment, these constitutional violations have continued apace—and in some cases, worsened. After S.B. 6 took effect, money bail in Harris County continues to be routinely set in amounts that plaintiffs cannot pay at perfunctory hearings lacking the substantive necessity finding that the Constitution requires. Hearing officers still rarely if ever make findings on the record about the arrestee's ability to pay, alternative conditions of release, or the need for pretrial detention, let alone explain on what evidence those findings are based.

For instance:

- A.R. appeared at magistration on May 6, 2022. She was charged with theft for allegedly stealing money from two people. The hearing officer was informed that A.R. was a single mother with four young children at home, including a daughter undergoing chemotherapy treatment, that she was indigent and relied on food stamps, and that she scored "below average risk." The officer denied a personal bond and required a $20,000 secured bond—double the State's request. The officer did not make findings of ability to pay or the necessity of detention. The hearing lasted less than two minutes. SUMF ¶ 113 (citing Ex. 48 (A.R. Bail Hearing, May 6, 2022)); *see also* Ex. 81 (A.R. Case Records).

- O.G. appeared at magistration on August 9, 2022. She was charged with criminal mischief charges. The state initially indicated the charge alleged was criminal mischief $30,000-150,000, but the ADA made the record that the charge should be criminal mischief $2500-$30,000, a state jail felony. The hearing officer was informed that it was the first time O.G. had ever been arrested, and that she had the lowest possible risk score. Her financial affidavit also indicated she supported 3 minor children and earned $300 a month at her part time job. Despite this, the hearing officer denied her a personal bond and required a $5,000 bond. The officer did not make findings of ability to pay or the necessity of detention. Several days later, she was released on a personal bond. SUMF ¶ 112 (citing Ex. 67–68 (O.G. Bail Hearing Part 1 & Part 2, Aug. 9, 2022); *see also* Ex. 123 (O.G. Case Records).

As a result of the County's practices, people arrested in Harris County who can access cash quickly purchase their freedom, while similarly situated people who cannot remain jailed. The named Plaintiffs and members of the putative class—poor people, many with disabilities and/or surviving solely on government assistance, many charged with low-level and non-violent

felonies—sit in jail for days, weeks, or months, not because their detention is necessary, but simply because they cannot afford their release. SUMF ¶¶ 1, 101–103, 111, 150. The Constitution will not tolerate such a system.[36] Plaintiffs are entitled to summary judgment on Counts I and II.

## II.    DEFENDANTS' BAIL PRACTICES VIOLATE PROCEDURAL DUE PROCESS.

Individuals the government seeks to detain are "entitled to constitutionally adequate procedures to establish the grounds for [their] confinement." *Foucha*, 504 U.S. at 79. Because Defendants do not provide the required protections when issuing bail orders that keep class members detained, Plaintiffs are entitled to summary judgment on Count III.

### a.    Plaintiffs Are Entitled to Constitutionally Adequate Procedures Before Being Deprived of Their Substantive Liberty Interests.

The Procedural Due Process inquiry has two steps: "We first ask whether there exists a liberty or property interest of which a person has been deprived." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (internal citation omitted)). As explained above, Plaintiffs have substantive interests in pretrial liberty and against cash-based detention.[37]

The second step of the procedural-due-process analysis—determining the constitutionally required procedures—proceeds under *Mathews v. Eldridge*, in which a court must balance (1) "the private interest," (2) "the risk of an erroneous deprivation" absent each additional safeguard, and

---

[36] *See, e.g.*, *ODonnell*, 251 F. Supp. 3d; *McNeil v. Cmty. Prob. Servs.*, LLC, No. 18-CV-33, 2019 WL 633012 at *13-15 (M.D. Tenn. Feb. 14, 2019), *aff'd*, 945 F.3d 991 (6th Cir. 2019); *Walker v. City of Calhoun*, No. 15-CV-0170, 2017 WL 2794064, at *3 (N.D. Ga. June 16, 2017), *vacated in part*, 901 F.3d 1245 (11th Cir. 2018); *Edwards v. Cofield*, No. 17-CV-321, 2017 WL 2255775 (M.D. Ala. May 18, 2017); *Martinez v. City of Dodge City*, No. 15-CV-9344, 2016 WL 9051913, at *1 (D. Kan. Apr. 26, 2016); *Rodriguez v. Providence Cmty. Corr.*, *Inc.*, 155 F. Supp. 3d 758, 768-70 (M.D. Tenn. 2015); *Thompson v. Moss Point*, No. 15-CV-182, 2015 WL 10322003, at *1 (S.D. Miss. Nov. 6, 2015); *Jones v. City of Clanton*, No. 15-CV-34, 2015 WL 5387219, at *2 (M.D. Ala. Sept. 14, 2015); *Snow v. Lambert*, No. 15-CV-567, 2015 WL 5071981, at *2 (M.D. La. Aug. 27, 2015); *Cooper v. City of Dothan*, No. 15-CV-432, 2015 WL 10013003, at *1 (M.D. Ala. June 18, 2015); *Pierce v. City of Velda City*, No. 15-CV-570, 2015 WL 10013006, at *1 (E.D. Mo. June 3, 2015); *Valdez-Jimenez*, 460 P.3d at 987.

[37] *See also* Brief of Conference of Chief Justices as Amicus Curiae in Support of Neither Party, *ODonnell*, 892 F.3d 147 (2018) (No. 17-20333), 2017 WL 3536467, at *26-27.

(3) the state's interest in not providing those safeguards. 424 U.S. 319, 335 (1976). The procedures due process requires prior to the deprivation of *any* liberty interest are well established. Most of them apply even in the post-conviction context, where a person's liberty interest is less than it is prior to trial.[38] The balancing of the *Mathews* factors here establishes that Plaintiffs are entitled to the following protections: adequate notice concerning the issues at stake; an inquiry into and findings concerning ability to pay; an adversarial, evidentiary hearing with counsel;[39] consideration of less-restrictive alternatives; and, in the event of a transparent or *de facto* order resulting in detention, findings on the record by clear and convincing evidence explaining why detention is necessary because less restrictive alternatives are inadequate to vindicate the government's compelling interests.

### i. Plaintiffs' private interest is fundamental.

The procedures required by due process derive from the substantial private interest at stake. *Mathews*, 424 U.S. at 335; *see also Goldberg v. Kelly*, 397 U.S. 254, 264 (1970). Plaintiffs' interest in "freedom 'from bodily restraint' lies 'at the core of the liberty protected by the Due Process Clause.'" *Turner*, 564 U.S. at 445 (quoting *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)).[40]

---

[38] In *Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973), the Court explained that before revoking a convicted person's probation, the government must still provide procedures including (a) "notice" of the critical issues to be decided; (b) "disclosure" of the evidence presented by the government; (c) an "opportunity to be heard in person and to present witnesses and documentary evidence"; (d) "the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)"; (e) a "neutral and detached" factfinder; and (f) findings and reasons on the record describing "the evidence relied on." *See also Morrissey v. Brewer*, 408 U.S. 471, 489 (1972) (holding that "the minimum requirements of due process" for parole revocations include the same six procedural protections). The *Mathews* test makes clear that these basic protections are also required here, particularly because the private interest at stake is greater given that an arrested individual is presumed innocent and has not had their liberty interest diminished by a criminal conviction, and because the government's interest in an accurate decision is therefore also heightened.

[39] Plaintiffs do not contest that arrestees receive counsel at pretrial detention hearings.

[40] *Salerno*, 481 U.S. at 750 (noting "fundamental" right to pretrial liberty); *Zadvydas*, 533 U.S. at 690; *Reno*, 507 U.S. at 302 (1993); *ODonnell*, 892 F.3d at 159; *Lopez-Valenzuela*, 770 F.3d at 780.

The fundamental importance of pretrial liberty is beyond debate. Even a few days of pretrial detention can destabilize, if not devastate, people's lives, causing them to lose jobs, housing, or custody of their children. *See, e.g.*, SUMF ¶¶ 191-197. Pretrial liberty is also crucial to realizing the presumption of innocence and the right to prepare for trial.[41] *Rainwater*, 572 F.2d at 1056–57; SUMF ¶¶ 140-141, 194, 186(p) and 192 (citing Ex. 1 (Copp Expert Report) ¶ 56 (finding that felony arrestees who remained detained pretrial in Harris County were more than twice as likely to plead guilty). The first *Mathews* factor thus strongly supports robust procedures to prevent erroneous infringements.

### ii. The risk of erroneous deprivation absent safeguards is high.

The risk of erroneous deprivation of Plaintiffs' liberty interest through the imposition of secured money bail is intolerable absent robust procedural safeguards. *ODonnell*, 251 F. Supp. 3d at 1144. The Supreme Court has long recognized that the private interest in liberty demands the most exacting procedures to ensure that any decision to detain a person is the right one. *Zadvydas*, 533 U.S. at 690-691 ("[W]e have upheld preventive detention based on dangerousness only when limited to specially dangerous individuals and *subject to strong procedural protections*." (emphasis added)); *Morrissey v. Brewer*, 408 U.S. 471, 488-489 (1972) (describing procedural protections required).

> ### 1. When requiring financial conditions, the government must inquire into ability to pay and make on-the-record findings to avoid erroneously detaining people because they are poor.

As a threshold matter, when the government contemplates imposing secured financial conditions, it must provide procedures adequate to determine whether the monetary condition will

---

[41] Pretrial detention in Harris County reduces access to quality legal representation. SUMF ¶ 194 (citing Ex. 27 (Harris County 30(b)(6) at 38:9–11) ("[Pretrial detention] impairs the ability to raise their innocence. It impairs the ability to investigate their cases.")).

operate as a detention order. The Supreme Court, the Fifth Circuit, and this Court have all held that, if the government seeks to condition physical liberty on a monetary payment, due process requires: (1) notice that financial information will be collected; (2) notice of the significance of the financial information; (3) an inquiry into the person's ability to pay; and (4) findings on the record as to whether the person can pay. *See Turner v. Rogers*, 564 U.S. 431, 447 (2011) (before jailing a person for not paying child support, the government must provide notice that ability to pay is a "critical issue," an opportunity to be heard, and "an express finding by the court that the defendant has the ability to pay"); *Bearden*, 461 U.S. at 673 (before revoking probation for nonpayment, state must determine whether the person could afford to pay such that the nonpayment was willful); *United States v. Payan*, 992 F.2d 1387, 1396 (5th Cir. 1993) (the "court must inquire into the reasons" the person did not pay and determine whether she could afford to pay and willfully refused to do so); *ODonnell*, 251 F. Supp. 3d at 1145–46.

The risk of erroneous deprivation without an inquiry into ability to pay is high. Plaintiffs and putative class members have been jailed solely because they are unable to pay a secured money bail amount. *See e.g.*, SUMF ¶¶ 1, 133, 165-169; *see also, e.g.*, 141 n.263 (citing Ex. 120 (M.W. Case Records) (detained for 105 days on $200 secured bond for two state jail felony charges of forgery)). That deprivation is erroneous because secured money bail is no more effective at increasing the likelihood of appearance or law-abiding behavior before trial than release on an unsecured or nonfinancial condition. SUMF ¶¶ 207–214.

If, based on this inquiry or otherwise, the government considers imposing a secured bail amount that the person cannot pay, then further safeguards are required.

2. **When pretrial liberty is at stake, the government must also provide notice, an adversarial hearing with the opportunity to present and confront evidence, and findings on the record.**

The substantive rights to pretrial liberty and against money-based detention require rigorous process to ensure the accuracy of any finding that pretrial detention is necessary and remains the "carefully limited exception." *Salerno*, 481 U.S. at 755. *Salerno* upheld the procedural protections required by the Bail Reform Act but emphasized that an order of detention under the Act was permissible only after a "full-blown adversary hearing," *id.* at 750, "findings of fact" by "clear and convincing evidence," and a "statement of reasons for a decision to detain," *id.* at 752. The *Mathews* test makes clear that due process requires safeguards similar to the provisions the Supreme Court emphasized when it upheld that law.

**Adequate notice of the issues at stake.** "[N]otice is essential to afford the" person whose liberty is at stake "an opportunity to challenge the contemplated action and to understand the nature of what is happening to him." *Vitek v. Jones*, 445 U.S. 480, 496 (1980); *Turner*, 564 U.S. at 447–48 (requiring "notice to the defendant that 'ability to pay' is a critical issue"). The notice must be tailored, "in light of the decision to be made, to the capacities and circumstances of those who are to be heard, to insure that they are given a meaningful opportunity to present their case." *Mathews*, 424 U.S. at 349 (internal quotation omitted). Adequate notice is a prerequisite for an adequate opportunity to be heard. *Wolff v. McDonnell*, 418 U.S. 539, 564 (1974).

**An adversarial, evidentiary hearing.** One requirement of due process is an individualized adversarial hearing where an arrested person can be heard, confront the evidence against them, and present evidence of their own. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews*, 424 U.S. at 333 (quotation marks omitted); *Caliste v. Cantrell*, 329 F. Supp. 3d 296, 312 (E.D. La. 2018) (opportunity to be

heard is essential requirement of due process at hearing where someone faces money-based pretrial detention) (citations omitted). In *Salerno*, the Supreme Court approvingly cited arrested individuals' ability under the Bail Reform Act to confront and present evidence when finding the Act "specifically designed to further the accuracy of th[e] determination" of "the likelihood of future dangerousness." 481 U.S. at 751 ("They may testify in their own behalf, present information by proffer or otherwise, and cross-examine witnesses who appear at the hearing."); *see also Vitek*, 445 U.S. at 495-496 ("minimum procedures" required before transferring an incarcerated person to a mental hospital include a hearing where one can "present documentary evidence" and "testimony of witnesses by the defense and . . . confront and cross-examine witnesses called by the state").

Thus, where a secured financial condition of release may result in pretrial detention, an arrested individual must have an "opportunity to be heard and to present evidence" on their behalf. *ODonnell*, 251 F. Supp. 3d at 1141; *United States v. Arzberger*, 592 F. Supp. 2d 590, 601 (S.D.N.Y. 2008) ("The additional procedural safeguards at issue—the opportunity to present evidence at a bail hearing as to a defendant's individual characteristics and the particular circumstances of the offense—would reduce the risk of erroneous deprivation at little cost.").

**Findings of fact on the record.** An "elementary requirement" of due process is that a decisionmaker "state the reasons for his determination and indicate the evidence he relied on[.]" *Goldberg v. Kelly*, 397 U.S. 254, 271 (1970). *Bearden* held that a court could not revoke someone's probation "absent evidence and findings that the defendant was somehow responsible for the failure or that alternative forms of punishment were inadequate." 461 U.S. at 665; *see also Morrissey*, 408 U.S. at 489 (requiring "statement by the factfinders as to the evidence relied on

and reasons for revoking parole"); *Wolff v. McDonnell*, 418 U.S. 539, 564–65 (1974) (for revocation of good-time credits); *Meza v. Livingston*, 607 F.3d 392, 409 (5th Cir. 2010) (for attaching sex offender conditions to parolee's supervision conditions). In cases like this one, a judge must make findings on the record either that the arrestee has the ability to pay the amount needed for release, or explaining why the government has no alternative to imposing detention.[42] *See ODonnell*, 251 F. Supp. 3d at 1145–46; *Caliste v. Cantrell*, 329 F. Supp. 3d 296, 314 (E.D. La. 2018) (due process required factual findings on the record in pretrial detention hearings), *aff'd on other grounds*, 937 F.3d 525 (5th Cir. 2019).

When pretrial liberty is at stake, each of these procedural safeguards is required to ensure that people are not erroneously detained. *See Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973) (listing the minimum requirements of due process when revoking probation); *Washington*, 494 U.S. at 220 (finding procedures for involuntary administration of medication sufficient because they include "notice, the right to be present at an adversary hearing [presided over by a medical professional], and the right to present and cross-examine witnesses").

### 3. The government must apply the clear and convincing evidence standard to any finding that detention is necessary.

Procedural due process also requires that the substantive finding that detention is necessary be made by clear and convincing evidence. "The function of a standard of proof . . . is [partly] to instruct the factfinder concerning the degree of confidence our society thinks he should have in the

---

[42] Plaintiffs acknowledge this Circuit's prior holding that findings of fact justifying pretrial detention do not have to be *written* to comply with Due Process, and that verbal findings may suffice. *ODonnell*, 892 F.3d at 160 ("We decline to hold that the Constitution requires the County to produce 50,000 written opinions per year to satisfy due process."). However, a written opinion is only required *if someone is detained pretrial*. Indeed, because "liberty is the norm, and detention prior to trial . . . the carefully limited exception," *Salerno*, 481 U.S. at 755 (1987), the actual burden on the Courts is a small fraction of the Court's estimate, tipping the scales convincingly back toward a defendant's interests in the accuracy of any decision to detain. For this reason, Plaintiffs reserve the option of appealing this issue.

correctness of factual conclusions for a particular type of adjudication." *Addington v. Texas*, 441 U.S. 418, 423 (1979) (quotation marks omitted). In addition (and relatedly), "[t]he standard serves . . . to indicate the relative importance attached to the ultimate decision." *Id.*

Given these functions, the Supreme Court has "mandated an intermediate standard of proof—'clear and convincing evidence'—when the individual interests at stake in a state proceeding are both 'particularly important' and 'more substantial than mere loss of money.'" *Santosky v. Kramer*, 455 U.S. 745, 756 (1982). Physical liberty is one such vital interest. As the Supreme Court explained in its seminal procedural-due-process decision in *Addington v. Texas*, 441 U.S. 418 (1979), the deprivation of the fundamental right to bodily liberty requires a heightened standard of proof beyond a mere preponderance to ensure the accuracy of the decision.

In *Addington*, the Supreme Court held that the Due Process Clause required a standard "equal to or greater than . . . clear and convincing" evidence before a person can be confined for mental illness based on the possibility of future dangerousness. *Id.* at 433. Applying *Mathews*, the Court concluded, "the individual's interest in the outcome of a civil commitment proceeding is of such weight and gravity that due process requires the state to justify confinement by proof more substantial than a mere preponderance of the evidence." *Id.* at 427. The Court explained that pretrial detention implicated no less of a private interest than other contexts, such as deportation and denaturalization, in which it had required "clear and convincing" evidence. *Id.* at 424. The "clear and convincing" standard enables the government to achieve its interest when it has a convincing basis but rigorously protects the fundamental individual rights at stake. *See id.*

Since *Addington*, the Supreme Court has never permitted a standard lower than "clear and convincing" evidence in any context in which bodily liberty is at stake. *See Santosky v. Kramer*, 455 U.S. 745, 756 (1982) ("This Court has mandated an intermediate standard of proof—'clear

and convincing evidence'—when the individual interests at stake in a state proceeding are both 'particularly important' and 'more substantial than mere loss of money."); *Cruzan by Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 282–83 (1990) (explaining that the Court has required the clear and convincing evidence standard in deportation proceedings, denaturalization proceedings, civil commitment proceedings, parental rights termination proceedings, civil fraud proceedings, and in a variety of other proceedings implicating important interests).

The same standard should apply to pretrial deprivations of liberty. *Salerno*'s rejection of a facial challenge to the federal Bail Reform Act repeatedly relied on the fact that the statute authorized pretrial detention only if the government proved by clear and convincing evidence that no conditions of release could reasonably assure public safety. *See Kleinbart v. United States*, 604 A.2d 861, 869 (D.C. 1992). *Salerno* referred to the clear and convincing requirement half a dozen times, including in the opening sentence of the opinion. *See* 481 U.S. at 741, 742, 744, 750-751. Although the Court was not asked to decide whether clear and convincing evidence was constitutionally required, *Salerno*'s pervasive references to that standard strongly suggest it is. So does the fact that the Court, in subsequently striking down Louisiana's system for "detention of insanity acquittees who are no longer mentally ill," *Foucha*, 504 U.S. at 81, repeatedly emphasized the clear and convincing standard, *see id.* at 80–81 (citing *Salerno*).[43]

---

[43] Before *Salerno*, some federal courts interpreted the BRA to impose only a preponderance standard when the issue is detention based on flight risk rather than (as in *Salerno*) possible dangerousness. Those courts' reasoning rested on the fact that the Act imposes a clear and convincing standard for dangerousness-based detention while remaining "silent with regard to the burden of proof governing the finding that a person poses a risk of flight." *United States v. Fortna*, 769 F.2d 243, 250 (5th Cir. 1985); *accord United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985); *United States v. Medina*, 775 F.2d 1398, 1402 (11th Cir. 1985). But none of those cases "analyze[d] the constitutional ramifications" of a preponderance standard. *Motamedi*, 767 F.2d at 1412 (Boochever, J., concurring in part and dissenting in part). And as a matter of due process, as later courts have explained, there is no reason that the standard should vary based on why an individual is detained. Whatever the basis, the deprivation of the individual's liberty—which is the rationale for the heightened standard—is the same. *See Kleinbart*, 604 A.2d at 870.

Lower courts, interpreting *Salerno*, have consistently required the same. *Lopez-Valenzuela* stuck down a state pretrial detention statute in part because the statute, unlike the Bail Reform Act, did not require the government to prove by clear and convincing evidence that detention was necessary. 770 F.3d at 784–85. As the Ninth Circuit explained, one of the features that *Salerno* explicitly relied on was that the Act required the government "to prove by 'clear and convincing evidence' that the individual presented 'a demonstrable danger to the community' and that 'no conditions of release c[ould] reasonably assure the safety of the community.'" *Id.* at 785. Most recently, the Supreme Court of California held under the federal Constitution that "[a]n arrestee may not be held in custody pending trial unless the court has made an individualized determination that . . . detention is necessary to protect victim or public safety, or ensure the defendant's appearance, and there is clear and convincing evidence that no less restrictive alternative will reasonably vindicate those interests." *In re Humphrey*, 482 P.3d 1008, 1022 (Cal. 2021); *see also Valdez-Jimenez v. Eighth Judicial District Court*, 460 P.3d 976, 987 (Nev. 2020) (same); *Caliste*, 329 F. Supp. at 313 (same).[44]

The intermediate "clear and convincing" standard applies regardless of whether the government seeks to detain a person pretrial based on a purported risk of danger to the community or a purported risk of flight because the private right at stake is the same. The Supreme Court already held in *Santosky*, *Addington*, and *Foucha* that fundamental private interests require a heightened burden of proof before the government can infringe them, because those interests are

---

[44] Numerous other state courts have held this same standard to apply.  *See, e.g.*, *State v. Ingram*, 165 A.3d 797, 803, 805 (N.J. 2017); *State v. Butler*, No. 2011–K–0879, 2011 WL 12678268 (La. App. 4th Cir. July 28, 2011), *writ not considered*, 75 So. 3d 442 (La. 2011); *Wheeler v. State*, 864 A.2d 1058, 1065 (Md. App. 2005); *Brill v. Gurich*, 965 P.2d 404, 409 (Okla. 1998); *Lynch v. United States*, 557 A.2d 580, 581 (D.C. 1989), *and compare Aime v. Com.*, 611 N.E.2d 204, 212–14 (Mass. 1993) (striking down preventive detention statute because it did not require the "clear and convincing" burden of proof), *with Mendonza v. Com.*, 673 N.E.2d 22, 30 (Mass. 1996) (upholding successor statute and holding that "clear and convincing" evidence standard is required for pretrial detention decisions based on a prediction of future dangerousness).

"particularly important" and "more substantial than mere loss of money." *Santosky*, 455 U.S. at 756. There is no compelling reason that "the degree of confidence our society thinks [it] should have in the correctness of factual conclusions," *id*. at 755, should be *lower* when the question is whether a person poses a risk of flight than when the question is whether the person poses a danger to other people in the community. *See United States v. Motamedi*, 767 F.2d 1403, 1415 (9th Cir. 1985) (Boochever, J., concurring and dissenting in part) (applying *Mathews* and finding that "due process requires that . . . the government must prove the facts supporting a finding of flight risk by clear and convincing evidence").

Although the issue should be uncontroversial in light of *Addington* and *Foucha*, and after balancing the *Mathews* factors, the case law on the proper standard of proof when determining flight risk is surprisingly thin, perhaps because appellate courts have difficulty resolving pretrial detention issues before cases become moot.[45] Only one court appears to have addressed in depth whether the standard of proof the government must satisfy to detain someone due to a concern about flight risk is the same as the standard when the concern is community safety. In *Kleinbart v. United States*, 604 A.2d 861, 868 (D.C. 1992), the D.C. Court of Appeals held that the "clear and convincing" evidence standard should apply to determinations about whether to order pretrial detention based on flight risk. The court explained that "[a] defendant's liberty interest is no less—and thus requires no less protection—when the risk of his or her flight, rather than danger, is the basis for justifying detention without right to bail." *Id.* at 870. The court therefore held: "Although the federal Bail Reform Act could be construed—purely as a matter of statutory construction—to

---

[45] Although several federal cases after *Motamedi* likewise apply a "preponderance" standard to risk of flight determinations, they do so as a matter of *statutory interpretation* under the Bail Reform Act; none of those cases raised, analyzed, or decided the constitutional issue. *See Querubin v. Com.*, 795 N.E.2d 534, 544 (Mass. 2003) (citing federal cases).

require only a preponderance standard in risk of flight cases . . . we believe that *Salerno*'s emphasis on the clear and convincing evidence standard to sustain the constitutionality of that statute as applied to danger necessarily carries over, as a requirement of due process, to risk of flight cases." *Id*. This analysis has been adopted by the American Bar Association's Criminal Justice Standards.[46] Thus, although the constitutional issue of what ultimate standard must apply at a pretrial detention hearing appears to be one of first impression in this Court, the holdings and reasoning in *Addington, Foucha, Santosky, Salerno*, *Lopez-Valenzuela*, *Humphrey,* and *Kleinbart* demonstrate that the deprivation of the fundamental right to bodily liberty requires a heightened standard whether the government is considering alternatives to mitigate a risk of flight or a risk of danger to the community.

### iii.   Additional procedures advance government interests.

The third *Mathews* factor—the government's interests—does not tip the balance against the procedural protections sought here. Even short periods of pretrial detention can lead to job termination, lost housing, separation from children, lapses in medical and mental health care, and pressure to plead guilty, SUMF ¶¶ 186(o)-(p), 191–193, thereby coercing people to relinquish the presumption of innocence and other constitutional trial rights. Both the individual and the government have a strong interest in avoiding these harms, ensuring the accuracy of the pretrial detention determination, and avoiding wrongful convictions and new crimes.

---

[46] *See* ABA Standards for Criminal Justice: Pretrial Release 10-5.8(a) (3d ed. 2007) ("clear and convincing" standard applies to decisions relating to dangerousness and risk of flight). Courts have long looked to the Standards for guidance when answering constitutional questions about the appropriate balance between individual rights and public safety in the criminal system. *See, e.g.*, *Padilla v. Kentucky*, 559 U.S. 356, 367 (2010); *Strickland v. Washington*, 466 U.S. 668, 688-689 (1984). Similarly, the Conference of Chief Justices has emphasized the safeguards upheld in *Salerno*. *See* Brief of Conference of Chief Justices, 2017 WL 3536467, at *26-27.

Defendants' legitimate interest in public safety is not a constitutional basis for detaining people without the required procedural protections. Unnecessary pretrial detention does not advance public safety or any other legitimate government interest. SUMF ¶¶ 207-219. In fact, unnecessary pretrial detention hurts the government's interest in community safety by increasing recidivism and contributing to the harm, violence, and death that occur inside the jail. *See, e.g.*, i*d.*; *see also id.* at ¶¶ 154-162.

Nor will complying with the Constitution require Defendants to release any particular person. The County can still detain any person who poses a danger that cannot be mitigated with less-restrictive conditions of release—so long as a finding that pretrial detention is necessary to serve a compelling government interest has been made and procedures afforded to ensure the accuracy of that determination. As a matter of summary judgment, Plaintiffs prevail on this point.

### b. Harris County Judicial Officers Systematically Fail to Provide the Required Procedural Safeguards Before Imposing Money-Based Pretrial Detention.

Although the procedural safeguards outlined above are required to ensure the accuracy of pretrial detention decisions, Plaintiffs do not receive them before being detained.

At magistration, hearing officers do not inquire into Plaintiffs' ability to pay before requiring financial conditions of release. SUMF ¶ 112. As a result, they do not know whether the bail amounts they set will result in detention; while the financial affidavit for misdemeanor arrestees asks about ability to pay, the financial affidavit for felony arrestees does not. SUMF ¶¶ 96-97. Hearing officers also deny Plaintiffs one of the most cherished procedural protections in our legal tradition: the opportunity to challenge the evidence against them and to present evidence on alternative conditions or the lack of any legitimate need for detention. SUMF ¶ 100. As one former hearing officer explained, "[W]e don't hold full evidentiary hearings." *Id.* Nor do hearing officers make findings on the record concerning arrestees' ability to pay, the availability or

adequacy of alternative conditions of release, or that pretrial detention is necessary despite less-restrictive alternatives. SUMF ¶¶ 97, 103, 109, 112-113. Finally, hearing officers apply no evidentiary standard, let alone the clear and convincing standard required by due process, to any factual findings. SUMF ¶¶ 106, 113.

Without procedural safeguards, people are detained for no other reason than a lack of financial resources. *See, e.g.*, SUMF ¶ 1. A few representative examples illustrate this reality:

- M.C-A. appeared at magistration in June 2020 charged with aggravated robbery. The hearing officer was informed that M. C-A. works and supports his wife and two children, that he had only $100 on hand, that he had transportation to get to court if released, and that he received the lowest possible risk score (1-1) on the PSA, without any "violence flag." Nevertheless, the hearing officer stated that she "[could not] approve a personal bond" and entered an order requiring a $35,000 secured bond in the case. She made no findings and provided no evidence or explanation for why it was necessary to deny a personal bond and impose that money bond amount. M.C-A. remained detained on this bond until, after seven months in jail, his case was dismissed when the state conceded the case could not be proven. SUMF ¶ 109 (citing Ex. 62 (M. C-A Bail Hearing, June 6, 2020)); *see also* Ex. 114 (M. C-A Case Records).

- J.M. appeared at magistration in April 2022 charged with a non-violent property offense for allegedly entering a building to steal pipes and wiring. The hearing officer was told that J.M. was indigent, had never been convicted of a violent offense, and was the primary caretaker for his mother, who was ill at home with Parkinson's. The hearing officer announced he was requiring a $25,000 secured bond. He made no findings and provided no evidence or explanation for why it was necessary to deny a personal bond and impose that money bond amount. The entire proceeding lasted barely three minutes. After six months in the jail, J.M. pleaded guilty to a 180 days in state jail, with credit for the 189 days he had already spent in pretrial detention. SUMF ¶ 113 (citing Ex. 58 (J.M. Bail Hearing, Apr. 22, 2022)); *see also* SUMF ¶ 86 (citing Ex. 103 (J.M. Case Records)).

These procedural shortcomings continue through Plaintiffs' appearance in the district court. Like hearing officers, Felony Judges do not make findings. SUMF ¶ 118 (citing Ex. 16 (Third Wood Decl.) ¶ 9) ("If and when the trial courts review the amount of secured bail, they also do not make any findings, even when they increase the amount of bail."). To the contrary, the Felony Judges routinely revoke bonds set by hearing officers without allegations of any violation of conditions, notice or a hearing. SUMF ¶¶ 123-128; *see also* SUMF ¶ 123 n.228 (citing Ex. 10

(Second Bunin Decl. ¶ 27)) (judges routinely "revoke bonds and detain people who have been released after arrest and who appear in court as required, with no notice or individualized hearing to determine whether detention serves any government purpose."); SUMF ¶ 123 n.228 (citing Ex. 18 (Mayr Decl.) ¶ 25) ("I observed [Judge Franklin's] court almost every day for several months and observed the same *sua sponte* revocations without due process or following the rules of evidence every week in dozens of cases."); *id.* (citing Ex. 18 (Mayr. Decl.) ¶ 28 ("[O]ther Judges revoke and unconstitutionally raise bond in a similar manner as Judge Franklin.")). For instance, H.L. was arrested in November 2021 and charged with third-offender theft (an enhanced misdemeanor) for allegedly stealing two jackets, four hats, and a backpack. SUMF ¶ 147 n.271 (citing Ex. 97 (H.L. Case Records)). A hearing officer released H.L. on a personal bond. *Id.* Court records show that when he appeared in court six days later for his scheduled setting, the Felony Judge assigned to his case revoked his personal bond and remanded him into custody on a $15,000 secured bond. *Id.* There is no evidence that H.L. was given notice of a bail hearing, and his attorney was not appointed until this date, leaving her no time to prepare. There are no findings in the court record justifying his detention. *Id.* A little over three months later, still detained, H.L. pleaded guilty. *Id.*

Most people detained on unaffordable bail will never receive a bail hearing at all, let alone the procedurally adequate one required by *Salerno.* District court "bail reviews" are quick and informal conversations, held off-the-record and without the presentation of evidence or application of any evidentiary standard. SUMF ¶ 127-128; *see also id.* ¶ 118 (citing Ex. 1 ¶ 49 (County data shows only 7 percent of people charged with a felony have a court setting labeled a "bail review")). Evidentiary bail hearings are rare. When they occur at all, they are after weeks or even months of pretrial detention. *Id.* ¶¶ 129-132. Even then, the Judges routinely fail to provide constitutionally

58

adequate protections. *Id.* ¶ 130-131. "Faced with this procedural morass," remarked one defense attorney, "many detained defendants will simply plead guilty or wait for trial." *Id.* ¶ 130 n.242 (citing Ex. 18 (Mayr Decl.) ¶ 37).

In sum, Harris County judicial officials systematically order indigent individuals detained on unaffordable bail without complying with the procedural safeguards required by the Constitution. Plaintiffs are unable to meaningfully challenge the evidence against them or their resulting pretrial detention, which is never explained on the record. Defendants continue to enforce the money bail orders produced by this unconstitutional process. These procedural failings are an additional, independent reason Defendants violate Plaintiffs' due process rights. Plaintiffs are entitled to summary judgment on Count III.

## III.   S.B. 6 DID NOT REDRESS PLAINTIFFS' CLAIMS.

Senate Bill 6 did not eliminate these violations of Plaintiffs' constitutional rights. The changes to felony bail practices in Harris County are important to understanding how the County's practices work now and to ensuring that any relief the Court crafts is appropriately tailored. But the key unconstitutional aspects of the system Plaintiffs challenged in 2019 remain the same. Most importantly, both before and after S.B. 6, Defendants have detained putative class members due to their inability to pay secured bail amounts required for release following proceedings that do not offer an opportunity to present evidence, that do not result in findings of ability to pay or an explanation on the record of why pretrial detention is necessary, and without application of a heightened standard of proof.

S.B. 6 changes none of those core deficiencies. Videos from earlier this year (after S.B. 6 took effect) establish it beyond question. Those videos demonstrate that magistration looks exactly as it did before the law went into effect, with one exception—now, hearing officers impose

unaffordable money bail on an even larger share of people. SUMF ¶¶ 29-35, 65, 138, 186(a); *see, e.g.*, *id.* ¶ 83 (citing Ex. 59 (J.S. Bail Hearing, Aug. 5, 2022) (hearing officer required a $25,000 secured bond at hearing where J.S. was not present; his next court appearance was scheduled for two months later, in October)). These proceedings still routinely last just a few minutes. *See, e.g.*, SUMF ¶ 113 (citing Ex. 48 (A.R. Bail Hearing, May 6, 2022) (under two minutes); Ex. 69 (R.J.M. Bail Hearing, July 29, 2022) (70 seconds)). Hearing officers still rarely if ever make any findings on the record about the arrestee's ability to pay, alternative conditions of release, or the need for pretrial detention, let alone explain on what evidence those findings are based. SUMF ¶¶ 97, 103. And they do not allow arrested individuals to present evidence at all, let alone about alternative conditions of release or the lack of any legitimate need for detention, or to challenge evidence presented against them by the government on the question of bail. SUMF ¶ 34.

The facts show unambiguously that the Sheriff is liable for enforcing unconstitutional bail orders,[47] and that the County is liable because the Felony Judges—who act as policymakers for the felony post-arrest process—have promulgated administrative rules and procedures that violate Plaintiffs' rights and have failed and refused to promulgate alternative rules that would remedy the violations. The County and Sheriff must be enjoined.

---

[47] Sheriff Gonzalez is liable for prospective injunctive relief in his official capacity as a Texas state law-enforcement officer. *See Ex parte Young*, 209 U.S. 123, 157, 28 S. Ct. 441 (1908). Additionally, although currently foreclosed by circuit precedent, Plaintiffs preserve their argument that the Sheriff acts as a municipal policymaker for Harris County because state law not only endows him with the power to act as a final policymaker, but *requires* him not to enforce unconstitutional bail orders. *See ODonnell*, 892 F.3d at 156 (finding municipal liability does not attach to Sheriff, while acknowledging, "State statutes . . . do not authorize the County Sheriff to avoid executing judicial orders imposing secured bail by unilaterally declaring them unconstitutional.").

## CONCLUSION

This Court should grant Plaintiffs summary judgment on all counts. All Defendants are liable for declaratory and injunctive relief, to be crafted following further proceedings.

Date: December 9, 2022                          Respectfully Submitted,

*/s/ Jeremy D. Cutting*
Alec George Karakatsanis (*pro hac vice*)          Neal S. Manne
alec@civilrightscorps.org                          Texas Bar No. 12937980
Elizabeth Rossi (*pro hac vice*)                   nmanne@susmangodfrey.com
elizabeth@civilrightscorps.org                     Joseph S. Grinstein
Jeffrey Stein (Texas Bar No. 24124197)             Texas Bar No. 24002188
jeff@civilrightscorps.org                          jgrinstein@susmangodfrey.com
Kiah Duggins (*pro hac vice*)                      SUSMAN GODFREY L.L.P.
kiah@civilrightscorps.org                          1000 Louisiana Street, Suite 5100
Jeremy D. Cutting (*pro hac vice*)                 Houston, TX 77002
cody@civilrightscorps.org                          Telephone: (713) 651-9366
CIVIL RIGHTS CORPS
1601 Connecticut Ave NW, Suite 800
Washington, DC 20009
Telephone: (202) 681-2721


Dustin Rynders
Texas Bar No. 24048005
dustin@texascivilrightsproject.org
Travis Fife
Texas Bar No. 24126956
travis@texascivilrightsproject.org
Ashley Dorsaneo
Texas Bar No. 24127393
travis@texascivilrightsproject.org
TEXAS CIVIL RIGHTS PROJECT
2100 Travis Street
Houston, TX 77002
Telephone: (512) 474-5073 ext. 118

**CERTIFICATE OF SERVICE**

I certify that on December 9, 2022 a true and correct copy of this document properly was served on counsel of record via electronic filing in accordance with the USDC, Southern District of Texas Procedures for Electronic Filing.

/s/ Jeremy Cutting
Jeremy Cutting