# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| DWIGHT RUSSELL, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 4:19-cv-00226 |
| v. | ) | (Class Action) |
| | ) | The Honorable Lee H. Rosenthal |
| HARRIS COUNTY, TEXAS, et al. | ) | Chief U.S. District Judge |
| | ) | |
| Defendants. | ) | |
| | ) | |

**EXPERT REPORT OF DR. JENNIFER COPP**

1. My name is Jennifer Copp. I have been asked to review data produced in connection with *Russell v. Harris County*.

## I.    BACKGROUND

2. I earned an M.A. in Sociology in 2012 and a Ph.D. in Sociology in 2014 from Bowling Green State University, with areas of concentration in criminology, demography, and quantitative methods.

3. At present, I am an Associate Professor in the College of Criminology and Criminal Justice at Florida State University, a position I have held since 2020. Since 2017, I have also served as Director of the Jail Policy and Research Institute at Florida State University. I was an Assistant Professor at the Florida State University College of Criminology and Criminal Justice from 2015 until 2020.

4. My research primarily focuses on quantitative data analysis related to crime (and other problem behaviors) and the criminal justice system, including at the pretrial stage. I have authored articles, research reports, and chapters examining pretrial assessment instruments, measures to improve victim safety during the pretrial period, alternatives to arrest, the harms associated with jail including the impact of maternal incarceration on child wellbeing, the impact of pretrial interventions—and specifically money bail conditions— on pretrial failure, racial and ethnic bias in pretrial decision making, and the impact of incarceration and of jail visitation on recidivism. I am co-editor of the American Society of Criminology's Handbook on Pretrial Justice. A true copy of my Curriculum Vitae further detailing my educational and professional experience is attached as Appendix A.

1

5. In the past four years, I have provided testimony as an expert witness in *State v. Borroughs*, ID No. 2011011781 (Del. Super. Ct., New Castle Cty.) and *Feltz v. Regalado*, Case No. 18-CV-0298 (N.D. Okla.).

6. I am being compensated for my work in this case at $250 per hour, and my travel-related expenses will be covered.

## II.   MATERIALS REVIEWED & METHODOLOGY

7. In preparing this report, I have reviewed spreadsheets that Plaintiffs' counsel informed me were produced by Harris County and the Harris County Sheriff's Office via the discovery process in this case. A complete list of the spreadsheets and other materials that I have reviewed are identified in Appendix B. The academic studies and articles referenced herein are identified in Appendix C.

8. The data analyzed in preparing this report cover all arrests for one or more felony offenses made between January 1, 2015 and December 31, 2021. Data for 2022 were not available to me at the time of this report. My analysis is ongoing, and may be supplemented at a later date.

9. The final data file used for these analyses was at the arrest level, such that each row of the data represented a unique felony arrest event for a given individual. Because individuals could be charged with multiple offenses during a single arrest, the data were collapsed to focus on a singular charge per arrest.[1] This was accomplished by taking a series of steps. First, the observations were sorted based on SPN and arrest date. Then, for instances where multiple charges were associated with an arrest on the same date, the charge with the most recent disposition date was retained. If multiple charges associated with the same arrest were resolved on the same date, I retained the most serious charge.[2] In instances where multiple charges of the same seriousness were resolved on the same date, I prioritized charges with a disposition. The final dataset included 314,021 observations.

10. In Texas and elsewhere in the United States, a secured bond is a bond that requires an up-front cash payment, either of the full bond amount (known as a "cash bond") or of a non-refundable fee paid to a bonding company (known as a "surety bond"). An unsecured bond, referred to in Texas as a personal bond, does not require an up-front cash payment but instead constitutes a promise by the person accused of a crime to pay a financial amount if they do not appear for court and their bond is forfeited.

---

[1] I use the terms person (or people) and case(s) interchangeably throughout this report to refer to the focal charge per individual/arrest event, as this was the unit of analysis.

[2] Charge seriousness was ranked according to the National Incident-Based Reporting System (NIBRS) categories. After matching the offense codes in the data to the offense codes and associated NIBRS categories provided by the County, I developed a hierarchy (1-26) ranging from "homicide offenses" to "liquor law violations."

## III. SUMMARY OF FINDINGS

11. Based on my extensive analysis of the data provided to me I have reached the following general findings about the Harris County felony bail system.

12. <u>Delays while detained</u>:

    a. Over 80% of people were not able to bond out before magistration, presumably because they could not get the money together in time, if at all. Over 14,000 people were detained for more than 48 hours between arrest and magistration. Over 8,000 people were not present at magistration.

    b. Over two-thirds of people were still detained at their scheduled first appearance. Almost 20% spent five or more days in jail before that scheduled appearance.

    c. Half of the people who remained detained at their first appearance did not have counsel appointed three days after arrest. 44% did not have counsel appointed until after their first appearance.

13. <u>Bail conditions</u>:

    a. 53% of people were released while awaiting trial. 47% of people were detained when their case was disposed.

    b. 69% of people had secured money bail set in their case. Of those required to pay a secured bond to be released, 45% were detained when their case was disposed.

    c. Unsecured bonds were uncommon until the current litigation. From 2015 through 2018, the year before the lawsuit was filed, only 6% of people arrested were released on unsecured bonds.

14. <u>Review of bail</u>:

    a. Once a money bond was set, it typically remained in place until someone paid it or the case was resolved—as opposed to being lowered or converted into a personal bond. Bonds were modified in only 31% of cases.

    b. Since the County began tracking "bail review" settings, the vast majority of people still detained at magistration—93%—did not receive one before their case resolved.

15. <u>Time to disposition and case outcomes</u>:

    a. Time to disposition and case outcomes varied dramatically for people who were released while awaiting trial compared to people who were detained at disposition.

    b. Nearly half of people arrested on felony charges were detained when their case was disposed. If people did not bond out early on in their case, they were unlikely to

3

DocuSign Envelope ID: A0Z5CD1E-755F-46CA-821C-7E9EA2C92EB2

bond out before their case was disposed. People who were detained were more likely to resolve their case at early settings through guilty pleas than those who were released pretrial.

c.   People who remained detained pretrial experienced substantially worse case outcomes than those who were released pretrial: they were more likely to plead guilty (57% vs. 28%), less likely to have their case dismissed (18% vs. 28%), and more likely to receive a custodial sentence (70% vs. 39%).

d.   People released on unsecured bonds were more likely to resolve their cases within a year than people released on secured bonds, suggesting people released on unsecured bonds were not fleeing prosecution.

e.   Most resolved cases did not end in conviction. The majority of cases were disposed when the charges were dismissed or deferred.

16.   <u>Racial and economic disparities in release, and the role of Pretrial Services in the bail process:</u>

a.   The financial burden of the money bail system in Harris County falls most heavily on Black and Hispanic communities, and on low-income people.

b.   Most people interviewed by Pretrial Services were indigent. The median monthly income of interviewed people was $200.

c.   Under the risk assessment tools used by Harris County—both the one used before 2017 and the one used since—indicators of poverty correlated with higher risk scores, higher bond amounts, and higher shares of people detained at disposition.

d.   People who were poor were significantly more likely to be detained while awaiting trial than those who were not poor.

17.   <u>Bond forfeitures, bond revocations, and failures to appear:</u>

a.   According to the County's data, bond forfeitures and bond revocations were both infrequent events, occurring in 14% and 2% of cases, respectively.

b.   Bond forfeiture rates were similar regardless of whether the individual was released on a secured or unsecured bond.

c.   The County's data does not permit robust findings on comparative rates of failures to appear or new criminal activity by bond type.

## IV.  JAIL POPULATION

18.  The average daily population in the Harris County Jail between July 1 and October 31, 2022, exceeded 10,000 people,[3] the highest level it has reached in over ten years.[4]

19.  The County's public jail data shows that, in July 2022:

    a.  The average daily population in the Harris County Jail was 9,986 persons, a two-year-increase of 24% and nearly 2,000 people from July 2020;[5]

    b.  81% of the average daily population—8,082 people—were pretrial detainees who had been accused of an offense but were not convicted or serving a sentence;[6]

    c.  96% of the average daily population of pretrial detainees—7,792 people—were accused of a felony offense;[7]

    d.  7% of the average daily population of pretrial detainees—534 people—were charged only with a "state jail" felony, the lowest level felony offense, many of which are enhanced misdemeanors;[8]

    e.  3% of the average daily population of pretrial detainees—268 people—were charged only with a misdemeanor.[9]

## V.  DELAYS WHILE DETAINED

### **Summary:**

20.  I was asked to calculate the amount of time it took individuals to appear before a Criminal Law Hearing Officer and how long it took them to appear before a Criminal District Court Judge, if they were not released after arrest and prior to those proceedings.

---

[3]  Office of Justice and Safety, *Monthly Average Jail Population*, https://charts.hctx.net/dr00226/App/Monthly (last visited Nov. 6, 2022) (showing a daily average of 10,025 across the four months).

[4]  Office of Justice and Safety, Jail Population History, https://charts.hctx.net/jailpop/App/JailPopHistory (last visited Nov. 6, 2022).

[5]  Harris County Office of Justice and Safety, *July 2022 Jail Population Report* (Aug. 16, 2022), at 6, https://justiceinnovation.harriscountytx.gov/Portals/51/Documents/HCJ%20Population%20Report%20July%202022%20Final.pdf?ver=a9niN3Bw5HGM7nxcz7TL7g%3d%3d (stating that "total inmates housed" increased from 8,026 in July 2020 to 9,986 in July 2022).

[6] *Id.* at 2.

[7] *Id.*

[8] *Id.*

[9] *Id.*

21. The initial bail determination before a hearing officer (or magistrate) is referred to as "magistration" or an "Article 15.17 hearing." The subsequent appearance before a district court judge (or "felony judge") is commonly referred to as a "first appearance."

22. Although the County's data included scheduled court settings, the data was insufficient to determine (1) whether a scheduled court setting actually took place or was rescheduled, or, (2) if the setting did take place, whether an individual was brought into the courtroom.[10]

23. I found that over 80% of people arrested for felonies remained detained at magistration. Although Texas law requires individuals arrested for felonies without a warrant to be magistrated within 48 hours of arrest, over 14,000 people (8%) waited longer than 48 hours before their magistration hearing. Over 8,000 people (9%) were not present at magistration.

24. Further, I found that over two-thirds of people remained detained at their scheduled first appearance.[11] Although the first appearance is supposed to be a next-business-day setting, over 41,000 people (almost 20%) waited in jail for over five days after arrest before they were scheduled to see a judge.

25. Half of the people who remained detained at first appearance still did not have counsel appointed three days after arrest.

---

[10] *See* Transcript, 30(b)(6) Deposition of Christine Baldwin on behalf of Harris County, Apr. 22, 2021, at 29:24-30:7 ("Q. And is it correct that this data is not reliably -- appearance data is not reliably entered into the system, to your knowledge? A. Correct. Q. So where it says, you know, 'N/A,' we don't know – it's impossible to know whether 'N/A' means that the person was there or the person was not there, correct? A. Correct. Q. And even when a person was there, they may not have actually been physically in the courtroom; they might have been kept in the lockup outside of the courtroom, correct? A. Correct.").

[11] Although few studies have focused specifically on the initial period of pretrial detention, there is a general consensus in the literature that pretrial detention contributes to deleterious outcomes across multiple domains, increasing individuals' likelihood of being convicted (primarily through guilty pleas) and receiving custodial sentences, including sentences of longer length (Gupta et al., 2016; Heaton et al., 2017; Stevenson, 2018), and reducing their likelihood of employment and access to social benefit programs (i.e., earned income tax credit) (Dobbie et al., 2018). Scholars have also linked pretrial detention to an increased likelihood of recidivism (see e.g., Dobbie et al., 2018; Leslie & Pope, 2017). Using data from Kentucky, Lowenkamp et al., (2013) found that even short periods of pretrial detention (2-3 days) increased individuals' likelihood of failure to appear and new criminal activity pretrial, and that these effects were particularly pronounced among individuals identified as "low risk." In particular, they found that low risk individuals detained 2-3 days were 40% more likely to commit a new crime while on pretrial release than their equivalent counterparts who were detained for 1 day or less.

**Analysis:**

26. **82% of people arrested for felonies remained detained at magistration.**

    a. The share of people arrested without a warrant[12] who were released prior to magistration has increased over time, but is still less than one-third (29%). This broke down as follows across the observation period:
        i. 2015: 11%
        ii. 2016: 14%
        iii. 2017: 16%
        iv. 2018: 16%
        v. 2019: 17%
        vi. 2020: 25%
        vii. 2021: 29%

    b. It is likely that the increase in the share of cases where people were released was due to changes in the post-arrest system, including a 2017 change to the bail schedule that resulted in lower secured bond amounts and the start of an "early presentment" practice through which hearing officers would issue some personal bonds prior to magistration.[13]

27. **Over 14,000 people waited more than 48 hours in jail before appearing before a hearing officer at magistration.**

    a. Of 172,560 individuals arrested without a warrant who had valid data and were still detained at magistration:
        i. 14,155 of these people (8%) waited longer than 48 hours for magistration.
        ii. 5,288 of these people (3%) waited longer than 72 hours.

28. **Almost one in ten people were not present at magistration.**

    a. Among the 95,109 individuals for whom valid magistration hearing data was available,[14] almost one in ten (9% or 8,229 people) were marked not present.

---

[12] The date and time of magistration is only available in the data for cases filed after July 30, 2018. For cases filed before that date, the timing of magistration was estimated using the date and time that probable cause was established, an estimation that was only possible for warrantless arrests (because in warrant arrests probable cause is established before arrest). Many people did not have valid data. Subsequent analyses requiring the time and date of magistration focus exclusively on observations with valid information.

[13] *See* Dkt. 214-6, Harris County Felony Bail Schedule, Effective 7/29/2017, 8/22/2017; Transcript, Deposition of Chief Hearing Officer Courtney St. Julian as Harris County corporate representative under Rule 30(b)(6) and in her individual capacity, Mar. 25, 2021, at 28:4-15 (describing early presentment process).

[14] The County began tracking this data on July 30, 2018.

DocuSign Envelope ID: A0Z5CD1E-755F-46CA-871C-7E9EA2C92EB2

29. **68% of people were still detained at their scheduled first appearance.**

   a. 68% of people arrested for felonies were still detained at the time of their scheduled first appearance in the district court.

30. **Almost 20% of people still detained at their scheduled first appearance had already spent at least five days in jail at that time.**

   a. Among those still detained at first appearance (214,861 observations):
      i. 91,406 of these people (43%) waited more than 48 hours between arrest and first appearance;
      ii. 50,487 of these people (23%) waited more than 96 hours between arrest and first appearance; and
      iii. 41,083 of these people (19%) waited more than 120 hours between arrest and first appearance.

31. **50% of people detained three days after arrest still did not have counsel appointed.**

   a. Among detained individuals with valid appointment of counsel and first appearance information:[15]
      i. 50% did not have counsel appointed 3 days after arrest;
      ii. 25% did not have counsel appointed 5 days after arrest;
      iii. 10% did not have counsel appointed 17 days after arrest.

   b. 44% of detained individuals did not have counsel appointed until after their first appearance.

## VI. BAIL CONDITIONS

   **Summary:**

32. I was asked to calculate the typical bail conditions imposed at the beginning of a case, the extent to which unsecured bonds are utilized, the types of bonds people are released on, and the types of conditions that keep people detained.

33. 47% of people were detained when their case was disposed. 53% of people were released before their case was resolved, most of them on secured bonds, though the release rates and the proportion of people released on secured versus unsecured bonds varied widely over the years.

34. Prior to magistration, 60% of cases had a secured bond amount set on the complaint. The remaining 40% of cases required detention until magistration.

---

[15] I also excluded all negative values, including warrant arrests where counsel was appointed prior to arrest.

35. Secured bonds were required as a condition of release in about 69% of felony cases. In 45% of cases in which a person was required to make a payment of a secured bond to be released, the person was detained at disposition.[16]

36. Unsecured bonds were uncommon until the current litigation. From 2015 to 2018, before the lawsuit was filed, felony arrestees were released on unsecured bonds in only 6% of cases. That figure rose to 22% of people arrested in 2019, and 28% of people arrested in 2020.

37. Over 85,000 people had a secured bond set in their case and were detained when their case was disposed.

**<u>Analysis:</u>**

38. **47% of people arrested for felonies were detained when their case was disposed. The remaining 53% were released while awaiting trial.**

    a. 47% of those with valid disposition data, or 132,054 people, were detained at disposition.

    b. 53% of those with valid disposition data, or 146,919 people, were released pretrial:
        a. 56% of those released were released on a bail bond (cash or surety).
        b. 23% of those released were released on a personal bond (personal, pretrial, or GOB).[17]

39. **Prior to magistration, 60% of cases had money bail set on the complaint.**

    a. Of all cases with valid entries for the bail set on the complaint (308,859 observations)
        i. 60% had money bail set on the complaint prior to magistration.

---

[16] Research demonstrates that even relatively low bail amounts may inhibit release. In a recent study examining the harms and benefits of bail, fines and fees in the justice system, researchers found that approximately two-fifths of individuals in New Orleans assigned a monetary bail of $500 or less remained in jail until their cases were resolved (Laisne et al., 2017). This is consistent with findings from a Federal Reserve report on the economic well-being of U.S. households, which indicated that nearly two in five U.S. adults would not be able to cover a $400 emergency with cash, savings, or a credit charge that they would pay off at the next statement (Canilang et al., 2020).

[17] Whether an individual was detained at disposition was determined based on the timing of release and disposition, such that individuals whose release either coincided with or followed their disposition date were characterized as detained at disposition. Roughly 21% of those identified as having been released pretrial were released by means other than bail or personal bond, the majority of which (13%) reflected case dispositions. That is, although the release and disposition dates on these cases suggested that they were released pretrial, the reason reported for their release suggests that they were released at the time of their disposition. This evidence suggests that the figure provided for the share of individuals detained until disposition is likely an underestimate.

ii. 40% had an indication to detain until magistration (e.g., "Refer to 15.17," "Refer to magistrate," "888888").

b. These percentages were quite similar regardless of whether the case was filed pursuant to a warrant (102,314 observations)[18] (i.e. where probable cause is found prior to arrest) or without a warrant (206,545 observations):[19]

i. 62% of warrant cases had secured money bond set on the complaint compared to 59% of cases based on warrantless arrests.

ii. 38% of warrant cases had an indication to detain on the complaint compared to 41% of cases based on warrantless arrests.

**40. 69% of people arrested for felonies had secured bonds set in their cases. Only around half made the required bond amount.**

a. Of those with a secured bond set and a valid case complete date, only slightly more than half, about 52% (98,771 people), made bond.[20]

b. 45% (85,665 people) arrested for felonies with secured bonds set in their cases were detained at case disposition.[21]

**41. Unsecured bonds were uncommon until the current litigation.**

a. From 2015 to 2018, 6% of people arrested for felonies ended up being released on unsecured bonds.

b. From January 2019, when the lawsuit was filed, through December 2021, about 26% of people arrested for felonies were released on unsecured bonds.

i. The share of cases in which unsecured bonds were granted increased until early 2020. There was a slight dip at the start of the COVID-19 pandemic in April 2020; however, these numbers quickly recovered. By the end of the period, December 2020, the share of cases in which unsecured bonds were granted was just under one in three. The share of cases in which unsecured bonds were granted remained stable before beginning to decline between

---

[18] 547 observations identified as warrant arrests had null entries on the complaint.

[19] 4,613 observations identified as warrantless arrests had null entries on the complaint.

[20] A small share of people who had a secured bond set were released prior to disposition without paying the secured bond amount. Roughly one in ten of these were released prior to disposition on non-monetary conditions (e.g., unsecured bonds). The remainder were released for reasons, including deferred adjudication, no probable cause found, served time as condition of probation, or were transferred to other facilities (e.g., medical, intermediate sanction, treatment).

[21] Observations were identified as having been detained at disposition if their release date either coincided with or followed their disposition date. However, several of the release reasons listed for observations characterized as having been released prior to case disposition reflect dispositions, suggesting that the reported share who remained detained until case disposition is likely a conservative estimate.

DocuSign Envelope ID: A075CB1E-755F-46SA-871C-7E9EA2C92EB3

April and May 2021. By the end of 2021, unsecured bonds were granted in roughly 23% of cases.



42. **General Order Bonds (GOBs), unsecured bonds issued pursuant to a policy of the Felony Judges beginning in 2020, were infrequently utilized.**

a. During the time General Order Bonds were being issued, between March 20, 2020 and December 31, 2021, 10% of all bonds posted were GOBs. GOBs constituted a smaller proportion of all bonds *set*.[22]
  i. During the time the first General Order was in effect, between March 20, 2020 and April 1, 2020, 19 out of 1,012 bonds filed (2%) were GOBs;
  ii. During the time the Amended General Order was in effect, between April 2, 2020 and December 31, 2021, 11% of all bonds filed were GOBs.

b. People who were released on GOBs were released quickly.
  i. Almost 70% of people who received a GOB during this period were released in under 24 hours. Only 5% were detained longer than 48 hours.
  ii. These data show that people who are released on unsecured bonds are able to access release much more quickly than people ordered released on secured bonds, as evidenced by the significant number of people who are required to pay secured bail whose releases are delayed or never occur. It also shows that GOBs were generally issued soon after arrest or not at all.

---

[22] That number could not be adduced from the available data.

43. **Surety bonds were the most common type of bond for people who were released before trial. The average surety bond paid was nearly $20,000. The average cash bond paid was nearly $6,000.**

    a.  The average cash bond paid was $5,932 and the median was $2,500.
        i.  25% of cash bonds filed were under $1,000; 50% of cash bonds filed were under $2,500; and 75% of cash bonds filed were under $5,000.

    b.  The average surety bond paid was $19,398 and the median was $10,000.
        i.  25% of surety bonds filed were under $5,000; 50% of surety bonds filed were under $10,000; and 75% of surety bonds filed were under $25,000.
       ii.  The data does not allow me to determine what specific financial terms the person negotiated with the private bonding company, for example, a 10% down payment, a lower down payment, payment plan, fees, and/or other terms. Therefore, I cannot know exactly how much money the person paid to secure release through a surety bond.

44. **Among individuals with secured bond set on an open charge, nearly one-third (32%) remained in jail more than 90 days after their arrest.**

    a.  Across charge types, the greatest proportion of people with secured bond set who remain in jail more than 30 days after their arrest were charged with drug offenses (23%) or low-level assault (14%) offenses.

| Share of Individuals with Secured Bond Set who Remained in Jail at 30, 60, and 90 Days Post-Arrest, by Arrest Year | | | |
|---|---|---|---|
| | > 30 Days | > 60 Days | > 90 Days |
| 2015 | 60% | 51% | 43% |
| 2016 | 57% | 47% | 40% |
| 2017 | 52% | 44% | 38% |
| 2018 | 51% | 43% | 38% |
| 2019 | 42% | 35% | 31% |
| 2020 | 31% | 26% | 22% |
| 2021 | 30% | 26% | 23% |

## VII. REVIEW OF BAIL

### Summary:

45. I was asked to examine how, if at all, financial conditions of release are raised or lowered over the course of people's cases.

46. I found that the initial bail set pursuant to the bail schedule typically remained in place until a person made bond or their case was resolved as opposed to being lowered or converted into a personal bond. Bond amounts were modified in only 31% of cases.

47. Since the County began tracking "bail review" settings, the vast majority of people still detained at magistration—93%—did not receive one before their case resolved.[23]

**Analysis:**

48. **Once bond was set, it usually remained at that level until the case was resolved. Overall, bond was modified in 31% of cases.[24]**

    a. Where an initial bond amount was set on the complaint:
      i. In 85% of cases, the amount was not adjusted before the case was resolved.

    b. Where the complaint listed an indication to detain instead of a bond amount:
      i. In 88% of cases, a hearing officer or judge set a secured bond amount before the case was resolved;
      ii. In 12% of cases, a hearing officer or judge did not set a bond.

49. **Since the County began tracking "bail review" settings in April 2020, only 7% of detained felony arrestees had one listed in their court settings.[25]**

    a. Of the 61,218 arrests made between April 20, 2020[26] and December 31, 2021 where the arrestee remained in jail at the time of magistration, 4,407 (7%) had subsequently been set for a "bail review." There was no indication of a "bail review" setting for 93% of detained arrestees.
      i. Additionally, I have reviewed Harris County Chief Public Defender Alex Bunin's April 6, 2020 declaration and understand that these "bail reviews" are informal, off-the-record conversations with the judge that do not involve the presentation of evidence, or on the record findings or explanations.[27]

    b. Among those cases with a notation of a "bail review" setting, the setting was typically scheduled soon after arrest. Nevertheless, 50% of people waited more than 3 days after arrest to be scheduled for a "bail review" setting:

---

[23] This figure represents the share of individuals who remain in jail at the time of magistration and receive a bail review hearing.

[24] A bond adjustment was noted for 79,551 (31%) observations; however, 27 of these observations were either missing the bond amount set on the complaint or the adjusted amount.

[25] An additional 16 observations had a notation for a bail review hearing; however, the arrest that corresponded to that bail review occurred outside of the scope of these data. There were also 202 bail review hearing dates that were scheduled for 2022, and thus it is impossible to determine from these data whether those hearings correspond to arrests that occurred prior to December 31, 2021, or arrests that occurred during 2022.

[26] This date was selected because it was the first date on which bail review hearings were held, according to the data.

[27] *See* Dkt. 66-5 (Declaration of Alex Bunin) ¶ 6 ("[PACA/PIA] is not an opportunity for an adversarial 15.17 hearing").

13

DocuSign Envelope ID: A075CB1F-755F-46CA-871C-7E9FA2C92EB2

    i.   862 (20%) were detained at least 7 days before the scheduled "bail review" setting;

   ii.   637 (14%) were detained at least 14 days;

  iii.   505 (11%) were detained at least 30 days;

  iv.   412 (9%) were detained at least 60 days.

## VIII. TIME TO DISPOSITION AND CASE OUTCOMES

### Summary:

50.   I was asked to examine how long cases take to resolve, what outcomes those cases result in, and how the length of time to disposition and case outcomes correlate with whether someone was detained pretrial.

51.   For the analyses presented in paragraphs 59-71, each of which concerns case dispositions, I limited the sample to cases with valid disposition dates, excluding a total of approximately 11% of cases with arrest dates between 2015 and 2021. Wherever a year is referenced, it refers to the year of arrest. A sizeable share of cases with arrests in 2020 (20%) and 2021 (45%) do not have a valid disposition date. It is possible that the types of cases from 2020 and 2021 that had resolved by the end of 2021 are different from cases that were still pending.

52.   I found that time to disposition and case outcomes varied dramatically for people detained at disposition versus those released prior to disposition.

53.   Nearly half (47%) of people arrested on felony charges were detained at disposition.

54.   If someone did not bond out early on in their case, they were unlikely to bond out before their case was resolved. Among those who had not posted bond within 30 days of arrest, 71% remained detained at disposition.

55.   People who remained detained were considerably more likely to resolve their case at early settings, and more likely to plead guilty when doing so. These findings suggest that the fastest way out of jail for people who cannot afford to pay bail is to plead guilty.

56.   Overall, people who remained detained were nearly twice as likely as their released counterparts to plead guilty (57% vs. 28%), less likely to have their cases dismissed (18% vs. 28%), and more likely to receive a custodial sentence to jail or prison (70% vs. 39%).[28]

---

[28] These findings support what other research shows, which is that people who are released after arrest experience better outcomes in their cases. Specifically, they are less likely to be convicted because they are less likely to plead guilty (*see e.g.*, Dobbie et al., 2018; Gupta et al., 2016; Stevenson, 2018). While these linkages between pretrial detention and case outcomes are well supported in the empirical literature, recent research based on data from Harris County provides further evidence to suggest that reductions to pretrial incarceration contribute to fewer guilty pleas, lower conviction rates, and more lenient custodial sanctions (Heaton et al., 2022).

57. People released on unsecured bonds were more likely to resolve their cases within a year (45% for personal bonds, 42% for GOBs) than people released on surety bonds (35%), suggesting that people released on unsecured bonds were not fleeing prosecution.

58. Most disposed cases did not end in conviction. The majority of disposed cases were dismissed or deferred.

   **Analysis:**

59. **47% of people arrested on felony charges were detained at disposition.**

   a. Among cases with arrest dates from 2015 through 2019, 49% of people were detained at disposition. That figure has dropped over time:
      i. 2015 = 55% of people were detained at disposition
      ii. 2016 = 52% of people were detained at disposition
      iii. 2017 = 51% of people were detained at disposition
      iv. 2018 = 48% of people were detained at disposition
      v. 2019 = 39% of people were detained at disposition

   b. Among cases with arrest dates in 2020 and 2021 that have valid disposition dates, 40% of people were detained at disposition.

60. **People who were detained were considerably more likely to resolve their cases at early settings than were people who were released. When they did, they were significantly more likely to plead guilty.**

   a. 5% of people detained at first setting resolved their cases at first setting (compared to 2% of those released prior to first setting).

   b. 9% of people detained at second setting resolved their cases at second setting (compared to 3% of those released prior to second setting).

   c. 62% of people who resolved their cases at these settings while detained pleaded guilty, while only 51% of released people who resolved their cases at these settings pleaded guilty.

61. **When detained people charged with lower level felonies resolved their cases at early court appearances, they were typically released within two weeks, before they would be likely to have a subsequent setting. This data suggests that the fastest way out of jail for people who cannot afford to pay bail is to plead guilty.**

   a. Of detained people who resolved their case at first or second setting, 15% were released within 1 day, 35% within 7 days, and 48% within 14 days.

15

    b.  Of detained people charged with drug or theft offenses who resolved their cases at first or second setting, 16%, were released within 1 day, 40% within 7 days, and 57% within 14 days.

    c.  Of detained people charged with low-level drug possession or third-offender theft charges, 19%, 49%, and 67% of those who resolved their case at first or second setting were released within 1, 7, and 14 days, respectively.

**62.   49% of people who did not post bond before first appearance were still detained at disposition.**

    a.  Among those who had not posted bond by first setting, 49% were detained at disposition.

    b.  Among those who had not posted bond within 30 days of arrest, over two-thirds (71%) were detained at disposition.

    c.  The numbers were substantively identical regardless of whether disposed cases from 2020 and 2021 were included or excluded from the analysis.

**63.   Between 2015 and 2019, the average length of time from arrest to disposition was 366 days (median of 200 days).**

    a.  The types of cases that resolved in the shortest amount of time (considering all people, whether released or arrested at disposition) included:
        i.  motor vehicle theft (mean = 248 days)
       ii.  larceny/theft offenses (mean = 264 days)
     iii.  bribery (mean = 274 days)
     iv.  destruction/damage/vandalism (mean = 283 days)

    b.  The types of cases that resolved in the longest amount of time included:
        i.  homicide (mean = 668 days)
       ii.  animal cruelty (mean = 634 days)
     iii.  human trafficking (mean = 613 days)
     iv.  sex offenses (forcible) (mean = 552 days)

    c.  For resolved cases from 2020, the average length of time from arrest to disposition was 308 days. However, 20% of those cases were unresolved in the data. I would expect that average to increase substantially once those cases are resolved. I cannot yet draw meaningful conclusions about average length of time from arrest to disposition in 2021 cases, where 45% were unresolved in the data.

DocuSign Envelope ID: A075CB1F-755F-466A-871C-7E9FA2C92FB3

64.  **For people detained at disposition, cases resolved more quickly—between 2015 and 2019, the average time from arrest to disposition was 137 days (median of 68 days).**

    a.  Among cases in which the individual was arrested between 2015 and 2019 and was detained at disposition:
        i.  30,350 (30%) resolved within 30 days
        ii.  47,414 (47%) resolved within 60 days
        iii.  59,199 (58%) resolved within 90 days
        iv.  78,841 (78%) resolved within 180 days
        v.  91,744 (91%) resolved within 365 days

    b.  These figures are similar for resolved 2020 cases, though 20% of these cases were still unresolved in the data. I cannot yet draw meaningful conclusions about the 2021 cases, where 45% were unresolved in the data.

65.  **For people who were released pretrial, cases resolved more slowly— between 2015 and 2019, the average time from arrest to disposition was 550 days (median of 422 days).**

    a.  Among cases in which the individual was arrested between 2015 and 2019 and was released prior to disposition:
        i.  2,969 (3%) resolved within 30 days
        ii.  6,432 (6%) resolved within 60 days
        iii.  10,790 (10%) resolved within 90 days
        iv.  25,521 (23%) resolved within 180 days
        v.  49,715 (45%) resolved within 365 days

    b.  These figures are similar for resolved 2020 cases, though 20% of these cases were still unresolved in the data. I cannot yet draw meaningful conclusions about the 2021 cases, where 45% were unresolved in the data.

66.  **Between 2015 and 2019, people who remained detained resolved their cases more than three times as fast, on average, than people who were released before trial.**

    a.  A bulk of empirical findings suggest that pretrial detention increases the likelihood of conviction, and that this increased likelihood of conviction is driven by the greater probability that detained (as compared to released) individuals will plead guilty (Dobbie et al., 2018; Gupta et al., 2016; Stevenson, 2018). Research focused specifically on the timing of guilty pleas finds that people detained pretrial plead faster than those who are released (Petersen, 2020). The findings indicate that pretrial detainees are more likely to plead guilty, and to do so earlier on in their cases, than released defendants. From this we can conclude that pretrial detention is a powerful tool that weakens an individual's position in plea bargaining negotiations and places pressure on them to plead guilty.

67. **People who remained detained were considerably more likely to plead guilty and more likely to receive a custodial sentence. Their counterparts who were released were much more likely to have their cases dismissed.**

   a. I analyzed the share of individuals who received various dispositions and sentences, including guilty plea, dismissal, deferred adjudication, acquittal, probation, jail, and prison by detention status at disposition (i.e., released versus detained).

   b. Over twice as many individuals detained at disposition pleaded guilty (57% of detained cases vs. 28% of released cases).

   c. Conversely, a smaller share of individuals detained at disposition had their cases dismissed (18% of detained cases vs. 28% of released cases).

   d. A significantly greater share of individuals detained at disposition received a custodial sentence to jail or prison (70% of detained cases vs. 39% of released cases).

| Case Dispositions, by Detention Status at Disposition | | |
|---|---|---|
| | Released | Detained |
| Guilty plea | 28% | 57% |
| Dismissal | 32% | 18% |
| Deferred adjudication | 38% | 13% |
| Acquittal | < 1% | < 1% |

| Sentences, by Detention Status at Disposition | | |
|---|---|---|
| | Released | Detained |
| Probation[29] | 5% | 3% |
| Custodial Sentence | 39% | 70% |
| Harris County Jail | (16%) | (25%) |
| State Jail | (8%) | (17%) |
| Prison | (15%) | (28%) |

   e. These figures are substantively identical when the analysis is limited to the 2015-2019 time period.

68. **People released on unsecured bonds were more likely to resolve their cases within a year than people released on secured bonds.**

   a. Focusing on cases with a 2020 arrest date, I found that the share of cases that were resolved within 1 year was similar across the different bond categories. 45% of cases released on personal bonds were resolved within one year; 42% of cases released on GOBs were resolved within a year; and 35% of cases released on surety bonds were resolved within a year.

---

[29] Some individuals are listed in the data as having been sentenced to probation and a custodial sentence.

b. These findings remained true for specific categories of offenses:

   i. Assault: 41% of people released on personal bonds resolved their cases within one year, compared to 34% of people released on surety bonds.
   
   ii. Drug offenses: 49% of people released on personal bonds resolved their cases within one year, compared to 46% of people released on surety bonds.
   
   iii. Larceny: 50% of people released on personal bonds resolved their cases in one year, compared to 40% of people released on surety bonds.

c. These data show that people who were released on unsecured bonds were not more likely to flee prosecution. In fact, a greater share of people/cases released on unsecured bonds resolved their cases in less time as compared to people/cases released on surety bonds.

69. **Less than 40% of people arrested from 2019 through 2021 had their cases resolved by conviction.**

   a. 38% of people arrested on felony charges in 2019 were convicted. In contrast, 60% avoided a conviction either because their charges were dismissed (30%), deferred (30%), or acquitted (<1%).

   b. 36% of people arrested on felony charges in 2020 were convicted. In contrast, 62% avoided a conviction either because their charges were dismissed (35%), deferred (27%), or acquitted (<1%).

   c. 38% of people arrested on felony charges in 2021 were convicted. In contrast, 60% avoided a conviction either because their charges were dismissed (32%), deferred (28%), or acquitted (<1%).

70. **Across the entire observation period, most disposed cases did not end in conviction. The share of disposed felony cases ending in conviction has decreased over time, while the share of dismissed cases has increased.**

   a. A significant proportion of cases resulting from arrests in 2020 (20%) and 2021 (45%) did not have a valid disposition date and were presumably still pending.

| Share of Disposed Cases Resulting in Convictions and Dismissals, by Arrest Year | | |
|---|---|---|
| | Convictions | Dismissals |
| 2015 | 49% | 15% |
| 2016 | 46% | 20% |
| 2017 | 43% | 24% |
| 2018 | 41% | 26% |
| 2019 | 38% | 30% |
| 2020 | 36% | 35% |
| 2021 | 38% | 32% |

DocuSign Envelope ID: A075CB1F-755F-466A-871C-7E9FA2C92FB2

71. **Of all arrestees who pleaded guilty while detained, nearly one-half were released within two weeks and over three-quarters were released within a month.**

   a. Among those detained at disposition:
      i. 20% were released within 1 day of disposition
      ii. 21% within 2 days
      iii. 22% within 5 days
      iv. 33% within 7 days
      v. 40% within 10 days
      vi. 47% within 14 days
      vii. 76% within 30 days

   b. The numbers were substantially the same regardless of whether disposed cases from 2020 and 2021 were included or excluded from the analysis.

## IX. RACIAL AND ECONOMIC DISPARITIES IN RELEASE, AND THE ROLE OF PRETRIAL SERVICES IN THE BAIL PROCESS

<u>**Summary:**</u>

72. I was asked to examine racial and economic disparities in release, and to examine the role of Harris County Pretrial Services in the bail process, including how the risk assessment tools used to make bail recommendations affect who is released pretrial and who is detained.

73. I found that the financial burden of the money bail system in Harris County falls most heavily on Black and Hispanic communities, and on low-income people.

74. I found that most people interviewed by Pretrial Services were indigent; interviewees reported a median monthly income of $200.

75. Under the risk assessment tool used in Harris County through 2017, people with demographic characteristics that are associated in academic literature with poverty were more likely to be characterized as higher "risk," more likely to be recommended for pretrial detention, and more likely to remain in jail on an unaffordable secured bond. This suggests that the risk assessment tool used in Harris County through 2017 was biased against people experiencing poverty, overestimating their risk and causing more people to be detained simply because they could not afford money bail.

76. Under the risk assessment tool used in Harris County since 2017, people with higher scores reported lower monthly incomes, received higher secured bond amounts, and were more likely to be detained when their case was disposed.

77. I also found that people experiencing homelessness were significantly more likely to be detained at the time of disposition as compared to those not identified as homeless.

78.   Together, these findings demonstrate—consistent with the literature[30]—that people who were poor were significantly more likely to be detained before trial than those who were not.

**Analysis:**

79.   **The largest contributors to the total number of surety bonds paid across the period included many of the poorest neighborhoods of Harris County.**

a.   Zip code data was provided for 94% of the sample. After excluding erroneous entries, I focused on the remaining 3,249 zip codes, with observations ranging from 1 to 18,736. I sorted these zip codes based on the number of surety bonds paid.

b.   I found that people with addresses in 10 zip codes accounted for roughly 17% of all surety bonds.[31] Further investigation of these top 10 zip codes revealed that this group included some of the poorest parts of Harris County and the surrounding areas. In Harris County, approximately 16% of people live below the poverty line. Yet in the 10 zip codes with the most surety bonds paid, an average of 21% of people live below the poverty line, including three zip codes in which over 30% of families live below the poverty guideline.[32] Furthermore, whereas the percent non-Hispanic white ranged from 1 to 24% across these zip codes, Black and Hispanic or Latino individuals comprised between 60 and 97% of the population. This is relative to the racial and ethnic demographics of Harris County, where the population is 28% non-Hispanic white, 20% non-Hispanic Black, and 44% Hispanic or Latino.

c.   This analysis suggests that the County's money-based bail system effectuates a massive transfer of wealth from the poorest communities in Harris County, including especially Black and Hispanic communities, to private bonding companies. These findings align with empirical research demonstrating that Black and Hispanic individuals are less likely to be released via non-financial means, more likely to be detained pretrial (due to inability to pay the required secured bail amount), and are more likely to be required to pay higher secured bail amounts than similarly situated white people (Demuth, 2003; Schlesinger, 2005).

---

[30] Using data from the Bureau of Justice Statistics' State Court Processing Statistics, Reaves (2013) found that roughly 90% of detained individuals had been assigned a monetary bail amount that they could not afford. Moreover, scholars have demonstrated that differences in individuals' relative ability to post bail largely explain racial differences in the likelihood of pretrial detention (Demuth & Steffensmeier, 2004). Indeed, there is broad scholarly consensus that pretrial detention results overwhelmingly, from individuals' inability to pay bail and that the money bail system inflicts greater harms on low-income individuals (*see e.g.*, Dobbie, Goldin, & Yang, 2018; Liu, Nunn, & Shambaugh, 2018; Stevenson, 2018; Menefee, 2018).

[31] The top 10 zip codes, based on the overall number of surety bonds paid, included 77088, 77016, 77449, 77033, 77090, 77084, 77021, 77026, 77015, and 77093.

[32] The average share of families living below the poverty level across this group was 21.2%, according to five-year estimates from the American Community Survey (2016-2020). In three of these counties (77033, 77026, and 77093), the share below the poverty line exceeded 30%.

DocuSign Envelope ID: A075CD1E-755F-466A-871C-7E9FA2C92EB2

80. **Most people interviewed by Pretrial Services were indigent. The median monthly income of people interviewed was $200.**

   a. I reviewed the financial information collected by Harris County Pretrial Services. There are 126,301 interviews listed between January 2015 and September 2020. However, most of the fields contained in the financial interview data are blank. The most consistently reported information is total monthly income. These data show that the lowest earning 25% of individuals report no monthly income, while the top earning 25% report monthly incomes of $1,600 or more. The median monthly income is just $200.

81. **Under the risk assessment tool used in Harris County through 2017, people with demographic characteristics that are consistent with poverty were more likely to be characterized as greater risk—and more likely to be detained on secured bond or recommended for detention—than people without such characteristics or with fewer of them.**

   a. In July 2017, pretrial services switched from an interview-based risk assessment tool to Arnold Ventures' Public Safety Assessment (PSA). There is a vigorous and ongoing debate about the accuracy of pretrial risk assessment tools and whether they are exacerbating racial disparities in pretrial decisions (*see e.g.*, Barbaras et al., 2019; Copp & Casey, 2021; Desmarais et al., 2021; Koepke & Robinson, 2018). However, there is broad consensus that the use of demographic or socioeconomic indicators in algorithmic tools is discriminatory and likely to contribute to disparities (*e.g.*, Starr, 2015; Mayson, 2019).

   b. Notably, Harris County previously used an interview-based tool that included a number of background factors (e.g., education, employment status, car ownership, reside with someone other than spouse/children) that are correlated in the literature with—if not direct indicators of—socioeconomic disadvantage. Accordingly, people who are characterized as greater risk based on points contributed by these background factors are, on average, more socioeconomically disadvantaged than their counterparts with fewer background factor points.

   c. When a person scored a sufficiently high score on the interview-based risk tool, the County would recommend "detain." However, because of the limited circumstances under which the Texas Constitution allows for explicit pretrial detention, Hearing Officers followed through on the detention recommendation by imposing a high secured bond instead.

   d. To demonstrate the correlation between the background factors included in the old interview-based assessment and pretrial detention, I first created a variable that summed the background factors indicative of poverty, including whether the individual had less than a high school degree or GED, was unemployed and not attending school full time, lived with someone other than a spouse or children, and

22

DocuSign Envelope ID: A075CB1F-755F-466A-871C-7E9FA2C92EB2

did not own an automobile. This variable ranged from 0-4, such that individuals with none of the background factors received a 0 and those with all of the background factors received a 4. Then, focusing on the subset of individuals who received a pretrial recommendation of "detain," I examined the share of individuals who posted a secured bond across the poverty scores.

82. **I found that, when the County's tool recommended to "detain" someone (and a high bond was in all likelihood imposed), people with more poverty factors were less likely to be released (by paying the bond) than were those with fewer poverty factors. More specifically, roughly half of individuals with no poverty factors paid the secured bond whereas less than a quarter of those with all four of the poverty factors paid the secured bond.**

|  | Secured Bond Paid | |
| --- | --- | --- |
| Sum of "Poverty" Factors | No | Yes |
| 0 | 51% | 49% |
| 1 | 58% | 42% |
| 2 | 64% | 36% |
| 3 | 73% | 27% |
| 4 | 76% | 24% |

83. **I also compared how large a share of people the County recommended detaining had each of the different poverty factors, and compared it to the corresponding share of people the County did not recommend be detained. I found that each of the poverty factors was disproportionately represented among the group of people recommended detained as compared to those not recommended detained.**

| Share Recommended Detained across the Poverty Factors Included in the Risk Assessment Tool Used Prior to July 2017 | | |
| --- | --- | --- |
| "Poverty" Factors | Recommended Detained | Not Recommended Detained |
| Does not have high school diploma or GED | 61% | 42% |
| Lives with someone other than spouse/children | 71% | 58% |
| Does not own an automobile | 74% | 54% |
| Is not employed or attending school full time | 59% | 44% |

84. **I further broke this finding down by offense category. I found that even within specific offense categories, the share of individuals recommended detained was greater among those with more poverty factors.**

   a. I focused on offenses that constituted 3% or more of the sample, among observations with valid assessment data. These included: 1) assault, 2) burglary/breaking and entering, 3) driving under the influence, 4) drug/narcotic offenses, 5) larceny/theft offenses, 6) motor vehicle theft, 7) robbery, and 8) weapon law violations.

b. For example, 7% of individuals charged with assault with 0 poverty factors were recommended detain, whereas 23% of those facing the same charge with 4 poverty factors were recommended detain. Similarly, 7% of people charged with a drug/narcotic offense with 0 poverty factors were recommended detained as compared to 25% of those charged with a drug/narcotic offense with 4 poverty factors. These patterns looked similar across the offenses examined, with the share recommended detain increasing in a monotonic fashion across the poverty levels.

85. **Under the Public Safety Assessment (PSA) risk tool used in Harris County since 2017, people who scored higher on the PSA reported lower monthly incomes.**

a. The average monthly income for someone with a failure to appear (FTA) scale score of 1 was $1,823 (median $1,100), while the average monthly income for someone with an FTA scale score of 6 was $1,156 (median $300).

b. The average monthly income for someone with a new criminal activity (NCA) scale score of 1 was $2,393 (median $1,600) and the average monthly income for someone with an NCA scale score of 6 was $1,292 (median $400).

86. **People who scored higher on the PSA received higher secured bond amounts and were more likely to remain detained at disposition.**

a. As scores on the PSA's criminal activity scale (NCA) and failure to appear scale (FTA) increased, the share of individuals who were detained until case disposition increased as well. For example, 16% and 15% of those with NCA and FTA scale scores of 1, respectively, were detained at disposition, compared to 55% and 57% of those with NCA and FTA scale scores of 6.

b. This finding makes sense given the County's bail schedule, which assigned high secured bail amounts to people with higher "risk" scores,[33] and given that the research generally and in Harris County shows that the higher the bond amount, the less likely a person is to be released prior to disposition.

| NCA Scale Score | Average Bond Amount Set | % Released Prior to Disposition | % Detained at Disposition |
|---|---|---|---|
| 1 | $19,408.73 | 84% | 16% |
| 2 | $20,488.64 | 87% | 13% |
| 3 | $20,925.67 | 72% | 28% |
| 4 | $25,470.05 | 61% | 39% |
| 5 | $29,587.31 | 54% | 46% |
| 6 | $35,166.35 | 45% | 55% |

---

[33] Dkt. 214-6, Harris County Felony Bail Schedule, Effective 7/29/2017; 8/22/2017.

| FTA Scale Score | Average Bond Amount Set | % Released Prior to Disposition | % Detained at Disposition |
|---|---|---|---|
| 1 | $20,360.78 | 85% | 15% |
| 2 | $22,321.11 | 69% | 31% |
| 3 | $26,874.40 | 62% | 38% |
| 4 | $27,954.14 | 57% | 43% |
| 5 | $28,350.56 | 47% | 53% |
| 6 | $34,158.68 | 43% | 57% |



**87. As people received higher scores on the County's risk tools, it was more likely that they would be required to pay secured bail to be released, and therefore more likely that they would remain detained if they were poor.**

a. For example, under the interview-based risk assessment tool used through July 2017, 65% of those assessed as "low" risk were released on secured bonds, 11% were released on unsecured bonds, and 16% remained detained until the disposition of their case. Among those assessed as "high" risk, 29% were released on secured bond, 2% on unsecured bond, and 61% remained detained.

b. The same patterns are present under the County's PSA tool; however, the differences in the share issued personal versus surety bonds have decreased slightly. In particular, 48% of those assessed a score of 1 (based on the highest score received on either the FTA or NCA scale) were released on a bail bond, while 36% were released on a personal bond. An additional 11% remained detained until the disposition of their case. Among people who scored the highest level on the PSA, 34% were released on a bail bond and 13% were released on a personal bond, while 44% remained detained until their case was disposed.

25

88. **People identified as homeless were significantly more likely to be detained when their cases were disposed.**

   a. Using the address information provided in the data, I compared the outcomes of individuals listed as "homeless" to their counterparts. I found that 64% of homeless individuals were in jail at the time of disposition as compared to 36% of those not identified as homeless. That means the detention rate for people who are homeless is more than 75% higher than for people who are not homeless.

   b. These disparities persist when focusing on subsets of the larger sample based on their risk scores or current charges. For example, among those identified as "high risk" of new criminal activity (NCA scale scores of 5 and 6), 65% of homeless individuals as compared to 48% of non-homeless individuals remained detained at disposition. Similarly, among those as identified as "high risk" of failure to appear (FTA scale scores of 5 and 6), 65% of homeless individuals as compared to 52% of non-homeless individuals remained detained at disposition. Even focusing on those charged with the same offenses (larceny/theft or drug/narcotic offenses), 61% of homeless individuals as compared to 46% of non-homeless individuals were detained until their cases were disposed.

## X.   BOND FORFEITURES, BOND REVOCATIONS, AND FAILURES TO APPEAR

   **Summary:**

89. I was asked to examine trends in bond revocations, bond forfeitures, and failures to appear.

90. I found that, according to the County's data, bond forfeitures and bond revocations were both infrequent events, occurring in 14% and 2% of cases, respectively.

91. Bond forfeiture rates were similar regardless of whether the individual was released on a secured or unsecured bond.

92. The County's data does not permit robust findings on comparative rates of failures to appear or new criminal activity by bond type because the County, judges, and other local officials do not track that information.

   **Analysis:**

93. **Bond forfeitures and revocations were infrequent events.**

   a. According to the bond forfeiture data, 14% of people (44,537 observations) had a bond forfeited at some point during their case.

   b. According to the bond revocation data, 2% of people (6,557 observations) had a bond revoked during this period.

26

94. **The County's data does not permit robust findings on comparative rates of failures to appear or new criminal activity by bond type because it does not track that information.**

   a. Although Harris County tracks "bond revocations" and "bond forfeitures," these events are not one-to-one proxies for failures to appear or new criminal activity.
      i. A recorded bond revocation does not specify whether it was caused by a failure to appear, a new arrest, or some other reason, like a failed drug test. Similarly, a judge's decision to forfeit a bond is inherently discretionary based on a number of circumstances related to whether the person's absence is excusable. A single failure to appear does not necessarily result in a forfeiture of bond. Conversely, because some people are released on more than one bond, a single failure to appear may result in multiple forfeitures.
      ii. Additionally, the County has stated that they do not reliably track failures to appear.[34] Thus, there is no way to know whether—and how closely— bond forfeiture rates align with actual failure to appear rates.

95. **Bond forfeiture rates were similar regardless of bond type.**

   a. 20% of people released on personal bonds, 20% of people released on General Order bonds, and 19% of people released on surety bonds had their bond forfeited.

96. **Bond forfeiture rates appeared to vary widely by judge.**

   a. I reviewed the bond forfeiture data for each judge. Because cases are randomly assigned to courtrooms, I would expect the forfeiture rate to be similar across courtrooms.

   b. I found the numbers of forfeitures varied dramatically among the various judges, even among judges who had been on the bench for similar amounts of time.
      i. For example, despite both taking the bench on January 1, 2017, Judge Robert Johnson recorded 2,344 forfeitures between 2017 and 2021, while Judge Hazel Jones recorded 1,599 forfeitures during the same period of time, nearly one-third fewer.
      ii. Similarly, Judge Chuck Silverman and Judge Danilo Lacayo both took the bench on January 1, 2019. Judge Silverman recorded 1,221 forfeitures between 2019 and 2021, while Judge Lacayo recorded about half as many, 668.

   c. One possible explanation for the differences in forfeitures is that judges have different practices for setting court dates or use different standards in making the discretionary decision of when bond forfeiture is appropriate.

---

[34] *See* Transcript, Rule 30(b)(6) Deposition of Harris County, Christine Baldwin as corporate representative, Apr. 22, 2021, at 29:24-30:7 ("Q. And is it correct that this data is not reliably -- appearance data is not reliably entered into the system, to your knowledge? A. Correct.").

I declare under penalty of perjury that the foregoing is true and correct to the best of my ability.

_Jennifer Copp_
308B0AD14A234F6...

11/17/2022

Jennifer Copp, Ph.D.                                     Date

# Appendix A: Jennifer Copp Curriculum Vitae

# JENNIFER E. COPP

College of Criminology and Criminal Justice
Florida State University
112 S. Copeland St.
Tallahassee, FL 32306
jcopp@fsu.edu

## EDUCATION

| | |
|---|---|
| 2012-2014 | Ph.D., Sociology<br>Bowling Green State University, Bowling Green, OH<br>Areas of Concentration: Criminology, Demography, and Quantitative Methods |
| 2010-2012 | M.A., Sociology<br>Bowling Green State University, Bowling Green, OH |
| 2008-2009 | M.A., Gender Studies<br>The University of Cadiz, Cadiz, Spain |
| 2004-2007 | B.A., International Relations and Spanish<br>The Ohio State University, Columbus, OH |

## ACADEMIC POSITIONS

| | |
|---|---|
| 2020-present | Associate Professor, College of Criminology and Criminal Justice, Florida State University |
| 2017-present | Director, Jail Policy and Research Institute, Florida State University |
| 2015-present | Assistant Professor, College of Criminology and Criminal Justice, Florida State University |
| 2014-2015 | NIJ Postdoctoral Fellow, Department of Sociology, Bowling Green State University |
| 2013-2014 | Data Manager, Toledo Adolescent Relationships Study (TARS), Bowling Green State University |
| 2010-2013 | Graduate Research Assistant, Department of Sociology, Bowling Green State University |

## RESEARCH INTERESTS

pretrial justice; social influences on crime (and other problem behaviors); social inequality; intimate partner violence; adolescence and young adulthood; quantitative and qualitative methods

## PUBLICATIONS

### *Books*

2021    Scott-Hayward, Christine, **Jennifer E. Copp,** & Stephen Demuth (eds.). *Handbook of Corrections and Sentencing: Pretrial Justice*. New York: Routledge.

### *Refereed Articles*

In Press

> Mumford, Elizabeth A., **Jennifer E. Copp**, & Kai MacLean. "Childhood Adversity, Emotional Well-Being, Loneliness and Optimism: A National Study." *Adversity & Resilience Science.*

> Dismuke, Raven C., **Jennifer E. Copp**, & Jennifer M. Brown. "An Examination of Racial and Ethnic Variation in the Effect of Prison Visitation on Recidivism." *Crime & Delinquency.*

> Mumford, Elizabeth A., Wei Wei Liu, **Jennifer E. Copp**, Bruce Taylor, Kai MacLean, & Peggy C. Giordano. "Relationship Dynamics and Abusive Interactions in a National Sample of Youth and Young Adults." *Journal of Interpersonal Violence.*

2022    **Copp, Jennifer E.,** William Casey, Thomas G. Blomberg, & George Pesta. "Pretrial Risk Assessment Instruments (PRAIs) in Practice: The Role of Judicial Discretion in Pretrial Reform. *Criminology & Public Policy.*

2021    **Copp, Jennifer E.,** Elizabeth A. Mumford, & Bruce G. Taylor. "Online Sexual Harassment and Cyberbullying in a Nationally Representative Sample of Teens: Prevalence, Predictors, and Consequences." *Journal of Adolescence, 93,* 202-211.

2021    **Copp, Jennifer E.**, Elizabeth I. Johnson, Anneliese C. Bolland, & John Bolland. "Household Member Arrest and Adolescent Externalizing Behaviors: The Roles of Family and Peer Climates." *Children and Youth Services Review, 129,* 1-10.

2021    Vazquez, David, Eva Aizpurua, **Jennifer E. Copp**, and Jorge J. Ricarte. "Perceptions of Violence against Women in Europe: Assessing Individual and Country-Level Factors." *European Journal of Criminology, 18*(4) 566-584.

2021    Giordano, Peggy, **Jennifer E. Copp**, Wendy D. Manning, & Monica A. Longmore. "Relationship Dynamics Associated with Dating Violence Among Adolescents and Young Adults: A Feminist Post-Structural Analysis." *Feminist Criminology, 16*(3), 320-336.

2021    Casey, William, **Jennifer E. Copp**, & William D. Bales. "Releases from a Local Jail: The Impact of Visitation on Recidivism." *Criminal Justice Policy Review, 32*(4), 427-441.

2021    Aizpurua, Eva, **Jennifer E. Copp**, Jorge J. Ricarte, and David Vazquez. "Controlling

Behaviors and Intimate Partner Violence among Women in Spain: An Examination of Individual, Partner, and Relationship Risk Factors for Severe Physical and Psychological Abuse." *Journal of Interpersonal Violence, 36*(1-2), 231-254.

2020   Johnson, Elizabeth, **Jennifer E. Copp**, Anneliese Bolland, & John Bolland. "Substance Use Profiles among Urban Adolescents: The Role of Family-Based Adversities." *Journal of Child and Family Studies, 29,* 2104-2106.

2020   **Copp, Jennifer E.,** Peggy C. Giordano, Monica A. Longmore, & Wendy D. Manning. "Desistance from Crime during the Transition to Adulthood: The Influence of Parents, Peers, and Shifts in Identity." *Journal of Research in Crime and Delinquency, 57*(3), 294-332.

2020   Soller, Brian, **Jennifer E. Copp,** Dana L. Haynie, & Alena Kuhlemeier. "Adolescent Dating Violence Victimization and Relationship Dissolution." *Youth & Society, 52*(2), 187-208.

2020   Giordano, Peggy C., **Jennifer E. Copp,** Wendy D. Manning, & Monica A. Longmore. "When Worlds Collide: Linking Involvement with Friends and Intimate Partner Violence in Young Adulthood." *Social Forces, 98*(3), 1196-1222.

2020   **Copp, Jennifer E.,** Bruce G. Taylor, & Elizabeth A. Mumford. "Financial Behaviors, Couple-Level Conflict, and Adolescent Relationship Abuse: Longitudinal Results from a Nationally Representative Sample." *Journal of Research on Adolescence, 30*(S1), 255-269.

2020   Meldrum, Ryan, Brae Campion Young, Sadhika Soor, Carter Hay, **Jennifer Copp**, Madison Trace, Joanne P. Smith-Darden, & Poco D. Kernsmith. "Are Adverse Experiences Associated with Deficits in Self-Control? A Test among Two Independent Samples of Youth." *Criminal Justice and Behavior, 47*(2), 166-186.

2019   **Copp, Jennifer E.,** Peggy C. Giordano, Wendy D. Manning, & Monica A. Longmore. "Neighborhood Norms, Disadvantage, and Intimate Partner Violence Perpetration." *Sociological Forum, 34*(3), 594-615.

2019   Giordano, Peggy C., **Jennifer E. Copp,** Wendy D. Manning, & Monica A. Longmore. "Linking Parental Incarceration and Family Dynamics Associated with Intergenerational Transmission: A Life Course Perspective." *Criminology, 57*(3), 395-423.

2019   Giordano, Peggy C., & **Jennifer E. Copp.** "Girls' and Women's Violence: The Question of General versus Uniquely Gendered Causes." *Annual Review of Criminology, 2,* 167-189.

2019   **Copp, Jennifer E.,** Peggy C. Giordano, Monica A. Longmore, & Wendy D. Manning. "The development of attitudes toward intimate partner violence: An examination of key correlates among a sample of young adults." *Journal of Interpersonal Violence, 34*(7), 1357-1387.

2018   **Copp, Jennifer E.,** Peggy C. Giordano, Wendy D. Manning, & Monica A. Longmore. "Parental Incarceration and Child Well-being: Conceptual and Practical Concerns Regarding the Use of Propensity Scores." *Socius: Sociological Research for a Dynamic World, 4*(1), 1-12.

2018   **Copp, Jennifer E.**, and William D. Bales. "Jails and Local Justice System Reform: An Overview and Recommendations." *The Future of Children, 28*(1), 103-124.

2017   **Copp, Jennifer E.**, Peggy C. Giordano, Wendy D. Manning, and Monica A.  Longmore. "Living with Parents and Emerging Adults' Depressive Symptoms." *Journal  of Family Issues, 38*(16), 2254-2276.

        *Featured in the New York Times ("Late to Launch: The Post-Collegiate Struggle") and the Dayton Daily News ("Hard to Launch")

2017   **Copp, Jennifer E.**, Peggy C. Giordano, Monica A. Longmore, and Wendy D. Manning. "Gender Mistrust and Intimate Partner Violence during Adolescence and Young Adulthood." *Journal of Family Issues, 38*(14), 2047-2079.

2016   Longmore, Monica A., Wendy D. Manning, **Jennifer E. Copp,** and Peggy C. Giordano. "A Prospective Study of Adolescents' Sexual Partnerships on Emerging Adults' Relationship Satisfaction and Intimate Partner Aggression." *Emerging Adulthood*, *4*(6), 403-416.

2016   Woodard, Tracey, & **Jennifer E. Copp.** "Maternal Incarceration and Children's Delinquent Involvement: The Role of Sibling Relationships." *Children and Youth Services  Review, 70*, 340-348.

2016   **Copp, Jennifer E.**, Peggy C. Giordano, Monica A. Longmore, and Wendy D. Manning. "Dating Violence and Physical Health: A Longitudinal Lens on the Significance of Relationship Dynamics and Antisocial Lifestyle Characteristics." *Criminal Behaviour and Mental Health, 26*(4), 251-262.

2016   **Copp, Jennifer E.,** Elizabeth A. Mumford, and Bruce G. Taylor. "Money Lending Practices and Adolescent Dating Relationship Abuse: Results from a National Sample." *Journal of Youth and Adolescence, 45*(9), 1902-1916*.*

2016   **Copp, Jennifer E.**, Peggy C. Giordano, Wendy D. Manning, and Monica A. Longmore. "Couple-Level Economic/Career Concerns and Intimate Partner Violence in Young Adulthood." *Journal of Marriage and Family, 78:*744-758.

2016   Giordano, Peggy C., **Jennifer E. Copp**, Wendy D. Manning, and Monica A. Longmore. "Anger, Control, and Intimate Partner Violence in Young Adulthood: A Symbolic Interactionist  Perspective." *Journal of Family Violence, 31*(1):1-13*.*

2015   Giordano, Peggy C., **Jennifer E. Copp**, Monica A. Longmore, and Wendy D. Manning. "Contested Domains, Verbal 'Amplifiers,' and Intimate Partner Violence in Young Adulthood." *Social Forces, 94*(2):923-951.

2015    **Copp, Jennifer**, Danielle Kuhl, Peggy Giordano, Wendy Manning, and Monica
        Longmore. "Intimate Partner Violence in Neighborhood Context: The Roles of Structural
        Disadvantage, Subjective Disorder, and Emotional Distress." *Social Science Research,*
        *53,* 59-72.

2015    **Copp, Jennifer E.**, Peggy C. Giordano, Monica A. Longmore, and Wendy D. Manning.
        "Stay/Leave Decision-Making in Non-Violent and Violent Dating Relationships."
        *Violence and Victims, 30*(4):581-599.

2015    Giordano, Peggy C., and **Jennifer E. Copp**. "'Packages' of Risk: Implications for
        Determining the Effect of Maternal Incarceration on Child Wellbeing." *Criminology*
        *and Public Policy*, *14*(1): 157-168.

2014    Longmore, Monica A., Wendy D. Manning, Peggy C. Giordano, and **Jennifer E. Copp**.
        "Intimate Partner Victimization, Poor Relationship Quality, and Depressive Symptoms
        during Young Adulthood." *Social Science Research,* 48:77-89.

### *Book Chapters, Law Review Articles, and Other Publications*

2022    **Copp, Jennifer E.,** Peggy C. Giordano, Monica A. Longmore, and Wendy D.
        Manning. "Family- and School-Based Sources of Resilience among Children of
        Incarcerated Parents." In N. Rodriguez and J. Krysik (Eds.), *Children of Incarcerated*
        *Parents: From Understanding to Impact.* Springer.

2022    **Copp, Jennifer E.,** Peggy C. Giordano, Wendy D. Manning, & Monica A.
        Longmore. "A Life Course Perspective on Parental Incarceration and Other Family-
        Based Sources of Risk and Resilience." In J. Glick, V. King, and S. M. McHale
        (Eds.), *Parent-Child Separation: Causes, Consequences, and Pathways to Resilience*.
        Springer.

2021    Scott-Hayward, C., **Jennifer E. Copp**, & Stephen Demuth. "Introduction." In C.
        Scott-Hayward, J. Copp, and S. Demuth (Eds.), *Handbook of Corrections and*
        *Sentencing: Pretrial Justice*. New York: Routledge.

2021    **Copp, Jennifer E.,** and William Casey. "Pretrial Risk Assessment Instruments in the
        United States: Past, Present, and Future." In C. Scott-Hayward, J. Copp, and S.
        Demuth (Eds.), *Handbook of Corrections and Sentencing: Pretrial Justice*. New
        York: Routledge.

2020    **Copp, Jennifer E.** "The Impact of Incarceration on the Risk of Violent Recidivism."
        *Marquette Law Review, 103*(3):775-791.

2019    **Copp, Jennifer E.**, and Jessica N. Walzak. "Parent-Child Relationships, VI. Young
        Adulthood." In James J. Ponzetti, Maureen Blankemeyer, Sean M. Horan, Heidi
        Lyons, and Ayo Shigeto (Eds.), *Macmillan Encyclopedia of Families, Marriages,*
        *and Intimate Relationships* (pp. 631-634).

2018    Giordano, Peggy C., and **Jennifer E. Copp**. "Cognitions and Crime: Matza's Ideas  in

DocuSign Envelope ID: A075CB1F-755F-466A-871C-7E9FA2C92FB2

Classic and Contemporary Context." In Thomas G. Blomberg, Francis T. Cullen, Christoffer Carlsson, and Cheryl Lero Jonson (eds.), *Delinquency and Drift Revisited: The Criminology of David Matza and Beyond—Advances in Criminological Theory.* New Brunswick, NJ: Transaction Publishers.

2014    Manning, Wendy D., Monica A. Longmore, **Jennifer E. Copp**, and Peggy C. Giordano. "The Complexities of Adolescent Sexual and Relationship Biographies: Fluidity,  Meaning(s), and Implications for Well-Being." In E.S. Lefkowitz & S.A. Vasilenko  (Eds.), *New Directions for Child and Adolescent Development: Positive and Negative  Outcomes of Sexual Behaviors.* San Francisco, CA: Jossey-Bass.

2013    Payne, Krista K. and **Copp, Jennifer E.** *Young Adults in the Parental Home and the  Great Recession.* (FP-13-07). National Center for Family and Marriage Research. Retrieved from http://ncfmr.bgsu.edu/pdf/family_profiles/file126564.pdf.

### ***Research Reports***

2021    **Copp, Jennifer E.**, Jennifer M. Brown, & Thomas G. Blomberg. *Pretrial Detention, Public Safety, and Court Efficiency: Examining the Implementation and Impact of Administrative Order No.: 12.510-04/2020.9 on Felony Bond, Pretrial Release, Court Appearance, and New Criminal Activity.* Palm Beach, FL: Palm Beach County Criminal Justice Commission.

2021    **Copp, Jennifer E.,** and William Casey. *An Evaluation of the FSU Young Parents Project: Assessing the Impact of Program Participation on Recidivism.* Tallahassee, FL: FSU Center for Prevention and Early Intervention Policy.

2020    **Copp, Jennifer E.,** Thomas G. Blomberg, William Casey, and George Pesta. *Pretrial Risk Assessment in Palm Beach County, Florida: A Follow-Up to Recent Validation Efforts.* Palm Beach, FL: Palm Beach County Criminal Justice Commission.

2020    **Copp, Jennifer E.,** Thomas G. Blomberg, William Casey, and George Pesta. *Re-Validation of the Virginia Pretrial Risk Assessment Instrument-Revised in Palm Beach County, Florida: A Brief Report.* Palm Beach, FL: Palm Beach County Criminal Justice Commission.

2019    **Copp, Jennifer E.,** Thomas G. Blomberg, William Casey, and George Pesta. *Validation of the Virginia Pretrial Risk Assessment Instrument – Revised in Palm Beach County Florida.* Palm Beach, FL: Palm Beach County Criminal Justice Commission.

2019    **Copp, Jennifer E.,** Julie Brancale, George Pesta, and Samantha Brown. *Pretrial Risk Assessment Tools.* Washington, DC: Pew Charitable Trusts.

2019    Brown, Samantha, Julie Brancale, **Jennifer E. Copp**, and George Pesta. *The Effectiveness of Measures to Improve Victim Safety during the Pretrial Period.* Washington, DC: Pew Charitable Trusts.

2019    Brown, Samantha, **Jennifer E. Copp**, Julie Brancale, and George Pesta. *Jail Reentry.* Washington, DC: Pew Charitable Trusts.

2019    Brancale, Julie, Samantha Brown, **Jennifer E. Copp**, and George Pesta. *Alternatives to Arrest.* Washington, DC: Pew Charitable Trusts.

2019    Brancale, Julie, Samantha Brown, **Jennifer E. Copp**, and George Pesta. *No-Jail and Low-Jail Options for Sentenced Populations.* Washington, DC: Pew Charitable Trusts.

2019    **Copp, Jennifer E.**, Julie Brancale, George Pesta, Samantha Brown. *Harms Associated with Jail.* Washington, DC: Pew Charitable Trusts.

2019    Brancale, Julie, **Jennifer E. Copp**, George Pesta, and Samantha Brown. *The Impact of Pretrial Interventions on Pretrial Failure.* Washington, DC: Pew Charitable Trusts.

2019    **Copp, Jennifer E.**, George Pesta, Julie Brancale, and Samantha Brown. *The Impact of Money Bail on Pretrial Failure.* Washington, DC: Pew Charitable Trusts.

2019    Ranson, J.W. Andrew, **Jennifer E. Copp**, William Casey, Thomas G. Blomberg, and George B. Pesta. *Pretrial Decision-Making in Palm Beach County: An Examination of Racial and Ethnic Bias*. Palm Beach, FL: Palm Beach County Criminal Justice Commission.

2019    **Copp, Jennifer E.** *Assessment of the FDC's Pilot Program for the Spectrum Risk Assessment.* Tallahassee, FL: Florida Department of Corrections.

2018    Hay, Carter, **Jennifer E. Copp**, Brian Stults, Brae Young, and Tiffaney Tomlinson. *Predicting Reoffending: Improving the Validity of Risk Assessment in the Florida Juvenile Justice System.* Tallahassee, FL: Florida Department of Juvenile Justice.

2018    Ranson, J.W. Andrew, William D. Bales, Thomas G. Blomberg, William Casey, **Jennifer E. Copp**, and George B. Pesta. *Evidence-Based Policy Planning for the Leon County Detention Center: Population Trends and Forecasts.* Tallahassee, FL: Leon County Sheriff's Office.

2015    **Copp, Jennifer E.**, and Wendi L. Johnson. *Patterns, Precursors, and Consequences of Teen Dating Violence: Analyzing Gendered and Generic Pathways.* National Institute of Justice Report NCJ249002. Washington, DC: U.S. Department of Justice. (https://www.ncjrs.gov/pdffiles1/nij/grants/249002.pdf)

## GRANT SUPPORT

2022    "Evaluation of Money Bond Practices in Palm Beach County, Florida." Role: Co-Principal Investigator. Palm Beach County Criminal Justice Commission ($67,250), MacArthur Foundation Safety and Justice Challenge.

2021-2024    "Advising and Evaluation of the Walton County Jail and Reentry Program." Role: Co-Principal Investigator. Walton County Sheriff's Office ($386,816).

2021    "Pretrial Detention, Public Safety, and Court Efficiency: Exploring the Consequences of Measures Enacted to Reduce the Spread of COVID-19 in Palm Beach County Jails." Role: Co-Principal Investigator. Palm Beach County Criminal Justice Commission ($30,000), MacArthur Foundation Safety and Justice Challenge.

2020          "FSU Young Parents Project: A Program Evaluation." Role: Principal
              Investigator. FSU Center for Prevention and Early Intervention Policy
              ($17,751).

2020          "Predicting Reoffending and Informing Treatment for Florida Residential
              Youth." Role: Co-Investigator. Florida Department of Juvenile Justice
              ($53,781).

2020-2022     "Mechanisms Underlying Desistance from Crime: Individual and Social
              Pathways." Role: Co-Investigator. U.S. Department of Justice, National
              Institute of Justice ($797,079).

2019-2021     "Miami-Dade County Corrections and Rehabilitation Department Project
              Second Chance for Incarcerated Parents with Minor Children." Role:
              Principal Investigator of subcontract to Florida State University ($112,455).
              Office of Juvenile Justice and Delinquency Prevention ($689,315).

2019          "Review of the State of Jail Research in America." Role: Principal
              Investigator. Pew Charitable Trusts ($55,998).

2018          "Assessment of the FDC's Pilot Program for the Spectrum Risk Assessment."
              Role: Principal Investigator. Florida Department of Corrections ($15,000).

2018-2020     "A Validation of the Palm Beach County Jail Risk Assessment Instrument for
              the Palm Beach County Criminal Justice Commission." Role: Co-Investigator
              of subcontract to Florida State University ($205,878). Palm Beach County
              Criminal Justice Commission, funded by MacArthur Foundation Safety and
              Justice Challenge Grant ($2,424,400).

2018-2020     "Relationship Dynamics in the National Survey of Teen Relationships and
              Intimate Violence." Role: Co-Investigator. U.S. Department of Justice,
              National Institute of Justice ($998,574).

2017-2018     "Improving the Validity of Risk Assessment in the Florida Juvenile Justice
              System." Role: Co-Investigator. Florida Department of Juvenile Justice
              ($207,817).

2016-2017     "The Effects of Parental Incarceration on Child Well-Being: Identifying
              Sources of  Variability." Role: Principal Investigator. Florida State
              University's Council on Research  and Creativity, Planning Grant ($13,000).

2016          "Parental Incarceration and Child Well-Being: An Examination of Mediating
              Mechanisms and Conditional Effects." Role: Principal Investigator. Florida
              State  University's Council on Research and Creativity, First Year Assistant
              Professor  Program ($20,000).

2014-2015     National Institute of Justice (NIJ) – Longitudinal Data on Teen Dating Violence:
              Postdoctoral Fellowship ($199,139). Bowling Green State University,

Department of Sociology (Faculty Sponsor: Peggy C. Giordano).

## INVITED PRESENTATIONS

**Copp, Jennifer E.** "Bail Reform." Tallahassee Women's Lawyer Association. Tallahassee, FL, June 2022.

**Copp, Jennifer E.** "Addressing Crime in the Big Bend through Education, Job Training, and Community Support." Goodwill Industries – Big Bend, Annual Meeting. Tallahassee, FL, May 2022.

**Copp, Jennifer E.** "The State of the Science on Bond: Reviewing Recent Evidence from Palm Beach County and other U.S. Jurisdictions." Palm Beach Public Defender's Office. Palm Beach, FL, January 2022.

**Copp, Jennifer E.** "Pretrial Detention, Public Safety, and Court Efficiency: Examining the Implementation and Impact of Administrative Order No.: 12.510-04/2020.9 on Felony Bond, Pretrial Release, Court Appearance, and New Criminal Activity." Palm Beach County Criminal Justice Commission. Palm Beach, FL, December 2021.

**Copp, Jennifer E.** "Reimagining Pretrial." Visions Of Justice 2021. Delaware Center for Justice. Wilmington, DE, October 2021.

**Copp, Jennifer E.** "Qualitative Research Methods." Graduate Student Workshop Series, College of Criminology and Criminal Justice, Florida State University. Tallahassee, FL, February 2021.

**Copp, Jennifer E.** "A Life Course Perspective on Parental Incarceration and Other Family-Based Sources of Risk and Resilience." 28th Annual National Symposium on Family Issues. The Pennsylvania State University, October 2020.

**Copp, Jennifer E.** "Validation Study of the Virginia Pretrial Risk Assessment Instrument – Revised in Palm Beach County, Florida." Palm Beach County Criminal Justice Commission. Palm Beach, FL, December 2019.

**Copp, Jennifer E.** "Research on Jails and Jail Alternatives." Michigan Joint Task Force on Jail and Pretrial Incarceration. Traverse City, MI, August 2019.

**Copp, Jennifer E.** "The Impact of Incarceration on the Risk of Violent Recidivism." Marquette University Law School Conference, Responding to the Threat of Violent Recidivism: Alternatives to Long-Term Incapacitation. Milwaukee, WI, June 2019.

**Copp, Jennifer E.** "Longitudinal Data Analysis: An Introduction to Causal Analyses and Individual Growth Modeling." Graduate Student Workshop Series, College of Criminology and Criminal Justice, Florida State University. Tallahassee, FL, February 2017.

**Copp, Jennifer E.**, William D. Bales. "Jails." Authors' conference for *The Future of Children*, The Woodrow Wilson School of Public and International Affairs and The Brookings Institution, Princeton University. Princeton, NJ, March 2017.

DocuSign Envelope ID: A075CB1E-755F-466A-871C-7E9FA2C92FB3

**Copp, Jennifer E.,** Peggy C. Giordano, Wendy D. Manning, and Monica A. Longmore. "The Influence of Gender Mistrust on Trajectories of Intimate Partner Violence." Center for Family and Demographic Research (CFDR) Speaker Series, Bowling Green State University. Bowling Green, OH, January 2015.

## PROFESSIONAL PRESENTATIONS

**Copp, Jennifer E.,** & Stephen Demuth. 2021. "The Efficacy of Money Bail." Presented at the annual meeting of the American Society of Criminology, Chicago, IL.

William Casey, **Jennifer E. Copp,** & Stephen Demuth. 2021. "Disparities in the Pretrial Process: Race, Ethnicity, and Citizenship." Presented at the annual meeting of the American Society of Criminology, Chicago, IL.

**Copp, Jennifer E.,** Thomas Blomberg, Julie Brancale, Erin Castro, & Marin Wenger. 2021. "Evaluating a Comprehensive Jail and Reentry Program: A Partnership with the Walton County Sheriff's Office." Presented at the annual meeting of the Southern Criminal Justice Association, Daytona Beach, FL.

Johnson, Elizabeth, Julie Poehlmann-Tynan, J. Mark Eddy, & **Jennifer E. Copp**. 2020. "Risk and Resilience in Contexts of Accumulated Adversity: Adolescents with Incarcerated Parents." Panel discussion at the biennial meeting of the Society for Research on Adolescence, San Diego, CA. Cancelled due to COVID-19.

**Copp, Jennifer**, Kristina Henson, William Casey, Damir Kukec, George Pesta, & Thomas Blomberg. 2019. "Implementing and Evaluating Pretrial Reform." Paper presented at the 75th meeting of the American Society of Criminology, San Francisco, CA.

Taylor, Bruce, Elizabeth Mumford, Weiwei Liu, Peggy Giordano, & **Jennifer Copp**. 2019. "Findings from the National Survey of Teen Relationships and Intimate Violence (STRiV3)." Paper presented at the 75th meeting of the American Society of Criminology, San Francisco, CA.

Hay, Carter, Brian Stults, **Jennifer Copp**, Brae Campion Young, & Tiffaney Tomlinson. 2019. "The Implications of Race for Assessing Risk and Predicting Reoffending." Paper presented at the 75th meeting of the American Society of Criminology, San Francisco, CA.

**Copp, Jennifer E.,** William M. Casey, J.W. Andrew Ranson, & Thomas G. Blomberg. 2019. "Validation and Impact Assessment of the Virginia Pretrial Assessment Instrument-Revised (VPRAI-R) in Palm Beach County, Florida. Paper presented at the annual meeting of the Southern Criminal Justice Association, Nashville, TN.

Hay, Carter, **Jennifer E. Copp**, Brian Stults, Brae Campion Young, & Tiffaney Tomlinson. 2018. "Improving Risk to Reoffend Predictions in Florida Juvenile Justice." Paper presented at the 74th meeting of the American Society of Criminology, Atlanta, GA.

**Copp, Jennifer E.,** William D. Bales, Thomas G. Blomberg, & George Pesta. 2018.

"Pretrial Release Decision in a Local Jail: Examining the Role of Race/Ethnicity and Socioeconomic Status." Paper presented at the 74th meeting of the American Society of Criminology, Atlanta, GA.

Ranson, J.W. Andrew, Ashley Arnio, **Jennifer E. Copp**, & William D. Bales. 2018. "An Examination of the Use of Pretrial Detention across U.S. Counties." Paper presented at the 74th meeting of the American Society of Criminology, Atlanta, GA.

Bales, William D., **Jennifer E. Copp**, & Thomas G. Blomberg. 2018. "Recidivism among Inmates Released from a Local Jail." Paper presented at the 74th meeting of the American Society of Criminology, Atlanta, GA.

Casey, William, William D. Bales, Jennifer E. Copp, & Thomas G. Blomberg. 2018. "Releases from a Local Jail: The Impact of Visitation on Recidivism. Paper presented at the 74th meeting of the American Society of Criminology, Atlanta, GA.

**Copp, Jennifer E.** 2018. "Parental Incarceration and other Adverse Childhood Experiences: A Latent Class Approach to Understanding the Consequences of ACEs for Adolescent and Young Adult Well-Being." Paper presented at the annual meeting of the Population Association of America, Denver, CO.

**Copp, Jennifer E.,** Peggy C. Giordano, Wendy D. Manning, & Monica A. Longmore. 2018. "Linking Parental Incarceration and Family Processes Associated with Intergenerational Transmission: A Life Course Perspective on Social Learning." Paper presented at the 1st National Children of Incarcerated Parents Conference, Phoenix, AZ.

**Copp, Jennifer E.,** and Jillian J. Turanovic. 2017. "Disentangling Parental Incarceration Effects: Assessing Changes in Well-Being across the Transition to Adulthood." Paper presented at the 73rd meeting of the American Society of Criminology, Philadelphia, PA.

David Vazquez, Eva Aizpurua, **Jennifer E. Copp**, and Jorge J. Ricarte. 2017. "Perceptions of Violence Against Women (VAW): Assessing Individual and Country-Level Correlates." Paper presented at the American Association for Public Opinion Research, New Orleans, LA.

**Copp, Jennifer E.,** Peggy C. Giordano, Monica A. Longmore, & Wendy D. Manning. 2016. "The Neighborhood Normative Climate and Intimate Partner Violence during Young Adulthood." Paper presented at the 72nd meeting of the American Society of Criminology, New Orleans, LA.

Giordano, Peggy C., **Jennifer E. Copp**, Monica A. Longmore, & Wendy D. Manning. 2016. "Differential Effects of Maternal and Paternal Incarceration on Child Wellbeing? A Gendered, Life Course Lens on Long-Term Impact. Paper presented at the 72nd meeting of the American Society of Criminology, New Orleans, LA.

**Copp, Jennifer E.,** Eva Aizpurua, Jorge J. Ricarte, and David Vazquez. 2016. "Controlling Behaviours and Intimate Partner Violence among Spanish Women." Paper presented at

DocuSign Envelope ID: A075CB1F-755F-46SA-871C-7E9FA2C92FB2

Updated October 2022

the 16th annual conference of the European Society of Criminology, September, Muenster, Germany.

Copp, Jennifer E., Peggy C. Giordano, Wendy D. Manning, & Monica A. Longmore. 2016. "Parental Incarceration and Child Well-Being: A Methodological and Theoretical Critique of Propensity Score Analysis." Paper presented at the annual meeting of the American Sociological Association, August, Seattle, WA.

Aizpurua, Eva, David Vazquez, Jorge J. Ricarte, and Jennifer E. Copp. 2016. "Estrategias de Control y Violencia de Genero en las Relaciones de Pareja." Paper presented at the XI Congreso Espanol de Criminologia, June, Barcelona, Spain.

Copp, Jennifer E., Peggy C. Giordano, Monica A. Longmore, Wendy D. Manning. 2016. "Relationship Quality, Churning, and Intimate Partner Violence among Teens." Paper presented at the biennial meeting of the Society for Research on Adolescence, March, Baltimore, MD.

Copp, Jennifer E., Peggy C. Giordano, Monica A. Longmore, and Wendy D. Manning. 2015. "A Life Course Perspective on the Influence of Parental Incarceration on Child Well-Being: Unpacking Lifestyle, Parenting, and Incarceration Effects." Paper presented at the 71st annual meeting of the American Society of Criminology, November, Washington DC.

Giordano, Peggy C., and Jennifer E. Copp. 2015. "Will: Cognition and the Decision to Offend." Paper to be presented at the 71st annual meeting of the American Society of Criminology, November, Washington DC.

Copp, Jennifer E., Peggy C. Giordano, Monica A. Longmore, and Wendy D. Manning. 2015. "Neighborhood Norms, Disadvantage, and Intimate Partner Violence Perpetration Across Adolescence and Young Adulthood." Paper presented at the annual meeting of the Population Association of America, May, San Diego, CA.

Copp, Jennifer E., Peggy C. Giordano, Wendi L. Johnson, Monica A. Longmore, and Wendy D. Manning. 2015. "Complicating the IPV-Health Link: The Role of Relationship Context." Paper presented at the National Conference on Health and Domestic Violence, March, Washington, DC.

Copp, Jennifer E., Peggy C. Giordano, Wendy D. Manning, and Monica A. Longmore. 2014. "Adolescents' Gender Mistrust and Timing of First IPV Experience." Paper presented at the 70th annual meeting of the American Society of Criminology, November, San Francisco, CA.

Copp, Jennifer E., Peggy C. Giordano, Monica A. Longmore, and Wendy D. Manning. 2014. "IPV in Young Adulthood: The Role of Life Course Stressors and Health Concerns." Paper presented at the annual meeting of the American Sociological Association, August, San Francisco, CA.

Manning, Wendy D., Monica A. Longmore, Peggy C. Giordano, and Jennifer E. Copp. 2014. "Adolescents' Sexual Relationships and Young Adults' Well-Being." Paper presented at

annual meeting of the Population Association of America, April, Boston, MA.

Monica A. Longmore, Peggy C. Giordano, **Jennifer E. Copp**, and Wendy D. Manning. 2014. "Sexual Coercion, Sexual Manipulation, and Condom Coercion among Young Adults in Intimate Relationships." Paper presented at the Society for Research on Adolescence Biennial Meeting, March, Austin, TX.

**Copp, Jennifer E.**, Peggy C. Giordano, Wendy D. Manning, and Monica A. Longmore. 2013. "Measurement of Teen Dating Violence: Variation in Assessment based on Multiple Indicators." Paper presented at the 69th annual meeting of the American Society of Criminology  meeting, November, Atlanta, GA.

**Copp, Jennifer E.**, Danielle Kuhl, Peggy C. Giordano, Wendy D. Manning, and Monica A. Longmore. 2013. "Neighborhood Disadvantage, Strain, and Intimate Partner Violence: Linking Structural Context to Emotional Response." Paper presented at the 69th annual meeting of the American Society of Criminology, November, Atlanta, GA.

**Copp, Jennifer E.**, Peggy C. Giordano, Wendy D. Manning, and Monica A. Longmore. 2013. "Living with Parents and Well-Being in Emerging Adulthood." Paper presented at the 6th Conference on Emerging Adulthood, October, Chicago, IL.

Longmore, Monica A., Peggy C. Giordano, Wendy D. Manning, and **Jennifer E. Copp**. 2013. "Intimate Partner Violence and Young Adults' Well-Being: The Influence of Relational Quality." Paper presented at the annual meeting of the American Sociological Association, August, New York, NY.

Giordano, Peggy C., **Jennifer E. Copp**, Wendy D. Manning, Monica A. Longmore, and Julia Mack. 2012. "Delinquency Involvement Across the Period from Adolescence to Young Adulthood: The Complex Role of Friends and Romantic Partners." Paper presented at the 68th annual meeting of the American Society of Criminology, November, Chicago, IL.

**Copp, Jennifer E.** 2012. "Stay/Leave Decision-Making in Violent and Non-Violent Dating Relationships." Paper presented at the 68th annual meeting of the American Society of Criminology, November, Chicago, IL.

**Copp, Jennifer E.** 2011. "Stay/Leave Decision-Making in Violent Dating Relationships." Paper presented at the 5th Annual OSU/BGSU Graduate Student Conference, October, Columbus, OH.

## ACTIVITIES AND SERVICE

### *Professional Service*

| | |
|---|---|
| 2019-present | Advisory Committee Member, Florida Statistical Analysis Center, Florida Department of Law Enforcement |
| 2018-present | Research Advisory Council Member, Pretrial Justice Institute |
| 2016-2019 | Scientific Review Panel, Violence against Women, National Institute |

DocuSign Envelope ID: A075CB1E-755F-46SA-871G-7E9FA2C92EB3

Updated October 2022

of Justice and Office of Violence against Women

2018           Committee Member, Outstanding Scholarly Contribution Award of the ASA Section on Children and Youth

2015-present     Research Affiliate, Center for Family and Demographic Research, Department of Sociology, BGSU

Manuscript reviewer for: *American Sociological Review, Crime & Delinquency, Criminal Justice and Behavior, Criminal Justice Policy Review, Criminology, Demography, Emerging Adulthood, Journal of Adolescence, Journal of Family Issues, Journal of Marriage and Family, Journal of Research in Crime and Delinquency, Journal of Research on Adolescence, Psychology of Violence, Social Forces, Social Problems, Social Science Research, Sociological Spectrum, Violence & Victims, Violence Against Women, and Youth & Society, among others.*

## *University Service*

2022-present     Curriculum Review Committee (Chair), College of Criminology and Criminal Justice, Florida State University

2021-present     Graduate Policy Committee, Florida State University

2020-present     Tenure and Promotion Committee, College of Criminology and Criminal Justice, Florida State University

2019-present     Council of Associate Deans for Research, Florida State University

2021-present     Methods Committee (Chair), Graduate Comprehensive Examinations, College of Criminology and Criminal Justice, Florida State University

2019-present     Faculty Senate Library Committee, Florida State University

2019-2021        Faculty Recruitment Committee, College of Criminology and Criminal Justice, Florida State University

2019-2021        Methods Committee, Graduate Comprehensive Examinations, College of Criminology and Criminal Justice, Florida State University

2016-2021        Administrative Advisory Committee, College of Criminology and Criminal Justice, Florida State University

2016-2020        Scholarship Committee, College of Criminology and Criminal Justice, Florida State University

2016-2019        Methods Committee (alternate), College of Criminology and Criminal Justice, Florida State University

## AWARDS AND FELLOWSHIPS

2017          Distinguished Dissertation Award, Bowling Green State University

2014-2015     Postdoctoral Fellow, National Institute of Justice

2014          Outstanding Research Assistant, Bowling Green State University

## TEACHING EXPERIENCE

### *Graduate Courses*

CCJ 6920      *Collateral Consequences of Incarceration*
              College of Criminology and Criminal Justice, Florida State University

CCJ 6920      *Criminal Justice Contact and Family Life*
              College of Criminology and Criminal Justice, Florida State University

### *Undergraduate Courses*

CCJ 3010      *Corrections*
              College of Criminology and Criminal Justice, Florida State University
CCJ 4497      *Criminal Justice Policy*
              College of Criminology and Criminal Justice, Florida State University
CCJ 4663      *Women, Crime, and Justice*
              College of Criminology and Criminal Justice, Florida State University
SOC 2020      *Social Problems*
              Department of Sociology, Bowling Green State University

## STUDENT ADVISING

### *Doctoral Students*
William Casey, Doctoral Dissertation Chair, Florida State University
Julie Brancale, Doctoral Dissertation Committee, Florida State University
Carmen Maria Leon Marquez, Doctoral Dissertation Committee, Universidad de Castilla-La
        Mancha

### *Master's Students*
Alexis Singer, Master's Area Paper Committee, Florida State University
William Casey, Master's Area Paper Committee, Florida State University
Jessica Walzak, Master's Area Paper Committee, Florida State University
Julie Kuper, Master's Area Paper Committee, Florida State University,
Sarah Green, Master's Area Paper Committee, Department of Modern Languages, Florida State
        University
Emmanuel Manhiri, Master's Special Project Committee, Department of Human Development and
        Family Sciences, Florida State University
Melissa Callea, Master's Area Paper Chair, MPA/Criminology, Florida State University

### *Undergraduate Honors Students*
Caroline Mooney, Honors Thesis Chair, Florida State University

DocuSign Envelope ID: A075CB1E-755F-466A-871C-7E9FA2C92FB3

Updated October 2022

Destiny Carbello, Honors Thesis Committee, Florida State University

### *Directed Individual Study and Comprehensive Exam Preparation (Graduate)*
Tracey Woodard (DIS)
William Casey (comp prep, DIS)
Vivian Hughes (comp prep)
Kalle Pray (comp prep, DIS)
Raven (Stewart) Dismuke (DIS)
Jessica Walzak (DIS)
Matthew Vanden Bosch (DIS)
Jacob Judd (DIS)
Emily Hargrove (comp prep)

### *Directed Individual Studies (Undergraduate)*
Stephanie Prinsloo
Benjamin Weinrich
Taisel Fortun
Caroline Mooney
Kristy Batista
Rachel White

## PROFESSIONAL DEVELOPMENT

*Research*
> Preparing, Archiving, and Accessing NIJ Data at NACJD, August 2013
> Introduction to Propensity Score Analysis by Matthew VanEseltine (BGSU), June 2013
> ICPSR Qualitative Research Methods by Paul Mihas (UNC Chapel Hill), August 2016
> Causal Inference Pitfalls in Criminology and How to Avoid Them by Sarah Tahamont (ASC Annual Meeting Workshop), November 2021

*Teaching*
> Teaching workshop with Melinda Messineo (Ball State University), March 2014
> Graduate seminar on teaching sociology with Laura Sanchez, Fall 2011

## PROFESSIONAL AFFILIATIONS

American Sociological Association
> *Sections:* Crime, Law, and Deviance, Children and Youth, Aging and the Life Course
American Society of Criminology
> *Sections:* Division of Corrections and Sentencing
Population Association of America

DocuSign Envelope ID: A075CD1F-755F-46CA-871C-7E9FA2C92EB2

# Appendix B:
# Materials Reviewed

## MATERIALS REVIEWED

1. HCSO 0001e, spreadsheet of detainee data,
2. HC 478,900, spreadsheet of risk assessment data,
3. HC 478,901, spreadsheet of risk factor data
4. HC 478,902, spreadsheet of risk item data
5. HC 478,903, spreadsheet of associated case data
6. HC 478,904, spreadsheet of risk assessment data
7. HC 478,905, spreadsheet of PSA data
8. HC 779,607, spreadsheet of attorneys on cases data
9. HC 779,608, spreadsheet of bond document data
10. HC 779,609, spreadsheet of 2015-2016 case settings data
11. HC 779,610, spreadsheet of 2017-2018 case settings data
12. HC 779,611, spreadsheet of 2019-2020 case settings data
13. HC 779,612, spreadsheet of 2021 case settings data
14. HC 779,613, spreadsheet of judgments data
15. HC 779,614, spreadsheet of bail activity data
16. HC 779,615, spreadsheet of bond forfeiture data
17. HC 817,026, spreadsheet of general case data
18. HC 817,510, spreadsheet of 15.17 data
19. HC 817,511, spreadsheet of Pretrial Services financial data
20. Dkt. 214-6, Harris County Felony Bail Schedule, Effective 7/29/2017; 8/22/2017.
21. Dkt. 66-5, Declaration of Harris County Chief Public Defender Alex Bunin, Apr. 6, 2020.
22. Transcript excerpts, Deposition of Chief Hearing Officer Courtney St. Julian as Harris County corporate representative under Rule 30(b)(6) and in her individual capacity, Mar. 25, 2021.
23. Transcript excerpts, Rule 30(b)(6) Deposition of Harris County, Christine Baldwin as corporate representative, Apr. 22, 2021.

DocuSign Envelope ID: A075CD1E-755F-46CA-871C-7E9FA2C92EB2

# Appendix C:
# Referenced Literature

# REFERENCES

Barabas, C., Benjamin, R., Bowers, J., Broussard, M., Buolamwini, J., Constanza-Chock, S., Crawford, K., Dinakar, K., Doyle, C., Gebru, T., Harcourt, B. E., Helreich, S., Hopkins, B., Ito, J., Minow, M., O'Neil, C., Ochigame, R., Paxson, H., Priyadarshi, V. T., … Zuckerman, E. (2019). Technical flaws of pretrial risk assessment raise grave concerns. Retrieved from: https://www.media.mit.edu/posts/algorithmic-risk-assessment/

Canilang, S., Duchan, C., Kreiss, K., Larrimore, J., Merry, E., Troland, E., & Zabek, M. (2020). Report on the economic well-being of US households in 2019. Washington, DC: Board of Governors of the Federal Reserve System.

Copp, J. E., & Casey, W. M. (2021). Pretrial risk assessment instruments in the United States: A critical lens on issues of development, performance, & implementation. In C. C. Scott-Hayward, J. E. Copp, & S. Demuth (Eds.), Handbook of Corrections and Sentencing: Pretrial Justice. Abingdon, UK: Routledge.

Demuth, S., & Steffensmeier, D. (2004). The impact of gender and race-ethnicity in the pretrial release process. *Social Problems, 51*(2), 222-242.

Desmarais, S.L., Monahan, J., & Auston, J. (2022). The empirical case for pretrial risk assessment instruments. *Criminal Justice and Behavior, 49*(6), 807-816.

Dobbie, W., Goldin, J., & Yang, C.S. (2018). The effects of pretrial detention on conviction, future crime, and employment: Evidence from randomly assigned judges. *American Economic Review, 108*(2), 201-240.

Gupta, A., Hansman, C., & Frenchman, E. (2016). The heavy costs of high bail: Evidence from judge randomization. *The Journal of Legal Studies, 45*(2), 471-505.

Heaton, P. (2022). *The effects of misdemeanor bail reform*. Philadelphia, PA: University of Pennsylvania, Quattrone Center for the Fair Administration of Justice.

Heaton, P., Mayson, S., & Stevenson, M. (2017). The downstream consequences of misdemeanor pretrial detention. *Stanford Law Review, 69*, 711-794.

Koepke, J.L., & Robinson, D.G. (2018). Danger ahead: Risk assessment and the future of bail reform. *Washington Law Review, 93*, 1725-1807.

Laisne, M., Wool, J., & Henrichson, C. (2017). *Past due: Examining the costs and consequences of charging for justice in New Orleans*. New York: Vera Institute of Justice.

Leslie, E., & Pope, N.G. (2017). The unintended impact of pretrial detention on case outcomes: Evidence from New York City Arraignments. *The Journal of Law and Economics, 60*(3), 529-557.

Liu, P., Nunn, R., and Shambaugh, J. (2018). *The economics of bail and pretrial detention*. Washington, DC: Brookings Institution, The Hamilton Project.

Case 4:19-cv-00226   Document 634-3   Filed on 12/09/22 in TXSD   Page 51 of 51

Lowenkamp, C.T., VanNostrand, M., & Holsinger, A. (2013). The hidden costs of pretrial detention. Houston, TX: The Laura and John Arnold Foundation.

Mayson, S.G. (2019). Bias in, bias out. Yale Law Journal, 128(8), 2218-2

Menefee, M.R. (2018). The role of bail and pretrial detention in the reproduction of racial inequalities. Sociology Compass, 12(5), e12576.

Petersen, N. (2020). Do detainees plead guilty faster? A survival analysis of pretrial detention and the timing of guilty pleas. Criminal Justice Policy Review, 31(7), 1015-1035.

Reaves, B.A. (2013). *Felony defendants in large urban counties, 2009 statistical tables*. Washington, DC: US Department of Justice.

Starr, S.B. (2015). The new profiling: Why punishing based on poverty and identity is unconstitutional and wrong. *Federal Sentencing Reporter, 27*(4), 229-236.

Stevenson, M. (2018). Distortion of justice: How the inability to pay bail affects case outcomes. The Journal of Law, Economics, and Organization, 34(4), 511-542.