# EXHIBIT 2

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

RUSSELL, et al.,
　　　　　Plaintiffs

v.                                                    Case No. 4:19-cv-00226

HARRIS COUNTY, TEXAS et al.
　　　　　Defendants

## DECLARATION OF KRISHNAVENI GUNDU, CO-FOUNDER AND EXECUTIVE DIRECTOR OF THE TEXAS JAIL PROJECT

1.　　　I am the Co-Founder and Executive Director of Texas Jail Project. I am over the age of eighteen and have a sound mind.  I have personal knowledge of the facts set forth in this declaration and would testify to them if called to do so.

2.　　　This declaration describes the basis for my opinion that pretrial detention in Harris County, even for relatively short periods of time, causes people serious and often long-lasting harm by subjecting them to trauma and violence, isolating them from their families and community supports, and making it difficult to reintegrate into society.

3.　　　I prepared this declaration based on my experience and personal knowledge.

4.　　　I am not being compensated for my work in this case.

### I.　　Background

5.　　　In 2006, I co-founded Texas Jail Project ("TJP") with Diane Wilson, Col. Ann Wright and Diana Claitor. TJP is a non-profit advocacy organization, whose mission is to liberate communities by organizing with and advocating for individuals incarcerated in Texas county jails and their loved ones. Our work focuses on organizing through stories, testimonies, and community-building. TJP holds jails as well as the entire criminal punishment system accountable—informing the public and lawmakers about civil rights violations, mistreatment, and medical neglect inside Texas county jails.

6.　　　Through my work with TJP, I have more than 15 years of experience monitoring jail conditions, assisting loved ones in navigating the criminal legal system, and organizing with Texas communities affected by pretrial detention. Much of my work focuses on Harris County, where our organization is based.

1

7.      Our organization serves on the Texas Commission on Jail Standards' rulemaking working groups and participated in Sunset Review of the agency in legislative sessions 2008-2009 and 2020-2021. We are in frequent conversation about jail conditions and related issues with Harris County Jail's Chief of Detention Shannon Herklotz. We have regularly met with Chief Herklotz and his team throughout the pandemic.

8.      Additionally, TJP is a collaborative council member of the Texas Judicial Commission on Mental Health and its data committee. I am also an invited member of the criminal justice, pro bono and mental health statewide committees of the Texas Coordinating Council on Veterans Services. I am also an invited member on the Intellectual and Developmental Disability Advisory Committee that was mandated by the 86th Legislature in 2019.  My *curriculum vitae* is attached as Exhibit 1.

9.      This declaration summarizes my observations of Harris County Jail conditions and the experiences of community members detained pretrial, as well as my conclusions about the impact of pretrial detention in Harris County

10.     Since March 2020 alone, we have conducted over 700 interviews with, and received over 1,200 written correspondences from, people detained in Harris County Jail. I have visited both of the jail's facilities multiple times in 2022.  In the course of these interviews, my staff and I have borne witness to the neglect, deprivation, and punishment inflicted upon legally innocent community members in Harris County Jail.

## II.      Pretrial detention regularly exposes detainees to violence and death

11.     Since January 2020, at least 40[1] people have died in Harris County Jail custody, most of whom were being jailed pretrial. For perspective, in the same time period, the state of Texas executed 7 people.[2]

12.     Although many of those deaths were reported as "natural,"[3] our work in the Harris County Jail has made clear to us that no death in Harris County Jail is "natural." Even deaths reported as such occur in a context where medical neglect, isolation, poor nutrition, elevated stress levels, disease, violence and brutality are everyday occurrences.

13.      In the single month of August 2021, Harris County Jail reported 32 instances of jailers

---

[1] Exhibit 2

[2] "Executions by State and Year." *Death Penalty Information Center*, https://deathpenaltyinfo.org/executions/executions-overview/executions-by-state-and-year; "Death Row Information - Executed Inmates." *Texas Department of Criminal Justice*, https://www.tdcj.texas.gov/death_row/dr_executed_offenders.html.

[3] Exhibit 2

using force resulting in bodily injury.[4] In other words, more than once a day, jailers used enough violent force against detainees to cause serious bodily injury. During that same month, the jail reported 15 attempted suicides.[5]

14.     Reported uses of force are often an undercount, as prison guards frequently do not report their own use of force against people detained at the jail.

15.     For example, in February, 2021, Jaquaree Simmons' died at the Harris County Jail. The jail had not reported any prior uses of force against Jaquaree by prison guards. Yet an investigation into his death revealed that, in fact, jail staff had beaten him so severely on three separate occasions that he was taken to the hospital. Even after he died, the jail did not document any use of force.[6]

16.     Following the February 2021 investigation, seventeen jailers were implicated for beating Jaquaree to death over a period of two days.[7]

17.     The jail also fails to protect people not only from guards who might do them harm, but from other people detained there.

18.     Fred Harris was a 19-year-old, 98-pound Black teenager with a long and well-documented history of intellectual and developmental disabilities. On October 10, 2021, he was arrested at a group home.  He was charged with aggravated assault with a deadly weapon, though according to the allegations, he did not come within 10 feet of another person, much less cause anyone harm.[8]

19.     Two days after he was arrested, the court held a bail hearing in his case without him present.  He had no criminal history. He had no allegations of failure to appear for a court hearing. He had no pending charges. But the Hearing Officer still imposed a $20,000 secured bond.[9] Fred signed his bond conditions document in a childlike scrawl:

---

[4] Exhibit 3

[5] Id.

[6] Hatfield, Mycah. "11 Harris County Sheriff's Office Employees Fired after Inmate's Death; 6 Suspended." ABC13 Houston, KTRK-TV, 28 May 2021, https://abc13.com/harris-county-inmate-death-investigation-in-jail-jaquaree-simmons/10708973/

[7] Id.

[8] Groogan, Greg. "19-Year-Old Jail Beating Victim Dead; Family Donates His Organs." *FOX 26 Houston*, FOX 26 Houston, 6 Nov. 2021, https://www.fox26houston.com/news/19-year-old-jail-beating-victim-dead-after-family-donates-his-organs.

[9] Id.

**Defendant's Acknowledgment**

I understand that the court is ordering my compliance with the conditions listed above as a requirement of my continued release on bond. I agree to these conditions. I understand that my failure to comply with these conditions may result in the forfeiture or revocation of my bond and confinement, and possibly a separate action against me for contempt of court for which I could be separately fined and jailed as detailed above.

Dated: October 13, 2021      Defendant's Signature: _____

20.     Nearly three weeks later, Fred remained in jail because neither he nor his family could afford to pay the $20,000 secured bond. On October 31, twenty-one days after he was arrested, Fred died. He had been beaten, kicked and stabbed to death inside the Harris County Jail.[10]

### III.     Pretrial detention reduces access to quality legal representation

21.     I have heard many pretrial detainees express their frustration that they would otherwise be able to afford private counsel–as opposed to the court-appointed attorney they received– if they were released so that they could continue working.

22.     My staff and I have supported C.W., a Black veteran who was detained pretrial for two years in the Harris County Jail.

23.     C.W. reported that he was brought to court only once in a 12-month period.

24.     Frustrated with the agonizingly slow pace of his case, and desperate to provide for his family once again, C.W. felt pressured to accept a guilty plea in exchange for a sentence of time-served. In order to receive the time-served plea deal, C.W. pled guilty to a felony charge.

25.      After pleading guilty, C.W. was released immediately. According to my interview with him, he had been detained at the Harris County Jail for two years.

26.     C.W. is now unhoused because the felony conviction resulting from his guilty plea makes

---

[10] Person. "Teen with Special Needs Who Died in Harris County Jail Donated His Organs." *ABC13 Houston*, KTRK-TV, 5 Nov. 2021, https://abc13.com/houston-crime-teen-inmate-killed-fred-harris-michael-ownby/11200048/.

4

it difficult for him to find affordable housing. C.W.'s case is illustrative of the countless individuals with whom we have worked who waived their constitutional right to a trial and pleaded guilty simply because they had already spent the equivalent of a sentence in pretrial detention.

27.     In another representative example, our client M.M. was detained pretrial at the Harris County Jail and experienced several resets. With every interaction it was clear that the constant struggle of being in a kind of purgatory was squeezing every last ounce of hope out of him. Every time his court was reset, he expressed deeper despair. The last time I spoke with M.M, I was filled with dread for his safety.

28.     Other examples illustrate the impact of pretrial incarceration at Harris County Jail.

29.     B.M., a Navy veteran, was detained pretrial for 17 months because the pandemic caused their court dates to be reset several times. They did not have sufficient access to personal hygiene items while they waited:



31.     C.L. sent us a letter dated 12/28/2020 describing inhumane conditions, including insufficient food and separation from sunlight for nearly two years, while they waited:



30.     J.A. sent us a letter dated 12/28/20 about how they were detained for 5 months. The pandemic caused their court dates to be continuously reset, and they could not contact their lawyer, even when his mother was admitted to the Intensive Care Unit with a life-threatening condition:

32.    X.D. sent us a letter dated 11/05/2020 about how they were detained for 8 months, during which they were separated from their infant son:

> to BE IN COURT ON the 5th OF NovemBER
> But JUST this PAST Sunday, the 1St OF
> NovemBER, our Cell Pod ONCE AGAIN hAd
> NEW INMATES to ENTER AND SOMEONE hAd
> CAME UNTO CONTACT With the Covid-19 ViRUS
> AND NOW We ARE QUARANTINED FOR ANOTHER
> 3-4 weeks IN Which my COURT ; ATE
> hAS NOW BEEN RESET to DecembER 9th...
> My court dATE hAS BEEN RESET 3-4 times
> (APRil, JuNE, August, NovemBER) Because OF
> the Covid-19.. I hAVE A Child thAT I
> hAVE BEEN RAiSing since he wAS BORN
> AND NOW hE'S 2yRS old.. His mom hAd
> to MOVE to LouisiANA Because I'VE
> BEEN IN heRE Going ON A YEAR NOW...

33.    K.H sent us  a letter dated 02/08/2021 about how their case was reset several times, and about how they were unable to access their lawyer to discuss their case:

> am Curently in the Harris County
> Jail. And have been dealing
> with my lawyer reseting me
> over and over. Me and him
> never see each other. He
> has never came to see me
> or descuss my Case so Im
> writing in reguards to the
> storie in the Houston
> Chronical And it moved me
> to reach out to you for
> help. Im here on a state

7

34.     N.C. sent us a letter dated 03/26/2021 about how the pandemic prolonged their detention by causing their case to be reset several times. They did not see a judge or a lawyer. While they waited, they were infected twice with COVID-19:

> INMATE OF Harris County Jail Since Aug. 23, 2019.
> When Co-vid first hit Harris County Jail around
> Feb, 2020 there was many inmates & Gaurds
> from the streets that were allowed in our tank
> without being tested and as a result we had
> to be quarantined because one of the Gaurds &
> multiple inmates tested positive for Co-vid which
> infected the whole tank.
>     Since then I have been resetted in court &
> haven't seen my Judge or my Lawyer. Also the face
> mask that we are given are not N-95's and the
> mask that some gaurds wear are not appropiate
> mask's to prevent the spread of Co-vid. I have
> tested positive for covid twice due to ineffective
> masks that are being used.
>     Additionally During the February cold blast last

35.     A.R. sent us a letter dated 12/31/2020 about how their case was reset at least 7 times. They endured "horrific" conditions, including a lack of nutrition, while they waited.

> detain at the Harris County Jail at 1200 Baker Street. I
> have been incarcerated since November 5, 2019. Since
> my incarceration, and the COVID-19 pandemic, I have only
> been to court once, to be appointed a court attorney.
> I'm going on my seventh court reset due to dorm
> quarantine, and court lockdowns. The Jail conditions here,
> are horrific. No social distancing, improper sanitation pro
> cedures, improper COVID-19 testing. The food is cold, and
> very small portions are served. I'm financially disable,
> and what little money I do have goes to helping my family, which
> has shorten. My letter to your office, is to ask for assist-
> ence in support of my dire situation. Your support is very
> much appreciative. I heard that Texas Jail Project have
> reach out to indigent inmates here in the past during these

36.     A.R., a veteran with Post-Traumatic Stress Syndrome, sent us a letter dated 11/30/2020 describing how they are kept in unsanitary conditions and rarely saw their lawyer:

> BEEN INCARCERATED here at the HARRIS County JAIL FOR JUST OVER A YEAR NOW. I am AN INDIGENT INMATE with A COURT APPOINTED LAWYER. I CANNOT AFFORD ANYTHING FOR MYSELF And I only get to SEE/hEAR FROM my LAWYER WhEN IT's time to go to COURT AND then IT's A Long story on my CASE BEING RESET, I'm IN hERE FOR DRIVING WhiLE INTOXICATED. I FEEl that I am INNOCENT BECAUSE I was WALKing outside of my CAR WheN ANOTHER CITIZEN CALL the POLICE ON ME. I am NOW IN A DORM that BRINGS IN PEOPLE EVERYDAY WITH SYMPTOMS OF CoViD-19. THERE IS NO SOCIAL DISTANCING AND WE ALL EAT SIDE By SIDE, ELBOW to ELBOW. IT's VERY BAD IN hERE. THE GUARDS WEARS NO GLOVES AND SOMETIMES the only time they PUT their MASK ON IS WHEN their SERGEANT

37.     Q.S. sent us a letter dated 02/05/2021 describing unhygienic conditions and a sense of hopelessness at the Harris County Jail:

> with the steady on spread of the virus. But things are also strenuous in here. We are like caged animals, all waiting for a death sentence we did not sign for. We are sitting ducks with no where to run to. There is no social distancing nor sanitized environment. We are like sardines in a rusty can one on another cross contaminating. As soon as we are off Quarantine we are quickly put back on for re infection. They are not testing us nor keeping the others Quarantined long enough before putting them into general population long enough to stop the rapid spread of the virus, it is a vicious circle. In general population where I am they are having to constantly pull out positive inmates with critical symptoms, it has been so scary, the hysteria and a feeling of hoplesness. We look at our dyer fate everytime one of us are finally being pulled out burning up with fever or barely able to breath, its traumatizing. Medical ignores our pleas



are sick gets reset but everyone in the POD. Every time you here Quarantine you feel sick all over again, it feels like involuntary Euthanism. Many of our health are failing, including my own due to stress and improper care. The older cases such as myself or inmates whom where brought here before the COVID are suffering reset upon reset with no repose, as myself. The new inmates are speedily turning around to leave and going to court, while the older inmates are steadily being pushed back on a never ending docket.

All I ask is for Resolution. Some resolve in my case please. I am not a Menace to Society or a Pre Offender, but a person whom was in fear for her life as I was then November 2019 and I am even more so

## IV.   Harris County Jail conditions cause detrimental long-term health impacts and accelerate decompensation of people with mental illness and disabilities

### A.   Unaffordable medical charges

38.     A.D.W. is a Marine veteran and father of three children. He suffers from epilepsy, which results in frequent grand mal seizures forcing him to lose consciousness and memory.

39.     A.D.W. was in jail because he could not afford the bail amount imposed in his case. Last year, A.D.W. informed us that medical charges in the Harris County Jail –which were initially suspended during the pandemic–had resumed.

40.     The new medical charges meant that A.D.W. and others like him could not access basic medical and hygiene items unless he had the money to pay for them. Many people at the jail are indigent and are only there because they cannot afford to pay the secured bail amounts imposed in their cases.

41.     Those charges include $10 for nail clippers and extortive charges for other basic hygiene items, which are critical to people with certain medical conditions such as diabetes and eczema. My staff and I have even documented complaints of pretrial detainees being unable to afford necessities like unaffordable colonoscopy bags.

42.     A.D.W. requires the prescription medication Trileptal to be administered to him via oral suspension. Despite this prescription, the jail refused to provide him the medication as an oral suspension, and instead gave him varying dosages of the medication in pill form, relying on trial

and error to identify the appropriate dosage.

43.     Jail staff ultimately lowered A.D.W.'s dosage despite his doctor's orders. The jail's improper administration of his medication did not help prevent or control the seizures as it was supposed to, and he suffered seizures as a result.

44.     Despite the jail's refusal to follow A.D.W.'s prescription, the jail required A.D.W. to continue paying for the medication himself.

45.      As a result of the medical charges, A.D.W.'s commissary account was pushed into the negative, and he owed a debt of over $100 to the jail by the time he got out.

46.     The accrual of jail medical debt in spite of poor standards of care is not uncommon - my staff and I regularly work with pretrial detainees who cannot afford jail medical care and so accrue medical debt in jail.

47.     M.M is a 27-year-old who had been detained pretrial for over 5 months.

48.     At the time of his arrest in December 2019, with no priors and no criminal history, M.M's bond was set at $60,000. After 90 days, his bond was reduced to $30,000, but it was still well beyond his financial capability. Prior to being incarcerated pretrial, M.M's job at UPS provided him stable housing, medical benefits and a means of transportation, but not the kind of access to wealth that would have enabled him to post that bond amount.

49.     M.M suffered from Type 1 diabetes. By the time I spoke with him , he had already fallen unconscious on four different occasions at the Harris County Jail due to lack of food, lack of insulin or being given the wrong dosage of insulin. On one occasion it took the jail staff over 24 hours to administer M.M.'s insulin.

50.     His blackouts led to severe memory loss. By the time of his post-release interview on December 11, 2020 he had collapsed and passed out at the jail on at least five different occasions.

   B.   Denial of medical care

51.     My staff and I have intervened on behalf of a dozen pretrial women frustrated by the jail's refusal to allow detainees access to their "keep-on-person," medication. My staff and I stayed on the phone with people in debilitating pain after being denied post-operative care.

On March 26, 2021, a grandmother contacted us in a panic. Her grandson was detained pretrial at the Harris County Jail and had gone three days without receiving a mental health screening or his

medication. The grandson decompensated in administrative segregation for three days before we were able to contact the jail and directly advocate for him to immediately receive a mental health assessment and appropriate medication.

52.     This experience is not uncommon–my staff and I have repeatedly intervened after being contacted by family members reporting their loved one with a mental illness had not yet received a screening or medication after book-in.

53.     We receive so many letters and calls from pretrial detainees at the jail who are denied their prescribed medication, meaningful access to mental health treatment, or other necessary medical care that the magnitude of the harm is difficult to put into words. And those are just the calls and letters from people who are capable of initiating outreach themselves; many people at the jail–and particularly those who experience mental health crises after their treatment regimens are interrupted by their pretrial incarceration–are incapable of doing so.

54.     For example, P.C. wrote to my staff to explain how the jail refused to give them the correct dosage of their mental health medication or to schedule them for a visit with the doctor any more frequently than once per year:



55.     M.O. explained how the jail refused to respond to their requests for their prescribed mental health medication:

12

> They won't respond in a timely matter to my mental health requests for my medications that I have been prescribed here

56.    Yet another detainee A.C. wrote to my staff to explain how the jail refused to respond to their requests for their prescribed mental health medication:

> two weeks from the time I came in to get my medication on the cart, which probably could have benefited me during qurantine. I descried 3 pills (I think) when I came in from mental health but did not receive any more meds until I was out of qurantine and in general

> Fifth, and final to bring to your attention was how long it took for me to get my medication. It took almost

57.     My staff and I regularly receive letters from pretrial detainees detailing medical neglect. For example, many, such as R.W. describe backlogs of several days to even weeks before the jail will respond to requests for sick calls:

last you hear of that situation. About the "Medical" bad also because if you put in that your not feeling good it would take you several days to get to the informary which is a major problem especially if some one had a Heart Attack and during the time the Officer's are asking stupid questions

58.     Others such D.S describe being retaliated against for requesting medical attention:

I was given old celery in one of my chows, I developed symptoms common to food poisoning. I requested to be seen by a physician urgently. A week later my symptoms were gone and relayed what happened to a nurse during a follow up. to the urgent request. I was placed in a disciplinary tank cold and without a blanket. After requesting a blanket I was told by a guard he couldn't give me a blanket when I asked why he said he didn't know. I was placed in isolation

C.   Denial of mental health care

59.      The 16.22 mental health screening form became a mandatory part of the county jail intake and booking process under the Sandra Bland Act, which was passed by the 85th Texas Legislature after Sandra Bland committed suicide in Waller County Jail in Texas on July 13, 2015.

60.     The goal of the screening form is to immediately flag anyone with a history of receiving mental health services from the state in the past three years and to catch any history or tendency of suicides. The screening form must be sent to a magistrate within 72 hours in order to connect

the person with mental health services, connect them with 17.032 and 17.033 (unsecured) bonds, or divert them from the system.

61.     Even when the physical form is properly completed, it has been my experience that the jail regularly either fails to perform the accompanying screening adequately or fails to report the results of the screening in a timely manner to the magistrate.

62.     Almost a year into the pandemic, in the safety and comfort of our homes, we read with shock and dismay this account from N.P., a veteran with PTSD and a father of 3 who wrote to us in January of 2021:

*"First when you get here, immediately you are put into solitary confinement for 7-14 days. When I stepped into this hole there was filth, food, etc. from what looked like the last two inmates who were residents of this cruelty. You're not even given a mat, in some cases no blanket and tossed in this Hell for 23 hours a day for the next 7-14 days. I truly believe this is done to break a person down psychologically. You have persons like myself who have PTSD and other mental health issues, you hear men screaming and banging on the iron doors day and night. You are denied medical treatment and told to just "lay down and relax." This treatment is punishment on top of a punishment and completely inhumane, not to mention deadly in this Covid-19 climate."*

63.     Most suicides occur within the first three days of incarceration.[11] As of 07/27/2022, over 70% of the county jails in Texas that have failed inspection have failed on minimum standards relating to mental health screening and suicide watch.[12]

64.     For example, A.J. had documented history of mental illness and suicide attempts. While incarcerated pretrial at the Harris County Jail, his mental health deteriorated. He started banging his cell walls threatening to kill himself. His cellmates reached out to the family and his family in turn reached out to the judge. Recognizing the lack of responsive and supportive services at the jail, the judge advised the family to call me instead.

65.     I spoke with a Sergeant on A.J.'s floor who reported that A.J. had indeed lost continuity of mental health care due to a "gap" in the system and was now being seen by the mental health staff.

---

[11] Initiative, Prison Policy. "Rise in Jail Deaths Is Especially Troubling as Jail Populations Become More Rural and More Female." *Prison Policy Initiative*, https://www.prisonpolicy.org/blog/2021/06/23/jail_mortality/.
[12] "Non-Compliant Jail Reports." *Texas Jail Project*, https://www.texasjailproject.org/organizations/texas-commission-on-jail-standards/non-compliance-reports/

66.     When I think about A.J., I think about the hundreds of people like him who are detained pretrial in the Harris County Jail but have no one to advocate on their behalf.

   D.   <u>Negative health effects on detained pregnant people</u>

67.     I have also directly witnessed the negative effects of pretrial incarceration at the Harris County Jail on pregnant people's health.

68.     On July 15th 2020, I received a phone call from 28-year-old N.A. who was seven months pregnant in a solitary quarantine cell in Harris County Jail. [13]

69.     Through sobs and moans, N.A. described the blood and feces on the floors and walls of her cell. She neither had a proper mattress nor a blanket, despite the fact that TJP fought and won for the right of pregnant people in county jails to receive extra mattresses in 2009.

70.     N.A. was hungry and thirsty. Her only access to water was a faucet attached to the toilet. During our phone call she stated:

*"For breakfast, it's two pieces of bread, a little packet of jelly and a little pint of butter. It's like nothing, barely enough to keep you alive. They don't give you nothing to drink. You have to drink the water from the toilet. This little button above the toilet that water comes out. You don't have to drink the toilet water, but there's a buttons and it's a little fountain and it squirts water out. And that's the only thing you have to drink. It's not good. I'm pregnant. I need a little bit more than two slices of bread. It's not good. Every now and then they'll switch it up and they'll give me a boiled egg."*

71.     Sometimes there would be time for a shower in the 1 hour N.A. was allowed out of her cage, but there usually wasn't enough staff to facilitate that.

72.     I asked N.A. if she was getting prenatal vitamins - another right TJP fought and won at the legislature in 2009. She said *"I am so hungry. The portions are so small. I asked for Pedialyte. They said they'd bring it but they haven't."*

73.     If N.A. had been the only pregnant person I spoke with, I could have written it off as an anomaly. Unfortunately, she wasn't.

74.      Later that year on 13th Oct, 2020, we received a phone call from J.G. who had miscarried in Harris County Jail after being assaulted at the jail.

---

[13] Exhibit 6

75.     J.G. was bleeding for two hours before she was taken to medical and then forced to wait another 5-6 hours before being rushed by an ambulance to Ben Taub Hospital.

76.     J.G. described her long history of asthma and panic attacks, which she shared in detail during her intake and booking process. She needed an inhaler, but she reported that the staff told her that she would not be provided with one because there was no record of her asthma in their files.

77.     During her time in jail, J.G. witnessed one woman trying to hang herself and another eight-month pregnant woman who was so distraught that she kept jumping off repeatedly from the second bunk in an effort to kill herself.

78.     Q.G. was a 32-year-old, partially deaf Black survivor of domestic violence. She was also pregnant while detained pretrial at the Harris County Jail.

79.     On the morning of Saturday May 22, 2021, Q.G's mother called me begging for help. In a high-pitched and panic-ridden voice, she described Q.G's saga of surviving attempted murder by her ex-husband and the subsequent physical and untreated mental trauma that had led Q.G. to self-medicate.

80.     At almost four-months pregnant, Q.G was arrested during a court hearing for violating her probation due to the unconfirmed suspicion that she had relapsed.

81.     Despite sufficient funds in her commissary and phone account, Q.G had neither called her mother nor bought anything from the commissary for well over a week. It was unusual for Q.G not to call her mother because her mother was caring for her four children while she was incarcerated. Q.G's mother had a "bad feeling" that something was wrong.

82.     I reached out to the jail administrator to share all the information and ask for disability accommodations for Q.G. I heard nothing back.

83.     When I was later able to interview Q.G, I learned that, on several occasions, her asthma attacks went untreated by the jail medical staff and became so severe that she was unable to breathe. She was rushed to Ben Taub Hospital when it was clear that she was in distress and in danger of losing her fetus.

84.     Within a week we were able to divert Q.G. to a Santa Maria facility in Houston, where she underwent a successful residential rehabilitation program for pregnant women. But for Q.G.'s relative luck in having an involved mother eager to advocate for her daughter–much more than many others at the jail have–we would never have connected with Q.G. and, accordingly,

never intervened. I shudder to think of Q.G's fate at the jail—unable to advocate for herself due to her disabilities.

85.     As recently as June 23rd of this year, I learned of yet another pregnant person M.S. in the Harris County Jail who was three and a half months pregnant with twins. M.S. stated that she was roughed around by two jailers, shackled at least once - in violation of state law, confined in solitary under extremely unsanitary conditions, dehydrated and devoid of mandated prenatal care. She eventually miscarried one fetus and required hospitalization for three days. On a subsequent visit to the hospital, she was given an abortion without her consent, for the other fetus.[14] Her mother told us that she was also the victim of sexual assault in the jail. As I write this, M.S. is struggling to recover from a painful post-surgery vaginal infection. There is also an ongoing PREA investigation and an excessive use of force complaint being drafted for the FBI and Texas Rangers.

86.     These stories are not anomalies; they are representative. They are the product of persistent and systemic failures at the Harris County Jail.

### V.     Pretrial detention in Harris County Jail wreaks havoc on detainees' families, housing stability and financial security

87.     My staff and I have listened to hundreds of people express panic about their family's worsening financial situation after their incarceration deprived their household of an income that kept a roof over their head and food in their pantry.

88.     One such person was our Black veteran client C.W., who spent two years in the Harris County Jail waiting for a trial. His pretrial incarceration caused him to lose his job, which threw his family into financial tumult and forced them to move out of their home. He lost his driver's license, birth certificate, and social security card during the move.

89.     When C.W. was eventually released, he had lost the full-time job he had before being jailed. He had a very difficult time obtaining new employment without his driver's license, birth certificate, and social security card. He encountered "freedom" as a newly unhoused person with no identification.

90.     Likewise, M.M., who lost his job at UPS and is described above in paragraph 50-51, summarized the impact of his pretrial detention in the Harris County Jail as follows: "Being detained pretrial has robbed me of my job, my housing, my car and most tragic of all, my health."

---

[14] Exhibit 9

91.     C.A. provides another example. She is a mother who was held pretrial because she could not afford her bond on a substance-dependency-related charge. My staff and I sat in quiet silence when we opened her letter. She wrote:

*Today marks another day of sadness for me. My dog died, so I've lost my house, truck, [belongings], and now my dog - how much more do I have to go through here? I don't wanna be here for the Holidays, I have a daughter out there who needs me - everyday I pray that nothing happens to her.*

92.     Situations like those of C.W., M.M., and C.A. are all too common. My staff and I have answered many calls from housing advocates on behalf of desperate community members facing eviction proceedings while awaiting trial inside Harris County Jail. We began disbursing unrestricted cash aid to families facing eviction while a wage-earner was incarcerated, filling a gap in services. We've disbursed over $220,000 in aid across the state to date, and have also disbursed money to detainees' commissary and phone accounts. But we don't come close to covering the needs of those facing eviction while incarcerated pretrial at Harris County Jail.

93.     Our client M.J. is a father who was incarcerated pretrial because he could not afford his secured bond on a substance-dependency-related charge. He was an involved and participatory father to his eight-year-old son.

94.     While M.J. was detained pretrial, his son died. Because he was still detained pretrial at the Harris County Jail, he missed his son's funeral.

95.     I have spoken with sons who missed their parents' funerals and parents who missed their children's first day of school. I have spoken to detainees whose charges would later be dismissed but still faced stigmatization and social isolation after release because of the time they spent incarcerated pretrial, the harm they experience is deep and irreversible.

## VI.     Harris County Jail's response to the Covid-19 pandemic has accelerated the spread of the virus and worsened conditions across the board

96.     As of April 1, 2022, per data released by the Sheriff's office, at least 4,450 incarcerated people have tested positive for COVID-19 in Harris county jail and at least 10 have died from the virus.[15]

97.     Last year, we received a letter from A.A., a mother of two who has several large masses on her kidney and was experiencing symptoms of COVID-19:

---

[15]  Exhibit 4

"*The facility has still not responded to my grievances on medical attention. I keep getting called out to triage only so the nurse can tell me that an appointment will be made in 7 to 10 days, but it's been 60 days by the time you receive this letter.*"

Although the crisis of COVID-19 may be waning from its peak, the neglect and mistreatment of people that it unveiled at Harris County Jail is not.

98.     R.B., a woman housed in the "Freedom Project" pod wrote to us in the Fall of 2020 to recount her months of ongoing pretrial incarceration:

"*I was in quarantine for over 14 days. First thing I noticed was how filthy the one man cells were. Not once did the officers have a trustee come in and clean out cells before placing another 'inmate' in, coming fresh off the streets. . . .  Yet, with all honesty, to be placed in a small, one man cell for 3½ weeks, 23 hours a day...lets say I haven't been the same since. My lawyer has letters from me I wrote to him while in quarantine, telling him how I was rocking myself like a crazy person because I was losing my mind. MHMR came and checked on me, but thats all they did. I told them I needed to see a doctor. I was informed there's a 4 week wait. I ended up having to wait 2 months til I was able to see the mental health doctor. When I was put into 'GP,' 4C2 pod, there was no soap. If it was not for my care pack of hygienes, I would be soapless. I shared my one bottle of shampoo with 6 people. There were extreme fights nightly in that tank. . . . Yet not once, during the 14 day isolation, did anyone come check on us. On the 15th day of isolation, a nurse came in, checked our temperature, everyone passed. . . . One girl pressed the picket button because she couldn't breathe. The officer replied, "what do you want me to do about it?"*"

99.     Other women described how they were collectively sick with COVID-19 in a quarantine "tank" and received no medical care at all. They took care of each other taking turns to stay up nights watching over their neighbors who were too sick to even move. They used wet rags to control fever and sanitary pads to clean surfaces.

100.    In the course of interviewing detainees across all three buildings comprising Harris County Jail, my staff and I consistently learned of COVID-19 procedures that were more punitive than preventative. Visitation and recreation time were restricted, even as it took months for detainees to be given a mask. Food service changed to "johnny-sacks," - cold, sometimes moldy sandwiches.

101.    The practice of "cohorting" was and continues to be common when an individual displays symptoms. Their entire pod is quarantined but before the end of the quarantine, new individuals are brought into the pod, starting the quarantine clock all over again. One of the most frequent complaints we document are court resets due to avoidable quarantines.

102.    Another veteran named F.P. wrote to us in January of 2021 from the Brothers in Arms pod:

*"The conditions were horrible. The guards came in and made fun of the existence of Covid-19 in the jail. When anyone would ask the guards about the number of cases in the jail, one guard went to the extreme of removing his mask, coughing, and saying that Covid-19 does not exist. I saw another guard wear his mask on his forehead. There was one occasion to where a guard wore his mask over his eyes and said 'Do you see Covid…I cant see Covid.' I have seen two consecutive weeks where at one point there was simply No Soap."*

### VII.    Overcrowding in Harris County Jail has resulted in the forced transfer of pretrial detainees across state lines into a deadly for-profit prison facility operated by LaSalle Corrections

103.    The untenably high jail population has deteriorated day-to-day operations, leading to Harris County Jail being found repeatedly non-compliant by Texas Commission on Jail Standards and creating dangerous and burdensome delays in grievance processes, medical care, food service, and critical face-to-face observations of detainees.[16]

104.    As one quote from the report states:[17]

*"Lack of sufficient staffing has contributed to the heightened level of tension and hostility. A review of Serious Incident Reports reveals that reports of incarcerated person assaults have increased from 2020 to 2021"*

105.    My staff and I listened as interviewees scanned their cells in 1200 Baker Street and counted aloud how many people were sleeping on the floor. We documented firsthand accounts of the overcrowded mental health ward, where people were surrounded by dirty diapers and watched as their peers sat in their own excrement.

106.    S.D. recounted his experience in the ward to us last year:

---

[16] *Texas Commission on Jail Standards Jail Inspection Report*, 15 Nov. 2021, https://35b9y7dxj6m3euqw1pl9r818-wpengine.netdna-ssl.com/wp-content/uploads/2021/12/Harris_Special_NC_12-6-2021.pdf.

[17] Id.

*"And the Psyche Ward is like Hell on Earth.  Locked down 23 - 24 hours a day with the filthy and the hopeless. It has to be experienced to be understood. There was literally shit on the walls that they refused to clean up, or allow us to clean up."*

107.    The repeated non-compliance findings, and an overcrowded jail full of people too poor to afford their bail, resulted in Harris County's $10.95[18] million dollar decision to transfer 500 defendants to a for-profit facility in Louisiana.[19]

108.    Hundreds of miles from home, their families, and their attorneys, legally innocent community members are in custody of LaSalle Corrections—the same company that operated ICE facilities where reports have surfaced of migrant women being sterilized.[20]

109.    In less than three months, the first transferred person had died. Billie Davis was a 35-year-old Black man who was arrested on February 11, 2022.[21] According to our review of Mr. Davis' court records, it appears he never had a 15.17 bail hearing in front of a hearing officer at all. Five days later, Mr. Davis had a preliminary appearance in front of his judge. Billie's bonds were set, totaling $25,000 for non-violent charges.[22]

110.    When a colleague called the court reporter to obtain a transcript, they were told that there was no reporter record of what happened. Mr. Davis likely never had a bail hearing, and he certainly did not have one on the record. Mr. Davis was detained and shipped across state lines, where he died alone, because he could not afford the bonds apparently set without any hearing at all.

111.    Because his death occurred in Louisiana—outside the state of Texas—it is my understanding that Billie Davis' death has not been reported to the TX Office of the Attorney General as required by The Sandra Bland Act, or counted or recorded by the Texas Commission on Jail Standards.[23]

---

[18] Exhibit 5.

[19] Gabrielle Banks, and Joel Umanzor. "Hundreds of Harris County Inmates Headed to Private Louisiana Jail to Prevent Overcrowding." *Houston Chronicle*, Houston Chronicle, 10 Jan. 2022, https://www.houstonchronicle.com/news/houston-texas/houston/article/Hundreds-of-Harris-County-inmates-headed-to-16759951.php.

[20] "Whistleblower Complaint Asserts High Rate of Hysterectomies at Ice Detention Facility Run by LaSalle Corrections." *ACLU of Louisiana*, 15 Sept. 2020, https://www.laaclu.org/en/press-releases/whistleblower-complaint-asserts-high-rate-hysterectomies-ice-detention-facility-run.

[21] Brennan, Leah. "Harris County Jail Inmate Who Was Recently Transferred to Louisiana Correctional Center Has Died, Authorities Say." *Houston Chronicle*, Houston Chronicle, 2 Mar. 2022, https://www.houstonchronicle.com/news/houston-texas/article/Harris-County-Jail-inmate-who-was-recently-16970097.php.

[22] Exhibit 7

[23] Exhibit 8

## VIII.   Conclusion

112.        Pretrial detention in the Harris County Jail regularly exposes detainees to violence and death. It reduces access to quality legal representation and wreaks havoc on detainees' families, housing stability and financial security. Moreover, Harris County Jail conditions cause detrimental long-term health impacts and accelerate decompensation of people with mental illness and disabilities. In short, it is my opinion that pretrial detention in the Harris County Jail, even for relatively short periods of time, causes people serious and often long-lasting harm, making it difficult for individuals to reintegrate into society when they are eventually released.

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge.


_____          _____
Krishnaveni Gundu                Date

23

# EXHIBIT 1

# KRISHNAVENI GUNDU

krish.gundu@texasjailproject.org | (281) 854-4104 | Twitter: @kinsngops

## EDUCATION

**ST. ANN'S COLLEGE, OSMANIA UNIVERSITY,** B.S. in Electronics, Physics & Math, 1994
**KHAIRAGARH UNIVERSITY,** B.A. in Classical Dance (Kathak), 1989

## RELEVANT EXPERIENCE

**TEXAS JAIL PROJECT**                                                                         2006 - Present
*Co-founder, Former Board Member, Executive Director* since 2020

- Assess and address individual and community concerns regarding incarceration process, care and treatment of individuals in the 240 county jails spread across 254 counties in Texas, with a focus on vulnerable and marginalized populations such as individuals with developmental disabilities, mental illness, pregnant people, and veterans.
- Participated in cross-sectional coalition building with Criminal Justice and disability rights advocacy groups including ACLU TX, Texas Civil Rights Project, Texas Fair Defense Project, Disability Rights Texas, Texas Organizing Project, National Alliance for Mental Illness (NAMI TX), The Arc of Texas and Texas Coalition of Developmental Disabilities.
- Provide first hand knowledge from incarcerated people and their families, experience and recommendations to communities and lawmakers to reduce harms in county jails.
- Build and strategically leverage critical coalition relationships with system actors (sheriffs, jailers, jail medical, county commissioners, county judges, court appointed attorneys, social workers, mental health care professionals) and state level policy and law-making constituents.
- Won 2 year Peer Policy Fellowship from Hogg Foundation for Mental Health University of Texas, Austin.
- Hogg Fellow won appointment as Commissioner to Texas Judicial Commission on Mental Health and State Bar's Disability Rights Committee
- Enhance knowledge base for advocacy efforts for Texas Coalition of Healthy Minds (TCHM) member organizations in order to advocate for individuals with mental illness and developmental disabilities criminalized for behaviors resulting from their illnesses.
- Advocate for detained individuals leading to outcomes like reduced solitary confinement and lower charges, release into community mental health care, reuniting babies born in pretrial custody with their families, and shedding light on the abhorrent conditions and need for support of individuals isolated in suicide watch and administrative segregation.
- Key stakeholder engagement in Sunset Commission Review of Texas Commission on Jail Standards (TCJS) leading to a complete revamp of complaints process including shifting of personnel and resources for in-depth investigations into complaints and more robust jail inspections.
- Successfully advocate to strengthen the Texas Commission on Jail Standards (TCJS) rules and minimum standards that guide care of vulnerable populations.
- Strengthen direct services through mutual aid programs for individuals and families impacted by county jail incarceration with resources including mental health guide, and advocacy training programs.

1

# KRISHNAVENI GUNDU

krish.gundu@texasjailproject.org | (281) 854-4104 | Twitter: @kinsngops

- Successfully advocate for legislation mandating robust policies and increased resources for vulnerable pretrial detainees such as pregnant people and veterans.
- Create a unique program for receiving collect phone calls from county jails across Texas at the onset of COVID-19 to shed light on conditions and practices.
- Brief legislators, policy makers and think tanks on harmful impacts of cash bail, Operation Lone Star and the impacts of a growing forensic waitlist in county jails.
- Establish a revolving community bail fund in Smith county in 2021 which led to 47 individuals being reunited with their families and currently charges being dropped against 5.
- Spearhead a unique $70,000 mutual aid pilot program for commissary and phone support for incarcerated individuals in Harris and three surrounding county jails (May 2020) which increased to over a $300,000 direct program statewide to support critical needs of incarcerated individuals and their families in 25+ counties across Texas.
- Successfully filed complaints with the Department of Justice leading to civil and disability rights investigations in 3 county jails.
- Volunteer with Project Orange to register incarcerated voters inside Harris county jail during Covid-19 (Aug-Sept 2020).
- Led the organization from one full time employee to five full time employees within two years by raising the profile of the organization, adding three new programs, and increasing the budget four- fold through strategic fundraising.
- Working memberships and appointments with TCJS, TCCVS, JCMH, IDD, Task Forces, and Coalitions (see below).

## TEXAS COMMISSION ON JAIL STANDARDS (TCJS)                    2006- Present
*Rulemaking Working Group Member*
- Collaborate with sheriffs, jailers and legislative staff to translate bills into rules and minimum standards adopted in the Texas Administrative Code.
- Attend quarterly meetings and bring essential community testimony to inform about critical gaps.
- Create robust standards for detained pregnant people's prenatal, delivery in hospitals and postpartum care in county jails.
- Rulemaking participant for bills translated to rules and minimum standards, and government codes and best practice policies consultation for:
  - Prenatal care
  - Postpartum protection for pregnant people
  - Limiting of restraints during pregnancy & postpartum
  - Mandatory Ob-GYN visits
  - Transportation to hospitals at onset of labor
  - Good quality free feminine hygiene products
  - 24x7 access to mental telehealth services
  - Suicide prevention
  - Reinspection of jails
- Sunset Commission review process evaluation including in-depth interviews and data sharing from TJP cases
- Advocate for policy regarding:

# KRISHNAVENI GUNDU
krish.gundu@texasjailproject.org | (281) 854-4104 | Twitter: @kinsngops

---

- ○ Hygiene dignity for women in suicide watch and solitary confinement
- ○ Medication continuity for vulnerable populations
- ○ COVID-19 data collection and protocols
- ○ Custody death records, notifications and investigations

## TEXAS COORDINATING COUNCIL ON VETERANS SERVICES (TCCVS)
2019-Present
*Criminal Justice, Mental Health & Pro Bono Committee Member*
- State-wide council providing recommendations to governor's office about unmet needs of veterans incarcerated in county jails.
- Offer best practices regarding  unmet needs for veterans with mental health needs in county jail, gaps in care, and services.
- Provide mutual aid and hard cash.
- Advocate for best practices in data collection of veterans in county jail system.
- Coordinating with the Texas Veterans Commission to ensure connection to available resources and benefits.
- Cross-sectional collaboration between agencies.
- Advocate for more peer support services in jails and pre and post trial release.

## TEXAS JUDICIAL COMMISSION ON MENTAL HEALTH (JCMH)                2019-Present
*Collaborative Council Member, Data Committee Member (Appointed)*
- Attend monthly council meetings, workgroups and annual conferences.
- Provide analysis of Texas Jail Project cases in order to identify gaps, barriers and outcomes for people with mental illness and disabilities in county jails.
- Collaborate with mental health court judges, prosecutors, Texas Indigent Defense Commission, court liaisons and people with lived experience to share best practices across Texas counties.
- Responsible for TJP Hogg Foundation Peer policy fellow appointed as official commissioner on JCMH.
- Facilitated Mental Health Coordinator Grant from JCMH to an East Texas County.
- Highlight gaps, unmet needs and challenges in the mandatory 16.22 mental health screening process to identify people with mental health history and risks during jail intake.
- Provide mutual aid for pre-trial diversion support in select cases referred by JCMH.
- Member of the Data Subcommittee responsible for data-informed decisions on forensic waitlist.
- Relationship building with judges, mental health prosecutors, public defendersnto highlight issues and needs from casework.
- Liaison/conduit for impacted community members.
- Recommend sessions for annual JCMH conference.
- Provide recommendations, gaps in data, best practices for screening tools

# KRISHNAVENI GUNDU

krish.gundu@texasjailproject.org | (281) 854-4104 | Twitter: @kinsngops

**JUSTICE & ACCOUNTABILITY TASK FORCE AGAINST**      2021- Present
**OPERATION LONE STAR ORGANIZED BY MEXICAN AMERICAN LEGISLATIVE**
**CAUCUS**
*Invited Member*
- Monitoring and documenting conditions of pretrial confinement in Briscoe and Segovia prison units based on interviews with incarcerated undocumented immigrants and their families, and American citizens arrested under Operation Lone Star (OLS).
- File complaints with Texas Commission on Jail Standards as part of larger complaint filed by statewide civil rights and justice coalitions with Department of Justice.
- Provide briefings and recommendations to legislative task force and allies regarding civil and disability rights violations.
- Highlight illegality and unconstitutionality of OLS to legislators, policy makers and media.
- Successful submission of DOJ complaints.

**TEXAS STATEWIDE CRIMINAL JUSTICE BAIL REFORM COALITION**      2020 - Present
*Member*
- Bring stories of harmful impact of cash bail across state to inform coalition.
- Brief legislators and staff on harmful impacts of wealth based pretrial detention.
- Brought 5 testimonies from directly impacted community members to legislature.
- Testify in house Committee and Senate Committees on Criminal Jurisprudence against the bail bill that expanded wealth based pretrial detention.
- Collaborate on writing and publishing op-eds for individuals with lived experience.

**TEXAS COALITION OF HEALTHY MINDS**      2021 - Present
*Member of Legislative Sub-Committee*
- Shape bills and policy as a key member in Broad intersectional coalition building work between criminal justice and disability rights groups such as Texas Criminal Justice Coalition, Disability Rights TX, The Arc of Texas, Texas Coalition of Developmental Disabilities, National Alliance for Mental Illness TX and others.
- Share lived experience and stories from advocacy work to shape policy and legislation for interim charges and full session.

**INTELLECTUAL AND DEVELOPMENTAL DISABILITY**    **(IDD)**      April 2022
**ADVISORY COMMITTEE**
*Invited Member, member of Screening Tool, Data and Legislative Report sub-committee*
- Legislatively mandated committee under Texas Commission on Jail Standards.
- Study issue of individuals with IDD in county jails and make recommendations for better outcomes.
- Share lived experience of harms caused in jails and impact on families and communities.
- Create screening tool to identify individuals with IDD and divert them pretrial.

# KRISHNAVENI GUNDU

krish.gundu@texasjailproject.org | (281) 854-4104 | Twitter: @kinsngops

**TEXAS ENVIRONMENTAL JUSTICE ADVOCACY SERVICES**          2005 - Present
*Co-founder and Board Member, Current Treasurer*
- Work on environmental health and justice issues amongst low-income communities living around the Houston Ship Channel.
- Build the capacity of directly impacted communities.
- Execute fundraising, education, research, coalition building, and create campaigns to counter unfair burden of toxins on fence line communities most susceptible to industrial pollution.
- Key participant in Community Safety Agenda campaign(2022) to shift county budget to critical public safety measures instead of expanding carceral systems.
- Single-handedly raised seed funding to launch organization in 2005.

**INTERNATIONAL CAMPAIGN FOR JUSTICE IN BHOPAL**          2002– 2005
*USA Coordinator & Volunteer*
- Coordinated between member organizations in India, US and the UK.
- Represented ICJB to US and  international media.
- Enlisted the support of environmental, labor, advocacy and other non-profit groups for the campaign, including prominent South Asians and South Asian groups.
- Lobbied offices of Congresspersons to submit Amicus Curiae brief on behalf of the victims' ongoing lawsuit against Union Carbide in New York courts, and for resolutions on behalf of Bhopal survivor groups.
- Wrote project proposals for grants.
- Conducted teach-ins at universities.
- Organized US six city tour for Bhopal survivors and activists.
- Organized film screenings & teach-ins for mainstream audiences across the US.
- Recruited volunteers for the campaign.


## PUBLICATIONS AND INTERVIEWS (Partial)

**NATIONAL**
Press, Eyal. "A Fight to Expose the Hidden Human Costs of Incarceration." The New Yorker, 12 Aug. 2021, https://www.newyorker.com/magazine/2021/08/23/a-fight-to-expose-the-hidden-human-costs-of-incarceration.
Heiss, Jasmine, and Krishnaveni Gundu. "Opinion | Why Reimagining Safety Looks Different in Rural America." The Washington Post, WP Company, 28 Apr. 2021, https://www.washingtonpost.com/opinions/2021/04/29/reimagine-safety-cities-rural-communities
Pauly, Madison. "'It's Terrifying, It's Almost Crippling': Texas Jails and Prisons Are Freezing Over." Mother Jones, 19 Feb. 2021, https://www.motherjones.com/crime-justice/2021/02/its-terrifying-its-almost-crippling-texas-jails-and-prisons-are-freezing-over/

## KRISHNAVENI GUNDU

krish.gundu@texasjailproject.org | (281) 854-4104 | Twitter: @kinsngops

**STATE**

Barer, David, and Josh Hinkle. "'Horrifying' Wait Times for State Hospital Beds, Official Says." KXAN Austin, KXAN Austin, 19 May 2022, https://www.kxan.com/investigations/horrifying-wait-times-for-state-hospital-beds-official-says/

Barer, David, and Josh Hinkle. "State Hospital Staffing 'Emergency' Looms as Record 2,100 Wait in Jail for Treatment." KXAN Austin, KXAN Austin, 15 Mar. 2022, https://www.kxan.com/investigations/state-hospital-staffing-emergency-looms-as-record-2100-wait-in-jail-for-treatment/

Murney, Michael. "How a Recent U.S. Appeals Court Decision in Dallas Could Be Bad News for Bail Reform Advocates." Dallas Observer, Dallas Observer, 4 Mar. 2022, https://www.dallasobserver.com/news/dallas-countys-cash-bail-system-will-continue-federal-judges-rule-13286752

Jerome VanZandt. Opinion: "Despite new law, Texas still has far to go on bail reform" Houston Chronicle, 17 Oct 2021, https://www.houstonchronicle.com/opinion/outlook/article/Opinion-Despite-new-law-Texas-still-has-far-to-16536377.php

Barajas, Michael, and Sophie Novack. "Locked Up and Left To Die: In Texas, Dying in Jail Is 'Par for the Course'." The Texas Observer, 10 Dec. 2021, https://www.texasobserver.org/locked-up-and-left-to-die/

Kelly, Sam González, and Gabrielle Banks. "On July 4, Texans Reflect on Pledges of 'Lives, Fortune and Sacred Honor' Made in Declaration of Independence." Houston Chronicle, 4 July 2021, https://www.houstonchronicle.com/news/houston-texas/houston/article/On-July-4-Texans-reflect-on-pledges-of-Lives-16292299.php

## PANELS AND CONFERENCES (Partial)

| | |
|---|---|
| *"***Public Defender Training Panel With Death Row Exoneree Anthony Graves** | 04/25/2022 |
| *Organized by Zealous and presented at the University of Chicago, Law school* | |
| **"Punishing Ourselves - Impact Of Incarceration On Public Health"** | 03/02/2022 |
| *Online event: Organized by Texas Jail Project and Doctors for Change* | |
| **"Best Practices In Healthcare For Incarcerated Women"** | 02/22/2022 |
| *Online presentation: Organized by Womxn In Medicine* | |
| **LA County Public Defenders Training On Communications/Messaging** | 02/10/2022 |
| *Organized by Zealous and presented online* | |
| **"State Of Individuals With Disabilities In County Jails"** | 04/08/2021 |
| *Presented to TX Governor's Disability Rights Committee* | |
| **Reproductive Justice Conference** | 03/06/2019 |
| *Organized by Texas Women's University Denton* | |

# KRISHNAVENI GUNDU

krish.gundu@texasjailproject.org | (281) 854-4104 | Twitter: @kinsngops

## ADDITIONAL EXPERIENCE

**HAMILTON MIDDLE SCHOOL** 2020
*Texas State Standardized Test STAAR intervention Math Tutor*
- Targeted math coaching and testing support for 7th-8th graders; 13 hours/week.

**HAMILTON ELEMENTARY SCHOOL** 2014 – 2019
*Volunteer & temporary STAAR intervention Math Tutor*
- Math tutoring for STAAR test 3rd-5th grades 6-8 hours/week every spring.
- Managing the school library for an average 5 hours/week.
- Math tutoring for first graders - 2 hours/week.
- 

**LONE STAR COMMUNITY COLLEGE, UNIVERSITY PARK** 2015 - 2020
*Math Coach*
- Part-time math coach offering tutoring and testing support for a wide range of math courses including remedial up to calculus III.
- Students include high school dropouts, veterans re-entering civilian life, students with special needs, nurses and teachers training for elementary school math.

**FOLLETT HIGHER EDUCATION GROUP** 2012 – 2015
*Part-time Associate & later Assistant Manager at the Lone Star College (LSC) University Park & Cypress locations of Follett Bookstore*
- Manage and fulfill online book orders.
- Maintain internal website and paperwork related to online sales.
- Assist with in-store sales, inventory and buyback.
- Hire and train associates.
- Manage financial aid for entire campus.

**FOLLETT HIGHER EDUCATION GROUP** 2003 – 2008
*Part-time sales at various LSC campuses; Assistant manager at LSC-CyFair Bookstore*
- Over the course of 5 years, work on and off for FHEG in various capacities & bookstore locations including LSC-Tomball, LSC-CyFair, LSC-North Harris & LSC-University Park.

**PESTICIDE ACTION NETWORK UK** 2001- 2002
- Volunteer for Bhopal Medical Appeal (17th Anniversary fundraising).
- Handle donations, including credit card clearances. Correspond with credit card companies, banks, individual donors & institutional supporters.
- Respond to requests for information.
- Maintain the Bhopal Medical Appeal donor database.
- Network with donors for possible future activities.
- Write weekly status reports.
- Interact with media for free space for future ad campaigns.

7

# KRISHNAVENI GUNDU

krish.gundu@texasjailproject.org | (281) 854-4104 | Twitter: @kinsngops

---

**WWW.INDIACARES.ORG**                                                      2001
*Head of Content*
- Research credibility of voluntary organizations across India.
- Visit NGOs and grassroots groups to get a better understanding of development and rights issues, functioning of the organization, firsthand experience of their methods and perspective of the local communities.
- Create communication aimed at raising awareness of social issues and eliciting support from urban Indian and diaspora communities.
- Conduct communication and campaigning workshops for Indian voluntary sector professionals, social workers, grassroots activists.
- Write content for the website www.indiacares.org.
- Make presentations to potential funders, creating content.
- Work with NGOs, human rights groups, voluntary sector professionals.
- Chart out the vision and mission of the portal.

**NETKRAFT PVT. LTD**                                                        2000
*Senior Content Architect*
- Responsible for content on brand sites such as indigonation.com, scullers.com, indusleague.com.
- Navigation and design on B2C (Business to Consumer) sites for HMV Music; and user interface, schematics and content on an ongoing B2B (Business to Business) chemical exchange.

**BRITISH DESIGN & ART DIRECTORS COUNCIL**                                   1999
*Guest Participant (invited)*
- Guest participant at workshop on the Future of Advertising & Design in Emerging and Converging Media: Digital TV and The Internet as part of the Bhopal Advertising Award.

**ABBOT MEAD & VICKERS ADVERTISING/MOTHER ADVERTISING**                      1999
*Guest Copywriter*
- Work on live briefs such as McCallan Scotch, the British National Health Service and The Economist at two of London's most prestigious advertising agencies, as part of the Bhopal Advertising Award.

**OGILVY & MATHER ADVERTISING LTD.**                                         1997-1999
*Copywriter (English & Hindi)*
- Create of copy and storyboard for mass media (print, Point of Purchase and audio-visual – TV, radio).
- Portfolio consisted mainly of Lever brands such as Brooke Bond Bru, Lipton Taaza, Brooke Bond A1, Titan watches, TVS and Tata Cellular.

**PROFAD ADVERTISING**                                                       1996–1997
*Creative Consultant*
- Brands handled: Hotline Paging, Motorola and TTK foods.

# KRISHNAVENI GUNDU

krish.gundu@texasjailproject.org | (281) 854-4104 | Twitter: @kinsngops

**MADISON DMB&B ADVERTISING**                                               1995

*Junior Copywriter*
- Work primarily on P&G brands: Cinthol, Vicks and Whisper in all media.

**WPP WORLDWIDE CONTRACT ADVERTISING**                             1995

*Trainee (On full scholarship)*
- Partake in training programme on 'Basics of Advertising.'
- Work on live projects including Bajaj and Nivea for Men.

**HEIGHTS COMMUNICATIONS PVT LTD**                              1993 - 1995

*Copywriter*
- Work initially on a part-time basis while in college.
- Full-time writer handling accounts such as Treasure Island, Metro Estates, Golconda Hotel, Jukebox, Dasaprakash, NCL-Seccolor and other regional establishments.

**MBL - RCG (MARKET RESEARCH ORGANIZATION)**                     1993

*Freelance fieldwork and translations*
- Consumer research projects on leading fast moving consumer good (FMCG) brands such as P&G Vicks, Avon and Castrol.

## REFERENCES

**ALLISON FRANKLIN**

*CARES Ex-Program Director, Safe Alliances Austin*

Cellphone: 713-213-9339

Email: freedomfighteraht@ gmail.com

Allison Franklin is a passionate and dedicated Survivor Leader. She has extensive experience advocating for survivors of all forms of sexual exploitation, and for solutions to systemic practices that fuel oppression and stigma. Allison is an accomplished speaker, addressing sex trafficking and sexual exploitation accompanied by drug abuse, mental health, and intersections with the criminal justice system. She has worked directly with Governor Greg Abbott's Child Sex Trafficking team, and serve on numerous coalitions and work group to fight adult and child exploitation. Allison has used her lived experience to lobby and testify on countless bills in the state legislature and provided congressional fly-ins to effect change on national policy. Allison served as the 2018-2020 Hogg Foundation for Mental Health Peer Policy Fellow for Texas Criminal Justice Coalition, and she provides support groups for incarcerated girls. She is a survivor consultant National Criminal Justice Training Center and Mosaics and for the CEASE Network in Houston and currently serves as the Director of SAFE Alliances CARES Program and works on national, state, and local levels with numerous stakeholders to find innovative solutions to abolish modern slavery.

**CINDY ALVARADO**

# KRISHNAVENI GUNDU
krish.gundu@texasjailproject.org | (281) 854-4104 | Twitter: @kinsngops

---

*Community Engagement,  J P Morgan,*
Cellphone: (936) - 827-9469
cindy.alvarado@jpmchase.com

Cindy Alvarado is currently heading Community Engagement in J P Morgan's Houston's philanthropy division. She was the Evaluation and Impact Program Officer with The Simmons Foundation of Houston which has been a major funder of TJP's work for over three years. Her work includes evaluating the foundation's portfolio to help them learn and refine their grantmaking strategy. In addition to her program officer duties, Cindy enhances grantee learning through collaboratives, capacity building, and other efforts. Cindy is a strong advocate for equitable data and evaluation, feedback loops, and beneficiary engagement. Cindy is a 2019-2020 Harmony Initiative Fellow with the Justice Funders network. Cindy holds a MPA and a Bachelor's degree in Political Science from Texas A&M University. In her free time, she enjoys practicing yoga and spending time outside with her dog, Taz. Cindy envisions a just, inclusive community, where people have the right to self-determine and live their lives with dignity and respect.


**DR. LYNDA FROST, J.D., PH.D.**
*Independent Consultant*
lynda@lynfro.com
Cellphone (512) 657-3797
https://www.lynfro.com/
Dr. Frost brings extensive experience in grantmaking, program design, strategic planning, and public policy. She has two decades of teaching graduate students in law, public policy, education, and social work and approaches her work with an eye to strengthening the next generation. She's committed to helping foundations, nonprofits, and other agencies maximize their impact in improving health, human services, education, and criminal justice outcomes for the most vulnerable communities. She's passionate about fair and effective processes, with expertise in facilitating groups to maximize the engagement of each participant to apply what we know to make positive change on the ground.

# EXHIBIT 2

| Harris | James Reed JR | 53 | M | African American | 07-Jan-20 | 0935 | Hospital | Natural |
| Harris | Edward Lewis | 59 | M | African American | 08-Mar-20 | 2009 | Hospital | Natural |
| Harris | Jerome Nebowa | 30 | M | African American | 06-May-20 | 1425 | Hospital | Homicide |
| Harris | Ted Reed AKA Arnold Hall | 55 | M | African American | 06-May-20 | 0710 | Hospital * | Natural* |
| Harris | Wallace Harris | 64 | M | African American | 06-May-20 | 2317 | Hospital | Natural |
| Harris | Johnny White | 70 | M | Anglo | 13-May-20 | 1429 | Hospital * | Natural* |
| Harris | Keith Thomas | 27 | M | African American | 28-May-20 | 1022 | Hospital* | Natural* |
| Harris | Paul Jacobs | 33 | M | African American | 30-May-20 | 0312 | Hospital | Homicide |
| Harris | Preston Chaney | 64 | M | African American | 07-Aug-20 | 2315 | Hospital* | Natural* |
| Harris | Ronnie McDaniel | 30 | M | African American | 19-Aug-20 | 1009 | Hospital | Homicide |
| Harris | Bryant Davis | 27 | M | African American | 04-Sep-20 | 0249 | Hospital | Unknown |
| Harris | David Perez | 29 | M | Hispanic | 15-Sep-20 | 1445 | | Unknown |
| Harris | Robert Schultz | 60 | M | Anglo | 18-Sep-20 | 1832 | Hospital* | Natural |
| Harris | Thomas Diventi AKA Quigley | 62 | M | Anglo | 21-Sep-20 | 1724 | Hospital | Unknown |
| Harris | Buddy Martin | 47 | M | Anglo | 05-Oct-20 | 0907 | Hospital* | Unknown |
| Harris | Pedro Collado | 58 | M | African American | 18-Oct-20 | 1626 | Hospital | Unknown |
| Harris | Stephen Windsor | 65 | M | Anglo | 01-Jan-21 | 0540 | Hospital | Unknown |
| Harris | Justin Henderson | 35 | M | African American | 04-Feb-21 | 0152 | Hospital | Unknown |
| Harris | Israel Iglesias | 57 | M | Anglo | 09-Feb-21 | 0508 | Hospital | Unknown |
| Harris | Jaquaree Simmons | 23 | M | African American | 17-Feb-21 | 1327 | Hospital | Unknown |
| Harris | Jimmy Smith | 67 | M | African American | 02-Mar-21 | 2133 | Hospital* | Unknown* |

| Harris | Alejandro Tillman | 59 | M | Anglo | 25-Mar-21 | 1105 | Hospital | Unknown |
|--------|-------------------|----|----|-------|-----------|------|----------|---------|
| Harris | Rory Ward | 33 | M | African American | 12-May-21 | 1620 | Hospital | Unknown |
| Harris | Jeremy Renkel | 41 | M | Anglo | 30-May-21 | 1047 | Hospital | Unknown |
| Harris | Pete Perez | 64 | M | Anglo | 17-Jul-21 | 0056 | Hospital | Unknown |
| Harris | Bobbie Thompson | 53 | F | African American | 20-Jul-21 | 2157 | Hospital | Unknown |
| Harris | Deon Peterson | 42 | M | African American | 10-Aug-21 | 1256 | Hospital | Natural |
| Harris | Benito Alderete | 71 | M | Anglo | 19-Aug-21 | 1652 | Hospital | Unknown |
| Harris | Gregory Barrett | 51 | M | African American | 28-Aug-21 | 1009 | Jail | Unknown |
| Harris | Lisandro Zepeda | 19 | M | Anglo | 01-Sep-21 | 0312 | Hospital | Accident |
| Harris | Antonio Lara | 63 | M | Anglo | 02-Sep-21 | 1615 | Hospital | Natural |
| Harris | Billy Dunn | 47 | M | Anglo | 28-Sep-21 | 1341 | Hospital | Unknown |
| Harris | Sean Sutton | 51 | M | Anglo | 12-Oct-21 | 0536 | Hospital | Unknown |
| Harris | Fred Harris | 19 | M | African American | 31-Oct-21 | 1814 | Hospital | Unknown |
| Harris | Alan Ruth | 28 | M | African American | 22-Nov-21 | 0439 | | Unknown |
| Harris | Hasseneen Alwadi | 35 | M | | 25-Nov-21 | 1225 | Hospital | Unknown |
| Harris | Anne Murphy | 53 | F | Anglo | 01-Dec-21 | 1850 | Hospital | Unknown |
| Harris | Paul Douglass | 40 | M | Anglo | 10-Feb-22 | 0721 | Hospital | Unknown |
| Harris | Kevin Trejo | 21 | M | Anglo | 12-Feb-22 | 0819 | Jail | Unknown |
| Harris | Ray Love | 52 | M | | 13-Mar-22 | 1213 | Hospital | Unknown |

# EXHIBIT 3

August 2021 Serious Incident Report by County

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Ellis | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Erath | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Falls | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Fannin (P) | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 |
| Fayette | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Fisher | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Fort Bend | 0 | 1 | 0 | 0 | 12 | 0 | 0 | 1 |
| Franklin | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Freestone | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Frio | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Gaines | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Galveston | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| Garza | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Gillespie | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Goliad | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Gonzales | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 |
| Gray | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Grayson | 0 | 0 | 1 | 0 | 11 | 0 | 0 | 0 |
| Gregg | 0 | 2 | 0 | 0 | 9 | 0 | 0 | 0 |
| Grimes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Guadalupe | 0 | 1 | 0 | 0 | 4 | 0 | 0 | 0 |
| Hale | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hall | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hamilton | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hansford | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hardeman | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hardin | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Harris | 0 | 15 | 3 | 0 | 847 | 0 | 0 | 32 |
| Harrison | 0 | 0 | 0 | 0 | 7 | 0 | 0 | 0 |
| Haskell (P) | 0 | 0 | 0 | 0 | 3 | 0 | 1 | 1 |
| Hays | 0 | 1 | 0 | 0 | 18 | 0 | 1 | 2 |
| Hemphill | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Henderson | 0 | 0 | 0 | 0 | 6 | 0 | 0 | 0 |
| Hidalgo | 0 | 0 | 1 | 0 | 46 | 0 | 0 | 6 |

# EXHIBIT 4



## Gmail

Kiah Duggins <kiah@civilrightscorps.org>

---

## Fwd: HCSO COVID Data

**Krishnaveni Gundu** <krish.gundu@texasjailproject.org>                              Tue, Apr 19, 2022 at 12:34 PM
To: Kiah Duggins <kiah@civilrightscorps.org>

---------- Forwarded message ---------
From: **Casely-Hayford, Marquita** <mcaselyh@central.uh.edu>
Date: Fri, Apr 15, 2022 at 8:01 AM
Subject: Re: HCSO COVID Data
To: Amanda (County Judge's Office) <Amanda.Rocha@cjo.hctx.net>, AJ (JAD) <AJ.Roy@jad.hctx.net>, Saad (PHS)
<Saad.Zaheer@phs.hctx.net>, Herklotz, Shannon (HCSO) <Shannon.Herklotz@sheriff.hctx.net>, Egins, Otis R
<Otis.Egins@harrishealth.org>, krish.gundu@texasjailproject.org <krish.gundu@texasjailproject.org>, Juan M. – HHD
<Juan.Gonzalez@houstontx.gov>, Abisola - HHD <Abisola.Oladimeji@houstontx.gov>, Wallis (County Judge's Office)
<Wallis.Nader@cjo.hctx.net>

Good Morning,  🙂

Please see HCSO COVID Data below:

New House Inmates tested from 4/8/2022– 4/14/2022=  466

Inmate and Employee Coved 19 vaccinations given throughout the week = Inmates 73: Employees 28

Census

Number of staff (know this may not change often)= 2384

Number of detainees/censuses currently= 9, 485

Number of staff on leave= 1

Hospitalized

Number of staff hospitalized for COVID= 0

Number of detainees hospitalized for COVID= 1

Deaths

Number of deaths of inmates = 10

Number of deaths of staff = 7

Testing

Number of staff tested= 6, 994

Number of staff positive= 2, 104 cumulative,  1 currently
Number of detainees tested=   56, 105 cumulative ( I have completed an audit of the dashboard and have removed duplicates and inaccuracies, please note the change)

Number of detainees positive=   2, 781 cumulative, 2 currently


With Kindest Regards,
*Mrs. Marquita Casely-Hayford, RN, BSN, MSN, FNP-C*
Public Health and Safety Provider
**Mask-Up: It Shows You Care!**
**University of Houston - Harris County Sheriff's Office, CJC**
Office: 346-286-2816
Cellular: 281-923-7855
Fax. eFaxHCSOPubHealSty@hctx.net

"Success is not measured by what you accomplish, but by the opposition you have encountered, and the courage with which you have maintained the struggle against overwhelming odds." – **Orison Swett Marden**

**From:** Casely-Hayford, Marquita <mcaselyh@Central.UH.EDU>
**Sent:** Friday, April 8, 2022 10:17 AM
**To:** Amanda (County Judge's Office) <Amanda.Rocha@cjo.hctx.net>; AJ (JAD) <AJ.Roy@jad.hctx.net>; Saad (PHS) <Saad.Zaheer@phs.hctx.net>; Herklotz, Shannon (HCSO) <Shannon.Herklotz@Sheriff.hctx.net>; 'Egins, Otis R' <Otis.Egins@harrishealth.org>; krish.gundu@texasjailproject.org <krish.gundu@texasjailproject.org>; Juan M. - HHD <Juan.Gonzalez@houstontx.gov>; Abisola - HHD <Abisola.Oladimeji@houstontx.gov>; Wallis (County Judge's Office) <Wallis.Nader@cjo.hctx.net>
**Subject:** Re: HCSO COVID Data

Good Morning,  


Please see HCSO COVID Data below:


New House Inmates tested from 4/1/2022– 4/7/2022= 657

Inmate and Employee Coved 19 vaccinations given throughout the week = Inmates 75: Employee 2

Census

Number of staff (know this may not change often)= 2373

Number of detainees/censuses currently= 9, 539

Number of staff on leave= 2


Hospitalized

Number of staff hospitalized for COVID= 0

Number of detainees hospitalized for COVID = 0

Deaths

Number of deaths of inmates = 10

Number of deaths of staff = 7

Testing

Number of staff tested = 6, 951

Number of staff positive= 2, 103 cumulative,  1 currently
Number of detainees tested= 81, 115 cumulative

Number of detainees positive=  4, 452 cumulative, 2 currently

With Kindest Regards,
*Mrs. Marquita Casely-Hayford, RN, BSN, MSN, FNP-C*
Public Health and Safety Provider
**Mask-Up: It Shows You Care!**
**University of Houston - Harris County Sheriff's Office, CJC**
Office: 346-286-2816
Cellular: 281-923-7855
Fax. eFaxHCSOPubHealSty@hctx.net

"Success is not measured by what you accomplish, but by the opposition you have encountered, and the courage with which you have maintained the struggle against overwhelming odds." – **Orison Swett Marden**

**From:** Casely-Hayford, Marquita <mcaselyh@Central.UH.EDU>
**Sent:** Friday, April 1, 2022 8:59 AM
**To:** Amanda (County Judge's Office) <Amanda.Rocha@cjo.hctx.net>; AJ (JAD) <AJ.Roy@jad.hctx.net>; Saad (PHS) <Saad.Zaheer@phs.hctx.net>; Herklotz, Shannon (HCSO) <Shannon.Herklotz@Sheriff.hctx.net>; 'Egins, Otis R' <Otis.Egins@harrishealth.org>; krish.gundu@texasjailproject.org <krish.gundu@texasjailproject.org>; Juan M. - HHD <Juan.Gonzalez@houstontx.gov>; Abisola - HHD <Abisola.Oladimeji@houstontx.gov>; Wallis (County Judge's Office) <Wallis.Nader@cjo.hctx.net>
**Subject:** Re: HCSO COVID Data

Good Morning,  

Please see HCSO COVID Data below:

New House Inmates tested from 3/25/2022– 3/31/2022= 684
Inmate and Employee Coved 19 vaccinations given throughout the week = Inmates 116: Employee 0

Census
Number of staff (know this may not change often)= 2367
Number of detainees/censuses currently= 9, 473
Number of staff on leave= 1

Hospitalized
Number of staff hospitalized for COVID= 0

Number of detainees hospitalized for COVID = 0

Deaths
Number of deaths of inmates = 10
Number of deaths of staff = 7

Testing
Number of staff tested = 6, 914
Number of staff positive= 2, 102 cumulative,  0 currently
Number of detainees tested=  80, 452 cumulative
Number of detainees positive=  4, 450 cumulative, 0 currently

With Kindest Regards,
*Mrs. Marquita Casely-Hayford, RN, BSN, MSN, FNP-C*
Public Health and Safety Provider
**Mask-Up: It Shows You Care!**
**University of Houston - Harris County Sheriff's Office, CJC**
Office: 346-286-2816
Cellular: 281-923-7855
Fax. eFaxHCSOPubHealSty@hctx.net

"Success is not measured by what you accomplish, but by the opposition you have encountered, and the courage with which you have maintained the struggle against overwhelming odds." – **Orison Swett Marden**

---

**From:** Casely-Hayford, Marquita
**Sent:** Friday, March 25, 2022 10:52 AM
**To:** Amanda (County Judge's Office) <Amanda.Rocha@cjo.hctx.net>; AJ (JAD) <AJ.Roy@jad.hctx.net>; Saad (PHS) <Saad.Zaheer@phs.hctx.net>; Herklotz, Shannon (HCSO) <Shannon.Herklotz@Sheriff.hctx.net>; 'Egins, Otis R' <Otis.Egins@harrishealth.org>; krish.gundu@texasjailproject.org <krish.gundu@texasjailproject.org>; Juan M. - HHD <Juan.Gonzalez@houstontx.gov>; Abisola - HHD <Abisola.Oladimeji@houstontx.gov>; Wallis (County Judge's Office) <Wallis.Nader@cjo.hctx.net>
**Subject:** HCSO COVID Data

Good Morning,  

Please see HCSO COVID Data below:

New House Inmates tested from 3/18/2022– 3/24/2022= 561
Inmate and Employee Coved 19 vaccinations given throughout the week = Inmates 99: Employee 1

Census
Number of staff (know this may not change often)= 2384
Number of detainees/censuses currently= 9, 396
Number of staff on leave= 1

Hospitalized
Number of staff hospitalized for COVID= 0
Number of detainees hospitalized for COVID= 0

Deaths
Number of deaths of inmates = 10
Number of deaths of staff = 7

Testing
Number of staff tested = 6, 504
Number of staff positive= 2, 102 cumulative,  0 currently
Number of detainees tested=  75, 784 cumulative

Number of detainees positive=  4, 450 cumulative, 9 currently

With Kindest Regards,
*Mrs. Marquita Casely-Hayford, RN, BSN, MSN, FNP-C*
Public Health and Safety Provider
**Mask-Up: It Shows You Care!**
**University of Houston - Harris County Sheriff's Office, CJC**
Office: 346-286-2816
Cellular: 281-923-7855
Fax. eFaxHCSOPubHealSty@hctx.net

"Success is not measured by what you accomplish, but by the opposition you have encountered, and the courage with which you have maintained the struggle against overwhelming odds." – **Orison Swett Marden**

--
**Krishnaveni Gundu**, Co-Founder & Executive Director

krish.gundu@texasjailproject.org; (281) 854-4104

-------------------------------------------------------------------------------



*Listening, informing, advocating for people in county jails..*
texasjailproject.org • sheddinglight.in • jailhousestories.org
*We rely on your donations!*
M: (281) 854-4104 • HelpLine: (512) 469-7665

Mail: 13121 Louetta Road #1330 Cypress, Texas 77429

  

This email and any attachment(s) is(are) intended exclusively for the use of the addressee(s). If you are not the intended recipient, any use, copying, disclosure, dissemination or distribution is strictly prohibited.  If you have received this communication in error, please notify the sender immediately by email, or by the number listed above.

# EXHIBIT 5

G) <u>Agreement Transition</u>. In the event the Agreement ends by either expiration or termination, Contractor shall assist in the transition until such time that a new contractor can be completely operational. Contractor acknowledges its responsibility to cooperate fully with the replacement contractor and the County to ensure a smooth and timely transition to the replacement contractor. Such transitional period shall not extend more than ninety (90) days beyond the expiration/termination date of the Agreement, or any extension thereof. During any transition period, all other terms and conditions of the Agreement shall remain in full force and effect as originally written.

8) **NOTICE**

A) Any notice required to be given under the provisions of this Agreement shall be in writing and shall be duly served when it shall have been delivered in person or deposited, enclosed in a wrapper with the proper postage prepaid thereon, and duly registered or certified, return receipt requested, in a United States Post Office, addressed to the County or Contractor at the following addresses. If mailed, any notice or communication shall be deemed to be received three (3) days after the date of deposit in the United States Mail. Unless otherwise provided in this Agreement, all notices shall be delivered to the following addresses:

| To Contractor: | LaSalle Corrections |
| | 26228 Ranch Road 12 |
| | Dripping Springs, Texas 78620 |
| | Attn: Tim Kurpiewski, CFO |

| To the County: | Harris County Sheriff's Office |
| | 1200 Baker Street |
| | Houston, Texas 77002 |
| | Attn.: Ed Gonzalez |

B) Either Party may designate a different address by giving the other Party ten (10) days written notice.

9) **LIMITATION OF APPROPRIATION**

A) Contractor understands and agrees, said understanding and agreement also being of the absolute essence of this Agreement, that the total maximum compensation that Contractor may become entitled to for the Services performed under this Agreement, and the total maximum sum that the County shall become liable to pay to Contractor under this Agreement, shall not under any conditions, circumstances, or interpretations thereof exceed the sum of Ten Million Nine Hundred Fifty

Thousand and 00/100 Dollars ($10,950,000.00). Notwithstanding anything to the contrary, or that may be construed to the contrary, the County's liability under the terms and provisions of this Agreement is limited to this sum.

B)      Contractor understands and agrees that the laws governing the letting of contracts for the County require the approval of the County Auditor and the certification that funds are, or will be, available for the payment of the obligations created under the Agreement before such contracts become effective. Therefore, Contractor shall not proceed with any Services until such time that it receives a Purchase Order issued by the County Purchasing Agent. Any Services performed by Contractor prior to its receipt of a Purchase Order are at Contractor's own expense.

C)      Contractor does understand and agree, said understanding and agreement also being of the absolute essence of this Agreement, that the total maximum compensation that Contractor may become entitled to hereunder, and the total maximum sum that the Contractor shall become liable to pay to Contractor hereunder, shall not under any conditions, circumstances, or interpretations thereof exceed the sum certified by the Purchase Order. Notwithstanding anything to the contrary, or that may be construed to the contrary, the County's liability under the terms and provisions of this Agreement is limited to this sum. When all the funds so certified are expended, Contractor's sole and exclusive remedy shall be to terminate this Agreement. If the Services and charges to be provided for will equal or exceed the amount certified available, Contractor shall notify the County immediately.

D)      The Parties understand that some payment obligations created by this Agreement may be conditioned upon the availability of third-party funds, including but not limited to federal funds awarded to the State or County ("Grant Funds"), and appropriated for the payment of such obligations under the Grant. In the event these Grant Funds are discontinued or reduced during the Agreement term, the County shall not be liable for payment of any funds above the actual Grant Funds the County receives. If such discontinuation/reduction occurs and the Parties are unable to renegotiate the Agreement upon mutually acceptable terms, the Contractor's sole and exclusive remedy shall be to terminate this Agreement. The County's obligation to make any payments under the Agreement using Grant Funds is limited to the amount of Grant Funds received. Contractor agrees that it will not be entitled to any damages or remedies of any kind including, but not limited to, liquidated or incidental damages, late fees, penalties, and finance charges. Failure to certify funds or to certify sufficient funding for any reason shall not be considered a breach of this Agreement.

# EXHIBIT 6

Yes. They give soap, a little thing of soap, they give you a little toothbrush. They put you in a little cell for 23 hours of the day. They let you out for one hour to let you take a shower and to make a phone call. And after that hour, they put you back in the cell. And for breakfast, it's two pieces of bread, a little packet of jelly and a little pint of butter. It's like nothing, barely enough to keep you alive. They don't give you nothing to drink. You have to drink the water from the toilet. This little button above the toilet that water comes out. You don't have to drink the toilet water, but there's a buttons and it's a little fountain and it squirts water out. And that's the only thing you have to drink. It's not good. I'm pregnant. I need a little bit more than two slices of bread. It's not good. Every now and then they'll switch it up and they'll give me a boiled egg.

Yes. As soon as I get in, they give me a pregnancy test. They give all the girls a pregnancy test. And me, I'm seven months pregnant. You can see that I'm pregnant and then they give me a test and it comes out positive that I am pregnant. So they do know, of course, they know I'm pregnant. And if you're going to give me two slices of bread, at least gave me three slices of bread. The workers, the inmates that work for the jail, they pick out, I guess inmates that want to get out of their cell, or they make them work. And they go and they clean the floors and they go and they help pass out the food and stuff like that. Even the people that would come and give me my food, they would tell me, "Wow, you're pregnant, we should be giving you two, at least two bags, whenever we're giving you food, we got to give you two because you're pregnant." And they're like, "Well, we don't want to get in trouble."

They only give us enough for... And so the next day I would think, okay, maybe they're going to give me two bags so I can eat a little bit more because I would try to eat the bread and I don't need a full, and it's just two sides of bread and a little packet of jelly and a little pint of butter. That was breakfast. For lunch, they gave you a styrofoam plate and then they gave you, to be honest, I don't even know what the food was. It was just like, I don't know if it was like soup or slop or I don't know what it was.

I couldn't tell you what they were giving me. Maybe it was potatoes, smashed up potatoes. I don't know. It's not a portion of something like chicken or no, it's just, sometimes they would give us beans, a recognized bean. And it's like beans and then they'll give you like two slices of bread and that's it. A little pint of butter, and that would be lunch. And then everyday for dinner for every inmate is two slices of bread and couple slices of bologna, thin slices of bologna, not regular. They're really thin slices of bologna. Two or three slices of bologna and they'll give you apple, and that's it.

Maybe I'm pregnant. It's just not enough. I'm hungry. For the time I was in there, I completed 13 days. They said "you're going to be quarantined for 14 days." I got to do quarantine for 14 days for every inmate before they put them in the general population. The first time I went in there, they put me in quarantine. I completed 13 days and my husband bonded me out. He went and he paid for my bond to get me out because he wanted me to have my... We want us to have the baby out here. I don't want to have the baby in jail because I'm about to give birth next month on the 15th. Today's July 15th and I give birth... My due date is August 15th.

So, he bonded me out and I was so close to going to GP the general population. So this next time when I came out for my bond, I was out for two days and then my probation, they revoked my probation. And when they revoked my probation, they came knocking on my door at seven o'clock in the morning, because I picked up a charge because I went to jail. But when I went to jail my husband bonded me out. So I thought I was good. While I was out for two days on bond, I'm thinking, okay, I'm out on bond. I want to do the court out here. I'm going to go to court on September 2nd. And everything's going to be fine. I don't have to go. I don't have to be in jail and I can be out here.

I can eat. I could take care of my baby in my stomach and make sure he's getting into... My husband opened the door. And there was five police officers. They said, "Oh, we're looking for Nicole." And they came to pick me up. They said, "your probation is revoked." And I said, "sir, I'm out on bond." And they are like "no we need to take you back to jail. They revoked your probation." I said, "I don't understand. I was in jail. Are you taking me back to jail? I'm out on bond. I have permission to be out here." They're like, "no, we got to take you to jail there's a warrant." So I didn't understand. They said, "put your hands behind your back." They didn't ask. They didn't tell me nothing. They just wanted to hurry up and put me back in jail.

And I didn't understand. I wanted to ask questions.I told my husband "get all the bond papers. Why did you... How are you going to bond me out? And how was it the jail when they released me and then just let me out for two days and then y'all come pick me back up. That doesn't make any sense. I have permission to be out here, because I want to give birth out here. I don't want to give birth in jail. After I have the baby, okay, lock me up. I don't care, but I feel sorry for the baby. I don't want to give birth in jail." No, my original charge was evading arrest. I was in my car. I was on my way to go pick up my daughter from my husband's mother's house.

She was spending the weekend over there. So I'm driving on the freeway and a cop, he put on his sirens, he put on his light to pull me over because I didn't use my blinker and I didn't see it. I have tinted windows on my car. I have tint on my car and I listen to music and I was probably singing a song and I was just driving on my way to go pick up my daughter. It was a Sunday. I dropped her off at her grandma's on Friday. And I was going to go pick her up Sunday at three o'clock. I was on the freeway on my way to go pick her up and the cop put on his lights and I didn't see it. I was singing a song in my car and the cop said on the report that I went, not even a mile.

He said not even a mile. I didn't go further than a mile. And then I pulled over. So they got me for evading arrest. I didn't go two, three, four, five miles after he put on the siren. I went less than a mile. And they got me for evading arrest.

So I'm over here, just spending time with her and trying to eat and catch up. And while I was in jail, I wasn't eating right. So I'm trying to get my weight back and give this baby some normal food and proper rest and mainly eat. Very dehydrated and when they would let me out for that one hour, I would write down on a piece of paper and give it to the person in the... The jailer and tell her, "can I have some Pedialyte?" They never brought it to me, but I would ask for it. Some Pedialyte or Gatorade or something so I can, I was very thirsty. And when I was out for those two days, I was at home, ma'am.

My husband said, "come home. I want you to stay in the apartment and I want you to eat and rest and take care of yourself and the baby." And I did that. I did not leave the apartment. I was not exposed to anybody outside. [inaudible 00:12:23] Every time I would come out of the cell, I would have to put my hands behind my back and put the handcuffs on. They did tell me to put the face mask on. I'm always with my face mask. Always. They would wear a face mask. Not every guard, but most of the guards would wear a face mask. And I always wear a face mask. My husband, he works at the hospital so he got me into the face mask, wash your hands, keep it social distance.

Don't be around too many people, so I'm very cautious. A single cell for 23 hours of the day. No, when they put me back in the cell, the person before me, it was however they left it. There was dirty socks in there. There was a dirty towel. There was crumbs on the floor. They didn't sweep it. It was not cleaned out before they put me in there. It was a dirty cell. They didn't make sure that it was clean before they

put me in there. That bothered me too, because when they let me out for the hour, the first thing I did when they let me out, I would go rush to the phone because I needed to talk to my husband to see what was going on to see something I needed to talk to him.

Then after that, I hurried up and take a shower. They gave me a towel and they gave me... There was soap. There was a pump soap. And there was one pump soap for the whole, it was probably about 20 cells, which each person was in a cell. And there was 20 people in there. It was the bottom floor and the top floor. So total, they had a one pump for 20 people. So after I would use the phone to talk to my husband, I would rush and go take a shower.

After I would take a shower, I would have to hurry up because I only have one hour to be out. So I would have to hurry up, take a shower, and then I'll go find the broom. And then I'll go try clean my cell. Right after that they closed the door, go back into your cell. And then I would have to be in the cell for another 23 hours before they let me out again for another hour the next day. They gave me a prenatal, but I was two days, they didn't even give me a blanket. I had no blanket for the first two days that I was in there.

So I was just sleeping on a mat. No, they gave me a prenatal vitamins.

I kept asking for a blanket. And they're like, "well, we don't have a blanket for you. There's a lot of other girls that don't have blankets either, got to wait." After the second day they brought me a blanket. I was very grateful. They kept telling me "you're supposed to be getting two meals" like the inmates that would feed me, the workers were getting two. And I'm like, "can you give me an extra one please? Because, I'm very hungry." And they're like, "well, we're going to get in trouble if we give you two, you have to write a note." I wrote a note, but they never brought me. They never responded to me, put an grievance. I wrote it on a letter, put it in the thing. I pushed it. It's in there. I never got an extra meal.

It's on file. Never got an extra meal. They would give me one milk in the breakfast. It wasn't a 1% milk but I'd take two drinks of it. It's like when you go to the elementary school, the little carton, it's only two drinks. And that was the best thing they gave me in there. Was the milk. I loved the milk, but it was only two drinks of the milk and that was for breakfast. And the two slices of bread.

# EXHIBIT 7

COURT DIRECTIVE 287 / BOND SET / MODIFICATION

CAUSE NO. 175891801010

THE  STATE  OF  TEXAS                    IN THE 183rd DISTRICT COURT

       VS.

DAVIS, BILLIE PORTIS                     OF HARRIS COUNTY, TEXAS


OFFENSE: EVADING ARREST/DETENTION W/VEHICLE


TO THE SHERIFF OF HARRIS COUNTY, TEXAS:  GREETINGS

      BY ORDER OF THE COURT ON February 16, 2022, A.D.  THE FOLLOWING ACTION IS DIRECTED IN THE ABOVE STYLED AND NUMBERED CAUSE:

     BOND  SET  TO $25000  BAIL DENIED: ☐

     Please select  THE COURT HAS ORDERED THE FOLLOWING BAIL OPTIONS:

     CONDITIONS OF BOND: Please select

BAIL SET AS TO WITNESS ONLY:  SPN:        NAME:

NOTES TO SHERIFF:  BOND SET $25K PER JUDGE CS

WITNESS MY HAND AND SEAL OF OFFICE AT HOUSTON, TEXAS, THIS  February 16, 2022 10:44 AM

                                Marilyn Burgess, DISTRICT CLERK

                                HARRIS COUNTY, TEXAS

                            BY: _James Swallows_____

                                J SWALLOWS

SNU: 999

BOND SET

# EXHIBIT 8



Kiah Duggins <kiah@civilrightscorps.org>

## Fwd: Billie Davis Harris county pretrial custody death - request for inclusion in TCJS DIC count

**Kiah Duggins** <kiah@civilrightscorps.org>
To: Kiah Duggins <kiah@civilrightscorps.org>

Thu, Aug 4, 2022 at 1:48 PM

---------- Forwarded message ---------
From: **Krishnaveni Gundu** <krish.gundu@texasjailproject.org>
Date: Wed, Aug 3, 2022 at 8:48 AM
Subject: Re: Billie Davis Harris county pretrial custody death - request for inclusion in TCJS DIC count
To: Brandon Wood <brandon.wood@tcjs.state.tx.us>

Good morning Brandon,

It's been over 5 months since Billie Davis died in LaSalle Correctional Facility after being transferred from Harris county jail. We're in receipt of the jail custody deaths spreadsheet collated by your agency as of 07/05/2022. Mr. Davis' death has still not been listed.

We've yet to receive an official response from your agency on why his death has not been counted and included in the TCJS database.

Many thanks in advance for your response,
Krish

On Fri, Jul 1, 2022 at 2:52 PM Krishnaveni Gundu <krish.gundu@texasjailproject.org> wrote:
  Good afternoon Brandon,

  Just a friendly reminder that today marks 4 months since Billie Davis died. We have yet to receive an official response from you on noting his custody death in the TCJS custody death database.

  Thank you for your consideration and we look forward to your response.

  Best,
  Krish

On Fri, Jun 24, 2022 at 8:45 AM Krishnaveni Gundu <krish.gundu@texasjailproject.org> wrote:
    Good morning Brandon,

    It's been three months and approximately twenty three days since 35 year old Billie Davis died in the La Salle detention facility in LaSalle Parish, Louisiana after being transferred with almost 500 other low risk pretrial detainees from Harris county due to conditions of overcrowding in our jail.

    I say approximately, because what little I know of Mr. Davis' death is from a brief article in the Houston Chronicle. I've yet to see a custody death report or an official record of his death.

    As per your understanding, the TEXAS statute on custody deaths* does not require Harris county jail to report Mr. Davis' death to the OAG nor does it mandate you to record his death in your agency's database of Deaths in Custody.

    Additionally, I understand from our previous conversations that your position is that you cannot record a death which did not physically occur in a Texas county jail since you neither have the authority to investigate such a death nor oversight powers to cite an out-of-state facility for failure to comply with TCJS minimum standards, if indeed that is what contributed to the death.

    While I understand your arguments and limitations to a certain extent, I invite you to consider the implications of your position and policy given that what I've been asking for these past 3+ months, is

merely for you to **count** his death and have it reflected in the **annual tally of custody deaths** of individuals **incarcerated** *by* **Texas county jails.**

It's logical that we should count his death because immediately prior to dying, Mr. Davis was **counted** as a pretrial individual in the custody of Harris county Sheriff's office and he was **counted** as one of the 9,000+ Harris county jail population despite being housed out of state and he was **counted** as a citizen of Harris county whose incarceration, transfer and housing was paid for by Harris county taxpayers, including myself.

**With all that responsibility, comes complicity and the need for accountability.**

If we do not count and archive Mr. Davis' death, I believe it will create a dangerous precedent for, quite literally, "disappearing" our incarcerated community members. The point of a count and an archive is to preserve history long after you and I and others with institutional memories are gone.

You had suggested that folks might be able to find that data from Harris county jail through a public information request to HCSO but you do realize that folks won't even *know* to look for that data!

When people are researching custody deaths in jails, they come to your agency because it's the official record keeper of all county jail related data. In my opinion, not counting Mr. Davis' death is going to contribute to the erosion of faith and trust in your agency's authority and to a certain degree, even its legitimacy.

You and I have often discussed the importance of data driven decision making. I think you'll agree with me, that it's impossible to make smart decisions about pretrial detention policies when significant impact and outcomes data such as injuries and deaths, are missing from the official narrative.

While it's true that you could strictly follow the rules and not do anything more than you have to, you could also look beyond the narrow stipulations and do what is ethically and morally compelling.

Mr. Billie Davis' life, like any other Texan's life, should meaningfully count in death.

Thank you for reading this far and I look forward to your response.

Krish
-----------

<span style="color:blue">Spring Newsletter - A Season of Organizing</span>

<span style="color:blue">Explore TJP's work through news stories in 2021</span>

**Krishnaveni Gundu**, Co-Founder & Executive Director

krish.gundu@texasjailproject.org; (281) 854-4104

---



*Listening, informing, advocating for people in county jails..*
texasjailproject.org • sheddinglight.in • jailhousestories.org
*We rely on your donations!*
M: (281) 854-4104 • HelpLine: (512) 469-7665

Mail: 13121 Louetta Road #1330 Cypress, Texas 77429

  Instagram icon

This email and any attachment(s) is(are) intended exclusively for the use of the addressee(s). If you are not the intended recipient, any use, copying, disclosure, dissemination or distribution is strictly prohibited.  If you have received this communication in error, please notify the sender immediately by email, or by the number listed above

# EXHIBIT 9

# TEXAS COMMISSION ON JAIL STANDARDS



**EXECUTIVE DIRECTOR**
Brandon S. Wood

P.O. Box 12985
Austin, Texas 78711
Voice: (512) 463-5505
Fax: (512) 463-3185
http://www.tcjs.state.tx.us
info@tcjs.state.tx.us

July 21, 2022

Krishnaveni Gundu
13121 Louetta Road #1330
Cypress, Texas 77429

Dear Ms. Gundu,

Your letter regarding the Harris County Jail was received. After a thorough investigation it appears that an area of concern did exist.

You alleged that inmate Mikala Savage was not receiving adequate medical care. The Texas Commission on Jail Standards does not question the professional opinion of medical personnel. Texas law will not allow the Commission to disclose protected health information or medical records to anyone, including family members, and further prohibits it from disclosing any information that even reflects that an individual received health care. If you want to obtain the inmate's medical records or if you believe that the treatment the inmate received is not appropriate, you must direct these matters to the facility medical staff.

You alleged that that inmate Savage is "often shackled". Based on the records received from the Harris County Jail, inmate Savage was subject to restraints a single time. This incident was investigated and was found to have been inappropriate. The Harris County Jail has taken disciplinary action against the staff member responsible for the incident.

The Texas Commission on Jail Standards has regulatory authority over county and privately-operated jails that house county and out of state inmates. Our commission regulates jails to ensure that they are in compliance with minimum standards. The issues that you addressed in your complaint regarding Savage's housing (a single cell) is not within our purview. The housing area is appropriate for inmate Savage's classification. Therefore, I suggest you address this concern to the Harris County Jail staff, Jail Administrator, or the Sheriff.

You alleged that inmate Savage was housed with a "dirty blanket". Upon inspection, inmate Savage had multiple blankets and one was indeed soiled. It was replaced at the conclusion of the interview between inmate Savage and the respective staff member.

While this case will be closed, we will continue to monitor the Harris County Jail for compliance with minimum standards.

You may appeal this decision. Appeals must be received within 30 days of the closing date and contain new information that justifies re-opening the case.

---

| | | |
|---|---|---|
| Judge Bill Stoudt, Longview, Chair | Sheriff Kelly Rowe, Lubbock | Commissioner Ben Perry, Waco |
| Dr. Esmaeil Porsa, M.D., Houston, Vice-Chair | Sheriff Raul "Pinky" Gonzales, Refugio | Duane Lock, Southlake |
| Ross Reyes, Melissa | Patricia M. Anthony, Garland | Monica McBride, Alpine |

"The Commission on Jail Standards welcomes all suggestions and will promptly respond to all complaints directed against the agency or any facilities under its purview".
*To empower local government to provide safe, secure and suitable local jail facilities through proper rules and procedures while promoting innovative programs and ideas*

# TEXAS COMMISSION ON JAIL STANDARDS

**EXECUTIVE DIRECTOR**
Brandon S. Wood



P.O. Box 12985
Austin, Texas 78711
Voice: (512) 463-5505
Fax: (512) 463-3185
http://www.tcjs.state.tx.us
info@tcjs.state.tx.us

Respectfully,

Richard Morgan
Complaint Inspector
Texas Commission on Jail Standards

Judge Bill Stoudt, Longview, Chair     Sheriff Kelly Rowe, Lubbock     Commissioner Ben Perry, Waco
Dr. Esmaeil Porsa, M.D., Houston, Vice-Chair     Sheriff Raul "Pinky" Gonzales, Refugio     Duane Lock, Southlake
Ross Reyes, Melissa     Patricia M. Anthony, Garland     Monica McBride, Alpine

"The Commission on Jail Standards welcomes all suggestions and will promptly respond to all complaints directed against the agency or any facilities under its purview".
*To empower local government to provide safe, secure and suitable local jail facilities through proper rules and procedures while promoting innovative programs and ideas*