# EXHIBIT 17

DocuSign Envelope ID: D9B31D00-C7C4-4A17-918A-2A839E4CAA04

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| DWIGHT RUSSELL, et al. )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>HARRIS COUNTY, TEXAS, et al. )<br>)<br>Defendants. )<br>) | Case No. 4:19-cv-00226<br>(Class Action)<br>The Honorable Lee H. Rosenthal<br>Chief U.S. District Judge |

**DECLARATION OF COLIN AMANN**

I, COLIN AMANN, hereby declare and state:

1. The facts set forth in this declaration are based on my personal knowledge, unless otherwise indicated, and, if called as a witness, I could and would testify thereto. The content below does not include all of the facts that I have learned and observed. Where the contents contain statements and conversations with others, they are reported in substance and in part. I reside in Houston, Texas.

2. I am an attorney licensed to practice law in the state of Texas. I am currently employed as an assistant public defender with the Harris County Public Defender's Office. I have held that position since April 2021. Before I was a public defender, I worked as a Harris County Criminal Law Hearing Officer for approximately four years. Before that, I was an attorney in a private practice specializing in criminal defense.

**I.    Experience as a Harris County Criminal Law Hearing Officer**

3. I was employed as a Harris County Criminal Law Hearing Officer from August 2017 to April 2021. As a hearing officer, I reviewed and signed warrants and presided over 15.17

1

dockets, where I "magistrated" people arrested for class A and B misdemeanors and felonies by determining whether or not probable cause existed and making a bail determination.

### a. Hearing Officer Background

4. The hearing officer job comes with challenging conditions. When I was a hearing officer, there were usually around 15 to 20 people on a 15.17 docket, each of which had to be completed in less than two hours. Two hours is a woefully insufficient amount of time to admonish, evaluate probable cause, and make a bail determination for that many people. It was often impossible to do a thorough job and get through the entire docket on time. Despite taking steps to be as efficient as possible, such as pre-filling many of my forms, I would often still be finishing one docket when it was time to begin the next one.

5. I never saw someone call a witness in a 15.17 hearing. Although I am not aware of any rule prohibiting it, it was commonly understood among the hearing officers, attorneys, and members of the sheriff's office that the 15.17 hearing was not an opportunity to present evidence other than the probable cause statement by the arresting officer or complaining witness. Because Rule 9 requires that misdemeanor arrestees be given the opportunity to present evidence in the 15.17 hearing, if someone had asked me to present a witness or other evidence in support of a bail argument in a misdemeanor case, I would have attempted to accommodate them. With no rule requiring me to allow similar presentations in felony cases, I couldn't have allowed it, even if I thought it could have helped inform my bail decision. If I had allowed the presentation of witness testimony or other live evidence in felony cases, which made up the majority of my dockets, the time that it would take me to complete each docket—and the resulting delay and pileup of dockets—would have brought the 15.17 process to a standstill, preventing most people from receiving probable cause and bail determinations before they appeared in district court.

6. Despite the extensive demands placed on hearing officers, the County did not treat hearing officers like legitimate full-time employees. We had no written contract of employment. Our term lasted for only a year at a time. At the end of each year, a committee comprised of judges from the juvenile, misdemeanor, and felony courts would decide whether or not to renew our term for another year. We were never informed of any system or criteria by which we were evaluated, and we could be fired in the middle of a term without any formal process. The other hearing officers and I often spoke about the possibility that our contracts might not be renewed for the following year, particularly if the judges did not agree with the decisions that we were making, or how we performed our jobs. None of us ever knew for sure how long we would be employed.

7. Our precarious employment status was not the only sign that hearing officers were an afterthought. We received no formal training for the position. Instead, new hearing officers would just shadow a more experienced officer for two weeks before they would begin. We didn't receive any sick leave or vacation time. If we could not make our shift for any reason, we had to convince one of our fellow officers to cover for us or leave our shift partner to go it alone and do double the work. We had no dedicated support staff, and we typically relied on each other when we had legal questions.

8. At one point in early 2020 as 15.17 dockets grew particularly crowded, and my colleagues and I were becoming especially exhausted and overworked, we made a modest request for support. We identified several retired judges who could serve as substitute hearing officers so that the full-time hearing officers could occasionally take time off. My fellow hearing officer Lionel Castro reached out to Chief Hearing Officer Courtney St. Julian to try to put the substitute system in place. However, he received no further responses and we never got additional help.

9. That was not the only time it felt like the resources we hearing officers needed to do a better job were out of reach. For example, the facility where we worked, the Joint Processing Center, was designed and built with two courtrooms, yet only one courtroom was ever in use for 15.17 dockets. It was frustrating to know that we could have been running two dockets at the same time, dividing the number of people on each docket in two, if the will existed to hire the necessary staff and make use of that available space. I saw at least one email where one of my fellow hearing officers raised that issue with Ed Wells of the Office of Court Administration, but he did not receive a response and we continued to use one courtroom.

10. The nonstop sense of urgency pervading each of my shifts as a hearing officer was one of my primary reasons for leaving the job. I couldn't bear going to work because from the moment I arrived to the moment I left it couldn't be characterized as anything but a fire drill. I was not the only officer to leave. In the last year or two, a number of the hearing officers I worked with have left. Some left on their own accord. Others were fired or their terms were not renewed.

### b. Required Findings in 15.17 Hearings

11. During my time as a hearing officer, I followed the procedural requirements of Rule 9 in misdemeanor cases once it was promulgated. However, since there was no equivalent rule governing felony cases, I did not make the same findings or provide the same procedures in the course of setting bail for felony arrestees.

12. In my opinion, it would be a good idea to apply the same procedural requirements that exist in misdemeanor cases to felony cases as well. But applying those requirements takes time, and hearing officers who are already struggling to complete overfilled dockets will not take those extra steps unless they are required to. The longer I took while going through the 15.17 docket, the longer I was putting my next docket (or the next hearing officer's) behind. If the felony

judges had issued a rule that forced hearing officers to treat felonies the same way that they treated misdemeanors, I would have followed that rule. I am confident that my fellow hearing officers would have done the same.

### c. External Pressures on Hearing Officer Decision-Making

13. As a hearing officer, I tried to exercise my independent discretion in each case. However, I occasionally felt outside pressures that influenced my thinking. For instance, in one case, a man appeared on my docket for a bail determination on a charge of felony murder for his alleged involvement in the death of a police officer. I took the charge against the man seriously, but I also saw that he had several outstanding cases with high or no bond, so I knew that he would not be released no matter what bond I set. I set a secured bond of $150,000, an amount three times greater than the $50,000 that the felony bond schedule used to dictate for that charge. As a hearing officer, Texas law did not authorize me to deny bond altogether.

14. I expected some people to be displeased with that decision, but the backlash was harsher than I had expected. I was all over the news. Multiple public officials, including the Sheriff, attacked me and my decision on social media. On Facebook, I received countless hateful and threatening messages. Ultimately, some people even went to Commissioners Court to demand that I be fired from my position. Fortunately, I kept my job. Yet that incident was a warning to all of the hearing officers about what happens if our decisions draw the ire of law enforcement officials.

15. More directly, on two occasions, felony judges reached out and personally contacted me to instruct me how to set bail on a certain case or type of cases.

16. On June 12, 2019, I received a phone call on my personal cell phone from Judge Ramona Franklin, who left a message asking me to call her back. When I did, Judge Franklin told me that she was concerned about a bond I had set in a family violence case. I believe I had set an

5

unsecured bond, and Judge Franklin objected to that decision. Judge Franklin told me that, when an arrestee was charged with any of a certain set of felony assault or family violence cases, I should "leave them" to her. I understood that to mean that I should deny bond in those cases. I told Judge Franklin that I would continue to set bond where required to do so by law, but the conversation weighed on my mind any time I had a case assigned to her courtroom.

17. Later, in early 2020, I received another call from a district court judge, this one on my office phone from Judge Randy Roll. Judge Roll wanted to talk about a specific case that was assigned to his courtroom. It was a capital murder case, and Judge Roll said "please don't set a bond" on it. Judge Roll expressed concern that a number of the bonds being set by the hearing officers were not nearly as high as he thought they should be. I ended up setting the case at no bond, however I probably would have done that anyway. Still, I felt that it was highly inappropriate for Judge Roll to be calling me directly to tell me how to do my job.

18. While I was a hearing officer, another officer assembled a cheat sheet that showed which court number was associated with which felony judge. Referring to it, a hearing officer could tell which judge a particular arrestee's case was going to after magistration. The cheat sheet was taped to the side of the computer monitor that we used when doing the 15.17 dockets. I understood this information, which allowed me to know which judge would ultimately preside over a case, to be relevant only so that the hearing officers could apply the judges' preferences. Otherwise, it shouldn't matter which judge would hear the case.

19. I tried not to look at the courtroom cheat sheet, but I couldn't fully ignore it. I started hearing stories about district court judges immediately revoking bonds granted during 15.17 dockets and I became worried. I would ask myself, if I set a low bond and this person makes it and is released, when they go to their district court appearance are they just going to be taken back into

6

custody, lose the deposit they paid to a bail company, and then have to try to come up with even more money to pay for a second bond? As a result of these concerns, I began to take note when people facing certain felony charges were headed before district court judges who I knew had a propensity for revoking bonds in that type of case. I can't say for sure if it changed my mind on any case, but I thought about it often, and I imagine that it had some type of impact.

## II.     Experience as an Assistant Public Defender in the District Criminal Courts

20.     I currently work as an assistant public defender with the Harris County Public Defender's Office (PDO). I joined the PDO in April 2021. I work in the trial division.

21.     I am typically assigned to each of my clients just before their preliminary appearance in the district court. On a typical intake day, I will receive two to four new clients. Most of them will be detained. I start by going to speak with them in "holdover," a set of holding cells adjacent to the district courts. I typically speak with each person for 10 to 15 minutes. I try to get as much information relevant to bail as I possibly can, but the conversation is always rushed and it does not take place in a confidential setting.

22.     After speaking with my client, I return to the courtroom and speak to the judge to attempt to convince them to lower the secured bond that the hearing officer has set in the case to an amount that my client might be able to afford. This conversation with the judge is always informal and off the record. My client is typically not present in the courtroom.

23.     On multiple occasions, I've represented clients who had a bond revoked *sua sponte* by a district court judge. This has happened to me in cases before Judge Robert Johnson and Judge Nikita Harmon. In each one of those cases, my client received a bond from a hearing officer and was released from the jail, then came to the district court for their preliminary appearance, where the judge revoked or raised the bond and remanded the person, ordering them back into the custody

of the sheriff right there in the courtroom. In each case, my client was given no notice that the appearance would involve a reconsideration of their bail. I was not appointed as counsel until that appearance. My first chance to meet and talk to my client was moments before the judge ordered them re-detained. Without any chance to prepare, I was unable to present witness testimony or other evidence in favor of continued bail for my client.

24. Senate Bill 6 went into full effect on April 1, which further restricts the circumstances where district courts can grant unsecured bonds. This results in more people being detained, oftentimes to the point that they are not brought to court for their initial appearance because they are still being processed by the jail.

I declare under penalty of perjury that the foregoing is true and correct to the best of my ability

*Colin Amann*  
Colin Amann

10/18/2022  
Date

8