# EXHIBIT 192

# Monitoring Pretrial Reform in Harris County

# Fourth Report of the Court-Appointed Monitor

*April 18, 2022*



**Brandon L. Garrett, JD, Monitor**
*L. Neil Williams Professor of Law*
*Director, Wilson Center for Science and Justice*
*Duke University School of Law*
*210 Science Drive*
*Durham, NC  27708*
*(919) 613-7090*
*bgarrett@law.duke.edu*

**Sandra Guerra Thompson, JD, Deputy Monitor**
*Newell H. Blakely Chair*
*University of Houston Law Center*
*4604 Calhoun Road, BLB 122*
*Houston, TX 77204-6060*
*(713) 743-2134*
*sgthompson@Central.uh.edu*

**Dottie Carmichael, PhD, Research Scientist**
**Iftekhairul Islam, Asst. Research Scientist**
**Andrea Seasock, Project Coordinator**
*Texas A&M University*
*Public Policy Research Institute*
*Research Scientist*
*4476 TAMU*
*College Station, TX 78743-7746*
*(979) 854-8800*
*dottie@ppri.tamu.edu*

**Songman Kang, PhD, Consultant**
Professor, Division of Economics & Finance
Hanyang University
Seoul, Korea

Provided to:

**The Honorable Lee H. Rosenthal**
**Chief Judge, United States District Court**
**for the Southern District of Texas**

Also provided to:

**Representatives of Plaintiff Class:**

**Elizabeth Rossi, Plaintiffs' Counsel, elizabeth@civilrightscorps.org**

**Cody Cutting, Plaintiffs' Counsel, cody@civilrightscorps.org**

**Representatives of Harris County:**

**Rachel Fraser, Assistant County Attorney,**
**Rachel.Fraser@cao.hctx.net**

**Dr. Ana Correa, Director, Justice Administration Department,**
**Ana.YanezCorrea@jad.hctx.net**

**Representative of County Criminal Court at Law Judges:**

**Allan Van Fleet, Counsel for the 16 County Criminal Court at Law**
**Judges, allanvanfleet@gmail.com**

**Representative of Harris County Sheriff's Office:**

**Major Patrick Dougherty, patrick.dougherty@sheriff.hctx.net**

## *Executive Summary*

- **The ODonnell Consent Decree:**
  - *Misdemeanor Bail Reform:* In Harris County, secured money bonds are no longer required for most misdemeanor cases under the court rule adopted as part of the *ODonnell v. Harris County* settlement.  Most people arrested for misdemeanors are released promptly without a hearing.
  - *Bail Options Unchanged for Cases with Public Safety Concerns:* People who are charged with misdemeanors that potentially present public safety risks (e.g., repeat DWIs, family violence, prior bond violations or outstanding warrants) are not automatically released.  A hearing officer makes a decision regarding bail, usually following a hearing at which magistrates have the traditional options to require financial bonds, protective orders, pretrial supervision requirements, or other release conditions.
  - *Better Bail Hearings:* Defense attorneys continue to represent people at bail hearings, as required by Rule 9 and the Consent Decree. Before 2017, people arrested in Harris County had no defense attorney at these hearings. Judges also must give greater attention to more rigorous bail requirements.

- **Major Consent Decree Accomplishments:**
  - *Text Notifications*: New email, text, and voice notifications for court appearances in misdemeanor cases were implemented in November, 2021.
  - *Court Appearance*: An $850,000 allocation to mitigate causes of nonappearance was approved by Commissioner's  Court as part of the FY22 budget.  Ideas42 conducted studies of primary causes of court non-appearance, with analyses and reporting ongoing.
  - *Data Portal*: Much of the relevant information is now available in an automated report.   We have continued work to provide feedback on Harris County's development of the public data portal.
  - *Third Public Meeting*: Harris County held its third official public meeting regarding the ODonnell Consent Decree at which the Monitors presented the Third Report. The Monitors presented the Third Report at a series of additional presentations to community groups and stakeholders.
  - *Training*: An RFP for a new vendor to provide refresher trainings has been issued.
  - *Indigent Defense*: The County is planning its response to the National Association for Public Defense (NAPD) evaluation of Harris County's misdemeanor indigent defense systems.[1]  A written plan for the system of private appointed counsel is also being developed by the Office of the Managed Assigned Counsel, and is scheduled to be completed on July 7, 2022.

- **Ongoing Work by the Monitor Team:**
  - *Cost Study:* We continue to gather data to permit a more detailed cost analysis of the misdemeanor system. Here we begin to quantify the cost consequences of policy

---

[1] *See National Association for Public Defense Harris County Misdemeanor Assessment Report* (July 6, 2021), at https://www.publicdefenders.us/files/Harris%20County%20Report%20July%206%202021%20FINAL.pdf.

changes under the Consent Decree on key system processes including arrest, booking, pretrial screening, bond hearings, court settings, and pretrial detention. We also assess impacts of O'Donnell on defendant costs of bond and pretrial detention. Measures still in development include prosecution costs, victim services, pretrial supervision, and indigent defense among others.

o   *Data Development:* We analyzed data prepared by Harris County and provided continual feedback on data development in regular meetings concerning the assembly and validation of data regarding misdemeanor cases.

o   *Community Work Group*: We convened our monthly Community Work Group, to share our work and solicit input from our diverse community stakeholders.

o   *Regular Meetings:* We held regular meetings with the parties and Harris County stakeholders, including weekly calls, monthly meetings with both judges and hearing officers, and periodic calls with public defenders and prosecutors.

o   *Feedback:* We provided feedback to the parties on several improvements to the hearing process, the designed and implemented training, and the assessment work regarding holistic defense services and nonappearance.

- **Our Findings:**
  o   *Data Analysis:* Our analysis now includes richer and more comprehensive data regarding misdemeanor cases in Harris County. Our findings largely confirm what we reported in our first three reports.

    ▪   *Overall, the work suggests that repeat offending by persons arrested for misdemeanors has remained largely stable in recent years.*

    ▪   For example, as the numbers of persons arrested for misdemeanors have declined so have the numbers of those arrested for misdemeanors who had new charges filed within one year.  In 2015, that number of people charged with misdemeanors who had a new charge filed within one year was 11,888 persons, while in 2020 it was 8,647 persons.

  o   We note the analyses which have not been completed at this time because adequate data has not yet been available to the Monitor team, include a separate subgroup analysis on persons experiencing homelessness or mental health needs. We plan to undertake these analyses and report the results as more data is available and validated.

  o   The analyses conducted show:

    ***Misdemeanor Case and Defendant Characteristics***
    ▪   The number of misdemeanor charges and the number of people arrested for misdemeanors in Harris County noticeably fell in 2020, a year heavily affected by the pandemic, and rose slightly in 2021.
    ▪   We continue to observe a notable downward trend in the number of misdemeanor cases filed, which fell from approximately 62,000 per year in 2015 to 49,828 in 2021.

- The number of people arrested for misdemeanors in 2021 (41,641) is slightly higher than the number from 2020 (38,114).
- The number of misdemeanor cases filed in 2021, 49,828 cases, is slightly higher than the number from 2020, or 45,614 cases.
- The number of misdemeanor cases with co-occurring felonies, where an individual is arrested for a misdemeanor and a felony on the same date, gradually increased between 2015 and 2020, accounting for approximately 5% of total misdemeanor cases in 2015-2019 and 8% of total cases in 2020. This share fell in 2021, when 6% of total misdemeanor cases had a co-occuring felony.
- We observe an increase in the share of misdemeanor offenses that fall within the carve-out categories (that are not automatically eligible for general order bonds at the time of booking), which rose from 18% in 2015 to 35% in 2021.
- The largest increases have been in the carve-out category for people who are arrested while on bond. It makes sense that this number would increase, given that many more people are being released on bond in light of the Consent Decree, and the pretrial period lasts much longer, including due to the relative lack of trials since the COVID-19 pandemic began. We note, that prior to the lack of trials due to the closure of the courthouse after Hurricane Harvey and during the pandemic and the adoption of Rule 9, cases more often resulted in guilty pleas within a short time (especially if people remained in the jail), so less reoffending occurred while "on bond."
- Currently, nearly 40% of people arrested for misdemeanors are Black and 60% are White (a category that includes people who identify as Hispanic or Latinx). We estimate that Latinx persons accounted for approximately one-third (36%) of all persons arrested for misdemeanor in 2015, but this share gradually increased over time, reaching 41% in 2021. Thus, Black and Latinx people represent approximately 81% of all misdemeanor arrestees. The racial distribution of people arrested for misdemeanors in Harris County has been stable over the past few years. However, it does not reflect the racial composition of Harris County, which includes approximately 20% Black persons, 44% Latinx persons, and 29% White (not Latinx) persons, according to 2019 Census estimates.
- Despite substantial changes in the misdemeanor bail system in recent years, there has been very little change in the 77% of people arrested for misdemeanors who are identified in the data as male and 23% as female.

### *Case Outcomes*
- The share of misdemeanor cases resulting in a conviction has noticeably declined between 2015 (59%) and 2019 (25%), while the share of cases dismissed or acquitted nearly doubled (30% in 2015 vs. 59% in 2019).
- A large number of cases filed in 2020 are yet to be disposed (31%), but for those disposed, the share of cases dismissed or acquitted (47%) far exceeds the share of cases that resulted in a conviction (20%).

### *Bond Amounts and Holds*

- The overall bond failure rate (i.e. the combined rate of bond forfeitures and bond revocations) rose from 17% in 2015 to 29% in 2018 (prior to the date the current misdemeanor judges took the bench), and has gradually declined since then, reaching 22% in 2020.
- This data from before 2021 is subject to important limitations. Judges have historically applied widely varying policies regarding when to forfeit or revoke a bond. Beginning in December 2020, a uniform set of definitions for "failure to appear" and "nonappearance" were adopted as required by the Consent Decree's court appearance policy. This should permit a more consistent interpretation of future bond failure data. We have just recently received data from the past year reflecting these definitions and will be examining it in the upcoming months.
- There were approximately 1,500 misdemeanor cases with ICE holds at the time of case filing in 2020.  The number of ICE holds at the time of case filing dropped to about 300 in 2021.

### *Repeat Offending*

- The share of people arrested for misdemeanors who had new charges filed within one year following the initial arrest remained basically constant between 2015 and 2021.  Twenty-two percent of misdemeanor defendants in 2020 were re-arrested within a year. These shares have remained largely constant since 2015.
- The numbers of persons arrested for misdemeanors who had new charges filed within one year has steadily declined.  In 2015, that number was 11,888 persons, while in 2020 it was 8,647 persons.
- Overall, the work suggests that repeat offending by misdemeanor arrestees has remained largely stable in terms of the share of individuals, while the numbers have steadily declined.

### *Cost Evaluation*

- If 2021 arrest, booking, pretrial screening, bond hearings, court settings, and pretrial detention processes established under the Consent Decree had been in place as early as 2015, Harris County is projected to have saved an estimated  $93 million in total criminal system costs.
- Projected savings for arrestees over the same timeframe are even greater: $478 million. Defendants and their families experience less harm from pretrial detention, earnings loss, loss of partner benefits and child support, and personal safety risk while in detention.
- A four percentage point decline in arrest rates between 2019 and 2020 as part of the COVID response saved law enforcement agencies an estimated $1.2 million in that one year alone.  "To Be" Warrants explained most of the decline, but citations are also a path to reducing arrest rates and cost.
- Bookings declined from 79% of misdemeanor cases in 2017 to 66% in 2020-21.  If the 2020-21 booking rate had been maintained over the 7-year

study period, an estimated $5.0 million could have been saved annually, assuming an average of 54,264 cases per year.

- Since the Consent Decree was signed, the share of cases with bond hearings has fallen from 34% in 2018 to 20% in 2021. This 14 percentage point decline (including public defender costs) has generated an estimated $1.4 million savings over 4 years, assuming a constant 54,264 cases per year.

- With a 68% pretrial detention rate in 2016 as compared to the 43% rate in 2021, we estimate nearly $22 million total 7-year reduction in jail costs ($3.6 million annually), assuming an average of 54,264 cases filed each year. Savings are largely due to General Order Bonds, which remove financial obstacles to pretrial release.

- **Next Monitoring Steps:**

  - Assist in further implementation of improvements to pretrial hearings and accompanying procedures to facilitate compliance with the Consent Decree.
  - Review County plans that follow recommendations made in NAPD indigent defense study.
  - Review county implementation of text and electronic court notification system.
  - Conduct further data analysis, including regarding vulnerable populations and further cost analysis.

## *Table of Contents*

### *Introduction*

**I. Community Viewpoints**      **10**

**II. Policy Assessment and Reporting**      **14**

**III. Data Analysis**      **20**

**IV. Cost Study and Project Management**      **51**

**V.  Our Work in the Next Six Months**      **78**

*Appendix*      **79**

**A. The Monitorship Structure**      **79**
**B. Community Working Group**      **83**
**C. Monitor Team Bios**      **88**
**D. Organizational Chart**      **91**
**E. Year 2 Statement of Work**      **92**
**F. Consent Decree Tasks and Milestones**      **104**
**G. Cost Evaluation Methods Detail**      **110**

### *Introduction*

On March 3, 2020, Professor Brandon L. Garrett at Duke University School of Law, was appointed to serve as Monitor for the ODonnell Consent Decree, along with Professor Sandra Guerra Thompson, University of Houston Law Center, who serves as the Deputy Monitor. The Monitor team includes research experts from the Public Policy Research Institute ("PPRI") at Texas A&M University, and the Wilson Center for Science and Justice ("WCSJ") at Duke University School of Law.

Our role is wholly independent of any of the parties in the ODonnell case; our role is to report to the federal court regarding the progress of this Consent Decree. We were appointed because the prior system of misdemeanor bail was found unconstitutional and after years of litigation, which we took no part in, and which the parties settled prior to our appointment. As such, our work pertains only to misdemeanor cases in Harris County.

Second, the parties envisioned a seven-year term for the monitorship because the ODonnell Consent Decree sets out a comprehensive plan for misdemeanor bail reform. People mean different things by both the term "bail" and the phrase "bail reform." Harris County is implementing a quite comprehensive model for misdemeanor cases, which governs more than just decisions whether to release a person or detain them pretrial. First, at the point of arrest, there are required releases for low-level misdemeanors. Second, at bail hearings, there is public defense representation and discovery and due process protections, making the hearings far more robust. Third, the Consent Decree aims to increase court appearance rates over time with sound rules and supports to help people comply with legal obligations, including new court appearance rules and electronic court notifications. Fourth, the Consent Decree calls for evaluations of the system, including third-party recommendations regarding indigent defense and court appearance, and a publicly accessible data portal, with responses in progress.

For those reasons, we emphasize that the Consent Decree is a long-term undertaking, with key pillars implemented, but others still in progress. These improvements will require assessment and implementation over time. Thus, while we have described in our six-month reports highly positive results, we will continue to update our findings over time. In this fourth report, we describe how key pillars of the Consent Decree are now in place, including the court appearance provisions and the electronic court notification system. Additional implementation remains in progress, including responses to recommendations regarding indigent defense in misdemeanor cases in Harris County and development of a public data portal.

## I. Community Viewpoints

### *Immigrant Communities, Family Violence, and Policing: A Conversation with Guadalupe Fernández and Hiram "Art" Contreras*

In this first edition of *Community Viewpoints*, the ODonnell Monitor team explores the topic of Harris County's misdemeanor bail system and the effects on immigrant communities, survivors of family violence, and law enforcement. On January 27, 2022, Deputy Monitor Sandra Guerra Thompson interviewed Guadalupe Fernández and Hiram "Art" Contreras, two members of

the Community Working Group, a group of community leaders who meet monthly to advise the Monitor team.



Guadalupe Fernández serves as Policy and Advocacy Manager for the Tahirih Justice Center, advancing advocacy projects to reform the systemic policies that affect immigrant survivors of gender-based violence.  She is the proud daughter of immigrants and a first-generation college graduate from Georgetown University.



Hiram "Art" Contreras served for 36 years with the Houston Police Department, rising to the rank of Assistant Chief of Police.  Contreras left HPD in 1998 when President Clinton appointed him as the U.S. Marshal for the Southern District of Texas.  He retired from law enforcement in 2002 and remains active in community affairs.  In 2015, the City of Houston re-named the Northeast Police Station as the "Hiram Arthur 'Art' Contreras Northeast Police Station" to honor his service as a police officer.

### *Misdemeanor Bail Reform and Crime*

Recently, many people in Harris County have expressed grave concerns about violent crime, which has spiked during the pandemic.  Reports about people arrested for serious crimes while "on bond" have garnered a great deal of media attention.  However, the people in those cases were not released under the ODonnell consent decree.  Fernández laments that "the debate around releasing people [charged with low-level offenses] under ODonnell is being sensationalized and convoluted in the discourse." The confusion often stems from a misunderstanding about the bail process.  ODonnell only affects misdemeanor cases, not the more serious felony cases involved in the homicides.  Many media reports described people previously arrested for *felonies*, and the vast majority were released on surety bonds that required them to pay tens of thousands of dollars for their release as well as comply with other requirements.

From his experience in law enforcement, Contreras agrees with the general sentiment that dangerous people should be in jail pretrial.  Indeed, the Constitution allows judges to use pretrial detention to protect the public from threats of future violence, although Texas law curtails their authority to deny bond altogether.  Contreras points to people charged with serious felonies like aggravated robbery as a group that potentially presents a grave risk of danger.

But Contreras sees the people affected by ODonnell's prompt release rule differently.  He says, "Lower level people, like those ODonnell addresses, are really in need of [social] services.  We need to get them out quickly."  Fernández agrees, "You shouldn't be locked up when you still haven't been found guilty and it's literally your inability to pay that keeps you behind bars.  You are not a violent criminal—it's a low-level, nonviolent offense."

11

### *Addressing the Causes of Family Violence*

Both Fernández and Contreras have many years of experience helping the survivors of family violence, and they agree that addressing family violence will take a more comprehensive approach than relying solely on the traditional criminal justice system.  Contreras would like a system that draws on the expertise of specialists as a means of reducing the dangers to families and law enforcement alike.  "Especially with COVID," he states, "family violence is off the charts, and that's one of the most dangerous calls [for service] that a police officer can make because you can't anticipate what's there.  Maybe it is just a situation where somebody slapped somebody and that's the end of it, but at the same time, it can escalate to a homicide very quickly."  He appreciates that "*ODonnell* recognizes family violence cases as a 'carve out'" exception to the general rule.  Unlike most misdemeanors, people charged with family violence offenses are not entitled to prompt release.  Instead, their bail is determined by a magistrate judge who decides the bail and may impose protective measures like GPS monitoring.

Contreras believes family violence cases should be heard in a specialty court like the drug court that operates in Harris County.  He argues that a specialty court would "have experts in that field who could get that couple together and see whether they can resolve their issues.  If they can't, well they can go their separate ways to eliminate that problem.  Let the professionals do it, not the police."

Fernández finds that survivors vary in whether they view the criminal justice system as the best source of justice for them.  Sometimes they do need the justice system to keep a dangerous person away.  But many times the person who harmed them is a loved one, the father of a woman's children or a partner.  In other cases, Fernández says survivors want their loved one to be released but to get the help they need.  She sees many survivors who would prefer a restorative justice approach that gives their loved ones the tools to rehabilitate.  Under ODonnell, the Harris County Public Defender's Office and the new Office of the Managed Assigned Counsel will soon offer their clients "holistic" defense services that utilize social workers to connect people with community-based resources to help them address the problems that resulted in their arrest.

### *Bridging the Cultural Divide*

Contreras underscores the importance of having the criminal justice system communicate effectively with the people of Harris County.  In response to ODonnell, Harris County officials recently began providing translations of the documents given to people charged with crimes explaining the process and their legal obligations.  A new electronic notification system, also required by ODonnell, sends people text and voice notices and emails to remind them of their court dates, and these are available in three languages.  Contreras applauds these initiatives.  He also argues that effective communication should include having more bilingual staff.  He explains, "Houston is probably one of the most diverse cities in the country . . . and an excellent microcosm of what the U.S. is going to look like in, say, 2040."  He long ago pushed for the adoption of hiring incentives as a means of obtaining a police force better equipped to relate to non-English speakers.  He says, "Way back when I was a Captain [at the HPD], I saw the language needs of the community and helped draft legislation to provide additional pay for bilingual officers."

Fernández points out that language translation can help in unforeseen ways. She tells the story of a client of hers who went through the criminal justice system being addressed in English when she actually only understood Spanish. The client was a Black woman from Guatemala who was mistaken for African American. Fernández argues that more can be done to help people understand the American legal system and the expectation that they will attend court sessions regularly. She explains, "English is already complicated, so it is good that [county officials] are translating forms in different languages. But really, we should be *clarifying* the language we have, explaining to people, 'This is the system. . . This is where you're expected to go.'"

### *Criminal Justice and the Immigrant Experience*

Contreras reflects on the advice his father gave him when he started his career as a Houston police officer: "If you want to change the system, you need to work within the system and change it." Even today, decades after he patrolled the working class and immigrant neighborhoods of Houston's North East area, Contreras still runs into people who tell him he made a difference in their lives.

For her part, Fernández finds inspiration to work on behalf of immigrant survivors of gender-based violence from their sad plight. She tells the harrowing story of so many women who endure treacherous journeys to escape threats and violence in their countries of origin. Her clients have often endured more violence on their journeys as well. Once in the U.S., they often struggle with the effects of the trauma of past violence, while also finding a home and a means to provide for themselves within a new culture. As a result of their struggles, the women she serves sometimes find themselves in trouble with the law, while at other times they may be assaulted by partners, entitling them to special protection and services. Either way, Fernández notes that the problems they face stem from the social conditions that immigrants face.

For the women who Fernández serves "accountability is key." The low-level offenses that ODonnell addresses are often the product of poverty and other social ills, so she urges a restorative approach. "There's a need for accountability, but accountability doesn't have to mean punishment," she explains, "Let's hold people accountable for these low-level crimes, but in ways that support people. Otherwise, how can we ensure that we are looking at the root of the harm, the root of crime, the root of violence, which is the social conditions that lead to these harms."

Fernández calls for effective policies to prevent violence: "Instead [of sensational public discourse], we should all be organizing around actually preventing violence in our community. What does an actual safe Harris County look like? It's one where people have what they need to survive, so they don't resort to soothing with [controlled] substances. It means having the economic stability that our families need for the common good, so they don't have to resort to theft. Let's organize around that."

## II. Policy Assessment and Reporting

We started our work upon our appointment on March 3, 2020.[2]  In this fourth report, we describe our progress towards carrying out the tasks outlined in our Second Year Proposal and Work Plan, focusing on the time period following the completion of our third report on September 3, 2021.  Our goal is to assess the implementation of this Consent Decree and assist officials in Harris County in meeting their goal of making the Harris County misdemeanor system a national model.  During our first year, we conducted a detailed initial examination of the misdemeanor process and implementation of Rule 9 in Harris County.  Our work continues to be informed by regular conversations with County stakeholders and an intensive analysis of court records, ranging from docket entries to videos.  We have welcomed suggestions from Harris County officials, local stakeholders, and the public, and we look forward to the conversations to come.  As our Monitor Plan described, during this time period, we have:

(1) Conducted regular meetings with the parties to discuss progress under the Consent Decree, as well as conducted regular meetings with hearing officers, judges, and a wide range of stakeholders.

(2) Approved proposals for the County to retain outside researchers to study topics such as causes of nonappearance, indigent defense, and court forms. The indigent defense and court form studies have been completed, and are in the process of implementation, while the study of causes of nonappearance is in progress.

(3) Continued to convene monthly with the Community Working Group.

(4) Continued data collection and analysis and incorporated this work into the fourth six-month Monitor Report.

## A. Policy Assessment

This Report describes our work reviewing the implementation of a range of policies under the Consent Decree.  Below we describe: (1) studying pretrial hearing outcomes and changes to the magistration hearing process; (2) work with agencies including the Harris County Sheriff's Office; (3) work with the CCCL and the Office of Court Management; and (4) Pretrial Services. We also describe engagement with nonparties, (5) the Harris County Public Defender's Office (HCPD) and the relatively new Office of Managed Assigned Counsel (MAC).

---

[2] In the motion to appoint us as Monitor, our submission to the Court included a Proposal and Budget for Year 1 of work, which describes our team members, timelines, an organization chart, and a budget for all participants. We do not repeat that information here, but it is available on our Monitor website (https://sites.law.duke.edu/odonnellmonitor/).  On May 1, 2020, we also provided the Parties with a Work Plan setting out our first year of work, set out in quarterly deliverables, as was most convenient for the County and its budgeting process.  That Plan has been made available on our Monitor website, as is our second year Work Plan. *Id.*

**1. Studying Magistration Hearing Outcomes**

Since December 2020, when the Office of Court Management completed a system to automatically collect information regarding all filed misdemeanor bail hearings, we have examined a more comprehensive collection of misdemeanor magistation pretrial rulings. We have examined data concerning hearings recorded using the new misdemeanor pretrial form used by Hearing Officers. We have also viewed videos from magistration hearings. We report on this work below.

We continued to examine the text of Hearing Officers' pretrial rulings in misdemeanor cases. Among Hearing Officers, we have observed more detailed rulings, and rulings that better track the process and requirements of Rule 9 and the Consent Decree. The new hearing form has better focused written opinions on those key factual findings. One ongoing area for improvement is the need for factual findings regarding why or whether, when pretrial conditions are set, there is clear and convincing evidence that no less restrictive conditions can reasonably assure community safety and protect against flight from prosecution. While many rulings display real attention and care, we continue to review rulings that do not explain, for example, why prior offenses render the arrestee an unmitigable risk. The rulings often do not explain why alternative conditions to secured money bail were deemed insufficient. The oral and written hearing rulings sometimes do not make clear what *additional* evidence, relevant to flight and safety, provides the basis for the ruling beyond the charge and the allegations.

We note that we observed multiple instances in which errors were made that resulted in people being unlawfully detained. We stress that these are not common occurrences, but the results for the affected individuals can be quite drastic. Thus, we urge greater scrutiny when mistakes are discovered so that processes can be improved to avoid mistakes in the future. Most important, we urge development of systems to detect and correct such errors before they result in unlawful detention, rather than after the fact. We have discussed the need for such systems and have begun discussions with the parties regarding their development.

Several different types of errors have come to our attention. Some errors involved incorrect identification of carve-out cases. In some cases, individuals who were entitled to a General Order Bond (GOB) release under Rule 9 and the Consent Decree were nevertheless detained for a 15.17 bail hearing. In some of these cases, the hearing officer detected the violation, and issued an order with a personal bond. For example, one hearing officer noted: "SHOULD HAVE BEEN A GOB, BUT BECAUSE DA MARKED IT INCORRECTLY PTS COULD NOT PROCESS AS A GOB." However, in one case that was brought to our attention, although the public defender immediately brought the error to the attention of the hearing officer, the hearing officer nevertheless imposed a cash bond in violation of Rule 9 and the Consent Decree. We promptly discussed the matter with the Hearing Officers and were grateful for the responsiveness of all involved.

Other errors involved factual findings relied upon during bail hearings. Unsubstantiated allegations regarding other aspects of the pretrial decisionmaking process must be carefully examined by the hearing officer. For example, in one case the hearing officer  denied a personal bond for the reason that the individual had allegedly violated a prior bond due to "non-appearance" specifically. Yet, the person in question had appeared in court as directed, and the judge in the

15

earlier case had already removed the person from supervision in a written order. It was an administrative error that the person was subsequently found not to appear.

Still additional errors involved post-hearing process. We currently lack adequate data to assess the bail review hearings conducted after the initial 15.17 hearing. However, we have observed cases in which a person remained in jail, but did not receive a bond review hearing within a business day as required by Rule 9.13 and this Consent Decree. For example, one such case was brought to our attention in which the failure to appoint counsel and conduct the bond review, as required, had gone unnoticed by the relevant Court. Indeed, when the parties brought the matter to their attention on March 8, 2021, the Sheriff's Office erroneously told the parties that the person had already been released, due to the failure to provide the bond review. The person had counsel appointed on that date, but did not receive a release order. The person remained in jail for months, was assessed for competency in July 2021, found incompetent to stand to trial, was committed to outpatient treatment, and was eventually released from the jail on December 3, 2021, with charges dismissed on December 20, 2021. We are also concerned with the process by which bond failures may be entered, and plan to study those rulings as well.

We emphasize that basic fairness, due process, and compliance with the Consent Decree all require that hearing officers and judges carefully develop the factual record and make findings as part of exercising their discretion. We still observe cases in which the factual findings and the reasons supporting conditions of release are insufficiently explained. We emphasize the need to be vigilant, learn from errors, and prevent their recurrence. Clearly, further quality controls and improvements in the process are needed, including to prevent errors before, during, and after bail hearings. Further, a better system is needed to correct errors when they do come to light.

### a. Findings of Indigency and Ability to Pay by Hearing Officers at the Article 15.17 Hearings

We have now examined about 17,000 court records from bond hearings conducted in 2021. We observe, as in our last report, that the majority of persons at pretrial misdemeanor hearings are found indigent, but that there are currently large numbers of cases in which the financial affidavit was not filled out. Of the entries reviewed, about 8,000 included an affirmative finding of indigency, while only about 1,000 had an affirmative finding of non-indigency. About 9,000 entries, more than half of those reviewed, stated that the indigency determination was not determined or blank. Over half of these reviewed cases did not have a financial affidavit completed. Even for those entries that had a financial affidavit, ability to pay was often not recorded. Where that information was recorded, the most common entry regarding what persons can afford was zero dollars, present in about 4,000 cases. The average amount was $480. About half of the entries involved persons determined indigent. Even without a completed financial affidavit, Hearing Officers can assess indigency using information provided at magistration hearings.

We continue to observe a wide gap between the bail requests of district attorneys and public defenders at misdemeanor pretrial hearings. We commonly observe Assistant District Attorneys asking for secured bonds of $5,000, $10,000, and $20,000. Public defenders commonly request a

personal bond. We note that these data reflect information shared by the Office of Court Management, and entered by Hearing Officers.

### b. Studying Hearing Videos

Each magistration hearing in Harris County is video recorded. We continue to observe videos of misdemeanor pretrial hearings conducted, both selecting hearings at random and when individual cases are brought to our attention. We watched hearings from September, October, November, and December 2021. By watching these videos, we have learned a great deal about the important and challenging work of hearing officers during these hearings.

We note that, in a few hearings we have recently watched, hearing officers failed to provide the "adequate notice" of the procedure for bail hearings required by Rule 9.12.4 and this Consent Degree, which should be provided "in all material respects." Individuals should receive notice that the court must make findings, by clear and convincing evidence, before the judge may set an unaffordable bond amount as a condition of release, and that there is an opportunity to have the bail decision reviewed by another judge within one business day. Specifically, in the hearings we watched, the hearing officers failed to convey that they were "required to consider whether alternatives to pretrial detention could serve the government's interests in reasonably assuring public safety and reasonably protecting against flight from prosecution." Rule 9.12.4. We are cognizant that lengthy admonitions may not be effective and are time consuming. However, we were grateful that the County Attorney's Office and the judges have already begun to work on model language, based on what is set out in Rule 9, to ensure that the key provisions are always conveyed. We emphasize that we generally do observe that hearing officers sufficiently explain the Rule 9 process.

We also note that hearing officers have, consistent with the misdemeanor bail hearing form, offered an admonition, stating: "We ask everybody if they are a United States Citizen. The reason we ask that question is because if you are not a United States citizen, you have the right to request that we notify the consulate of your country of citizenship of your arrest." The hearing officers have often then asked each person, directly, "Are you a U.S. citizen?" Addressing this question to public defenders instead has the advantage of permitting counsel, who are familiar with the list of countries for which consular notification is required, to clarify if notification is requested or required. A practice of directing these questions to counsel would both be more efficient and rights-protective.

In their advocacy at the hearings, public defenders generally focused on individual factors, including employment status, financial information, positive record, court appearance, transportation to court, alternative housing options, and ties to and residency in Harris County. Prosecutors typically focused on criminal history, any history of court non-appearance, and the current charges.

More broadly, we hope that the continued conversations and future refresher trainings on Rule 9 and the Consent Decree will improve outcomes and consistency in bail hearings at magistration (and also at bail hearings in the Judges' courtrooms). We continue to explore the feasibility of additional changes:

- Enabling the defense to bring witnesses to bail hearings at magistration by using a courtroom that has public access.

- Ensuring that translators, or the technology to provide translations, are made available at all times.

- Charging people with all charges at initial booking (including JP cases) so as not to delay their time in custody by requiring a second booking on less serious charge later.

- Avoiding excess wait times between booking and hearings.

- Simplifying the financial affidavit form.

- Preventing delays in processing release and standardizing interdepartmental communications, terminology, and electronic documents.

- Making use of another courtroom to lighten dockets and speed up the magistration process.

We are extremely grateful for ongoing feedback and collaboration with the Hearing Officers.

## 2. Harris County Sheriff's Office

The Harris County Sheriff's Office ("HCSO") plays a central role in the Consent Decree's success, including by facilitating a wide range of logistics regarding booking, hearings, and release. We are grateful for their cooperation in implementing numerous improvements to the systems used in the past.

We noted in our third report that the NAPD report examined adequacy of space for public defender interviews and assurances of client confidentiality at the Joint Processing Center. Members of our team visited the Joint Processing Center on January 28, 2022, and we were grateful for the opportunity to tour the space and observe operations.  Further, we learned that the Harris County Public Defender and Pretrial Services have developed a solution to provide public defenders with access to additional needed space for confidential interviews.  We are grateful to all of the parties for their collaboration to address this issue.

We plan to further discuss additional improvements, including, as noted, implementing processes, which largely do not currently exist, to quickly identify individuals who have not received a timely hearing or bail review, or who otherwise have not received the process due under this Consent Decree.  We also plan to discuss improving the procedures and interdepartmental communication to reduce the time it takes to release people after making bond. We hope that Harris County further improves the availability of community reentry services so that people released

will be safe and have a means of getting home or to a shelter, no matter the day or time they are released. We are impressed with the Pretrial Services pilot program, in partnership with the Harris Center, discussed below.  We are incredibly grateful and fortunate to work with such responsive county officials.

### 3. CCCL: Court Appearance and Notifications

The Consent Decree requires Harris County to revamp the court appearance process and implement an electronic court notification system.  These policies have now been fully implemented.  We have recently received and look  forward to reviewing data concerning appearances under the new court appearance policies. We have had productive discussions with the Office of Court Management regarding studying and learning from these data. As noted, we plan to further study the process used to review bond, as well as decisions that a bond failure has occurred.  We are extremely grateful for the feedback and collaboration with the CCCL Judges and the Office of Court Management.

### 4. Pretrial Services and the Harris Center

Pretrial Services has begun to develop a range of improvements to their work, including changes that importantly impact misdemeanor cases.  We have discussed the importance of ensuring that only the least-restrictive conditions necessary are imposed and have provided information about how imposing excessive conditions of release can be counterproductive, making it more likely a person will miss court and/or reoffend. Pretrial Services has itself been examining such questions to improve the recommendations made to Hearing Officers and judges.  Pretrial Services has also had valuable conversations with us concerning what data concerning pretrial services may be available in the future, as new case management systems are implemented.  In the meantime, we have begun to examine conditions of release by reviewing individual cases by hand, and further, the Justice Administration Department is examining data that can identify cases in which bond conditions forms were filed.

Under Rule 9 and the Consent Decree, most people charged with misdemeanors are entitled to prompt release on General Order Bonds.  However, many of these people may be known to have serious needs that led to their arrests.  Last June, the Harris Center for Mental Health and Intellectual or Developmental Disabilities, supported by multiple funding sources, launched an innovative grant-supported pilot program to connect people released on General Order Bonds who are identified as having a mental health history, a mental health indicator, or community resource needs.  The program links individuals to services, which include housing for the homeless, rehabilitation programs, continued treatment with a clinic, and mental health referrals through the Harris Center.  The program also provides tangible supports that include providing bus passes, parking gift cards, child care gift carsds. The program is staffed by three diversion coordinators and two diversion navigators.  We find it quite promising that the program has been renewed for 2022.  The expanded program operates five days of the week, Thursday through Monday, which are the highest release days for the jail.

### 5. Public Defender's Office and the Office of the Managed Assigned Counsel (MAC)

The Consent Decree emphasizes that "zealous and effective representation at bail hearings is important to protecting arrestees' right to pretrial liberty and right against wealth-based detention."[3] Rule 9 and the Consent Decree require that a public defender is available to represent all individuals at bail hearings. Further, the Consent Decree envisions a process of continuous improvement in the public defense services provided at these hearings, including the retention of an expert in holistic defense services and development of a plan for improving indigent defense.[4] The County retained the National Association for Public Defense (NAPD) to: (1) evaluate its current misdemeanor indigent defense systems in Harris County; and (2) determine the need for essential support staff and holistic services to promote zealous and effective indigent defense. The NAPD's report was completed on July 6, 2021 and it is available online.[5] The report made a series of detailed recommendations, largely focusing on merits representation.

We are pleased that Harris County is developing plans to respond to these recommendations. Some of those recommendations have been responded to already, but other work is in the planning stages. Regarding magistration hearings, which are a central focus of our work under this Consent Decree, the report noted the need for prompt appointment of counsel at magistration. Currently, Judges have not authorized magistrates to appoint counsel. Further, the information obtained by the public defender at magistration should be promptly conveyed to whoever represents the person throughout the rest of the case. The report noted that additional space was needed for attorneys to adequately and confidentially interview clients before magistration (and as noted, that concern has recently been addressed). Further, space and resources were needed for social workers to assist with client logistics and to communicate with family members and others. The report called for further training for magistrates on several topics, including regarding pretrial conditions, which was a subject of the second set of training provided under this Consent Decree. As noted, the County is developing an indigent defense plan in response to the findings, as is the MAC. We recently met with the MAC to discuss their progress. We look forward to assisting in these important efforts.

## III. Data Analysis

The ODonnell Monitor team continues to do substantial work, jointly with the Justice Administration Department ("JAD"), to prepare and improve a data management system to permit analysis of misdemeanor cases in Harris County. Some of the key improvements made include the addition of data elements related to misdemeanor defendant addresses at the time of case filing. JAD has also worked on obtaining new data on probable cause hearings and court settings. We are extremely grateful to JAD for their hard work throughout these months.

Following the requirements set out in Section 88 of the Consent Decree, JAD has also worked on a public-facing online data platform where a series of key measures and outcomes related to the misdemeanor system in Harris County, such as the number of cases filed, bond

---

[3] Consent Decree at ¶37.

[4] Consent Decree at ¶41, 43.

[5] *See National Association for Public Defense Harris County Misdemeanor Assessment Report* (July 6, 2021), at https://www.publicdefenders.us/files/Harris%20County%20Report%20July%206%202021%20FINAL.pdf.

approvals, and pretrial detention, will be published. The Monitor team helped JAD's work by performing data validation and providing feedbacks and suggestions. We very much appreciate the opportunity to be part of this important ongoing work.

### 1. Ethnicity Imputation and Misdemeanor Defendant Addresses

As noted in our last report, we have used a well-established statistical technique to predict a person's ethnicity based on their last names, and presented the estimated ethnic distribution of the misdemeanor population. We plan to continue working closely with Harris County to collect accurate and reliable data on ethnicity, and explore other data sources and statistical techniques to improve the accuracy of our prediction results. One possible extension is to use both a person's last name and their neighborhood of residence as the predictors of ethnicity. To this end, we have worked with JAD over the last few months to improve the quality of defendant address data, and plan to use the updated address data in our ethnicity imputation procedure.

### 2. Expanded Data

Since the time of our last report, we continued to explore other avenues to expand our data. We met with the Houston Police Department (HPD) in June 2021 and January 2022 to discuss the possibility of linking the HPD's arrest, incident, and calls-for-service data with the Harris County's misdemeanor case data. The police data contain detailed incident-level information, which opens up new possibilities for investigating how the patterns of crime are reported to police, criminal victimization, and calls-for-service, including those that did not result in an arrest and a criminal charge, have changed since the implementation of the misdemeanor bail reforms. The HPD generously agreed to share their data with the Monitor team, and we expect that this police data will be incorporated into our data analysis by the time of the next Monitor report. We are extremely grateful to the HPD for their generosity and cooperation.

Thanks to JAD, we also obtained information on all recorded bookings and releases, court settings and appearances, and case disposition outcomes associated with each misdemeanor case. These data elements enable us to examine the extent to which the patterns of pretrial detention, court appearances, and disposition outcomes in Harris County have changed in recent years. JAD has also worked to construct a more comprehensive defendant address data, which contain not only the last known address of each misdemeanor defendant but also the address recorded at the time of each case filing. In our second report, we presented the geographic distribution of misdemeanor defendant addresses in Harris County before and after Rule 9 based on their last known addresses as of January 2021, but noted that this was likely a rough approximation of their actual residential locations at the time of arrest. Below, we present a set of new figures which illustrate the geographic distribution of misdemeanor arrestees in Harris County, by utilizing updated address data which correspond to their addresses at the time of the case filing.

We also note that some of the key data elements that were available before the period of data outage last year, such as the locations of misdemeanor offenses, misdemeanor arrestees' mental health status, and domestic violence flag, are yet to be restored.

In this report, our data analyses examine the following topics:

21

1. Number of misdemeanor cases and arrestees.
2. Demographic characteristics of misdemeanor arrestees.
3. Geographic distribution of misdemeanor arrestee addresses.
4. Number of misdemeanor cases that belong to "carve-out" categories.
5. Duration of pretrial detention and holds placed.
6. Initial bond decisions.
7. Case dispositions.
8. One-year repeat offense rate.

We note that analyses which have not been completed at this time include: Court appearance, probable cause hearings, and types of pretrial supervision (such as ignition interlock, alcohol monitoring, and electronic monitoring). We plan to undertake these analyses and report the results promptly in the future, as more data restoration, expansion, and validation take place.

### 3.  Number of Misdemeanor Cases and Arrestees

Our main data source is the case-level records on all Class A and B misdemeanor cases filed in the Harris County Criminal Courts at Law (HCCL) between January 1, 2015 and December 31, 2021, which was downloaded from JAD's database on February 7, 2022.[6] We begin our analysis by presenting the number of people arrested for misdemeanors in Harris County in Figure 1. Here, we consider all misdemeanor cases filed against the same individual during a calendar year as a single observation.

Figure 1 presents the number of people arrested for misdemeanors by the year of case filing date. We observe a steady decline in the number between 2015 and 2021, which fell from approximately 51,000 people in 2015 to 41,641 people in 2021. Although the count somewhat increased between 2020 and 2021 (38,144 vs. 41,641 people were arrested for misdemeanors), the numbers have declined by almost ten thousand people as compared to the years prior to 2020.

We also report in Figure 1 the number of people arrested for misdemeanors with co-occurring felonies, who were arrested for a misdemeanor and a felony on the same date. Unlike the total number of people arrested for misdemeanors, the number of people arrested for misdemeanors with co-occurring felonies has consistently increased since 2015, and more than doubled between 2015 (1,279) and 2021 (3,177).

---

[6] It is important to note the vintage date of our data, as a small number of cases may be sealed, expunged, or corrected over time, which will update and revise existing misdemeanor case records in the database.

Figure 1: Number of Persons Arrested for Misdemeanors by Year



The number of people arrested for misdemeanors, presented in Figure 1, understates the number of misdemeanor cases, as some individuals may be arrested multiple times during a calendar year and some are charged with multiple offenses from a single arrest. In Figure 2, we present the number of misdemeanor cases filed each year between 2015 and 2021, which has followed a similar trend as the number of misdemeanor arrestees. The count of misdemeanor cases has substantially declined between 2015 (62,377) and 2020 (45,614), and then modestly increased in 2021 (49,828). It is noteworthy that, in spite of the increased number of total misdemeanor cases, the number of misdemeanor cases with a co-occurring felony offense did not change much between 2020 (3,335) and 2021 (3,416).

Figure 2: Number of Misdemeanor Cases Filed by Year



Overall, we find that both the number of persons arrested for misdemeanors and the number of misdemeanor cases in Harris County have noticeably declined between 2015 and 2021. Some of these changes are likely to be driven by the misdemeanor bail reforms and the COVID-19 pandemic, but more research is needed to better understand the underlying causes. We plan to monitor whether this downward trend continues in 2022, and explore other factors that may explain the trends in the number of persons arrested for misdemeanors and cases in Harris County.

### 4.   Demographic Characteristics of Misdemeanor Defendants

We now examine the sex, race, and ethnic distributions of persons arrested for misdemeanors in Harris County and how they have changed over the last few years. Harris County follows the U.S. Census Bureau, in adhering to 1997 Office of Management and Budget definitions, in which a person may self-identify as having both race (with categories of White, Black or African American, American Indian or Native Alaskan,  Asian, and Native Hawaiian or Other Pacific Islander) and ethnicity (Hispanic, Latinx or Spanish).[7] A person is allowed to choose one race category, and the existing data may not reflect how a person would self-identify if they were given the option to select more than one category or self-identify as a mixed race. Regarding

---

[7] More information about the race and ethnicity definitions used by the U.S. Census can be found at: https://www.census.gov/topics/population/race/about.html.

ethnicity, we use the term Latinx throughout this report. As discussed in more detail below, information regarding ethnicity is not required to be filled out and is often not filled out by the Sheriff's Office. As in Figure 1, we present in the figures below the sex, race, and ethnic distribution at the *person-level*.

Figure 3: Sex Distribution of Misdemeanor Defendants



Sex information is available for virtually all misdemeanor arrestees in Harris County. For example, out of the 41,641 people arrested for a misdemeanor offense in 2021, sex information was missing for 148 people only (0.36%). As documented in our previous reports, the sex composition of the misdemeanor arrestee population in Harris County has been very stable over the past years. In each year between 2015 and 2021, males consistently made up 77 percent of the misdemeanor arrestees. We also note that the observed sex composition in Harris County is very close to the nationwide average. According to the FBI's arrest data, males accounted for 74 percent of misdemeanor arrestees nationwide in 2020.[8] Neither Harris County nor FBI arrest data contain information about persons who identify themselves as non-binary or transgender.

---

[8] *See* Federal Bureau of Investigation, Crime Data Explorer, at https://crime-data-explorer.fr.cloud.gov/pages/explorer/crime/arrest.

Figure 4: Racial Distribution of Misdemeanor Defendants



Similarly, we present the racial distribution of persons arrested for misdemeanors in Harris County between 2015 and 2021 in Figure 4. Among persons arrested for misdemeanors whose race information is observed in the data (98% of the total defendants), Blacks and Whites made up approximately 40 percent and 60 percent of the defendant population, with little change in the distribution over the years. We note that the share of Black persons arrested for misdemeanors in Harris County (39% in 2020) is substantially higher than the share of nationwide (26%, according to the FBI's national arrest statistics from 2020) and the share of Black population in Harris County (20%, according to the 2019 U.S. Census estimate).[9] The sum of Black and White defendant shares presented in Figure 4 do not add up to 100% because of a small number of Asian and Native Americans persons arrested for misdemeanors in the data (about 2 percent). Overall, we find that both sex and racial distributions of misdemeanor defendants in Harris County have been remarkably stable over the past years.

Unlike sex and race, information on defendant ethnicity is often not recorded and unobserved for most misdemeanor defendants. For example, ethnicity information is missing in 70 percent of misdemeanor arrestees from 2021. This is an important data limitation, especially given that Latinx persons account for 44 percent of the population in Harris County according to

---

[9]   *See* United States Census Bureau, Quick Facts, Harris County, at https://www.census.gov/quickfacts/harriscountytexas.

the U.S. Census.[10] We plan to work with the County to improve the data collection process and explore ways to collect accurate data on defendant ethnicity.

To address this data limitation, we implemented an imputation technique which predicts individuals' ethnicity based on their last names.[11] The prediction results seem to be quite accurate. For nearly 150,000 people whose actual ethnicity (Latinx or non-Latinx) is observed in our data, the method correctly predicts their recorded ethnicity more than 94 percent of the time. Based on the prediction results, we present the ethnic composition of misdemeanor defendants in Figure 5. Latinx arrestees accounted for slightly more than one-third (36%) of misdemeanor defendants in 2015, but this share has gradually increased over time, reaching 41 percent in 2021. This change likely reflects the increasing Latinx share of the Harris County general population, which was 44%, according to the 2019 U.S. Census estimate.

Figure 5: Ethnic Distribution of Misdemeanor Defendants



Although our ethnicity prediction result appears to be highly accurate, we plan to refine our imputation procedure and further improve its accuracy by using arrestees' neighborhood of residence as an additional predictor. As noted above, the data on misdemeanor arrestees' addresses at the time of case filing have recently become available to us. We plan to geocode the addresses

---

[10]   *See*   United   States   Census   Bureau,   Quick   Facts,   Harris   County,   at https://www.census.gov/quickfacts/harriscountytexas.
[11] We used the R package wru for this prediction. The package predicts individuals' race and ethnicity by applying a well-established statistical technique, the Bayes' Rule, to the U.S. Census Bureau's Surname List from 2010, which contains information on the racial and ethnic composition associated with each last name nationwide.

and link them to the matching Census geographic units (such as Census blocks and tracts) in the near future, which would enable us to incorporate the actual neighborhood-level ethnicity distribution data (published by the U.S. Census) into our imputation method.

### 5. Geographic Distribution of Misdemeanor Defendants

In our second report, we presented the geographic distribution of misdemeanor defendant addresses in Harris County before and after the implementation of Rule 9. Unfortunately, we lost our access to defendant address information during the data outage last year, and were not able to include the updated figures in the third report. Thanks to the hard work by the County, especially the Harris County Attorney's Office (CAO) and JAD, most of the data elements we used for our previous analysis are now restored.

We used this brief period of disruption as an opportunity to refine and improve the quality of our address data. Specifically, as noted in the second report, our previous geographic analysis was based on defendants' last known addresses as of January 2021, which may be different from the addresses at the time of their arrest. This data limitation may be particularly important for those who were arrested multiple times during our study period (2015-2021), who may have moved to a different address several times since the time of initial arrest. To take on this issue, we worked closely with JAD to construct a new data field, which represents the defendant's last known address *at the time of each case filing*, which is likely to be where the defendant lived while going through the early stages of the criminal justice process, such as arrest, pretrial detention, and bail hearing.

Perhaps not surprisingly, the quality of our address data may be less than perfect due to a small number of missing (e.g., homelessness) and data entry errors (e.g., incorrect street addresses and ZIP codes), and we plan to work on further data validation in the coming months. Moreover, we plan to geocode defendant addresses so that the addresses can be matched to the appropriate Census geographic units, such as Census blocks, block groups, and tracts. Once this matching is done, we can utilize the Census data to learn about a variety of demographic and socioeconomic attributes which characterize the neighborhoods heavily populated by misdemeanor arrestees.[12] For the current report, however, we present a preliminary analysis, in which we simply take ZIP codes provided in the defendant address data and use the United States Postal Service (USPS) ZIP code service areas as the unit of analysis.

Table 1 presents the number of misdemeanor arrestees whose address at the time of case filing contains a Harris County ZIP code.[13] To present the results at the person-level (as in Figure 1), if a person is arrested multiple times during a calendar year, we only consider their address associated with the first arrest observed during the year. In each year between 2015 and 2021, we find that roughly 80 percent of the arrestees had a Harris County address. We also note that both the number and share of persons arrested for misdemeanors with missing ZIP codes have fallen

---

[12] Census blocks and tracts are geographic units used for the presentation of statistical data of the U.S. Census. A Census block usually coincides with a street block in a city; Census block groups are clusters of the Census blocks, and typically have population between 600 and 3000. Finally, Census tracts are clusters of the Census block groups with a typical population size between 1,200 and 8,000 people.

[13] The list of Harris County ZIP codes is taken from Zillow: https://www.zillow.com/browse/homes/tx/harris-county

over the years; some of the potential explanations for this change include an increased effort by the county to collect address data and a decline in the number of homeless arrestees.

Table 1. Number of Misdemeanor Defendants with Harris County Address

| Year | Count of Misd. Defendants | Misd. Defendants with Harris County ZIP Code | | Misd. Defendants with Missing ZIP Code | |
|------|-----|-----|-----|-----|-----|
| | | Count | (Share) | Count | (Share) |
| 2015 | 50576 | 40462 | (80%) | 4866 | (10%) |
| 2016 | 48896 | 39607 | (81%) | 3965 | (8%) |
| 2017 | 43965 | 35686 | (81%) | 3456 | (8%) |
| 2018 | 46339 | 37848 | (82%) | 3421 | (7%) |
| 2019 | 44311 | 36017 | (81%) | 3094 | (7%) |
| 2020 | 38144 | 31135 | (82%) | 2515 | (7%) |
| 2021 | 41641 | 33803 | (81%) | 2241 | (5%) |

Figures 6 and 7 graphically illustrate the population share of persons arrested for misdemeanors across Harris County neighborhoods in 2017 and 2021, two years before and after the implementation of Rule 9. We aggregate defendant addresses up to the ZIP code level; ZIP code areas colored in dark red indicate more than 1,000 misdemeanor arrestees per 100,000 populations, and those in light yellow less than 250 misdemeanor arrestees. The figures show that the share of the misdemeanor arrestee population in most Harris County neighborhoods has fallen between 2017 and 2021, indicating that the decline in the total number of persons arrested for misdemeanors (presented in Figure 1) is not driven by a small number of specific neighborhoods. At the same time, the decline appears to be somewhat more pronounced in the ZIP code areas located in the eastern and southern parts of the county.

Figure 6: Residential Locations of Misdemeanor Defendants in 2017



Note: ZIP code areas in dark red indicate more than 1,000 misdemeanor arrestees per 100,000 populations, and those in light yellow indicate fewer than 250 misdemeanor arrestees.

Figure 7: Residential Locations of Misdemeanor Defendants in 2021



Note: ZIP code areas in dark red indicate more than 1,000 misdemeanor arrestees per 100,000 populations, and those in light yellow indicate fewer than 250 misdemeanor arrestees.

Next, we examine demographic characteristics of the neighborhoods heavily populated by persons arrested for misdemeanors. To this end, we combine our defendant address data with ZIP-code-level data on median household income and the share of non-White population, which come from the U.S. Census's American Community Survey (ACS). We use the 2019 ACS 5-year Estimates data, which represent the average "neighborhood" characteristics between years 2015 and 2019.

Consider the top panel of Figure 8 first. We find that, in both 2017 and 2021, ZIP code areas heavily populated by non-Whites (horizontal axis) tend to have a higher share of misdemeanor arrestees per 100,000 populations (vertical axis). In the bottom panel, we plot the within-ZIP-code change in the misdemeanor arrestee population share between 2017 and 2021 (vertical axis) against the average share of non-White populations from 2015-2019 (horizontal axis). Again, we find that the misdemeanor arrestee population share has declined in most neighborhoods, including both low- and high-minority ZIP code areas.

Similarly, we compare the share of persons arrested for misdemeanors and median household income at the ZIP code level in Figure 9. Perhaps not surprisingly, in both 2017 and 2021, misdemeanor arrestees were more heavily concentrated in low-income ZIP code areas (top panel). However, when the change in the arrestee population share is plotted against the ZIP-code level median household income (bottom panel), it seems that low-income neighborhoods as a group experienced a somewhat larger reduction in the misdemeanor arrestee population. Overall, the figure provides suggestive evidence that the decline in the number of misdemeanor arrestees since 2017 reduced the economic disparity between neighborhoods with high and low concentration of misdemeanor arrestees.

Figure 8: Misdemeanor Arrestee Population Share (per 100,000), by Non-White Population Share



Figure 9: Misdemeanor Arrestee Population Share (per 100,000), by Median Household Income



### 6. Number of Cases that Belong to "Carve-out" Categories

Under Local Rule 9, which became effective on February 16, 2019, all persons arrested for misdemeanors must "have unsecured bail amounts set initially at no more than $100 and be promptly released on a personal bond with or without other non-financial conditions as soon as practicable after arrest", except for those who belong to the following "carve-out" categories:

> 9.4.1 Individuals arrested and charged for protective order and bond condition violations.[14]
> 9.4.2 Individuals arrested and charged for domestic violence (namely, assault or terroristic threat against family and intimate partners).
> 9.4.3 Individuals arrested and charged for repeat DWI within the past five years.
> 9.4.4 Individuals arrested and charged with any new offense while on any form of pretrial release.
> 9.4.5 Individuals arrested on a capias issued after a bond forfeiture or bond revocation.
> 9.4.6 Individuals arrested while on any form of community supervision for a Class A or B misdemeanor or a felony offense.

The first three carve-out categories concern the type of offense committed (such as domestic violence and repeat DWI), while the last three concern the person's status at the time of an arrest (such as pretrial release and community supervision). These categories are not mutually exclusive, and a single case may belong to more than one carve-out category. For example, a person arrested for a repeat DWI while under community supervision would belong to the third and sixth carve-out categories at the same time.

With the cooperation of the Office of Court Management for the CCCL ("OCM"), JAD worked very hard to build a logic which determines the carve-out status of a given case based on the offense penal code and existing pretrial conditions, such as pretrial release, bond forfeiture, and community supervision. We are extremely grateful to JAD and OCM data teams for their hard work, but at the same time, we note that more work needs to be done to improve the data so that the carve-out status of a given misdemeanor case can be accurately recorded. One important data limitation is our inability to determine exactly which cases belong to the carve-out domestic violence cases. More specifically, the currently available data do not allow us to distinguish between terroristic threats against family (Penal Code 22.07©(1); domestic violence) and other types of terroristic threats that should not be considered as domestic violence cases. In the absence of this full penal code information, we consider all types of terroristic threat cases (Penal Code 22.07) as domestic violence cases below, which likely over-estimates the true count of carve-out domestic violence cases. We plan to explore this issue further by working with different county and city agencies which may collect data on domestic violence cases on their own, such as the HPD.

---

[14] We note that noncompliance with conditions of pretrial release is likely more common than is reflected by the number of charges filed for alleged violations of bond conditions because not every observed violation may result in a report of noncompliance.

Figure 10 presents the share of misdemeanor cases which belong to one of the carve-out categories, which has more than doubled between 2015 (18%) and 2021 (37%). Since the total number of misdemeanor cases has declined during this time period, the number of carve-out cases did not increase as much (11,459 in 2015 vs. 18,280 in 2020). However, it is still noteworthy that the share of carve-out cases has been consistently increasing during the seven-year span.

Figure 10: Share of Carve-out Misdemeanor Cases by Year



Table 2 breaks down the distribution of carve-out cases by the category (rows) and the year of case filing (columns). For example, 2% of the carve-out misdemeanor cases in 2015 involve violation of protective orders (6.4.1) and 41% involve domestic violence (6.4.2). Some of the cases belong to multiple carve-out categories, which is why the sum of the percentages within each column add up to more than 100%. Overall, we find some notable changes in the composition of carve-out cases over time. The shares of cases involving protective order violations (6.4.1), domestic violence (6.4.2), repeat DWIs (6.4.3), and arrests while out on bond (9.4.4) have all gradually increased between 2015 and 2021. On the other hand, the changes were more drastic for arrests after bond failure (6.4.5; 30% in 2015 vs. 49% in 2021) and arrests made while on community supervision (6.4.6; 25% in 2015 vs. 9% in 2021). In 2021, the three most common types of carve-out cases were domestic violence (6.4.2), arrests while out on bond (9.4.4), and arrests after bond failure (6.4.5). The prevalence of bond-related carve-out cases is consistent with the fact that the number of bond approvals and the average time to case disposition have both increased since 2019. (See Figures 12 and 18 below.)

33

Table 2: Distribution of Carve-out Cases, by Category and Year

| Carve-out Categories | Case Filing Year | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
| Protective Order Violation | 2% | 3% | 3% | 2% | 3% | 5% | 6% |
| Domestic Violence | 41% | 40% | 40% | 48% | 46% | 47% | 45% |
| Repeat DWI | 7% | 7% | 8% | 7% | 9% | 9% | 9% |
| Arrest while out on Bond | 32% | 33% | 34% | 35% | 40% | 43% | 36% |
| Arrest after Bond Failure | 30% | 31% | 33% | 34% | 40% | 45% | 49% |
| Arrest while on Supervision | 25% | 24% | 23% | 17% | 13% | 11% | 9% |
| Number of Carve-out Cases | 11459 | 11800 | 11611 | 14473 | 15042 | 16445 | 18280 |

## 7. Pretrial Detention and Holds Placed

Next, we examine the length of pretrial detention experienced by persons charged with misdemeanors by taking the time in days between initial booking and release dates. For the current analysis, we focus on the length of initial pretrial detention, which is known to have a substantial impact on the case disposition outcomes, as well as subsequent labor market and criminal outcomes.[15] To be specific, we examine whether a misdemeanor arrestee was detained within 7 days of the case filing date and if so, the length of that initial detention.

As noted in our previous reports, the booking and release data currently available appear to be somewhat incomplete, especially for the cases filed in the earlier years. For example, we observe that the number of misdemeanor cases and arrestees in 2015 are more than 10 percent greater than in 2017 (Figures 1 and 2), but the number of misdemeanor cases involving pretrial detention in 2015 is nearly 10 percent *lower* than in 2017. This discrepancy is likely to be driven by the fact that, prior to the opening of the Joint Processing Center (JPC) in 2019, some arrestees were able to bond out before reaching the Harris County Jail without leaving a booking record, and does not necessarily mean that misdemeanor defendants have become more likely to be detained in recent years.[16]

With this caveat in mind, we present the number of misdemeanor cases involving pretrial detention in Table 3 and its breakdown by the length of initial pretrial detention (namely, 0-2 days, 3-7 days, and more than 7 days). Panel (A) indicate that people charged with misdemeanor offenses in recent years tend to experience a relative short period of pretrial detention, compared to the previous years. For example, 87% of the misdemeanor cases filed in 2021 involved pretrial detention lasting two days or less, although this share was only 80% in 2017. Similarly, pretrial detention lasting more than 7 days has become less common and are observed in only 8% of the

---

[15] Will Dobbie, Jacob Goldin & Crystal S. Yang, *The Effects of Pretrial Detention on Conviction, Future Crime, and Employment: Evidence from Randomly Assigned Judges*, 108 AM. ECON. REV. 201 (2018).

[16] Before 2019, law enforcement agencies would initially transport the arrestees to their local jail or substation and then transport them to the Harris County Jail, but if an individual had a bond amount set in the system, the person could post a surety bond from that location and get released before reaching the Harris County Jail. Since JPC opened in February 2019, all arrestees are transported by the arresting officer directly to the JPC. Even after the opening of JPC, some of the defendants who are not in custody but have an active warrant are allowed to post unsecured personal bonds (if approved) without being admitted to the JPC's intake section.

misdemeanor cases filed in 2021. These trends are in line with recent changes in the misdemeanor bail system in Harris County, most notably the first preliminary injunction adopted in 2017 and Local Rule 9 implemented in 2019.

Table 3: Distribution of Pretrial Detention Duration

| (A) A) All Misdemeanor Cases with Initial Booking/Release Dates Observed | Length of Initial Pretrial Detention | | | |
|---|---|---|---|---|
| 2015 | 60% | 19% | 20% | 36985 |
| 2016 | 68% | 15% | 16% | 45096 |
| 2017 | 80% | 8% | 12% | 40230 |
| 2018 | 82% | 6% | 12% | 39690 |
| 2019 | 85% | 5% | 9% | 43849 |
| 2020 | 84% | 5% | 11% | 37468 |
| 2021 | 87% | 5% | 8% | 40074 |
| (B) Excluding Misdemeanor Cases with Co-occurring Felony | | | | |
| Year | 0-2 Days | 3-7 Days | > 7 Days | Obs. |
| 2015 | 61% | 19% | 19% | 35917 |
| 2016 | 69% | 15% | 15% | 43721 |
| 2017 | 82% | 8% | 10% | 38714 |
| 2018 | 84% | 6% | 10% | 37959 |
| 2019 | 87% | 5% | 8% | 41655 |
| 2020 | 86% | 5% | 9% | 34354 |
| 2021 | 88% | 5% | 7% | 37205 |

However, we cannot rule out other changes during this time period which may have influenced the length of pretrial detention. One such possibility is an increased number of misdemeanor cases with a co-occurring felony (Figure 2), in which the length of initial pretrial detention should be little affected by the misdemeanor bail reform. To separate the impact of this potential confounder, we remove misdemeanor cases with a co-occurring felony and repeat the analysis in Panel (B). Although the results remain very similar, this sample restriction further increases the share of short pretrial detention (lasting two days or less) and decreases the share of long pretrial detention (lasting more than seven days). Overall, we find that the vast majority of misdemeanor cases filed in recent years involved a relatively short period of pretrial detention.

Another important factor that may affect the duration of pretrial detention is whether a misdemeanor defendant is subject to an existing hold, which may be placed by other agencies such as the U.S. Immigration and Customs Enforcement (ICE), Texas Board of Pardons and Paroles (BOPP), or law enforcement agencies from other jurisdictions. Indeed, our data indicate that the prevalence and composition of holds have substantially changed since 2015. The number of misdemeanor cases with an existing hold nearly doubled between 2015 (N=2,169) and 2019 (N=3,757), and then sharply dropped in 2020 (N=2,967) and 2021 (N=2,150). We also find a notable change in the types of holds placed over time. The share of ICE holds increased sevenfold

between 2015 (7%) and 2020 (49%), and then fell down to 14% in 2021. The change is just as drastic when we consider the counts instead of the shares. The number of misdemeanor cases with an ICE hold in place at the time of case filing increased from 840 in 2017 to 1,722 in 2019, and then fell down to 308 in 2021.

Figure 11: Share of Misdemeanor Cases with an Active Hold



### 8. Initial Bond Decisions

As noted above, one of the most important consequences of Rule 9 is that most misdemeanor arrestees who do not belong to one of the carve-out categories can now be released on an unsecured personal bond or general order bond with an initial unsecured bond amount of no more than $100. We examine whether this change is in line with the actual bond decisions observed in the data. To focus our analysis on the initial stage of the criminal justice process, our analysis only considers the first bond decision associated with a given case. For the same reason, we also omit from the analysis a small number of the cases in which the first bond decision took place after the first setting date.

Figure 12 presents the share of misdemeanor cases in which defendants were released on a bond before the first setting, by the year of case filing. We find that the release rate has substantially increased since 2017 (the year that the first preliminary injunction was in effect, in June 2017 to August 2018) and reached 83 percent in 2019 (the year when Local Rule 9 became effective). Since then, the release rate has slightly declined and reached 78 percent in 2021.

Figure 12: Share of Misdemeanor Cases in which Defendants Were Released on a Bond before First Setting



The level of financial burden associated with bail decisions should vary depending on whether they are released on a secured bond (cash or surety) or an unsecured bond (personal or general order bonds). In Figure 13, we observe a clear increase in the use of unsecured personal bonds and general order bonds over time. Specifically, 87 percent of the bond releases in 2015 involved secured bonds, but this share fell to 21 percent in 2019 and 15 percent in 2021. About 85 percent of the bond releases in 2021 involved either personal bonds or general order bonds, which impose little financial costs on the arrestees. Overall, the observed patterns in the initial bond decisions show that the level of financial burden associated with pretrial release has declined in recent years.

Figure 13: Types of Initial Bond Approvals



Next, we examine the distribution of initial bond amounts set and posted. If a person is ordered to be released on a secured bond (but not a personal bond or general order bond), the bond amount set can have a significant impact on whether the person can actually be released or not. Prior to Rule 9, many misdemeanor arrestees routinely remained in jail even though their bonds were approved, because they could not afford the set bond amount. Rule 9, however, required most misdemeanor defendants (barring a small number of exceptional cases) to be released with an unsecured bond amount of $100, and the Consent Decree requires the arrestees' financial information to be reviewed before a secured bond is given and the bond amount is set. It is of great importance to examine whether these changes are in line with the distribution of bond amounts set actually observed in the data.

We present in Table 4 the distribution of initial bond amounts set and posted by misdemeanor arrestees, by the year of case filing. Panel (A) shows that Rule 9 has clearly reduced the bond amount set initially for most misdemeanor cases. In virtually all misdemeanor cases prior to 2019, the initial bond amount was $500 or more—which is consistent with the bail schedules that were in place during those years. But since then, bond amounts of $100 or less have become more common, and are now observed in nearly 70 percent of the cases filed in 2021.

Panel (B) presents the distribution of initial bond amounts posted. We note that the number of observations in Panel (B) is often lower than that in Panel (A), which suggests that some of the surety and cash bond approvals that required people to pay in order to be released did not actually result in a release. Prior to 2019, the number of initial bonds that were approved but not posted (that is, the difference in the number of observations between the two panels) was very high, which

may be explained by the widespread use of surety and cash bonds during that period of time. Perhaps not surprisingly, we also observe that a large share of bonds that were approved but not posted involves very high bond amounts ($3,000 or more). However, since 2019, this discrepancy has largely diminished, and the numbers presented in the two panels more closely resemble each other.

Table 4: Distribution of Initial Bond Amount Set and Posted

| (A) Outcome: | Initial Bond Amount Set | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Year | $100 or Less | | $101-$499 | | $500-$2999 | | $3000 or More | | Obs. |
| 2015 | 5 | (0.01%) | 1 | (0.00%) | 33489 | (60%) | 22522 | (40%) | 56017 |
| 2016 | 15 | (0.03%) | 7 | (0.01%) | 34530 | (61%) | 22496 | (39%) | 57048 |
| 2017 | 226 | (0.47%) | 18 | (0.04%) | 34527 | (72%) | 13302 | (28%) | 48073 |
| 2018 | 532 | (1.1%) | 101 | (0.2%) | 40876 | (86%) | 6040 | (13%) | 47549 |
| 2019 | 29397 | (62%) | 329 | (0.7%) | 12955 | (27%) | 4452 | (9%) | 47133 |
| 2020 | 26375 | (66%) | 403 | (1.0%) | 8509 | (21%) | 4700 | (12%) | 39987 |
| 2021 | 28992 | (68%) | 444 | (1.0%) | 9639 | (23%) | 3710 | (9%) | 42785 |
| (B) Outcome: | Initial Bond Amount Posted | | | | | | | | |
| Year | $100 or Less | | $101-$499 | | $500-$2999 | | $3000 or More | | Obs. |
| 2015 | 5 | (0.02%) | 1 | (0.00%) | 25779 | (77%) | 7528 | (23%) | 33313 |
| 2016 | 15 | (0.04%) | 6 | (0.02%) | 26887 | (78%) | 7380 | (22%) | 34288 |
| 2017 | 193 | (0.52%) | 16 | (0.04%) | 29921 | (81%) | 6638 | (18%) | 36768 |
| 2018 | 446 | (1.1%) | 63 | (0.2%) | 36105 | (89%) | 3829 | (9%) | 40443 |
| 2019 | 28725 | (66%) | 238 | (0.5%) | 10832 | (25%) | 3652 | (8%) | 43447 |
| 2020 | 25372 | (70%) | 305 | (0.8%) | 7036 | (19%) | 3533 | (10%) | 36246 |
| 2021 | 28205 | (72%) | 353 | (0.9%) | 8138 | (21%) | 2259 | (6%) | 38955 |

From the evidence presented so far, it seems that recent bail reforms have significantly changed the patterns of pretrial release and bond approvals, helping more misdemeanor arrestees to be released from jail on a personal or general order bond and reducing the associated financial burden. A closely related question is whether the increased use of unsecured personal and general order bonds has led to an increase in non-appearance. Unfortunately, Harris County only began tracking appearance information in December 2020. Prior to that date, the only data that is available is bond forfeiture, bond surrender, and bond revocation data.

Using these available data, we computed the share of initial bonds that "failed," defined here as the bond approvals that resulted in bond forfeiture, bond surrender, or bond revocation within a year of the bond approval date.[17] We underscore, however, that bond-failure data may be a poor proxy for assessing nonappearance rates. Bond forfeiture, bond surrender, and bond revocation all reflect discretionary judicial decisions about whether a person missed court or violated a bond condition and, separately, whether the person's reasons for doing so warranted a forfeiture, surrender, or revocation. Different judges will make different decisions given the same

---

[17] Most bond failures seem to take place within the first few months after they are issued. Among all initial bonds in our data that were approved between 2015 and 2020 and failed within 365 days, 50 percent of the bond failures were observed within 43 days of the approval date, and 95 percent of bond failures within 258 days.

real-world facts. However, beginning in December 2020, a new set of definitions were adopted as the Consent Decree's court appearance policy was operationalized by OCM, which should help us obtain a more reliable measure of non-appearance in the future.

Figure 14 presents the one-year misdemeanor bond failure rate, defined as the share of bond that failed within 365 days of the bond approval date. The overall bond failure rate was relatively low for cases filed in 2015 and 2016 (17%). The rate then rose to 27 percent in 2017 and 29 percent in 2018, and has gradually declined since then, reaching 26 percent in 2019 and 22 percent in 2020. Note that the bond failure rates could not be computed for cases filed in 2021, because most of them cannot be followed up for a year yet.

Figure 14 also shows the bond failure rates by the type of bond approved, namely, surety and cash bonds, personal bonds, and general order bonds. Across all years considered, surety and cash bonds had the lowest one-year failure rate, which has remained mostly stable at around 15 percent. By contrast, there was a greater fluctuation in the personal bond failure rate, which increased from 21 percent in 2015 to 40 percent in 2018, and then fell down to 25 percent in 2020. Since the general order bond was adopted in 2019, its one-year failure rate can only be computed for 2019 and 2020; it fell from 29 percent in 2019 to 23 percent in 2020.

Figure 14: Rate of Bond Failures within 365 Days, by Bond Types



Lastly, we explore the extent to which initial bond decisions vary across different demographic groups. Specifically, we illustrate the pattern of pretrial release for each sex, race, and ethnic group, and examine whether and how the disparity in pretrial release rates across demographic groups, if any, has changed since the implementation of the bail reforms.

In panel (A) of Table 5, we present the rate of pretrial release, defined here as the share of misdemeanor cases in which a person was released on a bond before the first setting, for each sex, race, and ethnic group. It appears that there existed a substantial gap in pretrial release rates between females and males, Blacks and Whites, and Latinxs and non-Latinxs. For example, in 2015, females arrested for a misdemeanor offense were more likely to be released than their male counterparts by 10 percentage points, Whites were more likely to be released than blacks by 17 percentage points, and Latinx persons were more likely to be released than non-Latinx persons by 17 percentage points. These female/male, Black/White, Latinx/non-Latinx gaps have rapidly narrowed since then, as the percentage point differences fell by approximately two-thirds between 2015 and 2019. The Black/White and Latinx/non-Latinx differences slightly increased in 2020 and 2021, but overall, the sex, race, and ethnic gaps in pretrial release rates in 2021 (3, 8, and 7 percentage points, respectively) remain considerably smaller than in 2015.

Panel (B) of Table 5 shows the rate of pretrial release on an *unsecured* bond for each sex, race, and ethnic group. Consistent with the drastic increase in the use of personal and general order bonds over time (Figure 13), we find that the rate of pretrial release on an unsecured bond has also increased over time for all demographic groups considered. Unlike panel (A), however, the differences between sex, race, and ethnic groups have been rather modest and remained mostly stable, especially since 2017. In 2021, female/male, Black/White, Latinx/non-Latinx differences in the rate of pretrial release on an unsecured bond were 2, 3, and 5 percentage points, respectively.

Table 5: Initial Pretrial Release Rate by Sex, Race, and Ethnicity

| Year | By Sex | | By Race | | By Ethnicity | |
|---|---|---|---|---|---|---|
| | Female | Male | Black | White | Latinx | Non-Latinx |
| (A) Pretrial Release on Any Bond | | | | | | |
| 2015 | 60.8% | 51.2% | 42.9% | 60.1% | 64.6% | 47.6% |
| 2016 | 65.6% | 53.2% | 46.3% | 61.9% | 66.1% | 50.3% |
| 2017 | 75.1% | 67.5% | 62.7% | 73.0% | 75.5% | 65.5% |
| 2018 | 78.1% | 71.4% | 67.3% | 76.7% | 79.1% | 69.4% |
| 2019 | 86.1% | 82.6% | 80.3% | 85.5% | 86.3% | 81.5% |
| 2020 | 80.5% | 79.3% | 76.0% | 82.2% | 83.8% | 76.6% |
| 2021 | 80.3% | 77.8% | 73.9% | 81.6% | 82.7% | 75.3% |
| (B) Pretrial Release on PR/GOB | | | | | | |
| 2015 | 11.6% | 5.4% | 7.4% | 6.5% | 6.7% | 6.9% |
| 2016 | 15.1% | 7.9% | 10.5% | 8.7% | 8.9% | 9.8% |
| 2017 | 34.2% | 30.1% | 34.3% | 29.0% | 28.8% | 32.2% |
| 2018 | 45.6% | 39.8% | 44.7% | 39.2% | 39.0% | 42.4% |
| 2019 | 66.7% | 65.3% | 67.2% | 64.8% | 65.8% | 65.4% |
| 2020 | 66.7% | 66.8% | 65.7% | 67.8% | 69.6% | 64.7% |
| 2021 | 68.1% | 66.4% | 64.9% | 68.2% | 69.9% | 64.5% |

### 9. Case Disposition Outcomes

Given the change in the patterns of pretrial detention and bond decisions documented above, it is of interest to examine whether and how these changes affected case disposition outcomes. To explore this question, we present the distribution of case disposition outcomes for misdemeanor cases filed between 2015 and 2020 in Figure 15. (Misdemeanor cases filed in 2021 are again dropped from the analysis because most of them (70%) do not have a disposition outcome yet.) Clearly, the share of misdemeanor cases resulting in a criminal conviction has noticeably declined between 2015 (59%) and 2019 (25%), while the share of cases dismissed or acquitted has nearly doubled (30% in 2015 vs. 59% in 2019). A large number of cases filed in 2020 are yet to be disposed (31%), but even here, the share of cases dismissed or acquitted (47%) far exceeds the share of cases that resulted in a conviction (20%). We also note that the use of deferred adjudication, a court-imposed diversion agreement which places the defendant under community supervision, have become less common over time, with the share gradually falling from 8 percent in 2015 to 2 percent in 2020. Unlike probation, deferred adjudication is not considered as a criminal conviction if the community supervision is successfully completed.

Figure 15: Case Disposition Outcomes



Figure 16 repeats the analysis, this time removing cases in which the disposition outcomes are not observed yet. Not surprisingly, this sample restriction reduces the number of observations, especially for cases filed during the last two years (2019 and 2020), but the overall pattern remains mostly unchanged. Again, we observe more cases that are dismissed or acquitted over time, while the share of cases resulting in a conviction fell by more than one-half between 2015 and 2020.

Figure 16: Case Disposition Outcomes, Cases with Observed Disposition Only



Next, we examine the change in the share of misdemeanor convictions through a guilty plea in Figure 17. Prior to the preliminary injunction in 2017 and implementation of Rule 9 in 2019, nearly all misdemeanor convictions came from guilty pleas (97 percent in 2015 and 2016). Since then, the share of guilty pleas slightly fell, accounting for 94 percent of all misdemeanor convictions in 2019. The decline is even more pronounced when considering the count of guilty pleas. 35,996 misdemeanor cases filed in 2015 resulted in a conviction through guilty plea; but only 12,422 cases filed in 2019 did so. The number further declined to 8,324 in 2020, but this decline is largely due to the fact that many of these cases are not disposed yet. Overall, our findings provide suggestive evidence that the recent misdemeanor bail reforms in Harris County had a significant impact on the initial pretrial detention and bond decisions, as well as the eventual case disposition outcomes.

Figure 17: Share of Guilty Pleas among Misdemeanor Convictions



Another important disposition-related question we consider is the extent to which the duration of misdemeanor cases has changed since Rule 9 went into effect. To explore this question, we compute the time in days between case filing and initial case disposition and present in Figure 18 the share of cases disposed within 90, 180, and 365 days. The figure shows that cases filed in recent years tend to remain open for a longer period of time. For example, most cases (52%) in 2015 were disposed within three months of the case filing, but this share fell down to 14% in 2020. Likewise, about 90 percent of the cases filed in 2015 and 2016 were disposed within a year, but the number fell to 45 percent in 2020. The policy responses to the COVID-19 pandemic are likely to be responsible for some of these delays, as the pandemic caused a major disruption in the criminal justice system, increasing the backlog of criminal cases, reducing the setting of trial dates, and lengthening the time between court appearances. It remains to be seen whether this case processing delay would continue in 2022, as the pandemic enters its third year.

Figure 18: Time in Days between Case Filing and Disposition



## 10. Repeat Offense

Lastly, we explore the pattern of repeat offenses by persons charged with misdemeanors using several different measures, namely, 1) the share of *persons* charged with misdemeanors and then with a new offense within a year of the initial case filing date (person-level repeat-offense), 2) the share of misdemeanor *cases* in which the same person was charged with a new crime (case-level repeat-offense) within a year of the initial case filing date, and 3) the share of misdemeanor cases filed each year that were charged against former misdemeanor arrestees from the previous year.[18]

Consider the first two measures first. To obtain the case-level repeat-offense rate, we follow all misdemeanor cases filed during a calendar year and compute the share of cases followed by a new criminal case filing within 90, 180, and 365 days. To compute the person-level repeat-offense rate, we follow all misdemeanor cases filed against the same person during a calendar year and consider whether any of these cases was followed by a new criminal case filing with 90, 180, and 365 days. The case-level rate should be higher than the person-level rate, as multiple cases filed against the same person on the same day will be double-counted under the case-level measure.

---

[18] We thank the Harris County District Attorney's Office for helpful comments and discussions, which substantially improved our repeat offense analysis. We are especially grateful for their suggestion to consider both prospective and retrospective measures of repeat offense in the analysis, and to assess whether our findings are robust to the exclusion of out-of-county fugitive cases, which may have a systematically different risk of repeat offense compared to other misdemeanor cases in the data.

For example, if a person was charged for two separate offenses on the same day and again charged for a new offense a month later, this is counted as two cases with a new case filed under the case-level measure but a single person with a new case filed under the person-level measure.

It is important to note that just because a case is *filed* does not mean that the person is found guilty or convicted. Our analysis shows only *new cases filed*. It does not reveal whether the person was actually guilty or convicted of the offense in question. At the same time, we note that our person-level measure of repeat offending closely resembles the one used in the influential study by Heaton, Mayson, and Stevenson, which examined the share of persons charged with misdemeanors and then charged with a new offense within eighteen months of the initial bail hearing.[19] Although the two measures use slightly different reference dates (initial case filing date vs. initial bail hearing date), they are similar in the sense that both prospectively follow each misdemeanor case for a given period of time and look for a new criminal case filed against the same person during this follow-up period.

We also emphasize that both person-level and case-level measures consider all misdemeanor cases as the denominator, regardless of intermediate case outcomes such as pretrial release on a bond. This is noteworthy because separately computing the number of new cases filed against those who did and did not bond out on a prior charge, for example, confounds the overall trend in new case filings by misdemeanor defendants with the trend in hearing officers' propensity to approve pretrial release on a bond. As pretrial release on a bond has become far more common since Rule 9 (Figure 12), all else equal, the number of new cases filed while on bond should mechanically increase even if there were no actual change in the total number of new cases filed against persons facing misdemeanor charges. We elaborate more on this point below, by separately reporting the number of new cases filed by the type of initial bond decisions (Tables 9 and 10).

Table 6: Share of Misdemeanor Arrestees with a New Case Filed within 90, 180, and 365 Days

| Year | New Case Filed Within | | | | | | Obs. |
|------|------|------|------|------|------|------|------|
| | 90 Days | | 180 Days | | 365 Days | | |
| 2015 | 11% | (5598) | 16% | (8202) | 24% | (11905) | 50576 |
| 2016 | 11% | (5510) | 16% | (7981) | 23% | (11321) | 48896 |
| 2017 | 11% | (4801) | 16% | (6899) | 22% | (9851) | 43965 |
| 2018 | 11% | (5106) | 16% | (7230) | 22% | (10152) | 46339 |
| 2019 | 10% | (4625) | 15% | (6596) | 21% | (9171) | 44311 |
| 2020 | 11% | (4125) | 16% | (6010) | 23% | (8647) | 38144 |

We begin our repeat offense analysis in Table 6 by presenting the person-level rate of repeat offense within 90, 180, and 365 days. The share of misdemeanor arrestees who had a new criminal case filed within a year has changed little between 2015 (24%) and 2020 (23%). We also note that the rate of new cases filed has remained nearly constant across all three time periods considered, namely, 90, 180, and 365 days, although all three rates slightly increased between 2019 and 2020. Looking at the count of new cases filed, we find that the number of misdemeanor

---

[19] Paul Heaton, Sandra Mayson & Megan Stevenson, *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 Stan. L. Rev. 711 (2017).

arrestees who had a new criminal case filed has steadily decreased in each year since 2015.  As before, persons arrested for a misdemeanor offense in 2021 are dropped from this analysis as they cannot be followed up for a year yet.

Table 7 presents the shares of new cases filed within 90, 180, and 365 days of the initial case filing date, measured at the case level. As expected, this case-level measure provides a slightly higher rates of repeat-offense than the person-level measure, but the difference is rather modest. For example, 26 percent of misdemeanor *cases* filed in 2020 were followed by a new criminal case filing within a year, while 23 percent of misdemeanor *defendants* in 2020 had a new criminal case filed within a year. As in Table 6, for all three time periods considered (that is, 90, 180, and 365 days), the rate of new cases filed at the case-level changed little between 2015 and 2020.[20]

Table 7: Share of Misdemeanor Cases with a New Case Filed within 90, 180, and 365 Days

| Year | New Case Filed Within | | | | | | Obs. |
|------|------|---------|------|----------|------|----------|-------|
| | 90 Days | | 180 Days | | 365 Days | | |
| 2015 | 13% | (7914) | 19% | (11884) | 28% | (17196) | 62377 |
| 2016 | 13% | (8071) | 19% | (11886) | 27% | (16737) | 61323 |
| 2017 | 13% | (6939) | 19% | (10027) | 27% | (14149) | 53194 |
| 2018 | 13% | (7211) | 19% | (10319) | 26% | (14316) | 55413 |
| 2019 | 12% | (6126) | 17% | (8983) | 24% | (12457) | 52101 |
| 2020 | 12% | (5499) | 18% | (8183) | 26% | (11766) | 45614 |

So far, we have examined persons with prior misdemeanor charges who are charged with another offense within a year, regardless of the number of additional charges. Even though the share of such persons has remained stable, it is possible that the share arrested for multiple new offenses within a short period of time has changed. To explore this possibility, we present in Table 8 the breakdown of persons with prior misdemeanor charges arrested for a new offense within 365 days, by the number of new criminal cases filed.

Consider Panel (A) of Table 8 first. We find that the number of persons with prior misdemeanor charges arrested multiple times within a year is quite small. For example, only 0.54 percent of misdemeanor defendants in 2015 were re-arrested for five or more offenses within a year. Except a brief increase in 2017 (0.70%), this rate has remained largely stable, ranging between 0.49 percent (2019) and 0.58 percent (2020). Among persons with prior misdemeanor charges in 2020, the share of those re-arrested for three, four, and five or more offenses within a year were 1.8 percent, 0.8 percent, and 0.6 percent, respectively. These percentages from 2020 are somewhat higher than those from 2019, but they remain comparable to the rates observed during the previous years (2015-2018). Likewise, Panel (B) of Table 8 shows that the share of persons with prior misdemeanor charges arrested for multiple new misdemeanor offenses changed little, if not lower, since 2015.

---

[20] We note that we have computed the share of new cases filed excluding the out-of-county fugitive cases and obtained nearly identical results, which should not be surprising given that these cases only account for 2 percent of the total misdemeanor cases in the data.

Pan©(C) shows that the rate of new cases filed due to a new felony offense did not change much between 2015 (89%) and 2020 (87%). However, we also observe that the share of persons with prior misdemeanor charges arrested for multiple felony offenses somewhat increased in 2020. Between 2019 and 2020, the share of misdemeanor arrestees who were re-arrested for two felony offenses increased from 1.8 percent to 2.4 percent, the share of those re-arrested for three felony offenses increased from 0.5 to 0.7 percent, and those re-arrested for four felony offenses increased from 0.13 percent to 0.24 percent.

One potential explanation for the increased rate of new felony case filings is that the number of felony cases in Harris County notably increased in 2021 (see Table 11 below), which may reflect the nationwide increase in serious violent crimes last year. However, we cannot rule out other potential explanations for the increased likelihood of new felony case filings, such as changes in the arresting and charging decisions by police officers and persecutors, for example. We also note that, misdemeanor arrestees charged for multiple felony offenses remain very rare. Even in 2020, only 28 out of 38,144 persons charged with a misdemeanor offense had five or more felony charges filed against them within a year.

Table 8: Share of Misdemeanor Arrestees with a New Case Filed within 365 Days, by Number of New Case Filings

| (A) Outcome: | Number of New Offenses within 365 Days | | | | | | |
|---|---|---|---|---|---|---|---|
| Year | Zero | One | Two | Three | Four | Five or More | Obs. |
| 2015 | 76% | 16% | 5.0% | 1.7% | 0.61% | 0.54% | 50576 |
| 2016 | 77% | 16% | 4.7% | 1.6% | 0.69% | 0.58% | 48896 |
| 2017 | 78% | 15% | 4.7% | 1.8% | 0.63% | 0.70% | 43965 |
| 2018 | 78% | 15% | 4.6% | 1.7% | 0.63% | 0.51% | 46339 |
| 2019 | 79% | 14% | 4.2% | 1.6% | 0.62% | 0.49% | 44311 |
| 2020 | 77% | 15% | 4.8% | 1.8% | 0.76% | 0.58% | 38144 |
| (B) Outcome: | Number of New Misdemeanor Offenses within 365 Days | | | | | | |
| Year | Zero | One | Two | Three | Four | Five or More | Obs. |
| 2015 | 83% | 13% | 2.8% | 0.8% | 0.31% | 0.34% | 50576 |
| 2016 | 84% | 12% | 2.6% | 0.8% | 0.30% | 0.36% | 48896 |
| 2017 | 84% | 12% | 2.7% | 0.8% | 0.31% | 0.45% | 43965 |
| 2018 | 85% | 11% | 2.5% | 0.7% | 0.28% | 0.27% | 46339 |
| 2019 | 86% | 11% | 2.3% | 0.6% | 0.18% | 0.16% | 44311 |
| 2020 | 86% | 11% | 2.3% | 0.7% | 0.20% | 0.16% | 38144 |
| (C) Outcome: | Number of New Felony Offenses within 365 Days | | | | | | |
| Year | Zero | One | Two | Three | Four | Five or More | Obs. |
| 2015 | 89% | 9% | 1.8% | 0.3% | 0.05% | 0.00% | 50576 |
| 2016 | 89% | 8% | 1.8% | 0.3% | 0.05% | 0.02% | 48896 |
| 2017 | 90% | 8% | 1.9% | 0.4% | 0.08% | 0.03% | 43965 |
| 2018 | 89% | 8% | 1.8% | 0.4% | 0.10% | 0.02% | 46339 |
| 2019 | 89% | 8% | 1.8% | 0.5% | 0.13% | 0.07% | 44311 |
| 2020 | 87% | 9% | 2.4% | 0.7% | 0.24% | 0.07% | 38144 |

Tables 9 and 10 expand on the above analyses regarding new cases filed, by breaking down the number of misdemeanor cases that were followed by a new case filed against the same person, this time by whether a bond was filed for the initial misdemeanor case and the type of bond filed. (As in Figures 12 and 13, these bond outcomes reflect whether a bond was filed and the type of bond filed before the first setting.)  These tables highlight how, prior to the Rule 9 changes in early 2019, most persons facing misdemeanor charges who had a new case filed, did not receive bond. Many pleaded guilty after being denied bond and being detained in the jail.  However, subsequent to the Rule 9 changes, far more persons received bond, and therefore, most who reoffended, received some type of bond.  The composition of the bond types among those who had new cases filed changed a great deal as a result of the misdemeanor bail reforms, but as described, the rate of new case filings within each bond type did not.

Table 9. Number of Misdemeanor Cases with New Cases Filed by Bond or No Bond Filed

| | | | Number of Misd. Cases with a New Case Filed within | | | | | |
| Year | Bond Filed | Obs. | 90 Days | | 180 Days | | 365 Days | |
|---|---|---|---|---|---|---|---|---|
| 2015 | No | 29064 | 5711 | (20%) | 8234 | (28%) | 11323 | (39%) |
| 2016 | No | 27035 | 5776 | (21%) | 8202 | (30%) | 10969 | (41%) |
| 2017 | No | 16426 | 3569 | (22%) | 4832 | (29%) | 6407 | (39%) |
| 2018 | No | 14970 | 3094 | (21%) | 4204 | (28%) | 5615 | (38%) |
| 2019 | No | 8655 | 1468 | (17%) | 2103 | (24%) | 2819 | (33%) |
| 2020 | No | 9368 | 1600 | (17%) | 2253 | (24%) | 3090 | (33%) |
| 2015 | Yes | 33313 | 2203 | (7%) | 3650 | (11%) | 5873 | (18%) |
| 2016 | Yes | 34288 | 2295 | (7%) | 3684 | (11%) | 5768 | (17%) |
| 2017 | Yes | 36768 | 3370 | (9%) | 5195 | (14%) | 7742 | (21%) |
| 2018 | Yes | 40443 | 4117 | (10%) | 6115 | (15%) | 8701 | (22%) |
| 2019 | Yes | 43446 | 4658 | (11%) | 6880 | (16%) | 9638 | (22%) |
| 2020 | Yes | 36246 | 3899 | (11%) | 5930 | (16%) | 8676 | (24%) |

Table 10. Number of Misdemeanor Cases with New Cases Filed by Bond Type or No Bond Filed

| | | | Number of Misd. Cases with a New Case Filed within | | | | | |
| Year | Bond Type | Obs. | 90 Days | | 180 Days | | 365 Days | |
|---|---|---|---|---|---|---|---|---|
| 2015 | Cash | 29034 | 1960 | (7%) | 3226 | (11%) | 5190 | (18%) |
| 2016 | Cash | 28481 | 1936 | (7%) | 3092 | (11%) | 4773 | (17%) |
| 2017 | Cash | 20296 | 1143 | (6%) | 1858 | (9%) | 2959 | (15%) |
| 2018 | Cash | 17630 | 977 | (6%) | 1568 | (9%) | 2415 | (14%) |
| 2019 | Cash | 9277 | 550 | (6%) | 882 | (10%) | 1353 | (15%) |
| 2020 | Cash | 5847 | 403 | (7%) | 654 | (11%) | 1028 | (18%) |
| 2015 | PR | 4279 | 243 | (6%) | 424 | (10%) | 683 | (16%) |
| 2016 | PR | 5807 | 359 | (6%) | 592 | (10%) | 995 | (17%) |
| 2017 | PR | 16472 | 2227 | (14%) | 3337 | (20%) | 4783 | (29%) |
| 2018 | PR | 22813 | 3140 | (14%) | 4547 | (20%) | 6286 | (28%) |
| 2019 | PR | 11588 | 1541 | (13%) | 2288 | (20%) | 3202 | (28%) |

| 2020 | PR | 10837 | 1651 | (15%) | 2434 | (22%) | 3466 | (32%) |
| 2015 | GOB | N/A | N/A | | N/A | | N/A | |
| 2016 | GOB | N/A | N/A | | N/A | | N/A | |
| 2017 | GOB | N/A | N/A | | N/A | | N/A | |
| 2018 | GOB | N/A | N/A | | N/A | | N/A | |
| 2019 | GOB | 22581 | 2567 | (11%) | 3710 | (16%) | 5083 | (23%) |
| 2020 | GOB | 19562 | 1845 | (9%) | 2842 | (15%) | 4182 | (21%) |
| 2015 | No Bond | 29064 | 5711 | (20%) | 8234 | (28%) | 11323 | (39%) |
| 2016 | No Bond | 27035 | 5776 | (21%) | 8202 | (30%) | 10969 | (41%) |
| 2017 | No Bond | 16426 | 3569 | (22%) | 4832 | (29%) | 6407 | (39%) |
| 2018 | No Bond | 14970 | 3094 | (21%) | 4204 | (28%) | 5615 | (38%) |
| 2019 | No Bond | 8655 | 1468 | (17%) | 2103 | (24%) | 2819 | (33%) |
| 2020 | No Bond | 9368 | 1600 | (17%) | 2253 | (24%) | 3090 | (33%) |

An important limitation of the prospective measures of repeat offending, presented in Tables 6 and 7, is that they can be strongly influenced by trends in the total number of criminal cases filed. For example, from the available data, we find that the total number of felony cases filed in the Harris County District Courts increased by more than 10 percent between 2020 (N=41,756) and 2021 (N=46,559). Then, to a certain extent, the increased rate of new felony cases filed against former misdemeanor arrestees in 2020 (Table 7) simply reflects this underlying crime trend, and does not necessarily mean that the risk of serious repeat offense by misdemeanor arrestees actually increased.

To address this concern, we explore a complementary measure of repeat offending by computing the share of criminal cases each year that were charged against former misdemeanor arrestees from the previous year. Specifically, we count the number of criminal cases filed each year that were charged against former misdemeanor arrestees (namely, those arrested less than a year from the new case filing date) and divide it by the total number of criminal cases filed each year. Note that this measure is retrospective, as we start from each case's filing date and go backward, looking for a previous case filed against the same person within a one-year period. Cases filed in 2015 are dropped from this analysis, because we cannot observe whether another (misdemeanor) case was filed against the same person in 2014.

Table 11 presents the results. As shown in Figure 2, the number of misdemeanor cases has steadily declined since 2016, while the number of felony cases has substantially increased between 2019 (N=37,274) and 2021 (N=46,559). In spite of these opposing trends, we find that the shares of misdemeanor and felony cases filed against former misdemeanor arrestees have remained mostly stable, if not slightly lower. Less than 20 percent of the criminal cases filed in 2020 (17% for misdemeanors and 19% for felonies) were filed against persons charged with a misdemeanor in the previous year. Overall, we find little evidence that the risk of new case filings by persons with prior misdemeanor charges has significantly changed in recent years.

Table 11. Number of Criminal Cases Filed Against Persons Charged with Misdemeanor Cases in the Previous Year

| Year | Current Offense Type | Obs. | Charged Against Former Misd. Defendant | |
|------|---------------------|------|--------|------|
| 2016 | Misdemeanor | 61323 | 12629 | (21%) |
| 2017 | Misdemeanor | 53194 | 10363 | (19%) |
| 2018 | Misdemeanor | 55413 | 10359 | (19%) |
| 2019 | Misdemeanor | 52101 | 8725 | (17%) |
| 2020 | Misdemeanor | 45614 | 7546 | (17%) |
| 2021 | Misdemeanor | 49828 | 8338 | (17%) |
| 2016 | Felony | 36839 | 7699 | (21%) |
| 2017 | Felony | 34139 | 7048 | (21%) |
| 2018 | Felony | 35694 | 7038 | (20%) |
| 2019 | Felony | 37274 | 7450 | (20%) |
| 2020 | Felony | 41756 | 8223 | (20%) |
| 2021 | Felony | 46559 | 8763 | (19%) |

## IV. Cost Study and Project Management

This section of the Monitor Report reviews the status of two responsibilities assigned to the Public Policy Research Institute at Texas A&M University.  Section A presents statistics relating to the Cost Evaluation.  In Section B we review progress on PPRI's function tracking progress of the Parties in addressing requirements of the Consent Decree.

## A. Cost Evaluation

PPRI has been incrementally constructing the components of a model to estimate cost impacts of the ODonnell Consent Decree.  These costs fall into two broad categories:  system costs and defendant costs.  The research question considered here is:  "If 2021 policies had been in place each year since 2015, what would the total and average annual cost savings have been to Harris County and to arrestees?"  This analysis framework considers the combined effects of expedited pretrial release on General Order Bonds as well as other "front-end" efficiencies to reduce arrests and bookings during COVID.  Together, both sets of reforms contribute information about the efficacy of policies that could help contain costs of pretrial processes over the long term.  It should be noted that results presented here are a first look that form an early basis for more complex analyses to be developed in the future.

As shown in Table 12, we estimate that if pretrial practices had been amended as early as 2015 before the lawsuit was filed, Harris County might have saved an estimated  $15.6 million each year since, or as much as  $93.4 million in total.  The projected benefits of reform for defendants is even greater.  Driven by lower bond costs and less pretrial detention in recent years, arrestees are projected to have saved an average  $79.7 million per year or  $478 million over the past 7 years.

**Table 12.  Projected Cost Savings**
**If 2021 Post-ODonnell Criminal Justice Practices Were Implemented in 2015**
*(Holding Case Filings Constant at the 7-Year Average)*

|  | Average Savings per Year | Total 7-Year Savings |
|---|---|---|
| **System Costs** | | |
| Arrest | $199,795 | $1,198,770 |
| Booking | $5,034,308 | $30,205,849 |
| Pretrial Screenings | $990,165 | $5,940,987 |
| Article 15.17 Hearings | $244,189 | $1,465,136 |
| CCCL Court Settings | $5,477,090 | $32,862,539 |
| Pretrial Detention | $3,628,685 | $21,772,111 |
| **Subtotal System Cost Savings** | **$15,574,232** | **$93,445,391** |
| **Defendant Costs** | | |
| Pretrial Release | $1,563,530 | $9,381,183 |
| Lifetime Earnings | $63,107,109 | $378,642,652 |
| Partner Benefits | $13,066,538 | $78,399,226 |
| Child Support | $1,110,360 | $6,662,163 |
| Personal Safety | $810,732 | $4,864,391 |
| **Subtotal Defendant Cost Savings** | **$79,658,269** | **$477,949,614** |
| **PROJECTED TOTAL SAVINGS** | **$95,232,501** | **$571,395,005** |

In the sections that follow, system and defendant costs are discussed separately including the underlying estimates and rationale for the findings previewed here.  It is worth noting that offsetting costs such as or failures to appear in court or new criminal activity by defendants have not yet been accounted for.  Nonetheless, current evidence suggests the reforms under Rule 9 and the Consent Decree have had a net positive cost impact for Harris County and for misdemeanor defendants.

**1. Methods**

The following paragraphs review the methods used determine the cost estimates presented in this chapter.  They are useful for understanding and interpreting results.  In addition, a detailed step-by-step explanation of methods is provided in Appendix G.

A cost value for each measure is assigned to every case filed including a $0 entry for cases that did not experience a particular event (e.g., if there was no booking or if a person was not detained).  When events occur more than once for a case (e.g., multiple bookings or detentions), cumulative cost entries are made to account for each occurrence.  When events occur at the defendant level, costs are allocated proportionally across the felony and misdemeanor cases involved (e.g., arrest, booking, pretrial screening, and detention).  All costs are standardized in 2020 dollars except bond amounts which are taken at face value.

*Disposed* misdemeanor cases were then selected for analysis (see Table 13).   Using disposed cases ensures results are based on complete information about processing from filing through initial disposition.   However, excluding undisposed cases may also underrepresent the effect of more lengthy and potentially complex cases in recent years, as well as cases impacted by current court backlogs.   Comparing the number of cases filed vs disposed depicts the number of cases that will enter the analysis sample over time.   Results may change as these additional cases are included in the future, though long-term trends are strong and are expected to be generally preserved.

**Table 13. Number of Disposed Cases in the Analysis Sample**

|  | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|
| All Cases Filed *(Mean = 54,264)* | 62,377 | 61,323 | 53,194 | 55,413 | 52,101 | 45,614 | 49,828 |
| All Cases Disposed | 61,088 | 59,640 | 51,389 | 52,083 | 44,014 | 27,846 | 9,208 |
| Disposed Cases Trimmed at the 3rd Std. Dev. * | 60,742 | 59,368 | 51,305 | 52,027 | 43,769 | 27,770 | 9,171 |

* The trimmed n varies marginally for different cost elements.

The case counts depicted in Table 13 are used in several ways:  First, extreme values of disposed cases in the analysis sample (i.e., beyond the third standard deviation) are trimmed.  The remaining untrimmed values are then used to ascertain key metrics like mean, median, quartiles and maximums that show changes in distributions over time (see Figures 19-29 with accompanying "details" tables).

Next, these case-level descriptors are extrapolated to all cases filed in order to estimate comprehensive system-wide expenditures.  Results depicted in the "Projected Cost" Tables 14 through 24 are reported in two ways.

- "Cost assuming *Mean #* Cases" is the average cost per case multiplied by the mean number of cases over the 7-year study period:  54,264 cases.  This produces a comparison of change in total costs over time that is unaffected by the number of cases filed in a year.
- "Cost assuming *Actual #* Cases," substitutes the actual number of filings in a year instead of the average to view the combined effects of case costs and number of cases over time.

Finally, to assess potential cost savings over time, a difference is taken between 2021 and each prior year, then summed.  To annualize the resulting savings estimate, the sum is divided by the 6 annual change increments that occurred over the 7-year study period.  These summary estimates are presented in tabular form,  and described in the narrative.

## 2. System Costs

To date, detailed budget and case count information has been extracted from official documents and through direct communications with key Harris County criminal justice departments.  Within each department, budget data from HCFY 2019-20 were divided by the

number of events processed during that same timeframe to produce a cost per event for key case milestones.  As defendant data incrementally becomes available, we are applying the per-event cost amounts to determine total expenditures per case.   Here we report results and basic interpretation for the following seven categories:

- Initial Arrest
- Booking
- Pretrial Screening
- Article 15.17 Hearing
- 15.17 Public Defender
- CCCL Trial Court Settings
- Pretrial Detention

Other important categories are still in development and cannot be included at this time:

- Prosecution (case screening, 15.17 hearings, trial court prosecution, diversion)
- Victim Services
- Court-Appointed Counsel
- Court Orders (including mental health evaluations and treatment; diversion)
- Pretrial Supervision
- Protected health information

### a.   Initial Arrest

**HC FY20 Arrest Cost per Case:**

$$\frac{\substack{\textbf{\$19,749,022} \\ \text{Estimated 25\%[21] of HPD 2014 adopted} \\ \text{budget spent on arrests (adjusted to 2020} \\ \text{dollars)}}}{\substack{\textbf{67,383} \\ \text{2014 arrests reported by HPD[22]}}} = \textbf{\$293.09/arrest}$$

The incidence and cost of initial arrest[23] has remained quite stable over time (Table 14). Since 2015, about 85% of cases have involved an arrest with costs per case predominantly either $147 or $293 depending on the number of charges filed (see Figure 19 and Figure 19 Detail). It is noteworthy, however, that a 2020 policy change tangibly reduced the share of cases involving arrest from 86% in 2019 to 82% in 2020.  Although the 4% decline was modest, it offers a valuable

---

[21] Following Greenwood, P. W., Rydell, C. P., Abrahamse, A. F., Caulkins, J. P., Chiesa, J., Model, K. E., & Klein, S. P. (1994). Three strikes and you're out: Estimated benefits and costs of California's new mandatory-sentencing law. *Santa Monica, CA: Rand*.  See Table 3.1, pg. 15.

[22] See Bureau of Justice Statistics Arrest Data Analysis Tool (accessed 2/15/22 at https://www.bjs.gov/index.cfm?ty=datool&surl=/arrests/index.cfm).  The Monitor team has requested more recent HPD arrest data which can be used to update arrest cost estimates.

[23] Data is not currently available beyond initial arrest; later warrant arrests on the same charges are not considered in this analysis.

chance to explore the effect of non-arrest policies.  Therefore, unlike other sections, here analyses focus on the cost impacts of this one-year change in arrest policies.

### Table 14. Percent of Cases with Initial Arrest by Year

| Year | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|------|------|------|------|------|------|------|------|
| Percent | 84% | 85% | 85% | 85% | 86% | 82% | 85% |

If we standardize the number of cases in a year at the 7-year mean (54,264), then compare the years before and after the policy shift (Table 14a), we find the reduced arrest rate generated a direct savings to law enforcement agencies of  $1.2 million in 2019-20 alone (i.e., $12.5 million in 2019 minus $11.4 million in 2020).  Interestingly, if this same 2020 arrest rate had been in use for the entire 7-year study period, savings would have been   $824,449 per year on average, or $4.9 million total.  When calculations are adjusted to also account for the 12% actual 2019-20 decline in cases filed, estimated one-year savings increase to  $2.4 million in the year (i.e., $12.0 million in 2019 minus $9.6 million in 2020).

### Table 14a. Projected Cost of Initial Arrest by Year
*(@ $293.09 per Arrest)*

| Year | Cases Filed *(Mean = 54,264)* | Mean Cost per Case | Projected Costs Assuming *Mean # Cases* | Annual Savings vs. 2021 Assuming *Mean # Cases* | Projected Costs Assuming *Actual # Cases* | Annual Savings vs. 2021 Assuming *Actual # Cases* |
|------|------|------|------|------|------|------|
| 2015 | 62,377 | $222 | $12,050,999 | $110,743 | $13,852,669 | $2,888,569 |
| 2016 | 61,323 | $221 | $12,009,269 | $69,012 | $13,571,438 | $2,607,337 |
| 2017 | 53,194 | $227 | $12,335,676 | $395,420 | $12,092,373 | $1,128,272 |
| 2018 | 55,413 | $230 | $12,496,469 | $556,213 | $12,761,006 | $1,796,905 |
| 2019 | 52,101 | $231 | $12,543,054 | $602,798 | $12,043,016 | $1,078,916 |
| 2020 | 45,614 | $210 | $11,404,838 | -$535,418 | $9,586,790 | -$1,377,311 |
| 2021 | 49,828 | $220 | $11,940,256 | $0 | $10,964,100 | $0 |
| Projected 7-Year Savings vs 2021 | | | $1,198,770 | | | $8,122,688 |
| Projected Average Annual Savings vs 2021 | | | $199,795 | | | $1,353,781 |

During the COVID-19 pandemic, in an effort to reduce burden on the criminal intake system, on August 7, 2020 the Harris County Sheriff's Office established a Cite and Release Policy specifying procedures to release certain nonviolent misdemeanor defendants pending arraignment on an assigned date.  On September 28, 2020, the City of Houston issued an executive order affirming their participation in the program.  However, data show that only 388 citations were issued in 2020 and 2021.

Instead, most of the decline appears to be attributable to a separate, parallel non-arrest policy requiring greater use of "To Be" Arrest Warrants.  In the year between March 2020 and February 2021, the temporary JPC Booking Policy required, "Certain non-violent Class A and B Offenses on an agreed upon list, Class C municipal, and JP Warrant only defendants may not be

booked." During this interval, in lieu of arrest, eligible charges were submitted to the DA's Office for consideration of a "To Be" Warrant for future arrest.

While the evidence demonstrates benefits of two alternatives to arrest in low-level cases, this projection begs further evaluation of relative downstream costs. As a consequence of "To Be" Warrants, the DA's intake staff is currently working through a backlog of cases to determine which can be filed, and judicial involvement will presumably be required to issue the charging instrument. Citations may be a more cost-effective strategy in this regard. Certainly, additional savings accrue to county departments and to defendants due to bookings and bond screenings avoided. But benefits could be offset if failure to appear or new offending is more prevalent following citations relative to warrants. These questions can be explored in future analyses.



| Figure 19 Detail:  Initial Arrest Cost per Case | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** |
| Mean | $222 | $221 | $227 | $230 | $231 | $210 | $220 |
| Median | $293 | $293 | $293 | $293 | $293 | $293 | $293 |
| Minimum | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 25th Percentile | $147 | $147 | $147 | $147 | $147 | $147 | $147 |
| 50th Percentile | $293 | $293 | $293 | $293 | $293 | $293 | $293 |
| 75th Percentile | $293 | $293 | $293 | $293 | $293 | $293 | $293 |
| Maximum (*3rd SD trimmed*) | $293 | $293 | $293 | $293 | $293 | $293 | $293 |
| Maximum (*untrimmed*) | $293 | $293 | $293 | $293 | $293 | $293 | $293 |

### b. Booking

**HC FY20 Booking Cost per Case:**

$$\frac{\$49,788,880}{105,582} = \$471.56/ \text{ booking}$$

FY20 JPC Operating Cost ($34,764,198) +
City of Houston JPC Contract ($15,024,682)

FY20 felony and misdemeanor Booking IDs

Table 15 shows misdemeanor case booking rates peaked in 2017 at 79% and then gradually fell to 66% in recent years.  From a cost perspective, lowering the number of bookings yields substantial financial benefit (Table 15a).  For example, if the 66% 2020-21 booking rate had been maintained over the entire 7-year study period, Harris County could have saved an average  $5.0 million per year or  $30.2 million in total based on the standardized mean 54,264 cases.  After accounting for the additional effect of declining filings, savings increase to  $38.0 million, or  $6.3 million per year on average.

### Table 15. Percent of Cases Booked by Year

| Year | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|------|------|------|------|------|------|------|------|
| Percent | 64% | 78% | 79% | 75% | 72% | 66% | 66% |

### Table 15a.  Projected Cost of Bookings by Year
*(@ $471.56 per Booking)*

| Year | Cases Filed *(Mean = 54,264)* | Mean Cost per Case | Projected Costs Assuming *Mean # Cases* | Annual Savings vs. 2021 Assuming *Mean # Cases* | Projected Costs Assuming *Actual # Cases* | Annual Savings vs. 2021 Assuming *Actual # Cases* |
|------|------|------|------|------|------|------|
| 2015 | 62,377 | $277 | $15,013,168 | $2,206,796 | $17,257,693 | $5,498,285 |
| 2016 | 61,323 | $339 | $18,392,005 | $5,585,634 | $20,784,442 | $9,025,034 |
| 2017 | 53,194 | $380 | $20,616,555 | $7,810,183 | $20,209,922 | $8,450,514 |
| 2018 | 55,413 | $364 | $19,763,690 | $6,957,319 | $20,182,065 | $8,422,657 |
| 2019 | 52,101 | $341 | $18,488,412 | $5,682,041 | $17,751,358 | $5,991,950 |
| 2020 | 45,614 | $272 | $14,770,248 | $1,963,877 | $12,415,718 | $656,310 |
| 2021 | 49,828 | $236 | $12,806,371 | $0 | $11,759,408 | $0 |
| Projected 7-Year Savings vs 2021 | | | $30,205,849 | | $38,044,751 | |
| Projected Average Annual Savings vs 2021 | | | $5,034,308 | | $6,340,792 | |

Since February 2, 2019, bookings from more than 60 Harris County law enforcement agencies (LEAs) have occurred centrally at the JPC.  There, Sheriff's Office staff advance defendants in custody through the processes of charging, fingerprinting, medical and mental health screenings, pretrial screening, bond hearing, bond processing, and community reentry or transfer to detention.  Defendants may also be booked multiple times (e.g., in the event of bond failure).

There are at least three means by which a person may avoid this booking process:  (1) They may be ticketed in lieu of arrest under 2020 "cite and release" policy, though in practice the number

of citations has been vanishingly small – just 388 citations in 2020 and 2021 combined. (2) When issuing a warrant, a judge may set a personal bond eligible for release without booking at the HCSO bond processing window. (3) People with certain non-violent charges may choose to post a "scheduled" secured bond at the same bond processing window in lieu of having bond set during booking.  In addition, the Sheriff's year-long policy favoring "To Be" Warrants in place of arrest and booking temporarily suppressed bookings, though since expiration in February 2021, many of those cases may eventually be booked in the coming weeks and months.

As a next step, more needs to be understood about current booking practice and its impact on safety and court appearance.  If booking rates can be lowered without compromising these fundamental imperatives, then citations or other streamlined front-end processing for low-risk cases like General Order Bonds can potentially generate significant cost savings.



| Figure 20 Detail: Booking Cost per Case | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** |
| Mean | $277 | $339 | $380 | $364 | $341 | $272 | $236 |
| Median | $236 | $472 | $472 | $472 | $472 | $236 | $2,832 |
| Minimum | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 25th Percentile | $0 | $157 | $157 | $0 | $0 | $0 | $236 |
| 50th Percentile | $236 | $472 | $472 | $472 | $472 | $236 | $472 |
| 75th Percentile | $472 | $472 | $472 | $472 | $472 | $472 | $1,023 |
| Maximum (*3rd SD trimmed*) | $1,062 | $1,101 | $1,298 | $1,298 | $1,259 | $1,038 | $267 |
| Maximum (*untrimmed*) | $5,192 | $2,832 | $3,776 | $2,832 | $5,181 | $2,360 | $2,832 |

### c. Pretrial Screening

**HC FY20 Pretrial Screening Cost per Case:**

$$\frac{\substack{\$5,494,734 \\ \text{FY20 Pretrial Services screening budget}}}{\substack{\textbf{28,050}\ \text{FY20 felony and misdemeanor} \\ \text{GOBs weighted @ 10 mins. screening time} \\ \text{OR} \\ \textbf{61,530}\ \text{FY20 other felony and} \\ \text{misdemeanor bonds weighted @ 1 hour} \\ \text{screening time}}} = \begin{array}{l} \textbf{\$13.83/GOB or SB7 screening}[24] \\[1em] \textbf{\$83.00/non-GOB or SB7 screening} \end{array}$$

Pretrial Services screening staff are present at the JPC and in the trial courts to help judges set bond and prepare defendants for compliance with release terms.  Though the process has varied over time, pretrial officers generally compile information such as criminal histories, financial affidavits, and – prior to 2020 – risk assessments and personal interviews.  After the bond and conditions have been determined, pretrial staff also meet with defendants to review conditions of release.  While it has traditionally taken up to an hour to prepare the information needed for a bond hearing, since General Order Bonds became an option in 2019, this new class of cases can be prepared for pretrial release in only about 10 minutes.  There may also be a small group of cases that have no Pretrial Services bond screening[25] that need to be accounted for in analyses.

### Table 16.  Projected Cost of Pretrial Screenings by Year
*(@ $13.83 per GOB Screening or $83.00 per Other Bond Screening)*

| Year | Cases Filed *(Mean = 54,264)* | Mean Cost per Case | Projected Costs Assuming *Mean # Cases* | Annual Savings vs. 2021 Assuming *Mean # Cases* | Projected Costs Assuming *Actual # Cases* | Annual Savings vs. 2021 Assuming *Actual # Cases* |
|---|---|---|---|---|---|---|
| 2015 | 62,377 | $74 | $4,002,762 | $1,485,247 | $4,601,190 | $2,289,490 |
| 2016 | 61,323 | $72 | $3,918,859 | $1,401,344 | $4,428,625 | $2,116,925 |
| 2017 | 53,194 | $74 | $4,032,913 | $1,515,398 | $3,953,370 | $1,641,670 |
| 2018 | 55,413 | $75 | $4,060,488 | $1,542,973 | $4,146,444 | $1,834,744 |
| 2019 | 52,101 | $47 | $2,551,803 | $34,288 | $2,450,074 | $138,374 |
| 2020 | 45,614 | $46 | $2,479,253 | -$38,262 | $2,084,035 | -$227,665 |
| 2021 | 49,828 | $46 | $2,517,515 | $0 | $2,311,700 | $0 |
| Projected 7-Year Savings vs 2021 | | | | $5,940,987 | | $7,793,537 |
| Projected Average Annual Savings vs 2021 | | | | $990,165 | | $1,298,923 |

The impact of GOB cases has been striking (see Table 16).  Before 2019, with a full pretrial screening conducted for every arrestee, mean costs were consistent at about $74 per case.  After

---

[24] When multiple cases were screened together, the most costly bond type (either $13.83 for GOBs or $83.00 for other bond types) was used to determine the total screening cost.  That cost was then allocated across all felony and misdemeanor cases screened in proportion to the cost of each bond type (GOB or other) and summed at the case level.

[25] Cases that may not receive a bond screening are those that (a) did not have bond set in a "To Be" Warrant and (b) obtain release prior to booking by paying a "scheduled" secured bond at the Sheriff's bond processing window. Once it becomes possible to identify these cases in the data, analyses may be adjusted.

GOBs, costs for nearly one-third of all screenings fell to just $13.83. As a result, the mean cost per screening declined by 40% to $46 per person. To extrapolate more broadly, had the annual number of cases been constant at the average (54,264), GOBs would have saved the Pretrial Services Department nearly $1 million each year over the 7-year study period, or $5.9 million total (Table 16). If we also account for the actual declines in cases filed, savings to pretrial screenings would be $1.3 million per year or $7.8 million in total.



| Figure 21 Detail: Pretrial Screening Cost per Case | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** |
| Mean | $74 | $72 | $74 | $75 | $47 | $46 | $46 |
| Median | $83 | $83 | $83 | $83 | $42 | $42 | $42 |
| Minimum | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 25th Percentile | $83 | $83 | $83 | $83 | $14 | $14 | $14 |
| 50th Percentile | $83 | $83 | $83 | $83 | $42 | $42 | $42 |
| 75th Percentile | $83 | $83 | $83 | $83 | $83 | $83 | $83 |
| Maximum (*3rd SD trimmed*) | $83 | $83 | $83 | $83 | $83 | $83 | $83 |
| Maximum (*untrimmed*) | $498 | $747 | $581 | $498 | $747 | $346 | $360 |

### d. Article 15.17 Hearing

**HC FY20 Article 15.17 Hearing Cost per Case:**

$$\frac{\$2,170,232 \text{ FY20 hearing officer cost} + \$1,351,918 \text{ FY20 15.17 public defender cost}}{44,458 \text{ FY20 felony and misdemeanor cases with a 15.17 hearing}} = \begin{array}{l} \underline{\$48.81/\text{Art. 15.17 Hearing}} + \\ \underline{\$30.40/\text{Art. 15.17 Defense}} \\ \$79.21 \text{ per Case} \end{array}$$

Because Article 15.17 hearings were first documented electronically beginning in August 2018 earlier data is coded as missing. Still, some limited observations can be derived from the four years of available data.

**Table 17. Percent of Cases with an Article 15.17 Hearing by Year**

| Year | 2015 | 2016 | 2017 | Aug 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|
| Percent | -- | -- | -- | 34% | 31% | 21% | 20% |

Table 17 shows since the Consent Decree went into effect in November 2019, the share of cases experiencing a bond hearing has fallen by at least 10 percentage points from over 30% in 2018-19 to just 20% in 2021.  Similar to pretrial screenings, the declining number of bond hearings is largely possible because GOBs do not require a judge to set bond.  Moreover, the decline generates cost savings not only for the court (at $48.81 per case), but also for the public defender office with staff present at every magistration (at $30.40 per case).  In Table 17a, if the 2021 bond hearing rate (20%) had been used in the preceding years, these data point to more than  $1.4 million in reduced costs since 2018 alone ( $244,189 per year on average).  Additional savings associated with prosecution costs are still being developed.

**Table 17a.  Projected Cost of Article 15.17 Hearings by Year**
*(@ $79.21 per 15.17 Setting, Court and Defense)*

| Year | Cases Filed *(Mean = 54,264)* | Mean Cost per Case | Projected Costs Assuming *Mean # Cases* | Annual Savings vs. 2021 Assuming *Mean # Cases* | Projected Costs Assuming *Actual # Cases* | Annual Savings vs. 2021 Assuming *Actual # Cases* |
|---|---|---|---|---|---|---|
| 2015 | 62,377 | - | - | - | - | - |
| 2016 | 61,323 | - | - | - | - | - |
| 2017 | 53,194 | - | - | - | - | - |
| 2018 | 55,413 | $29 | $1,573,664 | $759,700 | $1,606,977 | $859,557 |
| 2019 | 52,101 | $27 | $1,465,136 | $651,171 | $1,406,727 | $659,307 |
| 2020 | 45,614 | $16 | $868,229 | $54,264 | $729,824 | -$17,596 |
| 2021 | 49,828 | $15 | $813,964 | $0 | $747,420 | $0 |
| Projected 7-Year Savings vs 2021 | | | | $1,465,136 | | $1,501,268 |
| Projected Average Annual Savings vs 2021 | | | | $244,189 | | $250,211 |

Moreover, this is almost certainly a low estimate:  If, before the Consent Decree, 80% of the mean 54,264 cases filed in a year had a bond hearing, the cost would have been $3.4 million including court and defense.[26]  Applying this value then to the three years with missing data (2015 to 2017), we find total cost of bond hearings could have been reduced by as much as  $9.3 million over the entire 7 years (or about $1.5 million per year on average) even before accounting for cost savings due to declines in cases filed.

---

[26] This is believed to be a conservative estimate since Figure 13, "Types of Initial Bond Approvals" affirms that prior to 2019, 100% of bonds were either sureties or personal bonds ordinarily set by a hearing officer.

Taken together, these findings imply that simplified front-end case processes – driven in part by non-arrest policies and General Order Bonds – are allowing more people to avoid the Article 15.17 hearing.  Instead they can receive magistrate's warnings at a later trial court appearance.  Resources can then be efficiently targeted toward an individualized bond hearing for the smaller category of misdemeanor cases "carved out" for the greater risk they are may pose to court appearance and public safety.[27]



Figure 22: Article 15.17 Hearing Cost per Case @ $79.21/Setting (Court & Defense)

| **Figure 22 Detail:** Article 15.19 Hearing Cost per Case | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** |
| Mean | $0 | $0 | $0 | $29 | $27 | $16 | $15 |
| Median | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Minimum | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 25th Percentile | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 50th Percentile | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 75th Percentile | $0 | $0 | $0 | $0 | $49 | $0 | $0 |
| Maximum (*3rd SD trimmed*) | $0 | $0 | $0 | $98 | $98 | $49 | $49 |
| Maximum (*untrimmed*) | $0 | $0 | $0 | $396 | $396 | $317 | $238 |

### e.  County Criminal Court at Law (CCCL) Trial Court Settings

**HC FY20 CCCL Court Setting Cost per Case:**

$$\frac{\substack{\$18,672,636 \\ \text{FY20 CCCL court staff (\$9,834,158) +} \\ \text{HCSO bailiffs (\$8,793,478)}}}{\substack{346,642 \\ \text{FY20 misdemeanor cases set}}} = \text{\$53.74/case setting}$$

---

[27] See Section B. Data Analysis, Part 4 for additional information on the definition and prevalence of carve-out offense categories.

The number of court settings required to dispose a misdemeanor case is directly affected by pretrial policies:  Following the 2017 preliminary injunction against secured bail without consideration of ability to pay or alternatives to secured bond, more people were released in order to press their case in trial court. In Harris County, though, other factors have also contributed to growing docket sizes:  In August of 2017 Hurricane Harvey closed the courthouse.  Then a COVID-induced move to online settings introduced additional case processing delays.  Most recently, in 2021, average settings per case (based on disposed cases) may to be leveling out, possibly reflecting efforts such as more case dismissals and the addition of visiting judges to confront backlogs.

### Table 18. Percent of Cases with a CCCL Court Setting by Year

| Year | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|------|------|------|------|------|------|------|------|
| Percent | 95.4% | 99.5% | 99.9% | 99.8% | 99.8% | 99.8% | 99.7% |
| Avg. # Settings | 4.6 | 5.0 | 5.9 | 6.6 | 7.6 | 6.8 | 4.1 |

### Table 18a.  Projected Cost of CCCL Court Settings by Year
*(@ $53.74 per Setting)*

| Year | Cases Filed *(Mean = 54,264)* | Mean Cost per Case | Projected Costs Assuming *Mean* # Cases | Annual Savings vs. 2021 Assuming *Mean* # Cases | Projected Costs Assuming *Actual* # Cases | Annual Savings vs. 2021 Assuming *Actual* # Cases |
|------|------|------|------|------|------|------|
| 2015 | 62,377 | $234 | $12,718,778 | $1,127,303 | $14,620,283 | $3,976,450 |
| 2016 | 61,323 | $253 | $13,726,923 | $2,135,448 | $15,512,526 | $4,868,692 |
| 2017 | 53,194 | $303 | $16,464,784 | $4,873,309 | $16,140,039 | $5,496,206 |
| 2018 | 55,413 | $338 | $18,352,027 | $6,760,551 | $18,740,519 | $8,096,685 |
| 2019 | 52,101 | $400 | $21,710,778 | $10,119,303 | $20,845,262 | $10,201,429 |
| 2020 | 45,614 | $358 | $19,438,099 | $7,846,624 | $16,339,466 | $5,695,633 |
| 2021 | 49,828 | $214 | $11,591,475 | $0 | $10,643,834 | $0 |
| Projected 7-Year Savings vs 2021 | | | $32,862,539 | | $38,335,094 | |
| Projected Average Annual Savings vs 2021 | | | $5,477,090 | | $6,389,182 | |

Because of these complex disruptions, isolating the effect of changing pretrial policy on court costs is challenging.  Following caseload trends, the number of court settings and median cost per case grew by 75% between 2015 and 2020, from $215 to $376 per case (see CCCL Court Setting Cost Detail, below).  In 2021, both settings and costs dropped back to the  2015 baseline amount.  In Table 18, overall court costs  ranged between $12 and $22 million per year based on the mean number of cases (54,264).

To better understand the effect of caseload and cost trends, the Monitor team might ask how a longer term of pretrial court supervision has affected new offending, court appearances, or case dispositions. In addition, backlogs create incentives for court actors including prosecutors, defenders, and judges to make deals in order to manage case volume.  These unusual concessions in sentencing are an opportunity to explore the effect of less punitive case resolutions on public safety and defendant outcomes over the long term.



| Figure 23 Detail: CCCL Court Setting Cost per Case | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** |
| Mean | $234 | $253 | $303 | $338 | $400 | $358 | $214 |
| Median | $215 | $215 | $269 | $269 | $376 | $376 | $215 |
| Minimum | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 25th Percentile | $107 | $107 | $161 | $161 | $215 | $215 | $107 |
| 50th Percentile | $215 | $215 | $269 | $269 | $376 | $376 | $215 |
| 75th Percentile | $322 | $376 | $430 | $484 | $537 | $484 | $269 |
| Maximum (*3rd SD trimmed*) | $806 | $860 | $1,021 | $1,075 | $1,182 | $967 | $591 |
| Maximum (*untrimmed*) | $2,526 | $2,794 | $2,956 | $3,063 | $5,159 | $4,783 | $1,451 |

#### f.  Pretrial Detention

**HC FY20 Pretrial Detention Cost per Case:**

$$\frac{\substack{\textbf{\$236,858,344} \\ \text{FY20 jail housing (\$167,911,760) +} \\ \text{Medical costs (\$68,946,584)}}}{\substack{\textbf{3,208,562} \\ \text{FY20 jail person-days including felony,} \\ \text{misdemeanor, pretrial, and post-disposition}}} = \textbf{\$73.82/jail person-day}$$

Among the most profound benefits of Rule 9 is that General Order Bonds largely remove financial obstacles to pretrial release in misdemeanor cases.  Not only do defendants benefit from greater access to liberty, but Harris County sees a considerable financial return from lower detention costs.  For instance, in 2016 when the ODonnell lawsuit was filed, 68% of misdemeanor defendants spent at least one day in jail prior to their case disposition (Table 19).  By 2020, the share of people with some amount of detention was 25 percentage points lower at 43%.  At the

same time, as lower-risk defendants were increasingly released without detention, the remaining more serious cases were held longer.  Average length of pretrial detention nearly doubled from 2015 (mean=5.6 days) to 2020 (mean=9.8 days).

### Table 19. Percent of Cases Detained by Year

| Year | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|
| Percent | 60% | 68% | 62% | 60% | 55% | 43% | 43% |
| Avg. Days | 5.6 days | 6.2 days | 7.3 days | 9.8 days | 10.3 days | 9.8 days | 7.4 days |

### Table 19a.  Projected Cost of Detention by Year
*( @ $73.82 per Jail Person-Day)*

| Year | Cases Filed *(Mean = 54,264)* | Mean Cost per Case | Projected Costs Assuming *Mean # Cases* | Annual Savings vs. 2021 Assuming *Mean # Cases* | Projected Costs Assuming *Actual # Cases* | Annual Savings vs. 2021 Assuming *Actual # Cases* |
|---|---|---|---|---|---|---|
| 2015 | 62,377 | $311 | $16,882,959 | -$1,402,079 | $19,407,025 | $2,616,849 |
| 2016 | 61,323 | $352 | $19,096,771 | $811,732 | $21,580,884 | $4,790,708 |
| 2017 | 53,194 | $378 | $20,500,103 | $2,215,065 | $20,095,768 | $3,305,592 |
| 2018 | 55,413 | $479 | $26,019,649 | $7,734,611 | $26,570,456 | $9,780,280 |
| 2019 | 52,101 | $478 | $25,936,577 | $7,651,538 | $24,902,596 | $8,112,420 |
| 2020 | 45,614 | $425 | $23,046,282 | $4,761,244 | $19,372,468 | $2,582,292 |
| 2021 | 49,828 | $337 | $18,285,038 | $0 | $16,790,176 | $0 |
| Projected 7-Year Savings vs 2021 | | | | $21,772,111 | | $31,188,142 |
| Projected Average Annual Savings vs 2021 | | | | $3,628,685 | | $5,198,024 |

Despite these countervailing trends we nonetheless find a positive aggregate effect on costs (Table 19a).  If 2021's detention rate had been used in preceding years, assuming the average 54,264 cases filed each year, total savings of  $21.8 million over the 7-year analysis period would have been attained, or  $3.6 million per year on average.  When calculations are revised to account for additional declines in the actual number of cases filed in these years, even greater savings are attained:  $31.2 million total or about $ 5.2 million per year.

These findings raise interesting possibilities about the affordability of bond reform, suggesting that restructuring of local criminal justice policies and systems may be more affordable than was previously believed.  Moreover the cost savings and other benefits accrue not only to public systems, but also to the private lives of the defendants affected.  Important questions remain, however, about whether these efficiencies come at a cost to public safety.  Future analyses will aim to illuminate this issue.



| Figure 24 Detail: | Detention Cost per Case | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** |
| Mean | $311 | $352 | $378 | $479 | $478 | $425 | $337 |
| Median | $74 | $74 | $74 | $74 | $74 | $0 | $0 |
| Minimum | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 25th Percentile | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 50th Percentile | $74 | $74 | $74 | $74 | $74 | $0 | $0 |
| 75th Percentile | $222 | $222 | $148 | $148 | $74 | $74 | $74 |
| Maximum (*3rd SD trimmed*) | $5,476 | $6,142 | $7,400 | $9,990 | $10,804 | $10,138 | $6,364 |
| Maximum (*untrimmed*) | $82,362 | $84,064 | $59,200 | $63,566 | $63,418 | $45,732 | $20,424 |

## 3. Defendant Costs

The second major set of cost analyses focuses on people in the criminal justice system and their families. In contrast to *system* cost estimates which are derived from Harris County's FY20 budget documents and defendant caseflow through departments, *defendant* cost estimates come from different sources. The cost of different types of bond is taken directly from defendant case records; other costs are extracted from the academic research literature then applied to cases as a function of pretrial detention. The measures presented here include estimations for:

- Pretrial release
- Loss of earnings
- Loss of partner benefits
- Loss of child support
- Loss of personal safety during detention

Additionally, other defendant costs still in development include:

- Fees and fines
- Pretrial monitoring or drug testing fees
- Diversion program participation
- Costs of wrongful conviction

### a. Cost of Pretrial Release

> **Cost of Pretrial Release per Case:**
> - Secured bonds, whether paid with a surety or unpaid, are assigned 10% of face value
> - Secured bonds paid with cash are assigned 2% of face value[28]
> - Unsecured bonds are assigned a cost of $0

The use of *secured* bond has declined steadily over the past 7 years from 92% of disposed cases in 2015 to just 31% in 2021.  in the same timespan, the use of *unsecured* bond has increased at such a pace that the average cost of release has fallen from $136 to just $34.  Trends favoring fewer and more affordable financial conditions have reduced "poverty holds" clearing clear the way for more people to stay out of jail until trial.

In 2015 the total amount paid by all defendants on all types of bond was about $7 million (Table 20).  But by 2021, largely due to GOBs and individualized bail determinations, that figure declined to a fraction of that amount -- $563,568 without accounting for the effect of declining cases.  The net impact of this shift in policy has been lower overall cost of release.

### Table 20. Percent of Cases with Secured Bond by Year

| Year | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|------|------|------|------|------|------|------|------|
| Percent | 92% | 89% | 66% | 55% | 34% | 30% | 31% |
| Avg. Bond Cost* | $136 | $135 | $66 | $22 | $6 | $10 | $34 |

*Includes $0 values for unsecured bonds.

If 2021 bond practices had been in place over the entire 7-year study period, holding the number of cases filed each year at the average, the cumulative savings to defendants would have been more than  $1.5 million per year, or  $9.4 million in total (Table 20a).  We can assess the secondary effect of case declines on cost by applying actual case counts instead of the average. Then savings due to low or no financial conditions increase slightly to  $2 million per year or $12.2 million total.

---

[28] The 2% premium accounts for transaction or opportunity costs related to the use of money to pay cash bail.  For example, extracting funds from savings or investment accounts, borrowing money, drawing credit card advances, or selling assets often incur unrecoverable transaction costs, attenuate interest or investment earnings, and may reduce resources available for other needs like food, shelter, or medical care.

**Table 20a.  Projected Cost of Pretrial Release by Year**
*(@ $0 Unsecured, 2% Cash or 10% of Secured Bond per Case)*

| Year | Cases Filed (*Mean = 54,264*) | Mean Cost per Case | Projected Costs Assuming *Mean* # Cases | Annual Savings vs. 2021 Assuming *Mean* # Cases | Projected Costs Assuming *Actual* # Cases | Annual Savings vs. 2021 Assuming *Actual* # Cases |
|---|---|---|---|---|---|---|
| 2015 | 62,377 | $136 | $7,398,607 | $5,568,305 | $8,504,726 | $6,824,057 |
| 2016 | 61,323 | $135 | $7,308,380 | $5,478,078 | $8,259,056 | $6,578,387 |
| 2017 | 53,194 | $66 | $3,577,298 | $1,746,996 | $3,506,741 | $1,826,072 |
| 2018 | 55,413 | $22 | $1,219,552 | -$610,751 | $1,245,368 | -$435,301 |
| 2019 | 52,101 | $6 | $299,790 | -$1,530,512 | $287,838 | -$1,392,830 |
| 2020 | 45,614 | $10 | $559,370 | -$1,270,932 | $470,201 | -$1,210,468 |
| 2021 | 49,828 | $34 | $1,830,302 | $0 | $1,680,669 | $0 |
| Projected 7-Year Savings vs 2021 | | | | $9,381,183 | | $12,189,917 |
| Projected Average Annual Savings vs 2021 | | | | $1,563,530 | | $2,031,653 |

In addition to the damaging financial effects of secured bond on economically fragile families, the very experience of detention imposes additional harm.  The next sections explore discounts on lifetime earnings, partner relationships, child-rearing, and personal safety that can be traced directly to confinement.



68

| Figure 25 Detail: Cost of Pretrial Release | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** |
| Mean | $136 | $135 | $66 | $22 | $6 | $10 | $34 |
| Median | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Minimum | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 25th Percentile | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 50th Percentile | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 75th Percentile | $250 | $250 | $0 | $0 | $0 | $0 | $0 |
| Maximum (*3rd SD trimmed*) | $1,500 | $1,600 | $1,500 | $1,001 | $400 | $751 | $2,000 |
| Maximum (*untrimmed*) | $50,000 | $50,000 | $95,000 | $50,000 | $10,000 | $25,000 | $50,000 |

### b.  Loss of Earnings

Defendant Loss of Earnings:  **$29,000 Lifetime Income Loss/Pretrial Detention of 3+ days**[29]
- Three or more days of pretrial detention has the effect of about $948 less earnings per year, $293 less unemployment insurance income, and $209 less Earned Income Tax Credit for a total average annual income loss of $1,450.
- The net present value amounts to a $29,000 loss of earnings over the working-age life cycle.

Even a brief period of pretrial detention can have significant long-term employment consequences.  In addition to immediate work interruption or even job loss due to confinement, criminal conviction – which grows more likely with longer jail stays – can further lower employment prospects.[30]  In turn, reduced participation in formal sector employment limits eligibility for employment- and tax-related governmental benefits like the Earned Income Tax Credit and unemployment insurance.  To quantify these effects, Dobbie, Goldin, and Yang (2021)[31] compared similar people with different pretrial detention conditions in randomly assigned courtrooms.  Subsequent lifetime earnings were measured through tax records over an average 34 years.  Other things being equal, results showed a $29,000 income and benefit penalty for people who spent at least three days detained.

### Table 21. Percent of Cases with 3+ Days Detained by Year

| Year | 2015 | 2016 | 2017 | Aug 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|
| Percent | 29% | 29% | 26% | 25% | 20% | 18% | 21% |

---

[29] Dobbie, W., Goldin, J., & Yang, C. S. (2018). The effects of pretrial detention on conviction, future crime, and employment: Evidence from randomly assigned judges. *American Economic Review*, *108*(2), 201-40.

[30] Digard, L., & Swavola, E. (2019). Justice denied: The harmful and lasting effects of pretrial detention. *Vera Evidence Brief. New York: Vera Institute of Justice*.

[31] Supra at note 29.

**Table 21a.  Projected Loss of Earnings by Year**
*(@ $29,000 per Detention ≥ 3 Days)*

| Year | Cases Filed *(Mean = 54,264)* | Mean Cost per Case | Projected Costs Assuming *Mean* # Cases | Annual Savings vs. 2021 Assuming *Mean* # Cases | Projected Costs Assuming *Actual* # Cases | Annual Savings vs. 2021 Assuming *Actual* # Cases |
|---|---|---|---|---|---|---|
| 2015 | 62,377 | $8,321 | $451,506,252 | $126,109,119 | $519,008,131 | $220,213,295 |
| 2016 | 61,323 | $8,532 | $462,996,097 | $137,598,964 | $523,222,766 | $224,427,930 |
| 2017 | 53,194 | $7,569 | $410,710,179 | $85,313,046 | $402,609,506 | $103,814,670 |
| 2018 | 55,413 | $7,369 | $399,889,538 | $74,492,405 | $408,354,753 | $109,559,917 |
| 2019 | 52,101 | $5,939 | $322,284,043 | -$3,113,090 | $309,435,952 | $10,641,117 |
| 2020 | 45,614 | $5,227 | $283,639,340 | -$41,757,793 | $238,424,309 | -$60,370,527 |
| 2021 | 49,828 | $5,997 | $325,397,133 | $0 | $298,794,836 | $0 |
| Projected 7-Year Savings vs 2021 | | | | $378,642,652 | | $608,286,402 |
| Projected Average Annual Savings vs 2021 | | | | $63,107,109 | | $101,381,067 |

Our results show loss of present and future income is the single most costly aspect of pretrial detention for defendants.  However, the share of people affected – those who remain in custody for 3 or more days – has declined by almost 10 percentage points between 2015 and 2021 (Table 21), generating significantly better outcomes for arrestees.  To quantify the effect, if 2021 release rates had been in place for the entire 7-year study period, $63.1 million per year would be restored to defendants in the aggregate, or $378.6 million in total, assuming the annual case filing rate holds at the 7-year average (Table 21a).  Adjusting for the actual number of cases filed each year (instead of the average) produces estimates that are influenced by both case counts and detention policies.  After making this adjustment, the average annual earnings loss becomes $101.3 million, with aggregate projected savings of $608.3 million over 7 years.



| Figure 26 Detail: Loss of Lifetime Earnings per Case | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** |
| Mean | $8,321 | $8,532 | $7,569 | $7,369 | $5,939 | $5,227 | $5,997 |
| Median | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Minimum | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 25th Percentile | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 50th Percentile | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 75th Percentile | $29,000 | $29,000 | $29,000 | $29,000 | $0 | $0 | $0 |
| Maximum (*3rd SD trimmed*) | $29,000 | $29,000 | $29,000 | $29,000 | $29,000 | $29,000 | $29,000 |
| Maximum (*untrimmed*) | $29,000 | $29,000 | $29,000 | $29,000 | $29,000 | $29,000 | $29,000 |

### c.  Loss of Partner Benefits

---

Defendant Loss of Partner Benefits:  **$271.25/Day of Pretrial Detention**
- $198,019/year is required to financially compensate for the loss of a marriage partner.[32]
- 50% of Harris County pretrial inmates have a spouse or partner.[33]
- ($198,019/365 days) x 50% of inmates = $271.25 per day detained

---

A 2018 survey of 12,694 defendants booked at the Harris County Jail[34] found an estimated 50% are either married (27%) or living with a partner (23%).  Supportive intimate partnership correlates with financial stability and reduced poverty.  Moreover, living together appears to boost financial wellbeing at least as much as marriage.[35]  Beyond economic advantages, cohabitation also enhances overall socio-emotional wellbeing, bringing health, mental health, and psychosocial advantages.[36]

When a partner is jailed, however, these benefits are denied, and the cost can be high: Loss of a life partner through death or separation has been valued at nearly $200,000 per year.  After adjusting for the share of partnered inmates, the cost to defendants for loss of the relationship is valued at $271.25 for each day of detention.

---

[32] Blanchflower, D.G., & Oswald, A.J. (2004).  Well-being over time in Britain and the USA.  Journal of Public Economics, 88, 1359-1386.

[33] Correa, N.P., A.M. Bhalakia, B VanHorne, A. Hayes, T. Cupit, V. KwartengAmaning, K.K. Lopez, R. Keefe, and C.S. Greeley (Feb. 2019).  The Forgotten Families: A Needs Assessment on Children with Incarcerated Parents in Harris County.  Houston, TX:  Texas Medical Center Health Policy Institute.

[34] Ibid

[35] What is the financial impact of being single in the U.S.? World Economic Forum. Retrieved March 3, 2022, from https://www.weforum.org/agenda/2021/10/what-is-the-financial-impact-of-being-single-in-the-united-states/

[36] Perelli-Harris, B., Hoherz, S., Addo, F., Lappegård, T., Evans, A., Sassler, S., & Styrc, M. (2018). Do marriage and cohabitation provide benefits to health in mid-life? The role of childhood selection mechanisms and partnership characteristics across countries. Population Research and Policy Review, 37(5), 703-728.  Perelli-Harris, B., & Styrc, M. (2018). Mental well-being differences in cohabitation and marriage: The role of childhood selection. Journal of Marriage and Family, 80(1), 239-255.

**Table 22. Projected Loss of Partner Benefits by Year**
*(@ $271.25 per Day Detained)*

| Year | Cases Filed (*Mean = 54,264*) | Mean Cost per Case | Projected Costs Assuming *Mean* # Cases | Annual Savings vs. 2021 Assuming *Mean* # Cases | Projected Costs Assuming *Actual* # Cases | Annual Savings vs. 2021 Assuming *Actual* # Cases |
|---|---|---|---|---|---|---|
| 2015 | 62,377 | $1,140 | $61,884,845 | -$5,373,836 | $71,137,236 | $9,376,851 |
| 2016 | 61,323 | $1,290 | $69,999,618 | $2,740,937 | $79,105,606 | $17,345,220 |
| 2017 | 53,194 | $1,385 | $75,143,563 | $7,884,882 | $73,661,851 | $11,901,465 |
| 2018 | 55,413 | $1,758 | $95,375,576 | $28,116,895 | $97,395,083 | $35,634,698 |
| 2019 | 52,101 | $1,752 | $95,071,073 | $27,812,392 | $91,281,476 | $29,521,090 |
| 2020 | 45,614 | $1,557 | $84,476,637 | $17,217,956 | $71,010,566 | $9,250,180 |
| 2021 | 49,828 | $1,239 | $67,258,681 | $0 | $61,760,386 | $0 |
| Projected 7-Year Savings vs 2021 | | | | $78,399,226 | | $113,029,504 |
| Projected Average Annual Savings vs 2021 | | | | $13,066,538 | | $18,838,251 |

Since 2016 -- the year before the ODonnell lawsuit -- the share of pretrial inmates experiencing any time in jail has fallen by 24 percentage points (Table 19).  Fewer jailed arrestees means families can avoid the financial and emotional toll of partner separation – stressors that can shatter the lives of people at the social margins.  In fact, if the most recent 44% detention rate and mean length of detention (7.4 days) had been policy over the past seven years, we project families could have avoided  $78.4 million in stressors and isolation (assuming the fixed mean of cases filed year-to-year; see Table 22).  Annualized, an estimated  $13.0 million in destabilizing partner separation has been shifted to families each year since 2015.  After considering the actual number of cases filed instead of the average, the overall cost burden increases.  Aggregate case-adjusted costs are estimated at $18.8 million annually or  $113.0 million total since 2015.



Figure 27: Loss of Partner Benefits per Case @ $271.25/Jail Day

72

| **Figure 27 Detail:** Loss of Partner Benefits per Case | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** |
|---|---|---|---|---|---|---|---|
| Mean | $1,140 | $1,290 | $1,385 | $1,758 | $1,752 | $1,557 | $1,239 |
| Median | $271 | $271 | $271 | $271 | $271 | $0 | $0 |
| Minimum | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 25th Percentile | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 50th Percentile | $271 | $271 | $271 | $271 | $271 | $0 | $0 |
| 75th Percentile | $814 | $814 | $543 | $543 | $271 | $271 | $271 |
| Maximum (*3rd SD trimmed*) | $20,073 | $22,514 | $27,125 | $36,619 | $39,603 | $37,161 | $23,328 |
| Maximum (*untrimmed*) | $301,901 | $308,140 | $217,000 | $233,007 | $232,461 | $167,632 | $74,865 |

### d. Loss of Child Support

> Loss of Child Support: **$23.05/Day of Pretrial Detention**
> - Applying the USDA annual cost of childrearing[37] to the share of Harris County Jail inmates with children, the average number of children for male (2.4) and female inmates (2.7), and the share of financial support provided,[38] the cost of lost assistance and support to children is $23.05 per day a parent is detained.

Often, people in jail are responsible for the costs and responsibilities of raising a minor child: According to a 2017 survey,[39] half of those booked into Harris County's jail have 2.5 children on average. Of those, 59% of male parents and 70% of female parents say they provide most or all of the financial support for dependents. An additional 26% of men and 16% of women provide at least some financial assistance. USDA research[40] puts the annual cost of raising 2 children at about $20,000 per year in a low to moderate income family. Yet when a parent and income-earner is detained, they may no longer be able to provide this benefit. As a result, children lose an estimated $23.05 to support their upbringing per day their responsible adult is jailed.

---

[37] Lino M., K. Kuczynski, N. Rodriguez, and T.R. Schap (2015). Expenditures on Children by Families, 2015. US Department of Agriculture, Center for Nutrition Policy and Promotion, Report No. 1528-2015. https://www.cnpp.usda.gov/sites/default/files/expenditures_on_children_by_families/crc2015.pdf

[38] Supra at note 33

[39] Ibid

[40] Supra at note 37.

**Table 23. Projected Loss of Child Support by Year**
*(@ $23.05 per Day Detained)*

| Year | Cases Filed (*Mean = 54,264*) | Mean Cost per Case | Projected Costs Assuming *Mean* # Cases | Annual Savings vs. 2021 Assuming *Mean* # Cases | Projected Costs Assuming *Actual* # Cases | Annual Savings vs. 2021 Assuming *Actual* # Cases |
|---|---|---|---|---|---|---|
| 2015 | 62,377 | $97 | $5,258,814 | -$456,655 | $6,045,026 | $796,816 |
| 2016 | 61,323 | $110 | $5,948,386 | $232,918 | $6,722,154 | $1,473,944 |
| 2017 | 53,194 | $118 | $6,385,505 | $670,037 | $6,259,560 | $1,011,350 |
| 2018 | 55,413 | $149 | $8,104,769 | $2,389,301 | $8,276,338 | $3,028,128 |
| 2019 | 52,101 | $149 | $8,078,893 | $2,363,425 | $7,756,822 | $2,508,612 |
| 2020 | 45,614 | $132 | $7,178,606 | $1,463,137 | $6,034,262 | $786,052 |
| 2021 | 49,828 | $105 | $5,715,468 | $0 | $5,248,210 | $0 |
| Projected 7-Year Savings vs 2021 | | | | $6,662,163 | | $9,604,903 |
| Projected Average Annual Savings vs 2021 | | | | $1,110,360 | | $1,600,817 |

As with other measures, declines in rates and length of detention have helped children avoid many of these costs in recent years.  If 2021 detention practices had been in use since 2015, and if cases filed had been constant at the average (54,264), children would have received additional parental support benefits valued at about  $1.1 million each year.  Instead, $6.6 million worth of benefits to sustain and nourish minor youth were lost over the 7-year study period.  Costs estimations are  about 45% higher if projections assume actual cases filed each year (Table 23).



Figure 28: Loss of Child Support per Case @ $23.05/Jail Day

| **Figure 28 Detail:** Loss of Child Support per Case | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** |
| Mean | $97 | $110 | $118 | $149 | $149 | $132 | $105 |
| Median | $23 | $23 | $23 | $23 | $23 | $0 | $0 |
| Minimum | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 25th Percentile | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 50th Percentile | $23 | $23 | $23 | $23 | $23 | $0 | $0 |
| 75th Percentile | $69 | $69 | $46 | $46 | $23 | $23 | $23 |
| Maximum *(3rd SD trimmed)* | $1,706 | $1,913 | $2,305 | $3,112 | $3,365 | $3,158 | $1,982 |
| Maximum *(untrimmed)* | $25,654 | $26,184 | $18,440 | $19,799 | $19,753 | $14,244 | $6,361 |

### e.   Costs of Violent or Sexual Assault in Detention

Inmate Cost of Violent or Sexual Assault: **$16.83/Day of Pretrial Detention**
- Cost to defendants of Violent or Sexual Assault during pretrial detention is $118,102 per assault. [41]
- 5.2% of inmates report such an assault[42]
- The daily assault rate (5.2%/365 days) x $118,102 victim cost yields a victimization cost of $16.83 per day detained.

A Bureau of Justice Statistics (BJS) survey[43] found that in 2012, 5.2% of Harris County jail inmates reported one or more incidents of violent or sexual victimization in the past 12 months (or since admission if less than 12 months). A more recent BJS survey of correctional administrators finds alleged victimization in jails increased six-fold between 2012 and 2018, implying the 2012 rate used here may even be an underestimate.[44] A separate study found cost to victims for three assaultive offenses (rape, other sexual assault, and assault). The resulting $118,101 average valuation includes tangible and intangible quality of life expenses. [45] Multiplying the cost by the daily incident rate, determined the risk of sexual or violent victimization costs each pretrial defendant about $16.83 per jail day on average.

---

[41] Miller, T. R., Cohen, M. A., Swedler, D. I., Ali, B., & Hendrie, D. V. (2021). Incidence and Costs of Personal and Property Crimes in the USA, 2017. Journal of Benefit-Cost Analysis, 12(1), 24-54. See Table 5, pg. 36. Note, costs for public services, adjudication and sanctioning, and perpetrator work loss were excluded because they were assigned to system-level entities rather than defendants.

[42] Beck, A., Berzofsky, M., Caspar, R., & Krebs, C. (2013). Sexual victimization in prisons and jails reported by inmates, 2011–12. U.S. DOJ: Bureau of Justice Statistics.

[43] Ibid

[44] Maruschak, L.M. & Buehler, E.D. (2021). Survey of Sexual Victimization in Adult Correctional Facilities, 2012-2018, Tables 13 and 19. U.S. DOJ: Bureau of Justice Statistics.

[45] Supra at note 41.

**Table 24. Projected Cost of Violent/Sexual Victimization During Detention by Year**
*(@ $16.83 per Day Detained)*

| Year | Cases Filed *(Mean = 54,264)* | Mean Cost per Case | Projected Costs Assuming *Mean* # Cases | Annual Savings vs. 2021 Assuming *Mean* # Cases | Projected Costs Assuming *Actual* # Cases | Annual Savings vs. 2021 Assuming *Actual* # Cases |
|---|---|---|---|---|---|---|
| 2015 | 62,377 | $71 | $3,839,732 | -$333,427 | $4,413,787 | $581,797 |
| 2016 | 61,323 | $80 | $4,343,225 | $170,065 | $4,908,193 | $1,076,203 |
| 2017 | 53,194 | $86 | $4,662,388 | $489,229 | $4,570,429 | $738,439 |
| 2018 | 55,413 | $109 | $5,917,712 | $1,744,552 | $6,042,983 | $2,210,993 |
| 2019 | 52,101 | $109 | $5,898,819 | $1,725,659 | $5,663,658 | $1,831,668 |
| 2020 | 45,614 | $97 | $5,241,472 | $1,068,312 | $4,405,927 | $573,937 |
| 2021 | 49,828 | $77 | $4,173,160 | $0 | $3,831,990 | $0 |
| Projected 7-Year Savings vs 2021 | | | | $4,864,391 | | $7,013,038 |
| Projected Average Annual Savings vs 2021 | | | | $810,732 | | $1,168,840 |

Victims of assault in pretrial detention – many of whom lack health insurance or trusted medical providers -- may suffer medical, mental health, productivity, and property loss as a result of the incident. Additionally, pain and suffering impose costs that are not always visible. Current pretrial release policies such as the GOB and individual determinations of bond are helping people avoid these problems, but these have not always been in place. If current detention rates and length of stay were instituted over the entire seven-year study period (Table 24), as much as $4.9 million in physical and emotional suffering would have been prevented. Annualized, these savings come to about $800,000 , and costs increase by about 45% when the projection assumes the actual number of cases filed each year.



| **Figure 29 Detail:** Cost of Victimization During Detention | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** |
| Mean | $71 | $80 | $86 | $109 | $109 | $97 | $77 |
| Median | $17 | $17 | $17 | $17 | $17 | $0 | $0 |
| Minimum | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 25th Percentile | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 50th Percentile | $17 | $17 | $17 | $17 | $17 | $0 | $0 |
| 75th Percentile | $50 | $50 | $34 | $34 | $17 | $17 | $17 |
| Maximum *(3rd SD trimmed)* | $1,245 | $1,397 | $1,683 | $2,272 | $2,457 | $2,306 | $1,447 |
| Maximum *(untrimmed)* | $18,732 | $19,119 | $13,464 | $14,457 | $14,423 | $10,401 | $4,645 |

## B. Project Management

PPRI is also charged with maintaining information necessary to manage the monitorship and assure careful tracking of Consent Decree implementation.  The project management function is at the operational center of the monitorship, receiving real-time progress updates from the Parties, integrating their work into a comprehensive plan, and communicating status information back to all sectors involved.  We owe a debt to the Justice Administration Division team for assisting with this work and for keeping us apprised of progress being made in departments across the County.  A status summary of Consent Decree requirements due in this reporting period is presented in Appendix F.

## V.  Our Work in the Next Six Months

Much of the central architecture of misdemeanor bail reform is now in place. However, implementation of a range of policies will occur in the next time period, including responses to studies of indigent defense needs and causes of court nonappearance, as well as evaluation of the impacts of new electronic notification and scheduling options, and ongoing training.  We note that additional data analysis will be ongoing in the months ahead, together with feedback on Harris County's work creating a fully functional data portal for misdemeanor cases.  We look forward to upcoming community working group meetings and public meetings.

We look forward to feedback on this report and the opportunity to continue to serve in this role. We are very grateful for the opportunity to serve as Monitor in this important Consent Decree.

**APPENDIX**

**A. The Monitorship Structure**

**1. Monitorship Goals**

As described in our first report, the ODonnell lawsuit laid bare in stark terms the failings of a money bail system in terms of racial, ethnic and socioeconomic fairness, wise use of taxpayer dollars, prevention of the needless suffering of vulnerable people, and the promotion of public safety. After three years of litigation, the parties reached a settlement consisting in this landmark Consent Decree, approved on November 21, 2019.[46] The ODonnell Consent Decree represents the first federal court-supervised remedy governing bail.  The Consent Decree sets forth a blueprint for creating a constitutional and transparent pretrial system to protect the due process and equal protection rights of people arrested for misdemeanor offenses.[47]

First, under the Consent Decree, people arrested for low-level misdemeanors are promptly released.  The Consent Decree incorporates the new Harris County Criminal Courts at Law (CCCL) Rule 9, which sets out bail policies.[48]  Persons arrested for misdemeanors that do not fall within a set list of carve-out offenses must be promptly released under General Order Bonds. Allowing this group to be quickly released without paying allows them to return to their jobs, take care of their children, and avoid the trauma and danger of incarceration.

Second, the Consent Decree has brought about more rigorous bail hearings with greater attention paid to the issues that matter—whether a person should be released and on what least-restrictive conditions—though much work remains to ensure the hearings and the recorded findings comply with Rule 9 and the Consent Decree. Persons arrested for misdemeanors that fall within the list of carve-out offenses must receive a magistration hearing, complying with Rule 9, at which there must be clear and convincing evidence supporting the pretrial conditions set and any decision to detain a person.  All misdemeanor arrestees have access to a public defender to represent them at that hearing. Counsel has access to the client and information needed to prepare for the hearing. New trainings on the Consent Decree policies are being conducted. Completed work to study indigent defense in misdemeanor cases will inform plans and standards for misdemeanor representation, including to ensure that defense lawyers have access to social workers, investigators, and other support staff necessary to provide effective representation to people arrested for misdemeanor offenses.

Third, following this pretrial stage, misdemeanor arrestees now benefit from a defined set of court appearance rules that, with limited exceptions, is uniform among the 16 misdemeanor courts. The Consent Decree sets out a new process for waiving or rescheduling appearances. People can change some court dates so they can make it to court without undue hardship due to

---

[46] Consent Decree, ODonnell et al v. Harris Cty., No. 16-cv-01414 (S.D. Tex. Nov. 21, 2019), ECF 708 [hereinafter, Consent Decree].

[47] *Id.* at ¶12 (noting "[T]he terms of this Consent Decree are intended to implement and enforce fair and transparent policies and practices that will result in meaningful, lasting reform…").

[48] Rules of Court, Harris County Criminal Courts at Law, Rule 9 (as amended through April 22, 2020), at http://www.ccl hctx.net/attorneys/rules/Rules.pdf; Consent Decree ¶ 30.

illness, lack of childcare and other issues. Further, a new court notification system is to be built by Harris County. New work will study the causes of non-appearance and improve the ability to address those causes.

Fourth, the Consent Decree provides that robust data will be made available, including regarding misdemeanor pretrial release and detention decisions and demographic and socioeconomic information regarding each misdemeanor arrestee, as well as prior data dating back to 2009.[49] The Consent Decree provides for public meetings and input, Harris County reports to be published every sixty days, and for Harris County to make information available online regarding the implementation of the Decree.[50]

Finally, the Consent Decree calls for a Monitor, with a set of responsibilities to evaluate compliance with the Decree and to approve a range of decisions to be made as the Decree is implemented. After applying to serve as Monitor, and proposing to conduct the work described below, we started our work upon our appointment on March 3, 2020. As we will describe below, remarkable changes have occurred in the Harris County misdemeanor system since the adoption of Rule 9 and then the Consent Decree. Key elements of the Consent Decree have now been implemented. Important work also remains, and all involved look forward to the work to come, as we build a model misdemeanor pretrial system in Harris County.

The principal task of this Monitorship, as set out in the Consent Decree, is to report to the Court as we oversee and support Harris County officials implementing a new pretrial justice system. This system is intended to restore the public's trust, safeguard constitutional rights, and accomplish the aims of bail: to maximize pretrial release while keeping the community safe and promoting the integrity of the judicial proceedings by preventing persons from fleeing justice. Thus, as the Consent Decree summarizes in its Introduction, this Decree: "is intended to create and enforce constitutional and transparent pretrial practices and systems that protect due process rights and equal protection rights of misdemeanor arrestees."[51] From the Consent Decree, we distilled nine guiding principles:

(1) **Transparency** – A transparent system keeps the public informed about how and why the system operates as it does—what rules and procedures apply and how effectively the system is meeting its goals.

(2) **Accountability** – We view accountability as part of an ongoing process of systemic evaluation and improvement with community participation.

(3) **Permanency** – We must not only evaluate progress, but also ensure that the administrative measures, policies, and processes, can work well long-term.

(4) **Protecting constitutional rights** – We must protect civil and human rights, including the constitutional rights of arrestees.

---

[49] Consent Decree, *supra*, at ¶83-85.
[50] *Id.* at ¶87-88.
[51] Consent Decree, supra, at ¶1.

(5) **Racial, ethnic, and socioeconomic fairness** – We must continue to measure and remedy disparities concerning racial, ethnic, and socioeconomic unfairness in pretrial detention.

(6) **Public safety and effective law enforcement** – We must seek to manage risk and improve public safety.

(7) **Maximizing liberty** – We must seek to maximize pretrial liberty and to minimize criminal legal involvement of people in Harris County.

(8) **Cost and process efficiency** – We will work to measure the wide range of costs implicated by the pretrial misdemeanor system to advise on the most cost-effective means for realizing the goals of a just system.

(9) **Evidence-based, demonstrated effectiveness** – In our approach to all of these goals, we should establish a system that is self-monitoring and can make ongoing improvements.

Thus, this Monitorship reflects a belief that an efficient and effective system, operated on the basis of relevant information and empirical data, will promote social justice while also meeting the goals of law enforcement and public safety.

## 2.  The Monitor Team

Our interdisciplinary team includes experts in law, social science, behavioral health, economic analysis, indigent defense, and project management.  Team biographies are included in Appendix B.  The team includes:

- Monitor, Professor Brandon L. Garrett (Duke University School of Law)

- Deputy Monitor, Sandra Guerra Thompson (University of Houston Law Center)

- Dottie Carmichael, Iftekhairul Islam, and Andrea Sesock  (Public Policy Research Institute at Texas A&M University)

- Marvin Swartz and Philip J. Cook (WCSJ at Duke University)

- Songman Kang (Hanyang University)

Our full organization chart is also included in Appendix C.



### 3. Consent Decree Authority

This Report contains the Monitor's review of compliance for the fourth six month time period that the Monitor has been in place. The Consent Decree provides in Paragraph 115 that such reports shall be conducted every six months for the first three years of the decree:

> The Monitor will conduct reviews every six (6) months for the first three years the Monitor is in place and annually for each year thereafter that the Monitor is in place to determine whether the County, CCCL Judges, and Sheriff have substantially complied with the requirements of this Consent Decree.

Further, the Consent Decree states in Paragraph 117:

> Every six (6) months for the first three years after the Monitor is appointed and annually for each year thereafter, the Monitor will file with the Court, and the County will publish, written public reports regarding the status of compliance with this Consent Decree, which will include the following information:

> a. A description of the work conducted by the Monitor during the reporting period;

> b. A description of each Consent Decree requirement assessed during the reporting period, indicating which requirements have been, as appropriate, incorporated into policy (and with respect to which pre-existing, contradictory policies have been rescinded), the subject of training, and carried out in actual practice;

> c. The methodology and specific findings for each compliance review conducted;

d. For any requirements that were reviewed or audited and found not to have been implemented, the Monitor's recommendations regarding necessary steps to achieve compliance;

e. A projection of the work to be completed during the upcoming reporting period;

f. A summary of any challenges or concerns related to the County, CCCL Judges, and Sheriff achieving full and effective compliance with this Consent Decree;

g. Whether any of the definitions in the Consent Decree need to be updated, and whether any additional terms need to be defined;

h. For each requirement of the Consent Decree that is assessed whether the requirement is producing the desired outcomes of:

  i. Maximizing pretrial liberty;
  ii. Maximizing court appearance; and
  iii. Maximizing public safety; and

i. The feasibility of conducting an estimated accounting of the cost savings to the County through any reductions in pretrial detention, including comparing estimated costs of jailing misdemeanor arrestees prior to trial for each year the Monitor is in place relative to the costs of jailing misdemeanor arrestees prior to trial in each of 2015, 2016, and 2017 and order an accounting if feasible.

Paragraph 118 adds:

The Monitor will provide a copy of the reports to the Parties in draft form not more than 30 days after the end of each reporting period. The Parties will have 30 days to comment and provide such comments to the Monitor and all other Parties. The Monitor will have 14 days to consider the Parties' comments and make appropriate changes, if any, before filing the report with the Court.

Our Monitor Work Plans are divided into three Deliverables and we describe each of the subjects detailed in Paragraph 117. As in our first two reports, we have divided this report into three parts, reflecting the main components of our work and addressing each subject set out in the Consent Decree: Policy Assessment and Reporting; Cost Study and Project Management; and Community Outreach, Participation, and Working Group.

## B. Community Working Group

The Monitor Team relies on the guidance of a Community Working Group (CWG), a dedicated group of community leaders who represent a diverse set of perspectives and specializations. The CWG meets on a monthly basis with the Monitor Team, as well as with various county officials responsible for the implementation of the Consent Decree.



**Hiram A. Contreras** served for 36 years with the Houston Police Department. He retired as Assistant Chief of Police in March 1998. While ascending the police ranks, Mr. Contreras' assignments included the Auto Theft, Juvenile, Recruiting, Planning and Research, Northeast Patrol and Major Offenders. He was promoted to the rank of Assistant Chief July 1991. In the same year as a result of a court ruling, he became the only Latinx person to attain the rank of Deputy Chief. This was retroactive as of March 1986. As Assistant Chief he directed the Professional Development Command. At retirement he was directing the Special Investigation Command. In his career with HPD, Mr. Contreras established the first HPD storefront in the city and initiated the Culture Awareness Program. In collaboration with the U.S. Marshal's Service, he initiated the Gulf Coast Violent Offenders Task Force. As commander of the Special Investigations Command, he coordinated HPD's participation with the Department of Justice High-Intensity Drug Trafficking Area Program. Also, he coordinated the International Symposium on the Police Administration and Problems in Metropolitan Cities with the Istanbul Police Department in Istanbul, Turkey. As Assistant Chief, Mr. Contreras, at the request of the Police Executive Research Forum, participated in police promotional assessment centers in Chicago, Denver, and San Francisco. Nominated by President William J. Clinton, Mr. Contreras became U.S. Marshal for the Southern District of Texas in 1998 and served until 2002. His consulting business, Art Contreras & Associates – LLC, specializes in human resource and marketing principles.



**J. Allen Douglas** is the executive director of the Downtown Redevelopment Authority (DRA). In addition, he performs the duties of general counsel for the organization and its related entities Central Houston and the Downtown District. Prior to joining the DRA, Allen practiced law for more than 20 years, beginning his career as a law clerk at Ahmad, Zavitsanos, Anaipakos, Alavi & Mensing P.C. in Houston. He worked for the United States Court of Appeals, Sixth Circuit and the United States District Court, Northern District of Ohio in Cleveland, Ohio. Most recently he was an associate attorney at Littler Mendelson, P.C. and assistant county attorney with the Harris County Attorney's office where he focused on appellate labor, employment, and civil rights cases. Allen has also served as vice-chair of the Midtown Management District's board of directors since June 2015, as well as chair of the organization's Urban Planning Committee.



**Guadalupe Fernández** joined the Houston Office of Tahirih Justice Center in 2015 and serves the Policy and Advocacy Manager. She leads the development and advancement of Tahirih's local and state-wide advocacy projects to transform the policies and practices that impact immigrant survivors of gender-based violence. Guadalupe joined Tahirih as the Children's Legal Advocate. Prior to Tahirih, she worked at Catholic Charities Houston as the Lead Legal Caseworker for the Child Advocacy and Legal Services Program. In Washington DC, Guadalupe was on the steering committee of the DC Detention Visitation Network and completed internships at the Lawyers' Committee for Civil Rights Under Law and the Central American Resource Center. Currently, she serves on the Public Policy Committee for the Texas Council of Family Violence, the Immigration and Racial Equity taskforces of the Texas Family Leadership Council, and the Harris Co. Housing Stability

Taskforce. She is a graduate of the Advocacy Learning Center hosted by Praxis International and Camp Wellstone. Guadalupe is the proud daughter of immigrants and a first-generation college graduate from Georgetown University. She is a Fully Accredited Representative through the Department of Justice and is allowed to practice before both DHS and the Executive Office for Immigration Review, which includes the immigration courts and the Board of Immigration Appeals.



**Tara Grigg Green** (formerly Garlinghouse) is the Co-Founder and Executive Director of Foster Care Advocacy Center. Prior to founding Foster Care Advocacy Center, Tara was a Staff Attorney and Skadden Fellow in the Houston office of Disability Rights Texas. There, she helped develop the Foster Care Team to provide direct representation to foster children with disabilities in state child welfare cases, special education litigation and Medicaid appeals. She authored an Amicus Brief in *M.D. v. Abbott*—class action litigation seeking to reform the Texas foster care system—cited by the Fifth Circuit in affirming the State's liability. She has consulted on child welfare policy issues for organizations such as Casey Family Programs, the ABA Center on Children and the Law, the Texas Children's Commission, and the United States Children's Bureau. Tara has published law review articles and research papers on the constitutional rights of children and families and quality legal representation in child welfare proceedings. Her passion for this field comes from her family's experience as a foster family caring for over one hundred foster children. She has received many awards and was recently named the National Association of Counsel for Children's Outstanding Young Lawyer. Tara clerked for the Hon. Micaela Alvarez of the U.S. Southern District of Texas in McAllen. She holds a J.D. from the University of Pennsylvania Law School where she was a Toll Public Interest Scholar, a M.P.P. from the Harvard Kennedy School of Government where she was a Taubman Fellow, and a B.A. from Rice University.



**Frances E. Isbell** is the Chief Executive Officer of Healthcare for the Homeless – Houston (HHH), a Federally Qualified Health Center providing care for 8,500 people annually. As the inaugural CEO of Healthcare for the Homeless – Houston, Ms. Isbell has been instrumental in bringing together a large number of community-based agencies, healthcare clinicians, educational institutions, and public organizations to forge a common strategic plan to effectively address the health needs of people experiencing homelessness. The primary aim of this consortium is to increase access to quality healthcare while concurrently reducing costly and ineffective service duplication. Since joining this endeavor in 1998, Ms. Isbell has received numerous local and national awards and recognitions for her work, and two of HHH's programs have been cited as a national best practice. Previous to this position, Ms. Isbell had a private practice in therapeutic counseling and taught Sociology at Houston Community College, North Harris College, and Sam Houston State University. She also has worked as a consultant in organizational development and has worked in clinical administration within large hospital systems. Ms. Isbell holds undergraduate and graduate degrees in Social Rehabilitation/Pre-Law and Behavioral Sciences, respectively.



**Jay Jenkins** is the Harris County Project Attorney at the Texas Criminal Justice Coalition. Since joining TCJC in 2014, he has promoted broad youth and adult justice reforms in Houston and the surrounding areas. Jay received his J.D. from Northwestern University School of Law, graduating *magna cum laude* in 2009. While at Northwestern, he worked at the Bluhm Legal Clinic's Children and Family Justice Center, focusing on a number of youth justice issues. In his third year, Jay was the lone law student at the newly formed Juvenile Post-Dispositional Clinic, where he promoted policy reform throughout Chicago while also advocating on behalf of juvenile clients. Jay was admitted to practice law in the State of Illinois and worked as a civil litigator in the private sector for three years. At TCJC, Jay has researched and pursued reforms related to over-policing and prosecution, while also reimagining the local bail system and supporting indigent defense, and he was instrumental in the development of a first-of-its-kind data dashboard that visualizes more than one million criminal case outcomes in Harris, Dallas, Bexar, and Travis Counties. Jay additionally serves as co-founder and President of the Convict Leasing and Labor Project, which launched in 2018 to expose the history of the convict leasing system and its connection to modern prison slavery.



**Terrence "TK" Koontz** currently serves as Statewide Training Coordinator for the Texas Organizing Project. His path to service began after he was arrested in 2010. While sitting in the Harris County Jail, he witnessed the mistreatment of black and brown people and realized that the criminal justice system was essentially about class and racial oppression. Koontz walked away as a convicted felon. Since that time, he has worked without cease to reestablish his life by fighting as an activist and organizing for criminal justice reform. His passion for criminal justice reform is rooted in his experience growing up in communities that were plagued with crime, poverty, and over-policing. In 2015, after the death of Sandra Bland, Koontz became heavily involved in the criminal justice reform movement. He served on the Harris County Criminal Justice Coordinating Council and led a field team of the Texas Organizing Project that mobilized voters in Fort Bend County that helped to elect Brian Middleton, the first African American D.A. in Fort Bend County history. He also served in the office of Harris County Precinct One Commissioner Rodney Ellis as a Community Engagement Coordinator. He has become a highly influential advocate for change in Houston and surrounding areas and has committed his life to criminal justice reform, social reform, and community service. Koontz hopes to continue to play a major role in creating second-chance opportunities for ex-offenders, specifically as it relates to housing and career opportunities.



**Johnny N. Mata** currently serves as the Presiding Officer of the Greater Houston Coalition for Justice, a coalition of 24 diverse civil rights organizations. Through the coalition, Mr. Mata has supported changes in policing use-of-force policies and called for the creation of a citizen review board. He led the effort to reform the Texas grand jury selection process and has strived to improve relations between the police and communities of color. He has also advocated for bail bond reform, victim's rights, protecting the voices of residents affected by community

development, and promoting the hiring of Latinx educators and administrators. He served two terms as Texas State Director of the League of Latin American Citizens (LULAC) and six terms as a District Director of LULAC. He worked for 32 years as a community director and human resources professional with the Gulf Coast Community Services Association. He organized the community to create the Latino Learning Center and served as a founding board member. Mr. Mata has received the NAACP President's Award, the OHTLI Award from the Republic of Mexico, the Hispanic Bar Association Lifetime Achievement Award, the Willie Velasquez-KTMD Telemundo Channel 48 Hispanic Excellence Award, Antioch Baptist Church Martin L. King Justice Award, and numerous others. The Houston Community College System awarded him an honorary Associate in Arts Degree in recognition of his achievements in promoting education in the Latinx community.



**Maureen O'Connell**, M.S.W., founded Angela House in 2001 to serve women coming out of incarceration. She thought it unconscionable that they had so many obstacles and so few opportunities to build a stable life and escape the cycle of recidivism. Sister Maureen created a successful program that has empowered hundreds of women using a standard of care other programs could emulate. Her wide range of experiences prepared her to create this successful ministry: 13 years as a Chicago police officer and police chaplain; 16 years as Clinical Services Coordinator at The Children's Assessment Center in Houston and Victim's Assistance Coordinator for the Archdiocese of Galveston-Houston; and more than 40 years as a Dominican Sister, a religious order known for its commitment to social justice. She developed a program of interventions focused on trauma-informed counseling, addiction recovery, employment readiness and personal and spiritual growth. Sister Maureen served as Executive Director of Angela House for 17 years, retiring in 2018 and joining the Board of Directors in 2019.



**Timothy N. Oettmeier** most recently served as Executive Assistant Chief of Police before retiring after 42 years of public service as a police officer. As Executive Assistant Chief of Police, he was assigned to the Investigative Operations Command supervising the Special Investigations Command consisting of Auto Theft, Gang, Major Offenders, Narcotics, Vehicular Crimes, and Vice Divisions; the Criminal Investigations Command consisting of the Burglary and Theft, Homicide, Investigative First Responder, Juvenile, Robbery, and Special Victims Divisions; and the Technology Services Command. He was a principal architect for implementing community policing throughout the agency. He received his Ph.D. in Police Administration from Sam Houston State University in 1982. He helped oversee national police research initiatives by the National Institute of Justice on fear reduction, organizational change, cultural diversity, measuring what matters, and training. He authored department reports, and articles for textbooks and journals on police management issues. Early in his career, the 100 Club of Houston recognized him as an Officer of the Year. Tim was the recipient of the prestigious Police Executive Research Forum's national Gary P. Hayes Award for outstanding initiative and commitment to improving police services. He received Lifetime Achievement Awards from the Houston Police Department, the State of Texas, and from The 100 Club of Houston.

**Sybil Sybille**, a Texas Advocates for Justice Fellow, is a military veteran, who is a survivor of childhood sexual violence and stabbing, as well as sexual assault in the military.  During her life, she nearly died of drug overdoses on seven occasions.  Convicted of organized crime, she served time in a Texas prison.  Since her release, she completed a college certificate program and was certified in 2015 by the Texas Department of Health Services to provide Peer Recovery Coach Training.   In 2017, she received a training certificate in Veterans Court Advocacy and Mentoring for Peers.  In 2018, she was a graduate of the Texas Southern University Anthony Graves Smart Justice Speakers Bureau.  In 2019, Ms. Sybille was named a Fellow for Texas Advocates for Justice and Grassroots.org.  Through that work she has testified before the Texas legislature regarding a bill to support trauma-informed training for staff within the criminal justice and juvenile justice systems. She is currently working on a portfolio to advocate for "banning the box" to eliminate the check box on job applications which requires disclosure of criminal convictions.  She believes this practice poses the greatest barrier for those reentering society.

## C. Monitor Team Bios

### University of Houston Law Center

**Sandra Guerra Thompson** is the Newell H. Blakely Chair at the University of Houston Law Center. She chaired committees for the transition teams of Houston Mayor Sylvester Turner in 2016 and Harris County District Attorney Kim Ogg in 2017. In 2012, Houston Mayor Annise Parker appointed her as a founding member of the Board of Directors of the Houston Forensic Science Center, Houston's independent forensic laboratory which replaced the former Houston Police Department Crime Laboratory. In 2015, she became the Vice Chair for this Board and served until 2019.  In 2009, she was appointed by Governor Perry as the representative of the Texas public law schools on the Timothy Cole Advisory Panel on Wrongful Convictions.  Her scholarly articles address issues such as pretrial hearings and prosecutorial ethics, the causes of wrongful convictions, forensic science, sentencing, jury discrimination, and police interrogations. Professor Thompson is an elected member of the American Law Institute and was appointed to the Board of Advisors for the Institute's sentencing reform project.  Since 2019, she is an elected member of the Council of the International Association of Evidence Science.

### Duke University

**Brandon L. Garrett** is the L. Neil Williams Professor of Law at Duke University School of Law, where he has taught since 2018.  He was previously the Justice Thurgood Marshall Distinguished Professor of Law and White Burkett Miller Professor of Law and Public Affairs at the University of Virginia School of Law, where he taught since 2005.  Garrett has researched use of risk assessments by decisionmakers as well as large criminal justice datasets, examining how race, geography and other factors affect outcomes.  Garrett will contribute to research design, data analysis plans, and analysis of legal and policy implications of findings, as well as engagement with policymakers.  Garrett's research and teaching interests include criminal procedure, wrongful

convictions, habeas corpus, scientific evidence, and constitutional law. Garrett's work, including several books, has been widely cited by courts, including the U.S. Supreme Court, lower federal courts, state supreme courts, and courts in other countries. Garrett also frequently speaks about criminal justice matters before legislative and policymaking bodies, groups of practicing lawyers, law enforcement, and to local and national media. Garrett has participated for several years as a researcher in the Center for Statistics and Applications in Forensic Science (CSAFE), as well as a principal investigator in an interdisciplinary project examining eyewitness memory and identification procedures. Garrett founded and directs the Wilson Center for Science and Justice at Duke.

**Marvin S. Swartz, M.D.** is the Professor and Head of the Division of Social and Community Psychiatry, Director of Behavioral Health for the Duke University Health System and Director of the Duke AHEC Program. Dr. Swartz has been extensively involved in research and policy issues related to the organization and care of mentally ill individuals at the state and national level. He was a Network Member in the MacArthur Foundation Research Network on Mandated Community Treatment examining use of legal tools to promote adherence to mental health treatment and led the Duke team in conducting the first randomized trial of involuntary outpatient commitment in North Carolina and the legislatively mandated evaluation of Assisted Outpatient Treatment in New York. He co-led a North Carolina study examining the effectiveness of Psychiatric Advance Directives and the NIMH funded Clinical Antipsychotics Trials of Intervention Effectiveness study. He is currently a co-investigator of a study of implementation of Psychiatric Advance Directives in usual care settings, an evaluation of implementation of assisted outpatient treatment programs and a randomized trial of injectable, long-acting naltrexone in drug courts. Dr. Swartz has done a range of work regarding diversion from jail, including among populations of co-occurring substance abuse and mental health disorders. Dr. Swartz was the recipient of the 2011 American Public Health Association's Carl Taube Award, the 2012 American Psychiatric Association's Senior Scholar, Health Services Research Award for career contributions to mental health services research and the 2015 Isaac Ray Award from the American Psychiatric Association for career contributions to forensic psychiatry.

**Philip J. Cook, ITT/Sanford Professor of Public Policy and Professor of Economics and Sociology at Duke University.** Cook served as director and chair of Duke's Sanford Institute of Public Policy from 1985-89, and again from 1997-99. Cook is a member of Phi Beta Kappa, and an honorary Fellow in the American Society of Criminology. In 2001 he was elected to membership in the Institute of Medicine of the National Academy of Sciences. Cook joined the Duke faculty in 1973 after earning his PhD from the University of California, Berkeley. He has served as consultant to the U.S. Department of Justice (Criminal Division) and to the U.S. Department of Treasury (Enforcement Division). He has served in a variety of capacities with the National Academy of Sciences, including membership on expert panels dealing with alcohol-abuse prevention, violence, school shootings, underage drinking, the deterrent effect of the death penalty, and proactive policing. He served as vice chair of the National Research Council's Committee on Law and Justice. Cook's primary focus at the moment is the economics of crime. He is co-director of the NBER Work Group on the Economics of Crime, and co-editor of a NBER volume on crime prevention. Much of his recent research has dealt with the private role in crime prevention. He also has several projects under way in the area of truancy prevention. His book (with Jens Ludwig), *Gun Violence: The Real Costs* (Oxford University Press, 2000), develops and applies a

framework for assessing costs that is grounded in economic theory and is quite at odds with the traditional "Cost of Injury" framework. His new book with Kristin A. Goss, *The Gun Debate* (Oxford University Press 2014) is intended for a general audience seeking an objective assessment of the myriad relevant issues. He is currently heading up a multi-city investigation of the underground gun market, one product of which is a symposium to be published by the *RSF Journal* in 2017. Cook has also co-authored two other books: with Charles Clotfelter on state lotteries (*Selling Hope: State Lotteries in America*, Harvard University Press, 1989), and with Robert H. Frank on the causes and consequences of the growing inequality of earnings (*The Winner-Take-All Society*, The Free Press, 1995). *The Winner-Take-All Society* was named a "Notable Book of the Year, 1995" by the *New York Times Book Review*. It has been translated into Japanese, Chinese, Portuguese, Polish, and Korean.

**Texas A&M University**

**Dottie Carmichael Ph.D.** is a Research Scientist at the Public Policy Research Institute at Texas A&M University. Since the passage of the Fair Defense Act in 2001, Dr. Carmichael has collaborated in a program of research sponsored by the Texas Indigent Defense Commission to advance high-quality, evidence-based practice. Her research aims to help jurisdictions balance costs and quality in indigent defense delivery systems. Moreover, she is knowledgeable and experienced in the operation of local governments. Beyond a number of statewide projects, Dr. Carmichael has conducted qualitative and quantitative research in more than thirty jurisdictions including all of the state's major urban areas.

Her work has informed criminal justice and court policy in at least the past six bi-annual state legislatures. Most recently, her investigation of costs and case outcomes in jurisdictions using financial- vs. risk-based pretrial release was a significant resource in efforts to pass bail reform legislation in 2017 and 2019. In addition to leading the state's first defender caseload studies for adult, juvenile, and appellate cases, Dr. Carmichael has evaluated cost- and quality impacts of public defenders, interdisciplinary holistic defenders, the state's regional capital defender office, Innocence Projects operated in publicly-funded law schools, and the school-to-prison pipeline.

Dr. Carmichael's research was cited in Supreme Court Justice David Suter's majority opinion in the landmark 2008 *Rothgery v. Gillespie County* decision. She also led the PPRI research team for the 2010 *Breaking Schools' Rules* report which was subsequently cited by President Obama announcing his "My Brothers Keeper" initiative, and by US Dept. of Education Secretary Arne Duncan and Attorney General Eric Holder announcing new programs and data requirements relating to school discipline.

**Iftekhairul Islam, PhD,** is an **Assistant Research Scientist** at the Public Policy Research Institute at Texas A&M University. Mr. Islam earned his Bachelor's degree in Engineering from Bangladesh University of Engineering and Technology and Master's degree in Finance from the University of Texas at Dallas. He completed PhD in Public Policy and Political Economy from the same university in 2021. He is trained in the latest experimental and quasi-experimental research methodologies, and has extensive experience with data management and analysis of large and complex data sets across different areas including criminal justice, education, and health. Mr. Islam is proficient in GIS and spatial analytics as well. His recent research covers

profiling/detecting prospective voters and donors from Collin and Dallas Counties using spatial tools.

## D. Organizational Chart



**E. Year 2 Statement of Work**

This Work Plan describes the second year of our work, set out in quarterly deliverables, with a budget of approximately $586,185. As with our Year 1 Work Plan, this second Year 2 Statement of Work is divided into three Deliverables: (1) Policy Assessment and Reporting; (2) Cost Study and Project Management; (3) Community Outreach, Participation, and Working Group.

**Task I: Policy Assessment and Reporting**

This Deliverable describes the tasks associated with reviewing and providing input, and then reporting to the parties and the Court, regarding policies associated with the adoption of Rule 9 and the ODonnell Consent Decree. A central goal of the Monitorship will be to ensure that constitutional rights are safeguarded permanently, through the new systems put into place. In Year 2, the Monitor will be producing reports, including: a Monitor Report at eighteen months and a second report at the year's end. The Monitor will be analyzing data from the county and reporting on these data in reports and to the parties. The Monitor will be providing feedback on a series of tasks that the parties must accomplish, as per deadlines set out in the Consent Decree.

**Task I:1. Provide Feedback on County Plans and Assessments**

Continue to conduct regular meetings/calls with the parties to discuss progress under Consent Decree.

Analyze data, including jail data, court data, hearing videos, and judicial opinions.

Review plans to develop systems and structures to deliver effective indigent defense services (e.g., investigation, mitigation).

Review results of research by outside vendors to study topics such as causes of nonappearance, indigent defense, court forms.

Consult with Harris County concerning data variables collected by the County, including data regarding court nonappearances; helps ensure the County develops a data website so that misdemeanor pretrial conditions are public; raw data is available for download; and reviews first of the 60-day reports generated by the County.

**Task I:2. Complete Monitor Report**

Continue to conduct regular meetings/calls with the parties to discuss progress under Consent Decree.

Analyze data, including jail data, court data, hearing videos, and judicial opinions.

Review plans to develop systems and structures to deliver effective indigent defense services (e.g., investigation, mitigation).

Review results of research by outside vendors to study topics such as causes of nonappearance, indigent defense, court forms.

Consult with Harris County concerning data variables collected by the County, including data regarding court nonappearances; helps ensure the County develops a data website so that misdemeanor pretrial conditions are public; raw data is available for download; and reviews first of the 60-day reports generated by the County.

Incorporate work into Monitor Report.

### Task I:3. Provide Feedback on County Plans and Assessments

Continue to conduct regular meetings/calls with the parties to discuss progress under Consent Decree.

Analyze data, including jail data, court data, hearing videos, and judicial opinions.

Review plans to develop systems and structures to deliver effective indigent defense services (e.g., investigation, mitigation).

Review results of research by outside vendors to study topics such as causes of nonappearance, indigent defense, court forms.

Consult with Harris County concerning data variables collected by the County, including data regarding court nonappearances; helps ensure the County develops a data website so that misdemeanor pretrial conditions are public; raw data is available for download; and reviews first of the 60-day reports generated by the County.

### Task I:4. Complete Year-end Report

Continue to conduct regular meetings/calls with the parties to discuss progress under Consent Decree.

Analyze data, including jail data, court data, hearing videos, and judicial opinions.

Review plans to develop systems and structures to deliver effective indigent defense services (e.g., investigation, mitigation).

Review results of research by outside vendors to study topics such as causes of nonappearance, indigent defense, court forms.

Consult with Harris County concerning data variables collected by the County, including data regarding court nonappearances; helps ensure the County develops a data website so that misdemeanor pretrial conditions are public; raw data is available for download; and reviews first of the 60-day reports generated by the County.

Incorporate work into year-end Monitor Report.

**Project Timeline and Staffing.**

This work will be conducted between March 3, 2021 and March 2, 2022.

**Monitor Team Personnel:**

- **Prof. Brandon Garrett** (Duke Law School)

- **Prof. Songman Kang**.

- **Research assistants** (Duke Law School and University of Houston Law Center)

- **Prof. Philip J. Cook** (Sanford School of Public Policy, Duke University)

**Travel:**

- Travel: travel to Houston for Duke University Team Members.


**Task II: Cost Study and Project Management**

The Public Policy Research Institute (PPRI) at Texas A&M University will evaluate the cost impacts of bail reform in Harris County.  There are a range of costs in the pretrial context, and not only the costs of detention, recidivism, court costs, costs of non-appearance, but also the costs of physical injury in jail, harm to physical and behavioral health, to families and communities, and the criminogenic harm of pretrial detention.  The Monitor team will assess each of those costs to determine what are the most cost-effective methods of realizing priorities under the Decree.  This work will be led by the Public Policy Research Institute (PPRI) at Texas A&M University, a leading interdisciplinary government and social policy research organization.  PPRI will also document information about community service data and lead the project management efforts of the team.

**Task II:1. Complete Cost Data Acquisition**

PPRI will continue to work with JAD and Monitor team colleagues to acquire, merge, and prepare datasets needed for analysis and statistical modeling.  We will also continue to collaborate with department representatives to assemble budget data showing the costs of key misdemeanor case processes.  Finally, we will conclude the literature review to quantify cost components that cannot be derived from Harris County data, but that are nonetheless essential for understanding the comprehensive impact of bond reform.  Examples include costs to defendants or families emanating from contact with the criminal justice system, pretrial detention, conviction, or sentences, or costs to victims when the bond system fails.  With these tools, we can create and apply standardized per-unit costs associated with key aspects of

94

defendant experiences such as booking, bond hearings, pretrial detention, court appearances, prosecution, defense, and case outcomes.

## Task II:2.  Produce Year 1.5 Cost Analysis Report

Cost analysis results will be summarized in a report submitted in conjunction with the September 2021 third six-Month Monitor Report.  Analyses will assess the costs of misdemeanor case processing generally as well as specific cost impacts of changes under the Consent Decree. Results will quantify the relative contributions of independent cost centers and the impact of programs or practices within and between departments.  Findings will summarize major findings, offer recommendations, and propose future directions for continued investigation in support of Consent Decree objectives.  Project partners and stakeholders will be kept informed of cost study findings through brief interim updates shared at stakeholder meetings. This practice will increase accuracy, transparency, and relevance of the work, and will promote timely integration of results to strengthen and calibrate the bail reform process.

## Task II:3.  Explore Community Service Data Acquisition

The Initial Cost Analysis Report produced in Task II:2 will answer initial questions about cost of misdemeanor processing within the Harris County jail and court systems.  However, a number of social service organizations offer supports to justice-involved individuals that can mitigate criminality.  The PPRI team will begin to explore mapping services and data from these external agencies.

Input and recommendations will be sought from knowledgeable stakeholders and collaborators within the county such as the public defender and managed assigned counsel office, and members of the Monitors' Community Working Group who are familiar with community service options.  Building on established connections where possible, we can reach out to each organization to learn more.  The focus for potential data partnerships in Year Two will be with Harris Health and the Coalition for the Homeless, both of which are key providers for crisis, routine, and re-entry services for people sometimes deemed "frequent flyers" in the criminal justice system.

The deliverable will be a written brief surveying agency service infrastructure, identifying points of intersection with the justice-involved population, and assessing the requirements, likelihood, and limits of successful data sharing.  With this information, the Monitor team can make informed judgments about future research on community integration as a means to address defendant needs, reduce or prevent criminal justice contact, improve lives, and save money.

## Task II:4.  Produce Year Two Cost Analysis Report

PPRI will continue to expand analysis centering on cost aspects of the Consent Decree.  Working with the Monitors, we will identify a menu of informative and useful potential targets for cost-related research based on developments in meetings/calls with key stakeholders, formal plans for system changes generated from within the county and by outside researchers, results of data analyses conducted by the Monitoring team, the academic research literature, and other sources

95

as appropriate.  Results will be integrated into the Year Two Monitor Report to be submitted March 3, 2022.

**Task II:5.  Maintain Project Management Protocol**

In their project management role PPRI will facilitate information-sharing and coordination of activities among members of the monitor team and other stakeholder implementing the Consent Decree.  We will assist the Monitor with managing a rolling an agenda of topics for meetings of the Parties, maintain progress notes recording accomplishments and obstacles toward implementing Consent Decree requirements, collaborate with JAD staff to document attainment of tasks and timelines in the cloud-based Monday.com project tracking system, memorialize key work products, and regularly report progress to JAD, the Parties, the Federal Court, and the public through semi-annual status reports on Consent Decree milestones.

Costs for this continuous support function will be apportioned evenly across billing for other deliverables over the course of the year.

**Project Timeline and Staffing**

This work will be conducted between March 3, 2021 and March 2, 2022.

- **Texas A&M, Public Policy Research Institute (PPRI)** will conduct a multi-year evaluation

- **Dottie Carmichael** (Research Scientist, Texas A&M University, PPRI)

- **Trey Marchbanks** (Research Scientist) will replace **George Naufal (**Economist, Texas A&M University, PPRI)

- **Bethany Patterson** (Research Associate), will replace **Jongwoo Jeong**.

- **Andrea Sesock** (Project Coordinator) will remain on the research team.

- Travel: to Houston for Texas A&M University Team Members

**Task III: Community Outreach, Participation, and Working Group**

The Monitor Team recognizes that the permanence of the Consent Decree's implementation will turn on its acceptance by local community leaders and stakeholders.  The Monitor Team will convene a Community Working Group, whose composition is detailed in the Monitor's Proposal to Harris County, that would advise the Monitor Team as well as assist in keeping the community informed of the County's progress in implementing the Consent Decree.

**Task III:1. Continued Public Outreach and Participation**

Convene monthly meetings of the Community Working Group (CWG).

Continue to reach out, with the guidance of the CWG, to local organizations to introduce themselves and offer to meet with community groups interested in learning more about the Consent Decree.

Begin set up of Houston office, when feasible to do so given the COVID-19 pandemic.

Continue to maintain Monitor website, to provide all Monitorship-related documents to the public, an overview of the goals and process, a calendar with relevant dates, answers to common questions concerning pretrial process under the Consent Decree, and a way for members of the public to share information, including anonymously, with the Monitor.

**Task III:2. Second Public Meeting, Third Monitor Report**

Convene monthly meetings of the Community Working Group (CWG).

Continue to reach out, with the guidance of the CWG, to local organizations to introduce themselves and offer to meet with community groups interested in learning more about the Consent Decree.

Begin set up of Houston office, when feasible to do so given the COVID-19 pandemic.

The Monitor Team will review County's plan for upcoming public meetings, in consultation with the Community Working Group, to ensure that fully transparent, representative, local, and robust participation is sought and achieved.

Incorporate work into upcoming Monitor Report.

Continue to update Monitor website.

**Task III:3. Convene CWG and Solicit Additional Public Input**

Convene monthly meetings of the Community Working Group (CWG).

Continue to reach out, with the guidance of the CWG, to local organizations to introduce themselves and offer to meet with community groups interested in learning more about the Consent Decree.

Begin set up of Houston office, when feasible to do so given the COVID-19 pandemic.

Continue to update Monitor website.

**Task III:4. Third Public Meeting, Fourth Six-month Report**

Convene monthly meetings of the Community Working Group (CWG).

Continue to reach out, with the guidance of the CWG, to local organizations to introduce themselves and offer to meet with community groups interested in learning more about the Consent Decree.

Begin set up of Houston office, when feasible to do so given the COVID-19 pandemic.

Third public meeting convened.

Incorporate work into upcoming Monitor Report.

Continue to update Monitor website.

**Project Timeline and Staffing**

This work will be conducted between March 3, 2021 and March 2, 2022.

- **Sandra Guerra Thompson** (University of Houston Law Center)
  Office Space, Equipment and Support:

- Office supplies: paper, pens, notepads in the Houston office space. We would plan to use the office space provided pursuant to the decree because of its central and accessible location, as well as an office phone, laptop computer and printing equipment and IT support for computer use, meetings via Zoom, and phone conferences.  We would need a meeting room with sufficient space for periodic Community Working Group meetings and meetings with stakeholders or researchers.

- Parking: A parking budget for downtown parking for the Monitor Team and twelve Community Working Group members (12 meetings per year).

- **Houston Office Assistant**
- **Houston Investigator**

**Houston Conference Costs:**

- Administrative support, food, publicity, space rental
- Travel: to Houston for Prof. Thompson (from vacation home).

**Deliverables**

| Deliverable I | Estimated Delivery Dates | Billable Amount |
|---|---|---|
| Task 1:1.<br><br>Continue to conduct regular meetings/calls with the parties to discuss progress under Consent Decree.<br><br>Analyze data, including jail data, court data, hearing videos, and judicial opinions.<br><br>Review plans to develop systems and structures to deliver effective indigent defense services (e.g., investigation, mitigation).<br><br>Review results of research by outside vendors to study topics such as causes of nonappearance, indigent defense, court forms.<br><br>Consult with Harris County concerning data variables collected by the County, including data regarding court nonappearances; helps ensure the County develops a data website so that misdemeanor pretrial conditions are public; raw data is available for download; and reviews first of the 60-day reports generated by the County.<br><br>Task II:1.<br><br>The Monitor Team (PPRI) continues work to acquire, clean, link, and prepare datasets and county department budget records for cost analysis.<br><br>Initial statistical analysis will be conducted in preparation for the cost analysis report.<br><br>Project management support includes preparing meeting agendas, keeping notes, tracking Consent Decree progress on Monday.com, and reporting status.<br><br>Task III:1.<br><br>Monitoring Plan re: outreach and participation for the second year.<br><br>Convene monthly meetings of Community Working Group (CWG). | June 1, 2021 | $130,738.25 |

| Begin set up of Houston office. Continue to maintain Monitor website. | | |
| --- | --- | --- |

| Deliverable 2 | Estimated Delivery Dates | Billable Amount |
| --- | --- | --- |
| Task I:2.<br><br>Continue to conduct regular meetings/calls with the parties to discuss progress under Consent Decree.<br><br>Analyze data, including jail data, court data, hearing videos, and judicial opinions.<br><br>Review plans to develop systems and structures to deliver effective indigent defense services (e.g., investigation, mitigation).<br><br>Review results of research by outside vendors to study topics such as causes of nonappearance, indigent defense, court forms.<br><br>Consult with Harris County concerning data variables collected by the County, including data regarding court nonappearances; helps ensure the County develops a data website so that misdemeanor pretrial conditions are public; raw data is available for download; and reviews first of the 60-day reports generated by the County.<br><br>Incorporate work into Monitor Report.<br><br><br>Task II:2.<br><br>The Monitor Team (PPRI) produces the Cost Analysis Plan for submission with the third six-month Monitor Report.<br><br>Project management support includes preparing meeting agendas, keeping notes, tracking Consent Decree progress on Monday.com, and reporting status.<br><br>Task III:2.<br><br>Continue Community Outreach. | August 20, 2021 | $150,622.25 |

| Convene monthly meetings of the Community Working Group (CWG). Review County's plan for upcoming public meetings. Incorporate work into third six-month Monitor Report. Updates to Monitor website. | | |
|---|---|---|

| Deliverable 3 | Estimated Delivery Dates | Billable Amount |
|---|---|---|
| Task I:3.<br><br>Continue to conduct regular meetings/calls with the parties to discuss progress under Consent Decree.<br><br>Analyze data, including jail data, court data, hearing videos, and judicial opinions.<br><br>Review plans to develop systems and structures to deliver effective indigent defense services (e.g., investigation, mitigation).<br><br>Review results of research by outside vendors to study topics such as causes of nonappearance, indigent defense, court forms.<br><br>Consult with Harris County concerning data variables collected by the County, including data regarding court nonappearances; helps ensure the County develops a data website so that misdemeanor pretrial conditions are public; raw data is available for download; and reviews first of the 60-day reports generated by the County.<br><br>Task II:3.<br><br>The Monitor Team (PPRI) develops a community service data acquisition plan documenting points of intersection with the justice-involved population, and opportunities, limits, and requirements for successful data sharing. | November 28, 2021 | $129,641.25 |

| Project management support includes preparing meeting agendas, keeping notes, tracking Consent Decree progress on Monday.com, and reporting status. | | |
|---|---|---|
| Task III:3. | | |
| Outreach to share results of third six-month Monitor Report. | | |
| Convene monthly meetings of the Community Working Group (CWG). | | |
| Updates to Monitor website | | |

| Deliverable 4 | Estimated Delivery Dates | Billable Amount |
|---|---|---|
| Task I:4. | | |
| Continue to conduct regular meetings/calls with the parties to discuss progress under Consent Decree. | March 2, 2022 | $175,183.25 |
| Analyze data, including jail data, court data, hearing videos, and judicial opinions. | | |
| Review plans to develop systems and structures to deliver effective indigent defense services (e.g., investigation, mitigation). | | |
| Review results of research by outside vendors to study topics such as causes of nonappearance, indigent defense, court forms. | | |
| Consult with Harris County concerning data variables collected by the County, including data regarding court nonappearances; helps ensure the County develops a data website so that misdemeanor pretrial conditions are public; raw data is available for download; and reviews first of the 60-day reports generated by the County. | | |
| Incorporate work into year-end Monitor Report. | | |

| | | |
|---|---|---|
| Task II:4.<br><br>The Monitor Team (PPRI) produces Year Two Cost Analysis Report reflecting informative and useful targets for research developed in collaboration with the Monitor and Deputy Monitor, and with input from key stakeholders such as the Parties and the Community Working Group.<br><br>Project management support includes preparing meeting agendas, keeping notes, tracking Consent Decree progress on Monday.com, and reporting status.<br><br>Task III:4.<br><br>Convene monthly meetings of the Community Working Group (CWG).<br><br>Third public meeting convened.<br><br>Continued outreach, with the guidance of the CWG, to local organizations and community groups.<br><br>Incorporate work into fourth six-month Monitor Report.<br><br>Updates to Monitor website. | | |

Total Year 2 Budget: $ 586,185.00

## F. Consent Decree Tasks and Milestones

| Section | ¶ | Due Date | Milestones | Status |
|---------|---|----------|------------|--------|
| 7 | 38 | 3/1/2022 *Done* | **Provide FY 22-23 PDO allocation > FY 19-20 approved budget -** The County will provide funding and staffing at or above the Public Defender Office's FY 19-20 approved budget to meet obligations for zealous and effective misdemeanor representation at bail hearings and at other stages of the process. | **STATUS: Done**<br><br>Budget was approved by the Commissioner's Court 1/26/2022. |
| 7 | 41a | 12/15/2020 *Nearly Done* | **Provide support staff for private apptd. counsel at bail hearing -** CCCL Judges will establish a process, approve, and provide funding for qualified support staff to assist private appointed counsel at bail hearings. | **STATUS: Nearly Done**<br><br>The Managed Assigned Counsel officially began serving all 16 misdemeanor courts as of December 27, 2021.<br>Status will be changed to "Done" once the requirements of ¶ 43b have been met. |
| 7 | 41b | 3/1/2021 (Extended) *Nearly Done* | **Fund at least min. holistic defense staff recommended by expert -** Based on the expert's written report and recommendations, in consultation with the Monitor, the County must fund the minimum number of recommended holistic defense support staff. | **STATUS: Nearly Done**<br><br>Funding for holistic defense staff is being provided as part of the Managed Assigned Counsel office grant from the TIDC (212-20-D06) in the amount of $2.17 million approved in FY20.  The NAPD report recommendations were submitted to the Commissioner's Court 8/10/21.<br>Status will be changed to "Done" once Harris County Budget Management develops the full implementation with JAD, PDO, and MAC of the recommendations. |
| 7 | 43 and 44 | 12/15/2020 (Extended) *TBD* | **Develop written plan for essential defense counsel supports -** Defendants must develop a written plan to ensure defense counsel have space to confer with clients before a bail hearing, have access to essential support staff by phone or video conference, can call witnesses and prevent/confront evidence, and can promptly discover information presented to the presiding judicial officer.  The plan will be reviewed by the Monitor with input from Class Counsel, and implemented within a reasonable timeline. | **STATUS: Working on it**<br><br>OCM staff report that a written plan to support defense counsel will be developed by the MAC director who began on Nov 2020.  The plan will incorporate recommendations from the NAPD Holistic Defense assessment (¶ 41b) completed on 7/7/21.<br>Status will be changed to "Done" once a written plan is in place. |
| 8A | 46 | 10/29/2020 (Extended) *Nearly Done* | **Provide court date notification forms to third party LEAs -** Defendants will make the court date notification forms required by ¶ 47 and ¶ 48 readily accessible to third-party law enforcement agencies that arrest or detain misdemeanor arrestees to be prosecuted in the Harris County | **STATUS: Nearly Done**<br><br>All court date notification forms were implemented by 11/4/21.<br>Status will be changed to "Done" once it's confirmed they have been provided to third party LEAs. |

| Section | ¶ | Due Date | Milestones | Status |
|---|---|---|---|---|
| 8A | 47 | 11/15/2020 (Extended) *Done* | **Provide written court date notifications to arrestees and case file -** Defendants will provide written notice of the date/time and location of each new scheduled court appearance to misdemeanor arrestees or the lawyer if the arrestee is not present.  Any such written notice will be considered a court form with a copy retained in the case file. | **STATUS:  DONE**<br><br>Revised forms were implemented: 8/30/21 bond conditions; 9/13/21 case reset; 9/20/21 affidavit of financial conditions; 10/4/21 personal bond; 10/13/21 cash bail add'l forms and cash bond; 11/1/21 surety bond and GOB; |
| 8B | 50f | 4/27/2021 (Extended) *Done* | **Implement court appearance reminder systems -** The County will implement the text- and telephone-based reminder systems within 180 days of approval by the Monitor. | **STATUS: Done**<br><br>Text/SMS, and voice messages were fully implemented by 11/4/21. |
| 8C | 52e | 12/15/2020 (Extended) *Expected 5/1/22* | **Receive recommendations to mitigate nonappearance -** Within 180 days of commencing the nonappearance study, researchers must provide the County initial actionable recommendations.  Researcher(s) may continue study and provide additional recommendations beyond that date. | **STATUS: Working on it**<br><br>Ideas42 submitted an initial findings summary 10/30/21.  They are currently building on this analysis by conducting follow-up interviews, sub-group analysis, and refining their findings for a draft report to the County by April 15, 2022 and a final report delivered May 1, 2022. |
| 8C | 55 | 5/14/2021 (Extended) | **Develop written nonappearance mitigation plan-** Within 180 days after receiving published results of study (Sec.52),the County will work with researchers to develop a written plan for mitigating causes of nonappearance including implementation timeline and proposed budget of at least $850,000 for each of the initial three years following the study.<br>The County will submit the plan to the Monitor for review. Monitor solicits Class Counsel's written comments/objections during a 30- day review period (per Sec.111-114). Monitor will convey Class Counsel's comments to County for response (objections or amendments) within 30 days of receipt. The Parties may submit unresolvable disputes to the Court. | **STATUS: Not Started**<br><br>Ideas42 started nonappearance study (¶ 51 & 52a-d) 5/1/21. Status will be changed to "Done" once final recommendations are received (¶ 52e), expected 5/1/22. |

| Section | ¶ | Due Date | Milestones | Status |
|---|---|---|---|---|
| 8C | 54 | 3/1/2021 (Extended) *Nearly Done* | **Allocate $850,000 Year 2 to support court appearance per mitigation plan timeline and budget -** After study concludes, absent good cause for a lesser amount, County must allocate at least $850,000/year toward mitigating causes of nonappearance. County will consult with researchers to determine a reasonable timeline and a budget for implementing the first three years of the plan. To establish good cause, County submits purported cause to the Monitor; Monitor notifies Class Counsel; Monitor makes a determination; Either Party may file a motion to the Court if they disagree with the Monitor's determination. | **STATUS: Nearly Done** $850,000 allocation to mitigate causes of nonappearance was approved by Commissioner's Court as part of the FY22 budget on 1/26/21. Status will be changed to "Done" when County receives recommendations from nonappearance study (¶ 52e) and the timeline and budget for implementation of mitigation services have been determined for the first three years (¶ 55). |
| 9 | 58 | 8/30/2020 (Extended) *Done* | **Implement court date request/notification technology -** The County and CCCL Judges will work with the Monitor to identify effective technology for misdemeanor arrestees or counsel to request a new court date or be informed of newly set dates without having to appear in person. Notice of new court dates must be provided via text and telephone reminders (¶¶ 49-50) to arrestees and appointed or retained defense counsel. A record of notice must be preserved in the case file. The County must also provide an in-person option for rescheduling a court date during regular business hours. | **STATUS: Done** Online case reset request was implemented 6/1/21 on the main CCCL webpage and individual 16 courts web pages. Text/SMS messages were approved and started going out to misdemeanor arrestees 5/12/21 but not to all. Text/SMS and voice messages were fully implemented by 11/4/21. |
| 9 | 61, 62, 65, 66, 67, 68, 69 | 8/30/2020 *Done* | **Publicly post appearance, rescheduling, and warrant policies -** Notice of the CCCL Judges' appearance, rescheduling, and warrant policies must be provided on the updated form for written court date notification (¶¶ 47-48) and on the website (¶ 57). | **STATUS: DONE** CCCL judges approved appearance, rescheduling, and warrant policies specified in the Consent Decree by 8/30/20. Policies are posted on the District Clerk's court date scheduling website (¶ 57). Policies are now posted on written court date notification forms (¶ 48). |
| 9 | 72 | 12/15/2020 (Extended) *Done* | **Report to Monitor on court appearance policy -** CCCL Judges will evaluate local policies relating to court appearance to determine whether they can authorize more misdemeanor arrestees with counsel to waive personal appearance at more hearings. A report will be provided to the Monitor and Class Counsel regarding their process used and the conclusions reached. | **STATUS: Done** OCM provided the Monitor an initial report on 2/17/22 for cases Jan 2021 – Jan 2022. |
| 10 | 78 and 79 | *Estimated May - Aug 2022* | **Deliver Year 3 Refresher Consent Decree Training -** Defendants will implement the Training Plan on an annual basis with updates and improvements subject to review and approval by the Monitor and Class Counsel. | **STATUS: Working on it** RFP released to vendors 1/21/22 with selected vendor estimated to begin work June 2022. Trainings will take place summer of 2022. |

| Section | ¶ | Due Date | Milestones | Status |
|---|---|---|---|---|
| 9 | 81, 82, 84, and 85 | 8/30/2020 *Nearly Done* | **Provide data for Monitor to evaluate Consent Decree implementation -** Defendants will consult with the Monitor to systematically collect, preserve, and integrate data variables sufficient to permit tracking, analysis, and reporting required by the Consent Decree.  Will include all existing data relating to misdemeanor cases from 2009 through the present (¶ 84); data variables  specified in ¶ 85 to permit tracking, analysis, and reporting of information for each misdemeanor  arrestee; and all variables required to generate reports required by ¶ 87 and  ¶89. If collection or maintenance of any required data variables is cost prohibitive or infeasible, Defendants may submit a request for exemption to the Monitor. | **STATUS: Nearly Done** JAD staff are currently integrating data variables from multiple Harris County offices required to permit tracking, analysis, and reporting required by the Consent Decree. Existing data for cases from 2009 through the present are currently available to the Monitor team. Status will be changed to "Done" after all variables specified in ¶ 85 are available. Monitors are still waiting on #S: Any conditions of release or supervision imposed by a judicial officer, the date each was imposed, and the amount of any fees assessed. |
| 11 | 83 | 11/15/2020 (Extended) *Nearly Done* | **Make Consent Decree data publicly available -** The County will make the raw data that the Defendants are required to collect and maintain under this Consent Decree available for ready public access in a usable format (e.g. an Excel spreadsheet). | **STATUS:  Nearly Done** Much of the currently available information specified in ¶ 89 is available in automated report form but is not yet public-facing. Status will be changed to Done after raw data downloads are posted on the existing public Consent Decree website described in ¶ 90. |
| 9 | 87 | 8/30/2020 *Nearly Done* | **Begin generating 60-day data reports -** Defendants will begin generating reports every 60 days that post information specified in ¶ 89 on the public website (described in ¶ 90) unless they don't yet collect the data—in which case they work with the Monitor to determine a timeline for appropriate collection.  Reports may be generated by the Monitor, a subject-matter expert, or a TA provider experienced in large datasets. | **STATUS: Done**  A report is generated daily for the Monitor Team. |
| 9 | 88, 89 | 8/30/2020 *Nearly Done* | **Develop web-based Data Platform -** The County will develop a web-based Data Platform that organizes, integrates, analyzes, and presents the information required by ¶ 89 into a public -facing interface.  The County may engage a TA provider with expertise in data analytics to create the Data Platform. | **STATUS: Nearly Done**  Much of the currently available information specified in ¶ 89 is available in automated report form but is not yet public-facing. Status will be changed to Done after reports are posted on the existing public Consent Decree website described in ¶ 90. |

| Section | ¶ | Due Date | Milestones | Status |
|---|---|---|---|---|
| 12 | 92 | 11/21/2021 *Done* | **Conduct Year 1.5 Public Meeting -** Regular public meetings will be held at least once every six months in at least two geographic locations accessible to the maximum number of residents and including HCTX Consent Decree website simul-cast (Sec. 90).  Defendants and community groups will determine meeting parameters with approval by the Monitor. Knowledgeable representatives of each Defendant group and the Monitor must be present and report on CD implementation including areas of success and for improvement. | **STATUS: DONE**<br><br>Public meeting was held 10/27/2021. |
| 13 | 93 and 94 | 11/2/2021 *Done* | **Year 2.5 review of posted policies -** Every six months, defendants will review policies posted at the JPC and the CjC and update as necessary.. | **STATUS: DONE**<br><br>Key policies agreed by the Defendants are currently posted at the JPC & CJC and on the HCTX ODonnell Consent Decree website (https://jad harriscountytx.gov/ODonnell-Consent-Decree). |
| 14 | 103 | 3/3/2022 *Done* | **Monitor's Budget:  Year 3 -** The Monitor will submit a proposed budget annually. The County will fund the Monitor at a reasonable rate. | **STATUS: Done**<br><br>Monitor's budget was submitted 2/15/22. |
| 14 | 115 and 118 | 1/18/2022 | **Submit Draft Monitor's Report: Year 2 Comprehensive Assessment-** Every six months for the first three years, and annually thereafter, Monitor will provide a draft Monitor's Report (including the information specified in Sec.117) for review by the Parties. Monitor's Report will present results of reviews to determine whether the County, CCCL Judges, and Sheriff have substantially complied with the requirements of this Consent Decree. Parties will have 30 days to comment; Monitor will have 14 days to consider the Parties' comments before filing the report with the court. | **STATUS: Done**<br><br>The second year draft report was submitted on 1/18/22. |

| Section | ¶ | Due Date | Milestones | Status |
|---|---|---|---|---|
| 14 | 120 | 3/3/2022 | **Publish Monitor's Report:  Year 2 Comprehensive Assessment -** After 2 years, 5 years, and 7 years, the Monitor publishes a comprehensive assessment covering material outlined in Sec. 120 (county compliance with Consent Decree, whether outcomes are being achieved, whether Consent Decree should be modified, etc.).  The comprehensive assessment should address areas of greatest progress and achievement, concerns, and strategies for moving forward. To the extent that modifications to the Consent Decree are needed and the Parties agree, the Parties must move the Court to modify this Consent Decree accordingly. In the event of a disagreement that the Monitor is unable to resolve, the Parties will submit their positions to the Court for resolution. | **STATUS: Working on it**<br><br>The year 2 report will be published on 3/3/22. |
| 14 | 116 | 3/3/2022 *Done* | **Monitoring Plan:  Year 3 -** In coordination with the Parties, the Monitor will prepare an annual Monitoring Plan to be made public and published on the County's Consent Decree Website (see Sec. 90).  The Plan must delineate requirements of the Consent Decree to be assessed for compliance, identify the proposed methodology, and create a schedule with target dates for conducting reviews or audits. | **STATUS: Working on it**<br><br>Monitor's Year 3 plan was submitted 2/15/22. |

## Consent Decree Tasks and Milestones in the Next Six-Month Reporting Period

| Section | ¶ | Due Date | Milestones |
|---|---|---|---|
| 12 | 92 | 5/19/2022 | **Conduct Year 2 Public Meeting -** Regular public meetings will be held at least once every six months in at least two geographic locations accessible to the maximum number of residents and including HCTX Consent Decree website simulcast (Sec. 90).  Defendants and community groups will determine meeting parameters with approval by the Monitor.  Knowledgeable representatives of each Defendant group and the Monitor must be present and report on CD implementation including areas of success and for improvement. |
| 13 | 93, 94 | 5/2/2022 | **Year 3 review of posted policies -** Every six months, defendants will review policies posted at the JPC and the CjC and update as necessary.. |
| 14 | 115, 118 | 7/21/2022 | **Submit Draft Monitor's Report:  Year 2.5 -** Every six months for the first three years, and annually thereafter, Monitor will provide a draft Monitor's Report (including the information specified in Sec. 117) for review by the Parties.  Monitor's Report will present results of reviews to determine whether the County, CCCL Judges, and Sheriff have substantially complied with the requirements of this Consent Decree.  Parties will have 30 days to comment; Monitor will have 14 days to consider the Parties' comments before filing the report with the court. |
| 14 | 117 | 9/3/2022 | **Publish Monitor's Report:  Year 2.5 -** Monitor will file with the Court, and the County will publish, written public reports on compliance, which will include the information specified in Sec. 117. |

**APPENDIX G:  ODonnell Monitor Fourth Report, Cost Evaluation Methods Detail**

Public Policy Research Institute, Texas A&M University

March 29, 2022

This document is a step-by-step description of the methods used to develop the cost evaluation results presented in the ODonnell Monitor Fourth Report.  The research question considered here is:  "If 2021 policies had been in place each year since 2015, what would the total and average annual cost savings have been to Harris County and to arrestees?"  This analysis framework considers the combined effects of expedited pretrial release on General Order Bonds as well as other "front-end" efficiencies to reduce arrests and bookings during COVID.  Together, both sets of reforms contribute information about the efficacy of policies that could help contain costs of pretrial processes over the long term.  It should be noted that results presented here are a first look that form an early basis for more complex analyses to be developed in the future.

**1)  Determine unit costs of milestone events and assign costs to affected cases.**

Two major cost categories – system costs and defendant costs - were identified for analysis.  For each category, different approaches were used to estimate a cost per event.
- System costs:  Harris County FY 2019-20 department budgets were divided by the number of events processed – e.g., arrests, bookings, pretrial screenings, Article 15.17 hearings, court settings, and detentions -- to produce a cost per event for key case milestones.
- Defendant costs:  The cost of pretrial release (based on bond type) was taken directly from defendant case records; other costs are extracted from the academic research literature then applied to cases.

**Table 1.  Cost per Event** *(in 2020 dollars)*

| EVENT | COST | ALLOCATION METHOD |
|---|---|---|
| **SYSTEM COSTS – from Harris County FY20 Department Budgets** | | |
| Initial Arrest | $293.09/initial arrest | Allocated across cases arrested |
| Booking | $471.56/booking | Allocated across cases booked |
| GOB/SB7 Pretrial Screening | $13.83/screening | Applied per case with bond set |
| Other Pretrial Screening | $83.00/screening | Applied per case with bond set |
| Article 15.17 Hearing | $48.81/hearing | Applied per case with bond set |
| Article 15.17 Defense | $30.40/hearing | Applied per case with bond set |
| CCCL Court Setting | $53.74/setting | Applied per case heard in court |
| Pretrial Detention | $73.82/day detained | Allocated across cases detained |

**Table 1.  Continued…**

| DEFENDANT COSTS – from case records and academic literature | | |
|---|---|---|
| Pretrial Release | 10% of secured bond amount 2% of cash bond amount (paid or unpaid) | Applied per case with bond set |
| Loss of Earnings | $29,00 lifetime income loss if detained 3+ days | Allocated across cases detained |
| Loss of Partner Benefits | $271.25/day detained | Allocated across cases detained |
| Loss of Child Support | $23.05/day detained | Allocated across cases detained |
| Assault in Detention | $16.83/day detained | Allocated across cases detained |

Per-event costs[52] were assigned to affected cases as shown in Table 2 to attain a cost per *case*.
- If an event was *not* experienced, $0 cost was entered (see "Bill").
- If an event happened more than once (e.g., multiple jail days) the event cost was multiplied by the number of occurrences (see "Calculation" column).
- If a single event involved multiple cases, the cost was allocated proportionately across the cases affected (see "Joe").

**Table 2.  Example Approach for Assigning Pretrial Detention Cost to Cases**

| CASE | CALCULATION | COST PER CASE |
|---|---|---|
| Bill – Case 1 | 0 days @ $17.82/day | $0 |
| Ann – Case 1 | 2 days @ $17.82/day | $147.64 |
| Joe – Case 1 | 17 days @ $17.82/day | $627.47 |
| Joe – Case 2 | | $627.47 |

## 2)  Select *disposed* misdemeanor cases for analysis.

Cases with an initial disposition were chosen for analysis.  Table 3 shows the total count of "All Cases Filed" in a year alongside the "Analysis Sample of Disposed Cases."  This approach has advantages and disadvantages:
- Advantages:  Results are based on complete information about processing from filing through case disposition.
- Disadvantages:  More complex cases that take longer to complete, and cases delayed by court backlogs, are underrepresented in recent years.  However, as these cases become disposed, they will be added to analyses and findings.

---

[52] Most of the cost events shown in Table 1 could potentially occur multiple times.  Arrest is an exception; with data only available for the *initial* arrest. Expense of later arrests related to the same charges is not included.

**Table 3. Cases Filed and Analysis Sample**

|  | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|
| All Cases Filed *(Mean = 54,264)* | 62,377 | 61,323 | 53,194 | 55,413 | 52,101 | 45,614 | 49,828 |
| Analysis Sample of Disposed Cases | 61,088 | 59,640 | 51,389 | 52,083 | 44,014 | 27,846 | 9,208 |
| Average # Cases Trimmed per Analysis | 517.2 | 516.6 | 528.0 | 551.5 | 358.3 | 278.2 | 63.2 |

## 3)  Trim extreme values with a disproportionate impact on results.

To limit the influence of extreme outliers, cases above the third standard deviation (i.e., the highest 0.3% highest values) were "trimmed" from the analysis sample for each variable analyzed and for each year of analysis.  This conservative approach helps ensure results represent more typical values while keeping most cases in the study.  On average between 63 and 517 cases were omitted per measure in any given year (Table 3).

## 4)  Calculate average *costs per case* over time.

For each of the measures shown in Table 1, key descriptors  – mean, median, and quartiles –were calculated.
- Because $0 cost was entered for events that did not occur in a case, results account for policy-driven changes in the share of people that experience various events each year.
- Table 4 and Figure 1 show the descriptive "cost per case" metrics using pretrial detention as an example.

**Table 4.  Descriptive Metrics Using Pretrial Detention Costs per Case as an Example**

| Detention Cost per Case | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|
| Mean | $311 | $352 | $378 | $479 | $478 | $425 | $337 |
| Median | $74 | $74 | $74 | $74 | $74 | $0 | $0 |
| Minimum | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 25th Percentile | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 50th Percentile | $74 | $74 | $74 | $74 | $74 | $0 | $0 |
| 75th Percentile | $222 | $222 | $148 | $148 | $74 | $74 | $74 |
| Maximum (*3rd SD trimmed*) | $5,476 | $6,142 | $7,400 | $9,990 | $10,804 | $10,138 | $6,364 |
| Maximum (*untrimmed*) | $82,362 | $84,064 | $59,200 | $63,566 | $63,418 | $45,732 | $20,424 |



Figure 1: Detention Cost per Case @ $73.82/Jail Day

**5)  Multiplied costs per case by number of cases filed to estimate _total costs_ and _savings_ by year.**

To estimate the annual cost of each pretrial processing event, the average cost per case is projected onto all disposed and undisposed cases filed in Harris County.  Aggregate costs depend on both the *cost per case* and the *number of cases* in a year; to isolate the effect of costs and eliminate the influence of cases, the case count was held constant at the 7-year average using the following formula:

- *Average # cases filed (@ 54,264) x Average cost per case in the year.*

**Table 5.  Projected Cost of Detention by Year**
*( @ $73.82 per Jail Person-Day)*

| Year | Cases Filed *(Mean = 54,264)* | Mean Cost per Case | Projected Costs Assuming *Mean # Cases* | Annual Savings vs. 2021 Assuming *Mean # Cases* | Projected Costs Assuming *Actual # Cases* | Annual Savings vs. 2021 Assuming *Actual # Cases* |
|---|---|---|---|---|---|---|
| 2015 | 62,377 | $311 | $16,882,959 | -$1,402,079 | $19,407,025 | $2,616,849 |
| 2016 | 61,323 | $352 | $19,096,771 | $811,732 | $21,580,884 | $4,790,708 |
| 2017 | 53,194 | $378 | $20,500,103 | $2,215,065 | $20,095,768 | $3,305,592 |
| 2018 | 55,413 | $479 | $26,019,649 | $7,734,611 | $26,570,456 | $9,780,280 |
| 2019 | 52,101 | $478 | $25,936,577 | $7,651,538 | $24,902,596 | $8,112,420 |
| 2020 | 45,614 | $425 | $23,046,282 | $4,761,244 | $19,372,468 | $2,582,292 |
| 2021 | 49,828 | $337 | $18,285,038 | $0 | $16,790,176 | $0 |
| Projected 7-Year Savings vs 2021 | | | | $21,772,111 | | $31,188,142 |
| Projected Average Annual Savings vs 2021 | | | | $3,628,685 | | $5,198,024 |

113

The resulting "Projected Cost Assuming *Mean* # Cases" (Table 5)  is then used to answer a basic question of interest:  "If 2021 policies had been in place each year since 2015, what would the total and average annual cost savings have been?" [53]

- The formula was:  *Projected costs in the year – Projected costs for 2021*
- Annual savings estimates are reported in Table 5 as: "Annual Savings vs. 2021 Assuming *Mean* # Cases"

Annual savings are then reported two ways:
- Summed to get the "Projected 7-Year Savings vs. 2021" and
- Divided by six annual change intervals to get the "Projected Average Annual Savings vs. 2021"


## 7)  Incorporate the effect of cases filed on *total costs* and *savings* by year.

Though the primary focus of the analysis is to quantify the effect of changing *costs*, annual differences in number of cases *filed* also contributes to pretrial processing expense.  To provide this additional context for policymakers and stakeholders, the combined effect of both costs and cases was calculated using the formula:
- *Actual # cases filed x Average cost per case in the year*.

As in the preceding analysis, the resulting "Projected Cost Assuming *Actual* # Cases" reported in Table 5 is then used to assess the same question:  "If 2021 policies had been in place each year since 2015, what would the total and average annual cost savings have been?"
- The formula was:  *Projected costs in the year – Projected costs for 2021*
- Annual savings estimates are reported in Table 5 as: "Annual Savings vs. 2021 Assuming *Actual* # Cases"

---

[53] 2021 was chosen as the comparison year because policies and practices in that year incorporate efficiencies derived from the use of General Order Bonds, as well as additional accommodations to further reduce arrest and bookings in response to COVID.  The question asks what the financial return might have been if these recent "least restrictive" practices had been permanently integrated into pretrial processes for the preceding 6 years.